1  Robert D. Mitchell (*will comply with LR IA 11-2 within 45 days*)
2  William M. Fischbach III (*will comply with LR IA 11-2 within 45 days*)
   Christopher J. Waznik (*will comply with LR IA 11-2 within 45 days*)
3  Matthew D. Dayton, Nevada Bar No. 11552

   **TB   T I F F A N Y & B O S C O**
          P.A.

5  Camelback Esplanade II, Seventh Floor
   2525 East Camelback Road
6  Phoenix, Arizona 85016-4229
   Telephone: (602) 255-6000
7  Fax: (602) 255-0103
8  E-mails: rdm@tblaw.com; wmf@tblaw.com;
   cjw@tblaw.com; md@tblaw.com
9
   Counsel for Defendant Martin Tripp
10

11              **UNITED STATES DISTRICT COURT**

12                  **DISTRICT OF NEVADA**

13

14  TESLA, INC., a Delaware corporation,          Case No. 3:18-cv-00296-LRH-VPC

15                        Plaintiff,              **DEFENDANT MARTIN TRIPP'S**
                                                  **ANSWER TO COMPLAINT AND**
16  vs.                                           **COUNTERCLAIM**

17
    MARTIN TRIPP, an individual,
18
19                        Defendant.

20

21         Defendant Martin Tripp ("Mr. Tripp" or "Defendant"), by and through undersigned

22  counsel, for his Answer to Plaintiff Tesla, Inc. ("Tesla" or "Plaintiff")'s Complaint hereby

23  admits, denies, and affirmatively alleges as follows:

24                       **SUMMARY OF DISPUTE**

25         1.     Defendant admits he is "a former employee of Tesla, Inc."  Defendant denies

26  all remaining allegations of Paragraph 1.

27

28                                    1

1    2.    Defendant denies the allegations of Paragraph 2.

2    3.    Defendant denies the allegations of Paragraph 3.

3    4.    Defendant admits he "claimed that punctured battery cells had been used in

4  certain Model 3 vehicles[.]"  Defendant also admits he "claimed that Tesla was delayed in

5  bringing new manufacturing equipment online."  Defendant also admits he made claims

6  about the "amount and value of 'scrap' materials that Tesla generated during the

7  manufacturing process[.]"  Defendant denies all remaining allegations of Paragraph 4,

8  including any and all allegations or insinuations that the foregoing "claim[s]" are "false" or

9  "exaggerated."

10    **JURISDICTION AND VENUE**

11    5.    Paragraph 5 states a legal conclusion of which no response is required.

12  Notwithstanding the lack of required response, Defendant admits the allegations of

13  Paragraph 5.

14    6.    Paragraph 6 states a legal conclusion of which no response is required.

15  Notwithstanding the lack of required response, Defendant admits the allegations of

16  Paragraph 6.

17    7.    Paragraph 7 states a legal conclusion of which no response is required.

18  Notwithstanding the lack of required response, Defendant admits that venue is proper in this

19  District.

20    **PARTIES**

21    8.    Paragraph 8 does not pertain to Defendant, and Defendant is without sufficient

22  knowledge or information to form a belief as to the truth or falsity of the allegations of

23  Paragraph 8.  Therefore, Defendant denies the allegations of Paragraph 8 in their entirety.

24    9.    Defendant admits that during all times relevant to this action, he resided in

25  Sparks, Nevada.  Defendant denies any allegation in Paragraph 9 that he currently "resides"

26  in Sparks, Nevada.

27

28    2

**BACKGROUND**

10.    Defendant admits he "joined Tesla in October 2017 at the Nevada Gigafactory[.]"   Defendant also admits he had "access" to "certain facets of the manufacturing process for the company's battery modules."  Defendant denies all remaining allegations of Paragraph 10.

11.    Defendant denies the allegations of Paragraph 11.

12.    Defendant admits that "on or about May 17, 2018, Tripp was assigned to a new role."  Defendant denies all remaining allegations of Paragraph 12.

13.    Defendant denies the allegations of Paragraph 13.

14.    Defendant admits that "[o]n June 14 and 15, 2018, Tesla investigators interviewed Tripp[.]"  Defendant denies all remaining allegations of Paragraph 14.

15.    Defendant denies the allegations of Paragraph 15.

16.    Defendant denies the allegations of Paragraph 16.

17.    Defendant admits he "claimed that punctured battery cells had been used in some Model 3 customer vehicles[.]"  Defendant also admits he "claimed that Tesla was delayed in bringing new manufacturing equipment online at the Gigafactory."  Defendant also admits he made claims about the "amount and value of 'scrap' material that Tesla generated during the manufacturing process[.]"  Defendant denies all remaining allegations of Paragraph 17, including any and all allegations or insinuations that the foregoing "claim[s]" are "false" or "grossly overstate[d]."

18.    Defendant denies the allegations of Paragraph 18.

**FIRST CLAIM FOR RELIEF**

**Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.***

19.    No facts are alleged in Paragraph 19, and thus, no response is required.  To the extent a response is required, Defendant incorporates herein by reference each and every response set forth in the foregoing Paragraphs.

3

20.     Paragraph 20 does not pertain to Defendant, and Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 20.  Therefore, Defendant denies the allegations of Paragraph 20 in their entirety.

