**JACKSON LEWIS P.C.**
Joshua A. Sliker (Nevada Bar No. 12493)
Joshua.Sliker@jacksonlewis.com
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101
Telephone:  (702) 921-2460
Facsimile:   (702) 921-2461

**CHARIS LEX P.C.**
Sean P. Gates *(admitted pro hac vice)*
sgates@charislex.com
Douglas J. Beteta *(admitted pro hac vice)*
dbeteta@charislex.com
301 N. Lake Ave., Suite 1100
Pasadena, California 91101
Telephone:  (626) 508-1717
Facsimile:   (626) 508-1730

Attorneys for Plaintiff/Counter-Defendant
TESLA, INC.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN TRIPP, an individual,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. 3:18-cv-00296-LRH-CLB<br><br>**TESLA, INC.'S OPPOSITION TO TRIPP'S MOTION TO COMPEL DEPOSITION OF ELON MUSK** |

1    Martin Tripp stole Tesla confidential information, disclosed it to a reporter with a grudge
2 against Tesla, and helped her publish false allegations of wrongdoing—all while employed at
3 Tesla. Tesla brought this lawsuit to remedy Tripp's theft and disclosure of its trade secrets. Tripp
4 responded with a counterclaim alleging that Tesla defamed him by: (a) informing Tesla employees
5 of the theft in an internal email that did not identify Tripp, (b) asking the reporter whether she paid
6 Tripp, and (c) notifying the press about a call Tesla received from a "very close friend" of Tripp
7 who was very concerned that he would come to the Gigafactory and shoot people.

8    Tripp now seeks to depose Elon Musk, Tesla's CEO. But Tripp does not need this
9 deposition for the underlying facts. He already had the opportunity to obtain that discovery, and his
10 counterclaim only quibbles with the wording Tesla used to describe the undisputed facts. For
11 example, ignoring the fact that Musk's email to employees ***does not even mention his name*** (nor
12 any other identifying characteristics), Tripp objects to his admitted conduct—stealing confidential
13 information, disclosing it to a reporter with a "grudge" against Musk, and helping publish
14 inflammatory articles—being described as "damaging sabotage." Tripp also complains that Musk
15 asked the reporter whether she paid Tripp, but Tripp cannot dispute that he asked a co-worker to
16 talk to the reporter and "GUARANTEE[D]" the co-worker would "get some money" if he was
17 "helpful." Tripp also admitted discussing with others that one could get "$50,000" for providing
18 confidential information to a reporter.

19    As to the Gigafactory threat, it is undisputed that a Tesla call center employee (Shamara
20 Bell) received a call from a self-identified "close friend of Tripp" stating that Tripp was "***extremely***
21 ***upset***" because of the lawsuit, "***extremely volatile***," "***very well heavily armed***," and that the caller
22 "***feared for the safety of the Gigafactory*** employees." ***That can mean only one thing***—the caller
23 was afraid that Tripp was headed to the Gigafactory to shoot people. Unsurprisingly, the call center
24 employee testified that what the caller told her and Tesla's statement to the press are ***"saying the***
25 ***same thing."*** In fact, while the call was taking place, another employee (Kristin Krerowicz) sent an
26 instant message up the chain reporting that the caller said Tripp "***is heavily armed and headed for***
27 ***the Giga Factory***."

28    Having shown no need for further discovery of the underlying facts, Tripp seeks to depose

-1-
TESLA, INC.'S OPPOSITION TO TRIPP'S
MOTION TO COMPEL DEPOSITION OF ELON MUSK

Musk about a litany of irrelevant and harassing topics, such as: Musk's "attitude toward his critics in general"; anonymous blog posts "critical of Tesla"; and any efforts by Elon Musk to publicly criticize or undermine critics of Musk or Tesla. And, in the waning days of discovery, Tripp produced a hodgepodge of irrelevant materials apparently aimed at Musk, including: a stack of Musk's twitter threads that have nothing to do with Tripp; various news articles about Musk's managerial style; and assorted pleadings from *four unrelated lawsuits*. The deposition thus could include questions about *anything* ever written that somehow criticizes Musk or Tesla, including, presumably, "criticism" of Musk's three other entirely unrelated companies or other professional endeavors or anything "critical" of him personally—as well as questions about the four unrelated lawsuits. Tripp seeks to turn this litigation into a never-ending circus of harassing and irrelevant allegations.

