# Exhibit 1 - Nicholas Gicinto Deposition Excerpts





COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







DEPOSITION AND TRIAL

(800) 528-3335

NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

TESLA, INC.,

     Plaintiff,

vs.                          No.3:18-CV-00296-LRH-CBC

MARTIN TRIPP,

     Defendant.

_____

**CONFIDENTIAL**

**DEPOSITION OF**

**NICHOLAS RYAN GICINTO**

**TAKEN ON**
**TUESDAAY, AUGUST 27, 2019**
**9:58 A.M.**

**HOME2SUITES CONFERENCE CENTER**
**2001 MAIN STREET**
**KANSAS CITY, MISSOURI 64108**

1      Q.    Kind of like being falsely accused of

2    being a mass shooter?

3           MR. UMHOFER:   Objection, calls for

4    speculation.

5      A.    I didn't accuse anybody of being a mass

6    shooter.

7    BY MR. FISCHBACH:

8      Q.    When did you first become involved in the

9    investigation of Mr. Tripp?

10     A.    Sometime I would say around June of 2018.

11     Q.    Well, do you have a specific date?

12     A.    No.

13     Q.    Are there --

14     A.    Early -- early June.

15     Q.    -- any records or documents you could

16   point me to that would tell me precisely when you

17   became first involved?

18     A.    I don't.  I didn't bring anything we me.

19   I'm not an employee of Tesla.  I don't have access

20   to any records or documents.

21     Q.    How did you first get involved in the

22   investigation of Mr. Tripp?  And by that, I mean, I

23   am assuming somebody reached out to you, somebody

24   probably in Tesla management, and advised you of a

25   situation and wanted you to do something about it,

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

1  **so I'm trying to get a grasp of how that came to be.**

2      A.   So as I recall Linette Lopez reached out

3  to the communications team at Tesla stating that she

4  was about to print an article and was looking for

5  comments.  That generated some sort of an email

6  thread I would imagine because that's typically how

7  it works, and because it was my job to investigate

8  theft of intellectual property and confidential

9  information, that that made its way over to me, I

10 was included in some email at some point in time

11 bringing that to my attention to investigate the

12 source of that leak.

13     **Q.   And how did you go about investigating the**

14 **source of that leak?**

15     A.   Well, as I recall initially when it was

16 only one outreach from Ms. Lopez at that time and I

17 was the only member of the team because Tesla had

18 frozen hiring on my fourth day so I didn't have

19 anybody to help me do this at that point.  I think I

20 was a little backed up and I think I kind of put it

21 on the pile of things to do.  But it was shortly

22 thereafter, I don't know the exact date, I'm sorry,

23 a second re-inquiry came from Ms. Lopez about

24 another article and that bumped it up on my priority

25 list because that indicated that there was an

 1  individual or individuals with ongoing access

 2  providing a flow of information.  So I looked closer

 3  into those threads and started to make some phone

 4  calls into the individuals who would have knowledge

 5  of the subject matter that was being discussed in

 6  her articles, because I'm not an expert in whatever

 7  those issues were, right?  Whenever there is a leak

 8  of information in a company it can come from

 9  anywhere, and as a security investigator I have to

10  go to the people who know about that particular

11  issue that's being discussed in that article and get

12  up to speed from them to understand more about, is

13  this significant, why is this important, who had

14  access to the information, talk to me about what do

15  you think is this a big deal, so I took those

16  initial investigative steps.

