# Exhibit 11 - David Arnold Deposition Excerpts

**CONFIDENTIAL - David Arnold - 6/6/2019**

Page 1

```
             UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
_____
TESLA, INC., a Delaware    )
corporation,               )
                           )
         Plaintiff,        )
                           )
v.                         )     Case No.
                           )  3:18-CV-00296-LRH-CBC
MARTIN TRIPP, an           )
individual,                )
                           )
         Defendant.        )
_____)
MARTIN TRIPP, an           )
individual,                )
                           )
    Counterclaimant,       )
                           )
v.                         )
                           )
TESLA, INC., a Delaware    )
corporation,               )
                           )
    Counterdefendant,      )
_____)
```

CONFIDENTIAL

Videotaped Deposition of David Arnold

Palo Alto, California

Thursday, June 6, 2019

Michael P. Hensley, RDR, CSR No. 14114

**Depo Dynamics, LLC**
**(888) 494-3370**

f30c01d1-40f2-4cbc-949c-e1cebbe8b9ef

**CONFIDENTIAL - David Arnold - 6/6/2019**

Page 15

```
 1   Q.      Do you recall receiving a copy of this email
 2   communication?
 3   A.      I do.
 4   Q.      And you know, of course, that Julia Wong is a
 5   reporter with The Guardian?
 6   A.      Yes.
 7   Q.      And in the first paragraph, there's a statement
 8   with a heading that says "Attributed to a Tesla
 9   spokesperson."
10           Quote, "This afternoon we received a phone call
11   from a friend of Mr. Tripp telling us that Mr. Tripp
12   would be coming to the Gigafactory to," quote, "shoot
13   the place up," period, end of quote.
14           "Police had been notified and actions are being
15   taken to enhance security at the Gigafactory," period,
16   end of quote.
17           This -- you understand this to be the official
18   statement of Tesla with respect to the incident that was
19   reported on June 20, 2018, concerning Mr. Tripp; right?
20   A.      Correct.
21   Q.      And this -- were you aware -- do you have
22   knowledge as to whether this was the first time this
23   statement was released to the press?
24   A.      I believe that it was.
25   Q.      You're aware that this statement was actually
```

```
 1   released by Tesla to the press multiple times over the
 2   course of several days; right?
 3   A.      That's correct.
 4   Q.      At the time that this was released, at 5:55 P.M.
 5   on the evening of June 20th, 2018, were you in the
 6   Palo Alto office?
 7   A.      I don't believe so.  I think I was in our
 8   Dunbarton office which -- it's closer to Fremont.
 9   Q.      All right.  And you were in California?
10   A.      I was.
11   Q.      You were not in the Gigafactory in Nevada?
12   A.      I was not.
13   Q.      When was the first time on June 20th that you
14   became aware of this matter?  Let's call it that.
15   A.      "This matter" as in what's described in the
16   statement?
17   Q.      Yes, sir.
18   A.      I believe it was -- there was an email exchange
19   prior to this email.  The reporter Julia Wong had
20   emailed Elon directly along with a couple other members
21   of the press team, and he responded making it clear that
22   a threat had been made.  That was the first time that I
23   was aware of it.
24   Q.      All right.  So your first awareness was from
25   Mr. Musk release to the press?
```

