# Exhibit 14 - Sarah O'Brien Deposition Excerpts

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

_____
TESLA, INC., a Delaware        )
corporation,                   )
                               )
         Plaintiff,            )
                               )
v.                             )        Case No.
                               )    3:18-cv-00296-LRH-CBC
MARTIN TRIPP, an               )
individual,                    )
                               )
         Defendant.            )
_____)
MARTIN TRIPP, an               )
individual,                    )
                               )
    Counterclaimant,           )
                               )
v.                             )
                               )
TESLA, INC., a Delaware        )
corporation,                   )
                               )
    Counterdefendant,          )
_____)


CONFIDENTIAL

Videotaped Deposition of Sarah O'Brien

Menlo Park, California

Wednesday, June 5, 2019



Michael P. Hensley, RDR, CSR No. 14114

**CONFIDENTIAL - Sarah O'Brien - 6/5/2019**

Page 20

```
 1   Q.      Okay.  And the -- the quote that you're pointing
 2   to or directing me to says "This afternoon we received a
 3   telephone call from a friend of Mr. Tripp telling us
 4   that Mr. Tripp would be coming to the Gigafactory to,
 5   quote, 'shoot the place up,' end of quote.  Police have
 6   been notified and actions are being taken to enhance
 7   security at the Gigafactory," end of quote.
 8           Can you tell me --
 9           MS. LIBEU:  Just for the record, I -- I think
10   you said telephone call.  It actually says "phone call,"
11   but otherwise I think you read that correctly.
12   BY MR. MITCHELL:
13   Q.      Can you tell me who author -- who authored that
14   quote?
15   A.      It would have been myself, with the help of
16   legal.  And potentially Dave Arnold.
17   Q.      Who is Dave Arnold?
18   A.      He -- he is the -- I'm trying to think of what
19   his job title was at the time -- the director of
20   corporate communications.
21   Q.      And so do you think you initiated the original
22   draft of that statement?
23   A.      I can't remember.
24   Q.      If you didn't, do you have a understanding of
25   who would have done that?
```

7510e958-db9e-47e5-83ce-7749a8b79d37

**CONFIDENTIAL - Sarah O'Brien - 6/5/2019**

Page 21

```
 1   A.       It would have been one of the three of us.
 2   Q.       And the three of you being who?
 3   A.       Be myself; legal, Todd Maron; and Dave Arnold.
 4   Q.       Tom Maron is legal?
 5   A.       Todd.
 6   Q.       Todd Maron?
 7   A.       Yeah.
 8   Q.       Okay.  And before you sent this email to
 9   Ms. Wong, what did you do to ascertain the veracity
10   of -- of this statement?
11   A.       So from -- from memory, I would have spoken to
12   security.  At the time it would have been -- yeah.  I
13   would have spoken to the security team.  I would have
14   spoken to legal.
15   Q.       What would legal be able to have told you to
16   verify the accuracy of this?
17            MS. LIBEU:  I'm going to -- don't dis- -- don't
18   reveal conversations you've had with counsel, that those
19   are privileged.
20            MR. MITCHELL:  Fair enough.
21            MS. LIBEU:  But I --
22            MR. MITCHELL:  Let me ask this a different way.
23   BY MR. MITCHELL:
24   Q.       Did you go to legal to verify the accuracy of
25   that statement?
```

Depo Dynamics, LLC
(888) 494-3370

7510e958-db9e-47e5-83ce-7749a8b79d37

```
 1   A.      No.  It would have been to the security team.
 2   Q.      All right.  And who on the security team did you
 3   speak with?
 4   A.      I can't remember.
 5   Q.      Okay.  Are there more than one -- during this
 6   time period in June of 2018, were there more than one
 7   spokesperson for Tesla, or were you the exclusive
 8   spokesperson?
 9   A.      Anyone that worked in the comms department.  At
10   the time there would have been 40 people would be
11   classified as spokespeople.
12   Q.      And did they work at the some -- same location
13   as you?
14   A.      No.
15   Q.      During this time period where were you based?
16   A.      Fremont.
17   Q.      Okay.  How many people in the communications
18   department worked at that location with you, of the 40
19   you described?
20   A.      10 to 12, I think.
21   Q.      What people in the communications department
22   were involved with you in determining what statements to
23   make to the public in -- on -- on or about June 20,
24   2018, related to Martin Tripp?
25   A.      Dave Arnold, who I've mentioned; Gina Antonini;
```

```
 1   so --
 2            MR. MITCHELL:  Can I finish with the -- the two
 3   questions that I have related to this quote?
 4            MS. LIBEU:  Yes, you can finish with the two
 5   questions you have.
 6            MR. MITCHELL:  All right.
 7   BY MR. MITCHELL:
 8   Q.       Ms. O'Brien, you see that in the bottom quote it
 9   says "I was just told we received a call at the
10   Gigafactory that he was going to come back and shoot
11   people."
12            Isn't that very similar to what -- a quote is
13   used in the "attributed to a Tesla spokesperson" above?
14   A.       They both have the word "shoot."
15   Q.       Right.  And -- and the quote that Mr. Musk used
16   was "shoot people."  How did that become "shoot the
17   place up" in the above quote?
18            Do you remember who changed those words?
19   A.       I believe that's what the information that we
20   received from the security team.
21            MR. MITCHELL:  All right.  This would be a good
22   time for a break.
23            MS. LIBEU:  Okay.
24            THE VIDEOGRAPHER:  We are going off the record
25   at approximately 5:50 P.M.
```

