1  Robert D. Mitchell (*admitted pro hac vice*)
   William M. Fischbach III (*admitted pro hac vice*)
2  Fletcher R. Carpenter (*admitted pro hac vice*)
   Jason C. Kolbe, Nevada Bar No. 11624
3  Kevin S. Soderstrom, Nevada Bar No. 10235
4
   **TB** **TIFFANY & BOSCO**
                    **P.A.**
5
   Camelback Esplanade II, Seventh Floor
6  2525 East Camelback Road
   Phoenix, Arizona 85016-4229
7  Telephone: (602) 255-6000
   Fax: (602) 255-0103
8  E-mails: rdm@tblaw.com; wmf@tblaw.com;
   frc@tblaw.com; jck@tblaw.com; kss@tblaw.com
9
10
   Counsel for Defendant/Counterclaimant Martin Tripp
11
12            **UNITED STATES DISTRICT COURT**
13               **DISTRICT OF NEVADA**

| | |
|---|---|
| TESLA, INC., a Delaware corporation, | Case No. 3:18-cv-00296-LRH-CBC |
| Plaintiff, | **DEFENDANT/COUNTERCLAIMANT** |
| | **MARTIN TRIPP'S REPLY IN SUPPORT** |
| vs. | **OF MOTION TO COMPEL** |
| | **DEPOSITION OF ELON MUSK** |
| MARTIN TRIPP, an individual, | |
| Defendant. | |
| MARTIN TRIPP, an individual, | **ORAL ARGUMENT REQUESTED** |
| Counterclaimant, | **PER LR 78-1** |
| vs. | |
| TESLA, INC., a Delaware corporation, | |
| Counterdefendant | |

**I.     This Court has already determined that the apex rule does not apply because the statements giving rise to Tripp's counterclaims originated from Musk.**

Most of Tesla's response is dedicated to exalting the apex rule[1] despite the Court's admonition exactly one year ago that it didn't apply in this case.  At the December 3, 2018 telephonic case management conference in this case, the Court made the following statement for the record:

> That takes us, then, to the deposition of Elon Musk.  Let me state this for the record*.  **I do not believe that he would fall within the apex rule**.  And the reason for that is this is not a case where a corporation is being sued in relation to something that this particular individual doesn't have personal knowledge of.  The very allegations that, as I read them, in the counterclaim particularly relate specifically to statements, emails, tweets that came directly from Mr. Musk.  So, to the extent that he has personal knowledge of the actions taking place in this case and, in particular, the fact that his own statements, as I understand them, are what raised the basis for the defamation and false-light claims themselves, that makes this different than most cases where the apex rule has been used to prevent the deposition of a CEO or other high level corporate executive.  **So, in this particular case, I do not agree that he would be protected under the apex rule**.

Transcript of December 3, 2018 Telephonic Case Management Conference, ECF No. 102 at 25:14-26:4 (emphasis added).  The Court went on to note that it would not want "an extensive deposition; we're not going to allow the deposition to be taken in Kansas or something to, you know, somehow harass or otherwise take away Mr. Musk from his daily activities as the CEO of Tesla." *Id.* at 26:5-9.  But nothing in Tesla's response undermines the Court's original observation that the apex rule is inapplicable here.

The apex rule is an outgrowth of Rule 26(c)(1) and state rule equivalents.  Rule 26(c)(1) provides generally that a court "may, for good cause, issue an order to protect a

---

[1] The apex rule is not a "rule" per se, as it appears nowhere in state or federal procedural rules.  *See, e.g., In re Alcatel USA, Inc.*, 11 S.W.3d 173, 181 (Tex. 2000) (Enoch, J., dissenting) (noting that the apex rule was a creation of "judicial fiat").  The "Ninth Circuit has not yet recognized" the apex rule.  *U.S. Commodity Futures Trading Comm'n v. Banc de Binary, Ltd.*, 2:13-CV-992-MMD-VCF, 2015 WL 556441, at *2 (D. Nev. Feb. 11, 2015).

party or person from annoyance, embarrassment, oppression, or undue burden or expense." An early "progenitor" of the apex rule was a 1988 case in which the Texas Supreme Court halted the plaintiff's efforts to depose Sam Walton, then Chairman of the Board of Walmart, on a slip-and-fall accident that occurred in a Texas Walmart and which Walton had no knowledge of and no involvement in.  *In re Miscavige*, 436 S.W.3d 430, 435 (Tex. App. 2014) (citing *Wal-Mart Stores, Inc. v. St.*, 754 S.W.2d 153 (Tex. 2008)).   Under such circumstances, the propriety and necessity of the apex rule is self-evident.

But here, Musk is the primary tortfeasor.  Tripp's defamation and false light invasion of privacy claims are predicated on four statements.[2]   Musk made the first three statements directly in his capacity as Tesla's CEO.  Although the fourth statement came from Tesla's communications team, it merely echoed what Musk himself had already told the press. Tesla cannot cite any case in which the apex rule was applied to bar, or even limit, the deposition of the primary tortfeasor just because he or she happened to be a "high level executive."  The apex rule exists to protect "an executive whose only connection with the matter is the fact that he is the CEO of the defendant," but not does not apply to a CEO "alleged to be highly involved" in the conduct at issue.  *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 127 (D. Md. 2009).  The latter is the case here with Musk.

Musk's statements also make him a key witness at trial.  The apex rule applies "to depositions, not trial testimony, which makes sense, because the rule finds its origin in Rule 26's limitations on burdensome discovery."  *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins.*

---

[2] (1) Musk's June 17, 2018 e-mail to all Tesla employees claiming that Tripp "had conducted quite extensive and damaging sabotage to [Tesla's] operations" and suggesting that Tripp was associated or otherwise working with an outside third-party "organization" to intentionally "cheat" or "sabotage" Tesla.  Counterclaim at ¶ 47-51; (2) Musk's June 20, 2018 e-mail to The Guardian claiming that Tesla "received a call at the Gigafactory [stating] that [Mr. Tripp] was going to come back and shoot people."  *Id.* at ¶ 53-65; (3) Musk's July 5, 2018 Twitter post insinuating that Tripp had accepted a bribe from Lopez.  *Id.* ¶ 67-69; (4) Tesla's June 20 and June 22, 2018 press releases claiming that it "received a phone call from a friend of Mr. Tripp telling [Tesla] that Mr. Tripp would be coming to the Gigafactory to 'shoot the place up.'"  *Id.*

1   *Co.*, 112 F. Supp. 3d 122, 149 (S.D.N.Y. 2015).  It would be nonsensical for the apex rule to

2   shield Musk from a pre-trial deposition when he will undoubtedly be a key witness at trial.

3   **II.    Even if the apex rule applies, Tesla has failed to carry its "heavy burden to show**

4   **why discovery should be denied."**

5   Although the Court directed Tripp to file a motion to compel Musk's deposition, the

6   burden is on Tesla to show that Musk's deposition should not occur.

7   > In determining whether to allow an apex deposition, courts

8   > consider (1) whether the deponent has unique first-hand, non-
> repetitive knowledge of the facts at issue in the case and (2)

9   > whether the party seeking the deposition has exhausted other less

10  > intrusive discovery methods.  ***However, a party seeking to***
> ***prevent a deposition carries a heavy burden to show why***

11  > ***discovery should be denied.***  Thus, it is very unusual for a court

12  > to prohibit the taking of a deposition altogether absent
> extraordinary circumstances.  When a witness has personal

13  > knowledge of facts relevant to the lawsuit, even a corporate
> president or CEO is subject to deposition.  A claimed lack of

14  > knowledge, by itself it is insufficient to preclude a deposition.

15  *Apple Inc. v. Samsung Electronics, Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (internal

16  quotes and citations omitted) (emphasis added).

17  In this case, the parties completed twelve depositions of present and former Tesla

18  personnel before turning to the deposition of Musk.  Following the final 30(b)(6) deposition

19  on September 9, 2019, and at Tesla's request, undersigned counsel sent Tesla's counsel a

20  letter on September 23, 2019 that identified six likely subjects for Musk's deposition:

21  > [1] Any written or e-mail communications disclosed by Tesla to
22  > or from Elon Musk.

23  > [2] Elon Musk's knowledge of Tesla's investigation of Martin
24  > Tripp.

25  > [3] Elon Musk's knowledge of the matters alleged in Tesla's
26  > Complaint and Mr. Tripp's Counterclaim.

27  > [4] Elon Musk's knowledge of the alleged threat to "shoot up"
28  > the Gigafactory, including any statements made to third parties

by Elon Musk and Tesla regarding the alleged threat.

[5] Any efforts by Elon Musk to publicly criticize, threaten legal action against, or undermine the public or professional standing of critics of Elon Musk or Tesla, including without limitation Vernon Unsworth and Lawrence Fossi (aka Montana Skeptic).

[6] Any matter bearing on Elon Musk's credibility or biases, which are always relevant.

Exhibit K to Motion to Compel Deposition of Elon Musk.   Tripp also offered to limit Musk's deposition to four hours.[3]   Tesla still refused to produce Musk as a witness, which prompted the instant motion.

It cannot be disputed that Musk has "unique first-hand, non-repetitive knowledge of the facts at issue in the case." Musk made three of the four statements at issue, and appears to be the catalyst for the fourth.  As noted in Tripp's motion, Musk's subjective motives and knowledge factor heavily into the issues of punitive damages and actual malice, particularly in light of N.R.S. §§ 42.005 and 42.007 (neither of which Tesla addresses in its response). The best source of evidence for Musk's subjective mental state is Musk.

Second, the parties completed all other discovery before turning to the issue of Musk's deposition.   Tesla insists that Tripp has still not "exhausted other less intrusive discovery methods" because Tripp did not depose Kristen Krerowicz or Jeff Jones.  Tesla characterizes Krerowicz and Jones as "two key people with firsthand knowledge of the facts" regarding Tesla's public statements about the alleged Gigafactory threat.  Response at 12:17-24.  This is a curious proclamation by Tesla, considering that Tesla never disclosed Krerowicz or Jones as witnesses under Rule 26(a)(1)(A)(i), which requires Tesla to disclose "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses."   Further, when Tripp noticed a Rule 30(b)(6) regarding Tesla's public statements about the alleged Gigafactory threat, Tesla didn't produce Krerowicz or Jones, but instead produced Bruce Watson.

Tesla further suggests that Tripp failed to propound written discovery to inquire about

_____

[3] As discussed *infra*, Tripp now seeks the presumptive seven-hour limit under Rule 30(d)(1).

Musk's subjective knowledge.  This is incorrect.  Tripp's written discovery was directed precisely at Musk's subjective knowledge.  *See* Tripp's Interrogatory Nos. 4, 12, 13, 14, 21, attached as **Exhibit T** and **U**.  Predictably, Tesla responded with conclusory, self-serving responses calculated to exonerate Musk from any wrongdoing.

A party seeking to invoke the apex rule must do more than shriek, "Harassment!", as Tesla has done here.  The potential for harassment "must be illustrated with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) (internal quotes omitted) (finding reversible error due to magistrate's presumption that "harassment and abuse are inherent in depositions of high-level corporate officers").

Tesla has no evidence that Tripp wishes to depose Musk just to produce "soundbites" or interrogate Musk over his prolific Tweet history.  Tesla also cannot point to a single deposition or discovery request in which Tripp engaged in "harassing" conduct.[4]  Tesla's only "evidence" of the potential for harassment is Tripp's disclosures.  Tripp disclosed a great deal of information throughout the case due to its potential relevance, which could include attacking the credibility or bias of Musk or any other Tesla witness.  Unlike many deponents, Musk has literally thousands of public domain statements and Tweets that, depending on what Musk says in his deposition or trial testimony, may be relevant to his credibility or bias, or any other issue within Rule 26(b)'s broad scope of discovery.  The best practice is to disclose even tangentially relevant evidence rather than withhold it.  So various lawsuits, news articles, and Tweets regarding Tesla and/or Musk were gathered and disclosed.  That hardly equates to "harassment."

The only subject in Tripp's September 23, 2019 letter that Tesla takes issue with is

_____

[4] Tesla's claim of "harassment" is difficult to take seriously given Tesla's own conduct in this case.  Tesla subpoenaed and deposed Tripp's former employers going back ten years, all of whom had no information regarding the facts of this case, and even deposed Tripp's ex-wife of six years ago, all in furtherance of a "scorched-earth" effort to uncover any possible morsel of embarrassing information about Tripp.

the fifth one—pertaining to Musk's efforts to "threaten legal action against, or undermine the public or professional standing of critics of Elon Musk or Tesla." This topic bears directly on Musk's motives and willingness to tarnish Tripp's reputation, which is precisely at issue in the claims for defamation, false light, and punitive damages. *Cf. Am. Family Life Assur. Co. of Columbus v. Teasdale*, 733 F.2d 559, 569 (8th Cir. 1984) (noting that insurance company's desire to "punish past critics and silence future critics, regardless of the well-founded bases for their criticisms" was evidence of "vindictive" motive).

Finally, Tripp was required to outline the merits of his case to demonstrate the relevance and necessity of Musk's deposition. While Tesla's response goes to great lengths to attack the merits of Tripp's counterclaims, "[a] party cannot resist discovery by asserting that a claim will fail." *U.S. Commodity Futures Trading Comm'n¸ supra*, 2015 WL 556441, at *2. Musk's declaration claiming that he has limited knowledge is also insufficient to preclude his deposition. *Luangisa v. Interface Operations*, 2:11-CV-00951-RCJ, 2011 WL 6029880, at *13 (D. Nev. Dec. 5, 2011) ("A claimed lack of knowledge, by itself, is insufficient to preclude a deposition.") (citing *Apple, Inc., supra*). And the fact that Musk "has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *In re Google Litig.*, C08-03172 RMW PSG, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011)).

For these reasons, Tesla has failed to carry its burden under the apex rule.

**C.** **Tripp should be allowed the presumptive seven-hour limit afforded under Rule 30(d)(1) because Musk will likely waste valuable deposition time by being combative, demeaning, and evasive.**

Although Tripp previously proposed a four hour limit to Musk's deposition in a good faith effort to compromise (which Tesla rejected anyway), Tripp should be permitted the presumptive seven-hour limit afforded under Rule 30(d)(1). On October 25, 2019—subsequent to Tripp filing his motion to compel Musk's deposition—Musk's previously sealed June 1, 2019 deposition in *In Re Tesla Motors, Inc.* C.A. No. 12711-VCS (the "Solar City deposition") was made public on the internet. Excerpts from Musk's Solar City deposition are attached as **Exhibit V.**

Musk's conduct at his Solar City deposition is an illuminating preview of what the Court can expect from Musk's deposition in this case.  In his Solar City deposition, Musk wasted time by being combative and demeaning, and he frequently avoided questions by posing his own sarcastic queries to opposing counsel.  Examples include:

- Musk calling opposing counsel a "jerk."  *Id.* at 300:3-6.
- Musk calling opposing counsel "reprehensible" and a "very, very bad person" for "attacking sustainable energy."  *Id.* at 69:25-70:10.
- Musk telling opposing counsel he hadn't paid attention in law school.  *Id.* at 205:7-22 ("And they teach you this in law school.  You weren't listening to the professor then.").
- Musk saying to opposing counsel, "People like you make me sad about the future and sad about America.  How do you live with yourself?  I think you should reconsider your life."  *Id.* at 142:4-143:3.
- Musk mocking opposing counsel's wardrobe.  *Id.* at 42:18-21 ("Who gets a custom suit?  Hardly anyone.  Savile Row type of thing.  You guys probably have custom suits.").
- Musk refusing repeatedly to answer a question unless it was rephrased because Tesla's attorney interposed a "form" objection.  *Id.* at 24:19-28:11 ("We can stare at each other until you rephrase it.").
- Musk saying to opposing counsel, "Are you a happy person?  You shouldn't be.  You must have no conscience."  *Id.* at 144:3-11.
- Musk saying to opposing counsel, "I think you're actually sad.  That's my guess.  You pretend to be happy."  *Id.* at 146:18-20.
- Musk saying to opposing counsel, "Do you drive a gasoline car?  How embarrassing.  You can afford an electric car.  Save the environment.  Why do you hate the environment?"  *Id.* at 236:1-7.
- Musk interrupting opposing counsel's questions.  *Id.* at 48:2-6.

