Robert D. Mitchell (*admitted pro hac vice*)
William M. Fischbach III (*admitted pro hac vice*)
Ace Van Patten (Nevada Bar No. 11731)

**TB** TIFFANY & BOSCO
P.A.

Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016-4229
Telephone: (602) 255-6000
Fax: (602) 255-0103
E-mails: rdm@tblaw.com; wmf@tblaw.com; avp@tblaw.com
*Counsel for Defendant/Counterclaimant Martin Tripp*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN TRIPP, an individual,<br><br>Defendant. | Case No. 3:18-cv-00296-LRH-CBC<br><br>**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED PER LR 78-1** |
| MARTIN TRIPP, an individual,<br><br>Counterclaimant,<br><br>TESLA, INC., a Delaware corporation,<br><br>Counterdefendant. | |

Defendant/Counterclaimant Martin Tripp moves for (1) summary judgment on Plaintiff/Counterdefendant Tesla, Inc.'s First, Second, Third, and Fifth Claims for Relief, and (2) partial summary judgment on Tesla's punitive damages claim in its Fourth Claim for Relief. If the Court grants this motion, Tesla's only remaining claim will be for $7,385 under its Fourth Claim for Relief.

## I.      Introduction and summary of argument.

Tesla claims nearly $168 million in damages.  At best, Tesla's damages are $7,385.

Tripp is a former Tesla employee and whistleblower who raised concerns to the press regarding safety issues and the extraordinary scrap levels at Tesla's Gigafactory outside of Reno, Nevada.  This resulted in the publication of two articles by journalist Linette Lopez on Business Insider's website (https://www.businessinsider.com/) on June 4 and June 6, 2018 based, in part, on information from Tripp.

Before publishing the first article, Lopez reached out to Tesla for comment.  Tesla realized immediately that an employee had given information to Lopez, and deployed a covert investigative team to uncover the identity of the Business Insider "leaker."  Tesla's investigators sifted through Tesla employee e-mails, secretly hacked into employees' private mobile devices, and examined logs of queries ran by Tesla employees on Gigafactory computers.  Tesla quickly identified Tripp as the source for the Business Insider articles.

Tesla's investigators interrogated Tripp on June 14 and 15, 2018, and Tripp confessed to providing information to Lopez.  Tesla formally terminated Tripp on June 19, 2018, but continued its investigation of Tripp through August 2018.

On June 20, 2018, Tesla filed its Complaint against Tripp in the United States District Court for the District of Nevada in Reno, Nevada.  Tesla alleges five claims for relief against Tripp: (1) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (2) violation of the Nevada Uniform Trade Secrets Act ("NTSA"), Nev. Rev. Stat. Ann. § 600A.050; (3) breach of contract; (4) breach of fiduciary duty of loyalty; and (5) violation of the Nevada Computer Crimes Law ("NCCL"), Nev. Rev. Stat. Ann. § 205.4765.

Tesla alleges damages[1] for each claim for relief, Complaint [ECF No. 1] at ¶¶ 27, 33, 43, 49, 55, and alleges "exemplary" or "punitive damages" for its First, Second, Fourth, and Fifth Claims for Relief, *id. at* ¶¶ 28, 35, 50, 56.  Regarding the former, Tesla alleges three

---

[1] Although Tesla's First and Second Claims for Relief also seek restitution for alleged "unjust enrichment," Complaint [ECF No. 1] at ¶¶ 27, 33, Tesla has never disclosed any unjust enrichment to Tripp under those two claims.

categories of damages: (1) $167.37 million in market capitalization damages to Tesla stock price; (2) $261,919 in investigative costs; and (3) $7,385 in wages that Tesla alleges are forfeited due to Tripp's breach of fiduciary duty of loyalty to Tesla.  Tesla also seeks injunctive relief, *id. at ¶¶* 25, 32, 49, and an order allowing for the inspection of Tripp's devices, *id. at ¶¶* 26, 34.  To date, Tesla has never pursued these latter two forms of relief.

This Court should grant this motion for the following reasons:

- Tesla cannot assert a claim under the NCCL because Tripp had authority from Tesla to access the data at issue.  Part IV.A., *infra*.

- Tesla's claimed $167.37 million in market capitalization damages are not compensable under any claim for relief because Tesla suffered no actual injury or loss.  Any diminution in Tesla stock price following the publication of the Business Insider articles was temporary and statistically insignificant.  Part IV.B., *infra*.

- Tesla fails to support its claimed $167.37 million in market capitalization damages with a proper event study, and Tesla's own expert admits that he cannot conclude that Tripp caused any diminution in Tesla stock price.  Part IV.C., *infra*.

- Tesla cannot assert an NCCL claim, so it cannot recover its $261,919 in investigative costs as "response costs" under the NCCL.  Tesla cannot recover investigative costs under its trade secrets claims or any other claim because those costs are attorney's fees and litigation expenses that are not recoverable as damages.  Part IV.D., *infra*.

- Tesla cannot recover punitive damages without actual damages, nor can it prove oppression, fraud, or malice by clear and convincing evidence.  Part IV.E., *infra*.

- Tesla never sought an order allowing for an inspection of Tripp's devices under the DTSA.  Discovery is closed and Tesla has waived any right to such relief.  Part IV.F., *infra*.

- Tesla never sought a temporary restraining order or preliminary injunction.  If Tesla seeks a permanent injunction to protect purported trade secrets, it cannot demonstrate the requisite "irreparable harm" because this Court has entered a stipulated protective order that remains in effect even after the termination of this litigation.  Part IV.F., *infra*.

**II.     Statement of facts per Rule 56(c) and LR 56-1.**

1.     Lopez authored two Business Insider articles: one published June 4, 2018 at 3:43 P.M. Eastern Time and one published June 6, 2018 at 3:21 P.M. Eastern Time.  **Exhibit A** and **Exhibit B.**

2.     Based in part on information from Tripp, Lopez's articles reported that the high production tempo at the Gigafactory caused Tesla to spend almost $150 million on scrap materials that year, and created potential safety hazards, such as Tesla repairing more than 1,000 punctured battery modules with adhesive and then placing them back on the manufacturing line.  Ex A and Ex. B.

