




IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

TESLA, INC.,

    Plaintiff,

vs.                      No.3:18-CV-00296-LRH-CBC

MARTIN TRIPP,

    Defendant.
_____

**CONFIDENTIAL**

**DEPOSITION OF**

**NICHOLAS RYAN GICINTO**

TAKEN ON
TUESDAAY, AUGUST 27, 2019
9:58 A.M.

HOME2SUITES CONFERENCE CENTER
2001 MAIN STREET
KANSAS CITY, MISSOURI 64108

```
 1  data on a chart in a Tableau --
 2       A.   Tableau chart.
 3       Q.   -- Tableau chart right down to the decimal
 4  point.
 5       A.   Yeah.
 6       Q.   Is that data something that Mr. Tripp had
 7  authority to access as part of his normal job?
 8       A.   Well, it's interesting because data from
 9  the MOS, from the manufacturing and operating system
10  is available to a number of production associates
11  who are asked to run charts, who are asked to do
12  different, you know, calculations, right, to produce
13  metrics for their team so they can track progress.
14            Did he have access?  Yes.
15            Was he authorized to use it in the way he
16  did?  No.
17       Q.   And I appreciate you making that
18  distinction because you're right, there's kind of
19  two components of that, there's did he have
20  authority to access the information and did he have
21  authority to give it to Linette Lopez.  I want to
22  focus on the first question, which is, did Mr. Tripp
23  as part of his ordinary job duties have authority to
24  access the information in that Tableau?
25       A.   As far as I know he, because he was able
```

```
 1  to access it, he had authority based on the
 2  permissioning systems.
 3          Q.    I'm going to read a statement to you.
 4          A.    Okay.
 5          Q.    Tell me if it's true or false.
 6          A.    Okay.
 7          Q.    To conduct his job responsibilities Tripp
 8  was provided the ability to query and access
 9  confidential part, quality, and process data from
10  Tesla's manufacturing operating system or MOS; true
11  statement?
12          A.    May I read it?  Is that possible?  I'm
13  more visual so forgive me.  I'll preserve the fold.
14                May I ask where this came from?
15          Q.    You can ask.
16          A.    I mean, if it's part of a broader
17  statement or if there's context around it, it would
18  be helpful, more helpful for me to answer the
19  question.
20          Q.    Generally speaking it's from a document
21  that Tesla prepared.
22          A.    Okay.
23          Q.    Other than that I would probably get into
24  something that Mr. Gates might object to, but
25  suffice to say these are words prepared by Tesla.
```

1     A.    Okay.  May I ask who in Tesla prepared
2  them?
3           MR. GATES:    I don't know.
4  BY MR. FISCHBACH:
5     Q.    Probably Mr. Gates or the associate
6  working for him.
7     A.    Okay.
8           MR. UMHOFER:    No pressure.
9     A.    I -- I believe that is a true statement.
10 BY MR. FISCHBACH:
11    Q.    Okay.  Fair enough.
12    A.    I'm not trying to overly complicate it but
13 seeing a snippet out of a document when you don't
14 have the broader context of something bigger is
15 difficult at times.
16    Q.    I'll read you another statement.
17    A.    Okay.
18    Q.    In fact, I'll read it to you and then I'll
19 show it to you.
20    A.    Get ready.  Thanks.
21    Q.    Tripp wrote structured query language SQL
22 scripts to obtain data from the entire Gigafactory
23 running these queries from different computers using
24 generic user names and downloading the data to a
25 personal USB drive.  I'm going to show you the

