

- COURT REPORTING
- LEGAL VIDEOGRAPHY
- VIDEOCONFERENCING
- TRIAL PRESENTATION
- MOCK JURY SERVICES
- LEGAL TRANSCRIPTION
- COPYING AND SCANNING
- LANGUAGE INTERPRETERS





NAEGELI
Expect Excellence
DEPOSITION AND TRIAL



(800) 528-3335
NAEGELIUSA.COM

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

TESLA, INC., a Delaware Corporation,

    Plaintiff,

vs.               Case No: 3:18-cv-00296-LRH-CBC

MARTIN TRIPP, an individual,

    Defendant.
_____

MARTIN TRIPP, an individual,

    Counterclaimant,

vs.

TESLA, INC., a Delaware Corporation,

    Counterdefendant.
_____

**VIDEOTAPED DEPOSITION OF**

**JACOB NOCON**

**TAKEN ON
FRIDAY, MAY 17, 2019
9:01 A.M.**

**COURTYARD CONFERENCE CENTER
FOUR SEASONS CONFERENCE ROOM
4320 EL CAMINO REAL
PALO ALTO, CALIFORNIA 94022**

```
 1  help me understand what you mean there?
 2       A.   Sure.  Others that I was working with, my
 3  understanding was were in conversation with counsel,
 4  getting direction from counsel.
 5       Q.   Who were those others that you were
 6  working with?
 7       A.   On this particular investigation, Nick
 8  Gicinto, Justin Zeefe, and some other employees from
 9  Nisos.
10       Q.   Is it -- is it -- is it your testimony
11  that by the time you came on board this
12  investigation -- strike that.
13            Throughout your tenure on this
14  investigation, were either you or Mr. Gicinto or Mr.
15  Zeefe kind of in coordination with Tesla's counsel,
16  working in coordination with Tesla's counsel?
17       A.   Yes, that's correct.
18       Q.   Okay.  Again, without -- I think we've
19  been clear about this, but I want to be very clear.
20  I don't want to hear about the substance of the
21  communications.
22            But is it fair to say that you and Mr.
23  Gicinto and Mr. Reefe (sic) were taking direction
24  from Tesla's counsel?
25       A.   I think that's fair to say.
```

```
 1        Q.    And that -- that goes throughout the
 2   entire investigation, at least for the part that you
 3   were involved with, sir?
 4        A.    Yes.
 5        Q.    Again, without disclosing the substance of
 6   the communications, do you know the names of the
 7   Tesla counsel that you were in communication with?
 8        A.    So I was directly in contact with Lynn
 9   Miller and Aarti Reddy.
10        Q.    Who are those two individuals?
11        A.    Both of them -- well, are and were lawyers
12   in Tesla's litigation department.
13        Q.    Are they in-house lawyers for Tesla, or
14   outside counsel, or do you know?
15        A.    They were in-house, or are and were in-
16   house.
17        Q.    So again, I just want to be very clear on
18   this.
19              True or false:  The investigation that you
20   performed in this case was done at the direction of
21   and in coordination with Tesla's attorneys?
22        A.    I would say that's accurate.
23        Q.    And again, just so I -- I want to make
24   sure I understand the nature of Tesla's objection.
25              To your knowledge, sir, you're not
```

```
 1              You can still answer.
 2              THE WITNESS:  So chronologically, yes.  We
 3   had identified him as one of the primary subjects,
 4   didn't know whether or not there were others on the
 5   14th.  And there was work that continued after that,
 6   including this 18th through the 23rd.
 7         Q.   Okay.  And this work that continued after
 8   the 14th, this was still being done at the direction
 9   of and in communication with Tesla's counsel?
10         A.   Yes.
11         Q.   Do you know when Mr. Tripp was terminated
12   from Tesla?
13         A.   I don't know the date.
14         Q.   Do you know when the lawsuit was filed in
15   this case?
16         A.   I don't know that date either.
17         Q.   Going back to Exhibit 5 -- actually, yeah,
18   going to Exhibit 5, there's an entry for "Marty
19   Tripp BG report, $11,250."
20              What is a BG report, background report?
21         A.   I would assume it means background, but I
22   don't know for sure.
23         Q.   Was a background report done on Mr. Tripp?
24         A.   Yes, it was.
25         Q.   Did it produce a document of sorts?
```

```
 1   forensics kit was used for other than examining data
 2   and computers?
 3        A.   That's correct.  I mean, that's not what I
 4   do.
 5             MS. LIBEU:  Can we take a break when it's
 6   a good time?
 7             MR. FISCHBACH:  Yeah, let's do it.
 8             THE VIDEOGRAPHER:  Please stand by.  The
 9   time is 10:10.  We're off the record.
10             (Short recess was taken.)
11             THE VIDEOGRAPHER:  We're back on the
12   record. The time is 10:23.
13        Q.   BY MR. FISCHBACH:  Sir, before we went on
14   the break, we were discussing the invoice from
15   Digital Intelligence in Exhibit 4.  And for purposes
16   of the record, it is -- the Bates number is Tes-
17   Tripp 1047 for that invoice.
18             And, sir, just so I'm clear, the -- the
19   software kit that's reflected by this invoice and
20   the software kit that was used -- or loaned by
21   Willis prior to this purchase, again, this is part
22   of the investigation performed by Nisos at the
23   direction of and in communication with Tesla's
24   counsel; is that correct?
25        A.   Yes.
```

1  investigation?

2     A.    I was not aware.

3     Q.    Sir, if you could please turn to page 6 of

4  Exhibit 9.  I'm looking at specifically paragraph

5  14.

6     A.    Okay.

7     Q.    It says, "Tesla's out-of-pocket costs come

8  in two forms.  First, Tesla hired Nisos Group to

9  investigate the identity of the employee that was

10 the source of the information contained in the two

11 Business Insider articles mentioned above."

12          Sir, was the Nisos investigation limited

13 to just to investigating the identity of the

14 employee that was the source of the two Business

15 Insider articles?

16    A.    I would not characterize the investigation

17 as limited to just that.  I mean, it was identifying

18 which individual or which individuals could have

19 leaked the information, the extent of what was

20 taken, whether or not there was more information

21 that was taken and could potentially be leaked, any

22 particular assets that could have been compromised,

23 or other coconspirators in the case.

24    Q.    Okay.  And so -- but again, even given

25 that broad range of the investigative topics, all of

1  that was done in the communication with and at the
2  direction of Tesla's counsel?
3       A.   Yes, that's accurate.
4       Q.   Are you able to apportion the Nisos
5  expenses that were incurred to identifying Mr. Tripp
6  as the source of the Business Insider article versus
7  other aspects of the investigation?
8       A.   What do you mean by that?
9       Q.   Well, identifying Mr. Tripp as the source
10 of the Business Insider leak, that was one component
11 of the investigation, correct?
12      A.   That's correct.
13      Q.   But there were other facets to the
14 investigation as well?
15      A.   That's accurate.
16      Q.   Going off of Exhibit 5, the total cost was
17 roughly $242,000?
18      A.   Right.
19      Q.   According to Mr. Kinrich, it's actually
20 about $249,000, but they're -- basically both
21 documents suggested an investigative cost of about
22 $250,000.
23           Of that amount, can you tell me what
24 specific portion, percentage, or amount was strictly
25 just to identify Mr. Tripp as the source of the

CERTIFICATE

I, Carli McKenny, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 3rd day of June, 2019.

_____
Carli McKenny