1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rory T. Kay (NSBN 12416)
MCDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV  89102
Telephone:  (702) 873-4100
Facsimile:  (702) 873-9996

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (admitted pro hac vice)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael T. Lifrak (admitted pro hac vice)
  michaellifrak@quinnemanuel.com
Jeanine M. Zalduendo (admitted pro hac vice)
  jeaninezalduendo@quinnemanuel.com
Aubrey Jones (admitted pro hac vice)
  aubreyjones@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

Attorneys for Plaintiff/Counter Defendant
TESLA, INC.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TESLA, INC.,<br><br>                  Plaintiff,<br>   v.<br>MARTIN TRIPP,<br><br>                  Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. 3:18-cv-00296-LRH-CBC<br><br>**TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL UNDER COURT ORDER ECF No. 44.**<br><br>**ORAL ARGUMENT REQUESTED PER LR 78-1** |

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1

**INTRODUCTION**

2       Martin Tripp is a disgruntled former Tesla employee who admits to stealing Tesla's

3   confidential information and to disclosing it to a reporter, which led to the publishing of

4   misleading and damaging information about the company.  Tesla brought this case to remedy

5   Tripp's unlawful activity.  Tripp's response was to bring meritless counterclaims against Tesla for

6   defamation and for placing him in a false light, based on statements made by Tesla and its CEO,

7   Elon Musk, in the wake of Tripp's misconduct.  Tripp's counterclaims are without any merit and

8   should be summarily dismissed by the Court pursuant to FRCP 56(a).

9       Tripp's counterclaims are based on four sets of statements by Tesla and/or Musk.  In order

10  to survive summary judgment, Tripp must present clear and convincing evidence of actual

11  malice—that Musk or Tesla made the statements knowing they were false or with serious doubts

12  as to their truth.  *See*, Section I, *infra*; *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964);

13  *Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002) ("*Flowers I*"); *Hoff v. Walco Int'l, Inc.*,

14  2013 WL 275298, at *2 (D. Nev. Jan. 23, 2013).  But the statements here were based on

15  information obtained in an investigation and on Tripp's own admissions.  There is no evidence

16  that either Musk or Tesla had any reason to doubt the information let alone believe it to be false.

17  As a result, Tripp cannot demonstrate actual malice as to any of the statements at issue.  Nor can

18  he prove the statements were actually false.

19      First, Musk sent a June 17, 2018 email to Tesla employees describing an unnamed

20  employee's "sabotage" through his admitted exporting of "large amounts of highly sensitive Tesla

21  data" and transmitting it to third parties.  (Declaration of Elon R. Musk ("Musk Decl."), Ex. F).

22  In interviews, Tripp admitted taking these very actions to Tesla investigators days before, which

23  information was relayed to Musk.  There is no evidence that Musk thought the information was

24  false or even doubted its truth.  Tripp may quibble with Musk's word choices—but that is not

25  evidence of falsity or actual malice.  Indeed, all the statements made by Musk were grounded in

26  the findings of Tesla's investigation into Tripp's activities at that time.  *See* Section II.B., *infra*.

27      Second, on June 20, 2018, in response to press inquiries, Tesla and Musk released written

28  statements that accurately reported that a caller had contacted Tesla stating that Tripp was very

well armed and volatile, and that employees at the Gigafactory may be in danger.  Because the statements made to the press accurately reflected the phone call, there can be no showing of falsity or malice.  *See* Section III, *infra*.  Again, Tripp's only response are gripes about word choice—that the statements to the press used the verb "shoot" to describe the alleged threat when the caller apparently did not.  But the implication was obvious and accurate and cannot form the basis of a defamation claim.

Third, Tesla made another written statement to the press on June 22, 2018, in response to further press inquiries.  The statement simply repeated the June 20 statement about the Gigafactory threat, accurately described Tripp's admitted theft of Tesla's confidential information, and corrected inaccuracies in the reporting about the leaked data and in Tripp's continued public statements.  There is no defamation there either.  *See* Section IV, *infra*.

Fourth, Musk tweeted to the reporter who published the stolen Tesla information, asking her whether she paid Tripp for his information.  This tweet cannot be defamation because (a) it was a question, not an affirmative statement of fact; and (b) in any event, Tesla and Musk had evidence that the reporter *had* paid Tripp—through Tripp's own words and text messages to his co-worker.  *See* Section V, *infra*.

This is not a legitimate defamation case.  Tesla and Musk made public statements after Tripp had hacked Tesla's computers, downloaded confidential data about Tesla's manufacturing processes, and provided the information to a reporter.  There is **zero** evidence that any of the statements by Musk or Tesla were made with malice.  The statements were truthful and reflected what Tesla and Musk knew at the time.  Nor is there any evidence that the statements about the emergency threat to the Gigafactory were anything but true—and certainly not knowingly false—or that Musk's question in a tweet is a defamatory statement.  The Court should thus enter summary judgment in Tesla's favor on Tripp's counterclaims.

## STATEMENT OF RELEVANT FACTS

### A.     Tripp Is Hired by Tesla (Background).

In October 2017, Tesla hired Martin Tripp to work as a "lead" Process Technician at the Tesla Gigafactory near Reno, Nevada.  (Declaration of Michael T. Lifrak ("Lifrak Decl."), Ex.

12.)[1]  At that time, the factory was in the early stages of ramping up production of motors and batteries for its new car, the Model 3. (Musk Decl.     5.)  In late 2017, Tesla set an ambitious goal to eventually produce 5,000 Model 3 cars per week. (*Id.*     6.)  The work performed by the employees at the Gigafactory, including Tripp, was vital to achieve this goal. (*Id.*)

        As a condition of his employment, Tripp agreed to be bound by a number of non-disclosure agreements. (Exs. 13-16.)[2] ██████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ (Ex. 15), and agreed to not ████████████████████████████████████████████ ██████████████████████████ (Ex. 14.)  As detailed below, after less than a year of conflict-filled employment, Tripp repeatedly and egregiously violated his promises.

        **B.      Tripp Is Reprimanded and Transferred for Poor Work (Background).**

        Shortly after he was hired, Tripp formed the reputation of being a difficult employee who had frequent clashes with his co-workers.  According to colleagues, Tripp would "retaliate" against his co-workers if they "crossed him." (Ex. 3, Persyn Dep. 45-46.)  Only four months into the job, in February 2018, after repeated complaints from his co-workers (*see id.*), ████████ ████████████████████████████████████████████████████████████████████ ██████████████████████(Ex. 1, Tripp Dep. 233:1-13.)  Tripp reacted by sending an email to the Senior Director of Human Resources for the entire factory, copying Tesla's Chief Technical Officer, claiming that he ████████████████████████████████ ████████████████████████ (Ex. 17.)  Tripp felt he was ████████████████████ ████████████████████████████████████████ (Ex. 1, Tripp Dep. 233:1-13.)

        Tripp's problems continued.  A few weeks later, on March 8, 2018, Bowling reiterated to Tripp that ████████████████████████████████████████████████████████████ ██████████████ (Ex. 18.)  After further problems, Bowling ██████████████████ ██████████████████████████ (Ex. 11.)  Tripp's behavior and conduct did not change.

_____

[1]  Additional facts that have been included as background to provide context, are labeled as such.
[2]  Unless otherwise noted, all citations to exhibits are to the Lifrak Declaration.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   Shortly after the transfer, on May 25, 2018, ███████████████████████

2   ████████████████████████████████████████████████████████████████

3   █████████████████████████ (Ex. 19.) ████████████████████████████

4   ██████████████████████████████ (Ex. 1, Tripp Dep. 239:14-25.)

5   **C.**     **Tripp Steals Volumes of Confidential Tesla Information.**

6          Shortly after his transfer, Tripp implemented his scheme to get his revenge on Tesla.  As

7   detailed below, he would steal Tesla's confidential data and information and then leak selective

8   portions to the press in order to create a misleading picture to the public about the factory's

9   operations.  Tripp's theft of Tesla's confidential information is not disputed.  To carry out the leak

10  of this information, Tripp:

11         • Forwarded internal Tesla emails regarding production goals and scrap data to his
             personal email address.  (Exs. 21-22.)

