# Exhibit 1
# Martin Tripp Deposition
# Excerpts

MSJ_001

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

**REPORTER'S CERTIFIED TRANSCRIPT**

| | |
|---|---|
| TESLA, INC., a Delaware corporation, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MARTIN TRIPP, )<br>)<br>Defendant, )<br>_____)<br>)<br>AND RELATED COUNTER-CLAIMS.)<br>_____) | Case No.:<br><br>3:18-cv-00296 LRH-CBC<br><br>**CONFIDENTIAL** |

CONFIDENTIAL

VIDEOTAPE DEPOSITION OF MARTIN TRIPP

PHOENIX, ARIZONA
WEDNESDAY, SEPTEMBER 4, 2019
9:01 A.M.

DAVID M. LEE, RMR, CCR
Certified Reporter
Certificate Number 50391
File No.: 19-29468



**Martin Tripp-Confidential**

| | | |
|---|---|---|
| 09:51 | 1 | Q.  How should you be viewed then? |
| 09:51 | 2 | A.  Preferably not viewed at all. |
| 09:51 | 3 | Q.  All right.  You wanted to remain anonymous. |
| 09:51 | 4 | A.  That is correct. |
| 09:51 | 5 | Q.  You wanted to continue with your job at |
| 09:51 | 6 | Tesla while continuing to provide information to |
| 09:51 | 7 | reporters. |
| 09:51 | 8 | A.  Only if it was necessary. |
| 09:51 | 9 | Q.  And you were going to do that for as long |
| 09:51 | 10 | as you thought it was necessary. |
| 09:51 | 11 | A.  Yes. |
| 09:51 | 12 | Q.  As determined by you. |
| 09:51 | 13 | A.  Yes. |
| 09:51 | 14 | Q.  So you thought by changing -- by -- excuse |
| 09:51 | 15 | me.  Let me start that again. |
| 09:51 | 16 | You thought by sharing information with |
| 09:51 | 17 | Linette Lopez, you would change the -- what was |
| 09:52 | 18 | being done at the Tesla Gigafactory; right? |
| 09:52 | 19 | A.  That was my hope. |
| 09:52 | 20 | Q.  And you were going to continue to provide |
| 09:52 | 21 | information from Tesla to Linette Lopez as long as |
| 09:52 | 22 | it was -- you thought there were things that needed |
| 09:52 | 23 | to be changed at Tesla's Gigafactory. |
| 09:52 | 24 | A.  If it involved public safety, yes. |
| 09:52 | 25 | Q.  So a lot of the information that you |

Martin Tripp-Confidential

09:52   1   disclosed had to do with the amount of dollar value

09:52   2   of scrap.  Do you remember that?

09:52   3       A.  Yes.

09:52   4       Q.  How is that an issue of public safety?

09:52   5       A.  I can't say that it is.

09:52   6       Q.  Then why were you disclosing it to Linette

09:52   7   Lopez?

09:52   8       A.  Because there was a concern internally

09:52   9   amongst many employees.

09:52   10      Q.  Okay.  So there was a concern internally

09:52   11  amongst employees, and you didn't see it was

09:52   12  changing to your liking; right?

09:52   13          MR. FISCHBACH:  Object to the form of the

09:53   14  question.

09:53   15          THE WITNESS:  It was not changing to the

09:53   16  liking of anyone.

09:53   17      Q.  BY MR. GATES:  You didn't think that Tesla

09:53   18  was changing sufficiently in response to the

09:53   19  concerns about the level of scrap.

09:53   20      A.  That is correct.

09:53   21      Q.  And so because of that, you decided to

09:53   22  provide Tesla confidential information to Linette

09:53   23  Lopez.

09:53   24      A.  Yes.

09:53   25      Q.  But that's not an issue of public safety.

| 09:53 | 1 | A.  Not to my knowledge. |
|-------|---|--------------------------|

09:53   2      Q.  You also disclosed to her information about

09:53   3  the number of Model 3s that were being produced.

09:53   4  Do you remember that?

09:53   5      A.  Yes.

09:53   6      Q.  Was that an issue of public safety?

09:53   7      A.  I can't say that it is.

09:53   8      Q.  Why did you disclose it to Linette Lopez?

09:53   9      A.  Because Elon Musk was lying to investors and

09:54  10  the public about the amount of cars being produced

09:54  11  per day, and I was showing proof of that.

09:54  12      Q.  Okay.  Let's suppose that you thought the

09:54  13  numbers that you were being put to the public were

09:54  14  incorrect.  Why go to a reporter with Tesla

09:54  15  confidential information?  What's the importance of

09:54  16  that?

09:54  17      A.  I believed it was wrong.  I, myself, was an

09:54  18  investor with restricted stock units, and I believe

09:54  19  that it was wrong for him to say one thing, and we

09:54  20  were actually doing another.

09:54  21      Q.  So because you thought it was wrong, it was

09:54  22  okay to steal Tesla confidential information and

09:54  23  provide it to a reporter.

09:54  24      A.  Correct.

09:54  25      Q.  Did you raise the issue of the number of

Martin Tripp-Confidential

| | | |
|---|---|---|
| 10:08 | 1 | MR. FISCHBACH:  Object to the form of the |
| 10:08 | 2 | question. |
| 10:08 | 3 | THE WITNESS:  Answer? |
| 10:08 | 4 | MR. FISCHBACH:  Go ahead and answer, yeah. |
| 10:08 | 5 | THE WITNESS:  I didn't know about her.  I |
| 10:08 | 6 | possibly have read some articles by her, but I -- |
| 10:08 | 7 | the name was not familiar. |
| 10:08 | 8 | Q.  BY MR. GATES:  Okay.  You learned at some |
| 10:08 | 9 | point that she had a grudge against Elon Musk; |
| 10:08 | 10 | right? |
| 10:08 | 11 | MR. FISCHBACH:  Object to the form of the |
| 10:08 | 12 | question. |
| 10:08 | 13 | Answer if you can. |
| 10:08 | 14 | THE WITNESS:  I don't know if it was a |
| 10:08 | 15 | grudge; she definitely contested things that he |
| 10:08 | 16 | said and did. |
| 10:08 | 17 | Q.  BY MR. GATES:  Well, you described it as a |
| 10:08 | 18 | grudge; right? |
| 10:08 | 19 | A.  At some point I probably did. |
| 10:08 | 20 | Q.  You described it as also "She definitely |
| 10:08 | 21 | had it out for Elon." |
| 10:08 | 22 | A.  I would definitely agree with that. |
| 10:09 | 23 | Q.  Okay.  So you're not sure whether you knew |
| 10:09 | 24 | that at the point when you got this response from |
| 10:09 | 25 | Linette Lopez on May 27th? |

