# Exhibit 2
# Nicolas Gicinto Deposition Excerpts

MSJ_047



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







**(800) 528-3335**

**NAEGELIUSA.COM**

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**


TESLA, INC.,

        Plaintiff,

vs.                                    No.3:18-CV-00296-LRH-CBC

MARTIN TRIPP,

        Defendant.

_____


**CONFIDENTIAL**

**DEPOSITION OF**

**NICHOLAS RYAN GICINTO**


**TAKEN ON**
**TUESDAAY, AUGUST 27, 2019**
**9:58 A.M.**


**HOME2SUITES CONFERENCE CENTER**
**2001 MAIN STREET**
**KANSAS CITY, MISSOURI 64108**

1  misuse of confidential information.

2      Q.   Just to be clear that wasn't my question,

3  sir.  My question, sir, was:  When this case goes to

4  trial is that the subject matter you're going to

5  talk about, "Interview with Tripp; Tripp's misuse of

6  Tesla's confidential information?

7      A.   How -- I mean, how could I possibly know

8  what's going to happen in the future, going to

9  trial, right?  I'm not trying to be difficult, but I

10  don't -- it all depends on what you guys ask me so

11  ...

12      Q.   Well, is there something else you're going

13  to testify about that hasn't been disclosed in this

14  disclosure statement?

15      A.   I have no idea.  I wasn't part of

16  preparing this disclosure statement, so I didn't

17  work at Tesla this time, so I wasn't consulted about

18  it. This is the first time I've seen it.

19      Q.   Do you have any knowledge of Mr. Tripp

20  other than the subject matter listed here:

21  Interview with Tripp, Tripp's misuse of Tesla's

22  confidential information?

23      A.   Not that I am aware of, no.

24      Q.   You have no other knowledge of Mr. Tripp

25  other than what's stated in the subject matter

 1  **section of line 8 of page 3 of Deposition Exhibit 1?**

 2       A.   I mean, I had -- I had a couple of

 3  interviews with Mr. Tripp.  There are -- I mean

 4  anything that's I think probably on the --

 5  pertaining to the investigation of Mr. Tripp, I have

 6  general knowledge of that, so it all -- I guess

 7  again depends on what you ask me about and I'll

 8  answer to the best of my ability.

 9       Q.   **Anything else relative to this case that**

10  **you have information about other than what's listed**

11  **here?**

12            **MR. UMHOFER:**  Objection, vague and

13  ambiguous.  Calls for speculation.  Lacks

14  foundation.

15  **BY MR. FISCHBACH:**

16       Q.   **Do you understand the question, sir?**

17       A.   I understand it to be a super-broad

18  question and it's really difficult for me to know

19  how to answer that.

20       Q.   **Okay.  So you don't think you can answer**

21  **that question?**

22       A.   The way you've asked the question, I'm not

23  sure how to answer that.

24       Q.   **Okay.  Well, sir, I don't know what you**

25  **know, what's going on in your head so --**

```
 1        Q.    Kind of like being falsely accused of

 2   being a mass shooter?

 3            MR. UMHOFER:   Objection, calls for

 4   speculation.

 5        A.    I didn't accuse anybody of being a mass

 6   shooter.

 7   BY MR. FISCHBACH:

 8        Q.    When did you first become involved in the

 9   investigation of Mr. Tripp?

10        A.    Sometime I would say around June of 2018.

11        Q.    Well, do you have a specific date?

12        A.    No.

13        Q.    Are there --

14        A.    Early -- early June.

15        Q.    -- any records or documents you could

16   point me to that would tell me precisely when you

17   became first involved?

18        A.    I don't.  I didn't bring anything we me.

19   I'm not an employee of Tesla.  I don't have access

20   to any records or documents.

21        Q.    How did you first get involved in the

22   investigation of Mr. Tripp?  And by that, I mean, I

23   am assuming somebody reached out to you, somebody

24   probably in Tesla management, and advised you of a

25   situation and wanted you to do something about it,
```

1  so I'm trying to get a grasp of how that came to be.

2      A.    So as I recall Linette Lopez reached out

3  to the communications team at Tesla stating that she

4  was about to print an article and was looking for

5  comments.  That generated some sort of an email

6  thread I would imagine because that's typically how

7  it works, and because it was my job to investigate

8  theft of intellectual property and confidential

9  information, that that made its way over to me, I

10 was included in some email at some point in time

11 bringing that to my attention to investigate the

12 source of that leak.

