Robert D. Mitchell (*admitted pro hac vice*)
William M. Fischbach III (*admitted pro hac vice*)
Ace Van Patten (Nevada Bar No. 11731)

**TB** TIFFANY & BOSCO
P.A.

Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016-4229
Telephone: (602) 255-6000
Fax: (602) 255-0103
E-mails: rdm@tblaw.com; wmf@tblaw.com; avp@tblaw.com
*Counsel for Defendant/Counterclaimant Martin Tripp*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN TRIPP, an individual,<br><br>Defendant.<br><br>---<br><br>MARTIN TRIPP, an individual,<br><br>Counterclaimant,<br><br>TESLA, INC., a Delaware corporation,<br><br>Counterdefendant | Case No. 3:18-cv-00296-LRH-CBC<br><br>**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S RESPONSE IN OPPOSITION TO TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 155]**<br><br>**ORAL ARGUMENT REQUESTED PER LR 78-1** |

I.     **Introduction and summary of argument.**

Tesla and its CEO hardly need introductions.  Tesla is a publicly traded automotive manufacturer based in Palo Alto, California, and is one of the most talked about companies in the world.  This is due in no small part to Tesla's outspoken CEO Elon Musk, a South African-born billionaire known for his controversial public statements on Twitter and in other media.  In comparison, Tripp is a Michigan-born electronics engineer who was

unknown to the world until Tesla launched a high profile lawsuit against him.

Tripp's defamation and false light invasion of privacy counterclaims are predicated on the following four statements:

1.     Musk's June 17, 2018 e-mail to all Tesla employees claiming that Tripp "had conducted quite extensive and damaging sabotage to [Tesla's] operations," that Tripp had made "direct code changes" to Tesla's computer systems, that Tripp's "stated motivation" for doing so was that Tripp "wanted a promotion he did not receive," and insinuating that Tripp was working with "Wall Street short sellers," "oil & gas companies," or "big gas/diesel car company competitors" that "want Tesla to die."  Counterclaim at ¶¶ 47-52.

2.     Musk's June 20, 2018 e-mail to the press claiming that Tesla "received a call at the Gigafactory that [Tripp] was going to come back and shoot people."  *Id.* at ¶¶ 53-65.

3.     Tesla's subsequent press releases issued on June 20, June 21, and June 22, 2018 claiming that it "received a phone call from a friend of Mr. Tripp telling [Tesla] that Mr. Tripp would be coming to the Gigafactory to 'shoot the place up.'"  *Id.*

4.     Musk's July 5, 2018 Twitter post insinuating that journalist Linette Lopez had bribed, or offered to bribe, Tripp.  *Id.* ¶ 67-70.

The gist of Tesla's motion is that Tripp cannot prove actual malice by clear and convincing evidence as to these statements, or that the statements are substantially true.  The Court should deny Tesla's motion for summary judgment for these reasons:

•     Tripp is not a limited purpose public figure because Tripp purposefully attempted to keep himself out of any controversy by serving as a confidential and anonymous source to Lopez.  Tripp lost his anonymity only because Tesla exposed Tripp as the source and then sued him in a high profile lawsuit.  *See* Part IV.A., *infra*.

•     Even if Tripp were a limited purpose public figure, Tesla's false statements about the active shooter threat were not germane to the controversy.  Part IV.B., *infra*.

•     Tesla's false statements about the active shooter threat did not pertain to a matter of public concern because Tesla sought only to disparage Tripp by falsely portraying him as a mass murderer.  Even if the active shooter threat was initially a matter of public

concern, it ceased being one once Tesla learned the threat was not viable.  Part IV.C., *infra*.

- Musk's June 17, 2018 e-mail is not subject to the intracorporate communications privilege because Musk engaged in excessive publication. *See* Part IV.D., *infra*.

- To the extent the actual malice standard applies, a reasonable jury could find that Tripp has shown actual malice by clear and convincing evidence.  *See* Part V, *infra*.

## II.   Response to Tesla's statement of material facts and Tripp's statement of additional material facts.

Tesla's statement of material facts is laced with argumentative commentary.  ECF No. 155 at 4:10 ("Tripp repeatedly and egregiously violated his promises."); 5:6 ("Tripp implemented his scheme to get his revenge on Tesla."); 7:1-2 ("[Tripp] was the very definition of a disgruntled employee.").  This violates the "spirit" of LR 56-1, because "[s]uch facially argumentative background material may be appropriate as part of a brief but cannot constitute a statement of undisputed facts."  *John Bordynuik Inc. v. JBI, Inc.*, 2:13-CV-01463-RFB, 2015 WL 153439, *3 (D. Nev. Jan. 13, 2015).

Nevertheless, Tripp must identify only those *material* facts in Tesla's motion that are in dispute, as required by LR 56-1.  *See Mattson v. Kelly*, 3:15-CV-00182LRHWGC, 2017 WL 4102463, *4 (D. Nev. Sept. 14, 2017).  With that in mind, most of the facts asserted in Tesla's statement of material facts are *immaterial*.  Whether Tripp was right or wrong about scrap levels in the Gigafactory, and whether Tripp was a good or bad employee, have no bearing on whether he must prove actual malice.  Under LR 56-1, Tripp need not respond to *immaterial* facts in dispute.

As to those material facts Tesla does assert, Tripp does not dispute them *per se*.  Tesla's statement of material facts is guilty of painting a misleading picture by omitting or putting a favorable spin on material facts.  Accordingly, Tripp supplies this additional statement of facts ("SOF"), which are material to the disposition of Tesla's motion.

1.   Before he contacted the media, Tripp twice e-mailed Musk with his concerns regarding scrap at the Gigafactory.  Deposition of Elon Musk ("Musk Depo.") at 14:20-

16:25, attached as **Exhibit A**; Musk Depo Ex. 3 and Ex. 4.

2.    Musk responded to one such e-mail by saying, "Getting scrap from when cells exit Panasonic to less than 1% needs to be a hardcore goal."  Musk Depo. Ex. 4.

3.    When Tripp first reached out to journalists via e-mail on May 27, 2018, he stated that he wished to remain anonymous.  Declaration of Michael Lifrak ("Lifrak Dec.") [ECF No. 156] at Ex. 27.

4.    As part of his job responsibilities, Tripp had authority to access all of the information he would later give to Lopez.  Deposition of Nicholas Gicinto at 35:6-38:20, 170:8-171:20 attached as **Exhibit B**.

5.    Based in part on information from Tripp, Lopez's articles published on June 4 and June 6, 2018 reported that the high production tempo at the Gigafactory caused Tesla to spend almost $150 million on scrap materials that year, and created potential safety hazards, such as Tesla repairing more than 1,000 punctured battery modules with adhesive and then placing them back on the manufacturing line.  Lifrak Dec. at Ex. 30 and Ex. 31.

6.    Lopez's articles did not identify Tripp as her confidential source at Tesla, and did not name Tripp specifically in any capacity.  *See id*.

7.    Tripp hoped the information he shared with Lopez would lead to changes at Tesla, but still wished to remain anonymous.  Deposition of Martin Tripp, attached as **Exhibit C** at 55:23-57:4.

8.    When Musk learned about Lopez's article, he thought Tesla had been "wronged" and wanted her source to pay a "legal penalty."  Musk Depo. at 18:23-19:16.

9.    Musk considered it "reckless for Lopez to publish [the] information from . . . Tripp without verifying it."  *Id.* at 38:14-17.

10.    When Musk sent out his June 17, 2018 e-mail to all Tesla employees, Tesla had approximately 30,000 employees.[1]  Musk Depo. at 22:24-23:21; Musk Depo. Ex. 7.

11.    Musk's June 17 e-mail pertained to Tripp.  Musk Depo. at 24:6-9.

---

[1] Tesla probably had closer to 40,000 employees, but the precise number is immaterial.

12.    Musk's June 17 e-mail did not reference that Tripp had given information to a reporter.  Musk Depo. Ex. 7.

13.    Musk had no evidence that Tripp had inflicted physical damage or hindered production at the Gigafactory when he sent the June 17 e-mail.  Musk Depo. at 24:10-25:16.

