# EXHIBIT A

CONFIDENTIAL - Elon Musk - 2/21/2020

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

_____

TESLA, INC., a Delaware      )
corporation,                 )
                             )
          Plaintiff,         )
                             )
v.                           )           Case No.
                             )     3:18-CV-00296-LRH-CBC
MARTIN TRIPP, an             )
individual,                  )
                             )
          Defendant.         )
_____  )
MARTIN TRIPP, an             )
individual,                  )
                             )
     Counterclaimant,        )
                             )
v.                           )
                             )
TESLA, INC., a Delaware      )
corporation,                 )
                             )
     Counterdefendant,       )
_____)


CONFIDENTIAL

Videotaped Deposition of Elon Musk

Los Angeles, California

Friday, February 21, 2020




Michael P. Hensley, RDR, CSR No. 14114

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

```
 1   reporter please swear in the witness.
 2                          ELON MUSK,
 3   having been first duly sworn, was examined and testified
 4   as follows:
 5                          EXAMINATION
 6   BY MR. FISCHBACH:
 7   Q.      Sir, can I have your full name for the record.
 8   A.      Elon Reeve Musk.
 9   Q.      Mr. Musk, are you under the influence of any
10   medications or controlled substances or anything that
11   might impact your ability to give truthful and accurate
12   deposition testimony here today, sir?
13   A.      No.
14   Q.      Sir, did you understand the oath you just took?
15   A.      Yes.
16   Q.      What does it mean to you?
17   A.      How is this relevant to the testimony?
18   Q.      Sir, I'm not here to answer your questions.
19   You're here to answer my questions.
20   A.      Okay.
21   Q.      My question for you is, sir, do you understand
22   the oath that you just took?
23   A.      Yes, of course.
24   Q.      What do you think it means?
25   A.      To say the whole truth, nothing but the truth,
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1    you supported -- or that you submitted in opposition to

2    your deposition?

3    A.      I suppose it was.

4    Q.      All right.  Did you read this before you signed

5    it?

6    A.      Yeah.

7    Q.      Is everything in this declaration true?

8    A.      I certainly believed it to be true.  Do you want

9    me to read it in detail?

10   Q.      I do not, Mr. Musk.

11   A.      Yeah.

12   Q.      I want to ask you, however, why this deposition

13   would pose a substantial burden and hardship to you in

14   this case.

15   A.      Well, I have a lot of obligations to run two

16   companies and make sure that the right thing happens

17   there.  This case, in my view, is a frivolous case

18   brought by a counterparty who is just a terrible human

19   being.  And, frankly, if I may say so, I -- I'm troubled

20   by your association with him.

21           So instead of me being able to do my duty for

22   the companies, I'm here.  This is not -- this is not --

23   this is not -- does not serve anyone.  It's not good.

24   It's a waste of time.

25   Q.      I think you knocked your microphone down,

1    Mr. Musk.

2    A.      Yeah.

3    Q.      Thank you.

4            THE VIDEOGRAPHER:  Mr. Musk, if it could be on

5    your jacket, please.

6            THE WITNESS:  Yeah.

7            THE VIDEOGRAPHER:  Thank you, sir.

8    BY MR. FISCHBACH:

9    Q.      And, sir, if I understand you correctly, time is

10   a very precious commodity for you, given the

11   responsibilities you have to these various companies; is

12   that true?

13   A.      Yes.  This is -- I have a lot of responsibility,

14   and it's critical to execute that responsibility.  If I

15   am constantly deposed in cases that lack merit, as I

16   view this one to be --

17           MR. FISCHBACH:  May I have that marked, please?

18           (Exhibit 3 was marked for identification.)

19   BY MR. FISCHBACH:

20   Q.      Sir, the court reporter has handed you what has

21   been marked as deposition Exhibit 3.  That is an email

22   sent from Martin Tripp to you on May 16th of 2018.

23           The title of this email is "Stator Scrap Pareto

24   (Month of April)"; correct?

25   A.      Yes.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1   Q.      And it references something called "NCM"; is

2   that right?

3   A.      Yes.

4   Q.      NCM is shorthand for nonconforming material?

5   A.      Yes.

6   Q.      In other words, scrap; correct?

7   A.      Yes.

8   Q.      And the gist of this email is that Mr. Tripp is

9   expressing concern to you regarding scrap in the

10  Gigafactory; correct?

11  A.      Yes.

12  Q.      Does Tesla encourage the practice of its

13  employees reaching directly out to the CEO if they see

14  something that concerns them?

15  A.      I do.

16  Q.      In May of 2018 was the amount of scrap at the

17  Gigafactory a serious concern for you?

18  A.      Yes.

19  Q.      Did you do anything in response to Mr. Tripp's

20  email?

21  A.      I -- I don't recall exactly what I did, but I

22  wanted to -- like, I forwarded it on to have it be

23  looked into.

24          (Exhibit 4 was marked for identification.)

25          MR. FISCHBACH:  4?

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

```
 1              MR. SPIRO:  Copy for me?
 2              MR. FISCHBACH:  That is your copy.
 3    BY MR. FISCHBACH:
 4    Q.       Sir, the court reporter has handed you what has
 5    been marked as deposition Exhibit 4.  This is an email
 6    originally from Mr. Tripp to you on June 10th and then a
 7    response from you to Mr. Tripp.
 8              And in this email, you state "Getting scrap from
 9    when cells exit Panasonic to less than 1 percent needs
10    to be a hardcore goal."
11              Did you actually write that?
12    A.       Yeah.
13    Q.       And when you say something, do you mean it?
14    A.       Almost always.
15    Q.       Okay.  Well, should Tesla employees believe you
16    when you make a statement like that?
17    A.       Yes.
18    Q.       So Mr. Tripp should have believed you when you
19    stated that getting scrap down to 1 percent is a
20    hardcore goal for the company?
21    A.       Of course.
22    Q.       Did you do anything in response to this email to
23    meet that hardcore goal?
24    A.       We did many things, and we have achieved it.  No
25    thanks to Tripp.
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

**CONFIDENTIAL - Elon Musk - 2/21/2020**

1   confidentiality agreement and false information.

2   Q.     So this wasn't the first negative press that

3   Ms. Lopez had published regarding Tesla before; correct,

4   sir?

5   A.     I mean, I don't know if she published something

6   before June 4th or not.

7   Q.     Would you agree with me that, at least at this

8   point in time, you regarded her as somebody not friendly

9   to Tesla?

10  A.     I don't --

11         MR. SPIRO:  Objection.  Form.

12         THE WITNESS:  I don't know.

13  BY MR. FISCHBACH:

14  Q.     You don't understand the question, or you don't

15  know whether or not she was friendly to Tesla based on

16  those articles?

17  A.     Right.  I certainly don't know if she was

18  friendly to Tesla.  She's -- I mean, this -- these

19  articles are clearly not positive or -- yeah.

20         I mean, I have, like, 10,000 things that I need

21  to worry about to have Tesla operate effectively.  This

22  is 1 out of 10,000.

23  Q.     What did you think about the person that

24  provided the information to Lopez for those articles at

25  the time you learned about them?

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1   A.      Well, it's -- clearly somebody is leaking

2   confidential information, breaking their confidentiality

3   agreement, and exaggerating the reality of what is going

4   on.

5   Q.      And how did you feel about that?

6   A.      Well, obviously, I would feel as anyone would

7   feel.

8   Q.      Which was?

9   A.      That Tesla was being wronged.

10  Q.      What did you want to happen to the leaker when

11  you found them?

12  A.      Well, they would have to pay the appropriate

13  legal penalty for violating their confidentiality

14  agreement and misleading -- you know, not just leaking

15  information, but in a way that is actively damaging to

16  the company and, in some cases, false.

17  Q.      Now, both of these articles reference scrap in

18  the Gigafactory; correct?

19          MR. SPIRO:  You can take a minute to read the

20  articles if you want to.

21          THE WITNESS:  Absolutely.

22          MR. FISCHBACH:  Well, we'll go off the record if

23  he's going to read the whole articles.

24          MR. SPIRO:  Well, you're asking him a question

25  about the articles.  You asked the question.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

1   the Gigafactory and Tesla's seeming indifference to

2   those scrap levels?

3   A.     When I first received email from Tripp, I

4   thought he was sane and genuine.  And later, information

5   revealed he appeared to not be sane or at least

6   partially be insane and not be genuine and to be acting

7   out of malice.

8   Q.     And sitting here today, you -- you dispute the

9   veracity of the information that Mr. Tripp provided to

10  Ms. Lopez; is that correct, sir?

11         MR. SPIRO:  Objection as to form.  Which

12  information?

13         THE WITNESS:  He clearly provided scrap

14  information that was far in excess of reality in some

15  cases.

16         MR. FISCHBACH:  Mark that, please.

17         THE WITNESS:  I believe at one point he --

18         THE REPORTER:  Just a moment.

19         THE WITNESS:  Sorry.

20         THE REPORTER:  Thank you.

21         (Exhibit 7 was marked for identification.)

22         MR. FISCHBACH:  Ready?

23  BY MR. FISCHBACH:

24  Q.     Sir, the court reporter has handed you what has

25  been marked as deposition Exhibit 7.  These are two

1 emails that you sent to all Tesla personnel; is that

2 correct, sir?

3 A.       Yes.

4 Q.       And do you recognize these emails?

5 A.       Yeah.

6 Q.       And this email -- or both emails were sent

7 shortly after Mr. Tripp was identified as the Business

8 Insider leaker; correct, sir?

9 A.       Well, not that long.  Oh, I don't know when he

10 was identified as the -- this says June 18th.  I'm not

11 sure exactly what the date is that he was identified as

12 the leaker.

13 Q.       Well, I'll avow to you that he was interrogated

14 by Tesla personnel on June 15th --

15 A.       Okay.

16 Q.       -- and June 16th.

17 A.       Okay.

18 Q.       Approximately how many Tesla employees were

19 there at the time this email was sent?

20 A.       I don't know the exact number.  If -- 30,000

21 perhaps.

22 Q.    You wrote in this email "I was dismayed to

23 learn... about a Tesla employee who had conducted quite

24 extensive and damaging sabotage to our operations.  This

25 included making direct code changes to the Tesla

1   Manufacturing Operating System under false usernames and

2   exporting large amounts of highly sensitive Tesla data

3   to unknown third parties."

4           Did I read that correctly, sir?

5   A.      Yes.

6   Q.      And the employee you're referring to here is

7   Mr. Tripp; correct?

8   A.      Yes.  I do not mention him by name, but, yes,

9   that's -- that is who I was referring to.

10  Q.      What evidence did you have at the time that you

11  sent this email that Mr. Tripp had conducted, quote,

12  "extensive and damaging sabotage" to Tesla's operations?

13  A.      This is the -- the substance of the information

14  that was conveyed to me by Tesla's security team.

15  Q.      Okay.  So your attorney -- your prior attorney

16  suggested that I look up the definition of sabotage.

17  And in Merriam-Webster, it's defined as, quote,

18  "Destruction of an employer's property (such as tools or

19  materials) or the hindering of manufacturing by

20  discontented workers."

21          Did Mr. Tripp inflict any physical harm to the

22  Gigafactory?

23          MR. SPIRO:  Is that the whole definition?

24          MR. FISCHBACH:  Is that an objection?

25          MR. SPIRO:  Well, if -- this question's

CONFIDENTIAL - Elon Musk - 2/21/2020

1    misleading, yeah.   It's an objection to form.

2           MR. FISCHBACH:   All right.   The objection is

3    noted.

4    BY MR. FISCHBACH:

5    Q.      Please answer the question, Mr. Musk.

6    A.      I -- I suspect he probably did, but we do not

7    have evidence of that that's 100 percent in this regard.

8    Q.      Did Mr. Tripp destroy any batteries or equipment

9    at the Gigafactory?

10   A.      Not that -- not that we caught him doing.

11   Q.      Were production levels of the Gigafactory

12   hindered at all due to Mr. Tripp's conduct?

13   A.      Probably.

14   Q.      Do you have any evidence to support that,

15   Mr. Musk?

16   A.      We did not catch him doing it.

17   Q.      You go on to state "The full extent of his

18   actions are not yet clear."

19           So at the time you made this statement, you

20   didn't have a complete investigation of the facts, did

21   you, Mr. Musk?

22   A.      We had to -- there were a lot of -- a lot of

23   negative facts conveyed to me, or believed to be facts,

24   by security team.   And it appeared to be just the tip of

25   the iceberg.

1   Q.       Sir, but my question was, at the time you made

2   this statement, you did not have a complete

3   investigation of the facts, did you?

4           MR. SPIRO:  Objection to form.

5           THE WITNESS:  We did not have a complete

6   investigation of the facts, but the facts that had come

7   to light were extremely bad.

8   BY MR. FISCHBACH:

9   Q.       All right.  Do you do this often, make

10  statements to all your employees before you have all the

11  facts?

12          MR. SPIRO:  Objection to form.

13          THE WITNESS:  I think this notion that one can

14  have all the facts is -- is, again, sort of an example

15  of legal trickery.

16  BY MR. FISCHBACH:

17  Q.       You go on to write "However, there may be

18  considerably more to this situation than meets the eye;

19  so the investigation will continue in depth this week.

20  We need to figure out if he was acting alone or with

21  others at Tesla and if he was working with any outside

22  organizations.

23          "As you know, there are a long list of

24  organizations that want Tesla to die.  These include

25  Wall Street short-sellers, who have already lost

CONFIDENTIAL - Elon Musk - 2/21/2020

1    billions of dollars and stand to lose a lot more.  Then

2    there are the oil and gas companies, the wealthiest

3    industry in the world.  They don't love the idea of

4    Tesla advancing the progress of solar power and electric

5    cars.  Don't want to blow your mind, but rumor has it

6    that those companies are sometimes not super nice.

7           "Then there [all] the multitude of big

8    gas/diesel car company competitors.  If they're willing

9    to cheat so much about emissions, maybe they're willing

10   to cheat in other ways?

11          "Most of the time, when there is theft of goods,

12   leaking of confidential information, dereliction of

13   duty, or outright sabotage, the reason [is really]

14   something simple like wanting to get back at someone

15   within the company or at the company as a whole.

16   Occasionally, it is much more serious."

17          Are short-sellers and big oil companies --

18   sorry, short-sellers, big oil companies, and traditional

19   car companies enemies of Tesla in your view, Mr. Musk?

20          MR. SPIRO:  Objection to form.

21          THE WITNESS:  I wouldn't say that they're

22   initially enemies, but they have interests contrary to

23   that of Tesla.

24   BY MR. FISCHBACH:

25   Q.     Okay.  And according to you in that email, they

1   want to see Tesla die; correct?

2   A.      Some of them do.

3   Q.      Why did you feel the need to reference

4   short-sellers and big oil and competitor car companies

5   and their desire to see Tesla die in this email about

6   Mr. Tripp?

7           MR. SPIRO:  Objection to form.

8           You can answer if you can.

9           THE WITNESS:  I mean, I'm simply listing the --

10  that there are a lot of people and organizations out

11  there who have interests contrary to Tesla that people

12  may not be aware of.

13  BY MR. FISCHBACH:

14  Q.      Okay.  What was the point of you linking those

15  outside interests, the big oil and the short-sellers and

16  the car companies, to Mr. Tripp?

17          MR. SPIRO:  Objection to form.  Assumes facts.

18          THE WITNESS:  This was not implying that he

19  somehow works for all of those people, but -- but

20  that -- it's possible that he could.

21  BY MR. FISCHBACH:

22  Q.      At the time you sent that email, did you have

23  any evidence that Mr. Tripp was working with

24  short-sellers?

25  A.      On this -- on June 18th?

CONFIDENTIAL - Elon Musk - 2/21/2020

1    Q.      Yes.

2    A.      No.   I wouldn't say that we had direct evidence.

3    Q.      Did you have any evidence that Mr. Tripp was

4    working with oil and gas companies?

5    A.      No.

6    Q.      Did you have any evidence that Mr. Tripp was

7    working with big gas/diesel car companies that are

8    Tesla's competitors?

9    A.      No.

10   Q.      So sitting here today, you have no evidence that

11   Mr. Tripp was working with short-sellers, oil and gas

12   companies, or big gas/diesel car companies during his

13   employment with Tesla; is that correct, sir?

14           MR. SPIRO:   Objection.   Compound.

15           THE WITNESS:   The -- there did appear to be a

16   link to Jim Chanos, a prominent short-seller of Tesla

17   who is closely associated with Linette Lopez, and the

18   information that Lopez was publishing was beneficial to

19   Chanos.

20   BY MR. FISCHBACH:

21   Q.      Anything else?

22   A.      No.

23   Q.      Did you know about the supposed link with

24   Mr. Chanos when you sent that email?

25   A.      I'm not certain.

1    Q.      You followed up with an email on June 18th,

2    "...last night we had another strange incident that was

3    hard to explain.  Small fire on the body-in-white

4    production line.  No one was in the area and there were

5    no injuries or significant equipment damage, but it was

6    enough to stop the body production line for several

7    hours.

8            "Could just be a random event, but as Andy Grove

9    said, 'Only the paranoid survive.'  Please be on the

10   alert for anything that's not in the best interest of

11   our company.  If you aren't getting a respondent from

12   the emdesk email, please send me a note directly."

13           Sir, did you think that Mr. Tripp had anything

14   to do with the fire in the body-in-white line?

15   A.      No.

16   Q.      Then why did you follow up your prior email

17   regarding Mr. Tripp with an email about this fire?

18           MR. SPIRO:  Objection.  Form.

19           THE WITNESS:  It's just one of a series of

20   incidents that was concerning.  There were just a lot of

21   unexplained incidents that caused the Tesla production

22   line to get to -- to fall out that were in our

23   electronic control system and -- yeah.  It's just that

24   there were a lot of incidents that stopped the line and

25   there was no clear explanation for why the -- why these

CONFIDENTIAL - Elon Musk - 2/21/2020

1  things happened.

2  BY MR. FISCHBACH:

3  Q.      Okay.  When you sent out that email, did you

4  have any evidence that Mr. Tripp had anything to do with

5  that fire?

