# EXHIBIT D

```
 1                    DISTRICT COURT

 2                 DISTRICT OF NEVADA

 3                      --oOo--

 4  TESLA, INC., A Delaware         :
    corporation,                    :
 5                                   :
                    Plaintiff,      :
 6                                   :
    vs.                             :  CASE NUMBER:
 7                                   :  3:18-cv-00296-LRH-
    MARTIN TRIPP, an individual,    :  cbc
 8                                   :
                    Defendant.      :
 9                                   :
    ========================================================
10  MARTIN TRIPP, an individual     :
                                     :
11              Counterclaimant,    :
                                      :
12  vs.                             :

13  TESLA, INC., a Delaware corporation,:

14  ========================================================

15

16                   CONFIDENTIAL

17              VIDEO DEPOSITION OF

18                  SEAN GOUTHRO

19           WEDNESDAY, MAY 29, 2019

20                  RENO, NEVADA

21

22  Job No. 543507

23

24  Reported by:          CAROL HUMMEL, RPR, CCR #340
```

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 5

1 Fischbach on behalf of the defendant, counterclaimant,

2 Martin Tripp.

3          THE VIDEOGRAPHER:  On the phone?

4          MR. FORSTER:  Eran Forster for Sean Gouthro.

5          THE VIDEOGRAPHER:  Would the court reporter

6 please swear in the witness.

7                       SEAN GOUTHRO

8     having been first duly sworn, testified as follows:

9                   E X A M I N A T I O N

10 BY MR. MITCHELL:

11      Q   Good morning, Mr. Gouthro.  I'm Robert

12 Mitchell, together with my law partner Will Fischbach, and

13 we represent Martin Tripp in his litigation with Tesla.

14          Let me begin.  First of all, I understand you

15 are a former Marine.  Let me get out of the way, thank you

16 for your services.  We appreciate that.

17      A   Thank you.

18      Q   You're here pursuant to a subpoena that was

19 served upon you.  And as is typically with most subpoenas,

20 the subpoena asked you to bring copies of any responsive

21 documents to a particular request.  And the request in our

22 subpoena duces tecum asks for you to bring any and all

23 documents in your control or possession relative to the

24 Tesla versus Tripp matter.  Do you have any documents?

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 25

1      A   I believe that was in May of 2018.

**2      Q   2018?**

3      A   That is correct, yes.

**4      Q   And did someone assume his position as the**

**5 senior person in security for the gigafactory?**

6      A   It was two-fold.  To answer your question,

7 yes, correct.  Greg Slevit, who was his boss, took over

8 playing an interim role as his senior level leadership at

9 that time, but he was also fulfilling our direct

10 management.  So essentially it just took out one person,

11 and we reported to one person higher.

12           However, during the course of that time there

13 was some changes at that senior level.  Then Jeff Jones

14 from Uber came in and assumed that role for us.  Greg

15 Slevit still stayed in a similar capacity but was not our

16 senior level leadership anymore at that time.

**17      Q   Who took that position?**

18      A   Jeff Jones.

**19      Q   I've seen in some publication it was suggested**

**20 that your title was head of Tesla global security, is that**

**21 correct?**

22      A   No, not at all.

**23      Q   What was your title?**

24      A   It was just what I told you.  It was the

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 26

1 security operations center, investigation supervisor.

2        Q    And did that position or that title change

3 over time?

4        A    The title didn't change, but responsibilities

5 grew quite a bit.

6        Q    Could you describe that for me?

7        A    It was pretty much program related.  We had --

8 as soon as we started creating the foundation of what we

9 actually needed when it came to training, dispatch and

10 customer service, things of that nature, we started

11 building other programs such as support with the EP team.

12 We started doing social media monitoring, within reason.

13            The investigations were growing, and that's

14 what took a lot of my time.  Anywhere from like, for 2018

15 we had over 800 different requests of investigations.

16            And investigations meant essentially from our

17 department that we were receiving requests for video

18 reviews.  So we would corroborate situations by looking at

19 video.  And depending on the situation, we would

20 automatically get the legal, law employment relations

21 involved to let them know we were actually putting this

22 together.

23            From there we would release the information as

24 appropriate to substantiate whether it was a conclusive or

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 64

1 would, you know, insinuate, in my opinion, that it was

2 both or one or the other.  I can't answer that question.