21.     Paragraph 21 does not pertain to Defendant, and Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 21.  Therefore, Defendant denies the allegations of Paragraph 21 in their entirety.

22.     Defendant denies the allegations of Paragraph 22.

23.     Defendant denies the allegations of Paragraph 23.

24.     Defendant denies the allegations of Paragraph 24.

25.     Paragraph 25 states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations of Paragraph 25.

26.     No facts are alleged in Paragraph 26, and thus, no response is required.  To the extent a response is required, Defendant denies the allegations of Paragraph 26.

27.     Paragraph 27 states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations of Paragraph 27 and affirmatively alleges that he has not been enriched.

28.     Paragraph 28 states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations of Paragraph 28.

**SECOND CLAIM FOR RELIEF**

**Nevada Uniform Trade Secrets Act, Nev. Rev. Stat. §§ 600A.10 *et seq.***

29.     No facts are alleged in Paragraph 29, and thus, no response is required.  To the extent a response is required, Defendant incorporates herein by reference each and every response set forth in the foregoing Paragraphs.

4

30.     Paragraph 30 does not pertain to Defendant, and Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 30.  Therefore, Defendant denies the allegations of Paragraph 30 in their entirety.

31.     Defendant denies the allegations of Paragraph 31.

32.     Defendant denies the allegations of Paragraph 32.

33.     Defendant denies the allegations of Paragraph 33.

34.     No facts are alleged in Paragraph 34, and thus, no response is required.  To the extent a response is required, Defendant denies the allegations of Paragraph 34.

35.     Defendant denies the allegations of Paragraph 35.

**THIRD CLAIM FOR RELIEF**

**Breach of Contract**

36.     No facts are alleged in Paragraph 36, and thus, no response is required.  To the extent a response is required, Defendant incorporates herein by reference each and every response set forth in the foregoing Paragraphs.

37.     Defendant denies the allegations of Paragraph 37.

38.     Paragraph 38 does not pertain to Defendant, and Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 38.  Therefore, Defendant denies the allegations of Paragraph 38 in their entirety.

39.     Defendant denies the allegations of Paragraph 39.

40.     Paragraph 40 does not pertain to Defendant, and Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 40.  Therefore, Defendant denies the allegations of Paragraph 40 in their entirety.

41.     Defendant denies the allegations of Paragraph 41.

42. Defendant denies the allegations of Paragraph 42.

43. Defendant denies the allegations of Paragraph 43.

**FOURTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty of Loyalty**

44. No facts are alleged in Paragraph 44, and thus, no response is required. To the extent a response is required, Defendant incorporates herein by reference each and every response set forth in the foregoing Paragraphs.

45. Paragraph 45 states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations of Paragraph 45.

46. Defendant denies the allegations of Paragraph 46.

47. Defendant denies the allegations of Paragraph 47.

48. Defendant denies the allegations of Paragraph 48.

49. Defendant denies the allegations of Paragraph 49.

50. Defendant denies the allegations of Paragraph 50.

**FIFTH CLAIM FOR RELIEF**

**Nevada Computer Crimes Law, Nev. Rev. Stat. § 205.4765**

51. No facts are alleged in Paragraph 51, and thus, no response is required. To the extent a response is required, Defendant incorporates herein by reference each and every response set forth in the foregoing Paragraphs.

52. Paragraph 52 states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations of Paragraph 52.

53. Paragraph 53 states a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations of Paragraph 53.

54. Defendant denies the allegations of Paragraph 54.

55. Defendant denies the allegations of Paragraph 55.

56. Defendant denies the allegations of Paragraph 56.

**AFFIRMATIVE DEFENSES**

57.     Defendant affirmatively alleges that Plaintiff's Complaint fails to state a claim upon which relief may be granted against Defendant.

58.     Defendant affirmatively alleges that damages, if any, incurred by Plaintiff were caused or contributed to, in whole or in part, by Plaintiff's own negligence, acts, or omissions.

59.     Defendant affirmatively alleges that Plaintiff's claims are barred by the doctrine of *in pari delicto.*

60.     Defendant affirmatively alleges that Plaintiff assumed the risk of sustaining damages, if any, from Defendant's conduct.

61.     Defendant affirmatively alleges that damages, if any, incurred by Plaintiff were caused or contributed to, in whole or in part, by acts or omissions of third parties over which Defendant had no control and for whose acts or omissions Defendant is not responsible.

62.     Defendant affirmatively alleges that he is immune from prosecution of or being held liable for Plaintiff's claims pursuant to federal and/or state law.

63.     Defendant affirmatively alleges that his actions were necessary, reasonable, and/or privileged.

64.     Defendant affirmatively alleges that Plaintiff failed and/or neglected to reasonably mitigate its damages, if any, which bars or diminishes any recovery thereof.

65.     Defendant affirmatively alleges that he has not been enriched.

66.     Defendant affirmatively alleges that Plaintiff's claims are barred by its own illegal or otherwise wrongful actions.

67.     Defendant affirmatively alleges that Plaintiff's claims are barred by the doctrine of equitable estoppel.

68.     Defendant affirmatively alleges that Plaintiff acted with unclean hands.

7

69.     Defendant affirmatively alleges that he was excused from performance under the alleged contract in Plaintiff's Complaint.