The law does not allow this. To the contrary, because of the great potential for abuse and harassment, courts routinely prohibit depositions of CEOs where the requesting party fails to show both that (1) the CEO has unique, firsthand knowledge of the facts at issue, *and* (2) the requesting party has exhausted—without success—other less intrusive discovery methods, such as interrogatories, Rule 30(b)(6) depositions, and depositions of lower-level employees. Mere relevance is not enough.

Tripp utterly fails both prongs of the required showing. Although Tripp claims that he needs Musk's deposition to demonstrate actual malice, that is not the law. Under binding First Amendment jurisprudence, actual malice turns on whether Tesla's statements match the gist of the facts known to Tesla, *not* Musk's feelings toward Tripp. As to the facts that *are* relevant to actual malice, Tripp has already deposed—or had the opportunity to depose—the Tesla employees with firsthand knowledge of the facts known to Tesla at the time of the statements. He thus fails the first prong of the test. As to the second prong, Tripp chose not to depose Krerowicz, the person who messaged in real-time that Tripp "is heavily armed and headed to the Giga Factory"—yet he seeks to depose Musk, who was simply advising on what she and Bell had reported up the chain. Equally surprising, Tripp also never deposed the Tesla security employee (Jeff Jones) who the drafters of the press release Tripp challenges identified as *their likely source* of information. Furthermore,

even if Musk's feelings were relevant to actual malice—they are not—Tripp did not seek any discovery on that issue through less intrusive means.

Tripp now raises a ***newly-invented theory*** that Musk's subjective feelings are also relevant for punitive damages—a theory he has never raised before despite several prior requests for Musk's deposition. First, as reflected above, Tripp is seeking punitive damages for statements that are ***true.*** Moreover, he failed to first seek ***any*** discovery through less intrusive means into the words or acts of Musk or Tesla's other managing agents that might shed light on their subjective feelings. He served no written discovery (neither interrogatories nor document requests) targeting this issue, sought no 30(b)(6) topic on this issue, and ***did not ask a single question*** about Musk's (or anyone else's) views of Tripp despite ***three*** depositions of high-ranking Tesla employees who were communicating with Musk. Surely, if Musk had a "vendetta" against Tripp, as Tripp claims, it is likely these people would have heard something to that effect. Yet Tripp asked not one question on this topic, much less seek information through Rule 30(b)(6).

One false narrative running through Tripp's motion needs to be debunked. Tripp suggests that Musk kept coming after him for no good reason even after he was merely "an unemployed factory worker." Putting aside that he was an unemployed factory worker because he stole Tesla confidential information—it was Tripp who was determined to keep himself in the spotlight through continued misconduct. Incredibly, ***even after this lawsuit was filed***, Tripp publicly posted—as part of a series of vulgar, false attacks on Tesla—additional confidential information that he had stolen. This included, among other things, posting actual vehicle identification numbers (VINs) and telling Tesla customers that their cars contained defective battery cells—which the evidence has conclusively proven is false. And, although he complains about Tesla's press statement that continued to accurately report that Bell had received a call about a threat—he fails to mention that he was falsely telling the media that there was no call, and that it was all a hoax.

## BACKGROUND

### A.  Musk's Four Companies.

Musk is the head of multiple companies. As CEO of Tesla (a public company with over 40,000 employees), he oversees all product design, engineering and manufacturing of Tesla's

electric vehicles and energy products. (Declaration of Elon Musk ¶ 2.) Musk is also CEO and lead designer of Space Exploration Technologies where he oversees the development and manufacturing of advanced rockets and spacecraft for missions to and beyond Earth orbit. (*Id.* ¶ 3.) Although most of Musk's time is split leading Tesla and SpaceX, he also serves as CEO of Neuralink, which is developing ultra-high bandwidth brain-machine interfaces to connect the human brain to computers. (*Id.*) In addition, Musk founded The Boring Company, a developer of affordable tunneling technology seeking to alleviate urban congestion. (*Id.*)

**B.  Tripp Wants a Wide-Ranging Deposition Regarding Unnecessary, Irrelevant, and Harassing Topics.**

Tripp has been seeking Musk's deposition since the outset of the case but has offered wildly different explanations for why he needs it. He previously suggested, without support, that Musk had "unique personal knowledge" on everything from whether the information Tripp disclosed was a trade secret to whether there had been injuries involving the Tesla's Model 3. (ECF No. 52 at 3.) In response to Tripp's earlier claims, this Court advised that it "would not allow an extensive deposition of Musk" and told Tripp to try to get the information he needed from other sources. (ECF No. 54 at 2.)