17     **Q.  How did you determine that Mr. Tripp was**

18  **the individual that provided information to Linette**

19  **Lopez at Business Insider?**

20     A.   It was a fairly intent investigative

21  process over several days, but it involved taking

22  the articles that she had published, looking

23  specifically at each article, at what information

24  was confidential in those articles, listing those

25  out so we could see independently what those -- what

```
 1  that information was.  And then what you -- what you
 2  do is you go about determining who had access to
 3  every single bit of that information, to each
 4  component of the information.  And as that was
 5  listed up on the board and we were able to
 6  continuously attribute the information to Mr. Tripp,
 7  as well as rule out others who wouldn't have access
 8  to that information, eventually we got to the
 9  smoking gun, which was, there was a Tableau chart
10  which was on one of our systems that tied -- tied to
11  data from the manufacturing operating system.  And
12  that Tableau chart essentially populated in real-
13  time, it was always updating based on the data in
14  the MOS.  And there was an article -- in one of the
15  articles from Ms. Lopez it specifically stated some
16  numbers, very specific down to the decimal point,
17  and I forget what it was tied to.  I don't want to
18  inaccurately say, right, this was a year ago, I
19  haven't reviewed anything, so -- but it was tied to,
20  I want to say some -- some amount of scrap or
21  something to that effect.  And we found a Tableau
22  chart that populated the details for that data, we
23  went into the audit logs for that Tableau chart, we
24  looked to see who had accessed that chart, the exact
25  time and date when the figure on that chart equaled
```

Case 3:18-cv-00296-LRH-CLB   Document 113-1   Filed 11/20/19   Page 7 of 25
Nicholas Gicinto - August 27, 2019 - NOT Assgn #3021753

Page 28

1  the figure on -- within Ms. Lopez's article, and the

2  only individual who accessed the chart at that time

3  was Martin Tripp. It's so precise in that chart that

4  if you deviated even 30 seconds either way, you

5  would get a different figure, so it was -- it was

6  very clear and no one had accessed it, I believe,

7  within ten minutes of Mr. Tripp.  So it was very

8  clear to us that he was the only one who had access

9  to that information.

10       **Q.   Kind of like DNA evidence almost, the odds**

11  **are one in a trillion it could be somebody else?**

12       A.   Digital DNA is a good way to put it and --

13  but that wasn't the only factor.  We are able to

14  attribute a number of other pieces of data that were

15  in the -- that was in the articles to him and his

16  ability to access that based on emails he had

17  received, so we could tie each -- each data point to

18  him in some form or fashion.

19       **Q.   When did you -- when was this smoking gun**

20  **identified, the digital DNA?**

21       A.   The night of the day -- the night prior to

22  when we interviewed him for the first time.

23       **Q.   I will represent to you at least based on**

24  **the discovery here that the interview occurred on**

25  **both the 14th and 15th of June.  Do those dates jibe**

1   **with your recollection?**

2       A.    Yes.

3       Q.    So it sounds to me like you discovered the

4   smoking gun, the digital DNA, the evening of June

5   13th, 2018?

6       A.    That makes sense as I recall.  We were

7   very low on sleep, we were doing a lot of work

8   working long, long days, so I'll do my best to be

9   accurate here.

10      Q.    I appreciate that.

11      A.    Sure.

12      Q.    Well, you certainly identified the smoking

13  gun digital DNA before you interviewed Martin Tripp

14  on June 14th, correct?

15      A.    Correct.

16      Q.    You, like a good investigator, showed up

17  to the interview armed with the knowledge that Mr.

18  Tripp had done this, correct?

19      A.    Yes.

20      Q.    At this time were you in communicate --

21  and again, I don't -- your attorney's attorney-

22  client objection is well stated, so I'm not asking

23  what was said, but at this time were you

24  communicating with Tesla's attorneys?

25      A.    Yes.

1    Q.    The court reporter has handed you what's

2    been marked as Deposition Exhibit 5.  I will

3    represent to you these are reflect two emails that

4    Elon Musk sent to, quote, everybody, which I presume

5    is all Tesla employees, first on June 17th and then

6    again on June 18th of last year.  I want to focus on

7    the June 17th email.  I was dismayed -- and this is

8    Elon Musk speaking.  I was dismayed to learn this

9    weekend about a Tesla employee who conducted quite

10   extensive and damaging sabotage to our operations.

11   This included making direct code changes to the

12   Tesla manufacturing operating system under false

13   user names and exporting large amounts of highly

14   sensitive Tesla data to unknown third parties.

15        Did your investigation uncover any

16   damaging sabotage conducted by Mr. Tripp?

17   A.    I think it's fair to say that the

18   information he provided, particularly the extent and

19   the false nature of some of the information provided

20   Ms. Lopez, specifically around the timing of that

21   information being provided just prior to an earnings

22   call had the potential to be quite damaging to the

23   company.