1  Q.     All right.  What do you recall about how this
2  took place?
3  A.     The creation of this background information
4  actually pre-dated this, for the most part, by quite a
5  bit because this was all -- or largely copied directly
6  from the responses that we provided to an article that
7  appeared in Business Insider, and I think that had been
8  a couple weeks prior.  So this wasn't all created right
9  then.
10 Q.     What was the role of the communication
11 department in creating the statement attributed to a
12 Tesla spokesperson about the phone call incident?
13 A.     Sarah -- my understanding is that Sarah then
14 contacted our security team -- which would have been, I
15 assume, either Jeff Jones or Nick Gicinto -- to verify
16 and get that information.
17 Q.     How do you know she did that?
18 A.     I've seen documents, her response to a question,
19 indicating that she did that.  And also that would be
20 our typical practice.
21 Q.     Okay.  Did you speak with anyone in the security
22 team about this matter on the evening of June 20th?
23        MS. LIBEU:  Objection.  Vague and ambiguous.
24        THE WITNESS:  I -- prior to this -- I don't know
25 the answer to that.  I assume I would have spoken with

```
 1   them at some point later that day.  I don't know if it
 2   was prior to the release of the statement or not.
 3   BY MR. MITCHELL:
 4   Q.      Okay.  Again, I don't want you to speculate or
 5   assume.  If you can recall, tell me.  If you can't
 6   recall, just simply say "I don't know."
 7   A.      I can't recall.
 8   Q.      All right.  Did you have any personal input into
 9   this statement attributed to a Tesla spokesperson?
10   A.      I did not.
11   Q.      Now, do you know who did other than Ms. O'Brien?
12   A.      Input into the creation of it?
13   Q.      Yes, sir.
14   A.      It would have been the security team.
15   Q.      Did the communications department at Tesla have
16   a procedure for how to deal with a violence threat
17   situation?
18   A.      Not specifically a violence threat situation,
19   but we deal with, you know, time sensitive media
20   responses with some degree of regularity.
21   Q.      Okay.
22           MR. MITCHELL:  Would you mark this, please.
23           (Exhibit 3 was marked for identification.)
24           THE REPORTER:  This is Exhibit 3.
25                           ///
```

```
 1   immediately provide that to anybody who called them?
 2   A.      No.  This is a way to contact the communications
 3   team at Tesla.
 4   Q.      Okay.  And just again to tie the loose ends, for
 5   what purpose?
 6   A.      If you have a media inquiry and you would like a
 7   response from Tesla or like us to consider giving a
 8   response.  This is the way to reach the communications
 9   team at Tesla.
10   Q.      Okay.  Are you aware if Mr. Musk's statement in
11   the email you're looking at was used in -- as the basis
12   to form the Tesla official statement that was released
13   to the press first by Ms. O'Brien and later by you and
14   others?
15   A.      I -- my understanding is it wasn't his
16   statement -- that this particular message that was used
17   as the basis.  But I think he was operating from the
18   same set of facts that were used to create what we
19   eventually sent out to media as our statement
20   attributable to a Tesla spokesperson.
21   Q.      In the Tesla spokesperson statement, it has a
22   quoted clause that says, quote, "shoot the place up,"
23   end of quote.
24           Can you tell me where that came from?
25   A.      I believe that that was -- I don't know where
```

**CONFIDENTIAL - David Arnold - 6/6/2019**

Page 56

```
 1   Gigafactory that was issued in Exhibit 2?
 2   A.      It was.
 3   Q.      And did you think, at the time that the comms
 4   team put out the statement about the Gigafactory threat,
 5   that the call was a credible threat?
 6   A.      We did, and it was both for the reasons I stated
 7   earlier, you know, but the fact that Ms. O'Brien had
 8   looked into the matter with security.  But also, I mean,
 9   when you take in the totality of the all the
10   circumstances, you know, Mr. Tripp had leaked
11   information to a reporter.
12           He was -- there was an investigation.  He was
13   interviewed, said initially that it was not him who did
14   it.  Then it was determined that he did do it.  Then he
15   was fired.  Then we filed a lawsuit.  Then he emailed
16   Elon out of the blue with what seemed like a rather
17   threatening email, and then was lying to media saying
18   that in fact it was Elon who had emailed him first.
19           So when you take sort of the totality of all
20   those circumstances, the notion that then in addition to
21   that there was a threat, you know, involving Mr. Tripp,
22   that seemed extremely credible to us.
23   Q.      And I want to take those piece by piece for just
24   a little bit.  So you mentioned there was a leak from
25   inside the Gigafactory to Lynette Lopez; right?
```

```
 1   A.      Correct.
 2   Q.      And did that factor into your analysis as to
 3   whether you thought the threat to the Gigafactory was
 4   credible?
 5   A.      It did.
 6   Q.      And how so?
 7   A.      Well, in the sense that this seemed, at least
 8   from my advantage point, like a malicious leak, because
 9   there was information in there that we thought was
10   incorrect.  And, again, it ultimately resulted in his
11   termination which, you know, personally I can imagine it
12   would be -- you know, that would be upsetting to be
13   terminated.  And it made sense that, you know, if you
14   later heard about a threat being made, that seemed to
15   make sense as concerning as it was.
16   Q.      And did the fact that Mr. Tripp was terminated
17   or his employment was terminated from Tesla factor into
18   your analysis as to whether you thought the Gigafactory
19   threat was credible?
20   A.      It did.
21   Q.      And how so?
22   A.      For the same reason I just stated.  It's -- you
23   know, it would not be an enjoyable experience to be
24   terminated, and I think if you -- I -- one could assume
25   that it would, you know, engender hard feelings against
```