CONFIDENTIAL - Sarah O'Brien - 6/5/2019

Page 63

```
 1   I felt that the information was accurate.
 2   Q.      Okay.  But how did you get your understanding
 3   that the sheriff had discussions with Mr. Musk about
 4   this?
 5   A.      Not -- not the sheriff, the security team.
 6   Q.      The security team.
 7   A.      Yeah.
 8   Q.      All right.  Now, let's -- because you -- you
 9   made a distinction between the two exhibits, let's turn
10   back to Exhibit Number 1.
11   A.      Yeah.  And doing that just because in my -- in
12   my world a statement is the -- attributed to a Tesla
13   spokesperson in quotes.  So that's -- that's why I'm
14   kind of separating them out.
15   Q.      Okay.  And -- and that's fine with me--
16   A.      Right.
17   Q.      -- you clarified.  So thank you.
18   A.      Yeah.
19   Q.      Now, with respect to Exhibit 1 and the statement
20   that was attributed to a Tesla spokesperson, let me ask
21   you the same question.
22           Did -- did you have any thoughts at the time you
23   sent this email that we, perhaps, should wait until the
24   sheriff's office had completed their investigation
25   before disclosing Mr. Trip's identity?
```

1  A.      No.
2  Q.      And why not?
3  A.      Because an email had already been sent, with
4  that information in there, to a journalist.  And I had
5  spoken to the security team and had got the information
6  from them.
7  Q.      So are you basically saying the cat was out of
8  the bag and --
9          MS. LIBEU:  Objection.  Argumentative.
10 Mischaracterizes prior testimony.
11 BY MR. MITCHELL:
12 Q.      You can answer.
13 A.      I'm saying that if I -- I'd gotten the
14 information from the subject matter experts, who were
15 the security team, and I felt that the information in
16 the statement was accurate.
17 Q.      The information in the statement was accurate
18 insofar as Mr. Tripp was the person that was going to be
19 coming to the Gigafactory?
20 A.      The -- the information in terms of that they
21 received a phone call from a friend telling us that
22 Mr. Tripp.
23 Q.      Did you not feel, based upon your journal -- or
24 your communications experience as -- did you have any
25 sense as to whether it was responsible or irresponsible

```
 1   Q.    Okay.  What can you tell me about that, when you
 2   say "I believe so"?
 3   A.    I -- I -- I had spoken to security -- the
 4   security team a number of times during this time, to,
 5   obviously, get as much detail as possible.  I just can't
 6   remember the exact parts of those conversations.
 7   Q.    Can you remember any parts here today, as you
 8   testify under oath?
 9   A.    More just -- I -- I think everything that I've
10   said so far, really.
11   Q.    Do you know what was ultimately concluded, if
12   anything, by any internal investigation of Tesla -- by
13   Tesla, as to who made the call?
14   A.    I can't remember.
15   Q.    Do you -- do you recall ever having been told
16   what the conclusions were of Tesla's investigation,
17   whether you recall the details or not?
18   A.    I don't.
19   Q.    Did you have concerns, when this matter was
20   reported to you, that the call center -- the phone call
21   was not recorded by Tesla?
22   A.    I can't remember.
23   Q.    Did that cross your mind?
24   A.    No.
25   Q.    In your statement, the official statement you
```

```
 1  put out, again, you used this term, quote/unquote,
 2  "shoot the place up."
 3          Was that the statement that came directly from
 4  Shamara Bell?
 5  A.      That's the information I got from the security
 6  team, who I believe spoke to Shamara Bell.
 7  Q.      Okay.  Who -- who on the security team gave that
 8  information?
 9  A.      I was talking to -- at the time there was a chap
10  called Jeff Jones and another guy called Nick.  It would
11  have been one of them --
12  Q.      Okay.  But you don't recall who told you --
13  A.      -- but I can't remember which one.  Yeah.
14  Q.      All right.
15          But it would have been one of those two that
16  told you that was the exact language Ms. Bell used?
17  A.      Yes.
18  Q.      I think you indicated you may have subsequently
19  had a conversation with Ms. Bell.
20  A.      Yes.
21  Q.      Did you ask her if the terminology that was used
22  in the phone call was, quote, "shoot the place up," end
23  of quote?
24  A.      I can't -- I can't remember, but I don't think
25  so, just because of the nature of the conversation that
```

```