- Musk suggesting opposing counsel should not have been a lawyer and then bemoaning the number of lawyers in the United States. *Id.* at 57:16-21 ("But think if your talents could have been applied in manufacturing instead of law, that would have been much better. I heard yesterday that 3 percent of the U.S. economy is legal services. That's one of the saddest facts I've heard in a long time.").

- Musk criticizing the form of opposing counsel's questions. *Id.* at 24:3-4 ("It was a leading question. It was not good. You should not ask questions like that.")

- Musk accusing opposing counsel of making false claims during witness interviews. *Id.* at 24:7-10 ("[Y]ou stated something false about Lyndon when interviewing Ira in an attempt to trick him. Is that true?").

- Musk telling opposing counsel, "[I]n the years to come, this case will look silly and you will have wasted your time and ours. Mark my words, I'm sure you will." *Id.* at 39:17-24.

- Musk calling opposing counsel a "shameful person." *Id.* at 73:4.

- Musk questioning opposing counsel on his "purpose in life" and suggesting opposing counsel "just think[s] about money." *Id.* at 73:9-74:6.

- Musk telling opposing counsel, "I think it's a silly point that you're making." *Id.* at 80:20-21.

- Musk accusing opposing counsel of asking "tricky" or "trickstery" questions. *Id.* at 100:23-24; 115:14-15; 165:2-5; 205:7-9; 250:17-18; 284:10-11.

- Musk calling opposing counsel "a professional bully and trickster," but "not doing a very good job" of being one. *Id.* at 165:4-5.

- Musk saying to opposing counsel, "You just want to waste everyone's time and be a blight on the economy." *Id.* at 167:13-14.

- The moment the seven-hour time limits expired, Musk said, "Are we out of time? Okay. We're out of time. Good night.", and abruptly ended the deposition. *Id.* at 304:22-24.

Tesla suggests that Tripp wishes to depose Musk as part of "a never-ending circus of harassing and irrelevant allegations." Response at 3:10-11. To the extent Musk's deposition were to devolve into a circus, it will be due to Musk's own conduct. Which probably explains Tesla's extraordinary efforts to shelter Musk from a deposition in this case.

If the Court limits Musk's deposition to two hours as Tesla suggests, or even four hours, there is good cause to believe Musk will waste valuable deposition time with the documented behavior above. The Court should therefor place no time restrictions on Musk's deposition beyond the presumptive seven-hour limit in Rule 30(d)(1).

DATED this 4th day of December, 2019.

TIFFANY & BOSCO, P.A.

By /s/William M. Fischbach III
   Robert D. Mitchell
   William M. Fischbach III
   Fletcher R. Carpenter
   Camelback Esplanade II, Seventh Floor
   2525 East Camelback Road
   Phoenix, Arizona 85016-9239
   *Counsel for Defendant/Counterclaimant*

## PROOF OF SERVICE

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On December 4, 2019 I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S REPLY IN SUPPORT OF MOTION TO COMPEL DEPOSITION OF ELON MUSK**

on the following interested parties in this action:

Joshua A. Sliker
Jackson Lewis
300 S. Fourth Street, Suite 900
Las Vegas, Nevada 89101
Joshua.sliker@jacksonlewis.com
*Attorney for Plaintiff/Counterdefendant*
*Tesla, Inc.*

Sean P. Gates (*admitted pro hac vice*)
Douglas J. Beteta (*admitted pro hac vice*)
Charis Lex, P.C.
301 N. Lake Ave., Suite 1100
Pasadena, California 91101
sgates@charislex.com
*Attorneys for Plaintiff/Counterdefendant*
*Tesla, Inc.*

**[X] (BY E-MAIL)** By transmitting the above documents to the above e-mail addresses.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 4th day of December, 2019 at Phoenix, Arizona.

*/s/Kesha M. Cabanilla*

# EXHIBIT T

Robert D. Mitchell (*admitted pro hac vice*)
William M. Fischbach III (*admitted pro hac vice*)
Christopher J. Waznik (*admitted pro hac vice*)
Matthew D. Dayton, Nevada Bar No. 11552

**TB  TIFFANY & BOSCO**
P.A.

Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016-4229
Telephone: (602) 255-6000
Fax: (602) 255-0103
E-mails: rdm@tblaw.com; wmf@tblaw.com;
cjw@tblaw.com; md@tblaw.com

Counsel for Defendant/Counterclaimant Martin Tripp

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN TRIPP, an individual,<br><br>Defendant. | Case No. 3:18-cv-00296-LRH-VPC<br><br>**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S FIRST SET OF INTERROGATORIES** |
| MARTIN TRIPP, an individual,<br><br>Counterclaimant,<br><br>TESLA, INC., a Delaware corporation,<br><br>Counterdefendant | |

1

**INTERROGATORY NO. 3:**

Explain and Identify in detail All factual and documentary support for the assertion in the Complaint that "the true amount and value of 'scrap' material that Tesla generated during the manufacturing process" was "vastly exaggerated" by Tripp.

**INTERROGATORY NO. 4:**

Explain and Identify in detail why You stated that Tripp "sabotaged" Your operations in an e-mail from Elon Musk to Your employees dated on or about June 17, 2018.

**INTERROGATORY NO. 5:**

Explain and Identify in detail All actions You took Relating To or Regarding the Alleged Threat, Including, without limitation:

    a.    Who received the alleged phone call;

    b.    All steps You took to verify the veracity of the alleged phone call, including identification of the alleged caller;

    c.    All internal Communications You had regarding the Alleged Threat;

    d.    All external Communications You had with any third party, including the media and law enforcement, regarding the Alleged Threat; and

    e.    All security measures You took to secure the Gigafactory.

**INTERROGATORY NO. 6:**

Explain and Identify in detail All actions and efforts You have made to track, monitor, and/or locate Tripp since June 1, 2018.

6

**INTERROGATORY NO. 7:**

Explain and Identify in detail the process for how products and parts are identified and/or categorized in MOS.

**INTERROGATORY NO. 8:**

Explain and Identify all information You deleted or tried to delete from any of Mr. Tripp's electronic devises, including on June 13 and 14, 2018.

DATED this 24th day of September, 2018.

TIFFANY & BOSCO, P.A.

By _____
   Robert D. Mitchell
   William M. Fischbach III
   Christopher J. Waznik
   Matthew D. Dayton
   Camelback Esplanade II, Seventh Floor
   2525 East Camelback Road
   Phoenix, Arizona 85016-4229
   *Counsel for Defendant/Counterclaimant*

7

**PROOF OF SERVICE**

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On September 24, 2018, I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S FIRST SET OF INTERROGATORIES**

on the following interested parties in this action:

> John C. Hueston
> Robert N. Klieger
> Marshall A. Camp
> Allison Libeu
> Hueston Hennigan LLP
> 523 W. 6th St., Suite 400
> Los Angeles, California 90014
> jhueston@hueston.com; rklieger@hueston.com;
> mcamp@hueston.com; alibeu@hueston.com
> -and-
> Joshua A. Sliker
> Jackson Lewis
> 3800 Howard Hughes Parkway, Suite 600
> Las Vegas, Nevada 89169
> Joshua.sliker@jacksonlewis.com
> *Attorneys for Plaintiff / Counterdefendant Tesla, Inc.*

**[X] (BY E-MAIL)** By transmitting the documents listed above to the e-mail addresses set forth above.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 24th day of September, 2018 at Phoenix, Arizona.

*/s/ Kaleigh Peralta*

8

# EXHIBIT U

1  Robert D. Mitchell (*admitted pro hac vice*)
   William M. Fischbach III (*admitted pro hac vice*)
2  Christopher J. Waznik (*admitted pro hac vice*)
   Jason C. Kolbe, Nevada Bar No. 11624
3  Kevin S. Soderstrom, Nevada Bar No. 10235
4  **TB TIFFANY & BOSCO**
   P.A.
5  Camelback Esplanade II, Seventh Floor
6  2525 East Camelback Road
   Phoenix, Arizona 85016-4229
7  Telephone: (602) 255-6000
   Fax: (602) 255-0103
8  E-mails: rdm@tblaw.com; wmf@tblaw.com;
9  cjw@tblaw.com; jck@tblaw.com; kss@tblaw.com

10 Counsel for Defendant/Counterclaimant Martin Tripp

11              **UNITED STATES DISTRICT COURT**
12
13                    **DISTRICT OF NEVADA**

14 TESLA, INC., a Delaware corporation,          Case No. 3:18-cv-00296-LRH-VPC
15
                                     Plaintiff,   **DEFENDANT/COUNTERCLAIMANT**
16                                                **MARTIN TRIPP'S SECOND SET OF**
                                                 **INTERROGATORIES**
17 vs.
18 MARTIN TRIPP, an individual,
19
                                    Defendant.
20
21 MARTIN TRIPP, an individual,
22
23 Counterclaimant,
24
25 TESLA, INC., a Delaware corporation,
26
27 Counterdefendant

28                              1

# INTERROGATORIES

**INTERROGATORY NO. 9**: Identify and explain how the calculations included in the document bates-stamped as TES-TRIPP_0001220 are incorrect.

**INTERROGATORY NO. 10**: Since the Gigafactory began operations to the present, Identify and explain how Tesla accounted for Non-Conforming Material and Scrap in its publicly reported financial statements and all persons knowledgeable about such reporting.

**INTERROGATORY NO. 11**: Since the Gigafactory began operations to the present, Identify and explain whether MOS has provided or currently provides different financial information regarding the amount of Scrap and/or Non-Conforming Material generated at the Gigafactory than what is reported in Tesla's public financial reports and if so, Identify the differences and explain why such differences occur(ed).

**INTERROGATORY NO. 12**: Identify and explain All information regarding the Alleged Threat known by Elon Musk prior to his sending the e-mail communication referenced in Paragraph 54 of the Counterclaim, including:

- When Mr. Musk first became aware of the Alleged Threat
- All persons with whom Mr. Musk discussed the Alleged Threat on June 20, 2018
- Who provided Mr. Musk with the information of which he was aware
- What actions Mr. Musk took to verify the information

6

**INTERROGATORY NO. 13**: Identify and explain All information known by Elon Musk regarding the contents of the e-mail communication referenced in Paragraph 47 of the Counterclaim before sending said e-mail communication, including:

- When Mr. Musk first became aware of the "sabotage" alleged therein
- Who provided Mr. Musk with the information of which he was aware
- What actions Mr. Musk took to verify the information

**INTERROGATORY NO. 14**: Identify by paragraph number all allegations in the Complaint and Counterclaim that Elon Musk has personal knowledge of.

**INTERROGATORY NO. 15**: Identify all persons who had knowledge of and/or authorized Nisos Group LLC to conduct an investigation into the identity of the employee who was the source of the information contained in the two *Business Insider* articles and Identify what information each listed person knew about the investigative work of Nisos Group LLC.

**INTERROGATORY NO. 16**: Identify all Communications in which You reported to Your shareholders, management, auditors, and accountants the losses and/or damages claimed in the November 8, 2018 Expert Report of Jeffrey H. Kinrich.

**INTERROGATORY NO. 17**: Identify All video recordings and photographers who have videotaped, recorded, or took photos inside the Gigafactory since it first began operations.

**INTERROGATORY NO. 18**: Identify All information You allege Mr. Tripp improperly disclosed to third parties and All actions You took to ensure that the identified information is and was not disclosed to the public.

**INTERROGATORY NO. 19**: Identify all persons responsible for making any public comments on Your behalf regarding the Alleged Threat.

**INTERROGATORY NO. 20**: For all persons listed in Your Response to Interrogatory No. 19, Identify what each person knew about the Alleged Threat prior to issuing the comment on Your behalf.

**INTERROGATORY NO. 21**: Identify All communications to third parties by Elon Musk about the Alleged Threat or that Mr. Tripp was going to "shoot up" the Gigafactory or its employees.

**INTERROGATORY NO. 22**: State Your total claimed damages, including the method for calculating those damages and the legal and/or statutory basis allowing You to claim any particular item or category of damages.

**INTERROGATORY NO. 23:** Identify with particularity all Documents and information You claim to be "trade secrets" for purposes of the First and Second Claims for Relief in the Complaint.

**INTERROGATORY NO. 24**: Identify the resources from which Your Warpdrive pulls financial information for the prices of parts and materials and explain whether this financial information has ever been different than what is displayed in MOS and if so, why.

**INTERROGATORY NO. 25**: Identify the phone number of the person who called You to report the Alleged Threat.

8

DATED this 3rd day of January, 2019.

TIFFANY & BOSCO, P.A.

By _____
    Robert D. Mitchell
    William M. Fischbach III
    Christopher J. Waznik
    Jason C. Kolbe
    Kevin S. Soderstrom
    Camelback Esplanade II, Seventh Floor
    2525 East Camelback Road
    Phoenix, Arizona 85016-4229
    *Counsel for Defendant/Counterclaimant*

**PROOF OF SERVICE**

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On January 3, 2019, I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S SECOND SET OF INTERROGATORIES**

on the following interested parties in this action:

> John C. Hueston
> Robert N. Klieger
> Marshall A. Camp
> Allison Libeu
> Stephen Richards
> Hueston Hennigan LLP
> 523 W. 6th St., Suite 400
> Los Angeles, California 90014
> jhueston@hueston.com; rklieger@hueston.com;
> mcamp@hueston.com; alibeu@hueston.com;
> srichards@hueston.com
>
> Joshua A. Sliker
> Jackson Lewis
> 3800 Howard Hughes Parkway, Suite 600
> Las Vegas, Nevada 89169
> Joshua.sliker@jacksonlewis.com
> *Attorneys for Plaintiff / Counterdefendant Tesla, Inc.*

**[X] (BY E-MAIL)** By transmitting the documents listed above to the e-mail addresses set forth above.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 3rd day of January, 2019 at Phoenix, Arizona.