3.     According to Nicholas Gicinto, Tesla Senior Manager of Global Security, Tripp was given the ability to query and access confidential part, quality, and process data from Tesla's manufacturing operating system as part of his job responsibilities at Tesla's Gigafactory.  Deposition of Nicholas Gicinto at 36:3-37:9, attached as **Exhibit C**.

4.     Tripp had authority to access all of the information on Tesla's computer systems that he later provided to Lopez.  *Id.* at 35:6-16.  *See also id.* at 38:11-20, 170:8-171:20.

5.     Gicinto could not identify any instance in which Tripp accessed computer information that was outside his authorized level of access.  *Id.* at 39:9-21.

6.     Tesla's total claimed damages, and method for calculating those damages, are in the report of Tesla's damages expert Jeffrey H. Kinrich.  *See* Expert Report of Jeffrey H. Kinrich ("Kinrich Report"), dated November 8, 2018, attached as **Exhibit D**; Tesla's March 8, 2019 Response to Tripp's Second Set of Interrogatories, Interrogatory # 22, attached as **Exhibit E**.

7.     Kinrich identifies three categories of alleged damages: (1) $167.37 million in market capitalization damages to Tesla stock; (2) $261,919 in investigative costs; and (3) $7,385 in wages paid to Tripp during an alleged period of disloyalty from May 27, 2018 to June 19, 2018.  Kinrich Report (Ex. D) at ¶¶ 13 n. 16, 23-25.

8.     The Kinrich Report does not claim that Tripp caused Tesla to suffer any loss

of revenues, profits, sales, or customers. *Id.* at ¶¶ 23-25.

9.      The Kinrich Report does not claim that Tesla went bankrupt, was taken over by another company at depressed stock prices, or was sold in a distressed liquidation sale. *Id.*

10.     The Kinrich Report does not claim that Tesla or its shareholders incurred any losses by selling Tesla shares at depressed prices. *Id.*

11.     Kinrich bases his market capitalization damages on the 19- and 40-minute windows on June 4 and June 6, 2018, respectively, between the publication of each Business Insider article and the 4:00 P.M. Eastern Time closing of the NASDAQ exchange on which Tesla stock (TSLA) trades. *Id.* at ¶¶ 19-22.

12.     Tesla stock dropped $0.20/share in the last 19 minutes of normal trading on June 4, 2018. *Id.*

13.     Tesla stock dropped $0.78/share during the last 40 minutes of normal trading on June 6, 2018. *Id.*

14.     Kinrich multiplied the $0.20 and $0.78 by the 170.52 million shares of Tesla stock outstanding to calculate a "market capitalization effect":

|  | Price before BI article | Price at 4:00 PM (market close) | Change in share price | Shares outstanding | "Market capitalization effect" |
|---|---|---|---|---|---|
| 6/4/18 | $296.94 | $296.74 | -$0.20 | 170,520,000 | -$33.56 million |
| 6/6/18 | $320.28 | $319.50 | -$0.78 | 170,520,000 | -$133.82 million |
|  |  |  |  | **TOTAL:** | **-$167.37 million** |

*Id. See also id.* at Exhibit 7.

15.     When asked at his deposition if his report was an "event study,"[2] Kinrich testified, "It's in the same neighborhood . . . .  I would say it probably isn't quite an event study, but it certainly has some characteristics that are related."   Deposition of Jeffrey Kinrich ("Kinrich Deposition") at 194:2-8, attached as **Exhibit F**.

---

[2] An "event study" is a complex linear regression analysis used in securities fraud cases to show how publicly traded stocks respond to publicly reported events. *See* Part IV.C., *infra*.

16.    Kinrich testified at this deposition that he could not conclude that Tripp caused any damage to Tesla stock price:

> Q. Is it your opinion that Mr. Tripp caused $167 million of market cap damage to Tesla's stock?
>
> A. I cannot reach that conclusion.  I believe my information is relevant for a finder of fact combined this calculation with other information and draw some conclusion, but I can't reach that conclusion alone.
>
> Q. Is it your opinion that the Business Insider articles published on June 4 and June 6 caused Tesla's stock price to decline?
>
> A. I can't reach that conclusion, though I have attempted to rule out other things that would normally be considered as possible causes.  And I don't have anything else to rule out at this point.

*Id.* at 100:11-24.

> Q. Again, are you opining that Tesla's stock price was damaged by Tripp?
>
> A. I'll give you the same answer I did before, which is I am not – I've attempted to rule out other causes, but I can't conclude that it was caused by Tripp.

*Id.* at 102:7-13.

> Q. Is it your opinion that had that Business Insider article not been published, that Tesla's stock would have remained static at $296.94 for the remaining 19 minutes of the regular trading day?
>
> A. No, I can't draw that conclusion.
>
> Q. Sitting here today -- well, do you have any opinion as to what Tesla's stock price would have been at the end of regular trading on June 4 of 2018 had the Business Insider article not been published?
>
> A. I don't think I can answer that question.
>
> Q. Well, I'm asking you: Do you have an opinion?

A. I don't think I have an opinion. I have information that's consistent with the 20-cent drop being related to the Business Insider article, but it doesn't -- I can't demonstrate that it was caused by it.

*Id.* at 120:2-20.

17.    In terms of percentages, Tesla stock fell 0.07% during the last 19 minutes of trading on June 4, 2018 and fell 0.25% during the last 40 minutes of trading on June 6, 2018. Kinrich Report (Ex. D) at ¶¶ 21, 22.

18.    These drops in Tesla stock were not statistically significant.    Kinrich Deposition (Ex. F) at 102:19-23 (testifying that the 0.07% drop in stock price on June 4, 2018 was "inherently not [statistically significant]"), 104:5-9 (agreeing that "there was no statistically significant change in Tesla's stock price in the final 19 minutes of regular trading on June 4"), 128:2-10 ("[D]id the Tesla stock move in a statistically significant fashion[?] [T]he answer is probably not.").

19.    Kinrich has not "calculated what level of change is required in Tesla's stock to be statistically significant." *Id.* at 103:22-24.