1  statement so you can read it.
2      A.   Thank you.
3           MR. GATES:  In the meantime, I'll
4  interject a foundation objection.
5           THE WITNESS:  Okay.
6      A.   So based on what I recall from the
7  investigation I wouldn't say that that is false.
8  BY MR. FISCHBACH:
9      Q.   Would you say it's true?
10     A.   It appears to be an accurate statement.
11     Q.   We talked earlier about -- I don't like
12 putting words in your mouth, but I'm going to put
13 words in your mouth.  I believe you testified that
14 the fact that Tripp was able to access the data he
15 did was indicative of his authority to at least
16 access that data, correct?
17     A.   Based on the permissioning systems, if he
18 had access it was because he was given the authority
19 to access it, yes, assuming it was permissioned
20 correctly.
21     Q.   All right.  You obviously take issue with
22 how he used the data, but in terms of access he had
23 authority to access the information?
24     A.   Correct.  And as I -- as I recall, some of
25 that access had been limited based on some

```
 1  inappropriate use where he had given permissions to
 2  other users and he had been caught doing that.  And
 3  so at some point his access had been scaled down and
 4  that had upset him from what I recall in the
 5  investigation.  So I think at the time whatever he
 6  had accessed he had likely had permission to do so,
 7  but he may have ultimately had some access levels
 8  downgraded.
 9       Q.   Did your investigation ever uncover
10  instances in which Mr. Tripp accessed information
11  that was outside his authorized level of access?
12       A.   So using his personal login I don't recall
13  that being the case.  I think what I would want to
14  go back and take a closer look at from the
15  investigation, which again, I don't have any of that
16  in front of me and that's been some time, as I
17  recall he utilized a generic login which may have
18  been outside the scope of its intended or proper use
19  to access some -- some information, but that -- that
20  element I can't be positive of because it's just
21  been -- it's been a while.
22       Q.   Are there any documents that would help
23  you refresh your recollection on that issue?
24       A.   I mean, I -- it's a gray question and I
25  just can't say, not because I wouldn't say but I
```

1  **wrote software that hacked Tesla's MOS they're just**
2  **referring to three queries about a half page like**
3  **this?**
4       A.   Four queries, there were four things he
5  was looking for, bandoliers, modules and stators and
6  inverters, so there's four, again that we know about
7  based on -- based on this evidence.
8       Q.   So again when Tesla alleges Mr. Tripp
9  wrote software that hacked Tesla's MOS, all it
10 really boiled down to was four of these half-page
11 queries to obtain information that Mr. Tripp had
12 authority to access; is that correct, sir?
13      A.   When you say all it really boils down to,
14 I think that, like diminishes the technical
15 expertise that's required.  I mean, you say this is
16 half a page.  It's half a page on an 11 by, what,
17 17. That if you were -- I mean, four of those,
18 that's actually two pages' worth of queries that
19 somebody would need training and expertise to write.
20      Q.   Did you understand my question?
21      A.   I understand your question and you're
22 oversimplifying the question is what I'm explaining,
23 you are boiling it down to, boy, wasn't this easy to
24 do, and Tesla seems to be making a big deal out of
25 this.  And what I'm saying is this query isn't as

```
 1  simple as your question is making it out to be, so
 2  I'm taking issue with the question is what I'm
 3  saying.  If you would like to rephrase it, I would
 4  be happy to answer it.
 5       Q.   I don't know that I should rephrase it,
 6  but I will say again, sir --
 7       A.   It's your time.
 8       Q.   -- Tesla alleges that Mr. Tripp wrote
 9  software that hacked Tesla's MOS, all that means is
10  Mr. Tripp wrote four queries just like one on
11  Deposition Exhibit 16?
12       A.   What --
13            MR. UMHOFER:  Objection, lacks foundation.
14  Asked and answered.  Go ahead.
15            MR. GATES:  Argumentative.
16       A.   What it means is he wrote four queries
17  like this at least that we know of that obtained
18  information that while he may have had the access
19  technically he was not authorized to obtain for this
20  purpose.
21  BY MR. FISCHBACH:
22       Q.   True or false:  Mr. Tripp authored hacking
23  software and placed it into the computer systems of
24  three other individuals at the company so that
25  confidential Tesla data could be persistently
```

CERTIFICATE

I, the undersigned, David Leyland, am a videographer on behalf of NAEGELI DEPOSITION AND TRIAL. I do hereby certify that I have accurately made the video recording of the deposition of Nicholas Gicinto, in the above captioned matter on the 27th day of August, 2019, taken at the location of Home2suites Conference Center, 2001 Main St., Kansas City, MO 64108, consisting of 1 DVD(s).

No alterations, additions or deletions were made thereto.

I further certify that I am not related to any of the parties in the matter and have no financial interest in the outcome of this matter.

*/s/ David Leyland*
_____
David Leyland, Videographer

# CERTIFICATE

I, Terri L. Huseth, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 4th day of September, 2019.

_Terri L. Huseth_
Terri L. Huseth