12
13         • Took pictures of non-public parts and machines in the Gigafactory on his personal
             phone.  (Exs. 23-24; Ex. 1, Tripp Dep. 78:8-79:19; 149:21-150:19; 152:21-153:22;
             166:11-167:14.)

14
15         • Created ████████████████████████████ download
             data from Tesla's Manufacturing Operating System ("MOS"), which houses data
             regarding the company's inventory, work tasks, and quality.  (Ex. 1, Tripp Dep.
16           91:1-95:16.)

17         • Took screenshots of non-public factory data from Tesla computers.  (*Id.* at 106:17-
             20; Exs. 25-26.)

18
19         • Utilized ████████████████████████ to create reports that were outside of
             his job responsibilities.  (Ex. 1, Tripp Dep. 116:23-124:2; Ex. 2, Gicinto Dep.
             34:24-35:16.)

20
21         • Transferred non-public Tesla data to a personal cloud-based storage system.  (Ex.
             2, Gicinto Dep. 123:18-124:10; 136:23-137:12; Ex. 1, Tripp Dep. 166:11-169:13.)

22  During his employment, Tripp seemingly had convinced himself that the █████████████

23  ███████████████████████████████ (Ex. 1, Tripp Dep. 58:17-24; 245:2-246:8

24  (background).)  He apparently believed ████████████████████████ (*Id.* at

25  57:16-59:1 (background).)  But when he presented his data to co-workers, they told him his

26  numbers were wrong.  Among other things, ████████████████████████████

27  ██████████████████████ (Ex. 6, 6/14/2018 Tripp Int. 9:10-16:10 (background).)

28

McDONALD ⊛ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**D.      Tripp Offers the Stolen Information to Reporters.**

On May 27, 2018—two days after he was formally disciplined and ten days after he was transferred—Tripp took the next step in his scheme.   He emailed several business news publications that regularly report on Tesla—*Reuters, Business Insider, CNN*, and *Fox News*—indicating that he was a current Tesla employee and offering to disclose Tesla internal information. (Ex. 27.) He claimed that "on several occasions Elon [Musk, Tesla's CEO] has flat out lied to the public/investors" and he could "provide actual numbers and dashboards that are used" to refute some of Musk's purportedly false claims.  (*Id.*)

Although his allegations were false, Tripp knew that the press would be interested in his information.  Tesla, a publicly-traded company and one of the highest valued car manufacturer in the United States, was and is the focus of much interest and attention from the media, investors, government, and the public.  (Musk Decl.     7-8.)  When Tripp contacted news organizations, Tesla's operations and management were the topics of extensive public discussion and debate. Tesla's ambitious plan to produce 5,000 Model 3 cars per week caused news organizations to focus on Tesla's progress and methods.  (*Id.*; Exs. 8-10.)  In the winter and early spring, there was significant press coverage about Tesla's finances and production.  (*see e.g.*, Ex. 8, Musk Ex. A.)

**E.      Tripp Provides the Stolen Data to a Reporter.**

After reaching out to numerous reporters to disclose Tesla's confidential information, Tripp found one who was interested.  Linette Lopez at *Business Insider*, whom, according to Tripp, ██████████████████████████████████████ took Tripp up on his offer.  (Ex. 1, Tripp Dep. 71:17-22 (background).)   Tripp leaked to Lopez non-public data and information that he had taken from Tesla's computer systems ███████████████  (*Id.* at 91:7-97:5).)  He emailed her screenshots of internal Tesla reports, an internal Tesla email discussing rework statistics, a spreadsheet he created with six months' worth of data from the Tesla factory, and a May 16, 2018 email Tripp sent to Tesla's CEO, Elon Musk.  (*Id.*; Exs. 25, 28.)  He also sent to Lopez the photographs and videos he had taken inside the Gigafactory.  (Ex. 29; Ex. 1, Tripp Dep. 149:21-150:7; 166:11-169:13; 153:8-22.)  Each of these actions breached Tripp's non-disclosure and confidentiality agreements with Tesla.  (Exs. 13-16 (background).)

1    Tripp's own words at the time prove why he was engaged in this misconduct—he was the

2    very definition of a disgruntled employee.  On June 2, 2018, while he was feeding information to

3    Lopez, Tripp sent an email to his manager and Human Resources, █████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████  (Ex. 11.)

6    On June 4, 2018, the day before Tesla's annual shareholder meeting, *Business Insider*

7    published Lopez's article entitled, "Internal documents reveal Tesla is blowing through an insane

8    amount of raw material and cash to make Model 3s, and production is still a nightmare."  Based

9    almost entirely on the Tesla data that Tripp sent her, the article stated that the factory had scrapped

10   almost $150 million in parts in just the first six months of 2018.  (Ex. 30.)[3]

11   On June 6, 2018, the day after Tesla's annual shareholder meeting, Lopez published a

12   second article, "Tesla's new Gigafactory robots that are supposed to help it ramp up Model 3

13   production aren't working yet."  (Ex. 31.)  This article was also based on non-public information

14   that Tripp provided to Lopez.  (Ex. 1, Tripp Dep. 154:17-23.)

15   Tripp was, according to Lopez, "just getting started."  (Ex. 32 (background).)  And Tripp

16   was excited by the prospect of continuing to leak confidential Tesla information to the press,

17   responding "Muahahahahahha!!!" to Lopez's statement that she intended to continue to work with

18   him to publish negative stories about Tesla.  (*Id*. (background).)

19   **F.    Tesla Investigates The Leaks, and Tripp Admits His Misconduct.**

20   Tesla was concerned by the articles.  (Musk Decl.    12 (background).)  The articles were

21   published the days before and after the annual shareholder meeting.  Although the articles were

22   based on false and exaggerated information, it was clear that Lopez received confidential data

23   from a Tesla employee.  (*Id*. (background).)

24   Tesla Security, with assistance from an outside security service and counsel, investigated

25   the leaks.  (Ex. 2, Gicinto Dep. 16:19-17:8; 24:21-26:16; 30:9-34:6.)  They traced information

26

27   _____

28   [3]   Although not material to resolve Tripp's claims, the information Tripp provided to Lopez
     regarding the cost of scrap was inaccurate and based on his (mis)understanding of the Tesla data.
     (Ex. 6, 6/14/2018 Tripp Int. at 149:12-150:6; Ex. 25.)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

provided in the articles to searches run on the Gigafactory's MOS.  (*Id.* at 26:17-28:22.)  Based on this investigation, they determined that Tripp was likely the source of the leak.  (*Id.* at 26:17-28:22; 34:24-35:16.)  They interviewed Tripp on June 14, 2018, and forensically imaged his work computer.  (*Id.* at 28:23-29:19; 134:11-136:17.)

In the June 14, 2018 interview, ████████████████████████████████████ ████ (*Id.* at 28:23-29:19; 134:11-137:17.) ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████ (Ex. 6, 6/14/2018 Tripp Int. 147:1-3.)  In the hours-long interview, Tripp then admitted to taking Tesla's non-public information, providing it to Lopez, working with Lopez on the articles, and trying to hide his activities.  (*Id.* at 172:13-188:25.)  He stated, "All in all, I don't regret it." (*Id.* at 153:24-25.) ██████████████████████████████████████████████████████

█████████████████████████ (*Id.* at 244:13-17 (background).)

During the interview, Tripp also ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ (*Id.* at 49:8-18.)

███████████████████ (*Id.*) ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████ (*Id.* at 47:6-48:19.)

████████████████████████████████████████████████████████████████████████████

██████████████████████████████ (*Id.* at 50:9-51:16.)

Tesla excused Tripp from the interview and told him not to speak to Lopez.  (Ex. 2, Gicinto Dep. 70:13-71:8 (background).)  Instead, Tripp called Lopez immediately after leaving the Gigafactory.  (*Id.* (background).)  He later emailed Lopez stating, ████████████████████

████████████████████████████████████████ (Ex. 16.)

Following their interview with Tripp, Tesla Security forensically examined Tripp's laptop and the loaner computer they had provided him.  (Ex. 2, Gicinto Dep. 134:11-135:6; 142:13-144:6.) ████████████████████████████████████████████████████████████████████

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  ████████████████████████████████████████████████████

2  ████████████████████████████  (*Id.* at 139:4-140:24; Response to Interrogatory No. 13.)