**Martin Tripp-Confidential**

| | | |
|---|---|---|
| 10:28 | 1 | say: |
| 10:28 | 2 | "Pics [coming in on]" -- "incoming in |
| 10:28 | 3 | another thread." |
| 10:28 | 4 | Do you see that? |
| 10:28 | 5 | A.  Yes. |
| 10:25 | 6 | (Deposition Exhibit Number 5 was marked |
| 10:28 | 7 | for identification.) |
| 10:28 | 8 | Q.  BY MR. GATES:  Okay.  So I'm going to give |
| 10:28 | 9 | to you what has been marked as Exhibit 5, and this |
| 10:28 | 10 | is just the cover e-mail without attachments.  You |
| 10:28 | 11 | see that?  That's an e-mail that you sent to |
| 10:28 | 12 | Linette Lopez on May 27th at -- 2018 at 12:39 p.m. |
| 10:29 | 13 | Do you see that? |
| 10:29 | 14 | A.  Yes. |
| 10:29 | 15 | Q.  And attached to this e-mail were there |
| 10:29 | 16 | pictures that you had sent to her? |
| 10:29 | 17 | A.  It shows there are attachments, yes. |
| 10:29 | 18 | Q.  And is this the thread, the thread that you |
| 10:29 | 19 | were talking about in Exhibit 4, the other e-mail? |
| 10:29 | 20 | A.  I would believe so. |
| 10:29 | 21 | Q.  So these pictures that you sent to her, were |
| 10:29 | 22 | those pictures that you took? |
| 10:29 | 23 | A.  Yes. |
| 10:29 | 24 | Q.  On your phone? |
| 10:29 | 25 | A.  Yes. |

**Martin Tripp-Confidential**

| 10:29 | 1 | Q. In the Tesla Gigafactory. |
|---|---|---|
| 10:29 | 2 | A. Yes. |
| 10:29 | 3 | Q. Were you authorized to take those pictures? |
| 10:29 | 4 | A. Yes, I was. |
| 10:29 | 5 | Q. By whom? |
| 10:29 | 6 | A. By Michael Bowling. |
| 10:29 | 7 | Q. And were you authorized to take those |
| 10:29 | 8 | pictures for purposes of your job? |
| 10:29 | 9 | A. Yes, I was. |
| 10:29 | 10 | Q. Were you authorized to share those with |
| 10:30 | 11 | Linette Lopez? |
| 10:30 | 12 | A. No, I was not. |
| 10:30 | 13 | Q. And you knew that; right? |
| 10:30 | 14 | A. Yes. |
| 10:30 | 15 | ▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 16 | ▄▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 17 | ▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 18 | ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 19 | ▄▄ |
| 10:30 | 20 | ▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 21 | ▄▄▄ |
| 10:30 | 22 | ▄ ▄▄▄▄▄▄▄▄▄▄ ▄▄▄ |
| 10:30 | 23 | ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 24 | ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ |
| 10:30 | 25 | ▄▄▄▄▄▄▄▄▄ |

**Martin Tripp-Confidential**



| | | |
|---|---|---|
| 10:43 | 1 | |
| 10:43 | 2 | |
| 10:43 | 3 | |
| 10:43 | 4 | |
| 10:43 | 5 | |
| 10:43 | 6 | |
| 10:43 | 7 | |
| 10:43 | 8 | |
| 10:43 | 9 | |
| 10:43 | 10 | |
| 10:43 | 11 | |
| 10:43 | 12 | |
| 10:43 | 13 | |
| 10:43 | 14 | |
| 10:44 | 15 | |
| 10:44 | 16 | |
| 10:44 | 17 | |
| 10:44 | 18 | |
| 10:44 | 19 | |
| 10:44 | 20 | |
| 10:44 | 21 | |
| 10:44 | 22 | |
| 10:44 | 23 | |
| 10:44 | 24 | |
| 10:44 | 25 | |

**Martin Tripp-Confidential**



**Martin Tripp-Confidential**

| | | |
|---|---|---|
| 10:45 | 1 | ████████ |
| 10:45 | 2 | ██ ████████ |
| 10:45 | 3 | ██ ██ ████████████ |
| 10:45 | 4 | ████████ |
| 10:45 | 5 | ██ ████████████ |
| 10:45 | 6 | ██ ██ ████████████ |
| 10:45 | 7 | ██████████████ |
| 10:45 | 8 | ███ |
| 10:45 | 9 | ██ ██████ |
| 10:45 | 10 | ██ ████████████ |
| 10:45 | 11 | ██████ |
| 10:45 | 12 | ██ ██████ |
| 10:45 | 13 | ██ ██████████████ |
| 10:45 | 14 | ██ |
| 10:45 | 15 | ██ ███ |
| 10:45 | 16 | ██ ████████████ |
| 10:46 | 17 | ███ |
| 10:46 | 18 | ██ ████ |
| 10:46 | 19 | ██ ████████████ |
| 10:46 | 20 | ████████ |
| 10:46 | 21 | ██ ████████████ |
| 10:46 | 22 | ██████████████ |
| 10:46 | 23 | ██████████████ |
| 10:46 | 24 | ██ ████████████ |
| 10:46 | 25 | ████ |

**Martin Tripp-Confidential**



| 10:46 | 1 |
| 10:46 | 2 |
| 10:46 | 3 |
| 10:46 | 4 |
| 10:46 | 5 |
| 10:46 | 6 |
| 10:46 | 7 |
| 10:46 | 8 |
| 10:46 | 9 |
| 10:46 | 10 |
| 10:46 | 11 |
| 10:46 | 12 |
| 10:46 | 13 |
| 10:47 | 14 |
| 10:47 | 15 |
| 10:47 | 16 |
| 10:47 | 17 |
| 10:47 | 18 |
| 10:47 | 19 |
| 10:47 | 20 |
| 10:47 | 21 |
| 10:47 | 22 |
| 10:47 | 23 |
| 10:47 | 24 |
| 10:47 | 25 |

Martin Tripp-Confidential

| | | |
|---|---|---|
| 10:47 | 1 | Q.  Did you tell them why you were asking them |
| 10:47 | 2 | for that information? |
| 10:47 | 3 | A.  I can't remember. |
| 10:47 | 4 | Q.  Did you say "Hey, I want this information |
| 10:47 | 5 | so I can calculate the total scrap value, so I can |
| 10:47 | 6 | send that to a reporter"? |
| 10:47 | 7 | MR. FISCHBACH:  Objection; asked and |
| 10:47 | 8 | answered. |
| 10:47 | 9 | Q.  BY MR. GATES:  Did you say something like |
| 10:47 | 10 | that? |
| 10:47 | 11 | A.  No. |
| 10:48 | 12 | Q.  You didn't tell anybody that you were |
| 10:48 | 13 | sending information off to a reporter, did you? |
| 10:48 | 14 | A.  I can't remember if I did tell anybody or |
| 10:48 | 15 | not. |
| 10:48 | 16 | Q.  You don't remember.  Okay. |
| 10:48 | 17 | (Deposition Exhibit Number 10 was marked |
| 10:48 | 18 | for identification.) |
| 10:48 | 19 | Q.  BY MR. GATES:  Let's look at Exhibit 10. |
| 10:48 | 20 | So Exhibit 10 is a chart which has in |
| 10:48 | 21 | it data from Tesla.  Can you tell us what this data |
| 10:48 | 22 | is? |
| 10:48 | 23 | A.  I bel- -- I believe -- I -- I can't tell you |
| 10:48 | 24 | what it is.  I can only tell you what I believe it |
| 10:48 | 25 | is. |