13     Q.    And how did you go about investigating the

14 source of that leak?

15     A.    Well, as I recall initially when it was

16 only one outreach from Ms. Lopez at that time and I

17 was the only member of the team because Tesla had

18 frozen hiring on my fourth day so I didn't have

19 anybody to help me do this at that point.  I think I

20 was a little backed up and I think I kind of put it

21 on the pile of things to do.  But it was shortly

22 thereafter, I don't know the exact date, I'm sorry,

23 a second re-inquiry came from Ms. Lopez about

24 another article and that bumped it up on my priority

25 list because that indicated that there was an

1   individual or individuals with ongoing access

2   providing a flow of information.  So I looked closer

3   into those threads and started to make some phone

4   calls into the individuals who would have knowledge

5   of the subject matter that was being discussed in

6   her articles, because I'm not an expert in whatever

7   those issues were, right?  Whenever there is a leak

8   of information in a company it can come from

9   anywhere, and as a security investigator I have to

10   go to the people who know about that particular

11   issue that's being discussed in that article and get

12   up to speed from them to understand more about, is

13   this significant, why is this important, who had

14   access to the information, talk to me about what do

15   you think is this a big deal, so I took those

16   initial investigative steps.

17

18

19

20

21

22

23

24

25

```
1  ███████████████████████████████████████████
2  ██████████████████████████████████████
3  █████████████████████████████████████
4  ██████████████████████████████████████
5  ███████████████████████████████████
6  ███████████████████████████████████████████
7  ██████████████████████████████████████████
8  █████████████████████████████████████
9  ████████████████████████████████████████
10 ████████████████████████████████████████████
11 ███████████████████████████████████████████
12 ████████████████████████████████████████
13 ████████████████████████████████████████
14 ███████████████████████████████████████████
15 ███████████████████████████████████████████
16 ████████████████████████████████████████
17 ███████████████████████████████████████████
18 ███████████████████████████████████████
19 ████████████████████████████████████████████
20 ████████████████████████████████████████
21 ███████████████████████████████████████
22 ███████████████████████████████████████████
23 ████████████████████████████████████████████
24 ████████████████████████████████████████████
25 ████████████████████████████████████████████
```

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████

5 ██████████████████████████████████

6 █████████████████████████████████

7 ████████████████████████████████

8 ███████████████████████████████████████

9 ██████████████

10      Q.     Kind of like DNA evidence almost, the odds

11 are one in a trillion it could be somebody else?

12      A.    Digital DNA is a good way to put it and --

13 but that wasn't the only factor.  We are able to

14 attribute a number of other pieces of data that were

15 in the -- that was in the articles to him and his

16 ability to access that based on emails he had

17 received, so we could tie each -- each data point to

18 him in some form or fashion.

19      Q.     When did you -- when was this smoking gun

20 identified, the digital DNA?

21      A.    The night of the day -- the night prior to

22 when we interviewed him for the first time.

23      Q.     I will represent to you at least based on

24 the discovery here that the interview occurred on

25 both the 14th and 15th of June.  Do those dates jibe

Nicholas Gicinto   August 27, 2019   NDT Assgn # 30275-3

1  with your recollection?

2      A.   Yes.

3      Q.   So it sounds to me like you discovered the

4  smoking gun, the digital DNA, the evening of June

5  13th, 2018?

6      A.   That makes sense as I recall.  We were

7  very low on sleep, we were doing a lot of work

8  working long, long days, so I'll do my best to be

9  accurate here.

10     Q.   I appreciate that.

11     A.   Sure.

12     Q.   Well, you certainly identified the smoking

13  gun digital DNA before you interviewed Martin Tripp

14  on June 14th, correct?

15     A.   Correct.

16     Q.   You, like a good investigator, showed up

17  to the interview armed with the knowledge that Mr.

18  Tripp had done this, correct?

19     A.   Yes.

20     Q.   At this time were you in communicate --

21  and again, I don't -- your attorney's attorney-

22  client objection is well stated, so I'm not asking

23  what was said, but at this time were you

24  communicating with Tesla's attorneys?

25     A.   Yes.

1       Q.   Were you communicating with in-house

2   counsel or -- I always hated this word -- outhouse

3   counsel?

4           MR. UMHOFER:  I use outside counsel.

5   BY MR. FISCHBACH:

6       Q.   Outside counsel.  Were you communicating

7   with in-house counsel, outside counsel, or both?