14.    When Musk sent the June 17 e-mail, he "did not have a complete investigation of the facts" surrounding Tripp.  *Id.* at 25:17-26:7.

15.    When Musk sent the June 17 e-mail, he had no evidence that Tripp was working with "Wall Street short sellers," "oil & gas companies," or "big gas/diesel car company competitors" that "want Tesla to die."  Musk Depo. at 26:17-29:9.

16.    Musk's June 17 e-mail was in the hands of at least one journalist as early as the following day.  Lifrak Dec. Ex. 44 at MSJ_508-09.

17.    On June 18, 2018, Musk sent another e-mail to all Tesla employees insinuating that Tripp may be involved with a fire at Tesla.  Musk Depo. Ex. 7 at TES-TRIPP_0001221.

18.    Musk had no evidence that Tripp had anything to do with the fire.  Musk Depo. at 30:16-31:6.

19.    News outlets, including Newsweek and CNBC, published Musk's statements about Tripp in his June 17 e-mail.  *See* Counterclaim [ECF No. 25] at Ex. A and Ex. B.[2]

20.    Tesla filed its Complaint against Tripp on June 20, 2018.  [ECF No. 1].

21.    At 8:57 A.M. that morning, after learning Tesla was suing him, Tripp sent Musk an e-mail with the title "Termination/Lawsuit."  Musk Depo. Ex. 8.

22.    The two subsequently engaged in an argumentative e-mail exchange in which Musk called Tripp a "horrible human being."  *Id.  See also* Musk Depo. at 33:1-35:14.

23.    Musk engaged in this exchange because he took Tripp's conduct "personally" and believed that Tripp had "gone out of his way to harm [Tesla]."  *Id.* at 36:5-9.

---

[2] The Court may take judicial notice of news articles referenced herein for the limited purpose of establishing that the information in those articles was published.  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

24.    Musk ended the e-mail exchange by saying, "[Betraying] your word of honor, breaking the deal you had when Tesla gave you a job and framing your colleagues are wrong and some come with legal penalties.  So it goes.  Be well."  Musk Depo. Ex. 8.

25.    Musk was not wishing Tripp "good fortune" by saying "be well."   Musk Depo. at 39:15-40:7.

26.    Private investigators working for Tesla were following Tripp before the June 20 e-mail exchange between Tripp and Musk.  Deposition of Sean Gouthro attached as **Exhibit D** at 64:11-67:8, 170:8-171:7; Gouthro Depo. Ex. 11.

27.    Later that day at 1:39 P.M., Shamara Bell, a Tesla employee working at its Las Vegas call center, received an anonymous call lasting about seven minutes.  Musk Depo. Ex. 13 at TES-TRIPP_0004323.

28.    At 1:53 P.M., Bell e-mailed her supervisor a description of the call.

> Received a call.

> Caller preferred to remain unknown.  Friend of Martin Tripp is concerned that he may do something violent & volatile.  Says he is concerned because he's very hostile very well armed.

Musk Depo. Ex. 10.

29.    The caller did not initially mention Tripp by name, but Bell deduced that the caller was referring to Tripp because a co-worker had "advised [her] of the Martin Tripp story that broke" regarding Tesla's lawsuit.  Musk Depo. Ex. 13 at TES-TRIPP_0004324.

30.    The anonymous call came from a blocked number, and Tesla's call center was using phones that did not record calls.  Lifrak Dec. Ex. 38 at MSJ_459.

31.    The anonymous caller never stated that Tripp "was going to come back and shoot people" or that he "would be coming to the Gigafactory to shoot the place up."  Musk deposition at 73:12-15; Musk Depo Ex. 14; Deposition of Shamara Bell, attached as **Exhibit E**, at 48:2-10, 56:10-19, 59:6-22.

32.    Based on the anonymous call, Tesla employee Sean Gouthro, the security operations supervisor for the Gigafactory, reported an "active shooter threat" to the Storey

1  County Sheriff's Office at approximately 2:13 P.M.   Gouthro Depo. at 25:23-26:1, 75:18-
2  76:13, 77:4-78:19; Lifrak Dec. Ex. 47 at MSJ_520.

3        33.    When the call came in to the Las Vegas call center, Tesla's private
4  investigators were following Tripp in Reno.  Gouthro Depo. at 106:14-108:7.

5        34.    Gouthro and other Tesla employees were in regular contact with the private
6  investigators, particularly if there was any indication Tripp was heading toward the
7  Gigafactory.  Gouthro Depo. at 66:8-22, 107:3-108:7.

8        35.    Interstate Highway 80 is the only road that directly connects the Gigafactory
9  with Reno, and the drive usually takes about 20 minutes.  *Id.* at 106:7-13.  *See also*
10 *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1358 (9th Cir. 1998) ("The court
11 may take judicial notice of undisputed geographical facts.").

12       36.    Jake Nocon, one of Tesla's private investigators that had been investigating
13 Tripp, initially instructed Gouthro to withhold from the Sheriff's deputies the fact that
14 Tesla's private investigators were following Tripp.  Gouthro Depo. at 175:12-176:18.

15       37.    Gouthro would later share information with Sheriff's deputies regarding
16 Tripp's whereabouts, and when asked how he knew this information, Gouthro responded,
17 "little birds sing."  Lifrak Dec. Ex. 47 at MSJ_522.

18       38.    At 4:38 P.M., journalist Julia Wong e-mailed Musk seeking comment on
19 Tesla's lawsuit against Tripp.  Musk Depo. at 42:11-24; Musk Depo. Ex. 9 at TES-
20 TRIPP_0016929-30.

21       39.    Musk responded at 5:29 P.M. by sending Wong a copy of his exchange with
22 Tripp that morning, and stating, "I was just told that we received a call at the Gigafactory
23 that he was going to come back and shoot people."  *Id.* at TES-TRIPP_00169324.

24       40.    Musk copied employees Dave Arnold and Sarah O'Brien from Tesla's
25 communications team on his e-mail response to Wong.  *Id.*

26       41.    Tesla has a communications team to respond to such press inquiries, but Musk
27 chose to respond to Wong personally to discuss Tripp.  Musk Depo. at 42:25-43:12.

28       42.    When Musk sent this e-mail to Wong, he lacked specific information

1  regarding the active shooter threat, and the only evidence Tesla had was the anonymous

2  call.  *Id.* at 43:24-47:16, 52:8-58:8; Musk Depo. Ex. 12 (Tesla's Response to ROG 12).

3        43.    Musk's e-mail to Wong was the first communication from Tesla to the press

4  regarding the active shooter threat.  Musk Depo. at 50:11-51:5.

5        44.    Musk chose to inform Wong of the active shooter threat personally because he

6  was concerned that Wong "was clearly writing the story as though Mr. Tripp was the . . .

7  wronged party when he was, in fact, not the wronged party."  Musk Depo. at 60:12-61:9.

8        45.    Musk expected Wong to publish the information he provided regarding the

9  active shooter threat.  *Id.* at 63:9-24.

10       46.    After being copied on Musk's 5:29 P.M. e-mail to Wong, O'Brien e-mailed

11  Musk two minutes later and said, "I'll take it from here."  Musk Depo. Ex. 16; O'Brien

12  Depo. Ex. 7.

13       47.    At 5:55 P.M.—twenty-six minutes after Musk's "come back and shoot

14  people" e-mail to Wong—O'Brien  sent a formal press release to Wong:

15              Just so you have a statement for the tip we received and I've

16              included some additional background below.

17              **Attributed to a Tesla spokesperson:**

18              This afternoon, we received a phone call from a friend of Mr.
            Tripp telling us that Mr. Tripp would be coming to the

19              Gigafactory to "shoot the place up."  Police have been notified
            and actions are being taken to enhance security at the

20              Gigafactory.

21  Musk Depo. Ex. 17 at TES-TRIPP_0010122 (emphasis in original) (quotes in original).

22       48.    O'Brien's e-mail also repeated the essential allegations from Tesla's lawsuit

23  filed earlier that morning, such as claims that Tripp had "stole[n] Tesla data through highly

24  pernicious means" and that Tripp had "grossly exaggerated the value and amount of scrap

25  material at the Gigafactory."  *Id.*

26       49.    At 6:43 P.M., Sheriff's deputies found Tripp in Reno unarmed, "visibly

27  shaken," and "crying."  Lifrak Dec. Ex. 47 at MSJ_522.