6  A.      No.

7  Q.     You have a quote in here, "Only the paranoid

8  survive."  Did something that Mr. Tripp did make you

9  feel paranoid, Mr. Musk?

10  A.     Well, no.  This is a quote from Andy Grove where

11  he's essentially saying that you should not be

12  complacent and you should take potential threats

13  seriously.  And that is the -- an appropriate duty of

14  the CEO of the company.

15  Q.     Do you consider yourself a paranoid person?

16  A.     No.

17  Q.     Have there been fires in Tesla facilities before

18  June 18th of 2018?

19         MR. SPIRO:  Objection.  That's outside the

20  scope.

21         THE WITNESS:  Yes.

22         MR. SPIRO:  You don't have to answer if I say --

23         THE WITNESS:  Sure.

24         MR. SPIRO:  -- it's outside the scope.

25         THE WITNESS:  Okay.  Sure.  All right.  Sure,

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

```
 1              (Exhibit 8 was marked for identification.)
 2    BY MR. FISCHBACH:
 3    Q.      Mr. Musk, the court reporter has handed you what
 4    has been marked as deposition Exhibit 8.   This is an
 5    exchange between you and Mr. Tripp on June 20th of 2018;
 6    correct, sir?
 7    A.      Yes.
 8    Q.      And I'll avow to you, sir, that June 20th is
 9    also the same day that Tesla filed its lawsuit against
10    Mr. Tripp.
11            Are you aware of that?
12    A.      June 20th?
13    Q.      Yes, sir.
14    A.      Now that you mention it, I am.
15    Q.      And it first started -- the first message was
16    from Mr. Tripp to you at 8:57 A.M.; is that right, sir?
17    A.      Yes.
18    Q.      Subject of the email is "Termination/Lawsuit"?
19    A.      Mm-hmm.
20    Q.      And that's your Tesla email address?
21    A.      It doesn't state my email address, but it --
22    assume it is.
23    Q.      Erm@tesla.com?
24    A.      It doesn't show ERM.
25    Q.      But is that your Tesla email address, sir?
```

CONFIDENTIAL - Elon Musk - 2/21/2020

Page 34

```
 1   A.      Yes.
 2   Q.      And that's not a secret within the company, is
 3   it, sir?
 4   A.      No.
 5   Q.      Is it your common practice to communicate with
 6   employees that Tesla has recently fired?
 7   A.      It's not common.
 8   Q.      Why did you respond to this email from
 9   Mr. Tripp?
10   A.      I mean, he sent me an email that was clearly a
11   very threatening email saying I have what's coming to
12   me.  And so I said -- replied to him that "Threatening
13   me only makes it worse for you."
14   Q.      Did he threaten your physical safety?
15   A.      I took that to imply that it could be a physical
16   threat, yes.
17   Q.      It said "Don't worry.  You have what's coming to
18   you for the lies you have told to the public and
19   investors."
20           You took that as a threat to your physical
21   safety, Mr. Musk?
22           MR. SPIRO:  Objection.  Form.  Asked and
23   answered.
24           THE WITNESS:  Yes.
25                         ///
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

1    BY MR. FISCHBACH:

2    Q.      Why was it so important that you get personally

3    involved in this dispute with Mr. Tripp?

4            MR. SPIRO:  Objection to form.

5            THE WITNESS:  It is -- it is not usual for --

6    it's not common for me to get involved in individual

7    disputes, but it's also not common for me to have -- for

8    some -- somebody to interact with me in this way; so --

9    BY MR. FISCHBACH:

10   Q.      You go on to state "You should [be] ashamed of

11   yourself for framing other people.  You're a horrible

12   human being"; is that right, sir?

13   A.      Yes.  I do think he's a horrible human being,

14   yes.  I'm quite convinced of that actually.

15   Q.      Thank you.

16   A.      Yeah.

17   Q.      How did he frame -- who did he frame?

18   A.      When he was stealing the data from Tesla, he

19   logged in as -- with other people's usernames in order

20   to hide his tracks and make it look like they were the

21   ones taking the data, not him.

22   Q.      But who?  Give me a name, please.

23   A.      I don't recall the names offhand, but it was

24   he -- he logged in with multiple other usernames.  And I

25   believe at first we -- we actually thought the person

```
 1   who had taken the data was someone else because --
 2   because he had logged in with their name.  And so that's
 3   what I would -- any reasonable person would call framing
 4   somebody else.
 5   Q.      And you were taking this incident with Mr. Tripp
 6   personally, it looks like; is that right, Mr. Musk?
 7   A.      I -- I did take it personally in that he was --
 8   it seemed like this is someone who had gone out of his
 9   way to harm the company.
10   Q.      And --
11   A.      And he was -- he had betrayed our trust.  He
12   betrayed his confidentiality agreement.  He had just
13   been an awful person who had done harm to the company.
14   Q.      I want to get your -- I want to understand your
15   definition of a "horrible human being," Mr. Musk.
16           Steven Paddock, the Las Vegas shooter, is that a
17   horrible human being in your opinion?
18           MR. SPIRO:  Objection.  Form.
19           THE WITNESS:  Of course.
20           MR. SPIRO:  And if you know anything about these
21   people that he asks you about.
22   BY MR. FISCHBACH:
23   Q.      Do you think Jeffrey Epstein was a horrible
24   human being?
25   A.      Yes.
```

```
 1    "horrible" and "terrible" cover a wide range of -- of
 2    opinions.
 3    BY MR. FISCHBACH:
 4    Q.      So Mr. Tripp was like a bad meal for you?
 5    A.      Do you -- do you wish to spend this -- this
 6    deposition engaging in legal trickery or asking at real
 7    questions?
 8    Q.      Mr. Musk, can you please answer my question,
 9    sir.
10            MR. SPIRO:  Was it like a bad meal?  That's the
11    question pending.
12            THE WITNESS:  No, it's not like a bad meal.
13    BY MR. FISCHBACH:
14    Q.      Do you think it was reckless for Lopez to
15    publish this information from Mr. Tripp without
16    verifying it?
17    A.      Yes.
18            MR. SPIRO:  Objection.  Relevance.
19            THE WITNESS:  Oh.
20            MR. SPIRO:  Form.
21            You can answer.
22            THE WITNESS:  Yes.  More than reckless.
23    BY MR. FISCHBACH:
24    Q.      You go on to state "However, betraying your word
25    of honor, breaking the deal you had when Tesla gave you
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1   a job, and framing your colleagues are wrong and come

2   with some legal penalties.  So it goes.  Be well."

3          You also thought Mr. Tripp was a traitor;

4   correct, sir?

5   A.      I -- I guess.

6   Q.      Well, you said he --

7   A.      -- of course.

8   Q.      He betrayed his word of honor; correct?

9   A.      Yes.

10  Q.      So he's a traitor?

11  A.      To -- to Tesla, yes, of course.

12  Q.      He's a horrible human being and a traitor in

13  your mind; correct?

14  A.      He's a bad person for sure.

15  Q.      You state "So it goes."  I've seen you use that

16  phrase in other places.  What does that phrase mean to

17  you?

18          MR. SPIRO:  Objection to the windup colloquy.

19  BY MR. FISCHBACH:

20  Q.      You can answer the question, Mr. Musk.

21  A.      It's just a way of saying that that's life.

22  Q.      And you also wrote "Be well."  Did you really

23  wish Mr. Tripp good fortune when you said that?

24  A.      Probably not.

25  Q.      Did you wish him good health?

1    A.      I don't wish anyone bad health.

2    Q.      Hmm.  Well, then why did you say "Be well"?

3    A.      Neither here nor there.

4    Q.      You don't know why you said "Be well"?

5            MR. SPIRO:  Objection.  Asked and answered.

6            THE WITNESS:  It's an off-the-cuff comment.

7    BY MR. FISCHBACH:

8    Q.      You mention "legal penalties."  What penalties

9    did you have in mind?

10   A.      Whatever is appropriate under the law for

11   breaking confidentiality agreement and leaking vast

12   amounts of confidential information and misleading

13   journalists about the state of the company.

14   Q.      Did you have a particular penalty in mind,

15   though?

16   A.      I do not know of a particular penalty.  It's

17   whatever is appropriate under the law.

18   Q.      Now, most people would regard a penalty as a

19   form of punishment.  Did you want Mr. Tripp punished for

20   his conduct?

21           MR. SPIRO:  Objection to form.

22           And don't answer anything that you've had --

23   that has to do with conversations you've had with

24   counsel.

25           MR. FISCHBACH:  I agree with that, sir.

```
1    pay the appropriate legal penalty.
2    BY MR. FISCHBACH:
3    Q.      He was going to get what was coming to him;
4    right?
5            MR. SPIRO:  Objection to form.
6            THE WITNESS:  That's not how I put it.
7            MR. FISCHBACH:  9?
8            THE REPORTER:  Correct.
9            (Exhibit 9 was marked for identification.)
10   BY MR. FISCHBACH:
11   Q.      Mr. Musk, this exhibit, Exhibit 9, that the
12   court reporter handed you, this is an email from
13   yourself to Julia Wong.
14           She's a reporter with The Guardian; correct?
15   A.      Yeah.
16   Q.      Had you ever communicated with Julia Wong before
17   this email exchange on June 20th?
18   A.      I don't recall.  Possibly, but I don't recall.
19   Q.      And if I could direct your attention to the
20   second to last page, Mr. Musk, it appears that Ms. Wong
21   initiated this email communication with you because she
22   had questions about the lawsuit that Tesla had initiated
23   that day; is that correct, sir?
24   A.      Yes.
25   Q.      Now, Tesla has a communications team to respond
```

CONFIDENTIAL - Elon Musk - 2/21/2020

1    to press inquiries; is that correct, sir?

2    A.      Yes.   We -- well, yeah, we have communications

3    team.

4    Q.      And you don't respond personally to every press

5    inquiry received, do you, sir?

6    A.      No.

7    Q.      But you responded to this one; correct?

8    A.      This one was directed to me, and at times I do

9    respond directly.

10   Q.      And in this case the inquiry had to do with

11   Mr. Martin Tripp; correct?

12   A.      Yes.

13   Q.      The same Martin Tripp that earlier that day you

14   had called a horrible human being and a traitor;

15   correct?

16          MR. SPIRO:  Objection.  Misstates the evidence.

17   I don't remember the word "traitor" being in the email.

18   Was it?

19   BY MR. FISCHBACH:

20   Q.      You can answer the question, Mr. Musk.

21   A.      This is a person that I -- that I thought was a

22   horrible human being and had betrayed the trust of the

23   company.

24   Q.      Thank you, sir.

25          You wrote "Tripp sent me a threatening email

1  this morning.  Below is the exchange.  I was just told

2  that we received a call at the Gigafactory that he was

3  going to come back and shoot people.  The police have

4  been alerted and we have posted additional security.

5  Our comms team can fill you in."

6          What was Mr. Tripp going to shoot people with,

7  Mr. Musk?

8  A.      What was Mr. Tripp -- what do you mean "What was

9  Mr. Tripp going to shoot people with?"

10  Q.      Well, you wrote in here "I was just told that we

11  received a call at the Gigafactory that he was going to

12  come back and shoot people."

13          I'm asking you what was he going to come back

14  and shoot people with?

15  A.      Guns.  What do you mean?

16  Q.      Well, what kind of gun?  A rifle?

17  A.      I don't know what kind of guns.

18  Q.      A shotgun?

19          MR. SPIRO:  Objection.  Asked and answered.

20          THE WITNESS:  What -- what is the point of

21  asking me what type of guns he has?  I -- I don't know

22  what type -- I don't know what guns he has.

23  BY MR. FISCHBACH:

24  Q.      Do you know whether or not he was going to come

25  back with an automatic or semiautomatic weapon?

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1    A.        I was -- I was simply told by security that

2    the -- we received a call saying that -- that Marty

3    Tripp was going to -- was -- was on his way to the

4    Gigafactory and was heavily armed, was extremely

5    volatile and angry, and it sounded like he was going to

6    try to shoot everyone.

7    Q.        So when you sent this email to Julia Wong, you

8    didn't know what kind of gun Mr. Tripp was going to come

9    back and shoot people with, did you, Mr. Musk?

10   A.        No.  But I was told he was heavily armed.

11   Q.        And you didn't know what kind of --

12   A.        Presumably, that is not a small gun.

13   Q.        You didn't know what kind of ammunition

14   Mr. Tripp was going to use, did you, Mr. Musk?

15   A.        No.  It -- I was told he was heavily armed, and

16   that usually means something much bigger than a handgun.

17   Q.        All right.  You didn't know whether or not he

18   was going to use an automatic, a semiautomatic weapon,

19   did you, Mr. Musk?

20   A.        No.  I was simply told that he was heavily

21   armed, volatile, and on his way to the Gigafactory.

22   Q.        How was he going to get back to the Gigafactory?

23             MR. SPIRO:  Objection to form.

24             THE WITNESS:  I don't know.  By car presumably.

25                           ///

1    BY MR. FISCHBACH:

2    Q.       Well, did you know?

3    A.       No.  But, I mean, people -- he would just

4    get there -- go there by car or, like -- it's not like

5    it's in a secure location.

6    Q.       But you didn't know how Mr. Tripp was going to

7    go back to the Gigafactory -- did you, sir? -- when you

8    made that statement?

9    A.       Do you mean what form of transport he would use?

10   Q.       Yes.

11   A.       I mean, presumably he'd drive.  I mean, I don't

12   think he would use a helicopter or walk.

13   Q.       Who made the call?

14   A.       Who made what call?

15   Q.       The call that you reference in here, "We [just]

16   received a call at the Gigafactory."

17           Who made the call?

18   A.       I don't know who made the call.

19   Q.       Did the caller have an accent?

20   A.       I was not on the -- I was not on the phone when

21   this person called.

22   Q.       Did the caller have an accent?

23           MR. SPIRO:  Objection.

24           THE WITNESS:  I don't know if this caller had an

25   accent.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1          MR. SPIRO:  Asked and answered.  Form.  He has

2    no idea.

3    BY MR. FISCHBACH:

4    Q.      The Gigafactory is outside of Reno, Nevada; is

5    that correct, sir?

6    A.      Yes.  It's, like, 15 minutes east of Reno.

7    Q.      And the call center is actually in Las Vegas; is

8    that right?

9          MR. SPIRO:  If you know.

10          THE WITNESS:  We have a call center in Las

11    Vegas.

12    BY MR. FISCHBACH:

13    Q.      Do you know whether or not this call was

14    received at the actual Gigafactory in Reno or at your

15    call center in Las Vegas?

16    A.      I don't know.

17          As I said, I was simply told -- and this is

18    obviously a very serious matter -- that Marty Tripp is

19    heavily armed, extremely angry, and on his way to

20    Gigafactory.

21          And if, when you receive something like that,

22    it's a credible threat, you have to take such threats

23    seriously.  If you don't take them seriously, there

24    could be a lot of people that die.

25    Q.      And Tesla had informed the sheriff's department

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1    Mr. Musk.

2         MR. SPIRO:  If you can understand the question,

3    you can answer the question.

4         THE WITNESS:  I mean, it's not -- the exact

5    timing is not clear.

6    BY MR. FISCHBACH:

7    Q.    All right.  But you would agree with me that

8    Tesla notified the sheriff's department right away;

9    correct?

10   A.    Yes.

11   Q.    All right.  Are you aware that your statement to

12   Julia Wong is the first statement to any member of the

13   press regarding the alleged shooting threat?

14   A.    No.

15   Q.    All right.  Do you know why your comms team did

16   not make any prior statements to the press regarding the

17   shooting threat before you did?

18   A.    No.

19   Q.    And if it's such an important matter, why would

20   your comms team not inform the press?

21        MR. SPIRO:  Objection to form.  It's an improper

22   question.

23        You can answer if you can.  Do you know why they

24   didn't inform the press?  Do you know why some other

25   person didn't inform the press?  You can answer that

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

1  question.

2          THE WITNESS:   I think they -- they -- they would

3  have, but this was all happening very quickly.   And so

4  the -- you know, if it's happening quickly, then, well,

5  I will respond directly.

6  BY MR. FISCHBACH:

7  Q.      I want to go back to the information you

8  received about the call.   Who told you about this call

9  that was received at the call center?

10  A.      I was -- I think some members of our security

11  team and human resources.

12  Q.      Who?

13  A.      I don't recall.   I was told by many people.

14  There was -- I don't know.   Probably, I don't know, half

15  a dozen people that were on a call.

16  Q.      Did you ask any follow-up questions?

17  A.      Yes.   I asked can we -- do we have a recording

18  of the call?   Let's try to figure out, you know, how

19  serious is this.   Is this -- is he actually on his way

20  to the -- to -- you know, what -- you know, how -- how

21  seriously should we take this?   Is this, like, a -- a

22  four-alarm fire, a one-alarm fire?

23          It's obviously a very serious threat that one

24  needs to take credibly, but there is proportionate

25  response just as a fire department would have for a

**CONFIDENTIAL - Elon Musk - 2/21/2020**

1    class of fire.  So we need to try to find out what --

2    how severe, how immediate.  It's clearly a serious

3    threat, but how severe and what action should we take to

4    safeguard the people.

5    Q.      Was the call recorded?

6    A.      I believe it was not recorded.  That's what I

7    was told.

8    Q.      When you asked the question "Should we take this

9    threat seriously?" was there any other evidence or

10   information to corroborate what the alleged caller had

11   said?

12   A.      You always have to take a threat of a heavily

13   armed angry shooter seriously, obviously.

14   Q.      That wasn't what my question, Mr. Musk.  My

15   question was was there any other information or evidence

16   that you had to corroborate what was stated in this

17   anonymous phone call?

18           MR. SPIRO:  Him personally or Tesla's security?

19           MR. FISCHBACH:  Him personally.

20           THE WITNESS:  No.  That's -- the information I

21   had was -- was a direct threat to the company.

22   BY MR. FISCHBACH:

23   Q.      So the only information you had came from an

24   anonymous phone call when you made this statement to

25   Julia Wong at The Guardian; is that correct, sir?

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1          MR. SPIRO:  The only -- objection to form.

2          THE WITNESS:  We had received a -- what seemed,

3     to us, to be a credible threat to the safety and

4     well-being of the people at Tesla, yeah.