3 BY MR. MITCHELL:

4         Q    Do you know if Tesla provided cell phones to

5 people in the position that Mr. Tripp was in?

6         A    No, they did not.

7         Q    Are you privy to information that would

8 suggest to you that Elon Musk knew of the hacking into

9 Mr. Tripp's phone?

10        A    No.

11        Q    Was Mr. Tripp ever followed by any Tesla

12 personnel?

13        A    Yes.

14             MS. LIBEU:  Objection to the extent it calls

15 for privileged communications with counsel and activity

16 given under the direction of counsel.

17 BY MR. MITCHELL:

18        Q    What was your -- were you involved in

19 arranging for a personal investigator to follow Mr. Tripp?

20        A    Yes.

21             MS. LIBEU:  Objection.  Calls for privileged

22 communication of counsel and activities taken under

23 direction of counsel.

24             MR. MITCHELL:  If he was involved in arranging

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 65

1 for a private investigator, the act of doing that would

2 not be a privileged communication with counsel.  I'm

3 sorry.

4 BY MR. MITCHELL

5          Q    So tell us about your arranging of a private

6 investigator to follow Mr. Tripp.

7               MS. LIBEU:  Same objection.

8               THE WITNESS:  Jeff Jones was the individual

9 from a PO perspective and a cost perspective to arrange

10 for a PI team.  My involvement was from an operational

11 standpoint.

12               Going back to my scope of work from a security

13 operations standpoint, my responsibility was to stay in

14 communication with the PI team.  And if there was anything

15 of significance, then whether it was the radio, through

16 cell phone, right, I was to call Jeff or call Nick with

17 the update or anything of that nature.

18          Q    What was the name of the personal investigator

19 that was involved?

20          A    It was a company.  I don't recall the name,

21 but there were three or four different individuals.  It

22 was a shift-by-shift basis that they would do.

23          Q    What was the name of the company?

24          A    I don't recall.

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 66

1        Q    Were they in Sparks, Nevada; where were they

2  based?

3        A    Sparks or Reno.

4        Q    Do you remember any parts of their names, the

5  individual people that were involved in this surveillance?

6        A    No, not off the top of my head.  But I can

7  probably find out, but not right now.

8        Q    How often would you speak with these

9  investigators?

10        A    It would be few and far between.  It would be

11  a matter of shift change or the main communication would

12  be if we saw him coming back toward the site, and this is

13  also during the time after the article being released, and

14  also after the security incident took place from -- I

15  don't want to use this term loosely but as perceived as a

16  threat to the site with the whole weapon situation, things

17  of that nature.

18              So from an operational perspective, the

19  communication would be again toward shift change.  And

20  then if we saw a pattern of travel where he was coming

21  back toward the site it'd be a matter of notification of

22  leadership.

23        Q    The private investigator was engaged to

24  monitor Mr. Tripp before the alleged gigafactory theft

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 67

1 took place, correct?

2      A   Correct.

3      Q   Was that 24 hours a day?

4      A   Yes.

5      Q   Was he surveilled while he was at work?

6      A   No.

7      Q   It was just when he left work?

8      A   That is correct.

9      Q   And was he followed everywhere he went?

10     A   I can't answer that question.  But to my

11 knowledge, it was based off of the scope of work he was

12 responsible for.  I would imagine that was the fact.  But

13 I wasn't there with him 24/7.

14     Q   Do you have any personal knowledge as to

15 whether Mr. Musk approved of Tesla personnel utilizing a

16 private investigators to follow Mr. Tripp?

17     A   No.

18     Q   Did you have any direct communication with

19 Mr. Musk concerning the Tripp investigation?

20     A   I was in the room on a few conference calls,

21 but it was not my place, nor did I have the right to have

22 direct communication with Mr. Musk.

23     Q   The questioning that you described took place

24 on June 14, 2018, when Mr. Tripp was called in for

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 75

1 would be, termination of his employment, things of that

2 nature.

3          But again, specific conversations I was not

4 involved in, but that was what was relayed to me by Nick.

5          MS. LIBEU:  And I'll object to the extent that

6 you're asking -- I realize your question is not

7 necessarily calling for -- to the extent it calls for

8 privileged communication with Tesla in-house counsel.

9 BY MR. MITCHELL:

10          Q   Mr. Gouthro, just so we can save time here,

11 please presume that my questions are not asking you about

12 your discussion with any of Tesla's counsel.