70.     Defendant affirmatively alleges that Plaintiff is barred from recovery on the claims alleged in the Complaint as Plaintiff committed acts or otherwise acted improperly in dealing with Defendant.

71.     Defendant affirmatively alleges that Plaintiff is barred from recovery, in whole or in part, because Plaintiff's own actions and conduct excused Defendant from performing its alleged obligations, if any, to Plaintiff.

72.     Defendant affirmatively alleges that the allegations of the Complaint allege obligations non-existent, not contracted for, and/or outside of the contract, if any, between the parties, thus barring or diminishing recovery by Plaintiff.

73.     Defendant affirmatively alleges that he did not owe a legal duty of care to Plaintiff and was never in a fiduciary relationship with Plaintiff.

74.     Defendant affirmatively alleges that Plaintiff's Complaint is defective in that Plaintiff failed to join indispensable parties.

75.     Defendant affirmatively alleges that Plaintiff suffered no damages that were caused by Defendant.

76.     Defendant affirmatively alleges that Plaintiff waived any claims for damages.

77.     Defendant affirmatively alleges that the alleged agreement referred to in Plaintiff's Complaint is void due to lack of performance on the part of Plaintiff, unconscionability, as being against public policy, and/or being an illegal/unreasonable restraint on trade.

78.     Defendant affirmatively alleges that he was acting with express or implied authorization.

79.     Defendant affirmatively alleges each and every affirmative defense set forth in Federal Rule of Civil Procedure 8(c), in order to avoid waiver, and which defenses may be supported by the evidentiary matters discovered in this case.

80.     Defendant reserves the right to plead further affirmative defenses if and when disclosure reveals facts sufficient to support such other further defenses.

## PRAYER FOR RELIEF

WHEREFORE, having fully answered the Complaint, Defendant requests that the Court grant the following relief:

A.     Dismiss said Complaint in its entirety with prejudice, Plaintiff taking nothing thereby;

B.     Defendant have judgment on Plaintiff's claims;

C.     Defendant be awarded his attorneys' fees and costs incurred herein; and

D.     Such other and further relief as the Court deems just and appropriate under the circumstances in favor of Defendant.

## COUNTERCLAIM

For his Counterclaim against Plaintiff/Counterdefendant Tesla, Inc. ("Counterdefendant"), Counterclaimant Martin Tripp ("Mr. Tripp" or "Counterclaimant") alleges, based upon his own knowledge with respect to his own actions and based upon information and belief with respect to all other actions, as follows:

## PARTIES

1.     Mr. Tripp is an individual who, at all relevant times, resided in Sparks, Nevada.

2.     Based upon information and belief, Counterdefendant is, and at all relevant times was, a Delaware corporation doing business throughout the United States of America, including in Nevada.

3.    Elon Musk ("Mr. Musk") is, and at all relevant times has been, Counterdefendant's Chief Executive Officer ("CEO").  All of Mr. Musk's actions as alleged herein were performed within the scope of his employment with, and on behalf of, Counterdefendant.

**JURISDICTION AND VENUE**

4.    The Court has personal jurisdiction over Counterdefendant in this action because Counterdefendant consented to the jurisdiction of the Court by filing its Complaint in this Court, in response to which this Counterclaim is alleged.

5.    The Court also has personal jurisdiction over Counterdefendant in this action because Counterdefendant caused or otherwise directed actions in or towards Nevada and the Counterclaim arises from such actions.

6.    The Court has original subject matter jurisdiction of this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Mr. Tripp, on one hand, and Counterdefendant, on the other hand, are citizens of different states.

7.    Further, to the extent the Court determines it has subject matter jurisdiction over the claims set forth in Counterdefendant's Complaint, jurisdiction over this action is proper pursuant to 28 U.S.C. § 1367 because this Counterclaim arises out of the transactions, occurrences, or events that are the subject matter of said Complaint.

8.    This District is the proper venue for this action because Counterdefendant consented to the propriety of venue in this District by filing the Complaint in this District, and the Counterclaim arises from the facts and circumstances alleged in said Complaint.

9.    This District is also the proper venue for this action pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to the Counterclaim occurred in or were directed to this District.

**FACTUAL BACKGROUND**

10.     From October 2017 to June 2018, Mr. Tripp was employed by Counterdefendant as a Level 3 Lead Process Engineering Technician at the Gigafactory manufacturing compound in Sparks, Nevada (the "Gigafactory").

11.     Prior to his employment with Counterdefendant, Mr. Tripp had over two decades of experience in the electronic and engineering industries, including serving as an Aviation Electronics Technician in the United States Navy for approximately four years.

12.     In mid-2017, Counterdefendant initiated contact with and recruited Mr. Tripp, who was then residing in Wisconsin, for an employment position at the Gigafactory. During its recruitment, Counterdefendant paid for Mr. Tripp to fly to Nevada for an interview and tour of the Gigafactory.

13.     Without Counterdefendant's intentional recruitment, Mr. Tripp would not have applied to or become employed by Counterdefendant.

14.     According to Counterdefendant's website, "Tesla's mission is to accelerate the world's transition to sustainable energy."  Counterdefendant widely promotes itself to the general public as an environmentally-conscious company with cutting-edge technologies and manufacturing capabilities.