Despite this guidance, rather than limiting the topics, Tripp has done the opposite, expanding his list to include topics that have nothing at all to do with this litigation. As noted, Tripp wants to depose Musk regarding criticism of him or Tesla in general, various anonymous blog posts critical of Tesla, and supposed "efforts by Elon Musk to publicly criticize, threaten legal action against, or undermine the public or professional standing of critics of Elon Musk or Tesla, including without limitation Vernon Unsworth and Lawrence Fossi (aka Montana Skeptic)"— individuals who have ***absolutely nothing*** to do with this case. (Declaration of Douglas J. Beteta ("Beteta Decl.") Ex. 8 at 2.)[1] Thus, Tripp apparently seeks to ask Musk about ***anyone or anything*** "critical" of Tesla or Musk—or any of Musk's other professional or personal activities.

In fact, in the final days of discovery, Tripp produced a barrage of irrelevant material apparently aimed at Musk, including numerous irrelevant news articles, hundreds of pages of

---

[1] Unless otherwise stated, all Exhibit references are to the declaration of Douglas J. Beteta.

-4-
TESLA, INC.'S OPPOSITION TO TRIPP'S
MOTION TO COMPEL DEPOSITION OF ELON MUSK

tweets sent by Musk that have nothing to do with Tripp or this case, and documents from *four entirely* unrelated lawsuits, such as a ten-year old complaint filed by a former Tesla executive, a discovery order from a case involving a person who trespassed on Tesla property and injured a Tesla security guard, and pleadings from an SEC complaint. (Beteta Decl. ¶ 2.) Although the people and lawsuits Tripp has identified are completely irrelevant to this case, they have all garnered media attention, and Tripp's focus on them makes clear that Tripp is more concerned with creating sound bites than legitimate discovery.

## ARGUMENT

### A. Under Rule 26(b) and 26(c), Tripp Must Show That Musk Has Unique Firsthand Knowledge That Is Not Available from Other Sources.

Right off the bat, Tripp's motion is defective because it is based on the wrong legal standard. Tripp maintains that he need only show the sought-after discovery is relevant and proportional to the needs of the case. (Motion at 7-8.) However, Courts have long recognized the potential for harassment and burden in depositions of the senior-most executives of large corporations. "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *See Celerity, Inc. v. Ultra Clean Holdings, Inc.*, 2007 U.S. Dist. LEXIS 8295, at *8 (N.D. Cal. Jan. 25, 2007).

To minimize the danger of harassment and abuse, courts have adopted a well-recognized standard. To depose a party's CEO, the requesting party bears the burden of establishing both that (1) the CEO possesses unique, non-repetitive, firsthand knowledge of relevant information, and (2) the party seeking the deposition has exhausted other less intrusive discovery methods, such as interrogatories and depositions of lower-level employees, to get the information that is needed. *See, e.g.*, *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979). Courts have thus precluded efforts to depose high-ranking executives where a party was able to obtain the needed information through other means, *see, e.g.*, *Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995); *Doble v. Mega Life & Health Ins.*, No. C 09-1611 CRB (JL), 2010 U.S. Dist. LEXIS 56190, *9 (N.D. Cal. May 18, 2010), or failed to first seek discovery through less intrusive means, such as a Rule 30(b)(6) deposition, *see, e.g.*, *Sher v. Raytheon Co.*, No. 8:08-CV-889-T-33AEP, 2010 U.S. Dist. LEXIS 153011, at *15

(M.D. Fla. Mar. 10, 2010), or written discovery, *see*, *e.g.*, *Affinity Labs of Texas v. Apple, Inc.*, No. C 09-4436 CW (JL), 2011 U.S. Dist. LEXIS 53649, at *28 (N.D. Cal. May 9, 2011); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985).