24   Q.    Did he damage any equipment?

25   A.    Not that I know of.

```
1        Q.    Did he damage any machines at the

2   Gigafactory?

3        A.    Not that I know of.  You're focused on

4   physical sabotage, but that's not the only form of

5   sabotage.

6        Q.    Well, I'm focusing on the phrase damaging

7   sabotage, so I'm trying to figure out what things he

8   might have damaged.

9        A.    Reputation, stock value, earning potential

10  for the company from a -- strictly from the market

11  standpoint.  I mean, prior to an earnings call

12  that's certainly interesting timing.

13       Q.    To your knowledge did Mr. Tripp cause any

14  long-term damage to Tesla's stock price?

15       A.    I haven't conducted such research to be

16  able to speculate on such question.

17       Q.    But your investigation uncovered, though,

18  physical damage at the Gigafactory, correct?

19       A.    Correct.

20       Q.    And again I'm trying to understand what

21  the -- other than what you've told me so far,

22  reputation, stock price, did your investigation

23  uncover any other -- any, quote, damaging sabotage

24  to Tesla's operations?

25       A.    I think you also evaluate the extent to
```

 1  which a number of other teams had to stop what they

 2  were doing to try to identify him and his activities

 3  which was certainly damaging to their productivity,

 4  to things they were also working on. It's not great

 5  for morale when you have to think about from a

 6  company perspective and a culture perspective having

 7  to, you know, hunt -- hunt, so to speak, for someone

 8  who is conducting these types of activities and the

 9  number of teams that have to be involved to support

10  a technical investigation, particularly on a network

11  where you're looking for something where data

12  exfiltration is involved.  It takes a lot of time

13  and resources.  So I suppose it's also damaging from

14  a productivity perspective to a lot of teams.

15      Q.  **Did your investigation uncover any loss of**

16  **productivity as a result of Mr. Tripp?**

17      A.   I certainly had a lot of other things I

18  could have been doing so it impacted my productivity

19  on a number of other investigations and things I was

20  working on, but -- and it absolutely factored into

21  what other teams were doing as part of their normal

22  activities to have to stop and look for things that

23  he possibly had been responsible for making changes

24  or what he could have put on the system based on the

25  information we were seeing at the time steered them

```
 1  away from their normal business.
 2      Q.    Did the Gigafactory produce less
 3  components than it normally would have because of
 4  Mr. Tripp?
 5      A.    I have no knowledge of what the production
 6  numbers were, but again, you're focusing strictly on
 7  productivity, of one aspect of what Tesla does.
 8  There are a number of things from looking at what
 9  Tesla does in how to measure productivity.
10      Q.    Actually I'm focusing on the words of Elon
11  Musk that "Mr. Tripp conducted quite extensive and
12  damaging sabotage to our operation."
13      A.    There's a lot of operations at Tesla, not
14  just producing widgets for cars.
15      Q.    What are those other operations?
16      A.    Well, there's operations for, you know,
17  within HR, within security to help keep people safe
18  and protect people.
19      Q.    How did Mr. Tripp damage those operations?
20      A.    Well, there is a lot of work that we would
21  be -- that we were working on moving forward towards
22  building a security program, which I had to stop
23  because I was focused on this investigation. You
24  know, I couldn't focus on other things that I would
25  have been otherwise doing because I was having to
```

1       A.    So the Tesla investigative team at the

2   time was me, I've never followed Mr. Tripp, so

3   you're going to have to --

4       Q.    **Did Tesla ever hire anybody to follow Mr.**

5   **Tripp?**

6       A.    Tesla contracted private investigators to

7   determine Mr. Tripp's whereabouts, yes.