**CONFIDENTIAL - David Arnold - 6/6/2019**

Page 58

```
 1    the company.
 2    Q.      And you also mentioned, I think, earlier that
 3    Mr. Tripp initially lied about being the source of the
 4    Gigafactory threat; right?
 5    A.      Yes.
 6    Q.      Did that factor into your analysis as to whether
 7    you felt the threat to -- actually, let me rephrase.
 8            You mentioned that Mr. Tripp initially lied
 9    about being the source of Lynette Lopez's article; isn't
10    that right?
11    A.      Correct.
12    Q.      And does that factor into your analysis as to
13    whether you felt the threat to the Gigafactory was
14    credible?
15    A.      Yes.
16    Q.      How so?
17    A.      Well, you know, my feeling is if he were a
18    whistleblower, he would not, you know, lie about that.
19    It showed to me he had different motives.
20    Q.      And you also mentioned that Tesla sued
21    Mr. Tripp; right?
22    A.      Correct.
23    Q.      Did the fact of that lawsuit factor into your
24    analysis before the comms team issued the PR statement
25    about the Gigafactory threat, as to whether that threat
```

**CONFIDENTIAL - David Arnold - 6/6/2019**

Page 59

```
 1   was credible?
 2   A.      I did.
 3   Q.      How so?
 4   A.      Well, again, I think I can imagine if you are an
 5   individual and you are sued by a company, you might have
 6   hard feelings about that or be concerned or distraught
 7   in some way.
 8   Q.      And you also mention that had Mr. Tripp sent a
 9   threatening email to Mr. Musk; right?
10   A.      Correct.
11   Q.      And does that factor into your analysis as to
12   whether you thought the Gigafactory threat was credible?
13   A.      Yes.
14   Q.      How so?
15   A.      Well, if someone sends a threatening email to
16   your CEO out of blue, and then you learn at the same
17   time that there was a, you know, threat made or reported
18   into the Gigafactory, that's not a big leap to make.
19   Q.      And looking back at Exhibit 2, there's a --
20   there's two components here; right?  There's a section
21   that is attributed to a Tesla spokesperson and a section
22   that's on background; right?
23   A.      Correct.
24   Q.      Do you see that?
25           Earlier, you testified, I believe -- when
```

```
 1   STATE OF CALIFORNIA )
                         ) ss.
     COUNTY OF ALAMEDA   )
 3        I, Michael Hensley, Certified Shorthand Reporter,
 4   Registered Diplomate Reporter, in and for the State of
 5   California, Certificate No. 14114,
 6   do hereby certify:
 7        That the witness in the foregoing deposition was by
 8   me first duly sworn to testify to the truth, the whole
 9   truth, and nothing but the truth in the foregoing cause;
10   that said deposition was taken before me at the time and
11   place herein named; that said deposition was reported by
12   me in shorthand and transcribed, through computer-aided
13   transcription, under my direction; and that the
14   foregoing transcript is a true record of the testimony
15   elicited and proceedings had at said deposition.
16        I do further certify that I am a disinterested
17   person and am in no way interested in the outcome of
18   this action or connected with or related to any of the
19   parties in this action or to their respective counsel.
20        In witness whereof, I have hereunto set my hand
21   this 13th day of June, 2019.
22
23   _____
     Michael Hensley, CSR NO. 14114
24
25
```