 1   we were having wasn't on the actual specifics.  It was
 2   more because at that point media didn't believe us that
 3   a phone call had even taken place.  So we were --
 4   that's -- that's why I was calling her, to address that.
 5   Q.      Did you at any time, either before this press
 6   release was issued or afterwards, attempt to verify the
 7   use of those words, "shoot the place up"?
 8   A.      I would have done with the security team.
 9   Q.      Okay.  And when -- when you say you would have
10   verified, what did that entail?
11   A.      I can't -- I can't remember.  It could have been
12   a -- an email or a phone conversation, to try and get
13   the accurate information for this, for the statement.
14   Q.      But do you recall specifically that you tried to
15   verify that language, "shoot the place up"?
16   A.      I believe so.
17   Q.      In your statement, why did Tesla use -- place
18   the phrase "shoot the place up" in quotations?
19   A.      I can't remember specifically, but I -- I
20   believe it's because that's what we believed was said as
21   part of the phone conversation.
22   Q.      Did you make the decision to put that language
23   in quotes?
24   A.      I can't remember.
25   Q.      Do you know who would have made that decision?
```

```
 1         Exhibit 1 is your authorship, the "attributed to
 2    a Tesla spokesperson."  We already talked about that;
 3    right?
 4    A.     Yes.
 5    Q.     And that's the same language you use in your
 6    email that we've been looking at that's Exhibit 4 --
 7    A.     Yes.
 8    Q.     -- isn't that correct?
 9    A.     Yeah.
10    Q.     But that is not the language that Mr. Musk used
11    in his email that we looked at, which is Exhibit
12    Number 2 --
13    A.     Yes --
14    Q.     -- correct?
15    A.     -- correct.
16           THE REPORTER:  Remember to wait for the full
17    question.
18           THE WITNESS:  Sorry.
19    BY MR. MITCHELL:
20    Q.     So what I want to understand, Ms. O'Brien, is
21    who came up with the term, quote, "shoot the place up,"
22    end of quote?
23    A.     That was the information that we got from the
24    security team.
25    Q.     And do you have any idea -- okay.
```

```
 1            So are you telling me that somebody on the
 2   security team used those exact words to you?
 3   A.       Yes.
 4   Q.       And who used those exact words to you?
 5   A.       It would have either -- either been Jeff or
 6   Nick.  I can't remember which one.
 7   Q.       But it was definitely one or the other used
 8   those exact words?
 9   A.       Yeah.
10   Q.       And that's why you put it in quotes within the
11   quote that you released?
12   A.       Yes.
13            MS. LIBEU:  Can we take a break whenever it's
14   convenient?
15            MR. MITCHELL:  Anytime you'd like.
16            MS. LIBEU:  How about let's do one now.
17            THE VIDEOGRAPHER:  We are going off the record
18   at approximately 6:52 P.M.
19            (A break was taken.)
20            THE VIDEOGRAPHER:  We are back on the record at
21   approximately 6:59 P.M.
22            MR. MITCHELL:  Thank you.  I think, before the
23   break, you had suggested that we consider whether or not
24   to take a dinner break.  What -- what are your thoughts
25   after conferring with the witness?
```

```
 1   STATE OF CALIFORNIA )
                         ) ss.
     COUNTY OF ALAMEDA   )
 3        I, Michael Hensley, Certified Shorthand Reporter,
 4   Registered Diplomate Reporter, in and for the State of
 5   California, Certificate No. 14114,
 6   do hereby certify:
 7        That the witness in the foregoing deposition was by
 8   me first duly sworn to testify to the truth, the whole
 9   truth, and nothing but the truth in the foregoing cause;
10   that said deposition was taken before me at the time and
11   place herein named; that said deposition was reported by
12   me in shorthand and transcribed, through computer-aided
13   transcription, under my direction; and that the
14   foregoing transcript is a true record of the testimony
15   elicited and proceedings had at said deposition.
16        I do further certify that I am a disinterested
17   person and am in no way interested in the outcome of
18   this action or connected with or related to any of the
19   parties in this action or to their respective counsel.
20        In witness whereof, I have hereunto set my hand
21   this 13th day of June, 2019.
22
23   _____
     Michael Hensley, CSR NO. 14114
24
25
```