*Kaleigh Stilchen*

# EXHIBIT V

Page 1

1   THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2   ------------------------------------------------x

3   IN RE TESLA MOTORS, INC.     Consolidated

    STOCKHOLDER LITIGATION       C.A. No. 12711-VCS

4

5   ------------------------------------------------x

6

7

8

9

10

11          VIDEOTAPED DEPOSITION OF ELON MUSK

12

13   DATE:        Saturday, June 1, 2019

14   TIME:        9:53 a.m.

15   LOCATION:    Irell & Manella

                  1800 Avenue of the Stars

16                Los Angeles, California

17

18

19

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 3273459

Page 2

```
 1  THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2  -----------------------------------x
 3  IN RE TESLA MOTORS, INC.    Consolidated
    STOCKHOLDER LITIGATION    C.A. No. 12711-VCS
 4
 5  -----------------------------------x
 6
 7       Video Deposition of ELON MUSK, taken
 8  at Irell & Manella, 1800 Avenue of the Stars,
 9  Suite 900, Los Angeles, California,
10  commencing at 9:53 a.m., on Saturday, June 1,
11  2019 before Lynne Ledanois, Certified
12  Shorthand Reporter No. 6811
13
14
15
16
17
18
19
20
21
22
23
24
25  ///
```

Page 3

```
 1            APPEARANCES:
 2
 3  For the Plaintiffs:
 4       ROBBINS GELLER RUDMAN & DOWD LLP
 5       BY: RANDALL J. BARON
 6          MAXWELL R. HUFFMAN
 7          ALEX OUTWATER
 8       Attorneys at Law
 9       655 West Broadway
10       Suite 1900
11       San Diego, California 92101
12       (619) 231-1058
13  --and--
14       KESSLER TOPAZ MELTZER CHECK LLP
15       BY: ERIC L. ZAGAR
16       Attorneys at Law
17       280 King of Prussia  Road
18       Radnor, Pennsylvania 19087
19       (610) 822-2209
20
21
22
23
24
25  ///
```

Page 4

```
 1            APPEARANCES:
 2
 3  For the Witness and Director Defendants:
 4       CRAVATH, SWAINE & MOORE LLP
 5       BY: EVAN CHESLER
 6       Attorney at Law
 7       825 Eighth Avenue
 8       New York, New York 10019-7475
 9       (212) 474-1438
10
11
12  ALSO PRESENT:
13  Steven Togami, Videographer
14  Jonathan Chang, Tesla In-House Counsel
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1    I N D E X   O F   E X A M I N A T I O N
 2
 3  Examination by:                Page
 4     Mr. Baron                   16
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  ///
```

2 (Pages 2 - 5)

Page 6

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 1  SolarCity Form 10-Q for the
           period ended 9/30/16;        18
Exhibit 2  Document headed, Forecasted
           MW Inspected v Actual MW
           Deployed;                    29
Exhibit 3  SCTY Management Model Project
           Daedalus,
           EVR-TESLA_00193245;          29
Exhibit 4  Tesla Fourth Quarter & Full
           Year 2016 Update;            32
Exhibit 5  Tesla First Quarter 2017
           Update;                      50
Exhibit 6  Tesla Second Quarter 2017
           Update;                      58
Exhibit 7  Tesla Third Quarter 2017
           Update;                      65
Exhibit 8  Tesla Fourth Quarter & Full
           Year 2017 Update;            65
Exhibit 9  Tesla First Quarter 2018
           Update;                      74
Exhibit 10 Tesla Second Quarter 2018
           Update;                      82
///

Page 7

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 11 Tesla Third Quarter 2018
           Update;                      84
Exhibit 12 Tesla Fourth Quarter & Full
           Year 2018 Update;            85
Exhibit 13 Tesla Firsts Quarter 2019
           Update;                      86
Exhibit 14 Reuters News, 6/22/18: Tesla
           to close a dozen solar
           facilities in nine states;   117
Exhibit 15 Defendant Elon Musk's Responses
           and Objections to Plaintiff's
           First Set of Interrogatories; 125
Exhibit 16 Email chain, first on page to
           Tanguy Serra from Jonathan
           Bass dated 6/22/16,
           TESLA00080754-756;           130
Exhibit 17 Email chain, first on page to
           Jonathan Bass from tserra@
           solarcity.com dated 6/2216,
           TESLA00598138-148;           135
Exhibit 18 Income Statement, Cashflow
           and Balance Sheet,
           TESLA00605435;               137

Page 8

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 19 Tesla Board of Directors
           Meeting Agenda June 20,
           2016,
           TESLADIR0084652-773;         142
Exhibit 20 Email with attachments to
           Jeffrey Evanson from Eric
           Senay dated 10/7/16,
           TESLA0038955-970;            151
Exhibit 21 Email to Susan Repo from
           ████████ dated 12/7/26,
           TESLADIR0099791-792;         154
Exhibit 22 SolarCity Board of Directors
           Q1 2016 Meeting,
           TESLA00002323-2355;          162
Exhibit 23 Email to Fiona Taylor from
           tserra@solarcity.com dated
           4/3/16,
           TESLA00066924;               172
Exhibit 24 Document headed, SC Pre-
           liminary Forecast Cash -
           Inspection Basis,
           TESLA000302036;              175

Page 9

INDEX OF EXHIBITS

Deposition        Description        Page

Exhibit 25 Document headed, Project
           Icarus, 2/29/16,
           TESLA00001446-1454;          181
Exhibit 26 Email chain, first on page to
           Elon Musk from Bret Johnsen
           dated 3/27/15,
           SPACEX001029-039;            188
Exhibit 27 Email chain, first on page to
           Brad Buss from Bret Johnsen
           dated 3/26/15,
           SPACEX002289;                199
Exhibit 28 Document headed, SolarCity
           Bond Analysis Summary,
           SPACEX004003-007;            201
Exhibit 29 Minutes of the Meeting of
           the Board of Directors of
           SolarCity Corporation,
           2/2/16,
           TESLA00002047-049;           209
Exhibit 30 SolarCity Board of Directors
           Q1 2016 Meeting, 2/2/16,
           TESLA00002323-355;           210
///

3 (Pages 6 - 9)

Page 10

1          I N D E X   O F   E X H I B I T S
2 Deposition      Description      Page
3 Exhibit 31  Document headed, SolarCity's
4          Credit Quality has Weakened,
5          SPACEX004120-122;          216
6 Exhibit 32  Email chain, first on page to
7          Elon Musk and Todd Maron from
8          Jason Wheeler dated 2/29/16,
9          TESLADIR0080593-602;          219
10 Exhibit 33  Email chain, first on page to
11          Emma Gallagher from Lyndon
12          Rive dated 1/7/16,
13          SPACEX005083;          221
14 Exhibit 34  Minutes of a Special Meeting
15          of the Board of Directors
16          to Tesla, 2/29/16,
17          TESLA00001346-347;          223
18 Exhibit 35  SolarCity Board Meeting
19          Minutes 4/26/16,
20          SPACEX009508-510;          232
21 Exhibit 36  Email to John Fisher from
22          Elon Musk dated 4/25/16,
23          SPACEX000783;          233
24
25 ///

Page 12

1          I N D E X   O F   E X H I B I T S
2 Deposition      Description      Page
3 Exhibit 43  Email to Elon Musk from Lyndon
4          Rive dated 7/10/16,
5          TESLA00022462-463;          275
6 Exhibit 44  Email chain, first on page to
7          Todd Maron from Courtney
8          McBean dated 7/16/16,
9          EVR-TESLA_00163377;          287
10 Exhibit 45  SolarCity Corporation Minutes
11          of a Meeting of the Special
12          Committee of the Board of
13          Directors, 7/14/16,
14          TESLA00001866-867;          288
15 Exhibit 46 Email to Stuart Francis from
16          Roger Altman dated 7/21/16,
17          EVR-TESLA_00163736;          292
18 Exhibit 47  Tesla Board of Directors
19          Meeting dated 7/19/16,
20          TESLADIR0087768-88168;          293
21 Exhibit 48  Minutes of a Special Meeting
22          of the Board of Directors
23          of Tesla Motors, 7/19/16,
24          TESLA00001473-1478;          297
25 ///

Page 11

1          I N D E X   O F   E X H I B I T S
2 Deposition      Description      Page
3 Exhibit 37  Email chain, first on page to
4          Board of Directors from Aaron
5          Chew dated 4/26/16,
6          TESLA00531141-172;          234
7 Exhibit 38  Letter from SolarCity to SEC
8          re: Form 10-K for year ended
9          12/31/15;          244
10 Exhibit 39  Email chain, first on page to
11          Elon Musk from Lyndon Rive
12          dated 8/9/16,
13          SPACEX009657-658;          248
14 Exhibit 40  Email chain, first on page to
15          Courtney McBean from Chuck
16          McMullan dated 6/20/16,
17          EVR-TESLA_00162553;          251
18 Exhibit 41  Minutes of a Special Meeting
19          of the Board of Directors of
20          Tesla Motors dated 6/20/16,
21          TESLA00001459-468;          265
22 Exhibit 42  Email from Lyndon Rive dated
23          7/9/16,
24          TESLA00083765;          271
25 ///

Page 13

1          I N D E X   O F   E X H I B I T S
2 Deposition      Description      Page
3 Exhibit 49  Minutes of a Special Meeting
4          of the Board of Directors of
5          Tesla Motors, 8/13/16;
6          TESLA00001757-1758;          301
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25 ///

Page 14

1    Los Angeles, California
2    Saturday, June 1, 2019
3        9:53 a.m.
4    _____
5        VIDEOGRAPHER:  Good morning.  We are
6    on the record at 9:53 a.m. on June 1st,
7    2019.  Please note that the microphones are
8    sensitive and may pick up whispers, private
9    conversations and cellular interference.
10   Audio and video recording will continue to
11   take place unless all parties agree to go
12   off the record.
13       This is media unit Number 1 of the
14   video-recorded deposition of Elon Musk taken
15   by counsel for the plaintiffs In Re Tesla
16   Motors, Inc. Stockholder Litigation filed in
17   the Court of Chancery of the State of
18   Delaware, Consolidated CA Number 12711-VCS.
19       This deposition is being held at
20   Irell & Manella located at 1800 Avenue of
21   the Stars, Los Angeles, California 90067.
22       My name is Steven Togami from the firm
23   Veritext Legal Solutions and I'm the
24   videographer.  The court reporter is Lynne
25   Ledanois from the firm Veritext Legal

Page 15

1    Solutions.
2        I'm not related to any party in this
3    action nor am I financially interested in
4    the outcome.
5        If there are any objections to
6    proceeding, please state them at the time of
7    your appearance.
8        At this time will counsel and all
9    present please state their appearances and
10   affiliations for the record.
11       MR. BARON:  Randall Baron, Robbins
12   Geller Rudman & Dowd, for plaintiffs.
13       MR. OUTWATER:  Alex Outwater, Robbins
14   Geller Rudman & Dowd, for plaintiffs.
15       MR. HUFFMAN:  Max Huffman, Robbins
16   Geller Rudman & Dowd, for plaintiffs.
17       MR. ZAGAR:  Eric Zagar, Kessler Topaz
18   Meltzer & Check, for plaintiffs.
19       MR. CHESLER:  Evan Chesler, Cravath
20   Swaine & Moore, for defendants.
21       THE WITNESS:  Elon Musk.
22       MR. CHANG:  Jonathan Chang with Tesla
23   for defendants.
24       THE WITNESS:  Elon Musk, Tesla Motors,
25   defendant.

Page 16

1        VIDEOGRAPHER:  Thank you.  Could we
2    please have the oath.
3            ELON MUSK,
4    having been first duly sworn, testified as
5    follows:
6            EXAMINATION
7  BY MR. BARON:
8        Q    Mr. Musk, we're going to spend some
9    time today talking about the decision to acquire
10   SolarCity.
11       But before we start, would you agree
12   with me that as we stand here today, the
13   acquisition of SolarCity by Tesla has not worked
14   out that well?
15       A    No.
16       Q    So are you familiar with the concept
17   of megawatts deployed or megawatts invested?
18       A    Megawatts deployed, certainly.
19       Q    Have you ever heard of the term
20   megawatts invested -- I'm sorry, inspected, not
21   invested, sorry.  Inspected?
22       A    Do you mean by inspectors?
23       Q    No, just megawatts inspected as a
24   financial term.
25       A    I don't think that's a commonly used

Page 17

1    term.  Certainly not megawatts invested.
2        Q    No, I meant inspected.  I'm sorry, I
3    misspoke.
4        A    Megawatts deployed is obviously a
5    common term for how many -- what's the total
6    power output of the solar panels installed.
7        Q    In SolarCity's public filings, they
8    described megawatts deployed as we track
9    megawatts deployed or megawatt production
10   capacity of our solar systems that have had all
11   required building department inspections
12   completed during the applicable period.
13       Is that your understanding of what
14   megawatts deployed mean?
15       A    Megawatts deployed is just how many,
16   you know, solar panels you put on roofs and
17   ground mount.  It's very simple.
18       Q    And in analyzing what the importance
19   is, again, the public filings of SolarCity
20   indicated that, quote, we believe that tracking
21   the megawatt production capacity of deployed
22   systems is an indicator of our growth rate and
23   cost efficiency of our solar energy systems
24   business.
25       Do you agree that megawatts deployed

5 (Pages 14 - 17)

Page 22

1  will be high. But this is -- this is the not --
2  one does not follow uniquely from the other.
3      So if you have -- if your deployment
4  resources -- let's say you've got a thousand
5  installers, and a thousand of them are in use,
6  that would be very good efficiency. Everyone is
7  being -- is actively installing systems.
8      So high growth could be an indicator
9  of efficiency, but it doesn't mean it is
10  definitively an indicator of inefficiency. In
11  this case it is.
12      But if, on the other hand, you had
13  fewer installers, if you had -- if you lowered
14  the number of installers, you could have higher
15  efficiency with fewer installers. You could
16  also have lower efficiency with a high number of
17  installers if you only had them 50 percent
18  occupied.
19  Q   So in this case, you believe that
20  megawatts for -- at least for SolarCity as to
21  third quarter of 2016 was an indicator of both
22  growth and cost efficiency?
23  A   At that time it would be correct.
24  Q   And similarly, at that time that
25  megawatts deployed in a given period you agree

Page 23

1  would be an indicator of both asset growth and
2  efficiency of scale; correct?
3      MR. CHESLER: Objection to form.
4      THE WITNESS: Pardon?
5      MR. CHESLER: You can answer. I was
6  objecting to the form of the question.
7      MR. BARON: He will do that when he
8  doesn't like my question for some reason and
9  I'll ignore him unless he tells you not to
10  answer.
11  Q   So go to that next sentence. Do you
12  see where -- on the same document, the next
13  sentence says: We track megawatts deployed in a
14  given period.
15      Do you see that sentence?
16  A   Yes. "We track the megawatts deployed
17  in a given period as an indicator of asset
18  growth," is that what you're referring to?
19  Q   Yes. And do you see that --
20  A   Yeah, this is an accurate statement,
21  but you mischaracterized it before.
22  Q   And you also agree that it is an
23  indicator of efficiency of scale of our
24  operations in that period; correct? That's what
25  this says too?

Page 24

1  A   Yes. This statement is correct. The
2  way you phrased it earlier was incorrect. It
3  was a leading question. It was not good. You
4  should not ask questions like that.
5      Is it correct that you stated
6  something false when interviewing Lyndon? Is
7  that true? I think you did -- no, Ira, you
8  stated something false about Lyndon when
9  interviewing Ira in an attempt to trick him. Is
10  that true?
11  Q   I have no idea what you're talking
12  about. So let me show you --
13  A   Maybe that was an accident.
14  Q   Let me show you a couple of documents.
15  Can I have a --
16      MR. CHESLER: Are we done with this?
17      MR. BARON: Yes. Well, for now.
18  We'll go back to it in a moment.
19  Q   You'll agree with me, though, as an
20  indicator of growth that we just talked about,
21  megawatts since -- or megawatts deployed since
22  you have acquired SolarCity at Tesla have been
23  trending down substantially; correct?
24      MR. CHESLER: Objection to the form.
25      THE WITNESS: Is there a graph you

Page 25

1  want to give me?
2  BY MR. BARON:
3  Q   I'm first asking you a question. Do
4  you agree with me that megawatts deployed per
5  quarter has been trending down dramatically
6  since Tesla bought SolarCity?
7      MR. CHESLER: Same objection.
8      You may answer. If I don't instruct
9  you not to answer, do the best you can to
10  answer.
11      I'm objecting because I think his
12  question is not properly formed, but that's
13  a legal issue for the court to deal with.
14      THE WITNESS: Should I ask him to
15  reform the question or --
16      MR. CHESLER: If you understand it,
17  you should answer.
18      THE WITNESS: If you object, then it
19  seems like we should ask him to ask the
20  question again in a different form.
21      MR. BARON: I'm not going to. I'll
22  wait till you answer.
23      MR. CHESLER: If you can answer it,
24  you should. The objection could be just a
25  technical problem with the question that I

7 (Pages 22 - 25)

Page 26

1   have to preserve for court.
2        If you understand the question, you
3   should answer it.  If you don't, you should
4   tell him you don't understand it.  It's up
5   to you.
6        THE WITNESS:  I think since you
7   object, I think you should ask the question
8   in a different way.
9        MR. BARON:  I'll ask it exactly the
10  same way.
11  Q    Do you agree with me that megawatts
12  deployed has trended down substantially since
13  Tesla acquired SolarCity; correct?
14       MR. CHESLER:  Objection to form.
15       THE WITNESS:  I think you should ask
16  that question a different way.
17  BY MR. BARON:
18  Q    I'm not going to.  Are you telling me
19  you cannot answer the question?
20  A    Well, my counsel is saying you should
21  ask the question a different way, so then you
22  should.
23  Q    I'm not going to do that, though.
24  A    Okay.
25  Q    So if you can answer the question, you

Page 27

1   can answer the question.  If you're telling me
2   that you do not understand the question, then
3   we'll move on.
4        Do you understand the question?
5   A    I understand the question I think.
6   But it's a leading question and I'm sure my
7   legal counsel has reason for objecting and
8   you're refusing to ask in a different way.
9   Q    I'm going to ask it again.
10       The megawatts deployed have trended
11  down substantially since Tesla acquired
12  SolarCity; correct?
13       MR. CHESLER:  Objection to form.
14       THE WITNESS:  Do you want to keep
15  asking the question?
16  BY MR. BARON:
17  Q    I'm waiting for you to answer.  If you
18  don't understand the question, then we'll figure
19  out why you don't understand it.
20       Do you understand that question?
21  A    I believe we've objected.
22       MR. BARON:  Counsel, are you going to
23  instruct your witness to answer the question
24  or tell me he doesn't understand it as
25  opposed to wait for me to rephrase it?