20.    There were no unusual changes in Tesla's trade volume following the publication of the two Business Insider articles. *Id.* at 161:13-162:6

21.    Kinrich has "no opinion" on whether Tesla stock price demonstrated an unusual level of volatility following the publication of the two Business Insider articles. *Id.* at 190:19-23.

22.    Kinrich has "no opinion" on what Tesla stock price would have been when the market opened on June 5 and June 7, 2018 had the Business Insider articles not been published on June 4 and June 6, 2018. *Id.* at 123:22-124:4.

23.    Kinrich claims he "attempted to rule out" two possible causes for the 0.07% and 0.25% drops in Tesla stock price during the final minutes of trading on June 4 and June 6, 2018. *Id.* at 100:21-24

24.    First, Kinrich observes that the value of the S&P 500, NASDAQ, and

NASDAQ OMX Global Automotive indices increased between 0.02% to 0.16% during the same 19- and 40-minute windows.  Kinrich Report (Ex. D) at ¶¶ 21, 22; *see also id.* at Exhibit 8.

25.   Kinrich admits he conducted no analysis to test for correlation or statistical significance with respect to Tesla stock and the S&P 500, NASDAQ, and NASDAQ OMX Global Automotive indices:

> Q. And sitting here today, you can't tell me that the movement in any of those three indices was statistically significant in the last 19 minutes of trading on June 4, can you?
>
> A. No, in fact, I already told you it would be unlikely they would be, and that's consistent with what we'd expect to happen.
>
> Q. Once again, you've done no statistical analysis or linear regression analysis to analyze the general correlation between movement of Tesla's stock price and the movement of those three indices; correct?
>
> A. Correct.

Kinrich Deposition (Ex. F) at 110:15-111:2; *see also id.* at 115:17-22 (Kinrich admits that he did not "do any analysis to determine whether or not the Tesla stock price correlated with either the NASDAQ or the NASDAQ Automotive Index [from] June 5 to June 11 [2018]").

26.   Kinrich admits that he does not know, and did not examine, if the S&P 500, NASDAQ, and NASDAQ OMX Global Automotive indices finished with a gain or loss on June 4 or June 6, 2018.  *Id.* at 115:7-9.

27.   The other possible cause Kinrich claims to have investigated was the existence of other negative news stories about Tesla published during the 19- and 40-minute periods at issue.  Kinrich claims he found none.  *Id.* at 130:1-8.

28.   Tesla, a publicly traded company, never reported an actual $167.37 million loss to its shareholders, auditors, and accountants.  *See* Tesla's March 8, 2019 Response to Tripp's Second Set of Interrogatories, Interrogatory # 16 (Ex. E).

29.   On June 5, 2018—the day after the publication of the first Business Insider

Article—Tesla stock opened the morning at $297.70/share.  *See* Tesla historic stock prices, available at https://finance.yahoo.com/quote/TSLA/history/.[3]

30.     On June 7, 2018—the day after the publication of the second Business Insider Article—Tesla stock traded at an intra-day trading high of $330.00/share.  *Id.*

31.     On June 18, 2018, Tesla stock closed at $370.83/share.  *Id.*

32.     On February 19, 2020, Tesla stock closed at an all-time high of $917.42/share. *Id.*

33.     Investigators taking direction from, and working in coordination with, Tesla's counsel conducted the $261,919 investigation of Tripp.  *See* May 17, 2019 Deposition of Jacob Nocon at 24:22-25, 25:17-22, 51:7-10, 56:18-25, 64:24-65:3, attached as **Exhibit G**.

34.     Tesla refuses to produce the communications and documents underlying the investigation based on attorney-client privilege.  *See* Tesla's June 17, 2019 Response to Third Set of Requests for Production, Request # 21, attached **Exhibit H**.

**III.     Summary judgment standard.**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the moving party has carried its burden under Rule 56(c), the opposing party must show more than some "metaphysical doubt" as to the material facts; the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Pinnacle Minerals Corp. v. Whitehead*, 357 F. Supp. 3d 1053, 1057 (D. Nev. 2019).  "A mere scintilla of evidence will not [defeat summary judgment], for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation."  *Ray v. Cont'l W. Ins. Co.*, 920 F. Supp. 1094, 1100 (D. Nev. 1996) (quoting *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), cert. denied, 440 U.S. 981 (1979)).  *See also Pioneer*

---

[3] This Court may take judicial notice of Tesla's historic stock prices.  *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017) (citing Fed. R. Evid. 201(b)).

1    *Chlor Alkali Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 863 F. Supp.

2    1237, 1239 (D. Nev. 1994) ("If the factual context makes the respondent's claim

3    implausible, that party must come forward with more persuasive evidence than would

4    otherwise be necessary to show that there is a genuine issue for trial.").

5        Summary judgment is appropriate if the plaintiff cannot establish the existence of

6    damages. *Hannon v. Well Fargo Home Mortg.*, 2:10-CV-00966-MMD, 2012 WL 2499290,

7    at *4 (D. Nev. June 26, 2012) (granting summary judgment on breach of contract claim

8    because the plaintiffs "suffered no damages"); *Miller v. United States*, 2:09-CV-02033-RCJ,

9    2010 WL 3168224, at *4 (D. Nev. Aug. 9, 2010) (granting summary judgment) ("There are

10   simply no damages here. The evidence shows that Plaintiffs and the [defendant] are

11   square."); *Callahan v. First Commercial Title, Inc.*, 95 Nev. 441, 442–43 (1979) (affirming

12   summary judgment) ("[A]ppellants have neither money due them on the note, nor any

13   further security interest in the property and, therefore, they could suffer no damages as a

14   result of any impairment of security.").

15       Similarly, summary judgment is appropriate if the plaintiff cannot establish that the

16   defendant caused the damages alleged. *City of Vernon v. S. California Edison Co.*, 955 F.2d

17   1361, 1368 (9th Cir. 1992) ("[I]t appears that there are no damages attributable to [the

18   defendant's conduct].   Summary judgment on this claim was appropriate."); *Madden v.

19   Indep. Bank*, 771 F. Supp. 1514, 1520 (C.D. Cal. 1991) ("Plaintiff had nothing in

20   defendants' statements to rely on and suffered no damage by any supposed reliance.