3  The analysis also indicated to Tesla Security ████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████  (*Id.* at 142:13-144:6.) ████████████████████

6  ████████████████████████████████████████████████████

7  ████████████  (*Id.* at 143:22-144:6.)

Over the weekend of June 16-17, while the investigation into Tripp's activities was ongoing, Tesla Security provided Musk with an update and summary of the investigation. (Musk Decl.   16.) On June 17, 2018, Musk sent an internal email to Tesla's employees—and to nobody outside of the company—describing Tripp's activities and summarizing the investigation's findings to date. (*Id.*   19-20, Ex. F.) The email did not name Tripp as the leaker. (*Id.*) In his email, Musk instructed Tesla's employees to stay vigilant of similar efforts to misappropriate Tesla's confidential information and harm the company. (*Id.*)

On June 19, 2018, Tesla fired Tripp and filed this lawsuit the next day. (Dkt. 1, Ex. 34.)

**G.    Tesla Receives a Threat After Filing Its Lawsuit Against Tripp.**

The morning Tesla filed its lawsuit against Tripp, Tripp emailed Musk the following statement: "Don't worry, you have what's coming to you for the lies you have told the public and investors." (Musk Ex. G.)  Musk perceived this as a threat. (Musk Decl.   22.)  The two exchanged several emails until 10:28 a.m. (Musk Ex. G (background).)

At 1:40 p.m. that day, a few hours after Tripp emailed Musk, Tesla received a call at its Las Vegas call center warning that a "former Tesla employee" was "very well heavily armed," "extremely upset" because his name had been "released to the media," and the caller feared for the safety of employees at the Gigafactory. (Ex. 36.)  The caller was initially reluctant to give the name of the "former Tesla employee."  But when Shamara Bell, the employee who took the call, asked if the "former Tesla employee" was Tripp, the caller confirmed it was. (Ex. 4, Bell Dep. 29:3-30:25.)  The call originated from a blocked number, and the caller refused to provide his name because he said he didn't "want to be involved in this matter with his friend but doesn't

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    want anyone to get hurt."  (Ex. 36; *see also* Ex. 5, O'Brien Dep. 167:9-168:15.)  However, he

2    stated that he was a "very close friend" of Tripp's, and according to Ms. Bell, sounded "genuinely

3    concerned [and] afraid," apparently knew that Tripp had been "fired recently," and knew that

4    Tripp's identity had just been "released in the media" that same morning.  (*Id.*)

5           Due to the severity of the threat, Bell, while still on the call, relayed what she was being

6    told to another Tesla employee, Angel Besinaiz, who informed the call center coordinator, Kristin

7    Krerowicz.  (Ex. 4, Bell Dep. 32:25-34:2, 39:19-25.)  At 1:44 pm, Krerowicz sent a Skype message

8    to warn others:

9

10
11    
12
13

14   (Ex. 37.)   Krerowicz's message was then forwarded to other people at Tesla, including Tesla

15   Security.  (Exs. 37-38.)

16           After the call, at 1:51 p.m., Bell sent the following email:

17                 Received a call
18                 Caller preferred to remain unknown.  Friend of Martin Tripp is concerned
      that he may do something violent & volatile.  Says he is concerned because he's
19    very hostile & very well armed.  (Ex. 39.)

20           In response, Tesla took action to protect its employees, including contacting local law

21   enforcement to provide protection at the Gigafactory.  (Ex. 47.)  Musk was informed of the threat

22   that afternoon.  (Musk Decl.    24.)  Later that day, in response to a reporter's inquiry about Tripp,

23   Musk shared his email exchange with Tripp, and told her that Tesla "received a call at the

24   Gigafactory that [Tripp] was going to come back and shoot people."  (Musk Ex. G.)  Tesla's

25   Communications Department ("Tesla Communications") emailed the reporter the following

26   statement along with background information about Tripp's actions and claims based on

27   information that it obtained from Tesla Security:

28

**Attributed to a Tesla spokesperson:**
"This afternoon, we received a phone call from a friend of Mr Tripp telling us that Mr Tripp would be coming to the Gigafactory to "shoot the place up." Police have been notified and actions are being taken to enhance security at the Gigafactory."

(Ex. 40; Ex. 6, O'Brien Dep. 72:25-73:13.) Tesla later shared this statement with other reporters. (Exs. 41-45.)

At her deposition, Bell, who no longer works for Tesla, testified that she understood that the caller was warning her that Tripp might shoot employees at the Gigafactory. (Ex. 4, Bell Dep. 87:22-89:2.) She testified that both Musk and Tesla Communication's statements about the threat accurately described the "gist" of her phone call. (*Id.* at 86:18-87:5.)

The Sherriff's office investigated the threat and located Tripp. They determined that Tripp was not an active threat at that time and issued a release to that effect on June 22, 2018. (Dkt. 25, Counterclaims ("CC"), Ex. C (background).)

Tripp responded by claiming to reporters that either Musk or Tesla fabricated the call, (Ex. 44; Ex. 1, Tripp Dep. 211:16-212:17), which was false. (Musk Decl.   29.) Tripp further told members of the press that he was a "whistleblower" who was retaliated against by Tesla. (Ex. 45.) After Tripp's assertions, Tesla Communications received additional press inquiries and requests for comment, and issued a statement to certain reporters. (*See* CC Ex. C.) The statement included a copy of Tesla's initial description of the threat (indicating that it was originally sent on June 20) and a response to Tripp's claims that he was a whistleblower, including a summary of the results of the investigation to date. (*Id.*)

**H.     Tesla Obtains Evidence That Tripp Was Paid For Leaking Information; Musk Tweets Questions to Lopez.**

In the days and weeks after it terminated Tripp and filed this lawsuit, Tesla continued to investigate Tripp's activities. Tesla's investigation uncovered that Tripp encouraged other current and former Tesla employees to talk to Lopez. (Ex. 1, Tripp Dep. 251:17-254:7, Ex. 2, Gicinto Dep. 97:8-99:6, Ex. 49.) According to a former co-worker, Tripp suggested that he was paid $50,000 for providing information and implied that others would be paid too. (Ex. 7; Ex. 48, 6/24/18 Uelmen Int. 4:21-7:15; 16:8-18:1.) In fact, he texted this co-worker whom he put in contact with Lopez that "if you are helpful you will get some money, I GUARANTEE you." (*Id.*).

1    Tesla Security informed Musk of these developments.  (Musk     30.)  Meanwhile, Tripp stated to

2    co-workers that ████████████████████████████████████████████████████

3    ███████████ shortly after Tesla filed its Complaint.  (Ex. 1, Tripp Dep. 182:14-17, 184:12-

4    185:4; Ex 51.)

5         On July 5, 2018, after obtaining this information from Tesla Security, Musk posted two

6    questions to Lopez, via Twitter, relating to Tripp's claims and promises:

7              Indeed, very simple question. To be specific:
               @lopezlinette, did you compensate or
8              promise to compensate Martin Tripp for
               inside information about Tesla? Did he, under
9              that inducement, provide you with
               exaggerated negative info, which you printed,
10             but turned out to be untrue?

11   (Musk Ex. I.)

12   **I.    Tripp Asserts Counterclaims for Defamation and False Light Invasion of Privacy.**

13        On July 31, 2018, Tripp answered Tesla's complaint and filed counterclaims for

14   defamation, invasion of privacy/false light, and intentional infliction of emotional distress.

15   Specifically, Tripp alleges that the following communications made by Tesla are "defamatory"

16   and/or placed him before the public in a false light:

17        •    Musk's June 17, 2018 email sent internally to other Tesla employees describing
18             the conduct of an unidentified individual as "damaging sabotage." (CC, ¶¶ 47.)

19        •    Statements on June 20, 2018 by Musk and Tesla regarding the concerned call
               that a heavily armed and extremely angry Tripp was a threat to Tesla employees
20             at the Gigafactory.  (*Id.* at ¶¶ 53-54.)

21        •    The June 22, 2018 statements by Tesla repeating the warning about the factory
               threat and refuting Tripp's claims that he was a whistleblower.  (*Id.* at ¶¶ 64-
22             66.)

23        •    Musk's July 5, 2018 tweet to Lopez asking her whether she compensated or
               promised to compensate Tripp for information.  (*Id.* at ¶ 67.)