Martin Tripp-Confidential

| | | |
|---|---|---|
| 11:00 | 1 | the e-mail?  Like on page 3, for instance. |
| 11:00 | 2 | A.  But it doesn't show me that it's actually |
| 11:00 | 3 | part of the e-mail. |
| 11:00 | 4 | (Deposition Exhibit Number 17 was marked |
| 11:00 | 5 | for identification.) |
| 11:00 | 6 | Q.  BY MR. GATES:  Oh, okay.  Let's see.  Let |
| 11:00 | 7 | me give you what's been marked as Exhibit 17. |
| 11:00 | 8 | So Exhibit 17 is a photograph recovered |
| 11:00 | 9 | from your computers or servers that you've used, and |
| 11:01 | 10 | this is a photograph of your work laptop.  Is that |
| 11:01 | 11 | right? |
| 11:01 | 12 | A.  It is possible. |
| 11:01 | 13 | Q.  "Possible."  You don't recognize it? |
| 11:01 | 14 | A.  The computer? |
| 11:01 | 15 | Q.  No, the screenshot. |
| 11:01 | 16 | A.  Yes, I do recognize that screenshot. |
| 11:01 | 17 | Q.  Okay.  And so that is a photograph that you |
| 11:01 | 18 | took of a screenshot from a computer hooked up to |
| 11:01 | 19 | Tesla's systems; correct? |
| 11:01 | 20 | A.  Correct. |
| 11:01 | 21 | Q.  And you sent that photograph to Linette |
| 11:01 | 22 | Lopez. |
| 11:01 | 23 | A.  Yes. |
| 11:01 | 24 | Q.  Okay.  You sent it to her via this e-mail |
| 11:01 | 25 | on May 29th, 2018, at 12:43 p.m. |

Martin Tripp-Confidential

| 11:13 | 1 | Linette Lopez on June 1st at 7:10 p.m.; right? |

11:13    1    Linette Lopez on June 1st at 7:10 p.m.; right?

11:13    2         A.   Correct.

11:13    3         Q.   And you were attaching to that -- first off,

11:13    4    you embedded an image in the e-mail which was, it

11:13    5    looks like --

11:13    6              Well, you tell me.  What -- what is the

11:13    7    image that you embedded in the e-mail, if you can

11:13    8    ████████   ████████    ██████████████████████████

11:13    9              ██████████████████████████████████████

11:13   10              █████████

11:13   11     ██    ████████████

11:13   12     ██    ████████████████████████████████████████

11:13   13     ██    ██████████████████████████

11:13   14     ██    █████

11:13   15     ██    ████████████████████████   ████████████

11:13   16     ██    ██████████████████████████████   ██

11:14   17    ███

11:14   18            ████████████████████████████████████

11:14   19            ██████████

11:14   20     ██    ██████    ████████████████████████

11:14   21     ██    ████████

11:14   22     ██    ██████████████████████

11:14   23     ██    ██████   ████████████████████

11:14   24     ██    ██████████████████████████████████████████

11:14   25    █████████████████████████████████████████████

**Martin Tripp-Confidential**



**Martin Tripp-Confidential**



| 11:15 | 1 |
| 11:15 | 2 |
| 11:15 | 3 |
| 11:15 | 4 |
| 11:15 | 5 |
| 11:15 | 6 |
| 11:15 | 7 |
| 11:15 | 8 |
| 11:15 | 9 |
| 11:15 | 10 |
| 11:15 | 11 |
| 11:15 | 12 |
| 11:16 | 13 |
| 11:16 | 14 |
| 11:16 | 15 |
| 11:16 | 16 |
| 11:16 | 17 |
| 11:16 | 18 |
| 11:16 | 19 |
| 11:16 | 20 |
| 11:16 | 21 |
| 11:16 | 22 |
| 11:16 | 23 |
| 11:16 | 24 |
| 11:16 | 25 |

**Martin Tripp-Confidential**



**Martin Tripp-Confidential**



**Martin Tripp-Confidential**



| | |
|---|---|
| 11:19 | 1 |
| 11:19 | 2 |
| 11:19 | 3 |
| 11:19 | 4 |
| 11:19 | 5 |
| 11:19 | 6 |
| 11:19 | 7 |
| 11:19 | 8 |
| 11:19 | 9 |
| 11:19 | 10 |
| 11:19 | 11 |
| 11:19 | 12 |
| 11:19 | 13 |
| 11:19 | 14 |
| 11:19 | 15 |
| 11:19 | 16 |
| 11:19 | 17 |
| 11:19 | 18 |
| 11:19 | 19 |
| 11:19 | 20 |
| 11:19 | 21 |
| 11:19 | 22 |
| 11:20 | 23 |
| 11:20 | 24 |
| 11:20 | 25 |

**Martin Tripp-Confidential**



**Martin Tripp-Confidential**



Martin Tripp-Confidential

| | | |
|---|---|---|
| 11:22 | 1 | ███████████████████████████████ |
| 11:22 | 2 | ███   ██████ |
| 11:22 | 3 | Q.  Did you have any concern that Ms. Lopez |
| 11:22 | 4 | might somehow do something more than just write an |
| 11:22 | 5 | article with all the information that you were |
| 11:22 | 6 | giving to her? |
| 11:22 | 7 | MR. FISCHBACH:  Object to the form of the |
| 11:22 | 8 | question. |
| 11:22 | 9 | Answer if you can. |
| 11:22 | 10 | THE WITNESS:  I never had any concern like |
| 11:22 | 11 | that. |
| 11:22 | 12 | Q.  BY MR. GATES:  Okay.  You trusted her. |
| 11:22 | 13 | A.  Yes. |
| 11:22 | 14 | Q.  You hadn't met her before; right? |
| 11:22 | 15 | A.  No. |
| 11:22 | 16 | Q.  In fact, you provided her Tesla data without |
| 11:22 | 17 | even having talked to her on the phone. |
| 11:22 | 18 | A.  I believe I'd spoken to her on the phone. |
| 11:22 | 19 | Q.  Okay.  So now one phone call, and you think |
| 11:23 | 20 | that she's trustworthy. |
| 11:23 | 21 | A.  I'm a trusting guy. |
| 11:23 | 22 | Q.  Okay. |
| 11:23 | 23 | MR. FISCHBACH:  Do you want to take a |
| 11:23 | 24 | break? |
| 11:23 | 25 | MR. GATES:  Sure. |