8       A.   With as I recall in-house counsel.

9       Q.   Okay.  Now, Mr. Nocon relayed to me that

10  the entire investigation of Mr. Tripp was done at

11  the behest of and in coordination with Tesla's

12  attorneys; is that a fair statement?

13      A.   I think that's a fair statement.

14      Q.   So in terms of the investigation, I'm

15  trying to get a date range.  So sometime in early

16  June of 2018, was -- sometime after Linette Lopez

17  gave the heads-up that the article was coming and

18  certainly before you interviewed Mr. Tripp,

19  somewhere between those two events is when the

20  investigation got started?

21      A.   I -- so if you are saying the interview

22  was on the 14th, we hit the ground that Monday of

23  that week, so that would have been the 11th or -- I

24  would guess that we probably got -- really got into

25  it around the 10th.

1      Q.    Would you say that you were the lead

2  investigator, was that Jake Nocon the lead

3  investigator?  I'm trying to understand the dual

4  role the two of you had there.

5      A.    Sure.  I would say co-investigators, but I

6  was the only full-time employee at the time. So Mr.

7  Nocon was there in a contractor role through Nisos

8  Group, and then we had two additional colleagues

9  from Nisos who were provided forensic support.

10     Q.    Who were those additional colleagues

11  providing forensic support?

12     A.    I remember their first names, Willis and

13  Scott, so forgive me.  It's been a while.

14     Q.    Understood.  And you and Mr. Nocon -- you

15  were -- he wasn't a stranger to you, correct, you

16  had a previous relation or preexisting relationship

17  with Mr. Nocon, correct?

18     A.    Yes.

19     Q.    What was the nature of that preexisting

20  relationship?

21     A.    We worked together at Uber as well. And I

22  had known him -- known him for several years and I

23  was aware of his exceptional investigative skills,

24  integrity, and his knowledge of the investigative

25  process, particularly, you know, with his previous

1   role in NCIS.

2       Q.   **Previous role of what?**

3       A.   Naval Criminal Investigative Service.

4       Q.   **Oh, NCIS.   Thank you.**

5       A.   Yes.

6       Q.   **Did Mr. Nocon and Nisos Group, did they**

7   **get involved based on your recommendation or did you**

8   **need additional help or --**

9       A.    I needed help for the scope and magnitude

10  of an investigation like this, also given the sense

11  of urgency that was placed upon me, it was far

12  greater than one person could handle.   And as I

13  mentioned before, because hiring had been frozen on

14  my fourth day on the job, there was no one else

15  available with the skill set who was capable of

16  handling an investigation like this.

17      Q.   **So did you make a recommendation up your**

18  **own chain of command to procure the services of Mr.**

19  **Nocon and Nisos Group for this investigation?**

20      A.    I had the ability to choose vendors and my

21  boss Jeff Jones was also familiar with Nisos Group

22  as well and was comfortable using them.

23      Q.   **What was Jeff Jones' role at Tesla?**

24      A.    He was head of global security, senior

25  director of global security.   He was my boss.



1       Q.   So you made the decision on your own to

2   hire Nisos Group?

3       A.   I can't make -- I don't -- I didn't have

4   budget authority to do that.  I can't make a

5   decision on my own.  But I can say this is the

6   vendor we should use and here's why, and I

7   articulated that because they had the right skill

8   set, they were available and could respond on a

9   moment's notice, which is what we needed and they --

10  I also had knowledge of their -- from just work

11  history and knowing they were capable of performing

12  the skills we needed.  Typically you would go

13  through a process of evaluating vendors.  We didn't

14  have time.  We just didn't.  So we had to make a

15  decision quickly and you go with someone that you

16  know in that moment that you know can get the job

17  done.

18      Q.   So it sounds like realizing or

19  understanding that you were shorthanded and that

20  this was at least in your view a mission-critical

21  situation, you went to Mr. Jones and said I

22  recommend Nisos Group, I've worked with these guys,

23  they have the right skill set and Mr. Jones approved

24  that?

25      A.   He did and he also had knowledge of them

1  as well.  So it wasn't me unilaterally saying we

2  should use these guys that no one had ever heard of.

3  He was familiar with them as well, so this was not a

4  surprise, it wasn't a, you know, something that was

5  done in a vacuum and certainly not something that --

6  you know, they are a well-respected vendor.