28

50.     After interviewing Tripp, Sheriff's deputies "concluded that Tripp was not armed, did not likely have access to firearms, and did not present a threat at that time." *Id.* at MSJ_523.

51.     At 7:19 P.M., Chief Sheriff's Deputy Dosen communicated to Gouthro that "the active shooter threat was not viable at that time," and Gouthro immediately communicated this information to Jeff Jones, Tesla's Global Security Director. *Id.* at MSJ_523; Gouthro Depo. at 97:20-99:1.

52.     According to Gouthro, Tesla failed to perform an appropriate threat assessment of the anonymous call to determine if the active shooter threat was actually legitimate. *Id.* at 80:16-83:11.

53.     At 9:24 AM on June 21, 2018, Wong sent Musk, O'Brien, and Arnold the following e-mail: "The Sheriff's department has determined that there was 'no credible threat.' Does Tesla know who made the call?" O'Brien Depo Ex. 19.

54.     By this point O'Brien was getting information from the Tesla security team and was aware the active shooter threat was not viable. Deposition of Sarah O'Brien, attached as **Exhibit F**, at 140:7-141:18.

55.     Arnold claims he did not learn the active shooter threat was not viable until June 21, 2018, but cannot recall the precise time. Deposition of Dave Arnold, attached as **Exhibit G**, at 23:4-14.

56.     Tesla continued to send journalists the same press releases regarding the active shooter threat and lawsuit throughout June 21 and June 22, 2018. Lifrak Dec. Ex. 41, Ex. 42, Ex. 43, Ex. 44, Ex. 45; Musk Depo. Ex. 18; O'Brien Depo. Ex. 17 and Ex. 18; Counterclaim Ex. C (June 22, 2018 Tesla Press release to Ars Technica).

57.     These press releases omitted the fact that the Sheriff's Office had determined that the active shooter was not viable. Lifrak Dec. Ex. 41, Ex. 42, Ex. 43, Ex. 44, Ex. 45; Musk Depo. Ex. 18; Counterclaim Ex. C (Tesla Press release to Ars Technica).

58.     Tesla's communications team saw no reason to issue a retraction even after learning the active shooter threat was unfounded. Arnold Depo. at 24:1-6.

59.     Tesla's communications team would have issued the press release regarding the active shooter threat even after learning the active shooter threat was not viable.  Arnold Depo. at 22:16-24-6; O'Brien Depo. at 65:22-66:19.

60.     After the Sheriff's Office determined the active shooter threat was not viable, Musk directed Tesla's communications team to keep "pushing" the talking points in O'Brien's June 20, 2018 e-mail to Wong because Musk was "annoyed" that those talking points were "not cutting through."  O'Brien Depo. at 133:2-134:8; O'Brien Depo. Ex. 17.

61.     The "'shoot the place up'" statement in Tesla's press releases was published by media outlets on June 21 and 22, 2018, including Ars Technica, the Guardian, CNBC, Newsweek, Fortune, and the Washington Post.  *See* Counterclaim Exs. C, D, E, F, G.

62.     When asked at his deposition what message he intended to convey with his July 5, 2018 Tweet, Musk responded, "[O]ne of the members of Tesla security, had told me that there was some guy who was a friend of Tripp's who said that Linette Lopez had offered him $50,000 for, you know, basically insider information on Tesla and implied that Tripp had received similar payment."  Musk Depo. at 81:4-82:9.

63.     The "friend of Tripp's" was a terminated Tesla employee named James Uelmen, who e-mailed Musk on June 20 and June 21, 2018, begged for his job back, and offered to provide information on Tripp.  Musk Depo. Ex. 22 and Ex. 23.

64.     Musk responded to Uelmen via e-mail on June 21, 2018 and asked, "What is the situation with Marty [Tripp]?  How can I help?"  Musk Depo. Ex. 23.

65.     After Musk offered to help Uelmen, Uelmen began covertly assisting Tesla investigators by communicating with Tripp, and then reporting back what he learned to Tesla investigators.  *See generally* Lifrak Dec. Ex. 48 (Uelmen interview).

66.     Despite the "implication . . . that there was some quid pro quo," Musk insists that Tesla did not compensate Uelmen.  Musk Depo. at 86:19-91:5.

67.     Tesla's investigation of Tripp uncovered no evidence that Lopez compensated Tripp or offered to compensate Tripp.  Gicinto Depo. at 66:5-67:17; Jake Nocon deposition, attached as **Exhibit H**, at 109:13-24.

68.     Musk undertook no personal investigation to determine if Lopez compensated Tripp or offered to compensate Tripp.  Musk Depo. at 84:4-11.

69.     In July of 2018, Musk utilized Twitter user Bonnie Norman and her undisclosed associates on the internet to explore the theory that Tripp had infiltrated Tesla at the behest of Jim Chanos, a prominent short-seller of Tesla Stock.  Musk Depo. 91:13-99:23; Musk Depo. Ex. 24 and Ex. 25.

70.     Musk would e-mail Norman's investigative findings to his girlfriend, pop musician Claire Boucher, pka "Grimes," using the pseudonyms "Deth stayerr" and "C*" for Boucher.  Musk Depo. 91:13-99:23; Musk Depo. Ex. 24 and Ex. 25.

71.     Tesla's investigation of Tripp uncovered no evidence that Tripp was working with short sellers, "big oil," or Tesla's competitors.  Musk Depo. at 29:10-25; Musk Depo. Ex. 31 (Response to RFAs 15, 16, and 17); Nocon Depo. at 109:4-8.

72.     Musk wanted Tripp to face "legal penalties" for "misleading journalists about the state of [Tesla]."  Musk Depo. at 40:8-13.

73.     Musk believes Tripp is a "criminal" and "has no honor."  *Id.* at 102:2-14.

74.     Musk wanted to see "Tripp punished in the criminal justice system for what he had done at Tesla."  *Id.* at 103:104:12.

75.     Tesla's original counsel of record in this case, John Hueston, met with the FBI and Nevada Attorney General's Office to advocate for the criminal prosecution of Tripp. *Id.* at 105:23-106:4; Musk Depo. Ex. 26 at TES-TRIPP_0017352.

76.     No criminal prosecution occurred.  Musk Depo. at 104:13-14.

77.     Musk has never read Tripp's counterclaim to determine if its allegations are in fact true because he thinks "[Tripp] is just a huge liar and a criminal."  *Id.* at 126:2-16.

78.     Musk does not wish to retract any of the statements he made regarding Tripp. *Id.* at 117:16-120:16.

79.     Musk is "convinced" that Tripp is a "horrible human being" and regards him as a "traitor" to Tesla.  Musk Depo. at 35:10-14, 39:3-14.

80.     Musk regards Tripp as a "narcissistic sociopath."  *Id.* at 121:17-122:2.

81.     Musk's time is a "very precious commodity" given his responsibilities as CEO and at any given time, Musk has "10,000 things that [he] need[s] to worry about to have Tesla operate effectively." *Id.* at 13:12-14:16, 18:20-22.

82.     In an August 21, 2018 e-mail to Tesla's outside public relations consultant, Musk wrote, "Will Tweet as I wish and suffer the consequences.  So it goes."  Musk Depo. at 108:20-111:4; Musk Depo. Ex. 26 at TES-TRIPP_0017349.

83.     Tesla refuses to produce the communications and documents underlying its investigation of Tripp based on attorney-client privilege.  *See* Tesla's June 17, 2019 Response to Third Set of Requests for Production, Request # 21, attached as **Exhibit I**.