5     BY MR. FISCHBACH:

6     Q.     All right.  Sir, my question is other than this

7     anonymous phone call for which there was no recording,

8     when you made that statement to Julia Wong, did you have

9     any other independent evidence or information to

10    corroborate what that caller had said?

11         MR. SPIRO:  Objection.  Did you mean information

12    at that time, or other information they previously had

13    relating to Mr. Tripp being fired and any other issues

14    he had?

15    BY MR. FISCHBACH:

16    Q.     Do you understand the question, Mr. Musk?

17    A.     Well, now that you mention it, I believe I did

18    have a conversation with Nick Gicinto or one of Tesla's

19    security people about Marty Tripp.  And he said

20    something about the -- Marty Tripp having several guns

21    and trying to sell a gun to another employee.  This, I

22    think, adds some credibility to the threat.

23    BY MR. FISCHBACH:

24    Q.     When did that conversation happen?

25    A.     I'm not sure of the exact timing.

CONFIDENTIAL - Elon Musk - 2/21/2020

Page 54

1         He did try to sell the gun to --
2         MR. SPIRO:   What?
3         THE WITNESS:   Is that a --
4   BY MR. FISCHBACH:
5   Q.     Do you know whether or not the call with
6   Mr. Gicinto was before or after you made that statement
7   to Ms. Wong?
8   A.      I think it was probably before, but I'm not sure
9   of the exact timing.  I mean, I talked to Nick Gicinto
10  quite frequently at the time.
11  Q.     Did Mr. Tripp actually ever show up at the
12  Gigafactory and shoot anybody?
13  A.     No.
14  Q.     Was Mr. Tripp ever apprehended on his way to the
15  Gigafactory to shoot anybody?
16  A.     No.
17         (Exhibit 12 was marked for identification.)
18  BY MR. FISCHBACH:
19  Q.     Sir, the court reporter has handed you what has
20  been marked as --
21         THE REPORTER:   12.
22  BY MR. FISCHBACH:
23  Q.     -- deposition Exhibit 12.  I want to direct your
24  attention to Interrogatory Number 12, which is going to
25  be on page 7 of this document.

CONFIDENTIAL - Elon Musk - 2/21/2020

1        And it states "Identify and explain all

2   information regarding the alleged threat known by Elon

3   Musk prior to his sending the email communication

4   referenced in Paragraph 54 of the counterclaim

5   including:  when Mr. Musk first became aware of the

6   alleged threat, all persons with whom Mr. Musk discussed

7   the alleged threat on June 20, 2018, who provided

8   Mr. Musk with the information of which he was aware,

9   [and] what actions Mr. [took]" -- "[muster]" --

10  "Mr. Musk took to verify the information."

11        Now, if you could, sir, take a moment to

12  silently read to yourself Tesla's response to that on

13  the following page.

14        THE WITNESS:  Sir, may I have a water or

15  something?

16        MR. SPIRO:  Sure.

17        MR. FISCHBACH:  Go ahead.

18        MR. SPIRO:  Can you read back the question.

19        (The Reporter read the record as requested.)

20        MR. SPIRO:  Then the question before that.

21        (The Reporter read the record as requested.)

22        MR. SPIRO:  Sparkling okay?

23        THE WITNESS:  Sure, yeah.

24        Yes, I see it.

25                        ///

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

**CONFIDENTIAL - Elon Musk - 2/21/2020**

Page 56

1    BY MR. FISCHBACH:

2    Q.      All right, sir.  Did you have a chance to read

3    Tesla's response?

4    A.      The whole response?

5    Q.      Yeah.  It's about a page and a half.

6    A.      Yes, I read it.

7    Q.      All right.  Sir, there is no reference in that

8    response to Mr. Gicinto providing you any information

9    about Mr. Tripp having firearms, is there?

10           MR. SPIRO:  Objection to form.

11           THE WITNESS:  Not in this.

12   BY MR. FISCHBACH:

13   Q.      Do you have any evidence that Mr. Tripp did

14   anything to make preparations to go back to the

15   Gigafactory and shoot people?

16   A.      No.

17   Q.      All the information came from that one anonymous

18   phone call; is that correct, sir?

19           MR. SPIRO:  Objection to form, "all the

20   information."

21   BY MR. FISCHBACH:

22   Q.      Let me clarify.  All the information you had in

23   your possession when you made that email to Julia Wong

24   was based on that anonymous phone call on June 20th;

25   correct, sir?

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1          MR. SPIRO:  Objection to form.

2            If he's asking you about just that moment, fine.

3    If he's asking you about everything you had learned

4    prior to the moment of the anonymous call regarding

5    Mr. Tripp or regarding Business Insider, that's a

6    different question.

7            If you understand which of the two he's asking,

8    you can answer it.

9          MR. FISCHBACH:  Let me rephrase the question.

10          MR. SPIRO:  Yeah.  All right.

11   BY MR. FISCHBACH:

12   Q.     All the information you had about an alleged

13   threat to shoot up the Gigafactory came from that

14   anonymous phone call; is that correct, sir?

15   A.     Specifically about the threat to shoot up the

16   Gigafactory or however you want to call it, that -- that

17   was that call, yes.  But you have to take these things

18   very seriously.  It's when people don't take these

19   things seriously that they go awry.  You can't be

20   cavalier about such things.

21   Q.     And Mr. Tripp never actually bought a firearm to

22   the Gigafactory on June 20th, did he?

23          MR. SPIRO:  If you know.

24          THE WITNESS:  I don't know.  He may have.

25                        ///

1    BY MR. FISCHBACH:

2    Q.      Do you know whether or not Mr. Tripp ever fired

3    a weapon at the Gigafactory on June 20th?

4    A.      That is unlikely.

5    Q.      Do you know whether or not Mr. Musk -- or,

6    excuse me, Mr. Tripp ever set foot in the Gigafactory on

7    June 20th?

8    A.      I don't.

9    Q.      Are you aware that on June 20th Mr. Tripp was in

10   Reno being followed by private investigators hired by

11   Tesla?

12            MR. SPIRO:  Objection to form.

13            THE WITNESS:  I --

14            MR. SPIRO:  If you learned anything -- if you

15   learned anything about any of this through counsel, you

16   can't answer the question.

17            MR. FISCHBACH:  I disagree.  It's just a yes or

18   no question.  I'm not asking him for the contents of the

19   communication.  I just want to know were you aware of

20   this fact, Mr. Musk.

21            MR. SPIRO:  You can answer if you were aware of

22   the fact that Mr. Tripp was identified somewhere other

23   than -- near the factory, in other words.

24            Do you understand?

25            THE WITNESS:  Sorry, on what -- on what date are

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

```
 1              If you can answer that question, you can answer
 2    that question --
 3              THE WITNESS:  I mean, they said that --
 4              MR. SPIRO:  -- how people sometimes come to the
 5    Gigafactory.
 6              THE WITNESS:  Okay.  We have two highways:  one
 7    on north side, one on south side.
 8    BY MR. FISCHBACH:
 9    Q.    All right.  And approximately how far is it from
10    the Reno area, sir?
11    A.    15 -- 15 to 20 minutes.
12    Q.    Why was it so important that you inform the
13    press about the alleged threat rather than your
14    communications team?
15              MR. SPIRO:  Objection to form.
16              You can answer that.
17              THE WITNESS:  Right.  I mean, it's not that it
18    was so important that it be me or them, but since the --
19    given the timeliness of the email where the Guardian
20    reporter was clearly writing the story as though
21    Mr. Tripp was the wrong part -- the wronged party when
22    he was, in fact, not the wronged party.
23              And to the best of my information, he was at --
24    at risk of coming to Tesla and killing people.  I
25    thought perhaps this is information that she should be
```

CONFIDENTIAL - Elon Musk - 2/21/2020

1   aware of in writing this article that this -- this --
2   that, to the best of my knowledge, this person was armed
3   and dangerous and had already committed crimes against
4   the company.  This -- pretty serious.
5   BY MR. FISCHBACH:
6   Q.      I mean, your information or your communications
7   team was certainly capable of providing this information
8   to Ms. Wong; correct, sir?
9   A.      Yes, of course.
10          MR. FISCHBACH:  What are we on?
11          THE REPORTER:  13.
12          (Exhibit 13 was marked for identification.)
13  BY MR. FISCHBACH:
14  Q.      Sir, the court reporter has handed you what has
15  been marked as deposition Exhibit 13.  I want to draw
16  your attention to the second page.  It's an email from
17  Shamara Bell to Jeff Jones on June 21st, the day after
18  the alleged threat.
19  A.      Mm-hmm.
20  Q.      Can you read the second page silently to
21  yourself, sir.
22          MR. SPIRO:  He's not a recipient of this email.
23          MR. FISCHBACH:  I know he's not, but this has to
24  do with the investigation into the alleged threat, and
25  it's within the scope of the deposition.

CONFIDENTIAL - Elon Musk - 2/21/2020

1    Robert Smith.

2          She specifically says "I never said 'shoot the

3    place up' though.  I ain't that ghetto.  Sheeeeshh."

4          Did I read that correctly, sir?

5    A.     Yes.

6    Q.     Do you know why there's no recording of that

7    anonymous phone call, sir?

8    A.     I don't.

9    Q.     And by sending this information to Julia Wong,

10   it was your desire -- excuse me.

11         By sending this information to Julia Wong about

12   this alleged threat that he was going to come back and

13   shoot up the Gigafactory, you wanted Ms. Wong to publish

14   that in the media; correct, sir?

15   A.     I thought this was important information if

16   she's going to be writing an article about Marty Tripp.

17   Q.     So you wanted her to publish it; correct?

18   A.     It was salient information, and I certainly, you

19   know, believed at the time that this -- that he

20   represented a very serious threat to the safety of the

21   company.

22   Q.     Do you expect that she would publish this

23   information you gave to her?

24   A.     I thought she -- she might publish it, yes.

25         MR. FISCHBACH:  15.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1        MR. SPIRO:  "Shoot the place up" not "shoot up

2    the place."

3        MR. FISCHBACH:  Mr. Spiro, thank you, sir.

4    You're right.  It says "shoot the place up."  And since

5    we're -- our attention has been drawn to that exact

6    phrase, does that exact --

7        MR. SPIRO:  You just misquoted it.  That's why

8    I'm just --

9        MR. FISCHBACH:  Thank you, sir, and I greatly

10   appreciate that.

11   BY MR. FISCHBACH:

12   Q.      Does that exact phrase "shoot the place up"

13   appear in any of those communications from Shamara Bell

14   that we were looking at?

15   A.      That was not how she described it.

16   Q.      In fact, she specifically denied using words to

17   the effect of "shoot up the place" or "shoot the place

18   up"; isn't that right, sir?

19   A.      In that text exchange, she does, yes.  I mean,

20   she doesn't object to the substance of it, just the --

21   just the phrase itself.

22   Q.      Have you ever talked to Shamara Bell?

23   A.      No.

24   Q.      Now, there's roughly 26 minutes between

25   Exhibit 17, the email from Sarah O'Brien to Julia Wong,

CONFIDENTIAL - Elon Musk - 2/21/2020

```
 1   please.
 2            (Exhibit 19 was marked for identification.)
 3   BY MR. FISCHBACH:
 4   Q.      Mr. Musk, the court reporter has handed you what
 5   has been marked as deposition Exhibit 19.  This is a
 6   tweet from you dated July 5th of 2018.  "Indeed, very
 7   simple question.  To be specific:  @linette" -- or,
 8   excuse me, "@lopezlinette, did you compensate or promise
 9   to compensate Martin Tripp for inside information about
10   Tesla?  Did he, under that inducement, provide you with
11   exaggerated negative info, which you printed but turned
12   out to be untrue?"
13   A.      That is a correct reading.
14   Q.      Now, this was after Tesla filed its lawsuit
15   against Mr. Tripp; correct?
16   A.      There's no date on this but --
17   Q.      Actually it's dated July 5th of 2018.  And the
18   lawsuit was filed June 20th of 2018.
19   A.      Okay; so, yes, it's after.
20   Q.      Okay.  Why did you feel the need to comment on
21   Mr. Tripp when there's active litigation by Tesla
22   against him?
23            MR. SPIRO:  Objection to form.
24            THE WITNESS:  I'm -- I'm not sure.  I don't
25   know.
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

Page 82

1    BY MR. FISCHBACH:

2    Q.      What was the message you wanted to send with

3    this tweet about Mr. Tripp?

4    A.      Oh, actually I think the -- Nick -- Nick

5    Gicinto, one of the members of Tesla security, had told

6    me that there was some guy who was a friend of Tripp's

7    who said that Linette Lopez had offered him $50,000 for,

8    you know, basically insider information on Tesla and

9    implied that Tripp had received similar payment.

10            (Exhibit 20 was marked for identification.)

11   BY MR. FISCHBACH:

12   Q.      Sir, the court reporter has handed you what has

13   been marked as deposition Exhibit 20.

14            Sorry, I gave you the wrong one, Alex.  That's

15   Gicinto.  That's 20 right there.

16            MR. SPIRO:  All right.  Thanks.

17            MR. FISCHBACH:  And you've got Mr. Gicinto;

18   correct, Mr. Musk?

19            MR. SPIRO:  Can I just check?

20            MR. FISCHBACH:  The deposition --

21            THE WITNESS:  Yes, 20.

22            MR. FISCHBACH:  Thank you.

23   BY MR. FISCHBACH:

24   Q.      And, sir, I deposed Mr. Gicinto.  And you'll see

25   on page 66 of the deposition, I highlighted a specific

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

```
 1   compensated or offered compensation from Linette Lopez?
 2   A.      This was from his friend, or claimed friend,
 3   that Nick Gicinto told me about.
 4   Q.      Who was that?
 5   A.      I don't recall the name.
 6   Q.      And you didn't undertake any -- well, I
 7   shouldn't say that.
 8           Did you undertake any personal investigation to
 9   determine whether or not Mr. Tripp had been compensated
10   or offered compensation from Linette Lopez?
11   A.      No.
12           (Exhibit 21 was marked for identification.)
13           MR. FISCHBACH:  21?
14           THE REPORTER:  Yes.
15   BY MR. FISCHBACH:
16   Q.      Mr. Musk, the court reporter has handed you what
17   has been marked as deposition Exhibit 21.
18   A.      Mm-hmm.
19   Q.      It's there by your right hand, sir.
20   A.      Yes.
21   Q.      And this is you stating "Are you 100 percent
22   certain that @businessinsider stands by @lopezlinette
23   and supports everything she's done?  Why won't Lopez go
24   on record saying that she never offered Tripp anything
25   for inside info or asked him to break his
```

```
 1            THE WITNESS:  I have nothing to add.
 2    BY MR. FISCHBACH:
 3    Q.     You were just pondering something?  Is that what
 4    you were doing, Mr. Musk?
 5            MR. SPIRO:  Objection.  Form.  Objection.  Asked
 6    and answered.
 7            THE WITNESS:  The judge said don't waste time.
 8    BY MR. FISCHBACH:
 9    Q.     And the judge said answer my questions.  So I'm
10    asking you, Mr. Musk, were you just posing a question?
11    Or did you intend to convey a message with this tweet?
12            MR. SPIRO:  Objection.  Asked and answered.
13            But you can answer the same answer that you've
14    already given if you'd like.
15            THE WITNESS:  I answered the question.
16            (Exhibit 22 was marked for identification.)
17            MR. FISCHBACH:  22?
18    BY MR. FISCHBACH:
19    Q.     Sir, the court reporter handed you what has been
20    marked as deposition Exhibit 22.
21    A.     James Uelmen, yes.
22    Q.     Sir, this is an email from Mr. Uelmen to you
23    June 20th, 2018.  It says "Sir, I worked as a Quality
24    Tech in Stator as well as cooling tubes and a few other
25    departments.  I was terminated last week (unfairly I
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1    believe).  I was told someone called the 800 [number] on

2    me and that even though I had no history of offensive

3    behavior, that was enough to terminate me."

4         It goes on to state "All I want is my job back.

5    But while I was there, I did work closely with Martin

6    Tripp and he has reached out to me."

7    A.    Right.

8    Q.    What did you do in response to this email,

9    Mr. Musk?

10   A.    I believe I asked Nick Gicinto to talk to him.

11   Q.    All right.  Do you know if Mr. Gicinto ever

12   talked to him?

13   A.    Yes.

14   Q.    All right.  What -- what information did you

15   receive from Mr. Gicinto regarding Mr. -- is it

16   "Uelmen"?

17   A.    I'm not sure how to pronounce his last name.

18   Q.    All right.  What information did you receive

19   from Mr. Gicinto?

20         MR. SPIRO:  Is there a time period?

21         THE WITNESS:  Yeah.

22   BY MR. FISCHBACH:

23   Q.    Do you recall receiving any information from

24   Mr. Gicinto regarding Mr. Uelmen?

25   A.    Yes.  That -- Uelmen is -- is -- I think he

CONFIDENTIAL - Elon Musk - 2/21/2020

1    claimed to Nick Gicinto that there was, like, this

2    $50,000 payment for insider information from Linette

3    Lopez and, I believe, implied that Tripp had received

4    something to that effect.

5              MR. FISCHBACH:   23.

6              (Exhibit 23 was marked for identification.)

7    BY MR. FISCHBACH:

8    Q.        Sir, the court reporter has handed you what has

9    been marked as deposition Exhibit 23.   That's an

10   email --

11             MR. SPIRO:   Do I get a copy of this?

12             MR. FISCHBACH:   Where is the other one?

13             MR. SPIRO:   I can just look at his if that's --

14             THE WITNESS:   Yeah, that's fine.

15             MR. SPIRO:   It's short.   I don't care.

16             MR. FISCHBACH:   Thank you.

17             MR. MITCHELL:   Here it is.

18             MR. FISCHBACH:   Oh, there it is.   I'm sorry.

19   Here you go, Mr. Spiro.

20             MR. SPIRO:   Yeah, thanks.

21   BY MR. FISCHBACH:

22   Q.        It's originally an email from Mr. Uelmen to you.

23   "Sir, I worked with Marty Tripp.   I was a Quality Tech

24   and I am being contacted by reporters because he gave

25   them my name.   I need some advice.   I was a loyal and

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

**CONFIDENTIAL - Elon Musk - 2/21/2020**

1    hardworking employee.  I believe in what you" --

2    "[you're] trying to do.  I have a family and all I want

3    is to be a good father and husband.  Please contact me."