13          A   Okay.

14          Q   Were you involved in any conversation with

15 anyone regarding Tesla filing a complaint against

16 Mr. Tripp?

17          A   No.

18          Q   Let's talk about the alleged phone call threat

19 on June 20, 2018.  Can you tell me from your knowledge and

20 experience what happened the day Martin Tripp was accused

21 of threatening to shoot up the gigafactory?

22          A   My initial reaction?

23          Q   Just describe the day for me from your vantage

24 point.

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

1        A    I assumed the natural leadership

2 responsibility at that site because the call center being

3 essentially a nerve system, and then everything taking

4 place and not have a senior leader there.  I got a phone

5 call from Jeremie Hansen of Fremont there was an email

6 threat that started from a Las Vegas call center.  There

7 was a message that came across saying that Mr. Tripp was

8 armed, distraught, and that he was en route to the

9 facility.

10               I got a phone call from Mr. Jeremie Hansen

11 initially, which there was several phone calls that came

12 in right after the fact of the possibility that was

13 described to me that he was on his way to the gigafactory.

14        Q    And who is Jeremie Hansen?

15        A    He was a security manager of Fremont.

16        Q    Would you describe for me these call centers

17 at Tesla, was there a call center at every location or --

18        A    It wasn't from a security perspective.  I

19 believe the one in Vegas was more of a service center for

20 the customers that call.  Again, I don't know the exact

21 details of that specific call center itself.  But that's

22 where the information originally came from.

23        Q    Was your belief this was a call center where

24 owners of Tesla cars can call with issues regarding their

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 77

1 cars?

2          A    To my understanding.  But I'm not sure the

3 full extent of what the capabilities are.

4          Q    **What do you recall what happened next?  You**

5 **described there was a series of phone calls.  Tell me as**

6 **best you can recall about what happened over the course of**

7 **that day.**

8          A    There's several conversations that took place.

9 Number one is that -- you know, we never at that time, we

10 reacted because we did not have -- there's two things.  We

11 did not have any armed presence at that facility to where

12 if there was an armed threat that was going to take place

13 there we didn't have the means to neutralize the threat.

14               Response times from Storey County or Washoe or

15 any surrounding neighboring areas is 20 minutes plus

16 because of the remote location of where the Tesla -- the

17 decision was made not to call 9-1-1 but to get in contact

18 with our points of contact at the sheriff's department to

19 ask for assistance.  Meaning that we had a possible threat

20 at the time, right, and that we needed an armed presence

21 there.

22               Jeff Jones at that time sanctioned the fact

23 that we needed to have that there while he immediately

24 looked for off-duty officers from a contractural

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 78

1 perspective so that we could have a more recurring

2 presence there.

3            So got in contact with Storey County.  Storey

4 County is very small, eight officers total that work

5 there.  I was able to get the sergeant and two other

6 officers to come there, and then they also got in contact

7 with Nevada Highway Patrol to send an additional couple

8 units out there and just have an armed presence at

9 different spots throughout the facility in case there was

10 a credible threat of Mr. Tripp actually coming there.

11            During the same course of time I also asked

12 the question, we're receiving the information from

13 Las Vegas.  It was never clearly articulated what location

14 he was on his way to.  It could have been Fremont, it

15 could have been Sparks, et cetera, et cetera.  But it was

16 presumed because of the fact that he was on administrative

17 leave at that time that the intent was for him to show at

18 the gigafactory.  That's the reason why we made a decision

19 to have the armed presence there at that site that day.

20        Q   **Prior to this occurrence on June 20th, 2018,**

21 **did Tesla have any kind of armed security personnel on**

22 **site?**

23            A   No.  It was a program that was being looked

24 into from a legal standpoint.  But it was, at that time it

Page 80

1 Mr. Tripp.

2        Q    And that's what you were told?

3        A    That is correct.

4        Q    Who were you told that by?

5        A    That was given to me by -- I can't recall the

6 exact name, but when all the phone calls were taking place

7 between myself and leadership, that was the information

8 that was given to me as to who the person actually was.

9        Q    Did you personally speak to the call center

10 employee that received the phone call?

11        A    No.  My main action was the safety of the

12 employees, the assets and the facility itself, because

13 that was presumed where the threat was going to.