15.     At the Gigafactory, Counterdefendant manufactures vehicle batteries and drive units for its Model 3 vehicle.  Based upon information and belief, Counterdefendant has, and at all relevant times had, more than 1,000 employees working at the Gigafactory.

16.     Based upon information and belief, Counterdefendant's ability to mass produce the Model 3, an electric vehicle, is critical to its current and future economic success, as well as its viability as an ongoing concern.

17.     Based upon information and belief, since Counterdefendant first publicly announced that it would be producing Model 3 vehicles, Counterdefendant has accepted

reservations and monetary deposits for the vehicle from hundreds of thousands of customers.

18.     During his employment with Counterdefendant, Mr. Tripp was assigned to work on production lines for two different vehicle parts used in the Model 3: the stator production line and the battery module production line.

19.     While assigned to the stator production line, Mr. Tripp's primary responsibilities included reporting daily scrap/non-conforming material volumes to Counterdefendant's engineering and production departments; performing high-level functions as a process technician; assisting Counterdefendant's engineering department with process improvements; and working with other process technicians to, among other things, train, mentor, assign tasks, and place orders for necessary materials.   During this time, Mr. Tripp began witnessing several concerning business practices that were inconsistent with Counterdefendant's mission statement and its representations to investors and the general public.

20.     For example, throughout the first few months of his employment, Mr. Tripp observed large quantities of waste and "scrap" vehicle parts lying haphazardly on the ground inside the Gigafactory.  Mr. Tripp discussed this issue, amongst others, with his supervisors and questioned why so many vehicle parts were being scrapped and carelessly left on the ground inside the facility.  Mr. Tripp's concerns were never addressed or resolved.  In one instance, Mr. Tripp's supervisor stated that despite the products being used in vehicles shipped to customers, Counterdefendant's stator production line was not a "signed-off" production line and was still being "validated."

21.     In or around March 2018, Counterdefendant initiated a company-wide effort to reach the 2,500 Model 3 vehicles per week production benchmark that it had been publicly promoting.  This company-wide effort, which had the end objective of producing 5,000 Model 3 vehicles per week by July 2018, was known as the "March to 2,500."

12

22.     Around this same time, Mr. Tripp observed that the waste and scrap levels and non-conforming materials generated by Counterdefendant dramatically increased.   Mr. Tripp frequently raised his concerns about the seemingly exorbitant amounts of scrap with his managers and supervisors but no action was taken to address the issues or reduce the amount of waste being generated by the manufacturing process.

23.     On May 16, 2018, Mr. Tripp directly e-mailed Counterdefendant's CEO, Mr. Musk, about the high levels of waste and scrap that was being generated by the stator production line.  In his e-mail, Mr. Tripp included graphical charts showing the high levels of waste and scrap.  Mr. Tripp had been told that Mr. Musk was scheduled to visit the Gigafactory that evening, so he wanted to notify Mr. Musk of the ongoing, uncorrected problems so Mr. Musk could take corrective action.

24.     Later in the afternoon on May 16, 2018, Mr. Tripp's Manufacturing Engineer Manager asked Mr. Tripp to "forward" him the "email to Elon so that I can avoid getting fired tonight."  After Mr. Tripp asked why the Manufacturing Engineer Manager would get fired, the Manufacturing Engineer Manager explained: "because I'm the guy showing him the line and our problems like yield, the guy standing in front of him is the guy who gets fired, and tonight I'm the guy in front of him."

25.     That same day, a Design Engineer asked Mr. Tripp to "clean up" the stator production line area so Mr. Musk would not see the mounds of scrap and waste lying on the ground.   Mr. Tripp declined to do so because he had repeatedly complained to his supervisors about that very issue over the course of several months, but his complaints had been ignored.  Mr. Tripp wanted Mr. Musk to observe how the Gigafactory was actually being operated.

26.     The next day, May 17, 2018, Mr. Tripp was "reassigned" to the battery module production line.

13

27.     While assigned to the battery module production line, Mr. Tripp's primary responsibility was to inventory aging work in process ("WIP") of the various components of the battery modules used in Model 3 vehicles.

28.     As is publicly known, the battery modules used in Model 3 vehicles are comprised of multiple components, including thousands of individual battery cells. A battery cell is comprised of a thin, metallic cannister containing lithium powder and/or cobalt. Approximately one hundred and fifty battery cells are then affixed to a cooling ribbon to form a "bandolier." Seven bandoliers are then affixed side-by-side to make a battery module. One Model 3 has four battery modules.

29.     While assigned to the battery module production line, Mr. Tripp learned of and witnessed additional unnerving, dangerous, and wasteful business practices that, again, were inconsistent with Counterdefendant's mission statement and its representations to investors and the general public.

30.     For example, Mr. Tripp routinely observed hundreds of bandoliers being scrapped during a single shift. Mr. Tripp also observed battery cells that supposedly had been permanently affixed to bandoliers, fall off and crash on the floor. Mr. Tripp even observed that the positive and negative ends of battery modules were sometimes reversed, thereby causing the batteries to short circuit.