  Tripp tries to brush aside decades of cases from this district and all over the country applying these well-settled rules by arguing that "the 'apex' witness doctrine has never been recognized or adopted by the 9th Circuit and the doctrine has been repeatedly rejected by the U.S. District Court of Nevada." (Motion at 7.) Not so. Courts, including this district, have recognized that the apex doctrine is derived from the principles of Rules 26(b) and 26(c). *See*, *e.g.*, *International Game Technology v. Illinois National Insurance Co.*, No. 2:16-cv-02792-APG-NJK, 2018 U.S. Dist. LEXIS 228393 (D. Nev. Apr. 6, 2018). Indeed, the "most recent amendments to the discovery rules are meant to curb the culture of scorched earth litigation tactics" by granting "efficient access to what is needed" but eliminating "unnecessary or wasteful discovery." *Id.* at *3 (quoting *Roberts v. Clark Cty. School Dist.*, 312 F.R.D. 594, 603-04 (D. Nev. 2016)). To that end, Rule 26(b) requires a court to limit discovery if it is "unreasonably cumulative or duplicative" or can be obtained from other sources that are "more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b). A court may also "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).

  In *International Game Technology*, for example, the court applied these principles to limit the deposition of a high-ranking executive to only those issues where he had "unique and personal knowledge" that was "'more than marginally relevant and enough to outweigh the burden' of the discovery." 2018 U.S. Dist. LEXIS 228393 at *10-11 (quoting *Klungvedt v. Unum Group*, No.2:12-cv-00651-JWS, 2013 U.S. Dist. LEXIS 20105, at *9 (D. Ariz. Feb. 13, 1013)). The court prevented a deposition on multiple topics on which the executive did not have "unique and personal knowledge," including where the information that was really needed had already been obtained from other sources. *Id.* at *14-19.

  Far from demonstrating a rejection of the apex doctrine, the very cases Tripp cites show that this district applies its principles. As the court in *United States CFTC v. Banc de Binary, Ltd.*, No. 2:13-cv-992-MMD-VCF, 2015 U.S. Dist. LEXIS 17567 (D. Nev. Feb. 11, 2015), recognized, the

"apex doctrine exists to prevent the 'tremendous abuse or harassment' that may occur when high-level corporate officials are deposed" but allowed the deposition because the plaintiff had shown through other discovery that the CEO possessed unique knowledge. *Id.* at *5 (quotation omitted); *see also Luangisa v. Interface Operations*, No. 2:11-cv-00951-RCJ-CWH, 2011 U.S. Dist. LEXIS 139700, *40-41 (D. Nev. Dec. 5, 2011) (applying apex doctrine but allowing deposition because other witnesses did not have personal knowledge of relevant facts); *Resort Properties of America v. El-Ad Properties NY LLC*, No. 02:07-CV-00964-LRH-RJJ, 2008 U.S. Dist. LEXIS 117003, *7-8 (D. Nev. July 10, 2008) (allowing deposition because executive was "personally responsible" for disputed purchase and other deponents could not recall the details of relevant meetings).

### B.     Courts Apply the Same Test Even Where a CEO Has Made Public Statements.

Based on his faulty starting premise, Tripp argues that he is entitled to Musk's deposition merely because Musk made some of the challenged statements. (Motion at 9.) Not true. Courts have regularly applied the apex doctrine to deny depositions of high-ranking corporate officers regarding statements they made, even statements regarding relevant issues.

For example, in *Affinity Labs of Texas v. Apple, Inc.*, No. C 09-4436 CW (JL), 2011 U.S. Dist. LEXIS 53649 (N.D. Cal. May 9, 2011), the plaintiff argued that a long list of public statements by Apple's CEO, Steve Jobs, describing Apple's technology went to "the heart of the damages and patent validity issues" in the case. *Id.* at *8, 12-17. The court, however, denied the motion since other employees had more direct knowledge of the issues. *Id.* at *34.

In *Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995), the Tenth Circuit upheld a protective order barring the deposition of the chairman of IBM even though he had "allegedly authored an IBM policy designed to discriminate against older employees" because the plaintiff failed to demonstrate the information could not be obtained from other IBM personnel. *Id.* at 483.