8       Q.    **When did that occur?**

9       A.    Shortly after an email exchange between

10  Elon Musk and Mr. Tripp just -- just after I believe

11  when Mr. Tripp made some type of a statement which

12  was interpreted as a veiled threat saying something

13  to the effect of you're going to get what's coming

14  to you.  But I'm not positive.  I don't have the

15  email in front of me and I don't know that I saw it

16  or that I maybe only heard about it.  But there was

17  some type of an email where Tripp made a statement

18  that was interpreted as a possible threat and not

19  knowing necessarily what the implication was or what

20  Mr. Tripp meant and in the interest of safety of the

21  employees at Gigafactory, it was requested that

22  Tesla's security team determine with Mr. Tripp was

23  located so we had an early warning if he were to

24  approach the Gigafactory.  We also knew from our

25  investigation that he had attempted to sell a

1   firearm to another employee at the Gigafactory.  We

2   had also seen he had attempted online to sell

3   firearms-related material.  So when you do a threat

4   assessment you think here's an individual who is

5   possibly armed, who obviously does not seem to hold

6   a favorable opinion of the company based on his

7   actions to subvert its livelihood and success, who

8   failed to respond to directions when we asked him

9   not to continue his contact with Ms. Lopez after the

10  first interview and he blatantly disregarded those,

11  we assessed that it was -- it was possible that he

12  could have posed a threat.

13      Q.    How do you know he blatantly disregarded

14  your instructions to not communicate with Lopez

15  after the first interview?

16      A.    Because he told me in the second interview

17  that right after -- and one of the last things I

18  said to him in the first interview was you are still

19  under a nondisclosure agreement, please do not have

20  anymore contact with Ms. Lopez.  And he said okay, I

21  understand.  And then in the second interview when I

22  asked him, have you had contact with Ms. Lopez, he

23  said, yes, right after the interview I called her.

24  He didn't -- after something like that, that

25  situation where he had interviewed with us for

1      A.   No.

2         **Q.   Did you have any concerns -- well, did**

3  **anything in that interview give you any concern that**

4  **Mr. Tripp might do something violent?**

5         A.   So we understood a few indicators of his

6  background.  We had the -- we had the information

7  about, you know, selling the firearm or attempting

8  to sell a fireman, attempting to sell some related

9  material online, and, you know, we understood from -

10 - from interviews and from his work history and file

11 that he had been somewhat volatile, getting very

12 upset particularly when he disagreed with

13 colleagues, you know, he walked in with a backpack,

14 we didn't ask to look at the backpack or see

15 anything inside.  We allowed him to sit close to the

16 door which put our backs to the wall with only one

17 exit.  These are things you think about from a basic

18 security standpoint.  It wasn't anything

19 specifically with him about how we placed the room

20 but we try to make the interviewee feel as

21 comfortable as possible.  So I think you tend to

22 have that always in the back of your mind about

23 whether or not when it gets to the point in the

24 interview where the interviewee feels as though, you

25 know, they -- they may be in the wrong and it's

Case 3:18-cv-00296-LRH-CLB   Document 113-1   Filed 11/20/19   Page 16 of 25
Nicholas Cicirto - August 27, 2019 - NOT Assgn # 30275-3

Page 88

1  obvious and apparent they're in the wrong based on

2  where the questions are going, they may react, you

3  know, in a certain way.  So it had come to our

4  attention in the past he had become quite upset. So

5  I think you just think about those factors.

6        Q.  **Do you own a firearm?**

7        **MR. UMHOFER:**  Objection.  I instruct the

8  witness not to answer.  He's got a right to privacy.

9        **MR. FISCHBACH:**  Do you have a position on

10 that, Sean?

11       **MR. GATES:**  No, it's up to him.

12 **BY MR. FISCHBACH:**

13       **Q.  Is it your testimony that the mere fact of**

14 **owning a firearm is an indicator that you might be a**

15 **violent person?**

16       A.  I've never said that and that's not what I

17 am saying.

18       **Q.  I just wanted to make sure because --**

19       A.  What I'm discussing is the access to,

20 right, so we had, at least had an indication of

21 access to.  If we had no -- nothing to -- nothing to

22 suggest that there was access to, it doesn't mean

23 that he didn't, but it's at least on our mind,

24 right? We know it because it had come up in the

25 interviews so you can't just block that out.

**NAEGELI**
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

1    A.    During the interview?

2    **Q.    Yes.**

3    A.    I don't think anything during the

4  interview gave me that impression that I recall.

5  But that wasn't what I was basing my assessment on.

6  You look holistically.  That's what I was assessing,

7  looking holistically at the situation, not at a

8  single factor.

9    **Q.    And thank you for clarifying.**

10   A.    And I don't know that I suggested or that

11 my conclusion was that he was prone to violence

12 either.