Page 28

1        THE WITNESS:  We can stare at each
2   other until you rephrase it.
3        MR. BARON:  I guess we can cancel this
4   deposition.  I'll just go back to -- we'll
5   go back to the vice chancellor and we'll
6   have him ordered to answer questions.
7        MR. CHESLER:  So let's step outside
8   for a minute.
9        MR. BARON:  Why don't we take a break
10  and you can have a conversation with your
11  client.  Thank you.
12       VIDEOGRAPHER:  Going off the record at
13  10:08 a.m.
14       (Recess taken.)
15       VIDEOGRAPHER:  Going back on the
16  record at 10:13 a.m.
17       MR. BARON:  Could you please read back
18  my last substantive question to the witness,
19  please?
20       (Requested testimony read by the
21  reporter.)
22       THE WITNESS:  No, I don't think
23  they've trended down substantially.
24       MR. BARON:  Okay.  I'll mark a couple
25  of documents, if I may.  First I would like

Page 29

1   to mark a chart that we've created.  Could
2   you mark this as Musk Exhibit 2.
3        (Exhibit 2 was marked.)
4        MR. BARON:  And I have a two-page
5   document, both have the Bates stamp range
6   00193245 and they are designated as SCTY
7   Management Model and Revised Model.  Could
8   you mark this as Exhibit 3, please.
9        (Exhibit 3 was marked.)
10  BY MR. BARON:
11  Q    So what I have before you is a chart
12  we prepared, and we'll go through and we'll show
13  how we actually generated that chart.
14       But I want you to see what we have as
15  Exhibit 3 which is from the native file which
16  is -- Exhibit 3 is the Bates thing, if you want
17  to open that up.
18       And that is from the native file, what
19  was produced under one Bates range, and in it
20  there are a number of tabs.  And this was
21  identified as being Evercore's model for the
22  projections that were set forth in the proxy
23  statement in connection with the SolarCity
24  acquisition.
25       I don't know whether you have, but

8 (Pages 26 - 29)

Page 38

1       So I took everyone from solar, and
2   said, "Instead of working on solar, you need to
3   work on the Model 3 program."
4       And as a result, solar suffered, as
5   you would expect.
6   Q    Help me out with that.  You said you
7   took everyone off of solar?
8   A    That could possibly be taken off
9   solar, yes.
10  Q    Okay.  So who would that include?
11  A    That would include engineering,
12  management, sales, service.  Everything that
13  could possibly be redirected towards the Model 3
14  program was so redirected.  This was the right
15  course of action for the company.
16  Q    So the engineers that you took off,
17  what were the engineers doing on solar that you
18  took them off to do on the Model 3?
19  A    They are working on the solar roof and
20  improving the costs of solar retrofit.
21  Q    How were they working on the cost of
22  solar retrofit?
23  A    It is important with solar retrofit to
24  reduce the cost of installation.  It's much more
25  complex and difficult than it may seem.  And

Page 39

1   actually requires quite a bit of engineering
2   to -- a lot of engineering to make the
3   installation process efficient and also to make
4   the retrofit solar esthetically appealing in as
5   much as retrofit can be esthetically appealing.
6       Then the solar roof is itself a
7   difficult product, a very difficult product.
8   Nobody has yet succeeded in such a product.  So
9   obviously that requires a lot of effort.  Many
10  people have tried, many companies have tried and
11  none have succeeded.  It's a hard problem.
12      So what you'll see as we solve these
13  things as -- because resources have now been
14  reapplied to solar is a dramatic increase in the
15  deployment of megawatts in the years to come.
16      At least -- one cannot predict these
17  things precisely, but in the years to come, this
18  case will look silly and you will have wasted
19  your time and ours.
20  Q    We are all entitled to our opinions.
21  It's a wonderful world, so -- and, you know,
22  everybody has them.
23      So --
24  A    Mark my words, I'm sure you will.
25  Q    So explain to me what solar retrofit

Page 40

1   is just so that I have an understanding of what
2   that means.
3   A    Solar retrofit is when somebody has an
4   existing roof and you put solar on their
5   existing roof.
6   Q    So do you have to have engineers
7   involved in every installation or is that just
8   engineers working on the concept and then those
9   go into each installation thereafter?
10  A    That's actually a more interesting
11  question then you realize.
12  Q    I'm not very smart, so I'll get lucky
13  every now and then.
14  A    The way it is traditionally done with
15  solar retrofit is not -- is -- maybe -- you're
16  not quite correct.
17      This is done still today at Tesla,
18  although it's changing, and it's done in the
19  rest of industry, where doing solar retrofit is
20  a bit like getting a custom-tailored suit.
21      So somebody will come out to your
22  house, they will carefully measure all of the
23  dimensions of your roof and then there will be
24  engineering involved.
25      They will engineer a solution that is

Page 41

1   specific to your roof, that matches the contours
2   and shape of your roof just like a
3   custom-tailored suit.
4       And it will often take two or three
5   visits.  It will take structural engineering.
6   It is complex.  And each installation requires
7   engineering.
8       MR. CHESLER:  Wait.
9   BY MR. BARON:
10  Q    I'm sorry, were you done?
11  A    No.
12      Now, a more efficient way to do this
13  is to come up with what you might call sort of
14  an off-the-rack suit solution where the -- where
15  you do not need engineering on a per
16  installation basis, but you have to engineer
17  that solution.
18      So you want to have something that
19  is -- that is just a few sizes, like -- just
20  like a suit, it's like suits on the rack will be
21  certain preset sizes.
22      And you don't want to make it too big
23  because if you make it too big, then it's very
24  difficult to fit on the roof without dealing
25  with the peculiarities of every roof.

11 (Pages 38 - 41)

Page 42

1    So you want to have something that is
2  small enough that you can put it on the roof and
3  find a section of the roof that's common across
4  roofs and where it's just sort of a preset,
5  prefab, consistent solar installation.
6    Now, the net result is on a per-roof
7  basis, you will generate less power but you will
8  do many more roofs because the cost, the total
9  cost from sales through installation will be
10  dramatically less.
11    And this is what we're going to do,
12  and it will be great.
13  Q    Okay.
14  A    Will be.
15  Q    My question was --
16  A    Think of the difference between a
17  custom suit and an off-the-rack suit. I mean, a
18  custom suit could be thousands of dollars. Who
19  gets a custom suit? Hardly anyone. Savile Row
20  type of thing. You guys probably have custom
21  suits.
22  Q    You're not wearing a suit.
23  A    Not today. Going down to San Diego.
24  You probably have one tucked away, I suspect.
25    So first -- you know, pretty

Page 43

1  expensive, as you know. People measure you;
2  there is a lot of effort in measuring. You have
3  to tailor everything. Whereas off-the-rack
4  suit, that could be half the cost or less, 20,
5  30 percent of the cost.
6    And that's the way to do it. So
7  we're -- that's what we're going to do with the
8  retrofit. It's going to be great. Super easy.
9  And -- but the team of SolarCity installers that
10  we acquired, going to put them to good use.
11  It's going to be great.
12    So we just did a software release of
13  this recently. We're going to iron out the
14  rough edges, and then we're going to do a hard
15  launch, sort of big launch.
16    And this is going to be amazing. I
17  can tell you why it's going to be amazing.
18  Q    That's not my question. I'm not
19  trying to cut you off, but none of this is my
20  question. So I'm happy to let you keep talking.
21  A    Cool.
22    MR. CHESLER: I'm not going to debate
23  with you what your question was, but you can
24  finish your answer.
25    THE WITNESS: I'm telling you you're

Page 44

1  going to want this at the end of this
2  meeting, you're like, oh, man, I want to get
3  this thing, it's going to be great.
4    The key is to make the solar
5  installation so cost efficient that at the
6  end of the day, net of your financing costs,
7  it generates say 500 to $1,000 a year.
8    So if you got financing -- if you have
9  a utility bill, that's maybe like 100 to 200
10  bucks a month.
11    And then so if you're going to have
12  financing on your solar, and then you're
13  going to generate electricity and then the
14  net effect will be a net cash generation of
15  500 to $1,000 a year.
16    And the system using high efficiency
17  panels will be small enough that you can
18  tuck it away on a section of your roof that
19  you can't see, or it's not sort of in
20  prominent view. Because there really -- you
21  don't want to have something which makes
22  your roof ugly.
23    That's very important because that
24  affects your image of the house and it
25  affects the resale value. So it has a real

Page 45

1  financial impact here.
2    So you want to have -- it's small
3  enough that it can be sort of put on a
4  section of your roof that's not too obvious
5  ideally near the garbage cans or something
6  like that, wherever you sort of have that --
7  the side of the house or something.
8    And then you basically have something
9  which is -- it's like a money printer on
10  your roof and it doesn't bother you
11  esthetically or affect the resale value of
12  your house.
13    This is a no-brainer.
14  Q    Right. Are you done? Because that
15  wasn't my question. But are you done with
16  whatever that was?
17  A    I was explaining to you why the -- Why
18  I think that the --
19  Q    Not my question.
20  A    Why I think that the solar growth is
21  going to be incredible.
22  Q    Good.
23  A    You seem to be caring about this a
24  lot.
25  Q    I don't care about anything you just

12 (Pages 42 - 45)

1  said, but we'll go on.  I just want to make sure
2  I understand --
3      A    It's going to knock your socks off.
4  You'll be amazed.  You'll love it.
5      Q    So the question that I am trying to
6  understand is in the context of the --
7      A    Do you want to try one?  We could try
8  one.
9          MR. BARON:  Counsel, I'm going to ask
10     you to have your client actually wait for a
11     question before he keeps talking, or else we
12     will have to end this deposition and I'm
13     going to go to the vice chancellor and have
14     him give specific direction as to how to
15     behave.
16         MR. CHESLER:  Counsel, don't make
17     speeches like that.  Look, you asked him
18     what retrofit was.  You wanted a very short
19     answer.  He told you, I think pretty
20     eloquently, what retrofit is.
21         MR. BARON:  And now I'm trying to ask
22     the next question and he keeps on --
23         MR. CHESLER:  Ask your next question.
24 BY MR. BARON:
25     Q    So let's talk about the engineers that

1  were used for solar retrofit.  Were those the
2  same engineers that came over from SolarCity or
3  were they different engineers?
4      A    The retrofit engineers primarily are
5  from SolarCity.
6      Q    So you used the people who were doing
7  engineering on each of the individual
8  installations and you moved them to Model 3; is
9  that what you're telling us?
10     A    As I answered in my previous question,
11 I moved everyone who could possibly be useful to
12 Model 3.  This included sales, service,
13 delivery, production, supply chain.  It's like
14 all hands on deck.  We need to solve Model 3.
15 And we had a lot of trouble with Model 3 last
16 year, as I'm sure you're aware.  That's in the
17 press.
18        So we solved those problems, and the
19 SolarCity team was very helpful in solving those
20 problems and was instrumental in Tesla's success
21 last year.
22     Q    So --
23     A    Instrumental.
24     Q    So you had the SolarCity engineers
25 doing -- from the retrofit that moved over to

1  work on the Model 3 --
2      A    As I said, more than just that.
3      Q    Please don't interrupt me.
4      Q    Please don't interrupt me.
5      Q    -- and I won't interrupt you.
6      A    Great.
7      Q    So now you also said that you moved
8  management over from solar to the Model 3.
9  Which management did you move over from solar to
10 Model 3 production?
11     A    I moved literally everyone who could
12 possibly be applied.
13     Q    So what's --
14     A    As most direct, Sanjay Shah has
15 been -- who was hired for solar, has been
16 focused on Model 3 activity and only recently
17 redeployed to solar.
18     Q    Anyone else who was hired for solar
19 who was moved over to Model 3?
20         MR. CHESLER:  You mean management?
21         MR. BARON:  Yes, on the management
22     level.
23         THE WITNESS:  I mean, there are
24     literally hundreds of people.  I don't know
25     their names.

1 BY MR. BARON:
2      Q    Okay.  And the sales force, the people
3  who were out trying to sell solar systems, how
4  were they moved over to work on Model 3?  What
5  did you have them do?
6      A    We put them in the Tesla stores.  We
7  had them deliver cars.  Delivery was a big
8  problem last year.
9      Q    Okay.  And how much of the sales force
10 did you move over to Model 3?  The entirety of
11 the sales force, half, 75 percent?
12     A    I think it was probably -- I'm not
13 sure of the exact number.  But it may have been
14 half.  My instructions were:  Move everyone that
15 can possibly be moved.
16     Q    And service, these are the people who
17 would go and fix panels if they would --
18     A    Yes.
19     Q    -- if they would break, et cetera;
20 correct?
21     A    Yes.
22     Q    And how did you move those people to
23 the Model 3?
24     A    I asked them to help out in service
25 and delivery.  Delivery especially was a big

13 (Pages 46 - 49)

1  out the engineering of the product or that it is
2  before you have gotten to that?
3    A    When you design a product, you first
4  come up with the product concept, you design the
5  product, and then a prototype is, relatively
6  speaking, easy compared to designing the
7  manufacturing system.
8        What most people don't appreciate
9  well, particularly in America these days, is the
10  difficulty of manufacturing.  It's extremely
11  difficult.  Especially manufacturing something
12  new and different.
13        So this is -- so you first must say,
14  okay, we'll come up with an initial concept
15  design.  Then let's -- let's try to figure out
16  how to make this initial product design.  Then
17  you have to keep iterating the product design
18  and on the design of the manufacturing system.
19        The manufacturing system is at least
20  ten to 100 times more difficult than the product
21  design itself.
22    Q    Okay.  That's very helpful.
23        So as of Q1, 2017, in that sort of
24  litany, where were you between concept,
25  prototype, and manufacturing?  Were you still on

1  concept; were you in the middle of prototype or
2  were you at manufacturing?
3    A    I think you're illustrating my point,
4  which is, like most people, you don't understand
5  manufacturing.
6    Q    Probably not.  That's why I'm asking
7  questions.
8    A    Right.  So making something, you could
9  make one of something and that's -- you could
10  call that manufacturing.  Or you could make,
11  say, a thousand of something or 10,000 or a
12  million of something.  And the difficulty of
13  manufacturing is roughly proportionate to that
14  rate.
15    Q    I understand.
16        And from your definition, I'm just --
17  you are the person who knows, not me.  You said
18  that -- and I was assuming that you were doing
19  so linearly, which was first you have a concept,
20  and then you can produce a single product, then
21  you can produce prototypes, then you can
22  manufacture, which you said is going into real
23  production that you said is ten to 100 times
24  harder than any of the others.
25        Is that an accurate recitation of what

1  you said?
2    A    Yes.
3    Q    So in that timeline between concept,
4  creating a single product, creating a product
5  prototype and manufacturing, as of Q1, 2017,
6  where were you on the solar roof?
7    A    We were just at the beginning --
8    Q    Okay.
9    A    -- of what's called pilot.
10    Q    So you were at concept?
11    A    Pilot just means you're at the very
12  beginning.
13    Q    What you said is that's the first
14  stage that you're talking about, which was
15  concept?
16    A    No.  You have a concept --
17    Q    Okay.
18    A    -- then you try to make -- you have a
19  concept, you translate the concept into a
20  detailed product design.  You have to create the
21  CAD drawings, you have to figure out the supply
22  chain and figure out all the pieces and put the
23  pieces together, try to make them work.
24        The concept is just an idea.
25    Q    Okay.