21   Accordingly, defendants' motion for summary judgment is granted on these plaintiffs'

22   claims for fraud and negligent misrepresentation.").

23       When, as in this case, the plaintiff is claiming that a particular news event harmed its

24   stock price, a court may grant summary judgment if the plaintiff fails to supports its claim

25   with a proper event study.  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d

26   1005, 1016 (C.D. Cal. 2003), aff'd sub nom. *Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th

27   Cir. 2005).

28

## IV.    Legal analysis.

### A.    The NCCL does not apply because Tesla granted Tripp authority to access the information he later gave to Lopez.

Tesla's lead investigator Nick Gicinto admits that Tripp, as part of his job responsibilities, had authority to access the information that forms the basis for Tesla's NCCL claim.  SOF ¶¶ 3, 4.  Gicinto could not identify any instance in which Tripp accessed data that he did not have authority to access.  SOF ¶ 5.  These facts preclude liability under the NCCL, because the NCCL applies only to accessing computer information without authority.  Because Tripp, a Gigafactory employee, had permission to access the information at the time he accessed it, it is irrelevant under the NCCL that he lacked permission to give that information to Lopez later.  *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir.), cert. granted, 139 S. Ct. 52 (2018), and rev'd in part on other grounds, 139 S. Ct. 873 (2019).

In *Oracle*, the jury found that the defendant violated the NCCL and California's Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA") by downloading the plaintiff's data through a method prohibited by applicable terms of use.  The Ninth Circuit adopted the District Court's reasoning that the CDAFA and NCCL are "essentially identical."  *Id.* at 962.  The Ninth Circuit then reversed the judgment of the District Court because the defendant had authorization to access the data, regardless of the download method employed.  "We hold that taking data using a method prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA.  Because the same reasoning applies to the NCCL claim, we reverse the judgment as to both claims."  *Id.*

The Ninth Circuit's analysis in *Oracle* is directly on point in this case.  "[T]he key to the [NCCL] is whether [Tripp] was authorized in the first instance to take and use the information that [he] downloaded.   Because [Tripp] indisputably had such authorization, at least at the time [he] took the data in the first instance, [Tripp] did not violate the [NCCL]."  *Id.*  Although *Oracle* was reversed in part by the Supreme Court on other grounds, *Oracle*'s

holding regarding the CDAFA and NCCL remains intact, and is consistent with the Ninth Circuit's holding in *Facebook, Incorporated v. Power Ventures, Incorporated*, 844 F.3d 1058 (9th Cir. 2016). In that case, the Ninth Circuit held that "[b]ecause [the defendant] had implied authorization to access [the plaintiff's] computers, it did not, at first, violate [the CDAFA]."). *Id.* at 1069.

Because it is undisputed that Tripp had authority to access the data he later gave to Lopez, the Court should grant summary judgment on Tesla's NCCL claim.

**B. Tesla's claimed $167.37 million in market capitalization damages are not compensable under the DTSA, NTSA, NCCL, or Nevada law governing breach of contract because a temporary decline in Tesla stock price, without more, is not an actual injury or loss.**

To obtain an award of damages under the DTSA, Tesla must prove "actual loss caused by the misappropriation of the trade secret." 18 U.S.C. § 1836(b)(3)(B)(i)(I). Similarly, to obtain an award of damages under the NTSA, Tesla must prove a "loss caused by misappropriation." Nev. Rev. Stat. Ann. § 600A.050(1). On a breach of contract claim, the plaintiff must show that damages are necessary to "place the plaintiff in the position he would have been in had the contract not been breached." *Hornwood v. Smith's Food King No. 1*, 107 Nev. 80, 84 (1991). Finally, the NCCL allows for "[d]amages for any . . . loss or injury suffered." Nev. Rev. Stat. Ann. § 205.511(1)(a).

Kinrich claims his methodology was something in the "same neighborhood" of, but "not quite," an event study. SOF ¶ 15. He took fractional and statistically insignificant dips in Tesla stock price during the final minutes of trading on June 4 and June 6, 2018, and multiplied that by the 170,520,000 outstanding shares of Tesla stock, to arrive at a "market capitalization effect" of $167.37 million. SOF ¶¶ 11-14. Even if one assumes that Kinrich conducted a proper event study (and he did not, *see* Part IV.C., *infra*), courts have consistently rejected the use of event studies to prove damages outside the context of "fraud on the market" securities cases. *See, e.g., LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 82–83 (1999), aff'd in part, vacated in part on other grounds, 317 F.3d 1363 (Fed. Cir. 2003) ("Courts which have adopted event studies have done so, as far as we can

1    tell, only in stockholder class action or derivative suits alleging fraud-on-the-market.");

2    *Perfection Corp. v. Lochinvar Corp.*, 349 Ill. App. 3d 738, 745 (2004) ("The event study

3    methodology has been universally rejected by Federal Courts in lawsuits for restitution other

4    than securities fraud class action litigation.")

5        In *Perfection Corporation*, the counterclaimants attempted to use an event study to

6    substantiate a claim for $182 million in "economic damage to [the counterclaimants']

7    business reputations" based on a decrease in stock price following the publication of

8    unfavorable news stories.  *Id.* at 472.  The court rejected this approach, noting that the

9    counterclaimants "could identify no lost customers, profits, declines in revenues, or loss of

10   sales as a result of the [adverse] media coverage."  *Id.*

11       Like the counterclaimants in *Perfection Corporation*, Tesla is using something like an

12   event study to prop up an enormous damages figure, but without any proof of actual

13   economic loss or injury.  There is no evidence that, subsequent to Lopez's articles, Tesla lost

14   revenues, profits, sales, or customers.  SOF ¶ 8.  There is no evidence that Tesla went

15   bankrupt, was taken over by another company at depressed stock prices, or was sold in a

16   distressed liquidation sale.  SOF ¶ 9.  There is no evidence that Tesla or its shareholders

17   incurred any losses by selling Tesla shares at depressed prices.  SOF ¶ 10.