24                                    **LEGAL DISCUSSION**

25        Tripp cannot establish necessary elements of his defamation and false light claims for the

26   separate and independent reasons that (1) he cannot establish with clear and convincing evidence

27   that Tesla made any of the statements at issue with actual malice, defined as knowledge of falsity

28   or reckless disregard of the truth; and (2) he cannot show that the statements are false—to the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

contrary, the "gist" and "sting" of the statements at issue were accurate. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991).[4]

## I.   TRIPP MUST PROVE THAT EACH STATEMENT WAS MADE WITH ACTUAL MALICE

In order to avoid summary judgment, Tripp is required to provide clear and convincing evidence of actual malice—that the author of the statement in question knew it was false or acted in reckless disregard of the truth. *Flowers I*, 310 F.3d at 1132. This is because (a) he is a limited purpose public figure for all the challenged statements; (b) the intracorporate communications privilege, which requires actual malice to overcome, applies to the June 17, 2018 internal Tesla email; (c) the June 20 and 22, 2018 statements regarding a threat to the Gigafactory related to an issue of public concern; and (d) actual malice is a required element in all false light claims under Nevada law, regardless of the status of the plaintiff or content of the statements at issue, *see id.* (citing RESTATEMENT (SECOND) OF TORTS § 652E (1977).

### A.   The Constitutional Framework and Elements.

To protect public debate and guard against the chilling effect of litigation, the First Amendment requires that public figures prove a statement is made with "actual malice." *See New York Times*, 376 U.S. at 280; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 (1974). Claims brought by "limited purpose" or "vortex" public figures—persons like Tripp who inject themselves into a public controversy and "become[] public figure[s] for a limited range of issues" related to that controversy—are also subject to the "actual malice" standard. *Gertz*, 418 U.S. at 351; *see also Pegasus v. Reno Newspapers, Inc.,* 118 Nev. 706, 720 (2002) ("A limited-purpose public figure is a person who voluntarily injects himself or is thrust into a particular public controversy or public concern, and thereby becomes a public figure for a limited range of issues."). They are less deserving of protection because, by injecting themselves into a public controversy, they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz*, 418 U.S. at 345. They also have "considerably greater access than

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

---

[4]   *Flowers I*, 310 F.3d at 1132 (requirements for false light invasion of privacy claim are identical to a defamation claim except under false light, (1) a plaintiff must prove actual malice even if plaintiff is a private figure and (2) a plaintiff does not have to show injury to reputation).

1    private individuals to the media" with which they engage in self-help to protect their reputations

2    and are thus less "vulnerable" to defamation injury.  *Id.* at 344-45.

3          A plaintiff is a limited purpose public figure and subject to the actual malice standard

4    where, as here: (1) there is a public controversy; (2) the plaintiff "undert[ook] some voluntary act

5    through which he or she sought to influence resolution of the public issue;" and (3) the statement

6    at issue is "germane" to the person's participation in the controversy.  *Oracle USA, Inc. v. Rimini*

7    *St., Inc.*, 6 F. Supp. 3d 1108, 1129 (D. Nev. 2014).  Whether a plaintiff is a limited purpose public

8    figure is a question of law the Court must resolve.  *See Pegasus*, 118 Nev. at 714.

9          **B.     Tripp Must Prove Actual Malice as to the June 17 Internal Tesla Email.**

10         Tripp must prove actual malice as to the June 17 email because (1) by June 17, 2018, Tripp

11   was a limited purpose public figure, and the statements in the internal Tesla email were germane

12   to the public controversy he injected himself into; and (2) the internal Tesla email is subject to

13   Nevada's intracorporate communications privilege, *Hoff*, 2013 WL 275298, at *2.

14              **1.     As of June 17, 2018 Tripp Was a Limited Purpose Public Figure.**

15         As of June 17, 2018, Tripp was a limited public figure.  He voluntarily injected himself

16   into the ongoing public debate regarding the operation and management of Tesla and the

17   statements in June 17, 2018 internal Tesla email were germane to Tripp's participation in the

18   public debate.  *See Oracle USA*, 6 F. Supp. 3d at 1129.

19                   **(a)     There Were Public Controversies Regarding the Operation and
                           Management of Tesla.**

20         A public controversy is an "issue [that] was debated publicly and had foreseeable and

21   substantial ramifications for nonparticipants."  *Id.*; *see also Waldbaum v. Fairchild Publications,*

22   *Inc.*, 627 F.2d 1287, 1296-97 (D.C. Cir. 1980); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 267

23   (9th Cir. 2013) ("[A] public controversy 'must be a real dispute, the outcome of which affects the

24   general public or some segment of it.'").  To determine whether one exists, courts consider "if the

25   press was covering the debate, reporting what people were saying and uncovering facts and

26   theories to help the public formulate some judgment," and should not "question the legitimacy of

27   the public's controversy" or substitute its judgment of newsworthiness, but "look to what already

28   were disputes."  *Waldbaum*, 627 F.2d at 1297.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

In the spring and summer of 2018, Tesla's practices and management—particularly the production of Tesla's Model 3—were subjects of public discussion and debate.  After Tesla announced a plan to produce 5,000 Model 3 cars per week, its progress and methods toward reaching the goal were tracked and debated by investors, ratings agencies, and the business press.  (Musk Decl.     7-8; Lifrak Exs. 8-10.)  These stories and debates had the potential to impact Tesla's stock price and to affect Tesla's vendors, shareholders, consumers, and the electric vehicle industry as a whole.  *See Makaeff*, 715 F.3d at 267 (company's business practices were a public controversy as they affected local market); *Waldbaum*, 627 F.2d at 1299 (public debate over supermarket business practices had potential to affect consumers and industry retailers in the surrounding area); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577-78 (2005) (debate over publicly traded company had foreseeable ramifications for shareholders).[5]

These precise topics—Tesla operations and Model 3 production issues—were the focus of both *Business Insider* stories for which Tripp served as the primary source.  (Ex. 30 ("Internal documents reviewed by Business Insider show that the company expects that as much as 40% of the raw materials used to produce batteries and driving units manufactured at Tesla's Gigafactory in Nevada need to be scrapped or reworked...This is all a byproduct of the march to reach Tesla CEO Elon Musk's manufacturing target of 5,000 Model 3s per week by July."); Ex. 31 ("The new robots at Tesla's Gigafactory, which CEO Elon Musk said would play a key role in ramping up Model 3 production, are not yet up and running.").)

### (b)   Tripp Injected Himself Into The Controversy.

There is no doubt that Tripp undertook a "voluntary act" aimed at influencing the resolution of the public controversy over the production of the Model 3 when he fed confidential Tesla information to the press.  *See Oracle USA*, 6 F. Supp. 3d at 1129; *Waldbaum*, 627 F.2d at 1299.  In his very first email to Lopez, Tripp claimed that "Elon has flat out lied to the

---

[5]   This brief occasionally cites to California state precedent for guidance where Nevada law is silent on an issue, consistent with Nevada practice.  *See Patin v. Ton Vinh Lee*, 134 Nev. 722, 724 (2018) (When "no Nevada precedent is instructive on this issue, we look to California precedent for guidance."); *Miller v. Skogg*, 2011 WL 383948, at *3 (D. Nev. Feb. 3, 2011) ("Nevada courts often look to California law where Nevada law is silent").

public/investors" about the production of the Model 3 and offered information to publicly rebut

Musk's alleged false statements.  (Ex. 27.)  None of that was true, but communicating with

members of the press in order to provide information aimed at influencing a public debate is a

quintessential "voluntary act" that converts a private person into a limited purpose public figure.

*See Flowers I*, 310 F.3d at 1129 (woman who spoke to the press about her alleged affair with a

presidential candidate "voluntarily inject[ed]" herself into a public controversy); *Rudnick v.*

*McMillan*, 25 Cal. App. 4th 1183, 1190 (1994) (plaintiff injected himself into controversy "by

discussing the matter with the press").[6]

Here, Tripp shared confidential information with the press with the intention that this

information be published by a widely read news outlet.  (Ex. 27; Ex. 1, Tripp. Dep. 59:8-11.)  By

doing so, he invited public attention to both the leaked information and the potential identity of

the leaker.  Thus, although he initially sought anonymity, "publicity was a foreseeable, if not an

inevitable, consequence of [his] relationship" with the press, and therefore gives rise to his status

as a limited purpose public figure.  *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 15 n.8 (1st

Cir. 2011); *see also Lohrenz v. Donnelly*, 350 F.3d 1272, 1280–81 (D.C. Cir. 2003) (plaintiff, by

applying for position, "assumed the risk…she would find herself at the center of the controversy;"

that plaintiff might have preferred a situation "that did not place her in the center of

the public controversy is legally irrelevant."); *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz.