| 12:01 | 1 | Q.  So what was the attachment that you sent to |
| 12:01 | 2 | her? |
| 12:01 | 3 | A.  I can't say with a hundred percent |
| 12:01 | 4 | certainty what it was.  I can't remember. |
| 12:01 | 5 | Q.  Did you send her data about Model 3s? |
| 12:01 | 6 | A.  I would assume, but I can't make an |
| 12:01 | 7 | absolute. |
| 12:01 | 8 | Q.  Do you remember sending her data about the |
| 12:02 | 9 | number of Model 3s that were produced in 2018? |
| 12:02 | 10 | A.  I do. |
| 12:02 | 11 | Q.  Was that data that you got from Tesla? |
| 12:02 | 12 | A.  Yes. |
| 12:02 | 13 | Q.  And that was data that you were not |
| 12:02 | 14 | authorized to share with her. |
| 12:02 | 15 | A.  That is correct. |
| 12:02 | 16 | (Deposition Exhibit Number 26 was marked |
| 12:02 | 17 | for identification.) |
| 12:02 | 18 | Q.  BY MR. GATES:  All right.  This is Exhibit |
| 12:02 | 19 | 26. |
| 12:02 | 20 | A.  Thank you. |
| 12:02 | 21 | Q.  All right.  So Exhibit 26 is an e-mail that |
| 12:02 | 22 | you sent to Linda Lorel, otherwise known as Linette |
| 12:02 | 23 | Lopez, on June 5th, 2018, at 12:43 p.m.  The |
| 12:02 | 24 | "Subject" is:  "Valeo robot being removed and pic |
| 12:02 | 25 | of the query for all Model 3s." |

**Martin Tripp-Confidential**

| 12:02 | 1 | Do you see that? |
|---|---|---|

12:02   1         Do you see that?

12:02   2     A.  Yes.

12:02   3     Q.  Okay.  And -- and there's a bunch of

12:02   4  attachments, images that are attached to this.  Do

12:02   5  you remember what you sent to her?

12:02   6     A.  I remember the picture of the Vale- --

12:03   7  Valeo robot, but none of the others:

12:03   8     Q.  Okay.  So what was the Valeo robot?

12:03   9     A.  If I remember correctly, it was a robot

12:03   10 that was physically -- Elon Musk physically told

12:03   11 everybody to turn off and not use, but everyone was

12:03   12 concerned that it was still needed and necessary.

12:03   13    Q.  So that's the picture that you took?

12:03   14    A.  Yes.

12:03   15    Q.  And that was from inside the Gigafactory.

12:03   16    A.  Yes.

12:03   17    Q.  Were you authorized to share that picture

12:03   18 with anybody outside of Tesla?

12:03   19    A.  No, I was not.

12:03   20    Q.  Okay.

12:03   21        Why did she want a picture of this

12:03   22 robot?

12:03   23    A.  It went along the same line as the genealogy

12:03   24 be turned -- being turned off.  She wanted to see

12:03   25 the robot.

MSJ_025

| | | |
|---|---|---|
| 12:05 | 1 | Q.  Why does she want you to comment on the |
| 12:05 | 2 | Tesla shareholder meeting? |
| 12:05 | 3 | A.  Well, they're discussing the amount of scrap, |
| 12:05 | 4 | or the scrap where it's being housed and things |
| 12:05 | 5 | like that, so she was interested in knowing more |
| 12:05 | 6 | information about that. |
| 12:05 | 7 | Q.  So this isn't something that you had |
| 12:05 | 8 | volunteered to give her, she was asking you for |
| 12:05 | 9 | information. |
| 12:05 | 10 | A.  Correct. |
| 12:05 | 11 | Q.  And you... |
| 12:05 | 12 | Did you answer this? |
| 12:05 | 13 | A.  (No response.) |
| 12:05 | 14 | Q.  Did you talk to her on the phone or |
| 12:05 | 15 | something, or by e-mail or text? |
| 12:05 | 16 | A.  I don't remember. |
| 12:06 | 17 | Q.  Okay. |
| 12:06 | 18 | (Deposition Exhibit Number 28 was marked |
| 12:06 | 19 | for identification.) |
| 12:06 | 20 | Q.  BY MR. GATES:  Exhibit 28. |
| 12:06 | 21 | So Exhibit 28 is an e-mail that you |
| 12:06 | 22 | sent to Linette Lopez on June 5th at 6:58 p.m., |
| 12:06 | 23 | also entitled:  "Tesla shareholder meeting 5/6 |
| 12:06 | 24 | NOTES," and you apparently attached a |
| 12:06 | 25 | video.  Do you see that? |

Martin Tripp-Confidential

| 12:06 | 1 | A. Yes. |
|---|---|---|

12:06   2   Q.  Do you remember what this video was of?

12:06   3   A.  Without any other information, I can't tell

12:06   4   you.

12:06   5   Q.  Would it have been video that you took

12:06   6   inside the factory?

12:06   7   A.  It's quite possible.

12:06   8   Q.  You did share with her videos that you took

12:06   9   from inside the factory; correct?

12:06   10   A.  Yes, I did.

12:06   11   Q.  And those were videos that you were not

12:06   12   authorized to share outside of Tesla; right?

12:06   13   A.  That is correct.

12:06   14   Q.  In fact, you had no reason to take those

12:06   15   videos as part of your job; right?

12:06   16   A.  Some videos I took were required as part of

12:06   17   my job.

12:06   18   Q.  And others were not.

12:06   19   A.  Correct.

12:06   20   Q.  Others that you shared with Linette Lopez

12:07   21   were not required for your job.

12:07   22   A.  That is correct.

12:07   23        MR. MITCHELL:  Sean, would you let us know

12:07   24   when we come to a good break for our lunch?

12:07   25        MR. GATES:  Oh, okay.  I see.

**Martin Tripp-Confidential**

| | | |
|---|---|---|
| 12:07 | 1 | Do you want to just go to like 12:30; |
| 12:07 | 2 | is that all right? |
| 12:07 | 3 | MR. MITCHELL:  If that's what you want, |
| 12:07 | 4 | that's fine. |
| 12:07 | 5 | MR. GATES:  Okay.  That will be about an |
| 12:07 | 6 | hour, so that works. |
| 12:07 | 7 | Okay.  It's not getting cold, is it? |
| 12:07 | 8 | MR. FISCHBACH:  What's that? |
| 12:07 | 9 | MR. GATES:  It's not getting cold, is it? |
| 12:07 | 10 | MR. FISCHBACH:  I don't think so; I think |
| 12:07 | 11 | they're sandwiches. |
| 12:07 | 12 | MR. GATES:  Okay.  We'll go to 12:30. |
| 12:07 | 13 | (Deposition Exhibit Number 29 was marked |
| 12:07 | 14 | for identification.) |
| 12:07 | 15 | Q.  BY MR. GATES:  Okay.  Let me give you |
| 12:07 | 16 | what's been marked as Exhibit 29. |
| 12:07 | 17 | So Exhibit 29 is an e-mail from Linette |
| 12:07 | 18 | Lopez to you on Wednesday, June 6th, 2018, at 12:36 |
| 12:07 | 19 | p.m., and she forwards to you a -- or sends you a |
| 12:08 | 20 | link to an article.  This is a link to her second |
| 12:08 | 21 | article that came out on June 6th using information |
| 12:08 | 22 | that you had provided to her; right? |
| 12:08 | 23 | A.  That is correct. |
| 12:08 | 24 | Q.  And were you at work when you received this |
| 12:08 | 25 | e-mail? |