7       Q.   Have you ever seen any of the motions or

8  pleadings or other filings, court filings in this

9  case?

10      A.   It's -- it's possible early on that I was

11 -- that I was on distro for certain things, but I

12 would have to see it to verify.

13      Q.   Upon distro meaning --

14      A.   Email.

15      Q.   -- emails from Tesla's counsel?

16      A.   Yes.

17      Q.   I think Mr. Tripp had several different

18 roles at the Gigafactory.  What was his role at the

19 time that you determined he had leaked information

20 to Business Insider?

21      A.   As I recall, he was a production

22 associate, but I -- I may be -- I may just not

23 recall.  It's been a while.

24 ████  ████████████████████████████████████

25 ████████████████████████████████████████████





17      Q.     And I appreciate you making that

18   distinction because you're right, there's kind of

19   two components of that, there's did he have

20   authority to access the information and did he have

21   authority to give it to Linette Lopez.  I want to

22   focus on the first question, which is, did Mr. Tripp

23   as part of his ordinary job duties have authority to

24   access the information in that Tableau?

25      A.     As far as I know he, because he was able

```
 1        A.    Okay.   May I ask who in Tesla prepared

 2   them?

 3            MR. GATES:   I don't know.

 4   BY MR. FISCHBACH:

 5        Q.    Probably Mr. Gates or the associate

 6   working for him.

 7        A.    Okay.

 8            MR. UMHOFER:   No pressure.

 9        A.    I -- I believe that is a true statement.

10   BY MR. FISCHBACH:

11        Q.    Okay.   Fair enough.

12        A.    I'm not trying to overly complicate it but

13   seeing a snippet out of a document when you don't

14   have the broader context of something bigger is

15   difficult at times.

16        Q.    I'll read you another statement.

17        A.    Okay.

18        Q.    In fact, I'll read it to you and then I'll

19   show it to you.

20        A.    Get ready.   Thanks.

21

22

23

24

25
```

1 ████████████████████████

2 ██  ████████

3 ████████  ██████████████

4 █████████████████████

5 ████████  ██████

6 ██  ████████████████████

7 ██████████████████████████████

8 ██████████████

9 ██  ████████████████

10 ██  ██████████████████████

11    Q.    We talked earlier about -- I don't like

12 putting words in your mouth, but I'm going to put

13 words in your mouth.   I believe you testified that

14 the fact that Tripp was able to access the data he

15 did was indicative of his authority to at least

16 access that data, correct?

17    A.    Based on the permissioning systems, if he

18 had access it was because he was given the authority

19 to access it, yes, assuming it was permissioned

20 correctly.

21    Q.    All right.   You obviously take issue with

22 how he used the data, but in terms of access he had

23 authority to access the information?

24    A.    Correct.   And as I -- as I recall, some of

25 that access had been limited based on some

```
 1  firearm to another employee at the Gigafactory.  We

 2  had also seen he had attempted online to sell

 3  firearms-related material.  So when you do a threat

 4  assessment you think here's an individual who is

 5  possibly armed, who obviously does not seem to hold

 6  a favorable opinion of the company based on his

 7  actions to subvert its livelihood and success, who

 8  failed to respond to directions when we asked him

 9  not to continue his contact with Ms. Lopez after the

10  first interview and he blatantly disregarded those,

11  we assessed that it was -- it was possible that he

12  could have posed a threat.

13        Q.    How do you know he blatantly disregarded

14  your instructions to not communicate with Lopez

15  after the first interview?

16        A.    Because he told me in the second interview

17  that right after -- and one of the last things I

18  said to him in the first interview was you are still

19  under a nondisclosure agreement, please do not have

20  anymore contact with Ms. Lopez.  And he said okay, I

21  understand.  And then in the second interview when I

22  asked him, have you had contact with Ms. Lopez, he

23  said, yes, right after the interview I called her.

24  He didn't -- after something like that, that

25  situation where he had interviewed with us for
```

1  something like four hours and had admitted to

2  exfiltrating intellectual property, confidential

3  information in violation of his agreements, he

4  didn't call his wife, he didn't call, you know, a

5  close friend, he called Linette Lopez.  He didn't

6  even get out of the gate first, which he admitted to

7  us.  So that in my estimation is a blatant disregard

8  of what I asked him not to do.