## III.     Applicable law and summary judgment standard.

Tripp has asserted claims for defamation, defamation *per se*, and false light invasion of privacy.  The elements of defamation in Nevada are (1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *Pope v. Motel 6*, 121 Nev. 307, 315 (2005). "A false statement involving the imputation of a crime has historically been designated as defamatory *per se*" and is "actionable without proof of damages." *Id.* A defendant may defame not only by express words, but also by insinuation and implication.  *Ornatek v. Nevada State Bank*, 93 Nev. 17, 20 (1977) (noting that a statement may convey a defamatory meaning when viewed in light of the "extrinsic circumstances," and even though "the defamation does not appear from the words themselves"); *see also Empire Printing Co v. Roden*, 247 F.2d 8, 14 (9th Cir. 1957) ("Defamation can be accomplished in a multitude of ways, [including] defamation by indirection, insinuations and associations, even if a direct and categorical charge were lacking.").  A statement is false for purposes of a defamation claim if the "gist or sting" of the statement was false.  *Rosen v. Tarkanian*, 453 P.3d 1220, 1224 (Nev. 2019).

To establish a claim for false light, the plaintiff must show that (1) the defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed

1   would be highly offensive to a reasonable person in the plaintiff's position.  Restatement

2   (Second) of Torts § 652E.  A false light claim may arise from "the false innuendo created by

3   the highly offensive presentation of a true fact."  *Godbehere v. Phoenix Newspapers, Inc.*,

4   162 Ariz. 335, 341 (1989) (citing Restatement (Second) of Torts § 652E).

5        A threshold issue in many defamation cases is whether the actual malice standard

6   applies.  "[A]ctual malice is proven when a statement is published with knowledge that it

7   was false or with reckless disregard for its veracity."  *Pegasus v. Reno Newspapers, Inc.*,

8   118 Nev. 706, 722 (2002) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280

9   (1964)).  "Reckless disregard for the truth may be found when the defendant entertained

10  serious doubts as to the truth of the statement, but published it anyway."  *Id.* at 722.

11  Whether or not the actual malice standard applies is a question of law.  *Hyland v. Wonder*,

12  972 F.2d 1129, 1134 (9th Cir. 1992) (whether speech is a matter of public concern is a

13  question of law); *Veterans in Politics Int'l, Inc. v. Willick*, 457 P.3d 970 n.1 (Nev. 2020)

14  (whether the plaintiff is a limited purpose public figure is a question of law); *Circus Circus*

15  *Hotels, Inc. v. Witherspoon*, 99 Nev. 56, 62 (1983) (whether a particular communication is

16  conditionally privileged is a question of law).

17       However, the standard of proof for actual malice is not as simple as Tesla suggests.

18  If the plaintiff is a limited purpose public figure, the plaintiff must prove actual malice by

19  clear and convincing evidence in all circumstances.  *Makaeff v. Trump Univ.*, 715 F.3d 254,

20  270 (9th Cir. 2013).  If the plaintiff is a private figure and the defendant's statements

21  involve a matter of public concern, a plaintiff need only prove negligence and falsity by a

22  preponderance of the evidence to recover special damages, but must prove actual malice by

23  clear and convincing evidence to recover presumed or punitive damages.  *Pike v. Hester*,

24  205 F. Supp. 3d 1190, 1196 (D. Nev. 2016), aff'd, 891 F.3d 1131 (9th Cir. 2018).  Where a

25  conditional privilege is applicable, a plaintiff need only prove actual malice by a

26  preponderance of the evidence.  *Pope*, 121 Nev. at 317.  Finally, a plaintiff must prove

27  actual malice on any false light claim, as it is an element of the tort.

28       To the extent the actual malice standard applies to Tripp's claims, Tesla still has a

heavy burden at summary judgment.  The Court should deny summary judgment "if there is sufficient evidence for the jury, by clear and convincing evidence, to reasonably infer that the publication was made with actual malice."  *Pegasus*, 118 Nev. at 721–22.  Similarly, "[w]here there are genuine evidentiary disputes over particular factual predicates of actual malice—such as questions about a witness's credibility—the issue is for the jury." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1113 (9th Cir. 2003). Finally, whether or not the statements at issue are false "is generally a question for the jury." *Nevada Indep. Broad. Corp. v. Allen*, 99 Nev. 404, 413 (1983); *accord Fink v. Oshins*, 118 Nev. 428, 437 (2002); *Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 929 (D. Nev. 2019).

**IV.     The actual malice standard does not apply to any of the statements at issue.**

> **A.     Tripp is not a limited purpose public figure because Tripp purposefully attempted to keep himself out of any controversy *vis á vis* Tesla by providing information confidentially to Lopez.  Tesla dragged Tripp into the public light with its investigation and high profile lawsuit.**

Tesla has the burden of demonstrating that Tripp is a limited purpose public figure. *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 347 ¶ 78 (Penn. 2008).  A limited purpose public figure is a person who places himself or herself—and not simply information—in the public eye for purposes of influencing a particular issue.  Limited purpose public figures are those that "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."  *Gertz v. Robert Welch*, *Inc.*, 418 U.S. 323, 345 (1974) (emphasis added); *see also Pegasus* 118 Nev. at 720 (adopting the *Gertz* test).  The prevailing rule after *Gertz* is that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."  *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 167-68 (1979).  As such, the actual malice standard applies only to those that "have thrust *themselves* to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id*. at 164 (emphasis added) (quotes omitted).

Under *Gertz* and *Wolston,* becoming a limited purpose public figure requires one to give up willingly the anonymity that goes with being a private citizen.  *See Merco Joint*

1    *Venture v. Kaufman*, 923 F. Supp. 924, 928 (W.D. Tex. 1996) (holding that the plaintiff's

2    extensive public relations campaign was "not the actions of an entity that wishes to remain

3    anonymous or private and therefore qualify [the plaintiff] as a limited purpose public

4    figure").   Here, Tripp purposefully avoided placing himself into any controversy by

5    providing information to Lopez confidentially.  SOF ¶¶ 1-3, 6, 7.  While he was hoping this

6    would cause Tesla to change its ways, SOF ¶ 7, by remaining anonymous Tripp never

7    "thrust" himself to the "forefront" of the controversy.

8         The fact that Tesla and its CEO are frequently in the news does not make Tripp a

9    limited purpose public figure.  "An individual does not become a limited purpose public

10   figure 'merely by stating a position on a controversial issue if he or she is not a principal

11   participant in the debate or is unlikely to have much effect on its resolution.'"  *Oracle USA,*

12   *Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1129 (D. Nev. 2014) (quoting *Tavoulareas v.*

13   *Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987)).  As Lopez's confidential source for two online

14   news articles, Tripp was not a "principal participant in the debate," nor was he likely "to

15   have much effect on its resolution."

16        Tesla cites no direct authority stating that a private person transforms into a limited

17   purpose public figure by serving as a journalist's confidential source.  The cases cited by

18   Tesla are distinguishable because the plaintiffs in those cases sought personal attention and

19   notoriety.  *See  Flowers v. Carville*, 310 F.3d 1118, 1122, 1129 (9th Cir. 2002) (plaintiff

20   was a limited purpose public figure because she sold the story of her affair with then-

21   candidate Bill Clinton to a national tabloid and personally held press conferences where she

22   played recordings of phone calls with Clinton); *Rudnick v. McMillan*, 25 Cal. App. 4th

23   1183, 1187, 1190-91 (1994) (plaintiff was a limited purpose public figure because he agreed

24   to multiple articles being written about himself and his ranch specifically to influence the

25   public issue).

26        Tesla also cites no direct authority stating that Tripp became a limited purpose public

27   figure because he assumed the risk he would lose his anonymity.  Again, the cases Tesla

28   cites are distinguishable.  In *Lluberes v. Uncommon Productions, LLC*, the plaintiff became

1     a "humanitarian attaché" to an outspoken religious figure and public advocate that became

2     the subject of a documentary.  663, F.3d 6, 15, n.8 (5th Cir. 2011).  In *Reuber v. Food*

3     *Chemical News,* the plaintiff was a widely published scientist who was "no stranger to the

4     scientific and political debates raging over the carcinogenicity of chemical pesticides." 925

5     F.2d 703, 706 (4th Cir. 1991).  Tesla otherwise relies on inapplicable cases involving people

6     that chose professions that naturally attract public controversy or scrutiny.  *See Lohrenz v.*

7     *Donnelly,* 350 F.3d 1272, 1274 (D.C. Cir. 2003) (plaintiff who volunteered to be a female

8     fighter pilot was aware of the public debate about women in combat); *Dombey v. Phoenix*

9     *Newspapers, Inc.*, 150 Ariz. 476, 481 (1986) (plaintiff was the designated insurance agent of

10    record for large county and administrator of deferred compensation program for county

11    employees); *McDowell v. Paiewonsky*, 769 F.2d 942, 950 (3d Cir. 1985) (plaintiff was a

12    public works architect that accepted a public project that was already the subject of public

13    scrutiny and likely to draw future criticism).