4         And you responded with "What is the situation

5    with Marty?  How can I help?"

6         Why did you respond personally to this email?

7    A.    It's normal for me to respond to people at

8    Tesla.  It's -- this was not unusual.  So I am actually

9    generally quite reachable.

10   Q.    Right.  But, sir, at this point in time you've

11   got investigators, you've got lawyers, all of them

12   looking at Martin Tripp.

13        Why did you feel the need to personally respond

14   to this email?

15        MR. SPIRO:  Objection to the form of the

16   question and the windup, if that's even -- if any of

17   that's even true.

18        But what -- what -- you can answer the question

19   of --

20        THE WITNESS:  I mean, it's --

21        MR. SPIRO:  -- why did you respond to this

22   email.

23        THE WITNESS:  I -- I mean, this -- this

24   guy is -- said he had important information regarding

25   Tripp.  So I replied "What is the situation with Marty?

1   How can I help?"

2   BY MR. FISCHBACH:

3   Q.      What were you going to do to help Mr. Uelmen?

4   A.      At no point did we offer him any compensation or

5   any quid pro quo.

6   Q.      Well, that wasn't my question, sir.  My question

7   was what were you going to do to help Mr. Uelmen?

8           MR. SPIRO:  If you know.

9           THE WITNESS:  I mean, this is just a simple

10   question, "How can I help?"

11   Q.      Well, but what were you going to do to help him?

12   A.      I -- you know, I need to know what is going on.

13   I don't know what I could do to help him.

14   Q.      What kind of help were you willing to offer

15   Mr. Uelmen?

16           MR. SPIRO:  If you can answer that question.

17           THE WITNESS:  What do you mean?

18   BY MR. FISCHBACH:

19   Q.      Sir, I -- it's your -- it's your email.  What

20   kind of help were you willing to offer Mr. Uelmen when

21   you wrote this email?

22           MR. SPIRO:  Again, I'm objecting to form.  It's

23   incomprehensible.

24           If you can answer that question, you can answer

25   it.

CONFIDENTIAL - Elon Musk - 2/21/2020

1           THE WITNESS:  Yeah, the -- I mean, the

2    implication is that -- that there was some quid pro quo

3    offered here where if he provided information, then he

4    would be compensated in some way.  And that did not

5    occur at any point.

6    BY MR. FISCHBACH:

7    Q.      Did you ever talk with Mr. Uelmen?

8    A.      I don't think I ever spoke to him.

9           MR. FISCHBACH:  24?

10          THE REPORTER:  Yes.

11          (Exhibit 24 was marked for identification.)

12   BY MR. FISCHBACH:

13   Q.      Sir, the court reporter has handed you what has

14   been marked as deposition Exhibit 24.  This is an

15   email -- at least it appears to be an email that you'd

16   forwarded to somebody with the name Deth stayerr with

17   the title "They're not [that] smart."  It includes some

18   communications between yourself and Bonnie Norman.

19          Who's Bonnie Norman?

20   A.      Bonnie Norman has a -- she used to run or may

21   still run Tesla Motors Club.  They're kind of a website

22   by Tesla users.

23   Q.      Is she generally a pro-Tesla person, anti-Tesla

24   person?

25   A.      I mean, she's mostly pro-Tesla.  Not -- you

CONFIDENTIAL - Elon Musk - 2/21/2020

1  know, she's -- yeah, that's a -- it is a

2  customer-focused web site.  So she's not entirely

3  pro-Tesla, but she's mostly pro-Tesla.

4  Q.      Well, is she a Tesla employee?

5  A.      No.

6  Q.      Is she compensated in any way by Tesla?

7  A.      No, not that I'm aware of.

8  Q.      Why were you communicating with her about

9  Mr. Tripp if she's the facilitator of this

10  consumer-oriented website?

11  A.      I guess she sent me an email saying that there's

12  some connection between a short-seller and Marty Tripp.

13  Q.      And so why did you -- so she sent you an email.

14  Why did you feel the need to respond to that email about

15  a connection between a short-seller and Mr. Tripp?

16  A.      I mean, I've had many email correspondences with

17  Bonnie; so yeah.  I mean, she's saying here that there

18  appears to be some connection between Chanos, Fossi, and

19  Tripp.  And then my reply is "I wonder if Tripp was sent

20  to work with Tesla directly or indirectly by Chanos.

21  That would be pretty crazy."

22  Q.      Who's Chanos?

23  A.      He's a short-seller of Tesla who goes on the

24  media all the time saying Tesla is going to be worth

25  zero.  Turns out that's not true.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1    Q.      What's the stock price today?

2    A.      I don't know.  Let's just say it didn't work out

3    well.

4    Q.      When you're right, you're right, Mr. Musk.

5    A.      Yeah.

6    Q.      Why was --

7    A.      Place your bets.

8    Q.      Why was she -- why was she even investigating

9    whether or not there was a link between Mr. Tripp and

10   Mr. Chanos?

11   A.      I don't know.

12   Q.      Did you ask her to investigate that?

13   A.      No.

14   Q.      So then she just provided you unsolicited

15   information that there might be a link between Mr. Tripp

16   and Mr. Chanos?

17   A.      I believe so.

18   Q.      Why did you forward this conversation on to Deth

19   stayerr?

20   A.      Do you mean ████████████?

21   Q.      Yeah.

22   A.      Oh, I just thought this was just crazy that -- I

23   just thought it was like, wow, this is pretty wild

24   stuff; so yeah.  I mean --

25   Q.      Why did you feel the need to -- why did Deth

CONFIDENTIAL - Elon Musk - 2/21/2020

1    stayerr need to know this information about Mr. Tripp

2    being allegedly connected with Mr. Chanos?

3    A.      Well, I had had some conversations with Deth

4    stayerr about this, you see.

5    Q.      Who is Deth stayerr?

6    A.      The Deth stayerr legal name is Claire Boucher.

7    Q.      And who is that?

8    A.      That is my girlfriend.

9    Q.      By the way, congratulations, Mr. Musk.

10   A.      Oh, thank you, I think.

11           (Exhibit 25 was marked for identification.)

12           MR. FISCHBACH:  That's 25; right?

13           THE REPORTER:  Yes.

14   BY MR. FISCHBACH:

15   Q.      Before we go on to Exhibit 25, sir -- I mean,

16   other than this speculation from Ms. Norman, did you

17   ever have any evidence that Mr. Tripp was in fact

18   working with Mr. Chanos?

19   A.      There was -- I think -- I think Uelmen conveyed

20   to Gicinto that there was some connection, yeah.

21   Q.      Did your investigation of Mr. Tripp uncover any

22   connection between him and Mr. Chanos -- strike that.

23           Did Tesla's investigation of Mr. Tripp uncover

24   any connection between him and Mr. Chanos?

25   A.      There were -- there were a lot of coincidences,

CONFIDENTIAL - Elon Musk - 2/21/2020

1   but there was not an -- there was no -- there was no

2   hard evidence, but a lot of strange coincidences.

3           Linette Lopez just constantly posts about Chanos

4   and how they're best friends and then -- and then writes

5   articles that are in his -- in his interests.

6   Q.      Sir, the court reporter has handed you what has

7   been marked as deposition Exhibit 25.  This is an email

8   from yourself, again, forwarded in -- forwarding an

9   email from yourself to C* titled "Fwd:  gigaman nv."

10          I see Todd -- is it "Maron"?  Is that how it's

11  pronounced?

12  A.      Yes.

13  Q.      He was Tesla's general counsel at the time?

14  A.      Yeah.

15  Q.      He's copied on these emails; correct?

16  A.      Yes.

17  Q.      Why is Todd Maron copied on your emails to

18  Bonnie Norman?

19  A.      Because it would obviously be a serious concern

20  if Tripp had been sent to work at Tesla by a

21  short-seller to provide them with insider information

22  and if he had exaggerated negative info to journalists

23  from a position of credibility on the inside.

24  Q.      Did Tesla's investigation of Mr. Tripp ever

25  uncover any evidence that Mr. Tripp had been sent to

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

1    work for Tesla by a short-seller or to provide -- inside

2    information?

3    A.      It sure seemed that way, but we couldn't -- we

4    couldn't ever find any hard evidence.  It sure seemed

5    odd that somebody would be this energized to provide

6    negative information to the press.  Unless they're paid

7    for it, why are they doing it?  Maybe you know.

8    Q.      It appears that Bonnie Norman is receiving

9    information from others that aren't really identified in

10   this email.

11           Do you know who was providing Bonnie Norman

12   information about Mr. Tripp?

13   A.      No.

14   Q.      Do you know how she vets these people that are

15   providing this information?

16   A.      No.

17   Q.      How would you know if -- whether or not their

18   agenda aligned with Tesla's agenda if you don't know how

19   they're vetted?

20           MR. SPIRO:  Objection.  Form.

21           If you can understand that question.  You can

22   answer it, if you can understand it.

23           THE WITNESS:  I don't understand the question.

24   BY MR. FISCHBACH:

25   Q.      All right.  If you don't know how --

**CONFIDENTIAL - Elon Musk - 2/21/2020**

1    A.      It's not an understandable question, I think, is
2    the problem.
3    Q.      That's a fair -- fair response, Mr. Musk.  I'll
4    try to rephrase it.
5            If you don't know how Bonnie Norman is vetting
6    these people that are giving her information, how do you
7    know whether or not their agenda aligns with Tesla's
8    agenda?
9    A.      I don't.
10   Q.      Why use Bonnie Norman to investigate Mr. Tripp
11   when you have attorneys and private investigators and
12   inhouse investigators?
13           MR. SPIRO:  Objection.  Assumes facts.
14           But you can answer the actual question.
15           THE WITNESS:  I mean, it's just sort of typical
16   legal complex question where you can't answer the
17   question without giving some credence to the initial
18   part of the question or the latter part of the question.
19   This is, like, Law 101 BS.
20   BY MR. FISCHBACH:
21   Q.      Well, let me -- let me break it down for you,
22   Mr. Musk.
23   A.      Yeah.
24   Q.      This is an email sent July 22nd of 2018;
25   correct, sir?

CONFIDENTIAL - Elon Musk - 2/21/2020

1    A.      Yes.

2    Q.      And the suit was filed on June 20th of 2018;

3    correct?

4    A.      Sure.

5    Q.      And even before the lawsuit was filed and after

6    the lawsuit was filed, Mr. Gicinto and Mr. Nocon and

7    their team were investigating Mr. Tripp; correct, sir?

8    A.      Yeah.  I -- yes, I think so.

9    Q.      So, again, sir, my question is if you've got

10   attorneys --

11   A.      Yeah.

12   Q.      -- if you've got investigators, why do you need

13   Bonnie Norman to be investigating Mr. Tripp?

14   A.      I'm not asking Bonnie Norman to investigate

15   Tripp.  She's doing it.  It's up to her.  Free country.

16   Q.      You don't think you're encouraging her, by

17   responding to these emails, to continue with her

18   investigation?

19          MR. SPIRO:  Objection to form.

20          If the question is, you know, were you

21   encouraging her, that would be a proper question.  You

22   can answer that question.

23          THE WITNESS:  I mean, I would certainly be --

24   welcome any information that was relevant to the

25   situation.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

1   BY MR. FISCHBACH:

2   Q.      Why did you forward this email on to C*?

3   A.      AKA Deth stayerr.

4   Q.      Oh, is that also Deth stayerr?

5   A.      Yes.

6   Q.      Okay.  Thank you.

7           But the question still stands, sir.  Why did you

8   feel the need to send this email to your girlfriend?

9   A.      I was discussing the case with her and -- and --

10  yeah.  Just sort of -- I was just outraged by the

11  situation.

12  Q.      So your girlfriend is somebody that you have had

13  discussions with regarding Martin Tripp?

14  A.      Yes.

15  Q.      What kind of discussions?

16  A.      Well, I just said that there was -- outrageous

17  that this guy was, you know, breaking his

18  confidentiality agreements and sending false information

19  to the media and he appeared to be working with

20  short-sellers.

21  Q.      Was this gigaman nv account ever linked to

22  Mr. Tripp?

23  A.      I don't know.

24          MR. FISCHBACH:  26?

25          THE REPORTER:  Yes.

1   A.      Yeah.

2   Q.      But my question for you, sir, is did you believe

3   Mr. Tripp -- in addition to being a horrible person and

4   somebody that betrayed his word of honor -- was also a

5   criminal?

6   A.      Do I believe that Tripp is a criminal and

7   someone who -- and I -- betrayed his -- he has no honor.

8   Q.      But, sir, my question was in addition to him

9   being a horrible person --

10  A.      Yes.

11  Q.      -- excuse me, a horrible human being and

12  somebody that betrayed his word of honor, did you also

13  think he was a criminal?