14 Everybody else was supporting numerous amounts of other

15 factors.

16        Q    What did Tesla do, to your knowledge, to try

17 to ascertain the identity of the person who called into

18 the call center?

19             MS. LIBEU:  Calls for speculation.

20             THE WITNESS:  We had a brief after action,

21 after the fact, to answer your question.  I don't know the

22 full extent of what took place while I was focused on the

23 site.  But it was determined that there were a lot of

24 missing steps that we did have.  Number one was

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 81

1 understanding who that person was in understanding that we

2 made action on a threat that was not assessed.

3 BY MR. MITCHELL:

4          Q    Can you explain what you mean by that, not

5 being assessed?

6          A    So essentially what you want to make sure you

7 do to any extent that you react to that nature, whether

8 it's a cyber threat or whether it's a physical threat, is

9 actually understanding that is it a legitimate threat, is

10 it a credible threat.  Pretty much going through a series

11 of questions to say is this a nonissue, is it speculation

12 or are we dealing with panic, or is this a credible threat

13 that we actually need to posture ourselves for.

14          Q    Based on your training and experience, you

15 believe that that assessment process was not done in

16 connection with this caller by Tesla?

17          A    During the course of what I was instructed to

18 do, and the decision I made, I knew that it wasn't fully

19 assessed.  And during the course of our after action

20 looking back on the situation, it was also mentioned that

21 there was a lot of missing steps that we could have had.

22               And again, this goes back to the infancy of a

23 program and having these procedures in place.  We all know

24 these situations can take place, but sometimes we don't

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 82

1 actually start focusing on those until it actually

2 happens.  Sometimes there's a good reason, sometimes it's

3 bad.

4            It could be that we're building up to that

5 level, which is we don't have the bandwidth at the time.

6 But yes, we did not fully assess that threat as we should

7 have.

8       Q    How long did you continue to be involved in

9 investigating this threat after June 20th?  Did you

10 continue to do any follow-up on that?

11      A    Zero.

12      Q    Did you ever come to have any suspicion one

13 way or the other about who made the call?

14      A    Yes.

15      Q    Would you please tell us about that.

16           MS. LIBEU:  Objection.  Lacks foundation.

17 Calls for speculation.

18           THE WITNESS:  Because of the fact that we

19 never knew, I was never told the information of who this

20 person was.  Number two, because of the fact it was deemed

21 that this was not a credible threat, and there was other

22 steps that took place during that date to kind of

23 substantiate that.

24           It kind of came down to how do we get to this

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 83

1 point, who this person was, who the threat was, did we

2 ever have that conversation with him, how do we even know

3 that he had a gun in his possession, what was the intent

4 of the call.  During the course of the welfare check,

5 during the time that the cops were actually going to his

6 house.  As soon as they made contact.

7              An ATF record was done, weapons checks were

8 done.  He didn't even have possession of a weapon.  So

9 there was a lot of other aggravating circumstances that

10 led to like we were involved in that situation that day of

11 who was this person or how did it get to this point.

12           (Exhibit 3 marked.)

13 BY MR. MITCHELL:

14        Q   I'm going to hand you what has been marked as

15 Exhibit No. 3.

16           Going back to your answer though, I'm not sure

17 we gleaned from your answer who it was that you suspected

18 may have been involved in the phone call.

19           MS. LIBEU:  Objection.  Calls for speculation.

20 Lacks foundation.

21 BY MR. MITCHELL:

22        Q   You had indicated earlier that you had formed

23 some ideas or thoughts about that, and then you proceeded

24 to discuss it.  But I'm not sure you identified who you

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

1 sure that badge is valid and active when they come into

2 the door.

3        Q   How many different doors are there at the

4 facility that employees can enter and exit?

5        A   Dozens.  I don't know the exact number.

6        Q   But they all have security at the door, and

7 they check badges?

8        A   Security is at the gates, and not every door

9 has a badge reader.  That's a separate issue that we were

10 given.  A lot of construction was taking place.

11        Q   So in June of 2018 there were a number of

12 doors that people, employees could come in, and their

13 badges weren't read?

14        A   Yes.  Correct.  Specifically D claw was going

15 under construction at that time.  So there were several

16 doors that were -- not either had readers on them because

17 it was during that part when construction or they weren't

18 active.  So that posed a different security threat that we

19 were dealing with as best we could.