31.     Mr. Tripp also observed Counterdefendant's employees systematically reusing vehicle parts, such as battery cells and bandoliers that had been previously discarded as waste. Mr. Tripp was even told by one colleague that the colleague, after seeing damaged products being reused, intentionally further damaged the parts to prevent them from being used in a Model 3.

32.     Mr. Tripp was also told about and personally observed several semi-trucks filled with scrap and other waste from Counterdefendant's manufacturing process. The semi-trucks, which were not climate-controlled, were parked in a parking lot near the

1  Gigafactory.  Based upon information and belief, Counterdefendant publicly stated that its
2  scrap battery modules were being stored in a climate-controlled environment.

3      33.    In mid-May 2018, Counterdefendant's Manufacturing Operating System
4  ("MOS") showed that from January 1, 2018 to mid-May 2018, approximately $150,000,000
5  to $200,000,000 worth of battery module parts, including bandoliers and battery cells, had
6  been categorized as "Scrap."  By running a "with child" query, Mr. Tripp determined that
7  these "Scrap" battery module parts were actual vehicle parts with an accompanying bill of
8  materials.

9      34.    Shortly thereafter, Mr. Tripp conducted the same standard query in the MOS
10  and found that many of the parts, once labelled as "Scrap," were now identified as "Test."
11  The parts that were changed from "Scrap" to "Test" were those parts that had initially been
12  identified as "Scrap" between January 1, 2018 and March 20, 2018.  Yet, based upon
13  information and belief, the vehicle parts that had been initially identified as "Scrap" had
14  already been removed from the Gigafactory and discarded.  The change in labelling from
15  "Scrap" to "Test" was corroborated by one of Mr. Tripp's colleagues, an Engineer with
16  Counterdefendant.

17      35.    Perhaps most egregiously, Mr. Tripp was told by multiple process technicians
18  and associates that a "teach pin" had been left on a robot used in the manufacturing process
19  of battery modules, causing damage to the battery modules.  Mr. Tripp was told by the
20  process technicians and associates that when the robot had picked up a battery module, the
21  teach pin, which had become "unthreaded" and "longer," struck the clamshell (*i.e.*, the outer
22  plastic coating) of the battery module, causing a dent and/or puncture.  Mr. Tripp was
23  further told that, eventually, the teach pin began puncturing the actual battery cells within
24  the battery module.  The process technicians and associates told Mr. Tripp that
25  approximately 1,173 battery modules had been damaged by this process.

15

36.     The approximately 1,173 dented and/or punctured battery modules were identified in the MOS as "Containment AR622."

37.     After informing Mr. Tripp about Containment AR622, the process technicians and associates personally showed Mr. Tripp several of the dented and/or punctured battery modules within the containment.  While observing the bottom of the battery cells in one battery module listed in Containment AR622, Mr. Tripp saw that a battery cell had been punctured and inserted a Q-tip into the punctured cell about one-half inch.  When Mr. Tripp removed the Q-tip, it was coated with a white powdery residue, indicating that the battery cell had short circuited.

38.     During his orientation, Mr. Tripp had been taught by Counterdefendant that when a lithium-ion battery, such as the batteries used in the Model 3, has internally short circuited, it is more prone to "thermal runaway" at high temperatures, thereby becoming more vulnerable to combustion and/or explosion.

39.     After observing the punctured battery cell in the battery module from Containment AR622, Mr. Tripp asked the process technicians and associates what happened to the battery modules within Containment AR622 and if they were scrapped.  Mr. Tripp was told that instead of scrapping the battery modules, technicians "reworked" the modules by squeezing an adhesive into the punctured battery cell and then gluing a piece of clamshell over the adhesive.  In doing so, Counterdefendant made it appear as though there was no internal or external damage to the battery module.  After being "reworked" with the adhesive, the battery modules were then returned to the manufacturing processing line.  Based upon information and belief, no quality inspections were performed on these "reworked" battery modules before they were returned to the manufacturing processing line.  Mr. Tripp personally observed technicians perform this process on several battery modules.

40.     Mr. Tripp researched Containment AR622 within the MOS and observed that the "cause" for Containment AR622 was "Punctured cells and damaged NIC clamshell due

clash with Robot teach pin."  Further, the "Title" of the battery modules within Containment AR622 in the MOS stated "Punctured Cell."

41.    Utilizing the MOS, Mr. Tripp monitored some of the dented and/or punctured battery modules in Containment AR622 over a few-day period by tracking the modules' serial numbers.  The tracking system showed that the dented and/or punctured battery modules, instead of being discarded, were being used in Model 3 vehicles.

42.    Mr. Tripp then performed a standard database query to determine how many of the battery modules in Containment AR622 were in Model 3 vehicles that had been shipped to or were being prepared to ship to customers.  The results showed that 732 of the dented and/or punctured battery modules in Containment AR622 were used in Model 3 vehicles that had been shipped to or were in the process of being shipped to customers.

43.    Based upon information and belief, Counterdefendant recently discontinued the use of its vehicle-part tracking system within the MOS.  As a result, traceability is unknown for many vehicle-parts and/or materials which could have a drastic effect on determining where the part(s) were made, when, and by whom.

44.    Mr. Tripp repeatedly raised the foregoing issues to his colleagues, including engineers, technicians, and a human resource representative; four of his supervisors and managers; his plant manager; and even Mr. Musk.