Likewise, in *Salter v. Upjohn Co.*, 593 F.2d 649 (5th Cir. 1979), the plaintiff sought the deposition of Upjohn's president regarding public testimony he had given before the United States Senate concerning the testing, marketing, and use of the drug at issue. The Fifth Circuit affirmed an order that the CEO could only be deposed if the testimony of the other employees showed that the CEO had unique knowledge or contradicted the CEO's public testimony. *Id.* at 651.

Similarly, in *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985), the court barred the deposition of Chrysler's CEO, Lee Iacocca, regarding statements he made in his published biography that plaintiffs claimed were "damaging" and relevant to Chrysler's liability. *Id.* at 366.

Recognizing the disruption and burden caused by forcing CEOs to submit to depositions merely because they made public statements based on information learned from employees with relevant firsthand knowledge, courts have applied the apex doctrine to protect CEOs, like Musk, who act as the public face of the companies that they serve. *See, e.g., Doble*, 2010 U.S. Dist. LEXIS 56190 at *9 (granting protective order prohibiting deposition of CEO because "his public statements were part of his job as the public face of the company" and plaintiffs got the information needed from lower level employees).

### C. Tripp Cannot Justify the Deposition By Claiming A Need For Discovery On Actual Malice.

Tripp argues he needs Musk's deposition with regard to actual malice. But actual malice has "nothing to do with bad motive or ill will." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 666 n.7 (1989). Rather, Tripp is required to prove, by clear and convincing evidence, that Tesla acted with knowledge that the challenged statements were false or with "reckless disregard for the truth" of the statements. *Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991). In other words, the relevant inquiry for actual malice is what were the facts known to Tesla at the time of the statement. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964).

Tripp has already obtained extensive discovery on the facts known to Tesla, could have easily obtained more, and cannot demonstrate that Musk has unique, non-repetitive, firsthand knowledge of the facts relevant to actual malice. Moreover, if Musk's "subjective state of mind" were relevant, as Tripp contends (it is not), Tripp failed to seek (as he must) discovery through less intrusive means.

#### 1. The June 17, 2018 Email.

Tripp complains about an internal Tesla email describing his activities as "damaging sabotage"—although he admits that he stole and disclosed Tesla's confidential data and documents to Linette Lopez (a reporter who Tripp said had a "grudge" against Musk) and then worked with her to publicize false and highly damaging articles. (Motion at 2, Exs. A & B; Beteta Decl. Ex. 10

-8-

at 71:8-22; Ex. 3 at 188:18-24, 244:19-21.) After an extensive investigation, Tesla investigators found a digital trail indicating that Tripp was likely Lopez's source. They interviewed Tripp on June 14 and 15, 2018. (Ex. 1 at 28:19-29:2; Ex. 2 at 33:14-21.)

After lying about his involvement for hours, Tripp finally admitted to stealing Tesla confidential information, providing it to Lopez, working with Lopez to publish the articles, and trying to hide his activities. (Ex. 3 at 144:1-147:14, 156:4-10; *see also* Ex. 2 at 67:9-68:12, 70:20-71:7.) Tripp provided the investigators with the SQL query (computer code he wrote to access Tesla's confidential information) and spreadsheet he used to collect and disclose Tesla confidential data. (Ex. 3 at 204:23-206:4; Ex. 2 at 73:13-74:5, 75:14-76:11.)

Based on information gathered by the investigators, Musk sent the internal June 17, 2018 email to Tesla employees describing Tripp's activities—**without ever naming Tripp** or providing any other identifying information—to warn them to be vigilant of similar efforts. (Motion Ex. C; Musk Decl. ¶ 4.)

Ignoring that he is not even identified in the email, Tripp claims the use of the word "sabotage" is false. (Motion at 4.) But Tripp obtained discovery from those with firsthand knowledge of the underlying facts that, at the time of the statement, Tripp had surreptitiously run SQL scripts on Tesla's systems to acquire confidential data, secretly taken screenshots from Tesla computers, stolen Tesla internal emails, taken steps to "cover his tracks," and leaked all of this information to a reporter to publish demonstrably false allegations of wrongdoing. (Ex. 1 at 60:1-63:1, 139:4-140:24; Ex. 2 at 38:18-39:14, 70:8-19; Ex. 3 at 135:19-136:2, 156:4-9, 172:16-173:16.) This conduct can easily be described as "sabotage." *Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1131 (D. Nev. 2014) (use of the word "theft" to describe copyright infringement not defamatory); *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of the word "blackmail" to describe negotiation techniques not defamatory); *Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986) (use of the word "kidnapping" to describe father's taking son in violation of custody order was not defamatory).[2]