13   **Q.    That's kind of what I'm getting at. Given**

14 **the holistic picture, by the time you completed this**

15 **interview of Mr. Tripp on June 15th, based on what**

16 **he had said, based on what your investigation**

17 **uncovered so far, had you made any conclusions that**

18 **he was prone to violence?**

19   A.    My conclusions were that he was a volatile

20 individual who appeared to have access to firearms

21 and obviously from what we were seeing was not

22 acting with Tesla's best interest in mind.  To put

23 myself in his mind-set would have been difficult but

24 what I do think, reflecting on that time, was that

25 it was difficult to know how he was going to react

1    to having been confronted and when he left that

2    interview knowing how he was going to handle the

3    ramifications of knowing that he had been caught in

4    his scheme.

5              MR. FISCHBACH:  Please read the last

6    question back to the witness.

7              (The record was read by the reporter.)

8         A.   I don't think we had concluded that he was

9    prone to violence, but I don't think we ruled

10   anything out considering we didn't know how he would

11   react to the ramifications of being caught in his

12   scheme and the weight of what might be the potential

13   consequences of that outcome.  We simply didn't

14   know.

15             (Deposition Exhibit 10 was marked for

16   identification.)

17   BY MR. FISCHBACH:

18        Q.   Sir, the court reporter has handed you

19   what's been marked as Deposition Exhibit 10.  Have

20   you ever seen this email before?

21        A.   I believe so, or it was read to me.

22        Q.   Subsequent to this email from Mr. Tripp to

23   Elon Musk, did you communicate with Mr. Tripp?

24        A.   I did.

25        Q.   How did you communicate with him?

```
1         Q.    Okay.  Can you tell us what it is?
2         A.    I mean, it appears to be -- it's a
3    printout of the -- it's the -- sorry, it's the --
4    it's a printout of his Excel spreadsheet that was
5    also on his cell phone.
6         Q.    That's Mr. Tripp's spreadsheet?
7         A.    Correct.
8         Q.    If we just -- so the first page is the
9    cover email, that's to you, correct?
10        A.    Correct.
11        Q.    Second page is the Excel spreadsheet that
12   we saw a picture of on his phone?
13        A.    Yes.
14        Q.    The third page is another tab that has
15   some values on it, correct?
16        A.    Correct.
17        Q.    And then the last two pages are entitled
18   Query that I Run?
19        A.    Yes.
20        Q.    What did he explain that last page to be?
21        A.    The last page is -- I have two pages.
22        Q.    Last two pages, sorry.
23        A.    Last two pages, okay.  It's -- so what he
24   stated was to provide proof to Linette Lopez that he
25   was acquiring the data from our system, he showed
```

1   her a copy of the exact query that he ran -- that he

2   wrote and ran on our system to extract the data that

3   populates his spreadsheet.

4       Q.    After your interview with Mr. Tripp on the

5   14th, did you do anything with that spreadsheet?

6       A.    Yes.

7       Q.    What did you do?

8       A.    Well, we -- we analyzed it, I mean from a

9   forensic standpoint we looked at it, we looked at

10  this code and query.  And one of the things that was

11  -- a couple of things stood out.  One of the things

12  just on face value that's particularly concerning

13  about this is that he's providing a specific query

14  that can be run on our system and he's sending that

15  to a third party, which would enable them to

16  essentially provide that to anyone who with access

17  to our system could run an identical query and

18  extract this data at any point in time.  So it

19  essentially does provides persistent access if Ms.

20  Lopez or whatever third party that document was

21  shared with just repeated this query on our system

22  even after Mr. Tripp was gone, right?  So it's the

23  blueprint to extract the particular data that he

24  used for his query.  Even without necessarily the

25  technical knowledge to write the query themselves,

1   somebody has the blueprint to do it here.

2           The second thing that jumped out at us

3   when I opened the spreadsheet on the laptop we were

4   using to look at this, a message that popped up that

5   said macros were enabled but it was unable to

6   connect to the host or something to that effect.  I

7   can't remember exactly what that message said.  The

8   implication was that something in this document was

9   attempting to call out and send information and that

10  was particularly concerning because it looked as

11  though the spreadsheet that he had used or he had

12  created was attempting to send a signal.