1    A    And then you try to build one of them,
2  which is -- even that is very difficult.  And
3  then you say, okay, and usually you get the
4  design wrong and you have to go through many
5  iterations before you finally get the design
6  right after a great deal of effort, and then you
7  get the manufacturing process right at the same
8  time.
9        This is also extremely hard.  It's
10  just tragic and I think sad that America has
11  moved away from manufacturing.  It's really sad,
12  you know.  And this is why people don't
13  understand manufacturing and why you're asking
14  me these questions because you're just too far
15  from it.
16        But think if your talents could have
17  been applied in manufacturing instead of law,
18  that would have been much better.
19        I heard yesterday that 3 percent of
20  the U.S. economy is legal services.  That's one
21  of the saddest facts I've heard in a long time.
22    Q    All right.  So --
23    A    Doesn't that seem wrong to you?
24    Q    No, not at all.
25    A    I suppose it wouldn't.

15 (Pages 54 - 57)

Page 66

1    A    Yes.
2    Q    Now going to the third page, middle of
3  the page under, "Advanced Sustainable Energy,"
4  do you see that it says that, "We deployed
5  87 megawatts in 4Q 2017"?
6    A    Yes.
7    Q    Now, again, as of 4Q 2017, had you yet
8  issued the edict that -- I think your quote was,
9  [as stated]: Everyone we could off of solar and
10  put them on to the Model 3.
11       Had you issued that edict as of Q4,
12  2017?
13    A    No, it was gradual over the course of
14  about a year.
15    Q    So as of Q4 2017, what percentage of
16  your solar employees were redeployed to the
17  Model 3?
18    A    I don't recall.
19    Q    Was it more than half, was it a
20  quarter, was it a --
21    A    I don't recall.
22    Q    Again, if you look at the paragraph
23  where you discuss the, again, reduction in
24  megawatts, it says:  The decision to close sales
25  channel earlier this year and focus on project

Page 67

1  with better margins.
2       What did you mean by close certain
3  sales channels?  Is that getting rid of Home
4  Depot and door-to-door?
5    A    Yes, we wanted to wind down
6  door-to-door, and the Home Depot sales channel
7  decision I think took place over the course of
8  about a year because we could not immediately
9  exit the Home Depot sales channel because of
10  some existing contracts.
11    Q    Again, this paragraph, you'll agree
12  with me, doesn't say anything about redeployment
13  of the solar workforce to the Model 3; correct?
14    A    It does not appear to do that, yes.
15    Q    Is there a reason why you did not
16  disclose that as a reason or one of the reasons
17  for the drop to 87?
18    A    There's only so much you can put in a
19  letter, so I don't think, you know, it warranted
20  being in the letter.  And I think there was
21  certainly at the -- the gravity of the Model 3
22  situation was not immediately apparent.  It took
23  several quarters, several months at least, to
24  understand the degree of difficulty of the
25  Model 3.

Page 68

1       So I think at various times we thought
2  we could solve the Model 3 issues and then
3  redeploy the solar resources back on solar.
4       Unfortunately, the depth of the
5  Model 3 problems were just far greater than we
6  realized.  Since we had never made cars at such
7  high volume before, we did not realize the
8  difficulty of large-scale manufacturing.  It was
9  unchartered territory for us.
10       So at various times, we were
11  optimistic that we could redeploy resources back
12  to solar and only need them temporarily.
13    Q    You made one statement which was we
14  did not consider it, I guess, important enough
15  or significant enough to put into this 4Q letter
16  to shareholders.
17       How do you make the determination as
18  to whether something is significant enough to
19  put into the shareholder letter?
20       MR. CHESLER:  Objection to the form.
21       THE WITNESS:  I mean, generally
22       speaking, it has to pass a financial
23       materiality threshold where it is more than,
24       let's say, a few percent impact on the total
25       financials of the company.

Page 69

1  BY MR. BARON:
2    Q    And at this point did you do some
3  analysis to see whether or not the redeployment
4  that you were doing thus far in fourth quarter
5  of 2017 was financially immaterial?
6    A    We did not think it was financially
7  immaterial.
8    Q    Was there some analysis that did that?
9    A    We thought it was de minimus and
10  really not warranting an analysis at the time.
11       MR. BARON:  We are going to take a
12       break now.  I will remind you that under
13       Delaware rules, you are not allowed to
14       discuss the deposition or the substance of
15       the deposition with your counsel during the
16       breaks.
17       VIDEOGRAPHER:  This marks the end of
18       media Number 1.  Going off the record at
19       11:10 a.m.
20       (Recess taken.)
21       VIDEOGRAPHER:  This marks the
22       beginning of media Number 2.  Going back on
23       the record at 11:25 a.m.
24  BY MR. BARON:
25    Q    As you were walking out after we went

18 (Pages 66 - 69)

Page 70

1   off the record, you said something about
2   somebody being "reprehensible."  What were you
3   talking about?
4       A    Oh, I thought you were reprehensible.
5       Q    For what?
6       A    For attacking sustainable energy.
7   Just, you seem like a very, very bad person.
8   Just a bad human being.  And I hope you come to
9   regret your actions in the future, but you
10  probably won't.  And that's sad.
11      Q    So on your fourth quarter -- let me
12  make sure.  I want to make sure.
13          Did you heed my admonition as to not
14  discuss the deposition with your counsel during
15  the break?
16      A    I know that you're not supposed to
17  discuss the deposition during the break, and I
18  did not.
19      Q    Now, in the same discussion on the
20  fourth quarter 2017, you also in your letter
21  said:  We expect growth to resume later this
22  year.
23          Do you see that?
24          MR. CHESLER:  Sorry.  Where are we?
25          MR. BARON:  Again it's on that same

Page 71

1       paragraph where it talks about 87 megawatts
2       being deployed in that quarter.  So it's
3       under "Advanced Sustainable Energy," about
4       the fifth paragraph down.
5          THE WITNESS:  Yes.
6   BY MR. BARON:
7       Q    Do you see at the end it says:  We
8   expect growth to resume later this year.
9          Do you see that?
10      A    Yes.
11      Q    Is that because as of the end of
12  fourth quarter 2017, you did not expect to be
13  deploying any more solar employees to the
14  Model 3 program?
15      A    The fourth quarter of 2017 update is
16  actually published in 2018.  So this would
17  represent more the situation in 2018, even
18  though this report is -- the financials are for
19  2017, but this report is issued in 2018.
20      Q    So as of the time that this was issued
21  in 2018, were you of the opinion that you were
22  no longer going to be needing to deploy
23  SolarCity employees or solar employees to the
24  Model 3 program?
25      A    No.

Page 72

1       Q    Okay.  How -- what was the basis for
2   you to put in this that you expected to grow
3   later this year?  And by that I assume you mean
4   by end of 2018?
5       A    Right, end of 2018.
6       Q    What was your basis for saying that if
7   you did not believe that you had ended your
8   deployment of SolarCity folks to Tesla Model 3
9   program?
10      A    At the time we did not realize the
11  full gravity of the difficulties with the
12  Model 3 program.  It took us awhile to
13  understand the scale of these difficulties.
14          As I said, we were in unchartered
15  territory.  So many times we thought we were on
16  a good track with Model 3 and, unfortunately, we
17  were not.  We would discover yet another issue
18  that we did not know about.
19          You do realize that it's been a
20  century, a century since any American carmaker
21  has reached volume production.  One hundred
22  years, that's how hard it is.  Many have tried;
23  they all failed.
24          And here you are attacking a company
25  that has done this, done this good thing for the

Page 73

1   United States, ultimately something that
2   benefits you and the world.
3       Q    To bail out SolarCity?
4       A    You are a shameful person.
5       Q    To bail out SolarCity was good for the
6   world you're telling us?
7       A    Advancing solar is absolutely good for
8   the world.
9       Q    They were all --
10      A    Do you just think about -- do you just
11  think about money?  Is that your motivation?
12  What is your purpose in life?
13      Q    My purpose is to try to get honest
14  answers out of you, Mr. Musk.  I've not been
15  successful thus far.
16      A    Why do you do anything?
17      Q    Let's go on.
18      A    What motivates you?  Is it money?
19      Q    So --
20      A    Is that the only thing?
21      Q    What motivates me now is to try to
22  actually get honest answers from you, Mr. Musk.
23  So let's see if we can achieve that.
24      A    You should ask yourself this question.
25      Q    I'm answering your question, but let's

19 (Pages 70 - 73)

Page 74

1  try to move on.
2      A   You should think about it.  Why do you
3  do anything?  What is the purpose of life?
4      Q   So let's move on.
5      A   What's good for the world, and is what
6  you're doing good for it or not?
7          MR. BARON:  I'm going to mark as
8  Exhibit 9 the Tesla first quarter 2018
9  shareholder update.
10         (Exhibit 9 was marked.)
11 BY MR. BARON:
12     Q   Before I focus on this, help me out on
13 your earlier statement that the reason that
14 megawatts deployed has been trending down since
15 the acquisition of SolarCity is because you --
16 because you took everyone off of SolarCity and
17 put them on the Model 3.  That was your words.
18     A   No, no.  I said everyone that could
19 reasonably be deployed.  My -- my instructions
20 were:  Over time, not immediately, but over time
21 to apply everyone that could reasonably be
22 applied to the Model 3 program from solar and
23 from every other part of the company, not just
24 solar, to work on the Model 3 program because if
25 we did not solve the Model 3 program, if we did

Page 75

1  not solve scale production of car manufacturing,
2  which no new company has sold for a century,
3  then Tesla would die.
4          This was the right decision for the
5  company, obviously.
6      Q   So at some point in time between Q3
7  2016 and Q1 2019, you, in fact, did take
8  everyone who could possibly be taken off solar
9  and put them on the Model 3 program; correct?
10     A   Those were my instructions.  My
11 instructions are followed to some degree but not
12 fully.  This is the nature of a large company.
13     Q   Do you know whether or not they were
14 followed?
15     A   They were followed to some degree.
16     Q   By when did it actually take place
17 that everyone who could be taken off of solar
18 was placed on Model 3?
19         Give me a time frame by when that had
20 actually taken place.
21     A   This is just -- this is an estimate
22 because obviously I do not have ESP.  So I only
23 know what people around me have said or if I
24 receive an email or text or something like that,
25 or perhaps I can do a best guess situation.

Page 76

1          But the most dire period for Model 3
2  was around -- it was basically early to mid
3  2018.  So like last year, I would say that
4  probably second quarter last year was the most
5  dire period for Model 3, although there were
6  many dire periods.
7      Q   So by the time you were in the most
8  dire period, was it your belief that your
9  employees had done what you asked and moved
10 everyone who could be moved off of solar on to
11 Model 3?
12     A   Yes.  But it's important to
13 appreciate, when there is a company that's sort
14 of over 40,000 people, just because you're the
15 CEO does not mean what you ask for exactly
16 happens.
17         And, in fact, sometimes bizarrely,
18 what you ask for, the opposite can happen or
19 something orthogonal or approximately what you
20 asked for.
21         So you may think things are one way
22 but they are actually another way.  This is the
23 way it goes.
24     Q   Did you ever learn that your
25 instructions to redeploy everyone who could be

Page 77

1  redeployed to the Model 3 did not get carried
2  out?
3      A   I'm not aware of anything.
4      Q   Okay.
5      A   It wasn't just redeployment from
6  solar, it was also redeployment from solar
7  storage -- I mean energy storage.  So the power
8  pack redeployed from Model S and X, from other
9  vehicle programs, from other future programs.  I
10 mean at various points, we even had the legal
11 team delivering cars.
12         THE WITNESS:  Jonathan, remember that?
13         MR. CHANG:  I do.
14         THE WITNESS:  More than once.
15         The point which you're redeploying
16 literally the legal team and the HR
17 department and the finance department to
18 deliver cars, you're in effect redeploying
19 the solar team as well.
20 BY MR. BARON:
21     Q   On Page 3 of what I've marked as
22 Exhibit 9, do you see under, "Advanced
23 Sustainable Energy," the second paragraph talks
24 about:  We also deployed 76 MW of solar energy
25 generation.

20 (Pages 74 - 77)

1        Do you see that?
2    A    Which one?
3        MR. CHESLER:  It's the third paragraph
4    under "Advanced Sustainable Energy."
5        THE WITNESS:  Yes.
6 BY MR. BARON:
7    Q    Again -- so that again is consistent
8 with what we have on the chart for Q1 2018;
9 correct?  It's again Exhibit 2.
10   A    Yes.
11   Q    Is that right?
12   A    Yes.
13   Q    And, again, you indicate that the
14 decline was due to the decision to shutter
15 certain sales channels and market segments.
16        Do you see that on the paragraph
17 directly below?
18   A    Yes.
19   Q    Again, there was no disclosure over
20 the fact that you were redeploying and
21 redeploying people from solar to Model 3;
22 correct?
23   A    Correct.  But, I mean, there were also
24 no disclosures on the fact that we redeployed
25 the finance team, the legal team, the HR team,

1 the power wall team, the Model S and X team to
2 help with Model 3 as well.
3    Q    Was the drop again from -- let's --
4 the drop from Q3 2016 to Q1 2018, which was from
5 189 down to 76 at this point, was that caused in
6 any part, or any material part, due to the
7 redeployment of solar employees to the Model 3
8 program?
9    A    Yes.  Of course in some part.
10   Q    Okay.
11   A    I mean, obviously there are three
12 parts to this:  There is exiting commercial
13 industrial installations; there is exiting
14 certain sales channels, and there was
15 redeployment to the Model 3 program.
16        Every point that we thought would be
17 temporary ended up lasting longer than we
18 expected.
19   Q    In the first quarter of 2018, you
20 disclosed to your shareholders that you
21 shuttered certain sales channels and that there
22 was decisions to alter market segments.
23        But, again, there was no decision to
24 discuss that you were redeploying as a cause for
25 the drop now down to 76 megawatts.