18       The undisputed facts show that the market erased any miniscule drops in Tesla stock

19   price on June 4 and June 6, 2018 in less than 24 hours.  Tesla stock dropped $0.20/share in

20   the last 20 minutes of trading on June 4, 2018 to close at $296.74/share.  SOF ¶ 12.  This

21   drop was eliminated overnight when the stock opened the morning of June 5, 2018 at

22   $297.70/share—an increase of $0.96/share during afterhours trading.  SOF ¶ 29.  Similarly,

23   Tesla stock dropped $0.78/share in the last 40 minutes of trading on June 6, 2018 to close at

24   $319.50/share.  SOF ¶ 13.  This drop also vanished the next day, June 7, 2018, when Tesla

25   hit an intra-day trading high of $330.00/share.  SOF ¶ 30.  By June 18, 2018, Tesla stock had

26   soared to $370.83/share by market close—an increase of nearly 25% in two weeks.  SOF ¶

27   31.  Less than two years later, Tesla stock had more than doubled when it closed at an all-

28   time high of $917.42/share on February 19, 2020.  SOF ¶ 32.

Without evidence of an actual "loss" or "injury," Tesla cannot equate a temporary and statistically insignificant drop in its market capitalization to compensable damages under the DTSA, NTSA, NCCL, or a breach of contract theory, particularly when Tesla stock price increased significantly in the days, weeks, and years after the publication of the Business Insider articles. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 242 n.1 (3d Cir. 2001) (noting that a drop in market capitalization, without any out-of-pocket losses, is "an inaccurate determiner of damages"); *Bolivar County Gravel Co., Inc. v. Thomas Marine Co.*, 585 F.2d 1306, 1309 (5th Cir. 1978) (holding that plaintiff had no damages for a "temporary reduction in the size of its surplus stockpile . . . that resulted in no economic injury" because "its stockpile is [now] at the same level" as before the accident). *See also LaSalle Talman Bank*, *supra*, 45 Fed. Cl. at 81 (rejecting use of an "event study to determine the quantum of damages for breach of contract").

For these reasons, the Court should grant summary judgment on Tesla's claim for market capitalization damages of $167.37 million.

**C.**   **Even if one accepts Tesla's $167.37 million calculation as an actual injury or loss, Tesla's expert Kinrich failed to conduct a proper event study to establish causation.  Kinrich even admits he cannot conclude that Tripp caused any decrease in Tesla stock price.**

Event studies are "regression analyses that seek to show that the market price of [a particular] stock tends to respond to pertinent publicly reported events." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014).  When a plaintiff claims that the defendant's release of information harmed the plaintiff's stock price, an event study is "necessary to provide an evidentiary basis for a reasonable jury to determine the existence of loss causation and damages." *Baker v. SeaWorld Entm't, Inc.*, __ F.Supp.3d __, 14CV2129-MMA (AGS), 2019 WL 6118448, at *8 (S.D. Cal. Nov. 18, 2019) (published opinion); *see also FindWhat Inv'r Group v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("Event studies can be used to determine retrospectively the cause of a stock price movement.").  The event study methodology is necessary "[g]iven the difficulty inherent in proving the effect, if any, of a single news item on the price of a stock." *Bricklayers &*

1  *Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 186

2  (D. Mass. 2012), aff'd sub nom. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*

3  *Suisse Sec.*, 752 F.3d 82 (1st Cir. 2014).  As noted *supra,* in *In re Imperial Credit Industries,*

4  a California District Court granted a defense motion for summary judgment because the

5  plaintiff could not establish causation without a proper event study, and the Ninth Circuit

6  affirmed.  252 F. Supp. 2d at 1016, aff'd sub nom. *Mortensen v. Snavely*, 145 Fed. Appx.

7  218 (9th Cir. 2005).

8       The key ingredient to any event study is a statistical analysis of whether the news

9  story at issue "can be linked in a *statistically significant* way to variations in stock price."

10  *United States v. Martoma*, 993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014) (emphasis added).

11
12          To do this, an expert will run a regression of the company's
   stock price on a market and/or industry index over a period of
13          time. . . .   The result of this regression analysis is a quantified
   relationship between the company and the market.  The
14          regression analysis will reveal a statistic measure of the strength
   of the relationship between the company's stock price
15          movements and the market and industry indices. . . .  A large
   abnormal stock price movement occurring at the same time the
16          market receives news about an event suggests that the event
17          caused the abnormal price movement.

18  Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of*

19  *Event Studies in Securities Fraud Litigation*, 15 Stan. J.L. Bus. & Fin. 183, 191–93 (2009)

20  (internal quotes, citations, and parentheticals omitted).

21       Even if one were to accept the event study methodology as a proper measure of

22  damages for Tesla's claims, Kinrich admits that his analysis "probably isn't quite an event

23  study."  SOF ¶ 15.   Kinrich admits that the drops in Tesla' stock price on June 4 and June 6,

24  2018 were not statistically significant.  SOF ¶¶ 17-19.  Kinrich admits there were no unusual

25  changes in Tesla's trade volume or volatility following the publication of the Business

26  Insider articles.  SOF ¶¶ 20, 21.  Kinrich did not know what Tesla stock price would have

27  been in the absence of the Business Insider articles.  SOF ¶ 22.  Under these circumstances,

28

no reasonable jury could find that Tripp caused a decline in Tesla stock price. *See In re 3dfx Interactive, Inc.*, 389 B.R. 842, 884 (Bankr. N.D. Cal. 2008), aff'd sub nom. *In re 3DFX Interactive, Inc.*, 585 Fed. Appx. 626 (9th Cir. 2014) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) (rejecting market capitalization damages analysis because it lacked an event study and was based merely on the expert's "*ipse dixit*"); *In re Novatel Wireless Sec. Litig., 08CV1689* AJB (RBB), 2013 WL 12144150, at *5 (S.D. Cal. Oct. 25, 2013) ("The absence of an event study for damages, in particular, will result in summary judgment in favor of defendants."); *In re Omnicom Group, Inc*. Sec. Litig., 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), aff'd, 597 F.3d 501 (2d Cir. 2010) (granting summary judgment because event study failed to establish causation) ("[T]here is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss.").