476, 485 (1986) ("[Plaintiff] cannot complain that the spotlight eventually turned on him; its

unwelcome glare was a matter of time, not surprise.").

### 2.    The June 17 Internal Tesla Email Was Germane To The Controversy.

A statement made in discussing a public controversy is germane unless it is "wholly

---

[6]   That Tripp initially attempted to keep his identity and participation in the public debate hidden
is of no moment here.  In the limited public figure analysis, "the voluntariness requirement may
be satisfied even though an individual does not intend to attract attention by his actions.  When an
individual undertakes a course of conduct that invites attention, even though such attention is
neither sought nor desired, he may be deemed a public figure."  *McDowell v. Paiewonsky*, 769
F.2d 942, 949 (3d Cir. 1985); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 709 (4th Cir. 1991)
("[E]ven 'involuntary' participants can be public figures when they choose a course of conduct
which invites public attention.").

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  unrelated" to that controversy. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016)

2  (citing *Waldbaum*, 627 F.2d at 1298). The June 17 email was directly related to Tripp's leak.

3      A direct response to the initial speaker's contentions is obviously "germane" to the

4  controversy. *Metastorm, Inc. v. Gartner Grp., Inc.*, 28 F. Supp. 2d 665, 669 (D.D.C. 1998)

5  (allegedly defamatory statements "directly refut[ing]" statements plaintiff made in a press release

6  were germane to plaintiff's participation in the public controversy); *see also Dubai World Corp.*

7  *v. Jaubert*, 2011 WL 579213, at *15 (S.D. Fla. Feb. 9, 2011) (allegedly defamatory comments

8  germane to controversy where reporter solicited the allegedly defamatory quote by seeking a

9  "response to [plaintiff's] assertions on the subject"). Moreover, a limited purpose public figure's

10  "talents, education, experience, and ***motives***" are germane to public controversy, because they are

11  "relevant to the public's decision whether to listen to him." *Waldbaum*, 627 F.2d at 1298

12  (emphasis added). Statements "relevant to understanding" Tripp's "role and why he wanted to be

13  involved in" the debate regarding Tesla's operations, management, and production of the Model

14  3 are "germane" to the public controversy. *Jankovic*, 822 F.3d at 589.

15      Under this framework, the June 17 internal Tesla email was germane to the controversy.

16  Musk's statement that he was "dismayed to learn this weekend about a Tesla employee who had

17  conducted quite extensive and damaging sabotage to our operations," and that this employee had

18  made "direct code changes to the Tesla [MOS] under false usernames" and exported "large

19  amounts of highly sensitive Tesla data to unknown third parties" was relevant to understanding

20  Tripp's "role" in the public controversy and to the credibility of the information he leaked. *Id*.

21  Likewise, Musk's statement that Tripp's "stated motivation is that he wanted a promotion that he

22  did not receive" relate to Tripp's reasons for inserting himself into the debate, which are always

23  germane. *See Waldbaum*, 627 F.2d at 1298. The internal Tesla email must be analyzed under the

24  actual malice standard. *See Pegasus*, 118 Nev. at 720-21.

25          **3.    The June 17 Internal Tesla Email is Also Subject to the Intracorporate**
               **Communications Privilege.**

26      The June 17 email is protected by Nevada's intracorporate communications privilege and

27  cannot be defamatory unless it was sent with "actual malice." *See e.g.*, *Simpson v. Mars Inc.*, 113

28  Nev. 188, 192 (1997); *Hoff*, 2013 WL 275298, at *2. The privilege "applies to a statement

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

involving 'the regular course of the corporation's business,' if the statement is made in good faith to a person with an interest in the subject matter of the statement" and requires a finding of malice to be actionable, even if the plaintiff is a private figure. *Cummings v. Valley Health Sys., LLC*, 705 F. App'x 529, 531 (9th Cir. 2017) (citing *Simpson*, 113 Nev. at 192). Internal company communications regarding an employee's performance or misconduct are conditionally privileged under Nevada law. *Gallues v. Harrah's Club*, 87 Nev. 624, 626-27 (1971) (internal company memo claiming that a card dealer was terminated for cheating was conditionally privileged); *Hoff*, 2013 WL 275298, at *2 (communications from management to other employees regarding an investigation into an employee were conditionally privileged). Whether the email is privileged is a question of law. *See Circus Hotels, Inc. v. Witherspoon,* 657 P.2d 101, 105 (Nev. 1983).

The June 17 email falls under the protection of the intracorporate communications privilege. Musk internally reported on an event—the large scale violation of Tesla's confidentiality rules and suspected misuse of Tesla's computer systems—important to the operation of Tesla's business to a group of people—Tesla's employees—that had an interest in the subject matter of the email. (Musk Decl. ¶ 19, Ex. F); *see e.g.*, *Gallues*, 87 Nev. at 626 (casino employees had an interest in reports of widespread misconduct by former employees). The email was internal; Musk did not send it to any persons who did not have an interest in Tripp's misconduct. (Musk Decl. ¶ 19.) Indeed, one of the primary stated purposes of the June 17 email—which did not identify Tripp by name—was to warn and advise Tesla employee's to remain vigilant of threats to the company. (*Id.*); *see Cummings*, 705 F. App'x at 531 (warning sent to employees regarding potential threat conditionally privileged); *Hoff*, 2013 WL 275298, at *2 (granting summary judgment where intracorporate communication not made with actual malice).

## C.   Tripp Must Prove Malice as to the Statements Regarding the Gigafactory Threat.

Tripp must also prove actual malice to establish his claims arising from statements made regarding the June 20 threat to the Gigafactory because (1) the statements—which described a threatened mass shooting—touched on an issue of public concern; and (2) Tripp was a limited purpose public figure, and the statements describing the threat were (as conceded by Tripp

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

himself) germane to his credibility as a participant in the existing public debate regarding Tesla's operations. *See Pegasus*, 118 Nev. at 720-21.

### 1. The Statements Touched on an Issue of Public Concern.

Tesla's statements regarding the reported threat to the Gigafactory discussed a matter of public concern—a potential act of violence—and thus require actual malice. "Speech on matters directly affecting the health and safety of the public is obviously a matter of public concern." *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997). And "[p]ublic allegations that someone is involved in crime generally are speech on a matter of public concern." *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1292 (9th Cir. 2014). Thus, statements relating to public safety such as police activity, reports of shootings, and threats of violence are paradigmatic speech on issues of public concern. *See Marr v. Anderson*, 611 F. Supp. 2d 1130, 1139–40 (D. Nev. 2009), *aff'd*, 374 F. App'x 703 (9th Cir. 2010) (speech about public safety touched on a matter of public concern); *Garcia v. Nevada Sys. of Higher Educ.*, 2014 WL 1006605, at *1 (Nev. Mar. 13, 2014) (comments about police activity addressed matters of public concern); *Mullen v. Meredith Corp.*, 271 Or. App. 698, 707 (2015) ("[T]he news reports of the shooting constitute an issue of public interest.") *cited by Pope v. Fellhauer*, 437 P.3d 171 (Nev. 2019); *see also Pacheco v. Waldrop*, 72 F. Supp. 3d 738, 746 (W.D. Ky. 2014) ("There is no debate that a potential bomb threat to a school is a matter of public concern.").

Under this test, there can be "no debate" that Tesla's statements to the press that it received a warning that Tripp intended to "shoot people" at the Gigafactory addressed issues of public concern. These statements about a threatened shooting at a facility employing more than 6,000 people clearly addressed matters of public safety, allegations that Tripp was engaged in criminal activity, and a threat of mass violence. *See Marr*, 611 F. Supp. 2d at 1139; *Obsidian*, 740 F.3d at 1291-92; *Pacheco*, 72 F. Supp. 3d at 746. They are therefore protected by the First Amendment and require actual malice to be actionable. *See Pegasus*, 118 Nev. at 721.