| | | |
|---|---|---|
| 12:19 | 1 | A.   True. |
| 12:19 | 2 | Q.   Does that remind you that you continued to |
| 12:19 | 3 | provide her confidential Tesla information after |
| 12:19 | 4 | June 7th? |
| 12:19 | 5 | A.   Yes, on June 7th.   This is on June 7th. |
| 12:19 | 6 | (Deposition Exhibit Number 34 was marked |
| 12:19 | 7 | for identification.) |
| 12:19 | 8 | Q.   BY MR. GATES:   Okay.   Let's go to Exhibit |
| 12:19 | 9 | 34. |
| 12:20 | 10 | Oh, probably.   I'm sorry. |
| 12:20 | 11 | All right.   So Exhibit 34 is an e-mail |
| 12:20 | 12 | that you sent to Ms. Lopez on June 9th, 2018, at |
| 12:20 | 13 | 9:37 a.m.; true? |
| 12:20 | 14 | A.   Yes. |
| 12:20 | 15 | Q.   And in there you sent her a link to a |
| 12:20 | 16 | Google Drive; right? |
| 12:20 | 17 | A.   Yes. |
| 12:20 | 18 | Q.   And a Google Drive is a cloud-based service |
| 12:20 | 19 | where you can share files with other people; right? |
| 12:20 | 20 | A.   That is correct. |
| 12:20 | 21 | Q.   And in it you uploaded a bunch of |
| 12:20 | 22 | information from Tesla to provide to Ms. Lopez; |
| 12:20 | 23 | true? |
| 12:20 | 24 | A.   At some point, yes. |
| 12:20 | 25 | Q.   In this particular one you uploaded a bunch |

**Martin Tripp-Confidential**

| | | |
|---|---|---|
| 12:20 | 1 | of photographs that you had taken at the Gigafactory; |
| 12:20 | 2 | right? |
| 12:21 | 3 |     A.   Possibly. |
| 12:21 | 4 |     Q.   Okay.  So in these e-mails you talk about |
| 12:21 | 5 | the fact that you went out and snooped around some |
| 12:21 | 6 | trailers on the Tesla Gigafactory site; right? |
| 12:21 | 7 |     A.   Yes. |
| 12:21 | 8 |     Q.   And you took pictures of the trailers, and |
| 12:21 | 9 | you opened the trailers, and you took pictures of |
| 12:21 | 10 | what was inside of them; right? |
| 12:21 | 11 |     A.   Correct. |
| 12:21 | 12 |     Q.   That wasn't part of your job |
| 12:21 | 13 | responsibilities; true? |
| 12:21 | 14 |     A.   True. |
| 12:21 | 15 |     Q.   And you were doing this in order to provide |
| 12:21 | 16 | information to Linette Lopez about scrap at Tesla; |
| 12:21 | 17 | correct? |
| 12:21 | 18 |     A.   That is correct. |
| 12:21 | 19 |     Q.   And you were hoping that she would publish |
| 12:21 | 20 | another article about what was going on at Tesla's |
| 12:21 | 21 | Gigafactory; right? |
| 12:21 | 22 |     MR. FISCHBACH:   Object to the form of the |
| 12:21 | 23 | question. |
| 12:21 | 24 |       Answer if you can. |
| 12:21 | 25 |     THE WITNESS:   I can't say that. |

**Martin Tripp-Confidential**

| | | |
|---|---|---|
| 12:21 | 1 | Q.  BY MR. GATES:  Well, why were you providing |
| 12:21 | 2 | her all these -- all this information and all these |
| 12:21 | 3 | photographs? |
| 12:21 | 4 | A.  Because she was listening. |
| 12:21 | 5 | Q.  "Because she was listening." |
| 12:22 | 6 | Okay.  What was significant about the |
| 12:22 | 7 | fact that she was listening? |
| 12:22 | 8 | A.  When no one else at Tesla would listen. |
| 12:22 | 9 | Q.  Okay.  So you just kept providing to her |
| 12:22 | 10 | Tesla confidential information because she was |
| 12:22 | 11 | listening to you. |
| 12:22 | 12 | A.  Yes. |
| 12:22 | 13 | Q.  Did you talk to anybody at the Gigafactory? |
| 12:22 | 14 | Did you send any e-mails saying "Hey, what about |
| 12:22 | 15 | all these battery cells that are out in these |
| 12:22 | 16 | trailers out there?  I'm worried about those." |
| 12:22 | 17 | Anything like that? |
| 12:22 | 18 | A.  Yes. |
| 12:22 | 19 | Q.  Who did you talk to? |
| 12:22 | 20 | A.  I talked to John Sheridan.  I talked to my |
| 12:22 | 21 | counterpart Mark Newsom -- excuse me -- Mark |
| 12:22 | 22 | Neumeister, and numerous other process engineering |
| 12:22 | 23 | technicians in the Module line, as well as process |
| 12:22 | 24 | engineering technicians in the Stator line. |
| 12:22 | 25 | Q.  Did you send anybody an e-mail? |

Martin Tripp-Confidential

| | | |
|---|---|---|
| 12:22 | 1 | A.   No. |
| 12:22 | 2 | Q.   Text? |
| 12:22 | 3 | A.   No. |
| 12:22 | 4 | Q.   Leave a voicemail? |
| 12:22 | 5 | A.   No. |
| 12:22 | 6 | Q.   And you were concerned that the batteries, |
| 12:23 | 7 | the scrap batteries that were in these trailers, |
| 12:23 | 8 | were stacked too high; right? |
| 12:23 | 9 | A.   No, I was concerned that they were going to |
| 12:23 | 10 | ignite because of the excessive heat being locked |
| 12:23 | 11 | in these trailers. |
| 12:23 | 12 | Q.   Okay.  So are you a battery engineer? |
| 12:23 | 13 | A.   No. |
| 12:23 | 14 | Q.   Did you call up your ex-wife and ask her |
| 12:23 | 15 | whether these batteries would explode if they were |
| 12:23 | 16 | in this heat? |
| 12:23 | 17 | A.   No. |
| 12:23 | 18 | Q.   Did you text her? |
| 12:23 | 19 | A.   No. |
| 12:23 | 20 | Q.   Did you ever text your ex-wife about the |
| 12:23 | 21 | batteries at the Tesla Gigafactory? |
| 12:23 | 22 | A.   No. |
| 12:23 | 23 | Q.   Why did you tell the investigators that? |
| 12:23 | 24 | A.   Because they were intimidating me. |
| 12:23 | 25 | Q.   Oh, okay.  So you lied about that. |