9      Q.   He said he didn't call his wife.  Is that

10 because Tesla was surreptitiously monitoring his

11 phone communications?

12     A.   That is absolutely laughable and frankly

13 offensive.

14     Q.   Well, why did you just testify under oath

15 that Mr. Tripp didn't call his wife?

16     A.   Because he told me he didn't.  He said,

17 and you can listen to the interview because it was

18 recorded, he called Linette Lopez.  That was the

19 first call he made.

20     Q.   Well, I didn't ask you what the first call

21 made was.  You said he didn't call his wife. How do

22 you know he didn't call his wife after the first

23 interview --

24     A.   Because he said to me --

25     Q.   Sir, remember, please don't talk over me.

1  related to him, I think, and that was tweeted with

2  photos and I believe she -- she had followed him

3  online and wrote some very positive or some comments

4  and affirmations about some of the things he said

5  about Tesla.  So then her interviewing Tripp I think

6  makes that indirect link, but I don't recall a

7  direct link.

8      Q.   Mr. Musk says based on what we've learned

9  so far the dollar amounts being paid for inside

10 info, hacking, are in the $50,000 range.  Did your

11 investigation uncover any information to verify what

12 Mr. Musk is claiming here?

13     A.   So Mr. Uhlmann informed us during an

14 interview that -- well, let me go back.  I don't

15 want to answer this incorrectly.  It wasn't Uhlmann,

16 it was others that we interviewed at the Gigafactory

17 who had -- sorry.

18          THE WITNESS:  Are we okay?  I snagged the

19 cord.

20          THE VIDEOGRAPHER:  Okay.

21          THE WITNESS:  Thank you.

22     A.   Others had entered who had informed us

23 that I believe it was Mr. Tripp had talked about the

24 going rate for information being $50,000.  But I

25 don't have a firm enough recollection to provide you

1  specifics here.

2  BY MR. FISCHBACH:

3      Q.   Did you ask Mr. Tripp during the interview

4  if he had been paid any money?

5      A.   I don't remember.  I'm sure the transcript

6  will show.

7      Q.   Other than what you just related to me,

8  any other information in your investigation that

9  substantiated the suggestion from Mr. Musk that

10  people were being paid $50,000 for inside

11  information on Tesla?

12      A.   So after that number had come up through

13  the course of some people mentioning that I believe

14  Tripp had thrown that number out, Mr. Uhlmann had

15  suggested to us that Mr. Tripp had been compensated

16  and was trying to get -- excuse me, Mr. Uhlmann to

17  provide information to Linette Lopez and that he

18  would be compensated for doing so.

19      Q.   Did Mr. Uhlmann tell you that Mr. Tripp

20  had made an explicit offer of payment or that he was

21  just reading that into what Mr. Tripp was saying?

22      A.   Well, he told us that that's what --

23  that's what Tripp was telling him.

24      Q.   Was it in the context of providing

25  information to Lopez or in the context of a

1  **whistleblower suit?**

2      A.   He didn't specify anything.  He never

3  mentioned anything about a whistleblower suit.  He

4  only specified talking to a reporter and that Tripp

5  was very anxious to get Uhlmann to speak to Linette

6  Lopez.

7      Q.   **Did Mr. Tripp ever reference anything to**

8  **Mr. Uhlmann about obtaining money through a**

9  **whistleblower lawsuit?**

10     A.   So I don't recall ever seeing or hearing

11 anything from Mr. Uhlmann specifically referencing a

12 whistleblower lawsuit.

13     Q.   **Are you saying it didn't happen or you**

14 **just don't recall it?**

15     A.   I'm saying I don't recall it.

16     Q.   **But again did Mr. Tripp ever tell Mr.**

17 **Uhlmann -- is it Uhlmann?**

18     A.   Your guess is as good as --

19     Q.   **My guess is as good as yours?**

20     A.   Yes.

21     Q.   **Did Mr. Tripp ever tell you that -- sorry,**

22 **did Mr. Uhlmann ever tell you that Mr. Tripp had**

23 **told you -- that is a terrible way to phrase that.**

24 **Did Mr. Uhlmann ever tell you that Mr. Tripp had**

25 **identified a specific source of payment?**

 1  **proprietary Tesla data.  I see that but in terms of**

 2  **trying to understand how it is he could hack data**

 3  **that he was permitted to access.**

 4      A.   I think it would -- the question would be

 5  would you have written that query to do anything

 6  else than to provide it to a third party or an

 7  outside individual who didn't have a reason to

 8  obtain it, right?  So if he is writing a query

 9  that's legitimately needed for his job, permitted

10  use.  But I think you're essentially hacking the

11  system, right, when you write a query that is meant

12  to then extract the data for an unauthorized or

13  impermissible use.