14        Nor was it foreseeable that Tripp would lose his status as a confidential source.

15    Nevada's robust news shield statute, N.R.S. § 49.275, protects journalists from being

16    compelled to divulge confidential sources and is "one of the most liberal in the country."

17    *Diaz v. Eighth Judicial Dist. Court*, 116 Nev. 88, 93 (2000).  *See also Laxalt v. McClatchy*,

18    116 F.R.D. 438, 452 (D. Nev. 1987).

19        Under Tesla's reasoning, a journalist's confidential source becomes a limited purpose

20    public figure if the subject of an unflattering news story can manage to smoke out the

21    source's identity.  But it is well established that the defendant cannot be the catalyst for the

22    plaintiff becoming a limited purpose public figure.  *Hutchinson v. Proxmire*, 443 U.S. 111,

23    135 (1979) ("[T]hose charged with defamation cannot, by their own conduct, create their

24    own defense by making the claimant a public figure."); *see also Pegasus*, 118 Nev. at 720.

25    In its motion, Tesla describes its extensive dragnet to uncover the unnamed source for

26    Lopez's articles.  ECF No. 155 at 7:20-8:4.  Tripp's anonymity was lost only because, after

27    an extensive investigation, Tesla summoned Tripp to an interrogation, obtained a

28    confession, and then initiated a high profile lawsuit that garnered immediate media

attention.  *Id.* at 8:5-12, 9:15; SOF ¶ 20.  Tripp did not thrust himself into the public debate; Tesla dragged him there.  The Court should therefore find that Tripp is not a limited purpose public figure for the defamatory statements at issue.

> **B.    Even if Tripp were a limited purpose public figure, Tesla's false statements regarding the active shooter threat were not germane to the information Tripp provided to Lopez or in Tesla's subsequent lawsuit.**

By definition, a limited purpose public figure is only considered a public figure for a "limited range of issues" within the "public controversy" at stake.  *Gertz,* 418 U.S. at 351-52  Even if Tripp were a limited purpose public figure with respect to Lopez's articles, Tesla's false statements regarding active shooter threat were unrelated to whatever "controversy" sprung from those articles.  *Makaeff*, *supra*, 715 F.3d at 266 (citation omitted); *Oracle*, *supra*, 6 F. Supp. 3d at 1129 ("[T]he alleged defamation must be germane to the person's participation in the controversy.").  The information Tripp gave to Lopez, and the articles themselves, pertained to production conditions at the Gigafactory, namely scrap levels and punctured batteries.  SOF ¶ 5.  *See also* ECF. No. 155 at 5:5-7:18.  This was the scope of any "controversy."  Even Tesla seems to concede that the scope of the public controversy was Tesla's operation and management.  ECF No. 155 at 14:16, 19:1-2.  Tesla's false statements regarding the active shooter threat are well outside that scope.

To the extent Tesla argues that Tripp was engaging journalists between June 20 and 22, 2018, this was only after Tesla had sued Tripp and journalists were seeking comment from both Tripp and Musk.  SOF ¶¶ 20, 21, 38; Lifrak Dec. Ex. 44 at MSJ_505.  Again, Tesla cannot push Tripp into the public limelight with a highly publicized lawsuit and then claim Tripp is a limited purpose public figure for seeking to defend himself in public.  *Hutchinson*, 443 U.S. at 135; *see also Wolston*, 443 U.S. at 166-67 (finding that the plaintiff was not a public figure in part because he "was dragged unwillingly into the controversy.").   Even if one were to view Tripp's post-suit engagement with journalists as him voluntarily entering the controversy, the controversy pertained to the issues raised in Tesla's lawsuit, not whether Tripp was a would-be mass murderer.

Tesla relies on *Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1298 (D.C. Cir. 1980) for the broad proposition that Tripp's "talents, education, experience, and motives" were all fair game once Tripp was in the public debate.  But *Waldbaum* is clear that such criticism must still be "germane to the plaintiff's participation in the controversy." *Id.* Whether or not Tripp was headed to the Gigafactory to shoot people was "wholly unrelated" to the issues raised in Lopez's articles and Tesla's lawsuit. *Id.*

Tesla also argues that the active shooter threat implicated criminal conduct, and was therefore for germane to Tripp's "credibility as a participant in the existing public debate regarding Tesla's operations." ECF No. 155 at 19:1-2.  Courts have rejected this argument. *See United States v. Flaharty*, 295 F.3d 182, 191 (2d. Cir. 2002) (holding that "nothing about" the witness's involvement in a prior murder "suggested that it would in any way reflect" on the witness' "truthfulness" and explaining that "[m]urder generally is not a crime of dishonesty"); *United States v. Meserve*, 271 F.3d 314, 328-29 (1st Cir. 2001) (holding that a "reputation of violence" was "completely irrelevant" to the "jury's credibility determination" and had "no bearing on [witness] credibility").

In sum, Tripp does not have to establish actual malice with respect to Tesla's false statements regarding the active shooter threat because they were not germane to the issue raised in Lopez's articles or Tesla's lawsuit.

C. **Tesla's statements regarding the active shooter threat did not pertain to a matter of public concern because they were motivated largely by Musk's personal grudge and his desire to preempt a favorable news story about Tripp.  Even if the active shooter threat was initially a matter of public concern, it ceased to be one once Tesla learned the threat was not viable.**

Whether speech pertains to "a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  Generally, "[s]peech on matters directly affecting the health and safety of the public is obviously a matter of public concern." *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997).  Yet the rule is not absolute.  The speaker's "motivation," including whether the speech stemmed from a

"private grudge," and the "chosen audience" of the speech, "are among the factors to be considered in light of the public's interest in the subject matter of the speech." *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 425 (9th Cir. 1995); *see also Pool v. Vanrheen,* 297 F.3d 899, 908 (9th Cir. 2002) ("Looking to the speaker's motivation has been suggested as helpful in determining public concern."); *Havekost v. U.S. Dept. of Navy*, 925 F.2d 316, 318 (9th Cir. 1991) ("One critical inquiry is whether the [speaker] spoke in order to bring wrongdoing to light or merely to further some purely private interest."). When the speaker's motivation appears to be largely vindictive, First Amendment protections do not apply. *See W.J.A. v. D.A.*, 210 N.J. 229, 244 (2012) (rejecting defendant's claim that public accusation his uncle molested him was a matter of public concern).

Musk's animosity towards Tripp is self-evident. *See* Part V.B., *infra*. It is particularly noteworthy that Musk, rather than Tesla's communications team, first disseminated the mass shooter narrative to the media with Musk's 5:29 P.M. e-mail to Wong on June 20, 2018—more than three hours after receipt of the anonymous call. SOF ¶¶ 38-41, 43. Musk was concerned that Wong was going to write a news story favorable to Tripp, and Musk sought to preempt this by feeding Wong the anonymous and unsubstantiated active shooter threat. SOF ¶¶ 44, 45. O'Brien's official press release followed 26 minutes later, ostensibly to validate Musk's statements. SOF ¶¶ 46, 47. O'Brien used the active shooter threat to piggyback the basic allegations in Tesla's lawsuit, such as that Tripp had "stole[n] Tesla data" and "grossly exaggerated" scrap levels at the Gigafactory. SOF ¶ 48. Meanwhile, Tesla had notified law enforcement of the anonymous call, security at the Gigafactory ramped up, and Tesla's private investigators tailing Tripp knew his whereabouts anyway. SOF ¶¶ 32-34. There was no public concern served by Tesla repeating an anonymous and unsubstantiated active shooter threat to the press over three hours later.