14  A.      Yes.

15  ███   ███ ███   ███ ███ ███ ███

███   ███   ███ ███ ███

███   ███   ███ ███   ███ ███ ███

███   ███   ███ █ ███ ███ ███ █ ███ ███ ███ ███

███   █████

███   ███   ███ ███   ███

███   ███   █ ███ ███ ███

███   ███   ███ ███ ███

███   ███   ███ ███ ███ ███

███   ███ ███ ███ ███ ███ ███

███   ███ ███ ███   ███ ███ ███ ███ █

**CONFIDENTIAL – Elon Musk – 2/21/2020**

```
  7            MR. SPIRO:  So you can't answer the question.
  8            THE WITNESS:  Yeah, so they're full of it.
  9    BY MR. FISCHBACH:
 10    Q.     Excuse me, what was that?
```

```
 19    Q.     Anything else, Mr. Musk?
 20    A.     Not at this time.
 21    Q.     When you sent this email, did you want to see
 22    Mr. Tripp punished in the criminal justice system for
 23    what he had done?
 24    A.     Certainly
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

▆▆▆  ▆▆▆▆▆ ▆ ▆▆▆▆▆▆ ▆▆▆▆ ▆▆▆▆ ▆▆▆ ▆▆▆

2    Q.       And, sir, I'm not referring to the fact that

3    maybe you or people working for you are -- are still

4    monitoring Mr. Tripp.   I'm referring to this email which

5    is a statement by you about a meeting having occurred

6    between Tesla legal and the Nevada -- Nevada Attorney

7    General's Office.

8             And my question for you is did you want to see

9    Mr. Tripp punished in the criminal justice system for

10   what he had done at Tesla?

11   A.       Yes.   I thought he had committed a crime and

12   deserved to pay the appropriate penalty.

13   Q.       Did a prosecution move forward?

14   A.       No.

15   Q.       You don't know?

16   A.       I -- they -- they did not move forward.

17   Q.       Why didn't they move forward if the facts were

18   unequivocal?

19   A.       I -- I still think this is a major issue with

20   the attorney -- the Attorney General's Office of Nevada

21   should have moved forward.

▆▆  ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆

▆▆  ▆▆▆▆▆ ▆▆▆▆▆ ▆ ▆▆▆ ▆▆▆▆▆ ▆▆▆▆ ▆▆▆

▆▆  ▆▆▆ ▆▆▆ ▆▆▆ ▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆

▆▆  ▆▆▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆▆▆ ▆▆▆

22   BY MR. FISCHBACH:

23   Q.       Are you aware that your counsel, your former

24   counsel of record, John Hueston, gave a PowerPoint

25   presentation to members of both the Nevada Attorney

1  General's office and FBI agents advocating for a

2  criminal prosecution of Mr. Tripp?

3  A.      I don't know that -- about a PowerPoint

4  presentation, but I -- I know he talked to them.

5  Q.      Were you present at that meeting?

6  A.      No.

7  Q.      Let's go to the first page of that exhibit, sir,

8  Exhibit 26.

9  A.      Yes.

10  Q.      You wrote at the bottom "Don't they have

11  anything" -- or, excuse me, "Don't they have something

12  else to write about?  It is so tiresome to see myself in

13  the news," exclamation point.

14          Do you see that?

15          MR. SPIRO:  Objection.  This is outside the

16  scope.

17          MR. FISCHBACH:  No.  It's --

18          MR. SPIRO:  You don't have to answer that.

19          MR. FISCHBACH:  It's a communication from

20  Mr. Musk.  It's an email from Mr. Musk.

21          MR. SPIRO:  Yeah.  But it's outside the scope of

22  the -- of the rules of your deposition.

23          MR. FISCHBACH:  Well, I'm glad you mentioned

24  that because --

25          Mark that.  Mark that.

1  A.      Yes.

2  Q.      All right.  Second bullet point is "Any written

3  or email communications disclosed by Tesla to or from

4  Elon Musk."

5          Did I read that right?

6  A.      Yes.

7  Q.      All right.  And I will avow to you, sir, that

8  this was in fact Exhibit K to our motion to compel your

9  deposition that's referenced in the court's order here

10  at Exhibit 28.  And it says "The Court will allow Elon

11  Musk to be deposed on items 1, 2, 3, and 5 as outlined

12  in Exhibit K [to] the motion to compel."

13          So subject to any written or email

14  communications disclosed by Tesla to or from email -- to

15  or from Elon Musk, Exhibit 26 is in that category, is it

16  not, Mr. Spiro?

17          MR. SPIRO:  My objection's noted.  You can ask

18  the question.

19  BY MR. FISCHBACH:

20  Q.      So, sir, you wrote in here "Don't they have

21  something else to write about?  It is so tiresome to see

22  myself in the news," exclamation point.

23          Did I read that correctly, sir?

24  A.      Yes.

25  Q.      And above that, you wrote "Will tweet as I wish

CONFIDENTIAL - Elon Musk - 2/21/2020

1    and suffer the consequences.  So it goes."

2            Did I read that correctly, sir?

3    A.       Yes.

4    Q.       Do you see any conflict between those two

5    statements, it's tiresome to see yourself in the news

6    but you'll tweet as you wish and suffer the

7    consequences?

8            MR. SPIRO:  Objection to form.  It's not a

9    permissible legal question.

10           But you can answer if you can understand it.

11           THE WITNESS:  I can't understand it.

12   BY MR. FISCHBACH:

13   Q.       I said do you see any conflict between those two

14   statements.

15           MR. SPIRO:  Same objection.

16           THE WITNESS:  Same response.

17   BY MR. FISCHBACH:

18   Q.       You don't understand the question?

19   A.       No.

20   Q.       Did I read the two statements correctly?

21   A.       Did you -- can you read?

22   Q.       I said did I read the two statements correctly,

23   Mr. Musk.

24   A.       I think you spoke the words from the email.

25   Q.       Do you know the two statements I'm referring to?

1    A.      Yes.

2    Q.      All right.  So do you see any conflict between

3    those two statements?

4            MR. SPIRO:  Objection to form.

5            THE WITNESS:  So --

6            MR. SPIRO:  You can -- if you can understand the

7    question, you can ask.  If you can't, you don't have

8    to --

9            THE WITNESS:  Yeah.  Unfortunately I cannot

10   understand it.

11   BY MR. FISCHBACH:

12   Q.      What did you mean when you said "Will tweet as I

13   wish and suffer the consequences"?

14   A.      Well, I think I meant that I will tweet as I

15   wish -- you know, First Amendment -- and suffer the

16   consequences.

17   Q.      Nothing more than that?

18   A.      I don't think there's a deep and hidden meaning

19   between -- behind the simple statement.

20   Q.      Is that -- is that a general attitude towards

21   your statements on Twitter, or was it more specific?

22           MR. SPIRO:  Well, objection to that question as

23   being outside the scope of the deposition.

24           MR. FISCHBACH:  I'm asking him what the

25   statement meant.

CONFIDENTIAL - Elon Musk - 2/21/2020

1          MR. SPIRO:  And he's already answered you.  It

2     meant what the words said.

3          Do you have anything further to add?

4          THE WITNESS:  No.

5          Well, I did delete my Instagram because it's

6     weak sauce.

7          MR. SPIRO:  Thank you for adding that for the

8     record.

9     BY MR. FISCHBACH:

10    Q.     Is it still deleted, Mr. Musk?

11    A.     It's hard deleted, unrecoverable.

12    Q.     Well, this was -- this email was dated

13    August 21st of 2018.  Before you deleted that Instagram

14    account, did you use it to message anybody about

15    Mr. Tripp?

16    A.     No.

17    Q.     Other than erm@tesla.com, what other email

18    accounts have you used to communicate with others

19    regarding Martin trip?

20    A.     I mean, I think some of the emails had

21    erm@spacex.com.  I don't think anything else.

22    Q.     So other than erm@tesla.com and erm@spacex.com,

23    what other emails have you used to communicate with

24    others regarding Martin Tripp?

25    A.     I don't think I've used any other emails.

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

**CONFIDENTIAL - Elon Musk - 2/21/2020**

1   Q.      If one of the other senior offers at Tesla had

2   come to you with that and said, "Let's not waste time

3   our time and money on Martin Tripp by suing him," would

4   you have listened?

5   A.      I would have taken that into account.

6   Q.      Would you have listened to the advice -- strike

7   that.

8           Would you have followed the advice?

9           MR. SPIRO:  Objection to form as to all these

10  questions.

11          You can answer if you can.

12          THE WITNESS:  I certainly listen to people's

13  opinion, and then I may agree or disagree with that

14  opinion.

15  BY MR. FISCHBACH:

16  Q.      Sitting here today, knowing what you know, do

17  you think any of the statements that are the subject of

18  Mr. Tripp's counterclaims are in fact false?

19          MR. SPIRO:  Objection to form.

20          But you can answer.

21          THE WITNESS:  Pardon?  Could you say that again.

22          MR. FISCHBACH:  Read the question back to the

23  witness, please.

24          (The Reporter read the record as requested.)

25          MR. SPIRO:  Same objection.

1          Try to answer it.

2          THE WITNESS:  I -- I don't -- wait.  Do I

3    believe that -- any of Tripp's counterclaims are what?

4    What are you talking about?

5    BY MR. FISCHBACH:

6    Q.     Well, sir, a counterclaim --

7    A.     Do you want say what these things are?

8    Q.     Certainly, Mr. Musk.  The counterclaim are based

9    on statements made by you about Mr. Tripp, statements

10   made in that June 17th email that you sent to everyone

11   at Tesla, statements that you made to Julia Wong on

12   June 20th to Julia Wong, and then statements you made on

13   Twitter insinuating that Mr. Tripp had been compensated

14   or promised compensation from Linette Lopez.

15          Sitting here today, knowing what you know, do

16   you think any of those statements are false?

17          MR. SPIRO:  Objection to form.

18          Answer the question if you can answer the

19   question.

20          THE WITNESS:  Can you just be specific about

21   what statements you're referring to.

22   BY MR. FISCHBACH:

23   Q.     I just told you, Mr. Musk.  Do you need me to

24   tell you again?

25          MR. SPIRO:  So the tweets to Linette Lopez.

CONFIDENTIAL - Elon Musk - 2/21/2020

1        THE WITNESS:  Okay.

2        MR. SPIRO:  The questions.

3        THE WITNESS:  Do I think the tweets were false?

4   The -- I -- where I asked the questions?

5   BY MR. FISCHBACH:

6   Q.      Sir, I'm asking you, sitting here today --

7   A.      Yeah.

8   Q.      -- knowing what you know, do you think any of

9   those three statements that I just referenced are in

10  fact false?

11  A.      Please state the statements --

12  Q.      All right.

13  A.      -- one at a time, and I'll say yes or no.

14  Q.      Statement number one --

15  A.      Yes.

16  Q.      -- June 17th email stating that Mr. Tripp had

17  caused extensive and damaging sabotage to Tesla's

18  operations.

19          Sitting here today, knowing what you know, do

20  you think that statement's false?

21  A.      No.  I think he did do it.

22  Q.      All right.  Sitting here today, the statement on

23  June 20th to Julia Wong stating that you had just -- or

24  the -- Tesla had just received a call at the Gigafactory

25  that Martin Tripp was going to come back and shoot the

1   place up, do you think that statement was false?

2   A.      No.  I think that's true.

3   Q.      All right.

4   A.      What?  Of course.

5   Q.      Sitting here today, the tweet you made on

6   July 5th insinuating that Mr. Tripp had been compensated

7   or promised compensation from Linette Lopez -- do you

8   think, sitting here today, knowing what you know, that

9   statement's false?

10  A.      That's -- that's -- again, you're engaging in

11  legal trickery.  I asked a question.  That's not the

12  same as making a statement.

13  Q.      Do you wish to retract any of the statements

14  regarding Mr. Tripp that are the subject of his

15  counterclaims?

16  A.      No.

17  Q.      Do you wish to apologize to Mr. Tripp for

18  anything?

19  A.      I certainly do not.

20  Q.      Have you read Mr. Tripp's deposition in this

21  case?

22  A.      No.

23  Q.      Did you watch the video of Mr. Tripp's

24  deposition?

25  A.      No.

CONFIDENTIAL - Elon Musk - 2/21/2020

1   Q.      Are you aware that during his deposition Tesla's

2   counsel asked if he had been ever diagnosed with any

3   kind of psychological condition?

4   A.      No.

5   Q.      Okay.  Based on Tesla's investigation of

6   Mr. Tripp, do you think he has any kind of psychological

7   condition?

8           MR. SPIRO:  Objection.  If you --

9           THE WITNESS:  You're asking my opinion?  I think

10  he's a -- mad and bad.

11  BY MR. FISCHBACH:

12  Q.      Is that a psychological condition?

13  A.      Yes.

14  Q.      All right.  Can I find -- can I find that in the

15  DSM-5?

16  A.      Well, you may know it better than I do.

17  Q.      Are you aware that your attorney also asked

18  Mr. Tripp during his deposition whether or not he had

19  ever been diagnosed as a, quote, "narcissistic

20  sociopath"?

21  A.      No, I didn't know that.  But it sounds like --

22  sounds true.

23  Q.      Do you think Martin Tripp's a narcissistic

24  sociopath?

25  A.      I think -- I think the word "narcissist" and

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

Page 122

1  "sociopath" are abused.  Do I think that it partly

2  applies to him?  Sure.

3  Q.     Do you have some kind of unique ability to

4  identify narcicisstic sociopaths?

5  A.     You mean by looking in the mirror?

6  Q.     That wasn't my question, sir.

7         Do you have some kind of unique -- do you have

8  some kind of unique ability to identify narcicisstic

9  sociopaths?

10 A.     I mean, I think I have above average insight to

11 people's personalities.

12 Q.     And, sir, since you've brought it up, do you

13 think you're a narcissistic sociopath?

14 A.     No.

15 Q.     All right.  Then why did you say "by looking in

16 the mirror"?

17 A.     I was making a joke.

18 Q.     All right.

19 A.     You obviously didn't get it.

20 Q.     Are we here to joke, Mr. Musk, or are we here to

21 talk about the truth?

22 A.     We're here to talk about the truth.

23 Q.     Are you aware that during Mr. Tripp's deposition

24 Tesla's counsel asked him if he had had an extramarital

25 affair?

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

CONFIDENTIAL - Elon Musk - 2/21/2020

```
 1    BY MR. FISCHBACH:
 2    Q.       Sir, the court reporter has handed you what has
 3    been marked as deposition Exhibit 31.  This is
 4    Mr. Tripp's answer and counterclaim.
 5             Did you ever review the counterclaim by
 6    Mr. Tripp?
 7    A.       No.
 8    Q.       Have you ever read it?
 9    A.       I have not.
10    Q.       Did you ever take the time to look as to whether
11    or not some of the allegations in his counterclaim are
12    in fact true?
13    A.       I -- no.
14    Q.       Why not?
15    A.       Because I -- I -- he -- he is just a huge liar
16    and a criminal in my opinion.
17    Q.       All right.  Was it not important to you to
18    determine whether or not there was any veracity to the
19    allegations in the counterclaim?
20             MR. SPIRO:  You can respond to that other than
21    revealing conversations you've had with counsel
22    obviously; so --
23             THE WITNESS:  Yeah.  We have to -- I mean, I've
24    certainly discussed this case with counsel.  But yeah, I
25    mean, it -- this is -- this is obviously just -- or, in
```