20        Q   Again talking about this particular event and

21 this day, when did you first learn that the Storey County

22 Sheriff's Office had concluded their investigation and

23 found there to be no credible threat on the part of

24 Mr. Tripp?

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 98

1                    MS. LIBEU:  Objection.  Assumes facts not in

2 evidence.

3                    THE WITNESS:  Verbally with my conversation

4 with Chief Dosen, it was that day.  But from the

5 investigation report release it wasn't until I saw a

6 report come out with statements or accusations from them

7 with regard to that date.

8 BY MR. MITCHELL:

9          Q    Was this in the afternoon or the evening that

10 you learned that they had determined there was no credible

11 threat?

12          A    Based off the interview time they actually had

13 with him at the Nugget Casino, I believe it was around

14 between 5:00 and 6:00 P.M.  But it went on for a few

15 hours.

16          Q    Was this Chief Dosen that spoke with you about

17 this?

18          A    Chief Dosen was our main point of contact

19 during that, yes.

20          Q    When you received that information from

21 Sheriff Dosen, did you tell that to Jeff Jones?

22          A    Yes.

23          Q    Do you recall how soon after your call with

24 Sheriff Dosen that you spoke with Mr. Jones?

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 106

1              THE WITNESS:  To answer your question is it an

2 accurate statement.  Based off the information that I

3 provided, witnessed, and after the fact, yes.

4 BY MR. MITCHELL:

5         Q   And you believe this to be true?

6         A   Yes.

7         Q   By the way, hold this thought.  We were

8 talking earlier about the gigafactory threat on June 20th.

9 And would it be fair to say generally it takes about 20

10 minutes to get from town to the gigafactory?

11        A   Depending on what part of town.  But on

12 average, down the 80 to Sparks or Electric Avenue, yes,

13 that's about the time.

14        Q   At the time the alleged phone tip came in that

15 Mr. Tripp was about to come to the gigafactory and shoot

16 the place up, based upon your earlier testimony, wouldn't

17 Tesla have had a private investigator tailing him at that

18 time?

19        A   That's correct.

20        Q   So Tesla would have been in a position to have

21 known where Mr. Tripp was, his whereabouts, and where he

22 was vis-a-vis the gigafactory?

23        A   That's correct.

24              MS. LIBEU:  Lacks foundation.  Calls for

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

1 speculation.

2 BY MR. MITCHELL:

3         Q    And that was something you would have had

4 personal knowledge of because you were in contact from

5 time to time with the private investigators?

6              MS. LIBEU:   Lacks foundation.  Calls for

7 speculation.  Assumes facts not in evidence.

8              THE WITNESS:   There were certain times

9 throughout the course of this that I was not the main

10 point of contact with them.  But to answer your question,

11 yes, that would have been correct.

12 BY MR. MITCHELL:

13        Q    Did you have any communications with the

14 private investigators on June 20th when you learned this

15 alleged threat to find out where Mr. Tripp was at the

16 time?

17        A    Yes, that is correct.

18        Q    And do you recall who you spoke with?

19        A    From the PI team?

20        Q    Yes, sir.

21        A    I don't recall the names of who they were.

22        Q    Do you recall what you asked them, and what

23 they told you?

24        A    At the time after the fact I asked about where

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 108

1 his location was currently.

2        Q    And what did they tell you?

3        A    At the time he was at Safeway across the
4 street from the Nugget.  Actually, he was at a Safeway
5 with his wife, at which point during the course of the
6 response from the Storey County sheriffs up and to the
7 welfare check he had gone to the Nugget Casino.

8        Q    Going back to the quote in the article of
9 March 18th, 2019.  It says, "Gouthro says Tesla's security
10 operation behaved unethically in a zeal to nail the
11 leaker."

12             What did you mean by that?

13        A    In regard to the gathering of the information,
14 whether it was the monitoring of his phone or the emails,
15 and in correspondence to -- the track history that these
16 individuals have had from another major lawsuit from Uber,
17 to some of the practices that we enacted, in my opinion,
18 and then to compound that, how we irrationally, in my
19 opinion, after the fact dealt with that perceived after-
20 shooter threat.

21             There were things that, in my opinion, whether
22 you want to call them unethical, which is still a
23 statement I believe in or just operationally
24 irresponsible, that is the basis to my statement.