45.    Counterdefendant never took any corrective action and terminated Mr. Tripp on June 19, 2018.

46.    Prior to and after Mr. Tripp was terminated, Counterdefendant published several false and defamatory statements and/or implications about Mr. Tripp.

47.    For example, based upon information and belief, on or about June 17, 2018, Counterdefendant's CEO, Mr. Musk, sent an e-mail to all of Counterdefendant's employees stating, in pertinent part, as follows:

> I was dismayed to learn this weekend about a Tesla employee who had conducted quite extensive and damaging sabotage to our operations.  This

17

included making direct code changes to the Tesla Manufacturing Operating System under false usernames and exporting large amounts of highly sensitive Tesla data to unknown third parties.

The full extent of his actions are not yet clear, but what he has admitted to so far is pretty bad. His stated motivation is that he wanted a promotion that he did not receive. In light of these actions, not promoting him was definitely the right move.

However, there may be considerably more to this situation than meets the eye, so the investigation will continue in depth this week. We need to figure out if he was acting alone or with others at Tesla and if he was working with any outside organizations.

As you know, there are a long list of organizations that want Tesla to die. These include Wall Street short-sellers, who have already lost billions of dollars and stand to lose a lot more. Then there are the oil & gas companies, the wealthiest industry in the world — they don't love the idea of Tesla advancing the progress of solar power & electric cars. Don't want to blow your mind, but rumor has it that those companies are sometimes not super nice. Then there are the multitude of big gas/diesel car company competitors. If they're willing to cheat so much about emissions, maybe they're willing to cheat in other ways?

Most of the time, when there is theft of goods, leaking of confidential information, dereliction of duty or outright sabotage, the reason really is something simple like wanting to get back at someone within the company or at the company as a whole. Occasionally, it is much more serious.

Please be extremely vigilant, particularly over the next few weeks as we ramp up the production rate to 5k/week. This is when outside forces have the strongest motivation to stop us.

*See* **Exhibits A–B**, attached hereto (the "June 17, 2018 Publication").

48. Counterclaimant did not "sabotage" Counterdefendant or its "operations" as asserted in the June 17, 2018 Publication.

49. Counterclaimant did not "mak[e] direct code changes to the Tesla Manufacturing Operating System under false usernames" or "export[] large amounts of highly sensitive Tesla data to unknown third parties" as asserted in the June 17, 2018 Publication.

50.    Counterclaimant did not "admit" or "state" that his "motivation" for reporting the foregoing issues regarding Counterdefendant's manufacturing process was "that he wanted a promotion that he did not receive" as asserted in the June 17, 2018 Publication.  In reality, during his employment with Counterdefendant, Mr. Tripp never applied for or actively sought a promotion, nor, to his knowledge, was he even eligible for a promotion.

51.    The implication in the June 17, 2018 Publication that Mr. Tripp was associated or otherwise working with an outside third-party "organization" to intentionally "cheat" or "sabotage" Counterdefendant is false.

52.    All of the foregoing statements and/or implications published in the June 17, 2018 Publication are false and defamatory and were published with negligence, if not actual knowledge, as to the falsity of the matters asserted therein.

53.    On or about June 20, 2018, a spokesperson for Counterdefendant stated:

> This afternoon, we received a phone call from a friend of Mr. Tripp telling us that Mr. Tripp would be coming to the Gigafactory to "shoot the place up." Police have been notified and actions are being taken to enhance security at the Gigafactory.

*See* **Exhibits C–F**, attached hereto (the "June 20, 2018 Statement").

54.    Similarly, based upon information and belief, on that same date, Counterdefendant's CEO, Mr. Musk, stated in an e-mail to a national media outlet that Mr. Tripp "sent [him] a threatening email" and that "we received a call at the Gigafactory that [Mr. Tripp] was going to come back and shoot people."  *See* **Exhibit G**, attached hereto (the "June 20, 2018 Publication").

55.    Mr. Tripp never stated, to a "friend" or otherwise, that he was "going to . . . shoot people" at the Gigafactory or that he was going to "shoot . . . up" the Gigafactory as asserted in the June 20, 2018 Statement and June 20, 2018 Publication, respectively.

56.     Based upon information and belief, Counterdefendant did not "receive[] a phone call from a friend of Mr. Tripp" who stated Mr. Tripp was going to "shoot . . . up" the Gigafactory as asserted in the June 20, 2018 Statement.

57.     Based upon information and belief, Counterdefendant did not "receive[] a call" from someone who stated that Mr. Tripp was going to "come back" to the Gigafactory and "shoot people" as asserted in the June 20, 2018 Publication.

58.     Even if Counterdefendant did receive a phone call from someone who alleged Mr. Tripp was going to "shoot . . . up" the Gigafactory, Counterdefendant did not, based upon information and belief, conduct a reasonable investigation to determine whether the purported caller was actually a "friend of Mr. Tripp" before making the foregoing false and defamatory publication, such as obtaining the name of the caller or ascertaining how the caller knew Mr. Tripp.  Counterdefendant, therefore, acted with at least negligence when it published that "a friend of Mr. Tripp" called Counterdefendant and stated Mr. Tripp was going to "shoot . . . up" the Gigafactory.