---

[2] Tripp asserts the email "insinuated falsely" that Tripp was "working with an outside third-

Tripp fails to show how deposing Musk would add anything relevant. Musk does not have firsthand knowledge of Tripp's activities in obtaining Tesla's confidential information and providing it to parties outside of Tesla. (Musk Decl. ¶ 4.) He did not personally conduct the investigation into Tripp's activities. (*Id.*) And he was not present during the interviews by Tesla's security team during which Mr. Tripp admitted to his unlawful conduct. (*Id.*)

### 2. Musk's July 5, 2018 Tweet.

Similarly, Tripp has not shown any need to depose Musk regarding the July 5 tweet, in which Musk asked Lopez, "[D]id you compensate or promise to compensate Martin Tripp?" (Motion, Ex. J.) Tripp complains merely asking this question implies he took a "bribe." (Motion at 9.) But Tripp admitted that he had discussed with co-workers that the "going rate" for providing confidential information to a reporter was $50,000. (Ex. 3 at 113:10-114:10, 189:22-190:22; Ex. 1 at 164:15-165:10.) Tesla's investigators further discovered that Tripp discussed the $50,000 payment with another former employee, James Uelmen, asked Uelmen to speak with Lopez, and sent a text "GUARANTEE[ING]" Uelmen "will get some money" if he was "helpful." (Ex. 4; Ex. 5 at 17:2-18:17.) Prompted by the information obtained by Tesla's investigation, Musk tweeted his question to Lopez. (Musk Decl. ¶ 7.)

Furthermore, the mere question asked of Lopez cannot justify the deposition—"inquiry itself, however embarrassing or unpleasant to its subject, is not an accusation." *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995). Under defamation law, "questions are questions" and not actionable, even if they are uncomfortable. *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1339 (D.C. 2015) (holding two questions were not open to a defamatory meaning: (1) "'Are the sons of the Palestinian president growing rich off their father's system?[']; and (2) 'Have they enriched themselves at the expense of regular Palestinians—and even U.S. taxpayers?'").

### 3. The Threat to the Gigafactory.

Tripp also fails to demonstrate any need to depose Musk regarding the threat to the Gigafactory. Tripp challenges Tesla's statements that the caller stated Tripp "would be coming to party 'organization.'" (Motion at 4.) To the contrary, the email states that Tesla needs "to figure out if he was acting alone or . . . with any outside organizations." (Motion Ex. C.)

the Gigafactory to 'shoot the place up,'" arguing that the "anonymous caller to Bell said no such thing." (Motion at 6.) Not true. The same day that Tesla filed this lawsuit, it received a call from someone who identified himself as a "very close friend" of Tripp. (Ex. 6.) The caller sounded "genuine," "scared," and "concerned." (Ex. 7 at 79:9-80:7, 92:3-16.) He said that he "feared for the safety of employees" at the Gigafactory because Tripp was "heavily armed," "extremely volatile," and "extremely upset" that his name had been "released to the media" through the lawsuit. (Ex. 7 at 78:2-15; Ex. 6.)

The call center employee who received the call, Shamara Bell, testified that it was "scary," causing her to be "concerned that Mr. Tripp might show up to the Gigafactory and shoot the place up." (Ex. 7 at 79:18-23, 82:7-18.) She further testified that Tesla's press statement and what the caller said "are saying the same thing." (Ex. 7 at 58:14-59:5.) Indeed, while Bell was still on the call, another employee, Kristen Krerowicz, sent an instant message to warn others at Tesla that a caller said that Tripp "is heavily armed and headed to the Giga Factory":

> We have an employee in Plant O&M that is on the phone with someone who is reporting that a former employee by the name of Martin Tripe
>
> He told her that he is heavily armed and headed for the Giga Factory
>
> 1:44 PM

This urgent message was quickly sent up the chain to several additional people, and law enforcement was called. (Ex. 9 at 2.)