13       Q.   **Send a signal out of the spreadsheet you**

14  **mean?**

15       A.   Right, transfer the data somewhere.

16       Q.   **Transfer the data in the spreadsheet?**

17       A.   To an unknown location, I mean, enabling

18  the macros and being unable to connect to a host was

19  concerning, whatever the statement was, I don't

20  remember how, but whatever it was to myself, to our

21  forensic experts, to the Tesla IT staff was

22  concerning enough to then look for whether or not

23  there was a persistent query that was running and

24  pushing data outside the system.

25       Q.   **Going back to the interview with Mr.**

1     Q.    Okay.  But you do recognize it as a text

2  message that Mr. Uhlmann sent?

3     A.    Yes.  And it looks like, as far as what I

4  recall, it's a message that he sent to a reporter.

5     Q.    Okay.  So this is a text message that he

6  sent to a reporter and then he provided it to you?

7     A.    Yes, I believe.  It's -- it looks like --

8  it looks like his screen from his phone from what I

9  recall.

10     Q.    Okay.  So let me do a couple more clips

11  from the interview with Mr. Uhlmann.

12          MR. FISCHBACH:  Same objection as before.

13          MR. GATES:  Understood.

14  BY MR. GATES:

15     Q.    So once again, this is TES TRIPP

16  underscore 0017327.  It's a recording and I'm going

17  to start at a minute 34 and 41 seconds.

18          (Audio played.)

19  BY MR. GATES:

20     Q.    Is that a portion of the recording of the

21  interview with Mr. Uhlmann?

22     A.    Yes.

23     Q.    And he mentions $50,000?

24     A.    Yes --

25     Q.    Did you hear that?

```
 1      A.    -- I heard it.
 2      Q.    You testified earlier that you had heard
 3   that number from somewhere else as well?
 4      A.    Yes.  I recall that I heard that through
 5   the course of the investigation interviewing others,
 6   although I can't recall exactly who provided the
 7   dollar figure, but it wasn't -- from my recollection
 8   it wasn't just Mr. Uhlmann who mentioned that
 9   mentioned that -- mentioned that coming from Mr.
10   Tripp.
11      Q.    Okay.  I'm going to play another clip from
12   the interview starting at mark 1 hour 31 minutes and
13   34 seconds.
14            MR. FISCHBACH:  Same objections as before.
15            (Audio played.)
16   BY MR. GATES:
17      Q.    In that portion of the interview -- first
18   of all, that was a portion of the interview,
19   correct?
20      A.    Yes.
21      Q.    Who was asking the questions?
22      A.    Justin Zeefe and myself.
23      Q.    Two more clips.  Okay.  Next clip is from
24   mark 1 hour 37 minutes and 32 seconds.
25            (Audio played.)
```

```
 1  BY MR. GATES:

 2       Q.   Was that clip from the interview with Mr.

 3  Uhlmann?

 4       A.   Yes.

 5       Q.   And who was asking the questions?

 6       A.   Justin Zeefe and myself.

 7       Q.   Who was answering the questions?

 8       A.   Mr. Uhlmann.

 9       Q.   Okay.  Last one.  This is starting at 1

10  hour 57 seconds and -- excuse me, 1 hour 57 minutes

11  and 50 seconds.

12            (Audio played.)

13  BY MR. GATES:

14       Q.   Was that a portion of the recording of the

15  interview with Mr. Uhlmann?

16       A.   Yes.

17       Q.   Who was speaking in that portion?

18       A.   Mr. Uhlmann, Justin Zeefe.

19       Q.   Can you find Exhibit 3 in your pile there.

20            MR. FISCHBACH:  What is that John, the

21  damages?

22            MR. GATES:  The damages report, yeah.

23       A.   Okay.

24  BY MR. GATES:

25       Q.   And if you kind of flip to the back
```

**NAEGELI**
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

```
1                        CERTIFICATE

2

3            I,  Terri L. Huseth,  do hereby certify that

4    I reported all proceedings adduced in the foregoing matter

5    and that the foregoing transcript pages constitutes a

6    full, true and accurate record of said proceedings to the

7    best of my ability.

8

9            I further certify that I am neither related

10   to counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13           IN WITNESS HEREOF, I have hereunto set my

14   hand this 4th day of September, 2019.

15

16

17   _____

18           Terri L. Huseth

19

20

21

22

23

24

25
```