1        Is there a reason you chose not to do
2 so?
3    A    I mean, there's limited space for what
4 we can put out in an earnings letter.
5    Q    Really?  So that extra phrase -- that
6 extra sentence was beyond the capacity of Tesla
7 to write a sentence:  And we are redeploying our
8 employees from solar to the Model 3?
9    A    I think if you were to take a look at
10 the earnings transcripts of the earnings calls,
11 I suspect you would find comments to that
12 effect.
13   Q    Okay.  But it wasn't because it was
14 not possible for Tesla to add another sentence
15 to this paragraph; correct?  That was within
16 Tesla's capabilities?
17   A    We could have added, I guess, an extra
18 sentence.  But you can make that argument for
19 any extra sentence and then you would have a
20 book.  So I think it's a silly point that you're
21 making.
22   Q    Okay.  Now --
23   A    But you said you wouldn't interrupt
24 me, sir, did you not?
25        Okay.  You can't include everything,

1 obviously, in an earnings letter.  And if you
2 can make the "can't you add just one more
3 sentence" argument, you can make that for every
4 sentence and then you can have a book.
5        However, if you look at the earnings
6 transcript, I'm quite confident you will find
7 repeatedly that I say we're redeploying every
8 available asset to the Model 3 over and over
9 again.
10   Q    Did you make a determination that the
11 amount of the redeployment of the Model 3 as to
12 first quarter 2018 was not, using your phrase,
13 financially material enough to disclose?
14   A    As I said, if you look up the earnings
15 transcript, I think you'll find many comments
16 where we're clear we're redeploying every asset
17 including people that are normally considered
18 not in the direct operating line of the company
19 towards the Model 3.
20   Q    My question was, and I'll ask it
21 again:  Did you make a determination for the
22 first quarter 2018 that the amount of
23 redeployment from solar to Model 3 was not
24 financially material?
25   A    Yes, I think we probably thought it

21 (Pages 78 - 81)



Page 98

1  detrimental to the business if we do not
2  improve the cost of installation, the total
3  cost of installation at a rate faster than
4  the ITC credit reduction.
5        Just sort of stepping back here for a
6  second.  I mean it when I say I think you
7  guys are wasting your time here.  I would
8  recommend you don't apply more resources to
9  this until end of the year or later ████
████ ██████████████████████████████████
████ ████████████████████████████████████
████ ████████████████
████ ██████████████████████████████████
████ ████████████████████████████And
16  it's just like why?  Life is short.  There's
17  better things to do.
18  BY MR. BARON:
19   Q    So was there a plan -- was there some
20  plan that actually did what you just said which
21  said, this is what we're going to lose in ITCs;
22  this is what we have to make up in costs and we
23  can do that by doing the following?
24        Is there a plan somewhere that I have
25  missed in the 2 million documents that have been

Page 99

1  produced in here that actually sets that forth?
2        MR. CHESLER:  Objection to form.
3        THE WITNESS:  I mean, I've been quite
4  distracted with this Model 3 program, at the
5  risk of like mentioning the word "Model 3"
6  too many times.
7        Man, I got major scar tissue in the
8  brain from the Model 3 program.  That was a
9  hard one.
10        So the principle that the total cost
11  of installation needs to decline faster than
12  the investment tax credit decline is
13  obvious.
14        But as we talked about, we had this
15  very difficult distraction with the Model 3
16  program.  It's not over yet, but I think it
17  will be over soon.  And then we can apply a
18  lot of attention to the solar system ████████
████ ██████████████████████████████
████ ██████████████████████
████ ████████████████
23  BY MR. BARON:
24   Q    My concern is at the time of the
25  acquisition, it was well known to you at least

Page 100

1  that for the SolarCity acquisition to be a
2  viable acquisition, there had to be a means by
3  which there was a cost-cutting plan that equaled
4  or exceeded the benefits to the ITC that were
5  going away; correct?
6        MR. CHESLER:  Objection to the form.
7  Misstates the testimony.
8        MR. BARON:  No.  I'm asking a
9  question.
10   Q    I don't care whether you said that or
11  not.  I want to know whether it's true.
12        Do you agree that at the time of the
13  acquisition, Mr. Musk, for it to make any sense,
14  people had to be sure that there was a
15  cost-cutting program that could equal or exceed
16  the benefits to the ITC program?
17        MR. CHESLER:  Objection to the form.
18  BY MR. BARON:
19   Q    That's the only way it makes sense;
20  right?
21        MR. CHESLER:  Objection to form.
22        THE WITNESS:  No.  You're sort of
23  stating the question in a sort of trickstery
24  way.  You can't be sure of these things.
25  How can you be sure of these things?

Page 101

1        How much are you sure of?  Probably
2  shouldn't be sure of a lot because, I mean,
3  hopefully the sun rises tomorrow.  It's
4  likely, but it's not certain.
5        So -- well, that is one of the more
6  certain things.  But predicting the outcome
7  of businesses and, you know, acquisitions,
8  you know, if that's -- if the requirement
9  for doing so is that you bat 1,000, then
10  there will be no acquisitions.
11        The same goes for starting any company
12  or trying to grow any company or trying to
13  launch a new product, that comes with a lot
14  of risk and a lot of unknown and you make
15  these decisions and you do your best and
16  hopefully it's a good outcome.
17        And it's a very difficult and arduous
18  thing to make electric cars and do solar
19  power.  And fighting all these incumbent
20  interests that are very powerful, but it's a
21  very important thing for the world.  We need
22  to accelerate this advent of sustainable
23  energy or it's going to be bad for all of
24  earth.  We have to do it.  We have to do it
25  even though it's very difficult and it's

26 (Pages 98 - 101)

Page 114

1  folks?
2      A    Yes, I think there was -- yes, I think
3  it did include sales folks.
4      Q    Okay.  And service, are service
5  salaried or some of them are and some are not?
6      A    You mean -- service -- generally those
7  who are managers, generally do not have -- they
8  are on salary.  And those who are -- if you're a
9  service technician, then you're hourly.
10     Q    Of that 9 percent, some of them were
11 also SolarCity service folks?
12     A    I do not -- I don't know specifically
13 what the exact numbers were.  This -- I mean,
14 the larger point was we needed to reduce our
15 costs in order to break even --
16     Q    But --
17     A    -- across the company.
18     Q    -- you'll acknowledge that by reducing
19 the number of employees that you have working in
20 solar, that is going to affect the ability for
21 the business to grow.  It may be more
22 profitable, but it's not going to grow as much;
23 correct?
24         MR. CHESLER:  Objection to form.
25 BY MR. BARON:

Page 115

1      Q    Less sales, less salespeople, less
2  sales; that's not brain surgery?
3         MR. CHESLER:  Objection to form.
4         THE WITNESS:  No, I think that the --
5      actually, our Model 3 sales grew quite a bit
6      from Q2 last year to Q3 and Q4.  And then we
7      had a lot of logistics challenges especially
8      in Q1 of this year and they declined.
9  BY MR. BARON:
10     Q    So are you saying that the layoff of
11 9 percent of the worldwide workforce had no
12 effect on the SolarCity business or the
13 megawatts deployed?
14     A    You keep trying to phrase these
15 questions in a tricky manner.
16     Q    I don't know why.  But if you can't
17 answer the question, I'll ask it again if you
18 think it's tricky.
19     A    Because, I mean, you'll use
20 absolutisms, so like "no effect," for example,
21 which is silly.  That's because, obviously, zero
22 is a small number.  So probably had some small
23 effect.  But did it have a big effect?
24 Certainly at the time this does not -- the
25 intent was not to -- neither the intent nor the

Page 116

1  expectation was that it would have a big effect
2  on solar.
3         But the attention was not on solar.
4  The attention was the Model 3 program, as I've
5  mentioned many times.  So I was not
6  micromanaging the solar program; I was busy
7  micromanaging the Model 3 program.  You can only
8  micromanage so much.  It's not easy.
9      Q    So as part of the 9 percent cut, that,
10 in fact, did sharply downsize the residential
11 solar business; isn't that correct?
12         MR. CHESLER:  Objection to form.
13         THE WITNESS:  No, I don't think --
14     there's something that was not intent or
15     expectation of downsizing the solar business
16     that I...
17 BY MR. BARON:
18     Q    It also included the closing of about
19 a dozen installation facilities too as well;
20 right?  Isn't that what happened when you
21 announced the 9 percent cut?
22     A    I think -- by "installation
23 facilities," do you mean like warehouses?  I
24 think that's what you mean.  There were some
25 warehouses that I was told were not worth it and

Page 117

1  so we closed some warehouses.  That's my
2  understanding.
3         I don't call them installation
4  facilities.  They are storage places for solar,
5  you know, warehouses.
6      Q    I'll show you where I got that from
7  and you can tell me whether it's wrong.
8         MR. BARON:  Can I have the Reuters'
9      article?
10        THE WITNESS:  God, not Reuters.  They
11     are the worst.
12 BY MR. BARON:
13     Q    You're welcome to tell me it's false.
14     A    Reuters has written so many false
15 articles.  They should get a metal.
16        MR. BARON:  Can you mark this as --
17        THE WITNESS:  Wait, give them the
18     Jayson Blair award.  Remember that guy?
19        MR. CHESLER:  I do.
20        THE WITNESS:  Award for best fiction
21     in the news industry goes to Reuters.  Send
22     them a trophy.
23        (Exhibit 14 was marked.)
24 BY MR. BARON:
25     Q    So I have before you a Reuters'

30 (Pages 114 - 117)

1       MR. BARON:  Can you mark this as
2   Exhibit 19, please.
3       (Exhibit 19 was marked.)
4       THE WITNESS:  People like you make me
5   sad about the future and sad about America.
6   BY MR. BARON:
7   Q    It's not my intention to make you sad,
8   Mr. Musk.
9   A    Instead of doing useful things, you do
10  this.  Instead of making things, you destroy.
11  Q    Oh, that was not a joke?
12  A    No, it wasn't.  How do you live with
13  yourself?
14  Q    Can you go to -- I'm showing you what
15  has been marked Exhibit 19, and this is a board
16  of directors' meeting agenda.
17      And as you can see, attending this
18  meeting was Elon Musk.  This is on June 20th,
19  which would be two days before you made the
20  statements identified in interrogatory 1 and 2.
21      Would you agree with that, that June
22  20th is two days before you made the statement?
23  A    That June 20th is two days before
24  June 22nd?
25  Q    So we can agree on things.

1       And you attended that meeting;
2   correct?
3   A    I think you should reconsider your
4   life.
5   Q    Would you like to answer my question?
6   A    What was the question?
7   Q    You attended the meeting on the 20th;
8   correct?
9   A    Are you saying June 20th, 2016?
10  Q    Yes.
11  A    Yes.
12  Q    At that meeting you were given a
13  presentation by Evercore; correct?  And that
14  would be -- if you can turn a couple of pages,
15  you'll see there is board discussion materials
16  prepared by Evercore.
17  A    Yes.
18  Q    You recall receiving that
19  presentation; correct?
20  A    Yes.
21  Q    In fact, that was probably emailed to
22  you before the actual presentation; correct?
23      It was emailed to you before you got
24  on the call?
25  A    It might have been.  I don't know.

1   Q    Go to Page 11 of this presentation,
2   please.
3   A    Are you a happy person?
4   Q    I'm an extremely happy person.
5   A    That's tragic.  You shouldn't be.
6       MR. CHESLER:  The page that's
7   Number 11 on the presentation?
8       MR. BARON:  Yes, that's correct.
9       THE WITNESS:  You must have no
10  conscience.  Yes, that rings true.  I can
11  tell by the laugh.
12  BY MR. BARON:
13  Q    So do you bully people all the time?
14  Is that sort of your regular course of conduct?
15  A    No, that's your job.
16  Q    I'm just asking you questions.  I have
17  not insulted you once, Mr. Musk.
18  A    You are a professional.
19  Q    Mr. Musk, I have not insulted you
20  once.  You've insulted me a number of times.  Is
21  that just your regular course of conduct?
22      Is that your regular course of conduct
23  is to insult people because they ask you
24  questions?
25  A    You are a professional bully.  That's

1   what you do for a job.
2   Q    I'm asking --
3   A    You chose that as a job.
4   Q    I'm asking you a question, Mr. Musk.
5   A    Why did you choose that job?
6   Q    I'm asking you the questions.  My
7   question is:  Are you a bully to everybody or is
8   it just in this particular context?
9   A    Why did you choose professional
10  bullying as a career?
11  Q    All right.  We'll move on.
12  A    That's very sad.
13  Q    So take a look at Exhibit 11 or
14  Page 11 of -- Page 11 of Exhibit 19.
15      Now, is this consistent with the
16  amount of debt that you understood that Tesla
17  would be inheriting once it acquired SolarCity?
18  A    I assume this is correct.  Obviously
19  it's three years ago.  Probably correct.
20  Q    It's $3 billion, $3.164 billion;
21  correct?
22  A    I mean, that's the number on this
23  page.  And can you explain to me how the fact
24  that it is acquiring $3.164 billion means that
25

1 it really doesn't increase the debt position or
2 lever up the bank balance?  Do you think those
3 are consistent phrases?
4     A    So, I mean, this says, "Total recourse
5 debt of 1.5, nonrecourse of 1.6."
6        I mean, obviously this adds debt to a
7 balance sheet, but Tesla had a lot of debt as
8 well.
9     Q    Yes.  So that would not -- that would,
10 in fact, lever up the balance sheet; correct?
11     A    I don't know if it changed the portion
12 of leverage by a lot relative to the debt that
13 Tesla had.  All companies have debt, obviously.
14     Q    So let's look at the combined debt
15 then.  Let's go to Page 77 of the document.
16        MR. CHESLER:  Sorry, what page?
17        MR. BARON:  Seventy-seven.
18        THE WITNESS:  I think you're actually
19 sad.  That's my guess.  You pretend to be
20 happy.
21 BY MR. BARON:
22     Q    So are you looking at Page 77?
23        So on the 20th, you were also told
24 what the combined debt was; correct?
25        Do you see that?

1     A    Yes.
2     Q    Okay.  And it shows that SolarCity
3 adds, you know, a substantial amount of debt to
4 what Tesla already had; correct?
5        MR. CHESLER:  Objection to form.
6        THE WITNESS:  Okay.  I see what one of
7 the issues is here.  The Tesla debt is
8 actually more than it appears on this chart.
9        But the -- it's quite a bit more than
10 appears on this chart because the revolving
11 credits or the asset-backed line has
12 generally a very big swing within a quarter.
13 But then it tends to be low at the end of
14 the quarter because we complete our
15 deliveries.
16        And so this -- thus, SolarCity does
17 not, I think, do that.  So the proportion of
18 debt that SolarCity adds I think is not --
19 was not especially vague from a recourse
20 debt standpoint.
21        Securitization of solar panels and of,
22 you know, car leases and loans is not
23 recourse debt to a company.  Revolving
24 credit and asset-backed lines are.
25        But it depends on when those revolving

1 credit lines are closed out and whether
2 there are large intra-quarter swings or not.
3        And because Tesla delivers cars all
4 around the world, it is typical for Tesla to
5 have large revolving credit swings within
6 the quarter that -- because we make cars for
7 Europe and Asia in month one, and we make
8 cars for the East Coast in month two, and
9 make cars for the West Coast in month three.
10 We have one factory which is located in
11 California.
12        So by the end of the quarter, the debt
13 is relatively low because we have completed
14 deliveries.
15 BY MR. BARON:
16     Q    Okay.  You understand these are
17 identified as being the debt maturities;
18 correct?
19     A    Revolving credit --
20     Q    No.  That's what this chart says, the
21 very top page says, "Summary of combined debt
22 maturities."
23        It's not talking about inter-month or
24 inter-period debt obligations?
25     A    Yes.  But you see that the biggest

1 green line is revolving credit.  Do you
2 understand what revolving credit is?
3     Q    I do.
4     A    Great.
5     Q    Again, all I'm asking in my question
6 was very simple.  Perhaps I misspoke.
7        You agree with me that regardless of
8 what Tesla's debt was, SolarCity was, in fact,
9 increasing the debt position of Tesla?
10     A    I mean, essentially every company
11 acquisition, if that company has any debt,
12 increases it to some degree.  The question is
13 whether it increases it to a materially
14 disproportionate degree.
15     Q    You said, when asked the question: It
16 doesn't increase the company's debt position.
17 Correct?
18        MR. CHESLER:  Objection to the form.
19        Mischaracterizes the statement.
20 BY MR. BARON:
21     Q    Okay.  It doesn't -- it really
22 doesn't, is that what the "really" meant was it
23 does but just not that much?
24        MR. CHESLER:  Same objection.  Same
25 problem with the question.