Most importantly, Kinrich himself admits that he cannot conclude that Tripp caused any decline in Tesla stock price.  SOF ¶ 16.  If Tesla's own expert cannot conclude that Tripp caused Tesla stock price to decline, then no reasonable jury could either, and summary judgment is appropriate. *See Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) (holding that summary judgment is appropriate if the plaintiff "offer[s] no evidence of causation"); *Pac. Inst. for Research & Evaluation v. Procter & Gamble Co.*, 15 F.3d 1088 (9th Cir. 1993) (affirming summary judgment because the plaintiff "presented no evidence to demonstrate a causal nexus between anything that [the defendant] may have done and any drop in third-party donations to [the plaintiff].").

Kinrich's "attempt to rule out" two other possible causes for the fractional and statistically insignificant drops in Tesla stock price does not prevent summary judgment. First, Kinrich notes that the S&P 500, NASDAQ, and NASDAQ OMX Global Automotive indices increased between 0.02% to 0.16% during the 19- and 40-minute windows on June 4 and June 6, 2018, while Tesla stock decreased by 0.07% and 0.25%.  SOF ¶¶ 23, 24.  Yet Kinrich conducted no analysis to test for correlation or statistical significance with respect to Tesla stock and those three indices.  SOF ¶ 25.  Kinrich did not know, or even examine, if these indices had overall gains or losses on the days in question.  SOF ¶ 26.

Kinrich's approach is identical to that of the expert in *Computer Aid, Incorporated v. Hewlett-Packard Company*, 56 F. Supp. 2d 526 (E.D. Pa. 1999). In that case, Hewlett-Packard sued a competitor for trade libel based on a press release issued around June 5, 1996. The competitor moved for summary judgment. The only evidence in the record regarding damages was an event study conducted by Hewlett-Packard's damages expert. Like Kinrich, Hewlett-Packard's expert observed that "Hewlett–Packard suffered a temporary dip in its stock price between June 5 and 6, 1996" and that "the overall market, as represented by the S & P 500, rose by .87%, while Hewlett–Packard's stock price fell by 1.97% between June 5 and June 6's closing price." *Id.* at 540. The court rejected the expert's report as being probative of causation or damages because the expert "assume[d] that Hewlett–Packard is essentially tied perfectly to or 'moves with' the market, which may not be the case," and "tend[ed] to focus on stock price changes, not the statistical and qualitative significance of those changes." *Id.* The court found that the expert's report was "dubious" and had "scant" evidentiary value, and was therefore unable to withstand summary judgment as to damages. This Court should reach the same conclusion. Kinrich's comparison of Tesla stock price to three stock indices without any analysis of statistical significance or linear regression is, at best, a "mere scintilla" of evidence that cannot withstand summary judgment. *Ray*, *supra*, 920 F. Supp. at 1100.

Second, Kinrich claims to have investigated the existence of any other negative stories about Tesla published during the 19- and 40-minute periods at issue. SOF ¶ 27. Courts have rejected this kind of subjective "news analysis" in the context of stock price movements as being inherently speculative and unreliable.

> [Kinrich's] principal approach was to read all the [Tesla]-related news released on a given day and to make subjective judgments about which news impacted the stock price. It would be just as scientific to submit to the jurors evidence of [Tripp's] alleged [misconduct] and [Tesla's] stock fluctuations and let them speculate whether the former caused the latter."

*Bricklayers*, 853 F. Supp. at 190. *See also In re Williams Sec. litigation-WCG Subclass*,

558 F.3d 1130, 1143 (10th Cir. 2009) (finding that expert's subjective conclusions regarding news articles "would be no less speculative and unreliable if reached by jurors").

In light of Kinrich's failure to conduct a proper event study and his unequivocal admission that he cannot conclude that Tripp caused harm to Tesla stock price, no reasonable juror would find a causal nexus between the Business Insider articles and the temporary and statistically insignificant dips in Tesla stock price. Once again, summary judgment on Tesla's $167 million in market capitalization damages is appropriate.

### D. Tesla cannot recover its $261,919 in investigative costs as "response costs" under the NCCL because Tripp had authority to access the data at issue. Nor can Tesla recover these investigative costs under any other theory because they are not damages.

The NCCL permits a victim of a computer crime to recover damages for "response costs," Nev. Rev. Stat. Ann. § 205.511(1)(a), which are "reasonable costs that arise in response to and as a proximate result of a [computer] crime," Nev. Rev. Stat. Ann. § 205.4759. As discussed in Part IV.A., *supra*, the NCCL cannot apply because Tripp had authority as part of his job responsibilities to access the information he later gave to Lopez. Tesla therefore cannot recover its $269,919 in investigative costs as "response costs" under the NCCL.

Nor can Tesla recover those investigative costs under its trade secrets claims under the DTSA and NTSA because they do not represent an actual loss or injury. "To allow [Tesla] to characterize the cost of its own investigation of suspected wrongdoing as actual damages would effectively eliminate [Tesla's] burden of proving actual harm resulting from [Tripp's] alleged violation of the trade secrets act." *News Am. Mktg. In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 542 (2004), aff'd, 276 Conn. 310, 885 A.2d 758 (2005) (applying Uniform Trade Secrets Act on which the NTSA is based). *Accord Tank Connection, LLC v. Haight*, 161 F. Supp. 3d 957, 966 (D. Kan. 2016) ("[P]ermitting the plaintiff to claim the cost of its own investigation as compensable damages would effectively eliminate the statutory requirement of 'actual loss' for an actionable misappropriation [under the Kansas Uniform Trade Secrets Act].").

18

Finally, Tesla's investigative costs are not recoverable as damages under any theory because those investigative costs are actually attorney's fees and litigation expenses. Investigators taking direction from, and working in coordination with, Tesla's counsel conducted the investigation.  SOF ¶ 33.  Tesla has refused to disclose documents and communications relative to the investigation, citing attorney-client privilege.  SOF ¶ 34. The investigative costs are therefore attorney's fees or other litigation expenses.  *See, e.g., Rolex Watch U.S.A., Inc. v. Zeotec Diamonds, Inc.*, CV02-1089GAFVBKX, 2003 WL 23705748, at *3 (C.D. Cal. May 2, 2003) (holding that "the award of attorneys' fees… include fees charged by investigators acting under the direction of an attorney"); *Lifted Research Group Inc. v. Biglarpour*, SACV0800033JVSANX, 2008 WL 11342709, at *4 (C.D. Cal. July 16, 2008) (holding that "as part of the attorneys' fees award, LRG may also recover reasonable investigative fees, as long as the investigator acted under the direction of an attorney").  Under Nevada law, attorney's fees and other litigation expenses typically "cannot be considered 'damages.'"  *Childs v. Selznick*, 281 P.3d 1161, at *2 (Nev. 2009). *Cf. Sandy Valley Associates v. Sky Ranch Estates Owners Ass'n*, 117 Nev. 948, 957 (2001), receded from on other grounds by *Horgan v. Felton*, 123 Nev. 577 (2007) ("[T]he mere fact that a party was forced to file or defend a lawsuit is insufficient to support an award of attorney fees as damages.").