### 2. The Statements Were Also Germane to an Existing Public Controversy.

As described above, Tripp was a limited purpose public figure in the existing public controversy and debate regarding Tesla's management and operations when Tesla received the

threat to the Gigafactory.  By that point, Tripp had injected himself into the controversy by leaking confidential Tesla information to the press and had already been named as the leaker.  (*See e.g.*, Dkt. 1.)  And as Tripp conceded in his Counterclaims, the statements by Tesla and Musk reporting the threat that Tripp intended to commit a shooting at the Gigafactory are relevant to Tripp's credibility as a participant in the public debate about Tesla and are thus germane to the existing public controversy.  *Compare Waldbaum*, 627 F.2d at 1298 (information "relevant to the public's decision whether to listen to" a limited purpose public figure is germane) *with* CC ¶ 63 (statements regarding threat served to "discredit Tripp before the general public.").  Tripp must prove that those statements were made with actual malice for this reason too.  *See Pegasus*, 118 Nev. at 721.

**D.**     **Tripp Must Prove That the June 22 Statement Was Made With Actual Malice.**

There can be no liability for Tesla's June 22 statement (CC Ex. C) without clear and convincing evidence of actual malice because (1) the statement, which described the Gigafactory threat and responded to Tripp's claims regarding Tesla's operations, touched on issues of public concern and (2) the statement was germane to the public debate that Tripp injected himself into. *See Pegasus*, 118 Nev. at 720-21.

**1.**     **The June 22 Statement Touched on Issues of Public Concern.**

The June 22 statement described the threat to the Gigafactory and responded to Tripp's false claims that Tesla's cars are unsafe and that Tesla was misleading investors.  (CC Ex. C ("On Thursday, Tripp told Ars that he wanted to reveal internal waste and safety flaws in Tesla batteries that he claimed he observed while working as a technician at the company's Gigafactory in Sparks, Nevada.").)  These statements addressed issues of public concern and thus require actual malice to be actionable.  *See Metabolife Int'l v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001) (safety of consumer products that could cause injury is matter of public concern); *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d 848, 856 n.3 (10th Cir. 1999) (financial information important to public investors is a matter of public concern); *Obsidian*, 740 F.3d at 1291 ("Public allegations that someone is involved in crime generally are speech on a matter of public concern.").

**2.**     **The June 22 Statement Was Germane to an Existing Public**

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ☩ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**Controversy.**

Additionally, Tripp must prove that the June 22 statement was made with malice because it was directed at a limited purpose public figure and germane to Tripp's role in a public controversy.  The June 22 statement directly responded to the information Tripp leaked and the claims Tripp publicly made to the press about Tesla; it also called into question Tripp's motives and credibility as a participant in the public debate.  *See Metastorm*, 28 F. Supp. 2d at 669 (statement refuting plaintiff is germane); *Jankovic*, 822 F.3d at 589; *Waldbaum*, 627 F.2d at 1298.

E.       **Tripp Must Prove the July 5 Tweet Was Made with Actual Malice.**

Finally, Tripp must also prove that Musk's July 5 tweet asking Lopez whether she paid Tripp for the information he leaked was made with actual malice because it was directed at Tripp, a limited purpose public figure, and was germane to the existing public controversy as it related to Tripp's motives for joining the public debate and the credibility of the information he disclosed to the public.  *Jankovic*, 822 F.3d at 589; *Waldbaum*, 627 F.2d at 1298.

II.      **THE JUNE 17 EMAIL IS NOT DEFAMATORY OR FALSE LIGHT**

A.       **Tripp Cannot Prove the Internal Tesla Email Was Sent with Malice.**

To establish that the June 17 email was written with actual malice—as he must—Tripp has to prove by clear and convincing evidence that Musk made the statements therein "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New York Times*, 376 U.S. at 280; *Wynn v. Smith*, 117 Nev. 6, 16–17 (2001) ("plaintiff must prove by clear and convincing evidence that one or both defendants knew the communication was false or acted in reckless disregard of these matters"); *Pegasus*, 118 Nev. at 721–22 ("The question of actual malice goes to the jury only if there is sufficient evidence for the jury, by clear and convincing evidence, to reasonably infer that the publication was made with actual malice."). "[T]he lack of *New York Times* malice is a proper ground for summary judgment."  *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1195 (9th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986)). To limit the "chilling effect of protracted litigation," summary judgment is a "'***favored remedy***' in defamation cases involving the issue of 'actual malice' under the *New York Times* standard."  *Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 252

(1984) (emphasis added); *see also D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1278 (C.D. Cal. 2000) (same).

This test is ***subjective***. *See e.g.*, *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). It is irrelevant whether a reasonable person would believe that the statements were false or entertain serious doubts as to their truth. The issue is what the ***defendant actually*** "believed and intended to convey at the time it published" the statement. *Pegasus*, 118 Nev. at 722. Malice requires "sufficient evidence to permit the conclusion that the ***defendant in fact*** entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). Only "false statements made with the high degree of awareness of their probable falsity" are liable under the actual malice test. *Garrison*, 379 U.S. at 74.

To overcome the favored remedy of summary judgment, the plaintiff has the burden to present clear and convincing evidence that the defendant in fact knew the statements were false or in fact entertained serious doubts as to their accuracy. *Pegasus*, 118 Nev. at 722; *Hoff*, 2013 WL 275298, at *2. "More than bad faith is necessary to establish malice;" instead, the plaintiff must have evidence "concern[ing] the defendant's belief regarding the truthfulness" of the statement, *Hoff*, 2013 WL 275298, at *2 n.3, and the "failure to investigate alone…is not grounds for a finding of actual malice," *Pegasus*, 118 Nev. at 723. Evidence of actual malice "must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." *Copp v. Paxton*, 45 Cal. App. 4th 829, 846 (1996); *Bose Corp. v. Consumers Union,* 466 U.S. 485, 498 (1984) 511 (1984) (no triable issue unless "the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'"). Thus, Tripp must identify clear and convincing evidence establishing that Musk actually had a "high degree of awareness of the" statements' "probable falsity." *Garrison*, 379 U.S. at 74. There is ***no*** such evidence here.

Musk's statements in the June 17, 2018 email were based upon information uncovered by Tesla's investigation into Tripp or that Tripp himself admitted. There is no evidence that Musk "had a high degree of awareness of the statement's probable falsity," nor could he have. *See Hoff*, 2013 WL 275298 at *2. In fact, the undisputed evidence shows the opposite:

| Alleged Defamatory Statement | Support from Investigation |
|---|---|
| "I was dismayed to learn this weekend about a Tesla employee who had conducted quite extensive and damaging sabotage to our operations" (Musk Ex. F.) | Tripp admitted to Tesla investigators that he surreptitiously downloaded and transmitted to the press confidential Tesla information. (Ex. 1, Tripp Dep. 91:1-95:16; 106:17-23; Ex. 6, 6/14/2018 Tripp Int. 172:13-188:25.) Tripp's information and allegations became the subject of two negative articles about Tesla published immediately before and after Tesla's annual shareholder meeting. (Exs. 30-31.) |
| "This included making direct code changes to the Tesla Manufacturing Operating System under false usernames and exporting large amounts of highly sensitive Tesla data to unknown third parties." (Musk Ex. F.) | Tesla investigators discovered ███████ ██████████████████████████ (Ex. 1, Tripp Dep. 91:1-95:16.)<br><br>Tesla investigators also discovered ██████████████████████████ (Ex. 2, Gicinto Dep. 37:21-38:10.)<br><br>As of June 17, 2018, Tesla investigators believed—based on forensic investigation of Tesla's computer systems—that ████████ ████████████████ (Id. at 139:4-140:24; 142:13-144:6; Ex. 50, Tesla Response to Interrogatory No. 13.)<br><br>Tripp admitted to providing internal Tesla data and information to members of the press, including the information published in the June 4 and 6, 2018 *Business Insider* articles. (Ex. 6, 6/14/2018 Tripp Int. 172:13-188:25.) |
| "The full extent of his actions are not yet clear, but what he has admitted to so far is pretty bad.   His stated motivation is that he wanted a promotion that he did not receive. In light of these actions, not promoting him was definitely the right move." (Musk Ex. F.) | Tripp admitted to Tesla investigators that he surreptitiously downloaded and transmitted to the press confidential Tesla information. (Ex. 6, 6/14/2018 Tripp Int. 172:13-188:25.)<br><br>Tripp told Tesla investigators ██████████████████████████████████████████ (Id. at 50:21-25; 47:12-13.) |

The undisputed evidence demonstrates that Musk did not make knowingly false statements about Tripp.  Musk, acting as any CEO would, was merely relaying the information that the investigative team at Tesla reported to him, which he believed to be reliable.  (Musk Decl. 16-20.)  This cannot be actual malice.  *See Flowers I*, 310 F.3d at 1130 ("One who repeats what he hears from a reputable news source, with no individualized reason external to the news report to doubt its accuracy, has not acted recklessly.") (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.")). Tripp cannot overcome this conclusion, which is based on undisputed evidence.