Martin Tripp-Confidential

```
13:32    1          THE WITNESS:  She knew of the concerns that
13:32    2   I had about Tesla.  She had fears about what they
13:32    3   would do to me, retaliation or whatnot, and she was
13:32    4   relieved and -- and was receptive to moving to
13:32    5   Hungary.
13:32    6       Q.  BY MR. GATES:  Okay.  You had planned to
13:32    7   move to Hungary at some point in the future with
13:32    8   your wife; right?
13:32    9       A.  Yes.
13:32   10       Q.  And in fact, you had planned to retire from
13:32   11   Tesla in under two years; right?
13:32   12       A.  We had planned to possibly make a move; we
13:32   13   didn't know what the future held though.
13:33   14       Q.  Did you tell people that you were going to
13:33   15   retire in two years?
13:33   16       A.  I told them I was going to retire soon; I
13:33   17   did not give them a time frame.
13:33   18          (Deposition Exhibit Number 40 was marked
13:33   19   for identification.)
13:33   20       Q.  BY MR. GATES:  Okay.  Let me give you what's
13:33   21   been marked as Exhibit 40.
13:33   22          So Exhibit 40 is a spreadsheet you
13:33   23   created that is a countdown to your retirement,
13:33   24   isn't it?
13:33   25       A.  That is a countdown to when we would be
```

Martin Tripp-Confidential

| 13:34 | 1 | to her family, take some time off, and then look |
| 13:34 | 2 | for employment there. |
| 13:34 | 3 | Q.  Didn't you tell other people that -- at |
| 13:35 | 4 | Tesla that you were going to retire? |
| 13:35 | 5 | A.  I don't know if I ever used that word. |
| 13:35 | 6 | Q.  Did you tell anybody else that you were |
| 13:35 | 7 | going to retire in a couple years and move to |
| 13:35 | 8 | Hungary? |
| 13:35 | 9 | A.  I don't know if I did or not. |
| 13:35 | 10 | (Deposition Exhibit Number 41 was marked |
| 13:35 | 11 | for identification.) |
| 13:35 | 12 | Q.  BY MR. GATES:  Let me give you what's been |
| 13:35 | 13 | marked as Exhibit 41. |
| 13:35 | 14 | Exhibit 41 is a booking for you, your |
| 13:35 | 15 | wife, and your son to fly to Hungary; correct? |
| 13:35 | 16 | A.  That is correct. |
| 13:35 | 17 | Q.  And you booked this on June 18th, 2016. |
| 13:36 | 18 | A.  No. |
| 13:36 | 19 | Q.  No, I'm sorry.  You booked it the 16th of |
| 13:36 | 20 | June, 2018. |
| 13:36 | 21 | A.  Yes. |
| 13:36 | 22 | Q.  And so this was after your two interviews |
| 13:36 | 23 | with Tesla security; you decided to leave to go to |
| 13:36 | 24 | Hungary at that point. |
| 13:36 | 25 | A.  It was after the -- it was just before the |

Martin Tripp-Confidential

| | | |
|---|---|---|
| 13:36 | 1 | second interview actually -- |
| 13:36 | 2 | Q.  That's when you booked it? |
| 13:36 | 3 | A.  -- so... |
| 13:36 | 4 | Yes. |
| 13:36 | 5 | (Deposition Exhibit Number 38 was marked |
| 13:36 | 6 | for identification.) |
| 13:36 | 7 | Q.  BY MR. GATES:  Okay.  So let me give you |
| 13:36 | 8 | what's been marked as Exhibit 38. |
| 13:36 | 9 | So Exhibit 38 is an e-mail from you to |
| 13:36 | 10 | Linette Lopez on June 15th at 10:59 a.m.; correct? |
| 13:37 | 11 | A.  That is correct. |
| 13:37 | 12 | Q.  And you tell her that she can freely use |
| 13:37 | 13 | your name as a source after the 29th, and by that |
| 13:37 | 14 | you meant the 29th of June; correct? |
| 13:37 | 15 | A.  I don't remember what it states. |
| 13:37 | 16 | Q.  Okay.  The e-mail says:  "Also, you can |
| 13:37 | 17 | freely use my name as source after the |
| 13:37 | 18 | 29th." |
| 13:37 | 19 | Do you see that? |
| 13:37 | 20 | A.  Right.  I see that. |
| 13:37 | 21 | Q.  You sent that to Linette Lopez on June |
| 13:37 | 22 | 15th, 2018; correct? |
| 13:37 | 23 | A.  That is correct. |
| 13:37 | 24 | Q.  So you were telling her that she could use |
| 13:37 | 25 | your name as a source of the information that you |

Martin Tripp-Confidential

| | | |
|---|---|---|
| 14:07 | 1 | evening; right? |
| 14:07 | 2 | A.  I believe it was after 5:30.  It was |
| 14:08 | 3 | evening. |
| 14:08 | 4 | Q.  It was still light though; right? |
| 14:08 | 5 | A.  Yes. |
| 14:08 | 6 | Q.  Okay. |
| 14:08 | 7 | So after your interview with the |
| 14:08 | 8 | Sheriff's deputies, did you have communications |
| 14:08 | 9 | with reporters? |
| 14:08 | 10 | A.  I did. |
| 14:08 | 11 | Q.  And why? |
| 14:08 | 12 | A.  Because they knew that there was this |
| 14:08 | 13 | fabrication, and I'd been speaking with them about |
| 14:08 | 14 | it, and so I called them back to tell them what had |
| 14:08 | 15 | happened after the interview with the Sheriff. |
| 14:08 | 16 | Q.  So did you speak with reporters prior to -- |
| 14:08 | 17 | on the 20th, prior to the interview with the |
| 14:08 | 18 | Sheriff's deputies? |
| 14:08 | 19 | A.  Yes. |
| 14:08 | 20 | Q.  And you told them that you believed the |
| 14:08 | 21 | threat to the Gigafactory was a fabrication. |
| 14:09 | 22 | A.  Yes. |
| 14:09 | 23 | Q.  And then after your interview with the |
| 14:09 | 24 | Sheriff's deputies you -- you also spoke with |
| 14:09 | 25 | reporters. |

| 14:09 | 1 | A. That is correct. |
| 14:09 | 2 | Q. Was that by phone? |
| 14:09 | 3 | A. Yes. |
| 14:09 | 4 | Q. Beforehand was by phone as well? |
| 14:09 | 5 | A. Yes. |
| 14:09 | 6 | Q. Okay. Who did you talk to? |
| 14:09 | 7 | A. Julie Wong and Drew Harwell. |
| 14:09 | 8 | Q. And Julie Wong is a reporter with The |
| 14:09 | 9 | Guardian; right? |
| 14:09 | 10 | A. Yes, she was at the time. |
| 14:09 | 11 | Q. And at the time Drew Harwell was a reporter |
| 14:09 | 12 | with The Washington Post; correct? |
| 14:09 | 13 | A. I believe that's true. |
| 14:09 | 14 | Q. And why did you think it was important to |
| 14:09 | 15 | tell them that this was a fabrication? |
| 14:09 | 16 | A. Because they're the ones that told me about |
| 14:09 | 17 | the threat. |
| 14:09 | 18 | Q. Okay. So they contacted you. |
| 14:09 | 19 | A. Yes. |
| 14:09 | 20 | Q. By e-mail or by phone? |
| 14:09 | 21 | A. (No response.) |
| 14:09 | 22 | Q. How did they contact you? |
| 14:09 | 23 | A. I cannot remember exactly if it was both. |
| 14:09 | 24 | Q. And then you forwarded to them the e-mail |
| 14:10 | 25 | exchange between you and Mr. Musk; right? |