14      Q.   **So whether or not someone is hacking**

15  **depends on the ultimate use of the information?**

16      A.   I think in this case that seems to make

17  sense to me.

18      Q.   **Then it says transferring several**

19  **gigabytes of confidential and proprietary Tesla data**

20  **to entities outside the company, entities is a**

21  **plural.  What entities were they transferred to?**

22      A.   So it was transferred to Microsoft when it

23  was transferred to SharePoint.  It was transferred

24  to Linette Lopez.  And it was transfer -- I mean, he

25  transferred it to his personal account, right, which

1  was an unauthorized use.  It was transferred to

2  Microsoft onto their platform, into his personal

3  account, which was off the Tesla network which

4  couldn't be monitored and safeguarded to protect it,

5  and it was then transferred to Linette Lopez and

6  then, you know, as we stated before, any other

7  potential third party she should have shared it

8  with, Business Insider, her editor and then

9  ultimately the public, right, when Business Insider

10 published their information.

11      Q.   Paragraph 16 states while its

12 investigation is still in the early stages Tesla has

13 also discovered that Tripp authored hacking software

14 and placed it onto the computer systems of three

15 other individuals at the company so that

16 confidential Tesla data could be persistently

17 exported off its network from these other systems to

18 unknown parties.

19           Who are these three other individuals?

20      A.   So at the time that we were running our

21 investigation, which again, I agree was in the early

22 stages, that's when we had observed what appeared to

23 be an identical query that had been running on other

24 machines.  And so we -- we were still in the point

25 of forensic review where we had not yet then

1  my objective in the investigation is certainly to

2  identify the party that's responsible but also is to

3  protect Tesla and we needed to answer those

4  questions.  So it took some time to get to that

5  point with Mr. Tripp, but he also was not truthful,

6  and was evasive with questions.  As opposed to just

7  coming forth and admitting certain things, we had to

8  go about it in a roundabout way with him and it

9  certainly would have saved a lot of time if he would

10 have answered truthfully to many of our questions.

11      Q.    **Prior to the interview I think you said**

12 **that he had been given a loner laptop?**

13      A.    Yes.

14      Q.    **Why was that?**

15      A.    We needed to image his primary work

16 computer hard drive to look for evidence to

17 determine what he had exfiltrated.  We wanted to do

18 that as part of our investigation to see whether or

19 not he was the individual who had -- who had

20 provided the information to Ms. Lopez, but we also

21 then, if you confirm that, you want to see what --

22 what evidence is present on the laptop to either

23 frame that question of the extent of the damage

24 because you may possibly see forensic evidence to

25 suggest this is how much information was

1    exfiltrated, this is the means of which the party

2    exfiltrated the data.  So while we were doing that

3    process we issued him a loner laptop so he could

4    continue working because we were trying not to arise

5    suspicion at that time that he was a person of

6    interest in our investigation.

7         Q.    Did he indicate to you anything about

8    getting the loner and whether that ticked him off or

9    anything?

10        A.    He did state I believe in one of the

11   interviews that at the point we called him in to the

12   IT desk to turn in his laptop that he realized that

13   was -- that was an indicator that he had been caught

14   and he subsequently admitted, stated that he

15   continued to exfiltrate data on that loner laptop

16   despite knowing that he had been caught.

17        Q.    Now, when you said he was not being

18   truthful with you prior to your confronting him with

19   the smoking gun evidence, how did you know he wasn't

20   being truthful with you?

21        A.    Well, we knew he provided the information

22   to Linette Lopez based on the information recovered

23   in the course of our investigation.  So when we

24   asked him questions like have you ever heard of

25   Linette Lopez, and I'm trying to remember -- I don't

1    remember the specific questions we asked, but are

2    you aware of this article that was, you know,

3    written on so-and-so day that was in Business

4    Insider, have you ever heard of this publication,

5    and he said no, that was clearly not a truthful

6    statement.

7         Q.    So after you confronted him with the

8    smoking gun evidence, remind me again, what was his

9    response?

10        A.    He said, "It is what it is."

11        Q.    Did -- after that point was he truthful

12   with you for the rest of the interview?