Any shooting or bomb threat—even one that is anonymous—should be reported immediately to law enforcement. Yet none of Tesla's cited cases involve a speaker with an obvious axe to grind. Here, Tesla disseminated the mass shooter narrative to the press just

1  to get the upper hand in its PR offensive against someone it had just sued.   SOF ¶ _.

2  Further, the analysis focuses on whether Tesla's various statements were a matter of public

3  concern "at the time of publication."   *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84

4  (2004); *Chancellor v. Town of Sportsmen Acres*, 11-CV-762-JED-FHM, 2013 WL

5  2422896, *4 (N.D. Okla. June 3, 2013) (citing *Roe*, 543 U.S. at 83-84).   Even if the active

6  shooter threat was initially a matter of public concern on the afternoon of June 20, it ceased

7  being one as of 7:19 P.M. that day when the Sheriff's Office advised Tesla the "active

8  shooter threat was not viable at that time."   SOF ¶¶ 49-51.   After that, there was no public

9  interest served by Tesla pushing the debunked active shooter narrative in its June 21 and

10  June 22 press releases.   SOF ¶¶ 53-57, 60.   *Dunn v. Carroll*, 40 F.3d 287, 293 (8th Cir.

11  1994) ("When what started out as protected debate turns into 'caustic personal attacks'

12  against colleagues in a public service workplace, the speech is no longer deemed relevant to

13  'a matter of public concern,' and is therefore not protected under *Connick*."); *Alderman v.*

14  *Pocahontas County Bd. of Educ.*, 223 W. Va. 431, 442 (2009) ("Because the issues were

15  resolved and unsubstantiated, they were no longer being asserted by [speaker] as a matter of

16  public concern. Rather, they were being asserted to embarrass and interrupt the business of

17  the Board and its members.").

18  **D.    Musk's June 17, 2018 e-mail to all Tesla employees was not protected by**
19  **the intracorporate communications privilege because Musk engaged in**
    **excessive publication.**

20        Tesla has the burden of establishing the existence of a qualified privilege.   *Simpson v.*

21  *Mars Inc.*, 113 Nev. 188, 191 (1997).   The intracorporate privilege is a qualified privilege.

22  *Gordon v. Dalrymple*, 2008 WL 2782914, *6 (D. Nev. July 8, 2008).   "[T]he intracorporate

23  privilege covers communications between individuals in a corporation only if the

24  communication occurs in the regular course of the corporation's business."   *Chocolate*

25  *Magic Las Vegas, LLC v. Ford*, 337 F. Supp. 3d 950, 958 (D. Nev. 2018) (quotes omitted).

26  The privilege applies only if the statement was made to a person within the corporation with

27  a justifiable interest in the subject matter of the statement. *Cummings v. Valley Health Sys.,*

28

1    705 Fed. Appx. 529, 531 (9th Cir. Aug. 11, 2017) (citation omitted).   Accordingly,

2    excessive publication will void the intracorporate privilege.  Restatement (Second) of Torts

3    § 604.

4          Even if one accepts Tesla's characterization of Musk's e-mail as a "communication[]

5    regarding an employee's performance or misconduct," ECF No. 155 at 18:5, Tesla cites no

6    authority that justifies sending such a communique to all 30,000 employees in the company.

7    SOF ¶ 10.  The two cases Tesla cites—*Gallues* and *Hoff*—involve intracorporate

8    communications to select employees.  *See, e.g., Gallues v. Harrah's Club*, 87 Nev. 624, 627

9    (1971) (privilege applied where "dissemination of the defamatory matter was to supervisory

10   personnel"); *Hoff v. Walco Int'l,* Inc., 03:11-CV-00623-LRH, 2013 WL 275298, *2 (D.

11   Nev. Jan. 23, 2013) ("[A]ll allegedly defamatory statements were made to management and

12   human resources personnel.").   There was also nothing in Musk's e-mail directing all Tesla

13   employees to hold the issue in confidence.  Virtually any statement by Musk tends to garner

14   media attention.  Given that his June 17 e-mail was obtained and published by the news

15   media the following day, SOF ¶¶ 16, 17, one could surmise that Musk anticipated, perhaps

16   even desired, that his e-mail would leak outside the company to the press.

17         It is certainly permissible for a CEO to send out a company-wide e-mail encouraging

18   employees to observe confidentiality protocols or remain vigilant for threats to the

19   company.  Musk could have done that without smearing Tripp before 30,000 people.  The e-

20   mail was an unnecessary exercise in excessive publication that is not entitled to protection

21   under the intracorporate privilege.  Restatement (Second) of Torts § 604(a) cmt. a ("[A]

22   privilege is abused by speaking defamatory words in the presence of persons whose

23   knowledge of them is unnecessary to the protection of the interest in question.").

24   **V.    To the extent the actual malice standard applies, Tripp has met his burden at**

25        **summary judgment under the clear and convincing standard.**

26        **A.    Actual malice is proven through circumstantial evidence, and summary**
             **judgment must be denied if there are sufficient facts in the record**

27             **through which the jury could find Tesla acted with actual malice.**

28   At summary judgment, it is not necessary that Tesla be "caught red handed" with

intentional prevarications.  All that is necessary is that there be sufficient evidence in the record through which a jury could "reasonably *infer* that the publication was made with actual malice."  *Pegasus*, 118 Nev. at 721-22 (emphasis added).  As noted *supra*, the standard of proof can be "clear and convincing evidence" or a "preponderance of the evidence" depending on the circumstance.  In the former, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986) (emphasis added).

Although the actual malice standard focuses on the defendant's subjective state of mind, proving actual malice necessitates reliance on circumstantial evidence, as defendants rarely confess they acted with actual malice.  *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence.").  "Professions of good faith [by the defendant] will be unlikely to prove persuasive. . . ."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  In the case of an entity defendant such as Tesla, the knowledge of an employee acquired in the course and scope of employment is imputed to the employer in the actual malice analysis under principles of *respondeat superior*.  *See Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 253 (1974); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989).  This applies even if one employee makes a statement in "good faith," while other employees have "knowledge of the actual or potential falsity of the information" in that statement.  *Dickinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 431 F. Supp. 2d 247, 259, 263 (D. Conn. 2006).

"[I]n most instances one factor alone will not establish actual malice by convincing clarity."  *Nevada Indep. Broad. Corp.*, *supra*, 99 Nev. at 415.  But "[r]ecklessness or actual malice may be established through cumulative evidence of negligence, motive, and intent."  *Pegasus*, 118 Nev. at 722.  Evidence of actual malice includes the following:

- A publication is "based wholly on an unverified anonymous telephone call" or

"there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. at 732.

- The defendant fabricates a statement made by a source, to include "wholly imagined but supposedly precisely quoted conversations" with the source. *Carson v. Allied News Co.*, 529 F.2d 206, 213 (7th Cir. 1976).

- "[W]hen a defendant failed to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contrary information," or engages in a "[p]urposeful avoidance of the truth." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir. 1987) (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967)).

- The defendant has a motive to defame the plaintiff or has demonstrated hostility or spite directed at the plaintiff. *Spacecon Spec. Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1042-43 (10th Cir. 2013); *Duc Tan v. Le*, 177 Wash. 2d 649, 669 (2013).

- The defendant refuses to retract or correct its statement once its falsity is exposed. *Golden Bear Distrib. Sys. of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983).

All of these factors are present here.

**B.    Tesla made false statements regarding the active shooter threat with actual malice because Tesla (1) materially altered the words used by the caller, (2) relied on an unverified, anonymous source (3) had a motive to defame Tripp, (4) knew Tripp's whereabouts the entire time, and (5) repeated these statements even after Chief Deputy Dosen advised Tesla's security team that the threat was unfounded.**

This much is clear: Tripp never headed toward the Gigafactory on June 20, 2018 with the intent of carrying out a mass shooting. The active shooter threat was a hoax. The question is whether Tesla knew it was or hoax, or recklessly disregarded this fact.

First, it is undisputed that the anonymous caller never used the words "shoot the place up," and never stated that Tripp was actually on his way to the Gigafactory. SOF ¶ 31. The precise words the caller used with Bell are imputed to Tesla. *Dickinson*, 431 F.