```
 1    Q.      Anything else?  Do you have any other insults
 2    you want to say to me during this deposition, Mr. Musk?
 3    A.      Do you have any insults you want to say to me?
 4    Q.      No.  I don't answer your questions, Mr. Musk.
 5    You answer mine.
 6            My question was do you have any other insults
 7    you'd like to state to me during this deposition?
 8            MR. SPIRO:  It's -- it sound like -- it sounded
 9    like no; so let's move on to another question about the
10    Tripp case.  It's, you know, limited categories for this
11    deposition.
12            MR. FISCHBACH:  Mr. Spiro, do you have any
13    questions?
14            MR. SPIRO:  I don't.
15            MR. FISCHBACH:  Mr. Musk, thank you for being
16    here today, sir.  So it goes.  Be well.
17            THE VIDEOGRAPHER:  This concludes today's
18    deposition of Elon Musk.  A total of two media was used.
19    We're going off record.  Time is 3:32 P.M.  Thank you.
20            (Deposition concluded at 3:32 P.M.)
21
22
23
24
25
```

7ce0a6f1-0c9d-45ff-8c40-5bf5a42eec72

| | |
|---|---|
| **From:** | Elon Musk |
| **Sent:** | Monday, June 18, 2018 9:36 AM |
| **To:** | Everybody |
| **Subject:** | Re: Some concerning news |

Late last night we had another strange incident that was hard to explain. Small fire on the body-in-white production line. No one was in the area and there were no injuries or significant equipment damage, but it was enough to stop the body production line for several hours.

Could just be a random event, but as Andy Grove said, "Only the paranoid survive." Please be on the alert for anything that's not in the best interests of our company. If you aren't getting a response from the emdesk email, please send me a note directly.

Thanks,
Elon

> On Jun 17, 2018, at 11:55 PM, Elon Musk <erm@tesla.com> wrote:
>
> I was dismayed to learn this weekend about a Tesla employee who had conducted quite extensive and damaging sabotage to our operations. This included making direct code changes to the Tesla Manufacturing Operating System under false usernames and exporting large amounts of highly sensitive Tesla data to unknown third parties.
>
> The full extent of his actions are not yet clear, but what he has admitted to so far is pretty bad. His stated motivation is that he wanted a promotion that he did not receive. In light of these actions, not promoting him was definitely  the right move.
>
> However, there may be considerably more to this situation than meets the eye, so the investigation will continue in depth this week. We need to figure out if he was acting alone or with others at Tesla and if he was working with any outside organizations.
>
> As you know, there are a long list of organizations that want Tesla to die. These include Wall Street short-sellers, who have already lost billions of dollars and stand to lose a lot more. Then there are the oil & gas companies, the wealthiest industry in the world — they don't love the idea of Tesla advancing the progress of solar power & electric cars. Don't want to blow your mind, but rumor has it that those companies are sometimes not super nice. Then there are the multitude of big gas/diesel car company competitors. If they're willing to cheat so much about emissions, maybe they're willing to cheat in other ways?
>
> Most of the time, when there is theft of goods, leaking of confidential information, dereliction of duty or outright sabotage, the reason really is something simple like wanting to get back at someone within the company or at the company as a whole. Occasionally, it is much more serious.
>
> Please be extremely vigilant, particularly over the next few weeks as we ramp up the production rate to 5k/week. This is when outside forces have the strongest motivation to stop us.
>
> If you know of, see or suspect anything suspicious, please send a note to emdesk@tesla.com with as much info as possible. This can be done in your name, which will be kept confidential, or completely anonymously.
>

1

EXHIBIT 7
Musk
2/21/2020
Reported by:  Michael P. Hensley
CSR 14114, RDR

TES-TRIPP_0001221

> Looking forward to having a great week with you as we charge up the super exciting ramp to 5000 Model 3 cars per week!
>
> Will follow this up with emails every few days describing the progress and challenges of the Model 3 ramp.
>
> Thanks for working so hard to make Tesla successful, Elon

TES-TRIPP_0001222

------- Original message --------
From: Elon Musk
Date: 6/20/18 5:17 PM (GMT-08:00)
To: Todd Maron, Sarah O'Brien
Cc: EMDesk
Subject: Re: Termination Lawsuit

Meant to say "no injuries"


On Jun 20, 2018, at 5:16 PM, Elon Musk wrote:

Begin forwarded message:


From: Elon Musk
Date: June 20, 2018 at 10:28:06 AM PDT
To: Marty Tripp

Subject: Re: Termination Lawsuit

There are literally injuries with Model 3. It is by far the safest car in the world for any midsize vehicle. And of course a company with billions of dollars in product is going to have millions of dollars in scrap. This is not news.

However, betraying your word of honor, breaking the deal you had when Tesla gave you a job and framing your colleagues are wrong and some come with legal penalties. So it goes. Be well.


On Jun 20, 2018, at 10:03 AM, Marty Tripp wrote:

I NEVER 'framed' anyone else or even insinuated anyone else as being involved in my production of documents of your MILLIONS OF DOLLARS OF WASTE, Safety concerns, lying to investors the WORLD.

Putting cars on the road with safety issues is being a horrible human being!


On Jun 20, 2018, at 10:00 AM, Elon Musk wrote:

You should ashamed of yourself for framing other people. You're a horrible human being.


On Jun 20, 2018, at 9:59 AM, Marty Tripp wrote:

I never made a threat. I simply told you that you have what's coming.

Thank you for this gift!!!!


On Jun 20, 2018, at 9:42 AM, Elon Musk wrote:

Threatening me only makes it worse for you


From: Marty Tripp
Date: June 20, 2018 at 8:57:29 AM PDT
To: Elon Musk
Subject: Termination/Lawsuit

Don't worry, you have what's coming to you for the lies you have told to the public and investors.

EXHIBIT 8

Musk

2/21/2020

Reported by:  Michael P. Hensley
CSR 14114, RDR

TRIPP000868

| | |
|---|---|
| **From:** | Elon Musk |
| **Sent:** | Wednesday, June 20, 2018 5:29 PM |
| **To:** | Julia Wong |
| **Cc:** | Dave Arnold;Press;Sarah O'Brien |
| **Subject:** | Re: Query re: Martin Tripp and your emails |

Tripp sent me a threatening email this morning. Below is the exchange. I was just told that we received a call at the Gigafactory that he was going to come back and shoot people. The police have been alerted and we have posted additional security. Our comms team can fill you in.


------- Original message --------
From: Elon Musk <erm@tesla.com>
Date: 6/20/18 5:17 PM (GMT-08:00)
To: Todd Maron <todd@tesla.com>, Sarah O'Brien <sobrien@tesla.com>
Cc: EMDesk <emdesk@tesla.com>
Subject: Re: Termination/Lawsuit


Meant to say "no injuries"

On Jun 20, 2018, at 5:16 PM, Elon Musk <erm@tesla.com> wrote:


     Begin forwarded message:


          **From:** Elon Musk <erm@tesla.com>
          **Date:** June 20, 2018 at 10:28:06 AM PDT
          **To:** Marty Tripp <martytripp@icloud.com>
          **Subject: Re: Termination/Lawsuit**


          There are literally injuries with Model 3. It is by far the safest car in the world for any midsize vehicle. And of course a company with billions of dollars in product is going to have millions of dollars in scrap. This is not news.

          However, betraying your word of honor, breaking the deal you had when Tesla gave you a job and framing your colleagues are wrong and some come with legal penalties. So it goes. Be well.



1

On Jun 20, 2018, at 10:03 AM, Marty Tripp
<martytripp@icloud.com> wrote:

I NEVER 'framed' anyone else or even insinuated
anyone else as being involved in my production of
documents of your MILLIONS OF DOLLARS OF
WASTE, Safety concerns, lying to investors/the
WORLD.

Putting cars on the road with safety issues is being a
horrible human being!

On Jun 20, 2018, at 10:00 AM, Elon
Musk <erm@tesla.com> wrote:

You should ashamed of yourself for
framing other people. You're a
horrible human being.

On Jun 20, 2018, at
9:59 AM, Marty
Tripp
<martytripp@icloud.c
om> wrote:

I never made a
threat.  I simply told
you that you have
what's coming.

2

Thank you for this gift!!!!

On Jun 20, 2018, at 9:42 AM, Elon Musk <erm @tesla .com> wrote:

Threatening me only makes it worse for you

On Jun 20, 2018, at 8

3

TES-TRIPP_0016926

:57 AM, Marty Tripp <martytripp@icloud.com> wrote:

Do

TES-TRIPP_0016927

n
,
t
w
o
r
r
y
,
y
o
u
h
a
v
e
w
h
a
t
,
s
c
o
m
i
n
g
t
o
y
o
u
f
o
r
t
h
e
l
i
e
s
y
o
u
h
a
v
e
t

5

o
l
d
t
o
t
h
e
p
u
b
l
i
c
a
n
d
i
n
v
e
s
t
o
r
s
.

On Jun 20, 2018, at 4:38 PM, Julia Wong <julia.wong@theguardian.com> wrote:

Hi Elon,

The Guardian is planning to publish an article shortly about Tesla's lawsuit against Martin Tripp. Tripp has acknowledged to the Guardian that he was a source for a Business Insider reporter, but denies any implication that he was a saboteur, or that he hacked Tesla's MOS. Instead, Tripp claims that he went to the media after making numerous attempts to raise concerns about excess NCM, scrap, and other issues like punctured batteries, and being ignored.

Do you or Tesla want to comment on Tripp's claim that he was acting as a whistleblower?

And do you want to add any comment to the emails you sent to Tripp's personal account today, calling him a "horrible human being", among other things. Why did you decide to email Tripp after you had already fired and sued him?

Feel free to give me a call at 646-935-9101 if you'd like to discuss anything by phone.

Thanks,

TES-TRIPP_0016929

Julia

--
**Julia Carrie Wong**
Reporter
Guardian News & Media
-----
Phone/Signal/WhatsApp: 646-935-9101
Email: julia.wong@theguardian.com
-----
twitter: @juliacarriew
-----

# The Guardian

1111 Broadway
Oakland, CA 94607
theguardian.com
-----
**Download the Guardian app for Android and iOS**
-----

This e-mail and all attachments are confidential and may also be privileged. If you are not the named recipient, please notify the sender and delete the e-mail and all attachments immediately. Do not disclose the contents to another person. You may not use the information for any purpose, or store, or copy, it in any way.  Guardian News & Media Limited is not liable for any computer viruses or other material transmitted with or as part of this e-mail. You should employ virus checking software.

Guardian News & Media Limited is a member of Guardian Media Group plc. Registered Office: PO Box 68164, Kings Place, 90 York Way, London, N1P 2AP.  Registered in England Number 908396

TES-TRIPP_0016930

| From: | Shamara Bell </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=59AC3167AFA5424A91250C74438C2292-SHAMARA BEL> |
|---|---|
| To: | Kristin Krerowicz |
| Sent: | 6/20/2018 1:50:33 PM |
| Subject: | Martin Trip: Possible Threat |

Received a call

Caller preferred to remain unknown. Friend of Martin Tripp is concerned that he may do something violent & volatile. Says he is concerned because he's very hostile & very well armed.

**Shamara Bell | Solar Technical Support**
6671 S. Las Vegas Blvd. Ste 300, Las Vegas, NV 89119
p. (877) 961-7652 | SolarSupport@tesla.com



The content of this message is the proprietary and confidential property of Tesla Inc, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.



Please consider the environment before printing this email.



1   **JACKSON LEWIS P.C.**
    Joshua A. Sliker, Nevada Bar No. 12493
2   *Joshua.Sliker@jacksonlewis.com*
    3800 Howard Hughes Parkway, Suite 600
3   Las Vegas, NV 89169
    Telephone:    (702) 921-2460
4   Facsimile:    (702) 921-2461

5   **HUESTON HENNIGAN LLP**
6   John C. Hueston *(admitted pro hac vice)*
    *jhueston@hueston.com*
7   Robert N. Klieger *(admitted pro hac vice)*
    *rklieger@hueston.com*
8   Allison L. Libeu *(admitted pro hac vice)*
    *alibeu@hueston.com*
9   523 West 6th Street, Suite 400
    Los Angeles, CA 90014
10  Telephone:    (213) 788-4340
    Facsimile:    (888) 775-0898
11
12  Attorneys for Plaintiff/Counter-Defendant
13  Tesla, Inc.

14          **UNITED STATES DISTRICT COURT**

15              **DISTRICT OF NEVADA**

16  TESLA, INC., a Delaware corporation,        Case No. 3:18-cv-00296-LRH-CBC

17          Plaintiff,

18      vs.                                     **PLAINTIFF AND COUNTER-DEFENDANT
                                                TESLA, INC.'S AMENDED RESPONSES
19  MARTIN TRIPP, an individual,                AND OBJECTIONS TO DEFENDANT AND
                                                COUNTER-CLAIMANT MARTIN TRIPP'S
20          Defendant.                          SECOND SET OF INTERROGATORIES**

21

22  AND RELATED COUNTERCLAIMS

23

24      PROPOUNDING PARTY:        Defendant/Counter-Claimant Martin Tripp

25      RESPONDING PARTY:         Plaintiff/Counter-Defendant Tesla, Inc.

26      SET NO.:                  Two (Nos. 9-25)

27                                                          **EXHIBIT 12**
                                                               Musk
28                                                           2/21/2020
                                                    Reported by: Michael P. Hensley
                                                            CSR 14114, RDR

────────────────────────────────────────────────────────────
    TESLA, INC.'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES, SET TWO
5539004

CONFIDENTIAL

**INTERROGATORY NO. 12**:

Identify and explain All information regarding the Alleged Threat known by Elon Musk prior to his sending the e-mail communication referenced in Paragraph 54 of the Counterclaim, including:

- When Mr. Musk first became aware of the Alleged Threat
- All persons with whom Mr. Musk discussed the Alleged Threat on June 20, 2018
- Who provided Mr. Musk with the information of which he was aware
- What actions Mr. Musk took to verify the information

5539004

CONFIDENTIAL

1   **AMENDED RESPONSE TO INTERROGATORY NO. 12**:

2       In addition to its general objections, which are incorporated herein by reference, Tesla

3 objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of

4 the case in that it asks Tesla to "[i]dentify and explain All information regarding the Alleged Threat

5 known by Elon Musk" regarding the threat to the Gigafactory on June 20, 2018. Tesla objects to

6 this Request as argumentative, particularly as to the use of the term "Alleged Threat." Tesla further

7 objects to this Interrogatory to the extent that it calls for information protected by the

8 attorney-client privilege, work product doctrine, and all other applicable privileges, protections, or

9 immunities. Such information will not be provided in response.

10       Subject to and without waiving the foregoing general and specific objections, Tesla

11 responds to this Interrogatory as follows:

12       On June 20, 2018, Shamara Bell, an operator at Tesla's Las Vegas call center, received a

13 phone call from someone who stated that he was a very close friend of Tripp. The caller told

14 Ms. Bell that he feared for the safety of employees at the Gigafactory because Tripp was extremely

15 volatile, very well heavily armed, extremely upset, and very hostile. The caller sounded genuinely

16 concerned and afraid that Tripp would do something violent and volatile. Ms. Bell asked the caller

17 to provide his name and contact information. The caller declined, stating that he wanted to remain

18 anonymous. *See* TES-TRIPP_0000970; TES-TRIPP_0003390. Ms. Bell reported the call to her

19 supervisors (including Angel Besinaiz and Kristin Krerowicz) who notified members of Tesla's

20 security team (including Jeff Jones, Avery Bustamante, and Marshall Sprott). *See, e.g.*, TES-

21 TRIPP_0003386-88. Tesla security immediately alerted the Storey County Sheriff's Office and

22 mobilized additional security personnel to the Gigafactory.

23       Tesla security also reached out to personnel at the Las Vegas call center to obtain more

24 information about the call. Mr. Bustamante spoke with Ms. Bell, who confirmed that the caller

25 identified Tripp as the source of the threat and the Gigafactory as the target. Mr. Bustamante spoke

26 to Ms. Bell a second time, asking Ms. Bell to send an email to Mr. Jones recapping the call that she

27 received. *See* TES-TRIPP-0016596-97. Tesla security also informed Sarah O'Brien, Tesla's

28 former Vice President of Communications, that security received an alert from the Las Vegas call

- 8 -

CONFIDENTIAL

1  center about a threat to the Gigafactory. Thereafter, Ms. O'Brien spoke to Mr. Besinaiz, who

2  confirmed that the call center received the call described above.  On June 21, 2018, Ms. O'Brien

3  spoke to Ms. Bell and **Ashley Ferrigno, Ms. Bell's and Mr. Besinaiz's supervisor**. Ms. Bell

4  confirmed that she answered a call on June 20, 2018 from an anonymous caller who identified

5  himself as a friend of Tripp. Ms. Bell further confirmed that the caller stated that he feared for the

6  safety of employees at the Gigafactory because Tripp was extremely upset, extremely volatile, and

7  heavily armed.

8         Mr. Musk was initially informed of the threat to the Gigafactory on June 20, 2018, likely by

9  Sam Teller, Director, Office of the CEO.  Mr. Musk was informed that Tesla received a call that

10  Tripp was going to come in and shoot people at the Gigafactory.  Mr. Musk was further informed

11  that Tesla security alerted the police and posted additional security personnel at the Gigafactory.

12  Mr. Musk also discussed the Gigafactory threat with Mr. Jones, Ms. O'Brien, and Dave Arnold,

13  Tesla's Senior Director of Global Communications. Mr. Musk relied on Tesla's security and

14  communications teams to obtain information concerning the threat to the Gigafactory.

15  **INTERROGATORY NO. 13**:

16         Identify and explain All information known by Elon Musk regarding the contents of the

17  e-mail communication referenced in Paragraph 47 of the Counterclaim before sending said e-mail

18  communication, including:

19         •       When Mr. Musk first became aware of the "sabotage" alleged therein

20         •       Who provided Mr. Musk with the information of which he was aware

21         •       What actions Mr. Musk took to verify the information

22  **RESPONSE TO INTERROGATORY NO. 13**:

23         In addition to its general objections, which are incorporated herein by reference, Tesla

24  objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of

25  the case in that it asks Tesla to "[i]dentify and explain All information." Tesla objects to this

26  Request as overly broad, vague, and ambiguous to the extent that it fails to specify the portions of

27  the email to which it refers. Tesla further objects to this Interrogatory to the extent that it seeks

28  information protected by the attorney-client privilege, work product doctrine, and all other

TESLA, INC.'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES, SET TWO

5539004

**CONFIDENTIAL**

1  applicable privileges, protections, or immunities. Such information will not be provided in
2  response.

3       Subject to and without waiving the foregoing general and specific objections, Tesla
4  responds to this Interrogatory as follows:

5       On June 14 and 15, 2018, Tripp was interviewed by Nicholas Gicinto and Jake Nocon
6  concerning the leak to *Business Insider*. █████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█
████████████████████████████████████████████████████████████████████

█                                           Mr. Gicinto also told Mr. Musk that Tripp admitted to
10 sharing other confidential information with Ms. Lopez, to reaching out to multiple other media
11 outlets, and to attempting to recruit additional sources inside the Gigafactory to share Tesla's
12 confidential information with third parties. Mr. Gicinto further communicated to Mr. Musk that
13 Tripp complained about his position at Tesla. In addition to the confidential information Tripp
14 disclosed and in connection with it, Tripp provided false information to *Business Insider* that put
15 Tesla in a falsely negative light.

16      Mr. Gicinto further informed Mr. Musk that Tripp admitted to taking actions to cover his
17 tracks. █████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█                                                              . Tripp's user
21 credentials also appeared on multiple different Tesla computers.

22      Mr. Musk relied on information concerning Tripp's misconduct provided to him by
23 Mr. Gicinto.

28

- 10 -

5539004

CONFIDENTIAL

11

12  Dated: May 20, 2019                    HUESTON HENNIGAN LLP

13

14                                         By: _____

15                                              Allison L. Libeu
                                                Attorneys for Plaintiff and
16                                              Counter-Defendant Tesla, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I am employed in the County of Orange, State of California. I am over the age of 18 and not |
| 3 | a party to the within action. My business address is 620 Newport Center Drive, Suite 1300, Newport Beach, CA 92660. |
| 4 | On May 20, 2019, I served the foregoing document(s) described as: |
| 5 | **PLAINTIFF AND COUNTER-DEFENDANT TESLA INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT AND COUNTER-CLAIMANT MARTIN TRIPP'S** |
| 6 | **SECOND SET OF INTERROGATORIES** |
| 7 | [X]   (BY E-MAIL) By transmitting a true copy of the foregoing document(s) by **Email or Electronic Transmission**: |
| 8 | |