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 170

1      A    I do.

2           Q    That was the same day where the potential

3 threat came into the gigafactory.  Do you remember that?

4      A    That is correct.

5           Q    And that potential threat, the call came into

6 the Las Vegas call center later in the afternoon, right?

7      A    Based on this time frame, you're correct.

8           Q    Before Mr. Musk received the email from

9 Mr. Tripp that is Exhibit 11, is it accurate that Tesla

10 had not engaged private investigators to follow Mr. Tripp?

11     A    Repeat the question.

12          Q    Before Mr. Musk had received the mail from

13 Martin Tripp --

14     A    This email?

15          Q    Yes, in Exhibit 11 that you're looking at.

16     A    Okay.

17          Q    Isn't it accurate that Tesla had not engaged

18 private investigators to follow Mr. Tripp?

19               In other words, that only happened after

20 Mr. Musk received this email?

21     A    No.  To my knowledge there was actually

22 personal investigators that were following him prior to.

23          Q    When did that start or where did you hear

24 that?

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 171

 1        A    That came from Nick Gicinto and team.  This is

 2 during the course at the beginning of the investigation

 3 through the middle of May.

 4        Q    When was the first time that you had personal

 5 contact with the private investigators?

 6        A    My initial contact was about a week, two weeks

 7 prior to the June 20th situation.

 8        Q    Was the PI team normally in contact with

 9 Mr. Gicinto and Mr. Nocon?

10        A    Yes, they were, because they received

11 information from them at some period of time.  I'm not

12 sure to what extent or how often because I wasn't looking

13 at their phones or I wasn't around them 24/7.

14        Q    I'm going to make a representation to you that

15 Mr. Nocon wasn't hired by Nisos Group and didn't come to

16 work with Tesla until June 11th.

17        A    He's a contractor working under Nick.  So we

18 were on a hiring freeze, correct.

19        Q    And that didn't happen until June 11th?  I'll

20 make that representation that Mr. Nocon didn't actually

21 start working for Nisos until June 11th.

22             Does that suggest to you that your time might

23 be a little off, it might be mid June instead of mid May?

24        A    No.  It may have been from like during his

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

1 better.

2       Q   Was it important to the team members at that

3 meeting that they discuss ways to make procedures better

4 in the future; it was something they took seriously?

5       A   Yeah.

6       Q   I want you to look at a document that's in

7 your -- what you were shown earlier.  I'll give you the

8 exhibit number.  It's Exhibit 5.  It is the police report

9 for the potential threat to the gigafactory.  Do you see

10 that?

11      A   I do.

12      Q   One of the things you said earlier, and you

13 can correct me if I get it wrong, was that you were told

14 not to tell the law enforcement where Mr. Tripp was; is

15 that correct?

16      A   At the point in time, yes.

17      Q   Was it that you were told not to tell where

18 Mr. Tripp was or was it that you were told not to say that

19 Tesla had private investigators following him?

20      A   Both.

21      Q   Who told you that?

22      A   Jake McComb.

23      Q   At the time that you received the call or you

24 were alerted about the gigafactory, the potential

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

Page 176

1 gigafactory threat, did you personally know where

2 Mr. Tripp was?

3          A    Not at that time, no.

4          Q    At some point it was -- you learned that

5 Mr. Tripp was spotted at a Safeway, correct?

6          A    To the best of my knowledge, yes.

7          Q    Did you pass that information onto the law

8 enforcement officers that were at the gigafactory?

9          A    Huh-uh.

10         Q    You did not?

11         A    Huh-uh.

12         Q    That's because -- why not?

13         A    Because that was early on in the time frame

14 where he was at the Safeway before he went to the Nugget.

15 So that wasn't until we escalated process, set up the

16 operational brief and everything like that before we

17 discussed the welfare check.  So during that timeline

18 there was never a need for that.

19         Q    Can I turn your attention then to Exhibit 5.

20 And I want you to turn to the first page of the report by

21 Christopher Parker, about four pages in.

22         A    Uh-huh.

23         Q    Do you have that page in front of you?

24         A    Page 4, you said, correct?

SEAN GOUTHRO (CONFIDENTIAL) - 05/29/2019

1           MS. LIBEU:  Sorry.  We were talking over you.

2 Thank you.

3           (The deposition of SEAN GOUTHRO

4           was concluded at 3:15 P.M.)

5                         -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24