59.     Based upon information and belief, when Counterdefendant reported the alleged phone call to the Storey County Sheriff's Office, Counterdefendant did not provide the name of the "friend of Mr. Tripp" who purportedly called Counterdefendant.  Further, Counterdefendant provided inconsistent responses to law enforcement officers with regard to whether the purported caller was a female or male.  Moreover, based upon information and belief, Counterdefendant provided false information to the Storey County Sheriff's Office with respect to Mr. Tripp, including that Counterdefendant was able to independently "verify" that Mr. Tripp was "armed" with a weapon when, in fact, he was not.

60.     The Storey County Sheriff's Office conducted an investigation into the alleged phone call.  During the investigation, Counterdefendant appeared to know exactly where Mr. Tripp was located the majority of the time and, after being asked by the

20

1  investigating deputies how it was aware of such information, Counterdefendant simply
2  replied "little birds sing."

3       61.    During the investigation, Mr. Tripp voluntarily met with two deputies from
4  the Storey County Sheriff's Office.  Before the interview, the deputies frisked Mr. Tripp and
5  noted in their report that Mr. Tripp was "visibly shaken and was crying."  The deputies also
6  noted that Mr. Tripp told them that his "life was in shambles" and that "out of fear for" his
7  family's safety, he and his family would be relocating.

8       62.    The Sheriff's Office determined there was no credible threat, that Mr. Tripp
9  was not armed, and that Mr. Tripp did not likely have access to firearms.

10      63.    Based upon information and belief, Counterdefendant wanted the purported
11 phone call and alleged threat against the Gigafactory to become highly publicized in order
12 to harm and discredit Mr. Tripp before the general public.  For example, Counterdefendant
13 repeatedly asked the Storey County Sheriff's Office whether it would be making a statement
14 to the press about the purported phone call and its investigation thereof.

15      64.    Counterdefendant also made false and defamatory statements about Mr. Tripp
16 in an e-mail communication to the media on or about June 22, 2018.  *See* **Exhibit C** (the
17 "June 22, 2018 Publication").

18      65.    The June 20, 2018 Statement, June 20, 2018 Publication, and June 22, 2018
19 Publication are false and defamatory and were published with negligence, if not actual
20 knowledge, as to the falsity of the matters asserted therein.

21      66.    Based upon information and belief, the June 20, 2018 Statement, June 20,
22 2018 Publication, and June 22, 2018 Publication were intentionally published to retaliate
23 against Mr. Tripp and discredit him before the general public.

24      67.    To further retaliate against and discredit Mr. Tripp, on July 5, 2018,
25 Counterdefendant's CEO, Mr. Musk, published the following statement on Twitter:
26 "Indeed, very simple question.  To be specific: @lopezlinette, did you compensate or

27

28

1  promise to compensate Martin Tripp for inside information about Tesla?  Did he, under that

2  inducement, provide you with exaggerated negative info, which you printed, but turned out

3  to be untrue?"  *See* **Exhibit H**, attached hereto (the "July 5, 2018 Publication").

4        68.    The Twitter account "@lopezlinette" belongs to Linette Lopez, a reporter with

5  Business Insider, who has published articles about Counterdefendant.

6        69.    Mr. Tripp has never received any compensation from Ms. Lopez, nor has Ms.

7  Lopez ever offered Mr. Tripp any compensation or promise of compensation.

8        70.    The July 5, 2018 Publication falsely implies that Mr. Tripp accepted a bribe

9  from Ms. Lopez in exchange for providing information about Counterdefendant.

10       71.    Mr.    Tripp   did   not   provide   "exaggerated   negative   info"   about

11  Counterdefendant to Ms. Lopez, nor did he provide any information to Ms. Lopez that

12  "turned out to be untrue" as asserted in the July 5, 2018 Publication.

13       72.    The foregoing false allegations and/or implications published in the July 5,

14  2018 Publication are defamatory and were published with negligence, if not actual

15  knowledge, as to the falsity of the matters asserted and/or implied therein.

16       73.    Mr. Musk's Twitter account currently has over 22,000,000 "followers."

17       74.    On June 14, 2018, after Mr. Tripp had been interrogated by Counterdefendant

18  for multiple days, three non-uniformed security officers escorted Mr. Tripp out of the

19  Gigafactory.   In doing so, the officers led Mr. Tripp directly through the engineering

20  production space, parading him before numerous of his colleagues.  Once outside, the non-

21  uniformed security officers surrounded Mr. Tripp's vehicle and would not let him leave

22  until a truck was able to follow Mr. Tripp off of the premises.  While he was being escorted

23  out of the Gigafactory, several employees Mr. Tripp knew asked him what was happening

24  but were sent away by the security personnel.  This ordeal, which, *inter alia*, implied that

25  Mr. Tripp was a danger to those around him, was highly embarrassing and distressing to Mr.

26  Tripp.

27

28

75.     Since his employment with Counterdefendant ended, Mr. Tripp has received numerous threats to his personal safety, which, upon information and belief, have been stirred by the foregoing false and defamatory statements published about him by Counterdefendant.  Mr. Tripp has even been followed and trailed on multiple occasions by unidentified individuals.