The threat was entirely credible. Tripp had been a troubled employee even before he stole company information and provided it to a reporter. (Ex. 10 at 232:21-233:25.) When Tesla received the warning call, Tripp had been unmasked, terminated, and was facing a lawsuit. (Ex. 11 at 56:3-22; Ex. 1 at 90:13-91:14.) Furthermore, Tesla's security team had reason to believe he had access to firearms. (Ex. 1 at 69:4-70:12; 87:2-88:5.)

Hours before Tesla received a call about the Gigafactory threat, Tripp sent an email to Musk stating "you have what's coming to you." (Ex. 11 at 59:8-18.) Later that afternoon, a reporter contacted Musk for comments about the lawsuit and the above email exchange with Tripp (which exchange Tripp had brought up with the reporter). (Ex. 12 at 3.) Musk forwarded Tripp's email,

1  told the reporter that he "was just told that we received a call at the Gigafactory that [Tripp] was
2  going to come back and shoot people," and directed the reporter to Tesla's communications team
3  for more information. (*Id.* at 1.)
4       Tesla's communications team confirmed the details of the threat with Tesla's security team
5  and emailed the reporter a summary of the call, stating that Tesla "received a phone call from a
6  friend of Mr Tripp telling us that Mr Tripp would be coming to the Gigafactory to 'shoot the place
7  up,'" and that law enforcement had been notified. (Ex. 13 at 1; Ex. 14 at 21:8-14, 63:19-64:16.)
8  Tesla later shared this statement with other reporters. (Ex. 11 at 15:7-16:3.) Sarah O'Brien, Tesla's
9  then-VP of communications, drafted the statement and, under questioning from Tripp's counsel,
10 repeatedly confirmed that Musk was not involved in drafting this statement and that Musk's email
11 regarding the threat was not the basis for it. (Ex. 14 at 20:1-16; 21:8-14; 51:8-20; *see also* Musk
12 Decl. ¶ 6.) Instead, O'Brien testified that the source of the information for the statement, and in
13 particular the words "shoot the place up," was Tesla security. (*Id.* at 51:8-20, 74:5-8; 94:20-24.)
14 Similarly, David Arnold, Tesla's then-Global Communications Director, testified that O'Brien
15 drafted the statement only with input from the security team. (Ex. 11 at 20:8-14, 27:10-20.)
16      Furthermore, Tripp failed to depose at least two key people with firsthand knowledge of the
17 facts. For example, he argues—contrary to the evidence—that the press release was based on
18 Musk's email because they are similar. But as Arnold explained, they are similar because the
19 information in both cases was coming from the same source: Tesla security. Yet, incredibly, Tripp
20 ***never deposed*** Jones, the head of Tesla security and who both O'Brien and Arnold testified ***likely***
21 ***was the person*** who provided them the information for the press release. (Ex. 11 at 19:10-16; Ex.
22 14 at 72:25-73:17.) Similarly, and equally surprisingly, Tripp never deposed Krerowicz despite her
23 real-time statement sent up the chain that Tripp was "heavily armed and headed to the Giga
24 Factory."
25      Tripp therefore has, or easily could have obtained, what he needs regarding the call and
26 Tesla's response to it. Tripp has the documents, deposed Bell and the security personnel, and yet
27 failed to depose other key players, such as Krerowicz and Jones. (Beteta Decl. ¶¶ 3-4.) Deposing
28 Musk adds nothing to the underlying facts. He did not receive, and therefore has no firsthand

knowledge, of the call. (Musk Decl. ¶ 5.) His email was based on information provided to him by others. (*Id.*) And Tripp cannot justify the deposition by "quibbling over manufactured differences" between the testimony of these witnesses and the statements at issue or complaining that he did not get the answers he wanted. *Affinity Labs*, 2011 U.S. Dist. LEXIS 53649, at *23, 34; *Doble*, 2010 U.S. Dist. LEXIS 56190 at *4.

Having failed to show a need to depose Musk regarding what information Tesla knew at the time of the challenged statements, Tripp demands a deposition to probe whether "Musk had a vendetta against Tripp" (Motion at 15). But this is irrelevant to actual malice: "[e]ven if the publisher intends to harm [the plaintiff], he cannot be held liable unless he knew the published material was false, or acted with reckless disregard of its falsity." *Wynn v. Bloom*, No. 2:18-cv-00609-JCM-GWF, 2019 U.S. Dist. LEXIS 75439, at *11 (D. Nev. May 2, 2019). Even if it were relevant (it is not), as noted elsewhere, Tripp utterly failed to seek any discovery about Musk's feelings toward Tripp.