38 (Pages 146 - 149)

1      That wasn't a true statement; correct?
2          MR. CHESLER: Objection to form.
3          THE WITNESS: I'm sure I thought it
4      was correct.
5  BY MR. BARON:
6      Q    Again, so we asked you for the basis
7  for it. So the first document that you
8  provided -- and again, look at the -- Appendix A
9  was Bates range number 02323, and that is a
10 board of directors Q1 '16 meeting from
11 SolarCity.
12         MR. BARON: Can you mark this as
13     Exhibit 22.
14         (Exhibit 22 was marked.)
15 BY MR. BARON:
16     Q    Just so that I am clear, you're
17 telling investors of the conference call that
18 this company is -- while it may be cash flow
19 positive now, in the next three to six months,
20 it will be cash flow positive.
21         Isn't that what this says?
22     A    That's the statement.
23     Q    And that's going forward, that's not
24 just like at one point in time, we may actually
25 be cash flow positive in one quarter and then

1  never again; that's not what you meant?
2      A    I mean, this is three years ago. I'm
3  not sure -- I don't recall exactly what every
4  statement meant, so --
5      Q    You agree with me that it would be
6  misleading to say we're going to be cash flow
7  positive when all you meant was we are going to
8  be cash flow positive for one quarter but never
9  again?
10         MR. CHESLER: Objection to the form --
11 BY MR. BARON:
12     Q    That would be misleading?
13         MR. CHESLER: Objection to the form of
14     the question.
15         THE WITNESS: I don't think I thought
16     that would be negative cash flow after that.
17 BY MR. BARON:
18     Q    Okay. So you first identified this
19 board of directors' meeting for Q1 2016. Did
20 you actually look at this presentation at some
21 time -- this was on February 2nd, 2016.
22         Did you look at this presentation at
23 some time prior to June 22nd when you made the
24 statement, other than maybe at the February 2nd,
25 2016 board meeting?

1      A    I don't recall.
2      Q    Well, what in this document supports
3  the fact that SolarCity is headed to be cash
4  flow positive in the next three to six months?
5      A    This is three and a half years ago.
6  Would you like me to carefully review this and
7  give you a considered answer? How much time
8  would you like me to spend on this?
9      Q    Well, didn't you just do that? Didn't
10 you just give a careful answer when you actually
11 signed under penalty of perjury that this
12 document supported it?
13         Didn't you already do that?
14         I shouldn't be asking you to do
15 something that you didn't do when you signed
16 under penalty of perjury.
17         MR. CHESLER: Objection to the form of
18     the question.
19         THE WITNESS: I can't recall what --
20     you're asking me to refresh what I looked at
21     some time ago. So what -- what sort of
22     expectations for memory do you have? This
23     is unreasonable.
24 BY MR. BARON:
25     Q    These interrogatories were served on

1  May 17th, 2019.
2      A    I mean, you just keep trying to ask
3  all of these tricky questions, just being sort
4  of a professional bully and trickster. But not
5  doing a very good job.
6      Q    So you signed under the penalty of
7  perjury that this was a document that supported
8  your March 22nd statement. I asked you when we
9  started: Does that mean that you actually
10 looked at these documents that were listed on
11 Exhibit A and identified what was in those
12 documents actually supported the statement.
13         You said, "yes."
14         So I'm just asking you what those --
15 what the statements within this document was
16 that supported your June 22nd statement that it
17 is headed toward cash flow positive in the next
18 three to six years. If you're telling me you
19 can't --
20     A    Three to six months.
21     Q    Three to six months. If you're
22 telling me that you can't do that, then we will
23 move on.
24     A    No. I just asked you how much time do
25 you want me to spend on this?

42 (Pages 162 - 165)

1    Q    This deposition is going until I'm
2  done, so I don't care.
3    A    It's going for seven hours.
4        MR. CHESLER: Going for seven hours.
5        MR. BARON: Under what law? Under
6  what jurisdiction?
7        MR. CHESLER: Do you want to swear me
8  in and take my deposition? We have seven
9  hours of clock time; that's how long he will
10  be here for.
11        MR. BARON: Well, then we're coming
12  back after that's done.
13        THE WITNESS: Yes, it will.
14        MR. CHESLER: That may or may not
15  happen. You don't get to control that.
16        MR. ZAGAR: The court gets to control
17  that.
18        MR. CHESLER: Exactly.
19        MR. BARON: What is your basis for
20  seven hours?
21        MR. CHESLER: I said if you want to
22  swear me and take my deposition, you can. I
23  just made a statement. Let's move on.
24        THE WITNESS: My understanding is this
25  lasts for seven hours. I guess we're --

1        MR. BARON: Your understanding would
2  be incorrect and not consistent with
3  Delaware laws. So this deposition is going
4  until we're done.
5        MR. CHESLER: You're here just for
6  today unless a court orders otherwise. So
7  let's go on.
8        THE WITNESS: Spend your time wisely.
9  BY MR. BARON:
10    Q    I'm the one that gets to ask the
11  questions. I'll keep asking them until you walk
12  out and then I'll bring you back.
13    A    You just want to waste everyone's time
14  and be a blight on the economy.
15    Q    Again you insult.
16    A    Statement of fact.
17    Q    Tell me what --
18    A    I think you should reconsider what
19  you're doing.
20    Q    Please tell me what within Exhibit 22
21  supports your statement on Interrogatory
22  Number 3.
23    A    Well, on Page 12, going from July to
24  December, cash increases from 144 to 153.
25    Q    Okay. Does that mean that you're cash

1  flow positive? Does that mean that out of
2  operations, you are going to -- operations, its
3  cash is going to -- that they are going to be
4  cash flow positive, meaning that they are going
5  to make more money than they are spending?
6        MR. CHESLER: Objection --
7  BY MR. BARON:
8    Q    Is that what liquidity means to you?
9        MR. CHESLER: Objection to the form of
10  the question.
11        THE WITNESS: This appears to show 144
12  going to 153, and 144 in July and 153 in
13  December, which 153 is bigger than 144.
14  BY MR. BARON:
15    Q    Okay. And you're right. It shows
16  that they are about to potentially default on
17  their -- or at least breach their covenant in
18  three months or three months in here. And then
19  in October, November and December, it will be
20  above their debt covenants on liquidity.
21        In your view, that was -- was that
22  your basis to say that the company was headed to
23  a cash flow positive situation in the next three
24  to six months?
25        MR. CHESLER: Objection to the form of

1  the question and that it doesn't correspond
2  to the interrogatory.
3        MR. BARON: I don't know what that
4  means. And it's a speaking objection.
5        THE WITNESS: My understanding was
6  that the cash flow by the end of the year
7  would be -- the cash position would be
8  better than -- you know, from July to
9  December would be better.
10  BY MR. BARON:
11    Q    Is that your definition of cash flow
12  positive is that if --
13    A    More cash.
14    Q    -- if you have more cash one quarter
15  than you did the quarter before, that in your
16  view is a cash flow positive company?
17        MR. CHESLER: Objection to the form of
18  the question.
19  BY MR. BARON:
20    Q    Just asking your definition of cash
21  flow positive.
22    A    You know, it would be if you have --
23  if the company, by whatever means, generates
24  more cash than it starts with over a period of
25  time, then its cash position has increased; it's

43 (Pages 166 - 169)

1  SolarCity -- and let's look at the credit
2  quality issues.
3       Did anybody ever tell you that solar
4  bonds were non-investment grade?
5    A   I don't recall.  I don't recall.  But,
6  like I said, I mean, I thought the probability
7  of repayment was very high.
8       Like I said, Moody's and S&P have
9  gotten it wrong so many times.  They just look
10 in the rearview mirror.  But I mean, the problem
11 with those guys is if it's a winding road, they
12 are wrong.
13      It was like look at the road ahead,
14 behind was all straight.  But then like to turn
15 around the cliff and from those guys'
16 standpoint, everything would be fine.  And then
17 the car goes off the cliff.
18   Q   Okay.
19   A   Their rearview mirror analysis is
20 their approach.
21   Q   And, again, if you look at this, it
22 says that, "Solar bonds are effectively
23 subordinate to virtually all of SolarCity's
24 other debt."
25      Did you see that?

1    A   I mean, yes.  I guess I saw it.
2    Q   And is that your understanding?  Is it
3  true?
4    A   Sure.
5    Q   Okay.
6    A   Like obviously SolarCity was able to
7  raise funding many times in the public markets.
8  And if there hadn't been a Tesla acquisition,
9  they would have just done that again and that
10 would have been that and it would have been
11 fine.
12   Q   Now, do you see the next bullet under
13 Credit Quality that: The company has amended
14 its credit facility terms over the past couple
15 of years because it has not been able to satisfy
16 covenant requirements.
17      Did you know that to be true?
18   A   You know, I don't think these details
19 are all that relevant.  I don't recall this
20 particular point.
21      I mean, at a high level, seems to me
22 that as long as SolarCity could continue to
23 raise money in the public markets, which they
24 demonstrated an ability to do, then they would
25 be able to repay whatever the debt was.  Yes.

1    Q   Again, on the company liquidity, do
2  you see here where it says that there are
3  several questions around liquidity in the event
4  of a downturn in the business?
5       Do you see that?
6    A   Sure.
7  █████████████████████████████████████
8
9  ██ ██████████████   As we talked about earlier
10 in this deposition, you know, had we not
11 repurposed so much of SolarCity's resources
12 towards helping Tesla with the Model 3, they
13 would have executed better, a lot better than if
14 they had been an independent entity.
15      And so you can't look at this thing
16 independent once it's a combined company.  And
17 you can't look at it from a standpoint of -- my
18 view -- that they should be different sales
19 channels which necessarily requires some
20 refactoring of the business.
21   Q   So let me --
22   A   So it's just -- you're just
23 fundamentally barking up the wrong tree.
24   Q   Let me make sure -- fair.  Let me make
25 sure I understand your premise.

1       Your premise is that SolarCity alone
2  could not operate and needed Tesla to be able to
3  operate at full potential, but that Tesla was
4  not able to bring SolarCity to its full
5  potential yet because of Model 3.  Is that a
6  fair assessment of your story?
7    A   Please stop it with the complex,
8  tricky questions.  Seriously.  This is a
9  nonsense --
10   Q   Is that not correct?  What is tricky
11 about that question, Mr. Musk?
12   A   When you create a complex question, in
13 answering a complex question, you effectively
14 agree with part of the question as what the
15 question is saying.
16      So when you read back the testimony,
17 this is like a common way that people like
18 yourself trick people.  It's not good.  And they
19 teach you this in law school.
20   Q   No one taught me this in law school.
21   A   Okay.  You weren't listening to the
22 professor then.  This is standard issue.
23      So Tesla and SolarCity both had a lot
24 of challenges, as all companies have challenges.
25 And SolarCity I think would have done just fine

52 (Pages 202 - 205)

Page 234

```
 1    A    Yes.
 2    Q    Do you know what those
 3  important/disturbing issues were?
 4    A    I don't recall.
 5    Q    Let's look at the presentation that
 6  was provided to the board of directors.
 7         MR. BARON:  Can I have the email and
 8  presentation dated April 26th.
 9         (Exhibit 37 was marked.)
10  BY MR. BARON:
11    Q    Just so that we're -- you did not --
12  when Mr. Fisher says, "It sounds like we have
13  some important/disturbing issues to discuss," it
14  looks to me like you were aware that there were
15  important/disturbing issues to discuss because
16  you did not ask Mr. Fisher what he's talking
17  about; correct?
18         MR. CHESLER:  Objection to the form of
19    the question.
20         THE WITNESS:  I didn't know what he
21    was talking about.  What I was saying is
22    that I'll be calling in and we can talk --
23    hear what he's talking about.
24  BY MR. BARON:
25    Q    You know for sure you didn't know what
```

Page 235

```
 1  he was talking about?
 2    A    I had no idea.
 3    Q    Now, going through --
 4    A    By the way, it looks like important
 5  and disturbing issues, like, is a standing
 6  comment at any --
 7    Q    At SolarCity?
 8    A    No, at any company that is in a high
 9  growth and isn't just like McDonald's or
10  something, although arguably they do have
11  disturbing issues.
12         But if you're steady state, things --
13  there's not much that rocks the boat.
14  McDonald's will sell about as many burgers last
15  year as they did this year.
16         But in a high-growth company with a
17  lot of things happening, new industry, there are
18  always important/disturbing issues.  It's a
19  standing -- this is nothing special.
20    Q    So going through -- so tell me whether
21  or not you think these are important or
22  disturbing issues.  Going through the
23  presentation, if you take a look at the
24  Quarterly Overview, this is going to be on
25  Page 6.
```

Page 236

```
 1    A    Do you drive a gasoline car?
 2    Q    Yes.
 3    A    How embarrassing.  You can afford an
 4  electric car.  Save the environment.
 5    Q    I'm one of the few.  I appreciate
 6  that.
 7    A    Why do you hate the environment?
 8    Q    I haven't sent a rocket into space, so
 9  I guess I haven't hurt the environment doing
10  that.
11    A    I got you.  What is it, a Mercedes or
12  an Audi?  Is it a diesel Audi?
13    Q    Nope.
14    A    Okay.
15    Q    It's not.
16         So let's look at the Quarterly
17  Overview.  We'll see from the Quarterly
18  Overview that from the first to fourth
19  quarter in the cash and short-term
20  investments it went down.
21         Do you see that?  It's on Page 6.
22  It's the other page.
23    A    Mercedes, Audi or BMW?
24    Q    So, again, you see that it went from
25  the short-term -- cash and short-term
```

Page 237

```
 1  investments went from -- in the 2015 -- first
 2  quarter in 2015 from 575 down to 361.
 3         Do you see that?  So cash went down?
 4         MR. CHESLER:  No -- oh, you're talking
 5    about through the first quarter of the
 6    following year?
 7         MR. BARON:  Yes.
 8    Q    You see that; right?
 9    A    What line are you referring to?
10    Q    I'm looking at Debt and Cash.  Cash
11  went from -- first quarter to first quarter, it
12  went down.  Do you see that?
13    A    In 2016?
14    Q    First quarter of 2015 down to first
15  quarter of 2016, cash was less?
16    A    Yes.
17    Q    All right.  And debt was more;
18  correct?
19    A    Yes.  According to this, yes.
20    Q    Did you find that disturbing or
21  important?
22    A    No.  This is common for a company that
23  is in high growth.
24    Q    Okay.  Go to the 2016 cash flow by
25  quarter.  And that is on Page 15.
```

60 (Pages 234 - 237)

Page 250

1 on the regular board meeting, you brought up
2 SolarCity again, the board gave you authority to
3 hire an investment banker and you did so;
4 correct?
5         MR. CHESLER: Objection to the form of
6     the question.
7         THE WITNESS: Sure.
8 BY MR. BARON:
9     Q    And you chose Evercore. How did you
10 choose Evercore?
11        MR. CHESLER: Objection to the form of
12    the question.
13        THE WITNESS: I'm not sure I actually
14    -- I think it may have been the board that
15    chose Evercore. I don't recall being the
16    one that chose Evercore.
17        I think that was one of your tricky
18    questions again.
19 BY MR. BARON:
20    Q    The board just gave you authority
21 according to the minutes. And you're welcome to
22 look back and see if I'm being tricky.
23        The minutes just say they gave
24 authority to hire an investment banker. Then
25 the next thing I know, Evercore was retained.