Accordingly, the Court should grant summary judgment on Tesla's claim for $261,919 in investigative costs.

**E.    Tesla cannot recover punitive damages because it cannot prove by clear and convincing evidence that Tripp has been guilty of oppression, fraud or malice, express or implied.**

"Nevada law sets a high threshold for punitive damages."  *Villagomes v. Lab. Corp. of Am.*, 783 F. Supp. 2d 1121, 1127 (D. Nev. 2011).  To recover punitive damages, the plaintiff must prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied." Nev. Rev. Stat. Ann. § 42.005(1). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship

with conscious disregard of the rights of the person."  Nev. Rev. Stat. Ann. § 42.001(4).  "'Fraud' means an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person."  Nev. Rev. Stat. Ann. § 42.001(2).  "Malice, express or implied" means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others."  Nev. Rev. Stat. Ann. § 42.001(3).  "'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences."  Nev. Rev. Stat. Ann. § 42.001(1).

A plaintiff cannot recover punitive damages in Nevada without actual damages.  *Land Baron Inv. v. Bonnie Springs Family LP*, 131 Nev. 686, 701 n.12 (2015).  The rule is the same under federal common law, unless a federal statute expressly allows for recovery of punitive damages in the absence of actual damages.  *In re S. California Sunbelt Developers, Inc.*, 608 F.3d 456, 465 (9th Cir. 2010); *Siddiqui v. United States*, 359 F.3d 1200, 1203–04 (9th Cir. 2004).  The only federal statute at issue here, the DTSA, does not allow punitive damages without actual damages.  18 U.S.C. § 1836(b)(3)(C) (allowing "exemplary damages in an amount not more than 2 times the amount of the [actual] damage").

As discussed above, Tesla cannot recover its $167.37 million in alleged market capitalization damages or its $261,919 in investigative costs.  Tesla therefore cannot recover punitive or exemplary damages predicated on those damages claims.  Tesla's remaining claim for $7,385 of Tripp's wages is limited to its claim for breach of fiduciary duty of loyalty to Tesla.  This claim, and the relief sought, is a manifestation of the "faithless servant" doctrine derived from Restatement (Second) of Agency § 387 (1958).  This claim is, in essence, Tesla's attempt to claw back $7,385 in wages paid to Tripp during an alleged 23-day period of disloyalty.  SOF ¶ 7.  *See Serv. Employees Internat. Union, Local 250 v. Colcord*, 160 Cal. App. 4th 362, 371 (2008) ("[D]isgorgement of salary and benefits [are] an appropriate remedy in 'faithless servant' cases.").

For purposes of this motion only, Tripp acknowledges that there are sufficient factual

disputes for Tesla's "faithless servant" claim for $7,385 to survive summary judgment. Whether Tesla can recover punitive damages under this claim is a different matter.

When a defendant challenges punitive damages through summary judgment, the trial court must examine the plaintiff's evidence "through the prism of the substantive evidentiary burden, which here is clear and convincing evidence." *Kinder Morgan Energy Partners, L.P. v. Claytor*, 130 Nev. 1205 (2014). Here, Tesla cannot meet its "high threshold for punitive damages" on its breach of fiduciary duty of loyalty claim. Tesla has alleged, and Tripp has admitted, that he gave information to Lopez that resulted in her reporting on safety issues and scrap levels at the Gigafactory. SOF ¶ 2. This has undoubtedly made Tesla unhappy, but Tesla lacks the necessary clear and convincing evidence of fraud, oppression, or malice as to Tripp. Nev. Rev. Stat. Ann. § 42.005. The only Nevada case affirming punitive damages on a breach of fiduciary duty claim is one in which the defendants were stealing from their business partner by secretly underpaying him on partnership distributions. *Clark v. Lubritz*, 113 Nev. 1089, 1099 (1997). Tesla has no evidence that Tripp enriched himself financially at Tesla's expense by providing information to Lopez. Further, Tesla has no evidence that Tripp gave any confidential information to a competitor. *Serv. Employees Internat. Union, Local 250*, *supra*, 160 Cal. App. 4th at 375 (punitive damages affirmed where employee was secretly working for competitor). Finally, the mere fact of disloyalty to an employer, by itself, does not support an award of punitive damages unless there is clear and convincing evidence of "extreme moral culpability" by the defendant. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 292 (2d Cir. 2006). Tesla has no such evidence.

For these reasons, the Court should grant summary judgment as to punitive damage on all of Tesla's claims.

## F.  Tesla has waived any right to inspect Tripp's devices and cannot establish the requisite "irreparable harm" for a permanent injunction.

Tesla's last two forms of relief are (1) an order allowing for the inspection of Tripp's devices, Complaint [ECF No. 1] at ¶¶ 26, 34 and (2) injunctive relief, *id. at* ¶¶ 25, 32, 49. The court should grant summary judgment for these claims for relief as well.

1    In nearly two years of litigation, Tesla has never actually sought an order compelling

2    the inspection of Tripp's devices under 18 U.S.C. § 1836(b)(3)(A)(ii) of the DTSA.[4]  With

3    the limited exception of Elon Musk's deposition, the discovery cutoff was September 9,

4    2019.   Amended Scheduling Order [ECF No. 81] ¶ 1.   By failing to seek an order

5    compelling the inspection of Tripp's devices before, or even close to, the discovery cutoff,

6    Tesla has waived its right to such relief.  *Cf. Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620,

7    622 (D. Nev. 1999) ("After two years of discovery in this case, it is not unreasonable to

8    expect a motion to compel to be filed in close proximity to the discovery deadline.").