## B.   Tripp Cannot Prove Falsity.

Tripp's claim as to the June 17 email also fails because he cannot establish another, separate element of his claim—falsity.  *See Pegasus*, 118 Nev. at 715.  Tripp has quibbled with the email's language—claiming he did not "sabotage" Tesla, did not make "direct code changes" to the operating system, and was not motivated by his failure to receive a "promotion."  (CC 48-50.)  These arguments do not prove falsity.

The operative question in the defamation context is whether the gist of Musk's statements was accurate and "substantially true."  *See Masson*, 501 U.S. 496, 516–17 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified."); *Bose*, 466 U.S. at 512–13 (misstatements of fact, exaggerations, and other inaccuracies do not give rise to actual malice); *Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986) ("substantially true" statement is not defamatory); *Oracle USA*, 6 F. Supp. 3d at 1131 ("[I]t is not the literal truth of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the 'gist or sting' of the statement is true or false."); *Cherry v. Clark Count. School District*, 2014 U.S. Dist. LEXIS 55777, *13 (D. Nev. Apr. 22, 2014) ("[T]he statements made by defendants, even if slightly exaggerated, were substantially true and are not reasonably capable of a defamatory construction.").

Here, the gist of the allegedly defamatory statements in the email are substantially true.  The email stated that an unnamed employee, unhappy with his position at Tesla, secretly used a

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

computer program to download tranches of confidential information and deliberately provided that information to unauthorized third parties.  (Musk Ex. F.)  This is all consistent with and supported by the information that Musk knew as of June 17. (Musk Decl.   20.) And it is all true and undisputed.  (Ex. 1, Tripp Dep. 78:8-79:19; 149:21-150:19; 152:21-153:22; 166:11-167:18; 91:1-95:16; 106:17-23.)

As to Musk's choice of words, the term "sabotage," used to describe Tripp's scheme of secretly downloading confidential Tesla information without permission and providing it to members of the press, is accurate. *See Oracle USA*, 6 F. Supp. 3d at 1131 (use of the word "theft" to describe copyright infringement not defamatory); American Heritage Dictionary (3d ed. 1994) ("Sabotage…The deliberate attempt to damage, destroy, or hinder a cause or activity.").[7]

Also accurate was Musk's statement that Tripp "export[ed] large amounts of highly sensitive Tesla data to unknown third parties." (Musk Ex. F.)  Whether or not Tripp used "direct code changes," "false usernames," (as was reported to Musk) or other methods to obtain Tesla's confidential information is of no moment because the "gist" of Musk's statement was true. *See Masson*, 501 U.S. at 517.  So too was Musk's statement that Tripp was motivated by being passed over for a promotion. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ (Ex. 6, 6/14/2018 Tripp Int. 50:21-25.) ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ (*Id.* at 47:12-13.) The difference between not getting a promotion and ████████████████████████████████████████ ████████ is semantics.  The statement is "substantially true," and at worst, a minor inaccuracy that would not give rise to a claim of defamation. *Anderson*, 789 F.2d at 845; *Bose*, 466 U.S. at

---

[7]  Although Tesla believes that Tripp's activities fall within the dictionary definition of "sabotage" set forth above, at worst, "sabotage" is an "exaggeration or generalization," or "rhetorical hyperbole," and therefore not defamation.  *Pegasus*, 118 Nev. at 715; *see also Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of the word "blackmail" to describe negotiation techniques not defamatory); *Anderson*, 789 F.2d at 845 (use of the word "kidnapping" to describe father's taking son in violation of custody order was not defamatory).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

512-13.  Because Tripp cannot prove falsity that alone defeats his claims based on the email.

### III.  THE STATEMENTS REGARDING THE GIGAFACTORY THREAT ARE NOT DEFAMATORY OR FALSE LIGHT
#### A.  The Statements Were Not Made With Actual Malice.

Tripp cannot establish—let alone prove by clear and convincing evidence—that the statements made by Musk and members of Tesla Communications to the press regarding the threat were made with a "reckless disregard for truth" or a "high degree of awareness of probable falsity." *See Harte-Hanks*, 491 U.S. 667.

Tripp's claim is based on statements by Musk and Tesla Communications to the press, which recounted that a caller had contacted Tesla warning it that a heavily-armed Tripp was headed to the Gigafactory. (*See e.g.*, Musk Ex. H; Exs. 40, 43.)  Both of the statements at issue— Musk's statement that Tesla "received a call at the Gigafactory that [Tripp] was going to come back and shoot people" and Tesla Communication's statements that Tesla "received a phone call from a friend of Tripp telling us that Tripp would be coming to the Gigafactory to 'shoot the place up'"—were good faith descriptions of an event that had actually occurred.

It is undisputed that on June 20, Tesla received a phone call from a person purporting to be a close friend of Tripp.  (Ex. 36; Ex. 4, Bell Dep. 28:20-32:14.)  That person stated that he feared for the safety of the employees at the Gigafactory because he was concerned that a "very well armed" and "very hostile" Tripp "may do something violent [and] volatile." (Ex. 39.)  Both Musk and Tesla Communications were informed of the threat that afternoon.  (Ex. 6, O'Brien Dep. 72:25-73:13; Musk Decl.  24.)  Specifically, Tesla Security informed Sarah O'Brien, the head of Tesla Communications, that the caller used the term "shoot the place up" when reporting the threat.  (Ex. 6, O'Brien Dep. 72:25-73:13.)  Tesla gave a similar description of the call to police.  (Ex. 47 at 2 (reporting that caller stated Tripp "was on his way to 'shoot up Tesla.'").)

There is no evidence that Musk or any member of Tesla Communications believed that the statements to the press describing the threat were untrue or entertained serious doubts as to their truth. *See Harte-Hanks*, 491 U.S. at 667.  Nor should they have.  Although the police determined that Tripp was not an active threat to the facility, the fact that a threat was made, which is all the June 20 and June 22 statements said, is true. *See Jesinger v. Nev. Fed. Credit Union*, 24 F.3d

1127, 1134 (9th Cir. 1994) (plaintiff could not show malice where "record supports the truthfulness of [the] charges"). *Cummings* is on point. There, like here, an employer received a report than an employee "threatened to 'shoot the place up' if she were terminated" and informed the other employees of the threat. 705 F. App'x at 531. The threat turned out to be "nothing more than a false rumor," but the court nonetheless held that there could be no defamation because, like here, it was a genuine report that the company had a good faith basis to believe. *Id.*

The fact that the reported threat originally came from an anonymous source is of no moment. First, Tesla and Musk's statements simply reported that a threat had been made and not that Tripp intended to harm employees at the Gigafactory as a matter of fact. Second, Tesla employees were able to corroborate and independently verify certain aspects of the caller's information, including the fact that Tripp was fired from Tesla and that Tripp's "name was in the media." (Ex. 4, Bell Dep. 31:22-32:14); *see St. Amant*, 390 U.S. at 733 (finding no actual malice where reporter was able to independently verify aspects of source's information).