Martin Tripp-Confidential

| | | |
|---|---|---|
| 14:49 | 1 | A.   During a one-on-one with myself, Imari |
| 14:49 | 2 | Henderson, and Michael Bowling just prior to this, |
| 14:49 | 3 | I was told that I was no longer a lead and there |
| 14:49 | 4 | was no such thing as a lead, yet I had to interact |
| 14:49 | 5 | with my counterparts in the other departments that |
| 14:49 | 6 | were considered leads, and I still had to perform |
| 14:49 | 7 | the same duties.  But at that point I was looked |
| 14:49 | 8 | down upon, and I felt I was being discriminated |
| 14:49 | 9 | against because I was being treated differently than |
| 14:50 | 10 | my peers, but I still had the same expectations of |
| 14:50 | 11 | me to do the same duties as I was doing.  And even |
| 14:50 | 12 | they were looking down upon me, kind of making jokes |
| 14:50 | 13 | about it. |
| 14:50 | 14 | Q.  You had the same pay; right? |
| 14:50 | 15 | A.  I don't know if it was the same pay or not. |
| 14:50 | 16 | Q.  Well, your pay didn't change; right? |
| 14:50 | 17 | A.  That is correct. |
| 14:50 | 18 | Q.  And you say you were being discriminated |
| 14:50 | 19 | against by whom? |
| 14:50 | 20 | A.  By Michael Bowling, Imari Henderson, the |
| 14:50 | 21 | process engineering technician supervisors for the |
| 14:50 | 22 | Stator line, many of the process engineering |
| 14:50 | 23 | technicians, my counterparts in the final assembly, |
| 14:50 | 24 | rotor, and inverter areas. |
| 14:50 | 25 | I don't know if I said Michael Bowling. |

```
14:57    1        A.  I was assigned to train the two latest

14:57    2    nightshift technicians, so I was training them, and

14:57    3    they started working with their respective shifts,

14:57    4    and they came to me asking why -- I believe they

14:57    5    were both on nights, and they were asking me why

14:57    6    nights was not performing their work.  Why they

14:57    7    were just going away and doing whatever for X

14:57    8    amount of time, and why they're getting pressured

14:57    9    by days, and I told them it was because there was a

14:58   10    lack of work ethic on nights.

14:58   11        Q.  On the nightshift.

14:58   12        A.  Yes, and they, of course, told the other

14:58   13    techs, and that came back to Mike Bowling.

14:58   14        Q.  Did you think it was fair for Mr. Bowling

14:58   15    to give you this verbal warning?

14:58   16        A.  I believe it was unfair.

14:58   17        Q.  And why was that?

14:58   18        A.  Because I had brought all these issues up

14:58   19    to him through the last several months, and they

14:58   20    were not addressed, and it just compounded and made

14:58   21    me look like a bad guy.  I -- I was...

14:58   22            There's -- there was a lot of animosity

14:58   23    towards me because of it, because of everything

14:58   24    that occurred and how it was handled directly by

14:58   25    Michael Bowling.
```

Martin Tripp-Confidential

| | | |
|---|---|---|
| 15:05 | 1 | what's Exhibit -- is marked as Exhibit 71. |
| 15:05 | 2 | So Exhibit 71, the top e-mail is an |
| 15:05 | 3 | e-mail that you sent from your work e-mail to your |
| 15:05 | 4 | private or personal e-mail on June 8th, 2018; right? |
| 15:06 | 5 | A.  Yes. |
| 15:06 | 6 | Q.  Okay.  So you were just forwarding an |
| 15:06 | 7 | internal Tesla e-mail between you and Chris Lister. |
| 15:06 | 8 | A.  And Elon and JB Straubel. |
| 15:06 | 9 | Q.  Right.  Well, you sent it to Chris Lister, |
| 15:06 | 10 | and copied Elon Musk and JB Straubel; right? |
| 15:06 | 11 | A.  You're correct, yes. |
| 15:06 | 12 | Q.  Okay. |
| 15:06 | 13 | So it says:  "Chris, thanks for spending |
| 15:06 | 14 | time with me today." |
| 15:06 | 15 | So you actually met with Mr. Lister on |
| 15:06 | 16 | June 8th? |
| 15:06 | 17 | A.  Yes, I did, for several hours. |
| 15:06 | 18 | Q.  Several hours. |
| 15:06 | 19 | Okay.  And Chris Lister was the head of |
| 15:06 | 20 | the Gigafactory. |
| 15:06 | 21 | A.  Yes.  I don't know his exact title, but |
| 15:06 | 22 | plant manager would be the -- |
| 15:06 | 23 | Q.  He was, over- -- overall, in charge of the |
| 15:06 | 24 | Gigafactory. |
| 15:06 | 25 | A.  He was what JB was previously. |

| 15:06 | 1 | Q.  Okay.  So that's pretty high up. |
| 15:07 | 2 | A.  Yes. |
| 15:07 | 3 | Q.  And you talked with him for several hours. |
| 15:07 | 4 | A.  Yes, I did. |
| 15:07 | 5 | Q.  And you told him about your concerns about |
| 15:07 | 6 | the scrap numbers. |
| 15:07 | 7 | A.  I told him about all my concerns, including |
| 15:07 | 8 | the safety issues. |

15:07  9    Q.  Huh.  You didn't mention Mr. Lister before.

15:07 10        So in your e-mail to him, can you point

15:07 11 to me where there is anything about the safety

15:07 12 issues?

15:07 13    A.  I was directed by him during that

15:07 14 conversation to let him handle that.

15:07 15    Q.  Hmm.  Okay.

15:07 16        So well why did you send this e-mail to

15:07 17 him then?

15:07 18    A.  I believe this was -- okay.  This was the

15:07 19 same day, so...

15:07 20        This was additionally concerns that the

15:07 21 process engineering technicians on that particular

15:08 22 shift, when I sent this e-mail, because they found

15:08 23 out that I had met with him, and they wanted to

15:08 24 voice their concern for the amount of scrap that we

15:08 25 had and were expecting on the line, and he had asked

Martin Tripp-Confidential

15:12      1    supposedly making statements to investors; right?