13        A.    It's difficult to say.  I think what we

14   saw in certain instances was cooperation and

15   providing information, but it was hard for us to

16   tell in certain circumstances whether he was sharing

17   the full extent.

18        Q.    Let me give to you what will be marked as

19   Exhibit 15.

20             (Deposition Exhibit 15 was marked for

21   identification.)

22   BY MR. GATES:

23        Q.    Mr. Gicinto, do you recognize Exhibit 15?

24        A.    Yes.

25        Q.    Can you tell us what it is?

1        A.    It's a photo of Mr. Tripp's cell phone

2    that he voluntarily provided me to look at this --

3    this spreadsheet, and I took that photo with my

4    Tesla cell phone.

5        Q.    And how did he describe this spreadsheet

6    that he was showing to you?

7        A.    He described this as the spreadsheet that

8    he used to collect the data, the quantity, and

9    assign a dollar value of scrap from the Gigafactory

10   and he described this as the document that he had

11   shared on his personal Microsoft Cloud with Linette

12   Lopez.

13       Q.    Did he subsequently give you a copy of

14   that spreadsheet?

15       A.    He did.

16       Q.    I want to give to you what's going to be

17   marked as Exhibit 16.

18            (Deposition Exhibit 16 was marked for

19   identification.)

20   BY MR. GATES:

21       Q.    Okay.  So Exhibit 16 is a cover email and

22   then attached to it I will a represent are printouts

23   from an Excel spreadsheet that was attached to the

24   email.  Do you recognize Exhibit 16?

25       A.    Yes.

```
1   her a copy of the exact query that he ran -- that he

2   wrote and ran on our system to extract the data that

3   populates his spreadsheet.
```





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25        Q.     Going back to the interview with Mr.
```

1  that was living on our system or existing on other

2  laptops somewhere that was continuously collecting

3  data and pushing it out somewhere.  That created a

4  number of additional questions in our mind that were

5  unanswered.  This became an urgent -- a much more

6  urgent situation for us because we needed to know

7  that we could stop an additional leak particularly

8  with the type of data we're talking about in this

9  spreadsheet.  And so -- and because we couldn't

10 resolve that in 24 hours, we called him back to

11 provide commentary on this to see whether or not we

12 could resolve it.

13 █  ████████████████████████████

14 ██████████████████████████████████

15 ████████████████████

16 █  ██████████████████████████████

17 ██████████████████████████

18 █████████████████████████████

19 █████████████████████

20 ████████████████████████████████

21 ████████████████████████████████

22 ██████████████████████████████

23 ██████████████████████████████

24 ████████████████████████████

25 ████████████████████████████

1

2

3      Q.    Did you narrow it down all that night or

4  was did this take longer?

5      A.    This was the course of several days if not

6  a couple weeks.

7      Q.    So you call him in for the second

8  interview to try to get more information from him --

9      A.    Yes.

10      Q.    -- about the extent of the exfiltration?

11      A.    Yeah, and to try to -- try to resolve this

12  particular spreadsheet and whether or not it was

13  pushing information out, how it was drawing

14  information in an automated fashion, if that was the

15  case, and to try to understand yes, the scope of the

16  potential damage or ongoing, unauthorized activity

17  on the network.

18      Q.    Was there anything in the second interview

19  that you learned from Mr. Tripp that was concerning

20  to you?

21      A.    Right -- right off the bat when I asked

22  him if he had had any contact with Ms. Lopez, he

23  admitted that the first call that he made to my --

24  as I recall, the first call he made right after our

25  interview on the 14th was to Ms. Lopez.  And he

```
 1                        CERTIFICATE

 2

 3        I, the undersigned, David Leyland, am a videographer

 4   on behalf of NAEGELI DEPOSITION AND TRIAL.  I do hereby

 5   certify that I have accurately made the video recording of

 6   the deposition of Nicholas Gicinto, in the above captioned

 7   matter on the 27th day of August, 2019, taken at the

 8   location of Home2suites Conference Center, 2001 Main St.,

 9   Kansas City, MO 64108, consisting of 1 DVD(s).

10        No alterations, additions or deletions were made

11   thereto.

12        I further certify that I am not related to any of the

13   parties in the matter and have no financial interest in

14   the outcome of this matter.

15

16

17

18   _____

19    David Leyland, Videographer

20

21

22

23

24

25
```