Supp. 2d at 259, 263.  Yet Tesla's official press releases on June 20, 21, and 22, 2018 put the words "shoot the place up" in quotes, as though the anonymous caller had used those words.  The fabricated quotation is evidence of actual malice.  *Carson*, 529 F.2d at 213. Tesla argues that the quotation is not false because it accurately conveyed the gist of what the caller said.  The Supreme Court has rejected such arguments.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 518 (1991) (rejecting Court of Appeals' determination that "an altered quotation is protected so long as it is a 'rational interpretation' of an actual statement").  In any event, the anonymous caller communicated a generalized, nonspecific concern about Tripp being angry and armed.  SOF ¶¶ 28.  Tesla's statements were explicit that Tripp was heading to the Gigafactory to shoot people.  SOF ¶¶ 39, 47, 56.  Whether or not such statements were "substantially true" is a jury question.  *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 466 (9th Cir. 1977).  Similarly, because Tesla failed to record the call (at a call center, no less, or even with a personal smart phone), SOF ¶ 30, it is for the jury to decide whether Bell's description of the call was even accurate.  *Cf. Harden v. State*, 128 Nev. 901 (2012) (where police officers failed to record interrogation, "it was for the jury to decide the credibility of the officers").

Second, the call of June 20, 2018 was anonymous, unverified, and originated from a blocked number, yet it was the sole basis for Tesla's statements regarding the alleged mass shooter threat.  SOF ¶ 27, 28, 30-32, 42.  This is also evidence of actual malice.  *St. Amant*, 390 U.S. at 732; *Makaeff*, 715 F.3d at 271.  The fact that Bell was able to deduce that the caller was referencing Tripp has little bearing.  Bell had learned about Tripp because Tesla's lawsuit filed earlier that day was in the news.  SOF ¶ 29.  More to the point, Tesla never corroborated the actual active shooter threat.  Like any company, Tesla hires and fires people daily.  Not all people who lose their jobs are potential mass murderers.  Musk has asserted that it was "reckless" for Lopez to publish unfavorable information about Tesla without first verifying Tripp's claims.  SOF ¶ 9.  It was no less reckless for Tesla to paint Tripp as a would-be mass murderer based on an anonymous and unverified phone call.

Third, Tesla—and Musk in particular—had an obvious motive to defame and

discredit Tripp before the public.  Tesla had just sued Tripp earlier that morning.  SOF ¶ 20.  Recall that the false mass shooter charge originated from Musk in his 5:29 P.M. e-mail to Wong—over three hours after the anonymous call.  SOF ¶ 43.  Musk gave this information to Wong because he was concerned that she might write a news story favorable to Tripp.  SOF ¶¶ 44.  Subsequent press releases from Tesla merely echoed what its CEO had already said about the active shooter threat.  SOF ¶¶ 47, 56.  Musk's acrimony towards Tripp was, and still is, palpable.  SOF ¶¶ 8, 10, 72, 73, 77-80.  Despite a busy job as Tesla's CEO, SOF ¶ 81, and despite having lawyers, investigators, and a communications team at his disposal, Musk repeatedly found the time to get personally involved when it came to Tripp.  SOF ¶¶ 21-25, 38-45, 63, 64, 66, 69-70.  Musk subscribed to the unusual theory that Tripp was dispatched by Jim Chanos or one of his other archenemies to infiltrate Tesla.  SOF ¶ 69.  Musk attempted (unsuccessfully) to have Tripp prosecuted.  SOF ¶¶ 76-76.  Musk even took the unusual step of engaging various internet sleuths outside of Tesla to investigate Tripp, and then gave those findings to his pop musician girlfriend.  SOF ¶¶ 69-70.  Musk sees Tripp as a "horrible human being" and a "traitor" to Tesla.  SOF ¶¶ 22, 24, 79.  Musk also cares little about the veracity of his public statements; he will say what he wishes and "suffer the consequences" later.  SOF ¶ 82.  Musk's animosity towards Tripp is not by itself determinative, but it is a "relevant consideration in evaluating other evidence to determine whether a statement was made with reckless disregard for its truth."  *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1259 (D.C. App. 2016), as amended (Dec. 13, 2018).

Fourth, Tesla knew Tripp's location the whole time.  Tesla's private investigators were tailing Tripp in Reno when the anonymous call was received and throughout the afternoon.  SOF ¶¶ 26, 33, 34.  Tesla deliberately misled the Sheriff's Office by initially concealing this fact.  SOF ¶¶ 36, 37.  Tesla's private investigators were regularly in contact with Tesla's internal security team who were employees of Tesla.  SOF ¶ 34.  There is only one road from Reno to the Gigafactory, and it would take approximately 20 minutes for Tripp to make the drive.  SOF ¶ 35.  If Tripp were "coming to the Gigafactory," Tesla's private investigators would know it instantly.  Even Gouthro, the head of Gigafactory

security, admitted that Tesla failed to validate the threat properly.  SOF ¶ 52.  Although Tesla has concealed much of its investigation regarding Tripp by invoking attorney-client privilege, SOF ¶ 83, the evidence is clear that Tesla's investigators, who were in direct contact with Tesla's internal security team, knew where Tripp was and what he was doing when the anonymous call came in.  The internal security team's knowledge is imputed to Tesla, *Dickinson*, 431 F. Supp. 2d at 259, 263, and Tesla as a whole therefore published an anonymous tip that was "weakened by inherent improbability [and] apparently reliable contrary information." *Zerangue*, 814 F.2d at 1070.  To the extent Tesla's communications team was not vetting information regarding the active shooter threat with Tesla's security team, the former engaged in a "purposeful avoidance of the truth" that could independently support a finding of actual malice.  *Harte-Hanks*, 491 U.S. at 692.  Further, whether or not Arnold and O'Brien should be believed as to when they did or did not learn the shooting threat was not viable is a matter of credibility for the jury to decide.  SOF ¶¶ 53-55.  *Suzuki*, *supra*, 330 F.3d at 1113.

Finally, Tesla continued to disseminate the false mass shooter narrative even after Sheriff's deputies had told Tesla the threat was not viable.  At 7:19 P.M., after interviewing Tripp, Sheriff's deputies "concluded that Tripp was not armed, did not likely have access to firearms, and did not present a threat at that time."  SOF ¶¶ 49, 50.  The Sheriff's deputies communicated this fact to Gouthro, head of Gigafactory security, who in turn immediately communicated the information to Jeff Jones, Tesla's Global Security Director.  SOF ¶ 51.  Yet subsequent Tesla press releases on June 21 and 22, 2018 deliberately omitted the Sheriff's findings that the threat was not viable.  SOF ¶¶ 56, 57, 61.  Tesla's communications team saw no need to issue clarifications, nor did it see any problem in continuing to publicize the active shooter narrative once it was determined to be unfounded.  SOF ¶¶ 58-61.  Tesla's alibi for this is that the subsequent press releases were accurate in so far as the anonymous call was in fact received.  But even technically true words can still be defamatory, especially when coupled with omissions of facts that create "a false impression." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 984 (9th Cir. 2002).

The factors above demonstrate why Tesla's reliance on *Cummings*, is misplaced.  In *Cummings*, the hospital security supervisory received a report from an employee named "Diane" who claimed that she had heard from "several employees" that Cummings had threatened to "shoot up the place" if she were fired.  The hospital supervisor informed hospital personnel that the access code to a door would be changed in response to the purported threat.  On the plaintiff's defamation claim, the Ninth Circuit affirmed the trial court's finding that the communication was protected by the intracorporate privilege because the supervisor acted in good faith.  *Cummings*, 705 Fed. Appx. at 532.  Unlike this case, the supervisor in *Cummings* (1) did not rely on an anonymous call from a blocked number, (2) did not materially alter the statement she received from Diane, (3) did not have an obvious motive to defame Cummings, (4) did not have private investigators tailing Cummings, and (5) did not repeat the statements about Cummings to the press after law enforcement found the threat to be unfounded.  The facts of *Cummings* are nothing like the instant case.