| 9 | Based on an agreement of the parties to accept service by email or electronic transmission. I caused the document(s) to be sent from email address sjones@hueston.com to the persons at |
| 10 | the email addresses listed on the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was |
| 11 | unsuccessful: |
| 12 | Robert D. Mitchell |
| 13 | William M. Fischbach III<br>Christopher J. Waznik |
| 14 | Matthew D. Dayton<br>TIFFANY & BOSCO, P.A. |
| 15 | 2525 E. Camelback Road<br>7th Floor, Camelback Esplanade II |
| 16 | Phoenix, AZ 85016-4229 |
| 17 | TEL: 602-255-6000<br>FAX: 602-255-0103 |
| 18 | E-MAIL: rdm@tblaw.com<br>E-MAIL: wmf@tblaw.com |
| 19 | E-MAIL: cjw@tblaw.com<br>E-MAIL: md@tblaw.com |
| 20 | I declare under penalty of perjury under the laws of the United States of America that the |
| 21 | foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made. |
| 22 | Executed on May 20, 2019, at Newport Beach, California. |
| 23 | |
| 24 | _____         _/s/ Stephen Richards_____<br>    Stephen Richards                                /s/ Stephen Richards |
| 25 | (Type or print name)                              (Signature) |
| 26 | |
| 27 | |
| 28 | |

- 24 -



From: Angel Besinaiz <abesinaiz@tesla.com>
Sent: Thursday, June 21, 2018 1:17 PM
Subject: RE: Martin Tripp Call
To: Shamara Bell <shabell@tesla.com>, Jeff Jones <jeff.jones@tesla.com>

Jeff,

Here the call log from yesterdays call. Sorry again we do not have a recorded call.

| Media Type | Interaction ID | Start Timestamp | End Timestamp | From | To | GUID | Handling Attempt ID | Type | Customer ID | Start | End | Service Type | Service Subt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Voice | 44762375 | 6/20/2018 1:39:46 PM | 6/20/2018 1:46:37 PM | +10000242010 | +16692728971 | 00VULU74RODH10BSN4UJ62LAES0091QD | 206404745 | Inbound | DEFAULT_CUSTOMER_ID | 6/20/2018 1:40:17 PM | 6/20/2018 1:46:37 PM | default | default - DEFAULT_SERVICE_SUBTYPI |

Angel C. Besinaiz |Supervisor, Solar Technical Support

LV HQ | 7180 Pollock Dr | Las Vegas, NV 89119

EXHIBIT 13
Musk
2/21/2020
Reported by: Michael P. Hensley
CSR 14114, RDR

4

CONFIDENTIAL

TES-TRIPP_0004323

877-961-7652 | abesinaiz@tesla.com



**From:** Shamara Bell
**Sent:** Thursday, June 21, 2018 12:13 PM
**To:** Jeff Jones <jeff.jones@tesla.com>
**Cc:** Angel Besinaiz <abesinaiz@tesla.com>
**Subject:** Martin Tripp Call

Hello Jeff,

I was asked to email you to recap the phone call that i received yesterday regarding Martin Tripp. I answered the phone to a man that sounded genuinely concerned & afraid. He explained that he is a very close friend of an ex-employee of Tesla that was fired recently. Explained that he fears for the safety of employees at the battery ( Giga Factory ) because of he is extremely volatile. Stated that he is very well heavily armed . Stated that he is extremely upset more -so now because his name was released in the media this past weekend.

**at that point i placed him on hold to recap with my supervisor who advised that i gather additional information**

A co-worker advised me of the Martin Tripp story that broke, so i asked if he was was referring to Martin Tripp when i returned to the line.  He confirmed that he was referring to Martin.

I commended him for being brave enough to make the call to us. I asked if he would like to provide his name or any contact information  so that we can gather additional information if needed. He declined because he says that he doesn't want to be involved in this matter with his friend but doesn't want anyone to get hurt. I thanked him for the incident report & reported to my supervisor who assisted with escalating this information to appropriete parties.

I hope this information was helpful.

Kindest Regards,

Shamara Bell

5

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

CONFIDENTIAL

TES-TRIPP_0004325

| Message | |
|---|---|
| **From**: | Shamara Bell [shabell@tesla.com] |
| **Sent**: | 6/21/2018 10:48:00 PM |
| **To**: | Robert Smith [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=dd67b80303e54b6db734deee0ecb728e-Robert Smit]; Shamara Bell [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=59ac3167afa5424a91250c74438c2292-Shamara Bel] |
| **Subject**: | Conversation with Robert Smith |

**Shamara Bell 3:33 PM:**
https://www.cnbc.com/2018/06/21/tesla-says-it-got-call-that-ex-employee-martin-tripp-threatened-violence.html

**Shamara Bell 3:33 PM:**
meant to tell u that i took this call :-(

**Shamara Bell 3:33 PM:**
i never said "shoot the place up " though... iaint THAT ghetto sheeeeshh

**Robert Smith 3:34 PM:**
wow that not even funny

**Shamara Bell 3:35 PM:**
RIGHT!! Tesla PR & security keeps calling me. Giving me the heads up for a potential media flock

**Shamara Bell 3:35 PM:**
i gotsta do my hair & make-up sheesh

**Robert Smith 3:35 PM:**
make sure you hook up those crows feet

**Shamara Bell 3:36 PM:**
(rofl)(rofl)(rofl)

**Shamara Bell 3:36 PM:**
*|



EXHIBIT 14
Musk
2/21/2020
Reported by:  Michael P. Hensley
CSR 14114, RDR

**From:** Sarah O'Brien
**Sent:** Wednesday, June 20, 2018 5:31 PM
**To:** Elon Musk
**Subject:** Re: Query re: Martin Tripp and your emails

I'll take it from here.

On Jun 20, 2018, at 5:29 PM, Elon Musk <erm@tesla.com> wrote:

Tripp sent me a threatening email this morning. Below is the exchange. I was just told that we received a call at the Gigafactory that he was going to come back and shoot people. The police have been alerted and we have posted additional security. Our comms team can fill you in.

------ Original message ------
From: Elon Musk <erm@tesla.com>
Date: 6/20/18 5:17 PM (GMT-08:00)
To: Todd Maron <todd@tesla.com>, Sarah O'Brien <sobrien@tesla.com>
Cc: EMDesk <emdesk@tesla.com>
Subject: Re: Termination/Lawsuit

Meant to say "no injuries"

On Jun 20, 2018, at 5:16 PM, Elon Musk <erm@tesla.com> wrote:

Begin forwarded message:

> **From:** Elon Musk <erm@tesla.com>
> **Date:** June 20, 2018 at 10:28:06 AM PDT
> **To:** Marty Tripp <martytripp@icloud.com>
> **Subject: Re: Termination/Lawsuit**

There are literally injuries with Model 3. It is by far the safest car in the world for any midsize vehicle. And of course a company with billions of dollars in product is going to have millions of dollars in scrap. This is not news.

However, betraying your word of honor, breaking the deal you had when Tesla gave you a job and framing your colleagues are wrong and some come with legal penalties. So it goes. Be well.

On Jun 20, 2018, at 10:03 AM, Marty Tripp <martytripp@icloud.com> wrote:



EXHIBIT 16
Musk
2/21/2020
Reported by: Michael P. Hensley
CSR 14114, RDR

TES-TRIPP_0010445

CONFIDENTIAL

TES-TRIPP_0010446

I NEVER 'framed' anyone else or even insinuated anyone else as being involved in my production of documents of your MILLIONS OF DOLLARS OF WASTE, Safety concerns, lying to investors/the WORLD.

Putting cars on the road with safety issues is being a horrible human being!

On Jun 20, 2018, at 10:00 AM, Elon Musk <erm@tesla.com> wrote:

You should ashamed of yourself for framing other people. You're a horrible human being.

On Jun 20, 2018, at 9:59 AM, Marty Tripp <martytripp@icloud.com> wrote:

I never made a threat.  I simply told you that you have what's coming.

Thank you for this gift!!!!

On Jun 20, 2018, at 9:42 AM, Elon Musk <erm@tesla.com> wrote:

Threatening me only makes it worse for you

CONFIDENTIAL

On Jun 20, 2018, at 8:57 AM, Marty Tripp <martytripp@icloud.com> wrote:

Don't worry, you have what's coming to you for the lies you have told to the public and investors.

On Jun 20, 2018, at 4:38 PM, Julia Wong <julia.wong@theguardian.com> wrote:

Hi Elon,

The Guardian is planning to publish an article shortly about Tesla's lawsuit against Martin Tripp. Tripp has acknowledged to the Guardian that he was a source for a Business Insider reporter, but denies any implication that he was a saboteur, or that he hacked Tesla's MOS. Instead, Tripp claims that he went to the media after making numerous attempts to raise concerns about excess NCM, scrap, and other issues like punctured batteries, and being ignored.

Do you or Tesla want to comment on Tripp's claim that he was acting as a whistleblower?

And do you want to add any comment to the emails you sent to Tripp's personal account today, calling him a "horrible human being", among other things. Why did you decide to email Tripp after you had already fired and sued him?

Feel free to give me a call at 646-935-9101 if you'd like to discuss anything by phone.

Thanks,

Julia

--
**Julia Carrie Wong**
Reporter
Guardian News & Media

Phone/Signal/WhatsApp: 646-935-9101
Email: julia.wong@theguardian.com
------
twitter: @juliacarriew

## The
## Guardian

1111 Broadway
Oakland, CA 94607
theguardian.com
------
**Download the Guardian app for Android and iOS**
------

This e-mail and all attachments are confidential and may also be privileged. If you are not the named recipient, please notify the sender and delete the e-mail and all attachments immediately. Do not disclose the contents to another person. You may not use the information for any purpose, or store, or copy, it in any way. Guardian News & Media Limited is not liable for any computer viruses or other material transmitted with or as part of this e-mail. You should employ virus checking software.

Guardian News & Media Limited is a member of Guardian Media Group plc. Registered Office: PO Box 68164, Kings Place, 90 York Way, London, N1P 2AP. Registered in England Number 908396

| | |
|---|---|
| **From:** | Sarah O'Brien |
| **Sent:** | Wednesday, June 20, 2018 5:55 PM |
| **To:** | Julia Wong |
| **Cc:** | Dave Arnold |
| **Subject:** | Re: Query re: Martin Tripp and your emails |

Just so you have a statement for the tip we received:

**Attributed to a Tesla spokesperson:**
"This afternoon, we received a phone call from a friend of Mr Tripp telling us that Mr Tripp would be coming to the Gigafactory to "shoot the place up." Police have been notified and actions are being taken to enhance security at the Gigafactory."

**On background:**
After being caught hacking Tesla's confidential and trade secret information and transferring it to third parties, Mr. Tripp is now claiming he is a "whistleblower." He is nothing of the sort. He is someone who stole Tesla data through highly pernicious means and transferred that data to unknown amounts of third parties, all while making easily disprovable claims about the company in order to try to harm it. As for Mr. Tripp's false claims:
· Mr. Tripp grossly exaggerated the value and amount of scrap material at the Gigafactory. Relying on the internal data that he hacked from Tesla's manufacturing operations system, Tripp incorrectly stated that Tesla has generated nearly $150 million in scrap at the Gigafactory in 2018. That number is wrong by more than a factor of two.
· Among other things, he included large quantities that were not scrap from 2018 at all, but that were instead items such as materials from last year that had already been included in Tesla's 2017 financials, or that were simply serial numbers assigned as part of routine system testing to components that were never even made.
· Mr. Tripp also admitted to Tesla's investigators that he does not actually know the value of the scrap that he assigned dollar values to. He just guessed.
· The scrap that Tripp claims is being stored unsafely could not possibly pose a safety risk. These pieces are kept in a temperature controlled room and are neither connected nor energized.
· No punctured cells were ever used in Model 3 vehicles in any way. In February 2018, a robot damaged some modules being produced at the Gigafactory, and a team was involved in identifying the scope of the damage. After conducting extensive testing, they threw out the punctured cells, confirmed the safety of the rest, and only then returned just those to the production line. If there was even a sliver of doubt about whether a cell could pose a safety concern, it was not used in any vehicle. Notably, there have been zero battery safety issues in any Model 3.
· With respect to Tripp's claiming that Tesla incorrectly reported the number of Model 3 vehicles produced at the end of Q1, literally thousands of people have ongoing access to the production numbers. It is updated in real-time on screens in the factory, plainly visible to anyone passing by. The claim that Tesla would report the wrong production number is ridiculous.
· On all of these issues, Tripp is either not telling the truth or he simply has no idea what he is talking about.

> On Jun 20, 2018, at 5:29 PM, Elon Musk <erm@tesla.com> wrote:
>
> Tripp sent me a threatening email this morning. Below is the exchange. I was just told that we received a call at the Gigafactory that he was going to come back and shoot people. The police have been alerted and we have posted additional security. Our comms team can fill you in.

1



EXHIBIT 17
Musk
2/21/2020
Reported by:  Michael P Hensley
CSR 14114, RDR

------- Original message --------
From: Elon Musk <erm@tesla.com>
Date: 6/20/18 5:17 PM (GMT-08:00)
To: Todd Maron <todd@tesla.com>, Sarah O'Brien <sobrien@tesla.com>
Cc: EMDesk <emdesk@tesla.com>
Subject: Re: Termination/Lawsuit

Meant to say "no injuries"

On Jun 20, 2018, at 5:16 PM, Elon Musk <erm@tesla.com> wrote:

> Begin forwarded message:

>> **From:** Elon Musk <erm@tesla.com>
>> **Date:** June 20, 2018 at 10:28:06 AM PDT
>> **To:** Marty Tripp <martytripp@icloud.com>
>> **Subject: Re: Termination/Lawsuit**

>> There are literally injuries with Model 3. It is by far the safest car in the world for any midsize vehicle. And of course a company with billions of dollars in product is going to have millions of dollars in scrap. This is not news.

>> However, betraying your word of honor, breaking the deal you had when Tesla gave you a job and framing your colleagues are wrong and some come with legal penalties. So it goes. Be well.

>>> On Jun 20, 2018, at 10:03 AM, Marty Tripp <martytripp@icloud.com> wrote:

>>> I NEVER 'framed' anyone else or even insinuated anyone else as being involved in my production of documents of your MILLIONS OF DOLLARS OF WASTE, Safety concerns, lying to investors/the

2

WORLD.

Putting cars on the road with safety
issues is being a horrible human
being!

On Jun 20, 2018, at
10:00 AM, Elon
Musk
<erm@tesla.com>
wrote:

You should ashamed
of yourself for
framing other people.
You're a horrible
human being.

On Jun
20,
2018,
at 9:59
AM,
Marty
Tripp
<marty
tripp@
icloud.
com>
wrote:

I never
made a
threat.
I

3

simply
told
you
that
you
have
what's
coming
.


Thank
you for
this
gift!!!!




On
Jun
20
,
2018
,
at
9
:
42
AM
,
Elon
Mu

4

TES-TRIPP_0010125

sk<erm@tesla.com> wrote:

Threatening me only makes it

5

TES-TRIPP_0010126

worse for you

On Jun 20, 2018, at 8:57 AM, Marty Tripp <mar

6

TES-TRIPP_0010127

tytripp@icloud.com> wrote:

Don't worry, you have what

7

TES-TRIPP_0010128

,scoming to you for the lies you have told to the public and in v

8

TES-TRIPP_0010129

e
s
t
o
r
s
.

On Jun 20, 2018, at 4:38 PM, Julia Wong <julia.wong@theguardian.com> wrote:

Hi Elon,

The Guardian is planning to publish an article shortly about Tesla's lawsuit against Martin Tripp. Tripp has acknowledged to the Guardian that he was a source for a Business Insider reporter, but denies any implication that he was a saboteur, or that he hacked Tesla's MOS. Instead, Tripp claims that he went to the media after making numerous attempts to raise concerns about excess NCM, scrap, and other issues like punctured batteries, and being ignored.

Do you or Tesla want to comment on Tripp's claim that he was acting as a whistleblower?

And do you want to add any comment to the emails you sent to Tripp's personal account today, calling him a "horrible human being", among other things. Why did you decide to email Tripp after you had already fired and sued him?

Feel free to give me a call at 646-935-9101 if you'd like to discuss anything by phone.

Thanks,

Julia


--
**Julia Carrie Wong**
Reporter
Guardian News & Media
-----
Phone/Signal/WhatsApp: 646-935-9101
Email: julia.wong@theguardian.com
-----
twitter: @juliacarriew
-----



1111 Broadway
Oakland, CA 94607
theguardian.com

9

-----
**Download the Guardian app for <u>Android</u> and <u>iOS</u>**
-----

This e-mail and all attachments are confidential and may also be privileged. If you are not the named recipient, please notify the sender and delete the e-mail and all attachments immediately. Do not disclose the contents to another person. You may not use the information for any purpose, or store, or copy, it in any way.  Guardian News & Media Limited is not liable for any computer viruses or other material transmitted with or as part of this e-mail. You should employ virus checking software.

Guardian News & Media Limited is a member of Guardian Media Group plc. Registered Office: PO Box 68164, Kings Place, 90 York Way, London, N1P 2AP.  Registered in England Number 908396

TES-TRIPP_0010131

| | |
|---|---|
| **From:** | Dave Arnold |
| **Sent:** | Thursday, June 21, 2018 7:33 AM |
| **To:** | j.murdock@newsweekgroup.com |
| **Subject:** | RE: Media comment request re. Legal action - Newsweek |

Hi Jason –

I saw your article published, but here's some information on background (not for quotation, but you can paraphrase and attribute to Tesla):

After being caught hacking Tesla's confidential and trade secret information and transferring it to third parties, Mr. Tripp is now claiming he is a "whistleblower." He is nothing of the sort. He is someone who stole Tesla data through highly pernicious means and transferred that data to unknown amounts of third parties, all while making easily disprovable claims about the company in order to try to harm it. As for Mr. Tripp's false claims:

- Mr. Tripp grossly exaggerated the value and amount of scrap material at the Gigafactory. Relying on the internal data that he hacked from Tesla's manufacturing operations system, Tripp incorrectly stated that Tesla has generated nearly $150 million in scrap at the Gigafactory in 2018. That number is wrong by more than a factor of two.
- Among other things, he included large quantities that were not scrap from 2018 at all, but that were instead items such as materials from last year that had already been included in Tesla's 2017 financials, or that were simply serial numbers assigned as part of routine system testing to components that were never even made.
- Mr. Tripp also admitted to Tesla's investigators that he does not actually know the value of the scrap that he assigned dollar values to. He just guessed.
- The scrap that Tripp claims is being stored unsafely could not possibly pose a safety risk. These pieces are kept in a temperature controlled room and are neither connected nor energized.
- No punctured cells were ever used in Model 3 vehicles in any way. In February 2018, a robot damaged some modules being produced at the Gigafactory, and a team was involved in identifying the scope of the damage. After conducting extensive testing, they threw out the punctured cells, confirmed the safety of the rest, and only then returned just those to the production line. If there was even a sliver of doubt about whether a cell could pose a safety concern, it was not used in any vehicle. Notably, there have been zero battery safety issues in any Model 3.
- With respect to Tripp's claiming that Tesla incorrectly reported the number of Model 3 vehicles produced at the end of Q1, literally thousands of people have ongoing access to the production numbers. It is updated in real-time on screens in the factory, plainly visible to anyone passing by. The claim that Tesla would report the wrong production number is ridiculous.
- On all of these issues, Tripp is either not telling the truth or he simply has no idea what he is talking about.

Also, so you're aware, yesterday afternoon, we received a phone call from a friend of Mr. Tripp telling us that Mr. Tripp would be coming to the Gigafactory to 'shoot the place up.' Police have been notified and actions are being taken to enhance security at the Gigafactory.

Begin forwarded message:

**From:** Jason Murdock <j.murdock@newsweekgroup.com>
**Date:** June 21, 2018 at 2:58:31 AM PDT
**To:** Press@tesla.com, EUPress@tesla.com
**Subject: Media comment request re. Legal action - Newsweek**

EXHIBIT 18
Musk
2/21/2020
Reported by: Michael P. Hensley
CSR 14114, RDR

1

Hi,

Writing from *Newsweek* about the legal filing against former employee Martin Tripp. Are you able to comment on his assertion that he was acting as a whistleblower? Any statement regarding what is the next step in the legal process would also be greatly appreciated.

Best,

Jason Murdock

--
**JASON MURDOCK | SENIOR TECH REPORTER**
**NEWSWEEK**
**Floor 24, 25 Canada Square, Canary Wharf, London, E14 5LQ**
E       **j.murdock@newsweekgroup.com**
W       **http://www.newsweek.com/**

 

*International Business Times Ltd  is a company registered in England & Wales, Company Number 08858096*

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

2

**From:** James Uelmen
**Date:** June 20, 2018 at 9:21:18 PM MDT
**To:** erm@tesla.com
**Subject: Re: Marty Tripp reached out**

On Wed, Jun 20, 2018, 8:16 PM James Uelmen wrote:

Sir,

I worked as a Quality Tech in Stator as well as cooling tubes and a few other departments. I was terminated last week (unfairly i believe). I was told someone called the 800 on me and that even though I had no history of offensive behavior, that was enough to terminate me. I moved my wife and 2 young kids out here from Detroit because i believe in what we (you) are doing. All I want is my job back. But while I was there I did work closely with Martin Tripp and he has reached out to me. I'm a loyal worker, a lot more loyal than most that work there. Give me some advice on what you need me to do.