76.     As the result of Counterdefendant's actions, Mr. Tripp, among other things, was forced to relocate with his wife and young child, has lost a significant amount of weight, has had difficulty eating and sleeping, has bouts with nausea and anxiety, and has had marital relationship problems.

## FIRST CLAIM FOR RELIEF

### Defamation and Defamation *Per Se*

77.     Counterclaimant repeats and realleges each and every allegation of the Counterclaim as if fully set forth herein.

78.     Counterdefendant's actions, statements, and publications as alleged herein constitute defamation.

79.     Counterdefendant negligently, if not knowingly and intentionally, published unprivileged, false, and defamatory statements of and concerning Counterclaimant.

80.     Counterdefendant published these false and defamatory statements out of malice and to retaliate against Counterclaimant and discredit him before the general public.

81.     Counterdefendant's false publications have subjected Counterclaimant to hatred, contempt, ridicule, or obloquy; lowered his reputation in the estimation of the business and public community; and deterred third persons from associating or dealing with him.

82.     Counterdefendant's false publications constitute defamation *per se* as they allege that Counterclaimant committed and/or would commit a crime and/or impute a lack of fitness for his trade, business, or profession.

23

83.     Counterdefendant's acts of defamation and defamation *per se* have caused substantial damages to Counterclaimant in a specific amount to be proven at trial but in an amount no less than $1,000,000.00.

84.     Based upon Counterdefendant's tortious acts of defamation *per se*, Counterclaimant is entitled to recover presumed damages, as well as his actual and consequential damages against Counterdefendant.

85.     Counterdefendant knowingly and intentionally engaged in conduct of a malicious, oppressive, or fraudulent nature and knowingly published false statements of and concerning Counterclaimant, thereby entitling Counterclaimant to an award of punitive damages.

## SECOND CLAIM FOR RELIEF

### Invasion of Privacy/False Light

86.     Counterclaimant repeats and realleges each and every allegation of the Counterclaim as if herein again set forth in full.

87.     Counterdefendant's actions as alleged herein constitute invasion of privacy and placed Counterplaintiff before the public in a false light.

88.     Counterdefendant's publications about Counterclaimant would be highly offensive and objectionable to a reasonable person and were, in fact, highly offensive and objectionable to Counterclaimant.

89.     Counterdefendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matters and the false light in which Counterclaimant was placed.

90.     Counterdefendant's actions have caused damages to Counterclaimant.

91.     Based upon Counterdefendant's misconduct, Counterclaimant is entitled to recover all of his damages against Counterdefendant in a specific amount to be proven at trial but in an amount no less than $1,000,000.00.

92.     Counterdefendant has engaged in conduct of a malicious, oppressive, or fraudulent nature, thereby entitling Counterclaimant to an award of punitive damages.

### **THIRD CLAIM FOR RELIEF**

#### **Intentional Infliction of Emotional Distress**

93.     Counterclaimant repeats and realleges each and every allegation of the Counterclaim as if herein again set forth in full.

94.     Counterdefendant's actions toward Counterclaimant by, *inter alia*, making false claims to law enforcement officers about Mr. Tripp and publishing highly-publicized, intentional and repeated false and defamatory statements regarding Counterclaimant, constitutes intentional infliction of emotional distress.

95.     Counterdefendant's conduct was either intentional or reckless.

96.     Counterdefendant's actions were extreme in degree, outrageous in character, went beyond all possible bounds of decency, and are regarded as atrocious and utterly intolerable in a civilized community.

97.     Counterdefendant intended to cause Counterclaimant emotional distress and/or were aware of and disregarded the near certainty that its conduct would result in emotional distress.

98.     As a direct and proximate result of Counterdefendant's actions, Counterclaimant has suffered and continues to suffer emotional and mental distress and pain and suffering.

99.     Based on information and belief, Counterdefendant's conduct was malicious and done with a willful and wanton disregard to Counterclaimant's interests, justifying an award of punitive damages sufficient to punish Counterdefendant and deter future similar conduct by Counterdefendant and others.

**PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing facts, Counterclaimant requests judgment against Counterdefendant awarding the following:

A.    For actual, compensatory, and presumed damages as a result of Counterdefendant's false and defamatory publications concerning Counterclaimant in a specific amount to be proven at trial but not less than $1,000,000.00.

B.    For punitive damages.

C.    For attorneys' fees and costs incurred by Counterclaimant.

D.    For interest on the foregoing amounts at the statutory rate.

E.    For such other relief in favor of Counterclaimant and against Counterdefendant as the Court or other trier of fact deems just and appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Counterclaimant demands a trial by jury of the causes of action alleged herein.

DATED this 31st day of July, 2018.

TIFFANY & BOSCO, P.A.

By */s/ Matthew D. Dayton*
   Robert D. Mitchell
   William M. Fischbach III
   Christopher J. Waznik
   Matthew D. Dayton
   Camelback Esplanade II, Seventh Floor
   2525 East Camelback Road

26

Phoenix, Arizona 85016-4229
*Counsel for Defendant/Counterclaimant
Martin Tripp*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify and declare under penalty of perjury that on July 31, 2018, I electronically filed the foregoing with the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to all parties of record.


  /s/ Tracee A. Loveland

28