### D. Tripp Failed to Seek the Information He Claims Is Relevant to Punitive Damages Through Less Intrusive Means.

Tripp now claims for the first time that he needs to depose Musk "to explore Musk's subjective motives and attitudes toward Tripp" for his claim for punitive damages. (Motion at 10.) In November 2018, Tripp advanced entirely different rationales, arguing that Musk had unique personal knowledge regarding whether the information Tripp disclosed was protected as a trade secret, whether damaged battery modules were used in any Model 3 (the undisputed evidence shows that they were not), and any injuries involved with Model 3. (ECF No. 52 at 3.) Tripp never said anything about motive or his claim for punitive damages.

Putting aside the shifting justifications, it has been nearly one year since this Court told Tripp to request the information that he needed through less intrusive means. But Tripp does not point to any written discovery regarding the motives or subjective feelings of Musk (or any Tesla's other officers or managing agents). *See Affinity Labs*, 2011 U.S. Dist. LEXIS 53649, at *28 (denying deposition of CEO; plaintiff failed to serve written discovery that "could have provided the information it now allegedly seeks"); *Mulvey*, 106 F.R.D. at 366 (prohibiting deposition of CEO because interrogatories could be used to explore knowledge underlying statements in CEO's

-13-

biography). Nor did Tripp seek deposition testimony from Tesla, the only party to this case, on these issues under Rule 30(b)(6). *See Sher*, 2010 U.S. Dist. LEXIS 153011, at *15 (denying deposition of CEO where plaintiffs "never sought a 30(b)(6) deposition or served interrogatories" on the topics at issue); *Gauthier v. Union Pac. R.R. Co.*, No. 1:07-CV-12 (TH/KFG), 2008 U.S. Dist. LEXIS 47199, at *10 (E.D. Tex. June 18, 2008) (precluding deposition of corporate executives because plaintiff did not first seek 30(b)(6) deposition of corporate witnesses). And, although he deposed three high-ranking individuals who were in communication with Musk about the Tripp matter,[3] **he did not ask a single question** of any one of them about Musk's views of Tripp.

Tripp has completely failed to show either of the two required prongs for obtaining Musk's deposition, and the deposition should not be ordered.[4]

## CONCLUSION

The Court should deny Tripp's motion.

Dated: November 20, 2019            **CHARIS LEX P.C.**

By: /s/ Sean P. Gates
Sean P. Gates
Attorneys for Plaintiff and
Counter-Defendant Tesla, Inc.

---

[3] Tripp deposed Sarah O'Brien, Tesla's former VP of Communications, David Arnold, former Senior Director of Global Communications, and Nicholas Gicinto, former Senior Manager of Global Security.

[4] Tripp has proposed a full four-hour deposition—which includes time for the irrelevant topics described above. (Ex. 8 at 1.) Yet, even in cases, unlike here, where there is a showing of unique personal knowledge and unsuccessful attempts at less intrusive discovery, courts routinely limit CEO depositions to one or two hours. *See, e.g.*, *In re Apple iPod iTunes Antitrust Litigation*, No. C05-00037 JW (HRL), 2011 U.S. Dist. LEXIS 33174, at *7-8 (N.D. Cal. Mar. 21, 2011) (two-hour deposition of Apple CEO on three out of five issues); *Oracle Am., Inc. v. Google Inc.*, No. C-10-03561-WHA (DMR), 2011 U.S. Dist. LEXIS 79465, at *6 & n.1 (N.D. Cal. July 21, 2011) (two-hour deposition of Google CEO on specified topics); *HCP Laguna Creek CA v. Sunrise Senior Living Mgmt.*, No. 3-10-0220, 2010 U.S. Dist. LEXIS 21500, at *16 (M.D. Tenn. Mar. 8, 2010) (one hour deposition of CEO); *Morales v. E.D. Etnyre & Co.*, 229 F.R.D. 661, 663 (D.N.M. 2005) (one hour deposition of CEO).