Page 251

1         So the question is: Were you not
2 involved in that?
3     A    Of course I was involved in it. Did I
4 make that decision; I don't recall making that
5 decision. I think the board made that decision.
6     Q    And Wachtell was also retained to give
7 you advice; is that correct?
8     A    Yes.
9     Q    Who made the decision to retain
10 Wachtell?
11    A    I think the board made that decision.
12    Q    So was there a system set up by which
13 Wachtell and the investment bank, or the
14 investment bank through Wachtell, would provide
15 you with materials before they provided them to
16 the rest of the board?
17    A    I don't think so, but -- I don't
18 recall that, but I don't think so.
19    Q    I have an email dated June 20th,
20 2014 --
21        MR. CHESLER: '14?
22        MR. BARON: 2016 from Chuck McMullan
23    at Evercore. Can I have that, please.
24        (Exhibit 40 was marked.)
25

Page 252

1 BY MR. BARON:
2     Q    So if you take a look at the June 19th
3 email, which I'll represent is the day before
4 the meeting, to Roger, Stu, and Chuck, says:
5 Attached is the latest draft of the materials
6 for tomorrow. These materials were sent to Ron
7 at Wachtell, who sent it to Elon as a draft per
8 Elon's request. I reiterated that that is a
9 draft and is subject to change.
10        Does that refresh your recollection as
11 to whether or not there was a process set up by
12 which Wachtell would forward to you drafts of
13 materials before they were provided to the rest
14 of the board?
15        MR. CHESLER: Objection to the form.
16        THE WITNESS: No, I don't think so.
17 BY MR. BARON:
18    Q    Did you, in fact, receive the
19 June 20th board presentation on -- or a draft of
20 it on June 19th?
21    A    I don't know. I suppose it's
22 possible.
23    Q    Now, on that June 19th presentation --
24 we've looked at it a number of times before --
25 do you recall whether you gave any comment to

Page 253

1 anybody regarding the presentation itself before
2 it was provided to the board?
3     A    I don't recall.
4     Q    Can you pull out Exhibit 29 for me,
5 please -- I mean, Exhibit 19 for me. It should
6 be in one of your piles there.
7         Go to Page 47 of that document. I
8 just want to make sure I understand.
9         Do you see -- on Page 79, this is an
10 overview of the financing process of SolarCity.
11 Is --
12        MR. CHESLER: You said 47?
13        MR. BARON: Page 47.
14        THE WITNESS: This is a weighty term.
15 BY MR. BARON:
16    Q    Yes, it is.
17        Now, do you recognize this page of the
18 presentation?
19    A    Not really. The presentation is very
20 long.
21    Q    Taking a look at this overview of the
22 financing process, is this an accurate
23 representation in your view of how SolarCity's
24 financing process was set up?
25    A    I mean, it's a way to represent it.

64 (Pages 250 - 253)

Page 282

1    A    No, because we thought the best way to
2 do this would be with the solar bond.
3    Q    Okay.  There was also a suggestion by
4 you at one point in time of buying Silevo first
5 to give them the cash and then following it up
6 with an acquisition of the entire company;
7 correct?
8    A    That was one of the things under
9 discussion.
10    Q    And, ultimately, that was rejected.
11 Was that rejected by you or the board?
12        Who said no to that idea?
13    A    Well, all of these things would have
14 been -- had to have been approved by the board.
15    Q    I understand.  But was that idea of
16 buying Silevo and then following that up with an
17 acquisition of SolarCity, was that -- was the
18 kibosh put on that by you or the board?
19    A    Both.
20    Q    So you did present that suggestion to
21 the board of directors?
22    A    We discussed a number of alternatives.
23        The entire premise of your argument is
24 just on quicksand.  So foolish.
25    Q    At the June meeting when they decided

Page 283

1 to go forward with the -- I'm sorry, I take that
2 back.
3        In the July board meeting of -- at
4 Tesla -- sorry, I take that back.
5        The June board meeting at Tesla, you
6 recused yourself from the vote at that time.
7        Do you recall doing that?
8    A    Yes.
9    Q    What did you understand your recusal
10 to be?  Did you understand that you were to just
11 not going to vote on issues regarding the
12 acquisition, or that you were not going to
13 participate in negotiations regarding that
14 merger or that you were not going to be at
15 meetings regarding discussions?
16        I just want to understand the scope of
17 the recusal that you thought you were giving.
18    A    I was just trying to do the right
19 thing.
20    Q    That's not my question.  My question
21 is what is the scope?
22        Did you understand yourself to be
23 recused from the process or just recused from
24 just a vote?
25        MR. CHESLER:  Objection to the form.

Page 284

1        THE WITNESS:  Obviously recused from a
2    vote.  I could not be recused from all
3    discussions.  That would be -- I needed to
4    voice my opinion, obviously.
5 BY MR. BARON:
6    Q    So you did not feel that you were in
7 any way limited to voicing your opinion or
8 hearing analysis and giving your views on the
9 analysis; correct?
10    A    This is another one of your tricky
11 questions.  In any way?  Sure.  In some ways --
12 but would it be appropriate for the board to
13 hear my views?  Of course.
14    Q    You were a participant in all of the
15 analysis --
16    A    No.
17    Q    No?  What analysis were you not
18 participating in?
19    A    How could I be a participant in all of
20 the analysis?  That's an absurd statement.
21    Q    The same analysis that the rest of the
22 board was involved in, you were involved with?
23    A    I was involved -- I think, actually,
24 the board got more analysis than I did.
25    Q    Why do you say that?

Page 285

1    A    Because during times of recusal, they
2 would have had more information, discussions
3 than I would have.
4    Q    And -- but you were involved in
5 reviewing the work and working with the bankers
6 and the lawyers in their analysis; correct?
7        MR. CHESLER:  Objection to the form.
8 BY MR. BARON:
9    Q    Let me ask you specifically:  You
10 received drafts of board books before they went
11 to the board; correct?
12        MR. CHESLER:  Objection to the form.
13        THE WITNESS:  No, I don't think so.
14 BY MR. BARON:
15    Q    We just saw one email on which that
16 was true.  Was that the only one?
17    A    I think that --
18        MR. CHESLER:  Object to the
19 mischaracterization of the record.  Go
20 ahead.
21        THE WITNESS:  It may not have been the
22 only one, but it was not a matter of course.
23 BY MR. BARON:
24    Q    And, in fact, you were involved in
25 discussions over -- pre discussion before the

72 (Pages 282 - 285)

1 representatives had requested the company
2 consider providing SolarCity with short-term
3 bridge financing in connection with the
4 potential acquisition to address its near-term
5 liquidity needs, which requests the company had
6 rejected.
7         Mr. Wheeler then reviewed with the
8 board the discussion representatives of
9 SolarCity and the company had held with
10 potential lenders regarding certain financing
11 solutions for SolarCity and a preliminary
12 proposal for a bridge financing from one such
13 lender.
14        Three questions involved there.
15 First, who at the company rejected the bridge
16 financing from Tesla?
17        MR. CHESLER: Object to the lack of
18 foundation.
19 BY MR. BARON:
20    Q    It says that -- again, it says the
21 company had rejected the request for bridge
22 financing from Tesla.
23        Who at the company rejected that? It
24 doesn't appear that the board knew about it. So
25 was that a board decision or was that your

1 decision?
2         MR. CHESLER: Object to the form and
3    to the lack of foundation.
4         THE WITNESS: Actually, I don't think
5    this is quite an accurate account of things.
6 BY MR. BARON:
7    Q    Why not?
8    A    We were trying to figure out what --
9 as I said, what is the most morally and legally
10 right way to provide interim financing for
11 SolarCity.
12        One of the paths would have been Tesla
13 providing that bridge financing. That is most
14 common in a transaction, public or private.
15        However, the thought was, well, you
16 know, there is going to be some set of jerks
17 that file a lawsuit against us -- that being
18 you -- and so what is the most defensible thing
19 we could do?
20        And that's working out with the solar
21 bonds.
22    Q    That's when you said the most
23 defensible thing we can do is for insiders to
24 buy the bonds?
25        MR. CHESLER: Objection to the form.

1    Don't answer that question. He's just --
2         THE WITNESS: Don't worry.
3    Specifically because we knew some jerk, like
4    you, were to file a suit, and so what is the
5    most morally and legally defensible way to
6    provide interim financing?
7         Solar bonds seemed like the best way
8    to do that.
9         We could have done it from Tesla, but
10   better to do it with solar bonds.
11        Now you know the answer. It's you.
12 BY MR. BARON:
13   Q    Just so for timing, I can show you the
14 document.
15        You're aware that the board approved
16 the merger agreement or the fairness opinion on
17 July 30th, 2016; correct?
18        Are you aware of that?
19   A    The what?
20   Q    The board approved the merger on
21 July 30th, 2016?
22   A    That sounds right.
23   Q    Okay. Just so that we have a frame of
24 reference. The transaction obviously did not
25 close right away. And you recall attending --

1 or, actually, not attending, but receiving board
2 materials for a SolarCity board meeting on
3 August 4th, 2016.
4         Do you have a recollection of that?
5    A    As to that specific date, I mean, it's
6 very difficult to say three years ago on what
7 date did something occur. It's hard to say.
8    Q    The August 4th presentation.
9    A    It was like, remind me there was some
10 filed suit against us for this 5,000 week
11 Model 3 thing, and then we got to 5,000 a week.
12        And this is obviously a waste of time.
13 It's the same thing. We will fix the solar
14 situation. And you'll see it's just a big waste
15 of time.
16   Q    Are you done? Good.
17        MR. BARON: So can you give me the
18 August 13th, 2016 board minutes.
19        (Exhibit 49 was marked.)
20 BY MR. BARON:
21   Q    Now, showing you a set of board
22 minutes from August 13th, 2016. I do not -- you
23 were not present at them, but I want to do this
24 to mark a point in time.
25        So as of August 13th, 2016, so three

Page 302

1  weeks or so after the vote on the merger,
2  SolarCity still had not gotten any short-term
3  financing; is that correct?
4      A    I mean, I don't recall the exact date.
5      Q    The reason I ask is if you take a look
6  in the third full paragraph, there is a specific
7  discussion about proposed -- a proposal that you
8  and others buy solar bonds; correct?
9          Do you see that in the third full
10 paragraph?
11     A    Yes.
12     Q    So the solar bond financing hadn't
13 occurred yet as of August 13th; right?  Because
14 otherwise they wouldn't discuss that that was a
15 proposal.
16     A    I guess so.
17     Q    And, again, they had been looking for
18 some form of financing both before the merger
19 agreement was signed and even more so afterwards
20 because there was a contingency that the deal
21 would not have to be submitted to shareholders
22 if short-term financing was not achieved;
23 correct?
24     A    I guess that's what it says.
25     Q    You do recall that there was a

Page 303

1  contingency that the deal would not have to be
2  given to shareholders if short-term financing
3  had not been achieved by SolarCity.
4          Do you recall that?
5      A    I guess so, yes.
6      Q    So at least we know that as of
7  August 13th no other means of short-term
8  financing had been decided.  And it was not
9  until some point in August that the decision, as
10 you said, for the legally and morally
11 appropriate measure for short-term financing of
12 the solar bond purchases was brought up;
13 correct?
14     A    As I said earlier -- and maybe there
15 were multiple paths to provide liquidity.  Tesla
16 could have provided liquidity directly, but it
17 seemed that it would be better in every way if
18 liquidity was provided by solar bonds.
19     Q    The company declined to provide bridge
20 financing in July before the vote to approve the
21 merger agreement; correct?  We saw that a moment
22 ago.
23     A    No.  That's not quite correct.  No.
24 It simply felt preferable to do the solar bond.
25     Q    The request was rejected to provide

Page 304

1  bridge financing before the merger agreement was
2  agreed to; correct?
3          Do you want me to go back to that
4  document to show you?
5      A    I don't feel that that was the final
6  rejection.  This is not a desirable path, but it
7  would be a normal path in an acquisition.
8          I mean, at one point Google was going
9  to try to acquire Tesla, and it was like, okay,
10 but you need to provide interim financing and
11 that -- and then according to the HSR issue with
12 like the interim financing, it was like, oh,
13 this is going to take too long.
14         So then it's like, well, we can't go
15 through this Google transaction.  We're going to
16 have to go raise money.  So we did.
17         And then our share price actually went
18 up a ton and then we got too expensive for
19 Google to acquire.
20         Standard operating procedure.
21     Q    Let's go back again to --
22     A    Are we out of time?
23     Q    Let's go back to Exhibit 48.
24     A    Okay.  We're out of time.  Good night.
25         MR. BARON:  Counsel, this deposition

Page 305

1  is not concluded.  We will ask you to see if
2  you can get us a time so that we can finish.
3  I think I can do so in a couple of hours,
4  maybe three at the most.
5          I would ask you to get us a time.  But
6  if you tell us that you will not, then we'll
7  ask the court for its assistance.
8          MR. CHESLER:  Okay.
9          MR. BARON:  Thank you.
10         MR. CHESLER:  As I told you hours ago,
11 we planned on being here for seven hours on
12 the clock.  Just for the record, it is now
13 6:25 p.m. and we've been sitting for a full
14 seven hours on the clock and --
15         MR. ZAGAR:  So to be clear on the
16 record, you are refusing to produce Mr. Musk
17 for another day; is that correct?
18         MR. CHESLER:  I just said we were
19 going to sit here today -- if you want to
20 take my deposition, you can notice it,
21 counsel.  Don't raise your --
22         MR. ZAGAR:  Perhaps I will,
23 Mr. Chesler.
24         MR. CHESLER:  Good idea.
25         MR. BARON:  Can we ask, are you --

77 (Pages 302 - 305)

Page 306

1  will you get your client back for a
2  continuation of the deposition or are you
3  saying you do not know yet?
4       MR. CHESLER:  I'm telling you that
5  we'll have that conversation off the record
6  when we don't have people who think that
7  yelling at me is going to get them anywhere.
8       MR. BARON:  We can go off the record.
9       VIDEOGRAPHER:  We're off the record at
10  6:26 p.m. and this concludes today's
11  testimony given by Elon Musk.  The total
12  number of media used was five and will be
13  retained by Veritext Legal Solutions.  We're
14  off.
15       (Proceedings concluded at
16  6:26 p.m.)
17
18
19
20
21
22
23
24
25

Page 307

1       I, LYNNE M. LEDANOIS, a Certified
2  Shorthand Reporter of the State of
3  California, do hereby certify:
4       That the foregoing proceedings were
5  taken before me at the time and place herein set
6  forth; that a record of the proceedings was made
7  by me using machine shorthand which was
8  thereafter transcribed under my direction; that
9  the foregoing transcript is a true record of the
10  testimony given.
11       Further, that if the foregoing
12  pertains to the original transcript of a
13  deposition in a Federal Case, before completion
14  of the proceedings, review of the transcript [ ]
15  was [X] not requested.
16       I further certify I am neither
17  financially interested in the action nor a
18  relative or employee of any attorney or party
19  to this action.
20       IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated: 6-3-19
23
24       *Lynne Marie Ledanois*
       _____
       LYNNE MARIE LEDANOIS
25       CSR No. 6811

Page 308

1  NAME OF CASE: In re Tesla Shareholders
2        Litigation
3  DATE OF DEPOSITION:6/1/19
4  NAME OF WITNESS: Elon Musk
5  Reason codes:
6    1. To clarify the record.
     2. To conform to the facts.
7    3. To correct transcription errors.
8  Page ____ Line ____ Reason____
   From _____ to_____
9
10 Page ____ Line ____ Reason____
   From _____ to_____
11
12 Page ____ Line ____ Reason____
   From _____ to_____
13
14 Page ____ Line ____ Reason____
   From _____ to_____
15
16 Page ____ Line ____ Reason____
   From _____ to_____
17
18 Page ____ Line ____ Reason____
   From _____ to_____
19
20 Page ____ Line ____ Reason____
   From _____ to_____
21
22
23
24       _____
25         Signature of Deponent

78 (Pages 306 - 308)