9    Likewise, Tesla has never sought a temporary restraining order preliminary injunction

10   under Rule 65 with respect to any alleged trade secrets in the nearly two years this case had

11   been pending.  If Tesla seeks a permanent injunction, Tesla must establish four factors: (1)

12   that Tesla has suffered irreparable injury; (2) remedies at law, such as monetary damages,

13   are inadequate to compensate for Tesla's injury; (3) considering the balance of hardships

14   between Tesla and Tripp, a remedy in equity is warranted; and (4) the public interest would

15   not be disserved by a permanent injunction against Tripp.  *Chemeon Surface Tech., LLC v.*

16   *Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 965 (D. Nev. 2018), on reconsideration in part on

17   other grounds, 315CV00294MMDVPC, 2018 WL 3127454 (D. Nev. June 26, 2018).

18   The fact that Tesla never sought Rule 65 relief undermines any claim of an

19   "irreparable injury" necessary to obtain a permanent injunction.  *Tokidoki, LLC v. Fortune*

20   *Dynamic, Inc.*, CV 07-1923DSF(PJWX), 2009 WL 2366439, at *15 (C.D. Cal. July 28,

21   2009), aff'd, 434 Fed. Appx. 664 (9th Cir. 2011), opinion withdrawn and superseded on

22   other grounds, 473 Fed. Appx. 522 (9th Cir. 2011), and aff'd, 473 Fed. Appx. 522 (9th Cir.

23   2011) ("[The plaintiff], which never found any need to seek issuance of a temporary

24   restraining order or preliminary injunction, failed to make the showing necessary for a

25   permanent injunction, including evidence that it has suffered an irreparable injury."); *In re*

26   *Adirondack Ry. Corp.*, 28 B.R. 251, 261 (Bankr. N.D.N.Y. 1983) (trustee's failure to seek

27

28   [4] Tesla cites to the DTSA in both its First and Second Claims for Relief.

1    preliminary injunction under Rule 65 warranted denying request for permanent injunction).

2    Further, on October 10, 2018—nearly 6 months after Tesla filed suit—the Court

3    entered a stipulated protective order with attorney's eyes only ("AEO") provisions and

4    which remains in effect even after the termination of this litigation.  Protective Order [ECF

5    No. 43] at ¶¶ 9, 17(b).  This protective order with AEO provisions eliminates the possibility

6    of "irreparable harm" to Tesla.  *Chamber of Commerce of U.S. v. Legal Aid Soc. of Alameda*

7    *County*, 423 U.S. 1309, 1312 (1975) (holding that party seeking an emergency order staying

8    discovery "will not suffer irreparable injury from disclosure of the documents because the

9    District Court has entered a protective order permitting only attorneys for the [plaintiff] to

10   examine the assertedly privileged documents."); *Oracle USA, Inc. v. Rimini St., Inc.*, 2:10-

11   CV-00106-LRH, 2012 WL 6100306, at *13 (D. Nev. Dec. 7, 2012) (holding that litigant

12   "has not established that it will suffer irreparable injury in the absence of a stay because the

13   court has ordered that the discovery materials at issue shall remain subject to the court's

14   stipulated protective order"); *Superior Edge, Inc. v. Monsanto Co.*, CIV. 12-2672 JRT/FLN,

15   2014 WL 7183797, at *3 (D. Minn. Dec. 16, 2014) ("[Defendant] has not shown a risk of

16   irreparable injury in light of the Magistrate Judge's protective order.").

17   **V.     Conclusion.**

18   Tesla is a multi-billion dollar global corporation.  Tripp is an unemployed factory

19   worker now living in Hungary.  Tesla's lawsuit was never about obtaining compensation for

20   financial losses or recovering purported trade secrets.  It was only about Tesla punishing and

21   disgracing Tripp publicly at the behest of Tesla's CEO Elon Musk, who has a personal

22   vendetta against Tripp.[5]  Tesla's damages claims are a mile wide and an inch deep, probably

23   because Tesla and Musk reckoned that Tripp would never get this far.  But he did.

24   There being no disputed material facts, this Court should grant summary judgment as

25   requested, and permit Tesla to proceed only on its $7,385 claim for breach of fiduciary duty

26   of loyalty.

27

28   [5] *See generally* Motion to Compel Deposition of Elon Musk (Redacted) [ECF No. 125].

DATED this 31st day of March, 2020.

TIFFANY & BOSCO, P.A.

By /s/William M. Fischbach III
    Robert D. Mitchell
    William M. Fischbach III
    Ace Van Patten
    Camelback Esplanade II, Seventh Floor
    2525 East Camelback Road
    Phoenix, Arizona 85016-4229
    *Counsel for Defendant/Counterclaimant*

**PROOF OF SERVICE**

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On March 31, 2020, I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S MOTION FOR SUMMARY JUDGMENT**

on the following interested parties in this action:

| | |
|---|---|
| Rory T. Kay (NSBN 12416) | Michael Lifrak |
| McDONALD CARANO LLP | Jeanine M. Zalduendo |
| 2300 West Sahara Avenue, Suite 1200 | Alex Bergjans |
| Las Vegas, Nevada 89102 | Aubrey Jones |
| Telephone: (702) 873-4100 | QUINN EMANUEL URQUHART & |
| rkay@mcdonaldcarano.com | SULLIVAN, LLP |
| | 865 S. Figueroa St., 10th Floor |
| Alex Spiro | Los Angeles, California 90017 |
| QUINN EMANUEL URQUHART & | Telephone: (213) 443-3000 |
| SULLIVAN, LLP | michaellifrak@quinnemanuel.com |
| 51 Madison Avenue, 22nd Floor | jeaninezalduendo@quinnemanuel.com |
| New York, New York 10010 | alexbergjans@quinnemanuel.com |
| Telephone: (212) 849-7000 | aubreyjones@quinnemanuel.com |
| alexspiro@quinnemanuel.com | |

**[X] (BY E-MAIL)** By transmitting the above documents to the above e-mail addresses.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 31st day of March, 2020 at Phoenix, Arizona.

*/s/William M. Fischbach III*