That Musk's statement used the term "shoot people" and the Tesla Communications' statement used the term "shoot the place up" does not establish malice. There is no evidence Musk or Tesla Communications knew that the caller did not use these exact phrases when they released their statements, and even if there were, "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co. v. Sullivan* and *Gertz v. Robert Welch, Inc.*, unless the alteration results in a material change in the meaning conveyed by the statement." *Masson*, 501 U.S. at 516–17 (internal citations omitted); *see also Flowers v. Carville,* 310 F. Supp. 2d 1157, 1167 (D. Nev. 2004) (*Flowers II*) ("Because the difference in wording between Defendants' statements and the news reports did not create 'a different effect in the mind of the hearer from that which the original would have produced,' knowledge of the discrepancies does not rise to knowledge of falsity or reckless disregard."). Here, there was no deliberate alteration; the call center employees themselves contemporaneously stated that the caller reported that Tripp was "heavily armed and headed for the Giga Factory."

The statements at issue—and inclusion of the phrases "shoot people" and "shoot the place up"—do not materially change the meaning conveyed by the original threat, which was that a

concerned friend worried that a heavily armed and volatile Tripp intended to hurt people at the Gigafactory.  (*Compare* Musk Ex. H *and* CC Ex. C *with* Ex. 36 (Bell's Summary of the Call) ("I answered the phone to a man that sounded genuinely concerned & afraid. He explained that he is a very close friend of an ex-employee of Tesla that was fired recently. Explained that he fears for the safety of employees at the battery (Giga Factory) because of he is extremely volatile. Stated that he is very well heavily armed. . . [caller] doesn't want anyone to get hurt").)  In fact, Bell, who received the threatening phone call and who was in the best position to determine the meaning conveyed by the threat, testified that both statements at issue reflected "the gist" of the threat and phone call.  (Ex. 4, Bell Dep. 86:18-87:5.)  Because the statements do not transform the meaning of the original call, they could not have been made with malice as a matter of law.  *See Flowers II*, 310 F. Supp. 2d at 1168.

### B.      The Statements About The Threat Were Not False.

Even if the Court concludes that Tripp does not have to prove malice—which it should not—the Court should still grant summary judgment on this claim because the statements were not false.  *See Oracle USA*, 6 F. Supp. 3d at 1131 ("[I]t is not the literal truth of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the gist or sting of the statement is true or false.") (cleaned up).

The statements at issue simply relay the contents of a phone call warning Tesla that Tripp may shoot or otherwise commit an act of violence against the employees of the Gigafactory.  These statements are not false.  To the contrary, as the recipient of the call testified, Musk and Tesla's statements accurately described the "gist of the threat to the Gigafactory" that she received.  (Ex. 4, Bell Dep. 86:18-87:5); *see Oracle USA*, 6 F. Supp. 3d at 1131.

### IV.    THE JUNE 22, 2018 STATEMENT WAS NOT DEFAMATORY OR FALSE LIGHT.

Tripp claims—without identifying the alleged defamatory statements with any specificity—that a June 22, 2018 statement from Tesla Communications to members of the press is defamatory and/or puts him in a false light.  (CC ¶ 64 (Tesla "also made false and defamatory statements about Tripp in an e-mail communication to the media on or about June 22, 2018.").)

Tripp cannot show by clear and convincing evidence that the contents of the statement

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

were made with actual malice.  (*See* CC Ex. C.)  For the reasons explained *supra* Section III, Tripp cannot establish that the description of the threat to the Gigafactory (which reproduced the June 20 statement) was false or was made with actual malice.  There is also no evidence that Tesla knew that the remaining content in the June 22 statement was false or entertained any serious doubt as to its truth.  For example, the statement that Tripp was "caught hacking Tesla's confidential and trade secret information and transferring it to third parties" was accurate.  At that point, Tripp had admitted to ███████████████████████████████████████ ████████████████████████████████ and providing that information to the press.  (Ex. 6, 6/14/2018 Tripp Int. 172:13-188:25); *see* Nev. Rev. Stat. § 205.4765(1) ("a person who knowingly, willfully and without authorization…transfers…takes… copies…data, a program or any supporting documents which exist inside or outside a computer, system or network is guilty of a misdemeanor.").  Tripp likewise cannot establish that the other statements about Tripp in the communication were false or defamatory, let alone made with a reckless disregard for their truth or falsity.  *See* Section II, *supra*.

**V.**     **THE JULY 5, 2018 TWEET TO LINETTE LOPEZ IS NOT DEFAMATORY**

    **A.**     **The Tweet Was Not Made With Actual Malice.**

Summary judgment should be granted because the tweet was not made with actual malice. *See e.g.*, *St. Amant*, 390 U.S. at 732; *Pegasus*, 118 Nev. at 722.  At the time Musk tweeted ***asking*** whether Lopez paid Tripp for the information he provided, Musk and Tesla had ample information from its investigation that Tripp received compensation in exchange for information.  Tesla learned that Tripp suggested to a Tesla employee that he was paid $50,000 for providing confidential information. (Ex. 2, Gicinto Dep. 97:8-99:6; Ex. 48, 6/24/18 Uelmen Int. 4:21-7:15; 16:8-18:1.)  This was corroborated by text messages from Tripp encouraging the employee to speak to Lopez, promising that "if you are helpful, you will get some money, I GUARANTEE you." (Ex. 48, 6/24/18 Uelmen Int. 4:21-7:15; 16:8-18:1; Ex. 7.)  This is not a situation "where a story is fabricated by the defendant [or] is the product of his imagination."  *See St. Amant*, 390 U.S. at 732.  Musk's tweet, even if interpreted as a statement of fact or insinuation, was supported by information—including Tripp's own words—discovered during Tesla's investigation.  There

McDONALD ✦ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   is no evidence that Musk had doubts as to the accuracy of this information—nor would he have

2   any reason to—and therefore, there can be no finding of malice.  *See id.*

3       **B.    The Tweet Asks Questions; It Does Not Make Actionable Statements of Fact.**

4       Summary judgment should also be granted because Musk's tweet did not contain any

5   statements of fact, only questions.  *See Pegasus*, 118 Nev. at 714 ("Defamation is a publication of

6   a false ***statement of fact***.") (emphasis added).  In general, "questions are questions" not "factual

7   representations."  *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015);

8   *see also Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) ("inquiry itself, however

9   embarrassing or unpleasant to its subject, is not an accusation").  Musk asked two questions: (1)

10  whether Lopez paid or promised to pay Tripp and (2) whether Tripp provided Lopez with

11  information in exchange for compensation.  (Musk Ex. I.)  He did not state as a matter of fact that

12  either event occurred.  By asking questions, Musk's tweet "makes clear his lack of definitive

13  knowledge about the issue and invites the reader to consider the possibility of other justifications

14  for" Tripp's actions.  *Partington*, 56 F.3d at 1157.

15      This is not a circumstance, like *Nevada Indep. Broad. Corp. v. Allen*, where Musk

16  embedded a factual assertion in a question or asked a question that assumed the predicate.  99

17  Nev. 404, 411 (1983) (holding the question, "[i]f a candidate doesn't pay his political bills, what

18  is he going to do with State money?" could be a statement of fact); *see also Abbas*, 783 F.3d at

19  1338 n.7 (listing "Given that Jones repeatedly abused children, why is he still employed by the

20  school district?," as an example of a question that could give rise to defamation because it is

21  coupled with a factual assertion).  There are no factual assertions here.  Instead, the questions are

22  open-ended and not defamatory.  *See e.g.*, *Abbas*, 783 F.3d at 1338 (holding that the questions

23  "Are the sons of the Palestinian president growing rich off their father's system?" and "Have they

24  enriched themselves at the expense of regular Palestinians—and even U.S. taxpayers?" could ***not***

25  give rise to defamation).  The tweet contains questions, not statements of fact (implied or

26  otherwise) and cannot give rise to a claim for defamation or false light invasion of privacy.

27                              **CONCLUSION**

28      For the aforementioned reasons, the Court should grant Tesla's motion.

1

DATED:  March 31, 2020

2

Respectfully submitted,
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

3

4

By  ___/s/ Alex Spiro_____

Alex Spiro
*Attorneys for Plaintiff/Counter-Defendant*
*Tesla, Inc.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDONALD ⬡ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on the March 31, 2020, a true and correct copy of the foregoing **TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to the following counsel of record registered to receive CM/ECF notification.

*/s/   CaraMia Gerard*
An employee of McDonald Carano LLP