15:12      2         A.  Yes.

15:12      3         Q.  But the fact that he's telling the people in

15:12      4    charge of the Gigafactory to meet a certain goal,

15:12      5    you just thought that was, what, nothing?

15:12      6              MR. FISCHBACH:  Object to the form of the

15:12      7    question; misstates the exhibit.

15:12      8              THE WITNESS:  We had previously seen

15:12      9    e-mails -- e-mails similar to this, and nothing was

15:12     10    ever done, so it was everyone's impression -- when

15:13     11    they saw this e-mail, they laughed.

15:13     12         Q.  BY MR. GATES:  Okay.

15:13     13              So I guess, what, Gigafactory is going

15:13     14    to collapse tomorrow without Martin Tripp; right?

15:13     15              MR. FISCHBACH:  Objection; argumentative.

15:13     16              THE WITNESS:  I don't know.

15:13     17         Q.  BY MR. GATES:  You don't know, right.

15:13     18              You know James Ohlemann (phonetic);

15:13     19    right?

15:13     20         A.  Yes, I do.

15:13     21         Q.  He was one of your coworkers at the

15:13     22    Gigafactory.

15:13     23         A.  Yes.

15:13     24         Q.  You talked to him; right?

15:13     25         A.  When?

Martin Tripp-Confidential

| 15:13 | 1 | Q. When you were at the Gigafactory. |
| 15:13 | 2 | A. On rare occasion. |
| 15:13 | 3 | Q. Did you talk to him after you were |
| 15:13 | 4 | terminated? |
| 15:13 | 5 | A. Yes. |
| 15:13 | 6 | Q. About what? |
| 15:13 | 7 | A. He conveniently showed up at the Nugget |
| 15:13 | 8 | Casino & Hotel on four different occasions, and was |
| 15:13 | 9 | voicing his concern about money, and the quality |
| 15:14 | 10 | issues that he had seen and why he was wrongfully |
| 15:14 | 11 | term- -- in his eyes wrongfully terminated by Tesla. |
| 15:14 | 12 | Q. Uh-huh. |
| 15:14 | 13 | Did you ask him to talk to Linette |
| 15:14 | 14 | Lopez? |
| 15:14 | 15 | A. I asked him to -- if he would be interested |
| 15:14 | 16 | in speaking to a reporter. |
| 15:14 | 17 | Q. Okay. Did you put him in contact with |
| 15:14 | 18 | Linette Lopez? |
| 15:14 | 19 | A. I did, but I don't remember how that came |
| 15:14 | 20 | about. |
| 15:14 | 21 | Q. Did you engage in text exchanges with |
| 15:14 | 22 | Mr. Ohlemann? |
| 15:14 | 23 | A. Yes. |
| 15:14 | 24 | (Deposition Exhibit Number 73 was marked |
| 15:14 | 25 | for identification.) |

Martin Tripp-Confidential

```
15:14   1    Q.  BY MR. GATES:  So I'll give you what's
15:14   2  marked as Exhibit 73, which is a photograph of a
15:14   3  Samsung phone showing a number of text messages.
15:14   4          Do you recognize these text messages?
15:14   5    A.  I do.
15:14   6    Q.  Okay.  And these are text messages between
15:15   7  you and Mr. Ohlemann; right?
15:15   8    A.  I can't determine that from this, but
15:15   9  assuming it is the conversation I had, yes.
15:15  10    Q.  I'm sorry.  You said you recognized them.
15:15  11    A.  Yes.
15:15  12    Q.  Okay.  How do you recognize them?
15:15  13    A.  It's familiar, that conversation.
15:15  14    Q.  The conversation represented by the text
15:15  15  messages is familiar to you.
15:15  16    A.  Correct.
15:15  17    Q.  And that is a conversation that you had
15:15  18  with James Ohlemann.
15:15  19    A.  I believed it to be James Ohlemann.
15:15  20    Q.  Okay.  You believe that you were texting
15:15  21  Mr. Ohlemann and had this text conversation; right?
15:15  22    A.  Yes.
15:15  23    Q.  And is this your phone that the photograph
15:15  24  is coming from?
15:15  25    A.  No.
```

Martin Tripp-Confidential

| 15:15 | 1 | Q. Do you know where this photograph came |
| 15:15 | 2 | from? |
| 15:15 | 3 | A. I do not. |
| 15:15 | 4 | Q. So did you tell Mr. Ohlemann: |
| 15:15 | 5 | "Oh, if you are helpful, you will get |
| 15:15 | 6 | some money, I guarantee you." |
| 15:16 | 7 | A. Yes. |
| 15:16 | 8 | Q. Why did you tell him that? |
| 15:16 | 9 | A. On those occasions he expressed a dire need |
| 15:16 | 10 | for money, and he had some valuable information |
| 15:16 | 11 | regarding what was going on with the cooling tubes |
| 15:16 | 12 | and why he was wrongfully terminated. And I had |
| 15:16 | 13 | been speaking with an attorney regarding the SEC |
| 15:16 | 14 | tip being filed, and there was a possibility that |
| 15:16 | 15 | there could be a large sum of money for an award, |
| 15:16 | 16 | and that's what that was discussing. There was no |
| 15:16 | 17 | promise of money made to him at all. |
| 15:16 | 18 | (Deposition Exhibit Number 74 was marked |
| 15:16 | 19 | for identification.) |
| 15:16 | 20 | Q. BY MR. GATES: Let me give you what is |
| 15:16 | 21 | going to be marked as Exhibit 74. |
| 15:16 | 22 | So Exhibit 74 is another photograph of |
| 15:16 | 23 | a text conversation, and it appears to be the same |
| 15:17 | 24 | conversation that we see in Exhibit 73. Wouldn't |
| 15:17 | 25 | you agree with that? |

1           I CERTIFY that the foregoing deposition
2  was taken by me pursuant to Notice; that I was then
3  and there a Certified Reporter for the State of
4  Arizona, and by virtue thereof authorized to
5  administer an oath; that the witness before
6  testifying was duly sworn by me to testify to the
7  truth; that the questions propounded by counsel and
8  the answers of the witness thereto were taken down
9  by me in shorthand and thereafter transcribed under
10  my direction, and that the foregoing typewritten
11  pages contain a full, true, and accurate transcript
12  of all proceedings had upon the taking of said
13  deposition, all done to the best of my skill and
14  ability; that deposition review and signature was
15  requested.

16           I FURTHER CERTIFY that I am in no way
17  related to nor employed by any of the parties
18  hereto, nor am I in any way interested in the
19  outcome hereof.

20           DATED at Phoenix, Arizona, this 16th
21  day of September, 2019.

22

23           _____
             David M. Lee, RMR, CRR
24           Arizona Certificate No. 50391

25