**C.** **Musk's statements in his June 17, 2018 e-mail to all Tesla employees were false and made with actual malice because (1) Tripp never committed "extensive and damaging sabotage," (2) Tripp did not rewrite Tesla's code, and (3) Tripp was never working with "Wall Street short sellers," "oil & gas companies," or "big gas/diesel car company competitors."**

"Whether a statement is capable of a defamatory construction is a question of law.  A jury question arises when the statement is susceptible of different meanings, one of which is defamatory."  *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 484 (1993). Tesla does not dispute that Musk's statements in his June 17, 2018 e-mail are capable of defamatory construction.  Rather, Tesla argues that Tripp cannot prove falsity.

Musk accused Tripp of "extensive and damaging sabotage to [Tesla's] operations."  SOF ¶ 11.  The Merriam-Webster dictionary (https://www.merriam-webster.com/) defines "sabotage" as "destruction of an employer's property (such as tools or materials) or the hindering of manufacturing by discontented workers," "destructive or obstructive action carried on by a civilian or enemy agent to hinder a nation's war effort," "an act or process

tending to hamper or hurt," or "deliberate subversion."  While Tesla may view Tripp's conduct as harmful to Tesla and therefore "sabotage" in the colloquial sense, Tesla overlooks the fact that Musk used the exact phrase "extensive and *damaging* sabotage," and that is the basis for Tripp's claim.

As to this statement, Musk has admitted to knowing that Tripp neither caused physical damage nor hindered production at the Gigafactory when Musk sent the e-mail. SOF ¶ 13.  Musk nevertheless reinforced the notion that Tripp had caused physical damage by sending a follow up e-mail suggesting that Tripp had something to do with a fire.  SOF ¶ 17.  Musk had no evidence for this assertion either.  SOF ¶ 18.  Musk made these statements without a complete investigation of the facts.  SOF ¶ 14.  Tripp gave information to a reporter, yet Musk said nothing about that.  SOF ¶ 12.  Instead, Musk made accusations of "damaging sabotage" when Musk knew there was no evidence of physical damage or production hindrance.  Musk's statement that Tripp had committed "extensive and damaging sabotage to [Tesla's] operations" was therefore false and made with actual malice.[3]

Next, Tesla's own evidence does not support Musk's charge that Tripp made "direct code changes" to Tesla's computers, or that his "stated motivation" for doing so was that he did not get a promotion.  *See generally* ECF No. 155 at 23.  Nothing in the cited portions of Tripp's interview even references his motivations for communicating with Lopez.  Nor would Tripp need to make any code changes to Tesla's Manufacturing Operating System, as he already had authority to access the data he would later give to Lopez.  SOF ¶ 4.

Finally, Tripp alleges explicitly that Tesla committed defamation and false light invasion of privacy through Musk's false insinuation that Tripp was working with "Wall Street short sellers," "oil & gas companies," or "big gas/diesel car company competitors." Counterclaim ¶ 51.  Tesla did not move for summary judgment as to this particular claim,

---

[3] It is of no moment that Musk's e-mail does not identify Tripp by name, so long as   "[A]n otherwise defamatory statement is actionable if the objects of the defamatory statement can be readily ascertained."  *Reynolds v. Reynolds*, 231 Ariz. 313, 318, ¶ 11 n.3 (App. 2013).

and it may not do so by seeking such relief in its reply.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").  Nevertheless, the record is clear that Musk had no evidence that Tripp was working with "Wall Street short sellers," "oil & gas companies," or "big gas/diesel car company competitors" when he sent the June 17 e-mail.  SOF ¶ 35.  This particular statement is therefore false and made with actual malice.  SOF ¶ 71.

> **D.**  **Musk's July 5, 2015 Tweet was intended to convey a factual message—namely that Lopez had compensated Tripp or offered to compensate Tripp to give her information.  This statement was false and Musk made it with reckless disregard for its veracity.**

With respect to Musk's July 5, 2018 Tweet, Tesla argues that a question can never be defamatory because questions are not statements of fact.  This misstates the law.  "A question can be defamatory, though it must reasonably be read as an *assertion* of a false *fact*; inquiry itself, however embarrassing or unpleasant to its subject, is not an accusation.  The language cannot be tortured to 'make that certain which is in fact uncertain.'"  *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993)) (emphasis in original).  *See also Point Ruston, LLC v. N.W. Reg. Council of the United Brotherhood of Carpenters and Joiners of Am.*, C09-5232BHS,  2010 WL 3732984, 8 (W.D. Wash. Sept. 13, 2010) (unpublished) (citations omitted) ("[U]sing a "?" at the end of a statement does not automatically insulate the [defendants] from liability for defamation.") (citing *Partington*).

When asked at his deposition what message he intended to convey with his July 5, 2018 Tweet, Musk responded, "[O]ne of the members of Tesla security, had told me that there was some guy who was a friend of Tripp's who said that Linette Lopez had offered him $50,000 for, you know, basically insider information on Tesla *and implied that Tripp had received similar payment*."  SOF ¶ 62 (emphasis added).  That Musk intended to convey a factual message is a given.  Even if reasonable jurors could reach different inferences on this point, summary judgment would be inappropriate.  *Nathanson v. Med. Coll. of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991) ("Summary judgment may not be

granted, however, if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

Musk implied that Lopez had bribed Tripp without any investigation on his part. SOF ¶ 68. Tesla's investigation of Tripp uncovered no actual evidence of payment. SOF ¶ 67. Tesla's undercover mole Uelmen explicitly told Tesla investigators that Tripp never said to Uelmen that Lopez paid him or offered to pay him. Lifrak Dec. Ex. 48 (Uelmen interview) at MSJ_539:4-22. Uelmen's subjective interpretation of Tripp's statements is a matter of credibility for the jury to decide. *Suzuki*, *supra*, 330 F.3d at 1113. Uelmen also had an obvious motive to fabricate or embellish, as he was desperate to get his Tesla job back and Musk had implied he could "help" in that regard. SOF ¶ 64, 65. Uelmen is the quintessential "informant" for which "there are obvious reasons to doubt [his] veracity . . . or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

Finally, Tesla' reliance on *Abbas v. Foreign Policy Group*, 783 F.3d 1328, 1338-40 (D.C. Cir. 2015) is unavailing. The policy consideration in *Abbas* was the preservation of journalists' ability to ask tough or even embarrassing questions as part of the news gathering process. "Reporters routinely and necessarily ask questions in order to obtain information, and the mere asking of a question may cast a shadow on the reputation of a person about whom the question is asked." *Id.* at 1339. Musk is no journalist. He is a mercurial billionaire with a Twitter account, millions of followers, and a score to settle with Tripp.

## VI.    Conclusion.

It was not enough for Tesla to terminate Tripp's employment and embroil him in a high profile lawsuit. Tesla—and Musk in particular—wanted to draw blood immediately while this litigation was in its infancy. So Musk and Tesla falsely portrayed Tripp as a saboteur, a corporate spy, and an unhinged mass murderer—and they did so either knowing their statements were false or in reckless disregard for their falsity. This Court should deny summary judgment for Tesla, and let a jury decide the validity of Tripp's counterclaims.

//

//

1 | DATED this 5th day of May, 2020.

2

3 | TIFFANY & BOSCO, P.A.

4 | By /s/*William M. Fischbach III*
    Robert D. Mitchell

5 | William M. Fischbach III
    Camelback Esplanade II, Seventh Floor

6 | 2525 East Camelback Road

7 | Phoenix, Arizona 85016-4229
    *Counsel for Defendant/Counterclaimant*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

**PROOF OF SERVICE**

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On May 5, 2020, I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S RESPONSE IN OPPOSITION TO TESLA, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 155]**

on the following interested parties in this action:

Rory T. Kay (NSBN 12416)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rkay@mcdonaldcarano.com

Alex Spiro
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com

Michael Lifrak
Jeanine M. Zalduendo
Alex Bergjans
Aubrey Jones
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
michaellifrak@quinnemanuel.com
jeaninezalduendo@quinnemanuel.com
alexbergjans@quinnemanuel.com
aubreyjones@quinnemanuel.com

**[X] (BY E-MAIL)** By transmitting the above documents to the above e-mail addresses.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 5th day of May, 2020 at Phoenix, Arizona.


*/s/William M. Fischbach III*