I loved my job and what I did as a Quality Tech but i was told that while doing my job that I rubbed people the wrong way because i would not allow bad parts to go down the line and for that I was fired? Help me get my job back please. Call me if you need to at

EXHIBIT 22
Musk
2/21/2020
Reported by: Michael P. Hensley
CSR 14114, RDR

TES-TRIPP_0020097

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**From:**        erm@tesla.com
**Sent:**        Thursday, June 21, 2018 11:36 PM
**To:**          James Uelmen
**Subject:**     Re: Contact me

What is the situation with Marty?

How can I help?

> On Jun 21, 2018, at 11:27 PM, James Uelmen ███████████████ wrote:
>
> Sir,
> I worked with Marty Tripp. I was a Quality Tech and i am being contacted by reporters because he gave them my name. I need some advice. I was a loyal and hard working employee. I believe in what your trying to do. I have a family and all i want is to be a good father and husband. Please contact me. ████████████

1



EXHIBIT 23
Musk
2/21/2020
Reported by:  Michael P. Hensley
CSR 14114, RDR

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**From:**     erm@tesla.com
**Sent:**     Monday, July 09, 2018 4:40 PM
**To:**       Deth stayerr
**Subject:**  Re: they're not so smart

Sounds about right

On Jul 10, 2018, at 12:27 AM, Deth stayerr ▇▇▇▇▇▇▇▇▇▇ wrote:

> um this literally feels like a video game
>
> been kinda thinking about how like... life feels like a big video game and shady investors r like ppl who don't mind using cheat codes
>
> it's like, i keep asking myself is this press nightmare a trial or punishment but it's probably a game so we shud attempt to win/ solve it
>
> like production is the final boss and the press bullshit is the DLC boss (granted we didn't fucking download this fucking dlc but it seems like we have no choice but to play thru it)
> On Mon, Jul 9, 2018 at 10:23 AM Deth stayerr ▇▇▇▇▇▇▇▇▇▇ wrote:
> WOW
> On Mon, Jul 9, 2018 at 8:28 AM Elon Musk <erm@tesla.com> wrote:
>
>
> Begin forwarded message:
>
>> **From:** Bonnie Norman ▇▇▇▇▇▇▇▇▇▇
>> **Date:** July 9, 2018 at 10:07:38 PM GMT+7
>> **To:** Elon Musk <erm@tesla.com>
>> **Subject: Re: they're not so smart**
>>
>> I've been wondering that, too.
>>
>> I have access to some databases that aren't avail to the general public. I've been looking for any connection between any Tripp & any Chanos in Wisconsin (cross indexing addresses looking for proximity, checking yearbooks, etc). So far nothing. But I'm not done.
>>
>> Just this morning I've been able to connect the two groups doing deep dives (one on Tripp, the other on Montana Skeptic), so I'm hoping they'll be able to pick up some additional info. Also one of them believes that Chanos and Rahr have homes very near each other in the Hamptons. Not a complete impossibility given that the Hamptons is a NY'er destination, but if they're really near each other, it likely means they're attending the same parties.
>>
>> I'll update you with both the suspicions the groups have and any hard data they get. With so many puzzle pieces on the table, something is going to connect.

EXHIBIT 24
Musk
2/21/2020
Reported by:  Michael P. Hensley
CSR 14114, RDR

On Mon, Jul 9, 2018 at 7:44 AM, Elon Musk <erm@tesla.com> wrote:
I wonder if Tripp was sent to work at Tesla directly or indirectly by Chanos.
That would be pretty crazy.

On Jul 8, 2018, at 9:14 PM, Bonnie Norman ▮▮▮▮▮▮▮▮▮▮▮▮
wrote:

> Lawrence Fossi (Montana Skeptic) - guy who works for Rahr
>
> He posted a photo on Seeking Alpha and forgot to remove the
> metadata - which leads straight to his house in Montana.
>
> I just burst out laughing when I heard. Also, they told me that
> Chanos and Marty Tripp are both from Milwaukee - but haven't
> been able to find any family ties. Just an interesting piece of
> info that may or may not link up later.
>
> https://docs.google.com/document/d/1xY16uO_NB_G8wZeKV
> c6OtfXKZKSRQuZWqAWhErQIar0/edit
> ---------------
> fyi, in case you haven't seen this - a former employee of yours
> has been giving Tripp nonstop shit on twitter for being an
> asshat.
>
> https://twitter.com/melissab8980/with_replies

**From:**     erm@tesla.com
**Sent:**     Sunday, July 22, 2018 6:55 PM
**To:**       C*
**Subject:**  Fwd: gigaman_nv

Begin forwarded message:

> **From:** erm@tesla.com
> **Date:** July 10, 2018 at 10:21:14 PM PDT
> **To:** Bonnie Norman
> **Cc:** Todd Maron
> **Subject:** Re: gigaman_nv
>
> What would be really concerning is if Tripp was actually sent to work at Tesla by a short seller specifically in order to provide them with material non-public info and/or feed exaggerated negative info to journalists from a position of credibility on the inside.
>
> If Tripp was using a fake account to trash Tesla right after he started, then he either has serious mental issues, was working for a short seller or both.
>
> On Jul 11, 2018, at 1:02 PM, Bonnie Norman                              wrote:
>
>> I've asked them to put a list together, they're on it.
>>
>> So with this Gigaman_NV account on Disqus -how much do you need to get a court order to freeze that info? It opened about his start date with Tesla (Nov 1 2017) and has been negative from the first post. That negates his whole 'I loved Tesla and believed in the mission until I saw what I saw' story.
>>
>> It's also possible he's used his duplicate accounts to fool journalists. That's a bit beyond 'just want to get the truth out there', when the truth he's giving is coming from sock puppets.
>>
>>
>> On Tue, Jul 10, 2018 at 9:53 PM, Todd Maron                          wrote:
>> Thanks Bonnie. If you send me what they're looking into, I can help prioritize among them.
>>
>>
>> -------- Original message --------
>> From: Bonnie Norman
>> Date: 7/10/18 9:43 PM (GMT-08:00)
>> To: Elon Musk <erm@tesla.com>, Todd Maron



EXHIBIT 25
Musk
2/21/2020
Reported by:  Michael P. Hensley
CSR 14114, RDR

Subject: gigaman_nv

Messages below that I received this evening. Is there any specific information they could dig in on that would be most helpful? They have a mountain of things to unravel and any prioritization would be helpful.

---------------

> Bonnie, it's him. But I need more time to prove it. I checked Twitter, his two Disqus profiles, his blog, and two music forums that he frequents. All of them have the same two linguistic tics. For example, Gigaman on Disqus used "..." in his messages 1430 times and he has 677 comments. Similar finding regarding the usage frequency of ALL CAPITALIZED WORDS across accounts.
>
> To really prove it statistically we would need time. So far we only collected Disqus and Twitter in machine readable formats.

   <Screen Shot 2018-07-10 at 9.21.35 PM.png>

(the Montana Skeptic Dossier account gave me the tip & I gave it to this group since they're focused on collecting Tripp info)

------

So here's the reference to Lora Kolodny - she may not know that the two sources she had were actually one and the same person. I've struck up an offline *friendship* with her, would be easy to give her a little hint that she's getting played if that's the case.



These are the two photos attached to that tweet - the first is Kolodny's article, the second is Tripp. And I wonder if the 'two engineers' she references might actually be Tripp & Tripp.

Two current engineers told CNBC that they are concerned some of the batteries being shipped do not have the minimum gap required between lithium ion cells. These engineers warned that this "touching cells" flaw could cause batteries to short out or, in worse cases, catch fire.

 **Gigaman_NV** → Dan · a month ago
One of the most prevalent issues is "touching cells". The sides of the individual cells are negative, the top is positive. Because of the variability in positioning of the cells when they are assembled and glued to the cooling tube, cells can be too close when sandwiched together in the module construction process. There is a minimum distance which is needed to assure there is no arc and possible thermal runaway condition. Now, there are a number of conditions that would need to take place for something catastrophic to happen...but I can tell you, they gave up trying to address this issue and rely on the "remoteness" of the possibility a battery ignition could take place.

And lastly, here is info on some other forums where he participates (links below the screenshot). None of this seems relevant, but including it for completeness.

Other important accounts:
Fractal Audio Blog (453 messages):
forum.fractalaudio.com/members/guitar…
Boogie Board (user: trippedover - tens of messages):
forum.grailtone.com/viewtopic.php?…

Less important accounts, would not bother (but they have the same tics!):
Facebook account of his band:
facebook.com/pages/Infinite…
Blog: guitartripper.blogspot.com
ec electronic (9 messages):
forum.tcelectronic.com/search/posts/u…

9m

https://forum.fractalaudio.com/members/guitartripp.30108/
http://forum.grailtone.com/viewtopic.php?f=9&t=52617
https://www.facebook.com/pages/Infinite-End-Studio/197651660266131
http://guitartripper.blogspot.com/
http://forum.tcelectronic.com/search/posts/user/10183/

TES-TRIPP_0020114

From:   Elon Musk

Sent:   Tuesday, August 21, 2018 4:02 AM

To:     Juleanna Glover

Cc:     Kimbal Musk; Dave Arnold

Subject:        Re: WSJ Story on Combating Tesla Critica

Will Tweet as I wish and suffer the consequences. So it goes.

I just deleted my Instagram. Weak sauce.



On Aug 21, 2018, at 4:10 PM, Elon Musk <erm@tesla.com> wrote:

Don't they have something else to write about? It is so tiresome to see myself in the news!



EXHIBIT 26
Musk
2/21/2020
Reported by: Michael P Hensley
CSR 14114, RDR



CONFIDENTIAL



CONFIDENTIAL



As far as Tripp is concerned, that guy stole gigabytes of Tesla data, changed the data to make it sound terrible (fortunately, to a ridiculous degree) and posted it online. At one point, he claimed we had more scrapped parts than the total output of our Gigafactory, which is physically impossible.

Tripp broke a dozen or more laws and caused great harm to the citizens of Nevada. Tesla legal has met with the Nevada Attorney General's office and my understanding is that they are likely to move forward with a criminal case. The facts are unequivocal.



What are we supposed to do here? Advice would be much appreciated.

Thanks,

Elon



CONFIDENTIAL



CONFIDENTIAL

1 | **JACKSON LEWIS P.C.**
Joshua A. Sliker, Nevada Bar No. 12493
2 | *Joshua.Sliker@jacksonlewis.com*
3 | 3800 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
4 | Telephone:   (702) 921-2460
Facsimile:   (702) 921-2461
5 |
**HUESTON HENNIGAN LLP**
6 | John C. Hueston *(admitted pro hac vice)*
*jhueston@hueston.com*
7 | Robert N. Klieger *(admitted pro hac vice)*
*rklieger@hueston.com*
8 | Allison L. Libeu *(admitted pro hac vice)*
*alibeu@hueston.com*
9 | 523 West 6th Street, Suite 400
Los Angeles, CA 90014
10 | Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898
11 |
12 |
Attorneys for Plaintiff/Counter-Defendant
13 | Tesla, Inc.

14 | **UNITED STATES DISTRICT COURT**

15 | **DISTRICT OF NEVADA**

| | |
|---|---|
| 16  TESLA, INC., a Delaware corporation, | Case No. 3:18-cv-00296-LRH-CBC |
| 17          Plaintiff, | |
| 18     vs. | **PLAINTIFF AND COUNTER-DEFENDANT TESLA, INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT AND COUNTER-CLAIMANT MARTIN TRIPP'S FIRST SET OF REQUESTS FOR ADMISSION** |
| 19  MARTIN TRIPP, an individual, | |
| 20          Defendant. | |
| 21 | |
| 22  AND RELATED COUNTERCLAIMS | |
| 23 | |

24 |     PROPOUNDING PARTY:        Defendant/Counter-Claimant Martin Tripp

25 |     RESPONDING PARTY:          Plaintiff/Counter-Defendant Tesla, Inc.

26 |     SET NO.:                             One (Nos. 1-17)

27 |

28 |

**EXHIBIT 31**
Musk
2/21/2020
Reported by:  Michael P. Hensley
CSR 14114, RDR

---

TESLA, INC.'S RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION, SET ONE

5455825

1    Plaintiff and Counter-Defendant Tesla, Inc. ("Tesla"), by and through its undersigned

2  counsel, hereby respectfully submits its responses and objections to Defendant and

3  Counter-Claimant Martin Tripp's ("Tripp") First Set of Requests for Admission (the "Requests").

4                              **PRELIMINARY STATEMENT**

5    As Tesla has not completed discovery in this action, these Responses and Objections

6  ("Responses") necessarily reflect only the current state of Tesla's knowledge, understanding, and

7  belief based upon the information reasonably available to Tesla at this time.  Tesla anticipates that

8  further facts and information may be discovered.  Without in any way obligating itself to do so,

9  Tesla reserves the right to modify, supplement, revise, or amend these Responses to correct any

10  errors or omissions which may be contained herein, in light of the information that Tesla may

11  subsequently obtain or discover.  These Responses are made solely for the purposes of this action,

12  and are subject to all objections as to competence, authenticity, relevance, materiality, privilege,

13  and admissibility.  All such objections and grounds are expressly reserved and may be interposed at

14  the time of summary judgment, trial, or otherwise.  Furthermore, these Responses are provided

15  without prejudice to Tesla's right to produce evidence of any subsequently discovered fact or facts,

16  which Tesla may later recall.  Tesla accordingly reserves the right to change any and all Responses

17  herein as additional facts are ascertained, analyses are made, legal research is completed, and

18  contentions are investigated.  This Preliminary Statement shall apply to each and every Response

19  given herein and shall be incorporated by reference as though set forth fully in each Response

20  below.  Subject to the general and specific objections listed below, Tesla provide the following

21  responses.

22                              **GENERAL OBJECTIONS**

23    The following general objections apply to each and every Request propounded by Tripp and

24  are incorporated by reference into each of the following specific responses as if set forth in full

25  therein.

26    1.    Tesla objects to the Requests to the extent that they are vague, ambiguous,

27  overbroad, unduly burdensome, incomprehensible, compound, duplicative and cumulative, call for

28  speculation, seek information and/or documents that are neither relevant nor reasonably calculated

TESLA, INC.'S RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION, SET ONE

5455825

1 | disclosure by the attorney-client privilege, work product doctrine, and any other applicable

2 | privileges, protections, or immunities.

3 |      Subject to and without waiving the foregoing general and specific objections, Tesla denies

4 | this Request.

5 | **REQUEST FOR ADMISSION NO. 15**:

6 |      Admit that You have no evidence that Mr. Tripp had any Communication with any short-

7 | seller of Your stock during his employment with You.

8 | **RESPONSE TO REQUEST FOR ADMISSION NO. 15**:

9 |      In addition to its general objections, which are incorporated herein by reference, Tesla

10 | objects to this Request as overbroad and unduly burdensome in its use of "any Communication."

11 | Tesla further objects to this Request (particularly the use of the term "evidence") as calling for a

12 | legal conclusion.  Tesla further objects to this Request as vague and ambiguous with respect to the

13 | term "short-seller of Your stock."  Tesla objects to this Request as neither relevant nor reasonably

14 | calculated to lead to the discovery of admissible evidence.  Tesla further objects to this Request as

15 | premature, particularly in light of the fact that discovery has not yet been completed.  Tesla further

16 | objects to the extent that this Request seeks information protected from disclosure by the attorney-

17 | client privilege, attorney work product doctrine, or any other applicable privileges, protections, or

18 | immunities.

19 |      Subject to and without waiving the foregoing general and specific objections, after a

20 | reasonable inquiry concerning the matter and the information known or readily obtainable, Tesla

21 | lacks sufficient knowledge or information to admit or deny this Request.

22 | **REQUEST FOR ADMISSION NO. 16**:

23 |      Admit that You have no evidence that Mr. Tripp had any Communications with any oil

24 | company during his employment with You.

25 | **RESPONSE TO REQUEST FOR ADMISSION NO. 16**:

26 |      In addition to its general objections, which are incorporated herein by reference, Tesla

27 | objects to this Request as overbroad and unduly burdensome in its use of "any Communications."

28 | Tesla further objects to this Request (particularly the use of the term "evidence") as calling for a

TESLA, INC.'S RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION, SET ONE

5455825

1   legal conclusion, Tesla further objects to this Request as vague and ambiguous with respect to the

2   term "oil company."  Tesla objects to this Request as neither relevant nor reasonably calculated to

3   lead to the discovery of admissible evidence.  Tesla further objects to this Request as premature,

4   particularly in light of the fact that discovery has not yet been completed.  Tesla further objects to

5   the extent that this Request seeks information protected from disclosure by the attorney-client

6   privilege, attorney work product doctrine, or any other applicable privileges, protections, or

7   immunities.

8        Subject to and without waiving the foregoing general and specific objections, after a

9   reasonable inquiry concerning the matter and the information known or readily obtainable, Tesla

10  lacks sufficient knowledge or information to admit or deny this Request.

11  **REQUEST FOR ADMISSION NO. 17**:

12       Admit that You have no evidence that Mr. Tripp had any Communication with any other

13  car company besides You during his employment with You.

14  **RESPONSE TO REQUEST FOR ADMISSION NO. 17**:

15       In addition to its general objections, which are incorporated herein by reference, Tesla

16  objects to this Request as overbroad and unduly burdensome in its use of "any Communication."

17  Tesla further objects to this Request (particularly the use of the term "evidence") as calling for a

18  legal conclusion.  Tesla further objects to this Request as vague and ambiguous with respect to the

19  term "car company."  Tesla objects to this Request as neither relevant nor reasonably calculated to

20  lead to the discovery of admissible evidence.  Tesla further objects to this Request as premature,

21  particularly in light of the fact that discovery has not yet been completed.  Tesla further objects to

22  the extent that this Request seeks information protected from disclosure by the attorney-client

23  privilege, attorney work product doctrine, or any other applicable privileges, protections, or

24  immunities.

25       Subject to and without waiving the foregoing general and specific objections,  after a

26  reasonable inquiry concerning the matter and the information known or readily obtainable, Tesla

27  lacks sufficient knowledge or information sufficient to admit or deny this Request.

28

TESLA, INC.'S RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION, SET ONE

5455825

1  Dated:  March 8, 2019                    **HUESTON HENNIGAN LLP**

2

3                                           By:  _____

4                                                Allison L. Libeu
                                                 Attorneys for Plaintiff and
5                                                Counter-Defendant Tesla, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TESLA, INC.'S RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION, SET ONE

5455825

1

## PROOF OF SERVICE

2       I am employed in the County of Orange, State of California.  I am over the age of 18 and not
a party to the within action.  My business address is 620 Newport Center Drive, Suite 1300, Newport
3   Beach, CA 92660.

4       On March 8, 2019, I served the foregoing document(s) described as:

5   **PLAINTIFF AND COUNTER-DEFENDANT TESLA INC.'S RESPONSES AND
OBJECTIONS TO DEFENDANT AND COUNTER-CLAIMANT MARTIN TRIPP'S
6   FIRST SET OF REQUESTS FOR ADMISSION**

7   [X]    (BY E-MAIL) By transmitting a true copy of the foregoing document(s) by **Email or
Electronic Transmission**:

8

9       Based on an agreement of the parties to accept service by email or electronic transmission. I
caused the document(s) to be sent from email address sjones@hueston.com to the persons at
the email addresses listed on the Service List. I did not receive, within a reasonable time after
10   the transmission, any electronic message or other indication that the transmission was
unsuccessful:

11

12       Robert D. Mitchell
    William M. Fischbach III
13       Christopher J. Waznik
    Matthew D. Dayton
14       TIFFANY & BOSCO, P.A.
    2525 E. Camelback Road
15       7th Floor, Camelback Esplanade II
    Phoenix, AZ  85016-4229
16
    TEL:  602-255-6000
17       FAX:  602-255-0103
    E-MAIL:  rdm@tblaw.com
18       E-MAIL:  wmf@tblaw.com
    E-MAIL:  cjw@tblaw.com
19       E-MAIL:  md@tblaw.com

20       I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct, and that I am employed in the office of a member of the bar of this
21   Court at whose direction the service was made.

22       Executed on March 8, 2019, at Newport Beach, California.

23

24   _____       */s/ Stephen Richards*
    Stephen Richards
    (Type or print name)               (Signature)

25

26

27

28

TESLA, INC.'S RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION, SET ONE

5455825