Rory T. Kay (NSBN 12416)
MCDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV  89102
Telephone:  (702) 873-4100
Facsimile:  (702) 873-9996

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (admitted pro hac vice)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael T. Lifrak (admitted pro hac vice)
  michaellifrak@quinnemanuel.com
Jeanine M. Zalduendo (admitted pro hac vice)
  jeaninezalduendo@quinnemanuel.com
Aubrey Jones (admitted pro hac vice)
  aubreyjones@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

Attorneys for Plaintiff/Counter Defendant
TESLA, INC.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TESLA, INC.,<br><div align="right">Plaintiff,</div><br>    v.<br>MARTIN TRIPP,<br><div align="right">Defendant.</div> | Case No. 3:18-cv-00296-LRH-CBC<br><br>**TESLA, INC.'S OPPOSITION TO DEFENDANT MARTIN TRIPP'S MOTION FOR SUMMARY JUDGMENT** |
| AND RELATED COUNTERCLAIMS | |

# INTRODUCTION

Defendant Martin Tripp is a disgruntled former Tesla employee who illegally stole confidential Tesla data, manipulated it, then gave it to a reporter to print misleading articles the day before and after Tesla's annual shareholder meeting. Tesla was harmed by Tripp's actions, including incurring out-of-pocket costs to fully uncover Tripp's malfeasance. Tripp, who fled to Hungary after getting caught, is not entitled to summary judgment, and his arguments to the contrary do not withstand even minimal scrutiny.

Tripp first asserts that he did not violate the Nevada Computer Crimes Law (NCCL) because he had authorization to access the data he leaked. This is a straw man argument. Regardless of whether he had authorized "access," the statute expressly prohibits the unauthorized use, disclosure, transfer, taking, possession, or copying of confidential information. Tripp admits he did all of those things. He violated the statute on its face.

Tripp next argues that Tesla is not entitled to recover its expenses in investigating the scope of his leaks and the harm it had suffered. But the NCCL specifically allows recovery of these "response costs." Likewise, courts have repeatedly held that such response costs are proper damages for misappropriation of trade secrets, breach of contract, and breach of fiduciary duty – all the claims Tesla brings here. Tripp ignores all of this and is left to make the nonsensical argument that these damages are unrecoverable "attorneys' fees," when no court has ever made such a determination.

Tripp then regurgitates his *Daubert* argument that Tesla's damages expert uses an unreliable methodology in relation to his "market capitalization" damages opinion. But this is not a proper ground for summary judgment, and the Court has already ordered that *Daubert* motions should be brought only after summary judgment has been determined. Moreover, Tripp ignores the ample evidence from Tesla's expert and otherwise that Tripp's actions caused a drop in Tesla's stock price and that Tesla was harmed as a result. Determining the scope of Tesla's harm is a job for the jury.

Finally, Tesla is entitled to seek punitive damages and to pursue a permanent injunction at trial. There is abundant evidence that Tripp leaked Tesla's confidential information to get revenge

on the company, that he wanted to harm the company, that he wanted to be enriched through his actions, and that he sought to conceal his actions and identity.  The applicable cases make clear that each of those are independent grounds for a finding of malice for purposes of punitive damages.  As to an injunction, Tripp's improper leaking of Tesla's confidential information, remarkably, continued after the filing of the Complaint, and without an injunction, there is a danger it will continue.  Tripp does not even argue otherwise.

Martin Tripp should face a jury to answer for his actions.  Tripp does not dispute that he transferred confidential information to a reporter, that he breached his agreements with Tesla, that he breached his fiduciary duties, that Tesla spent hundreds of thousands of dollars in reaction to his conduct, that Tesla is entitled to recover the wages he was paid while harming the company, or that Tesla's stock price was immediately impacted when the leaked information was made public.  The Court should reject Tripp's motion for summary judgment and permit Tesla to bring these claims to a jury.

## STATEMENT OF DISPUTED FACTS

Pursuant to Local Rule 56-1, Tesla sets forth the following disputed facts material to the disposition of Tripp's Motion for Summary Judgment (the "Motion" at ECF No. 154).

### A.    Tripp's Access to Confidential Data Was Limited.

In October 2017, Tesla hired Martin Tripp to work as a lead Process Technician at the Tesla Gigafactory near Reno, Nevada.  (Appendix of Exhibits in Support of Tesla's Motion for Summary Judgment, Or In The Alternative, For Partial Summary Judgment ("Tesla App.") at ECF No. 171-12).[1]  As a function of Tripp's employment, he was given certain, restricted access to Tesla's computers and Manufacturing Operating System ("MOS"), which houses data regarding the company's inventory, work tasks, and quality and which was created by Tesla specifically for use with regard to production of the Model 3.  (Declaration of Michael T. Lifrak in Opposition to

---

[1]   The Declaration of Michael Lifrak in support of Tesla's Motion for Summary Judgment was filed at ECF No. 170.  The exhibits attached thereto can be found in the Appendix, volumes 1-3, filed at ECF Nos. 171-173.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Tripp's Motion for Summary Judgment ("Lifrak Opp. Dec."), Ex. 52, Wu Dep. 11:1-23; 12:4-14; 14:16-21.)  However, his access was limited in several important ways:

First, Tripp agreed to be bound by a number of non-disclosure agreements regarding the information he learned as part of his employment.  (Tesla App. at ECF No. 171-13 - 171-16.)  Per the terms of Tesla's "Employee Proprietary Information and Inventions Agreement," Tripp agreed that he would ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ (Tesla App. at ECF No. 171-15.)  Tripp also agreed to ██████████████████████████████████████████████ ████████████████████ (Tesla App. at ECF No. 171-14.)

Second, Tripp was not entitled to make any changes to the MOS, to make changes to how certain parts were designated in the MOS, or to dictate access levels for other employees.  At the beginning of his employment, ████████████████████████, (Lifrak Opp. Dec. Ex. 53 (Tripp exclaiming ████████████████████████████████████████████████)), but that status was revoked prior to his stealing of the information at issue in this case because he had, without authorization or approval, ████████████████████████████ on several occasions.  (Lifrak Opp. Dec. Ex. 54, 06/14/2018 Int. 68:22-69:2; 70:11-75:3 (describing ████████████████████████████████████████████); Ex. 55 (stating Tripp's ████████████████████████████████████████████████████).)  When his ████████████████████████████████████████████████████████ ██████ (Lifrak Opp. Dec. Ex. 56.)

Third, Tripp's access was only to manufacturing systems, and not Tesla systems or servers related to other areas of business operations.  (Lifrak Opp. Dec. Ex. 52, Wu Dep. 75:9-13.)

Fourth, Tripp was not authorized to access Tesla's information on his personal email.  (Lifrak Opp. Dec. Ex. 57, Tripp Dep. 80:6-83:6; Ex. 58, Gicinto Dep. 38:21-39:8.)

Fifth, Tripp was only permitted to access Tesla information for authorized purposes.  (Lifrak Opp. Dec. Ex. 58, Gicinto Dep. 35:6-16; 122:10-123:13; Ex. 59, Nocon Dep. 76:7-11; Tesla App. at ECF No. 171-1, Tripp Dep. 116:23-124:2.)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Sixth, Tripp did not have access to certain documents and content created by other Tesla employees.  To gain access to that material, ██████████████████████████ ████████████████████████████. (Lifrak Opp. Dec. Ex 60.)  As Tripp admitted to a colleague:

> **Marty Tripp 6:38 PM:**
> ah just got your email...thanks!  Yeah I assume he probably did.  I hacked his old comment generator password...sure I can do it here
> HAHAHAHA
> I delete every email
> **Sam Kapner 6:38 PM:**
> you did how?
> **Marty Tripp 6:38 PM:**
> I have resources :D
> A large European network HAHAHAHA

(*Id.*)

### B.     Tripp Is Reprimanded and Transferred for Poor Work.

Only four months into the job, in February 2018, after repeated complaints from his co-workers (Tesla App. at ECF No. 171-3, Persyn Dep. 45-46.), Tripp had a one-on-one counseling session with a high-level supervisor, Michael Bowling, who stripped Tripp of his role as "lead." (Tesla App. at ECF No. 171-1, Tripp Dep. 233:1-13.)  A few weeks later, on March 8, 2018, Bowling reiterated to Tripp that he did not have the authority to direct other technicians and told Tripp to avoid any more "targeting."  (Tesla App. at ECF No. 171-18.)  After further problems, Bowling ██████████████████████████████████████████████ (Tesla App. at ECF No. 171-11.)  Tripp's behavior and conduct did not change.  A week later, on May 25, 2018, Bowling issued formal discipline against Tripp because he continued "to have conflict with team members," was "targeting other team members," and was "not working collaboratively." (Tesla App. at ECF No. 171-19.)  Tripp believed the discipline was unfair, and blamed Bowling for making him look like "the bad guy."  (Tesla App. at ECF No. 171-1, Tripp Dep. 239:14-25.)

### C.     Tripp Steals and Leaks Volumes of Confidential Tesla Information.

Two days after he was formally disciplined, Tripp emailed several business news publications that regularly report on Tesla—*Reuters, Business Insider, CNN*, and *Fox News*—

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

indicating that he was a current Tesla employee and offering to disclose Tesla internal information.[2]  (Tesla App. at ECF No. 172-2.)  By that point, Tripp had recently begun his clandestine process of taking Tesla's confidential data from Tesla computers.  During his breaks from Tesla work (Tesla App. at ECF No. 171-6, 6/14/2018 Tripp Int. 173:4-24), Tripp:

- Created ███████████████████████ data from Tesla's MOS.  (Tesla App. at ECF No. 171-1, Tripp Dep. 91:1-95:16.)
- Utilized ███████████████████████ that were outside of his job responsibilities.  (Tesla App. at ECF No. 171-1, Tripp Dep. 116:23-124:2; ECF No. 171-2, Gicinto Dep. 34:24-35:16.)
- Forwarded internal Tesla emails regarding production goals and scrap data to his personal email address.  (Tesla App. at ECF Nos. 171-21 – 171-22.)
- Saved Tesla data and worksheets to USB drives so that the information could be loaded to Tripp's personal computers.  (Tesla App. at ECF No. 171-2, Gicinto Dep. 37:21-38:10.)
- Took screenshots of non-public factory data from Tesla computers.  (Tesla App. at ECF No. 171-1, Tripp Dep. 106:17-20; ECF Nos. 171-25 – 171-26.)
- Transferred non-public Tesla data to a personal cloud-based storage system.  (Tesla App. at ECF No. 171-2, Gicinto Dep. 123:18-124:10; 136:23-137:12; ECF No. 171-1, Tripp Dep. 166:11-169:13.)
- Logged into random Tesla computers using generic credentials, rather than his own, to run certain data queries, without any job-related purpose. (Tesla App. at ECF No. 171-2, Gicinto Dep. 37:21-38:10).

Tripp then leaked large amounts of this non-public data and information to *Business Insider* reporter Lopez.  (Tesla App. at ECF No. 171-1, Tripp Dep. 91:7-97:5).)  He sent her screenshots of the reports he had created based on stolen data, a spreadsheet he created from six months' worth of data he had stolen from Tesla, an internal Tesla email discussing rework statistics, and a May 16, 2018 email Tripp sent to Tesla's CEO, Elon Musk.  (*Id.*; Tesla App. at ECF No. 171-25; ECF No. 172-3.)  He also sent photographs and videos he had taken inside the Gigafactory to Lopez.  (Tesla App. at ECF No. 172-4; Lifrak Opp. Dec. Ex. 57, Tripp Dep. 79:10-14; Tesla App. At ECF No. 171-1, Tripp Dep. 149:21-150:7; 153:8-22; 166:11-169:13.)

Tripp has admitted that the information he leaked to Lopez had nothing to do with his

---

[2]  Tripp reached out to Linette Lopez of *Business Insider*, in particular, because Lopez holds a "grudge" against Musk and "definitely has it out for him."  (Tesla App. at ECF No. 171-1, Tripp Dep. at 71:17-22.)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

purported "safety" concerns.  (Lifrak Opp. Dec. Ex. 57, Tripp Dep. 57:25-59:24.)  Rather, Tripp was speaking to Lopez because he was "upset" with Tesla, and Tripp even provided Lopez with names of other Tesla employees who he thought also may have been "upset enough to talk."  (*Id.* at 174:25-176:9.)  Additionally, according to a former co-worker, Tripp suggested that he was paid $50,000 for providing information Lopez.  (Tesla App. at ECF No. 171-7; ECF No. 173-8, 6/24/18 Uelmen Int. 4:21-7:15; 16:8-18:1.)  Tripp texted this co-worker whom he put in contact with Lopez that "if you are helpful you will get some money, I GUARANTEE you."  (*Id.*).

On June 2, 2018 and June 4, 2018, the days before and after Tesla's annual shareholder meeting, *Business Insider* published two articles, which Tripp admits were based on information he stole.  (Tesla App. at ECF No. 172-5; ECF No. 172-6; Tesla App. at ECF No. 171-1, Tripp Dep. 154:17-23; Mot. ¶ 2.)

After the publication of Lopez's articles, Tripp and Lopez communicated about the possibility of Tripp continuing to leak confidential information to her.  The pair were "just getting started."  (Tesla App. at ECF No. 172-7.)  Tripp appeared excited about the possibility of continuing to leak information to Lopez, responding "Muahahahahahha!!!" to Lopez's statement that she intended to continue to work with him to publish negative stories about Tesla.  (*Id.*)

### D.  Tesla Investigates the Leak and the Extent of Tripp's Hacking.

As soon as Tesla became aware that *Business Insider* had Tesla's internal, confidential information that it was planning to publish, Tesla began investigating the source of the leaks and the full extent of its data breaches to mitigate any further exposure.  (Tesla App. at ECF No. 171-2, Gicinto Dep. 16:19-17:8; 24:21-28:22; 30:9-34:6.)  The large scope of the investigation required Tesla to hire additional consultants.  (Mot. ¶ 33.)

Tesla and its consultants first attempted to determine who was the source of the leaks. They did so by compiling lists of "what information was confidential in those articles," and then using a computer program to check every search that had been run on the MOS to determine "who had access to every single bit of that information" that was leaked to Lopez.  (Tesla App. at ECF No. 171-2, Gicinto Dep. 26:17-28:9.)

1  ████████████████████████████████████████.  (*Id.*)  After Tesla

2  identified Tripp as the probable source of the leaks but still uncertain of the scope of Tripp's

3  actions, Tesla interviewed him and forensically imaged his work laptops.  (*Id.* at 28:23-29:19;

4  134:11-136:17; 142:13-144:6.)  Tripp was not forthcoming during the interview, initially lying to

5  investigators regarding his involvement in the leaks and the extent of his activities. (*Id.* at 133:3-

6  134:10; Tripp App. at ECF No. 171-2, Gicinto Dep. 135:17-136:17)  Eventually, when confronted

7  with the irrefutable evidence that he had stolen the data, Tripp admitted that he leaked the

8  information.  (*Id.* at 136:7-10; Tesla App. at ECF No. 171-6, at 147:1-3.)  ████████████

9  ███████████  (Tesla App. at ECF No. 171-6, at 153:24-25.)  And when asked whether he would

10  have done anything differently, Tripp responded, ███████████████  (*Id.* at 244:13-17.)

11        In examining Tripp's Tesla-issued computers, Tesla investigators attempted to determine

12  the volume and scope of information that Tripp had taken and was being passed externally.  (Lifrak

13  Opp. Dec. Ex. 58, Gicinto Dep. 130:11-132:17.)  This inquiry indicated that Tripp may have

14  programmed persistent code into Tesla's system that would continuously export data from Tesla,

15  even after Tripp was fired.  (*Id.* at 139:4-140:24.)  Only after additional forensic examination of

16  Tesla's MOS and computers, was it ultimately determined that Tripp had not planted such a code.

17  (Tesla App. at ECF No. 171-2, Gicinto Dep. 142:13-144:6.)  Nonetheless, Tripp's statements

18  indicate that the leaks would have continued had Tesla not done the work necessary to identify

19  and terminate Tripp.  (*See, e.g.,* Tesla App. at ECF No. 172-7).  Indeed, even after being fired and

20  cut off from ongoing confidential information—and even after this lawsuit--Tripp posted

21  additional confidential information stolen during his time at Tesla, discussed *infra*.  Tesla incurred

22  substantial costs in conducting the investigation into who was the source of leaks, the scope of the

23  leaks, and whether the leaks were ongoing.  (Lifrak Opp. Dec. Exs. 66-69.)

24        **E.    Tripp Has Admitted His Actions Were Unauthorized.**

25        In deposition, Tripp was questioned about his actions to steal and leak Tesla's

26  confidential information.  He admitted that:

27        •  he was not authorized to send internal Tesla emails to his personal email account,

28          yet he did so, (Lifrak Opp. Dec. Ex. 57, Tripp Dep., 82:2-6);

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

- scrap data that he leaked to Lopez was Tesla's confidential information that he was not authorized to reveal outside of Tesla, (*id.* at 84:2-13);

- he was not authorized to reveal outside of Tesla information regarding Tesla's "parts produced," yet he did so, (*id.* at 108:15-19);

- ███████████████████████ with data from the MOS was Tesla confidential information that Tripp was not authorized to share with Lopez, yet he did so, (*id.* at 118:20-119:12);

- he took screenshots of Tesla's MOS data "knowing that it was confidential, and knowing that [he] shouldn't share it with others, but that [he] sent to Linette Lopez" anyway, (*id.* at 132:6-12);

- he was not authorized to share data regarding purportedly damaged battery cells with anyone outside of Tesla, yet he did so, (*id.* at 139:12-18); and

- he was not authorized to share with Lopez data regarding the number of Model 3s produced in 2018, yet he did so, (*id.* at 149:8-15).

Tripp also admitted that he did not need to take any of these actions to do his job and that he conducted his unauthorized data extraction when he was ███████████ (Tesla App. at ECF No. 171-6, 6/14/2018 Tripp Int. 173:21-24.)  In addition to his admission that he lacked authority to take these actions, Tripp made numerous efforts to hide his identity as the source of the leaks. For example, ██████████████████████████████████████████ ███████████████████████████████████" (Tesla App. at ECF No. 171-2, Gicinto Dep. 37:21-38:10), took photos of his queries with his phone rather than taking screenshots on his Tesla computer in order to avoid the queries being traced back to him, (Lifrak Opp. Dec. Ex. 57, Tripp Dep. 108:1-19), frequently █████████████████████ (Tesla App. at ECF No. 171-6, 6/14/2018 Tripp Int. 244:13-17), and continued to lie to investigators about his role in the leaks even after having been caught.  (Tesla App. at ECF No. 171-2, Gicinto Dep. 135:17-136:10; Lifrak Opp. Dec. Ex. 58, Gicinto Dep. 133:3-134:10; 114:19-115:21 ("[H]is evasive tactics and lack of truthfulness throughout the interview gave us a fairly high degree of

1   doubt that he had provided us all the information. Simply put, when confronted he would admit it,

2   but unless confronted he was going to evade or lie.").)

3         **F.**      **Tesla's Stock Prices Fell in the Aftermath of the *Business Insider* Articles.**

4         Tripp's efforts to harm Tesla were successful.  Not only did they force Tesla to undergo a

5   costly investigation to determine the extent of the leaks and the damage that was done, but they

6   also impacted Tesla's stock price.

7         As Tripp admits, Tesla's stock price fell after the publications of the June 4 and June 6,

8   2018 *Business Insider* articles, which were timed for the day before and day after Tesla's annual

9   shareholder meeting.  (Mot. ¶¶ 12-13, 17.)  Tesla's damages expert, Jeffrey Kinrich examined

10  these price drops, and other potential causes of the observed price.  (Lifrak Opp. Dec. Ex. 61,

11  Kinrich Dep. 27:15-28:3.  First, Kinrich studied the timing of the publication of the two news

12  articles and the movements of Tesla's stock and several stock indices in the period shortly after

13  the publication of each article. (Expert Report of Jeffrey H. Kinrich ("Kinrich Report") at ECF

14  No. 154-D, ¶¶ 19-22, 25 and Exs. 5-8).)  Kinrich then studied Tesla's stock price movements

15  during the period.  He determined that "Tesla's share price fell $0.20 per share (or 0.07 percent)"

16  during the relevant period after publication of the first article on June 4, 2018, (*Id.* at ¶ 21,) as

17  Tripp concedes.  (Mot. ¶ 12.)   He also determined that "Tesla's share price fell $0.78 per share

18  (or 0.25 percent)" during the relevant period after publication of the second article on June 6,

19  2018, (Kinrich Report at ECF No. 154-D, ¶ 22,) which Tripp also concedes.  (Mot. ¶ 13.)  Kinrich

20  applied these per share calculations to the total number of Tesla shares outstanding in the market

21  to determine that Tesla's market capitalization decreased by $34 million immediately following

22  the June 4 disclosure and by $134 million immediately following the June 6 disclosure. (Kinrich

23  Report at ECF No. 154-D, ¶¶ 21-22.)  Kinrich then used his experience and training to select the

24  S&P 500, the NASDAQ Composite Index, and the NASDAQ OMX Global Automobile Index as

25  comparator indices to determine whether the decline in Tesla's stock price was attributable to

26  general market or industry trends.  (*Id.*)  His study of the price movements of these indices in

27  comparison to the price movement of Tesla's stock during the relevant periods led him to conclude

28  that Tesla's stock price decline "is not attributable to general market or industry trends."  (*Id.*).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    From there, Kinrich examined whether there was any other news regarding Tesla, apart

2    from the *Business Insider* articles using Tripp's information, that might have caused the drop in

3    Tesla's stock price.  Based on his study of news available on Factiva and Bloomberg regarding

4    Tesla, he determined that "there was no additional news beyond re-reporting prior news between

5    the June 4 Article and market close nor between the June 6 Article and market close on their

6    respective days."  (Kinrich Report at ECF No. 154-D, p. 8 & n. 20.)  Tripp has not alleged any

7    other potential causes of Tesla's stock drops on these dates.

8    **G.**    **Tripp Has Continued to Share Tesla's Confidential Information on Twitter.**

9    Months after Tesla filed its complaint against Tripp, remarkably, Tripp revealed additional

10   confidential Tesla data and information via Twitter.  On August 15, 2018, Tripp posted

11   screenshots and excerpts from confidential Tesla documents he stole from the company,

12   photographs of proprietary Tesla equipment and facilities, fabricated data, and incendiary and

13   false statements about Tesla.  (Lifrak Opp. Dec. Ex. 62 Tesla Interrogatory Response 18, Ex. 63.)

14   Tripp also posted vehicle identification numbers ("VIN") of certain Model 3s he had stolen from

15   Tesla, falsely claiming that ███████████████████████████████.  (*Id.*; Ex. 64,

16   Watson Dep. 49:19-50:6; 72:18-73:1; 87:20-88:3; 92:18-24.)

17   More remarkably still, even after the August 15, 2018 episode, Tripp has continued to

18   Tweet confidential Tesla data and information.  Since that time, Tripp has periodically reactivated

19   his Twitter account to tweet about Tesla.  For example, on February 2, 2020, Tripp made over 10

20   tweets describing confidential information regarding Tesla battery architecture, including

21   uploading photos.  (Lifrak Opp. Dec. Ex. 65.)

22   **LEGAL STANDARD**

23   Summary judgment is ***only*** appropriate where there is "no genuine dispute as to any

24   material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

25   *see also S. E. C. v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir. 1982) ("Summary judgment is

26   proper only when (1) the pleadings, depositions, affidavits and other material permitted by Rule

27   56(c) show that there is no disputed issue of material fact, and (2) on the agreed facts, the moving

28   party is entitled to prevail as a matter of law.").

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Tripp, as "a moving party without the ultimate burden of persuasion at trial" must either "produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery…show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). "Defendant's obligations under rule 56(c) must have some teeth; a defendant cannot trigger a plaintiff's burden of proof by simply uttering the words 'summary judgment,'" and citing to rule 56. *Bank of the Ozarks v. Perfect Health Skin & Body Ctr. PLLC*, 2019 WL 2513299, at *1 (E.D. Mich. June 18, 2019). In order to carry his burden under Rule 56(c), Tripp must show "the absence of a genuine issue of material fact, and the court must view all facts and draw all inferences in the light most favorable to the responding party." *Perrin v. Gentner*, 177 F. Supp. 2d 1115, 1118 (D. Nev. 2001); *see also Adickes v. S.H. Kress & Co*., 398 U.S. 144, 148 (1970) (summary judgment improper where defendant "failed to show the absence of any disputed material fact").

Tripp has not met this burden. Because Tripp has not shown that there are no disputed material facts as to each of the issues he raises in his Motion, either by producing evidence negating an essential element of Tesla's case or by showing that Tesla does not have enough evidence of an essential element of its claims, he is not entitled to summary judgment under Rule 56(c). *Id*. Further, even if Tripp had met his burden as the moving party, which he has not, the Court should not grant summary judgment because Tesla has met its burden of "set[ting] forth specific facts showing that there is a genuine issue for trial" with regard to each of Tripp's summary judgment requests. *Pinnacle Minerals Corp. v. Whitehead*, 357 F. Supp. 3d 1053, 1057 (D. Nev. 2019) (internal citations omitted); *Kohlrautz v. Oilmen Participation Corp.*, 2003 WL 27380941, at *2 (D. Nev. June 16, 2003), *aff'd*, 441 F.3d 827 (9th Cir. 2006) (opposing party can overcome properly supported motion for summary judgment by presenting "specific facts demonstrating that there is a factual dispute about a material issue."). As set forth below, taken in the light most favorable to Tesla, there are genuine issues of material fact as to each issue Tripp raises in his Motion. Therefore, summary judgment is improper.

**LEGAL ARGUMENT**

**I.   THE NEVADA COMPUTER CRIMES LAW PROHIBITS UNAUTHORIZED TAKING OF DATA, AS TRIPP HAS DONE HERE.**

Tripp argues that Tesla's claim under the Nevada Computer Crimes Law ("NCCL") fails because he was fully authorized to access the confidential data he stole and leaked.  (Mot. at 11).  His argument is based solely on the mistaken belief that the NCCL only prohibits *accessing* computer information without authorization.  *Id.*  It does not.

**A.   The NCCL Prohibits Unauthorized Use of Computer Data, Even by Employees Who May Otherwise Have Access Thereto.**

The NCCL is clear.   A person who "without authorization" "uses," "discloses," "transfers," "takes," "retains possession of," or "copies" "data . . . which exist inside or outside a computer system" violates the statue.  Nev. Rev. Stat. § 205.4765(1).  Tripp did all of those things here, and he admits as much.  That he may have had authorization to access some of the data does not mean he had authorization to use it, disclose it, transfer it, take it, or copy it.  *Id.*  He did not.

In *U.S. v. Christensen*, the Ninth Circuit held that ***unauthorized use*** of computer data is a violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA").[3] 828 F.3d. 763 (9th Cir. 2015).  The Court held that "the [CDAFA] does not require *unauthorized* access.  It merely requires *knowing* access. [] What makes that access unlawful is that the person 'without permission takes, copies, or makes use of' data on the computer.  Cal. Penal Code § 502(c)(2).  A plain reading of the statute demonstrates that its focus is on unauthorized taking or use of information." *Id.* at 789 (emphasis in original).  Thus, even if Tripp had authority to *access* Tesla's confidential data and documents due to his employment, he violated the NCCL because his subsequent use and disclosure of the data and documents was unauthorized.

*Christensen* is not alone.  In *Gilbert v. City of Sunnyvale*, an officer was terminated for accessing DMV computer files, obtaining confidential information, and releasing the confidential DMV information to a third party without a legitimate law enforcement purpose.  130 Cal. App.

---

[3]  The Ninth Circuit has applied the same analysis to the NCCL as the CDAFA.  *See Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018).

4th 1264, 1273 (2005).  In denying the officer's writ of mandate, the court stated that the officer's unauthorized use and disclosure of law enforcement information for unofficial purposes was a violation of the CDAFA and thus grounds for dismissal.  *Id.* at 1281.  Similarly, in *People v. Hawkins*, although the defendant was authorized to access the source code of his employer within the scope of his job duties, he was not authorized to take the source code to start his own competing business, and in doing so was found guilty of violating the CDAFA. 98 Cal. App. 4th 1428, 1433-34 (2002).  These cases demonstrate that the fact of authorized access due to employment, alone, does not insulate one from liability under the CDAFA (or NCCL), where data is taken and used outside the scope of such employment.

There is no doubt that Tripp knew his use and disclosure of Tesla's data and documents was without authorization.  He admitted numerous times throughout his deposition that he lacked authorization to take and disseminate Tesla's information.  For example, Tripp admitted that he was not authorized to send internal Tesla emails to his personal email account, (Lifrak Opp. Dec. Ex. 57, Tripp Dep. 82:2-6); that bandolier scrap data was Tesla's confidential information that he was not authorized to reveal outside of Tesla, (*id.* at 84:2-13); that he was not authorized to share data regarding purportedly damaged battery cells with anyone outside of Tesla (*id.* at 139:12-18); and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with data from the MOS was Tesla confidential information that he was not authorized to share with Lopez.  (*Id.* at 119:3-12; *see also id.* at 108:15-19; 149:8-15.)  Moreover, Tripp's concerted effort to conceal his identity and evade detection, corroborates his admissions that he knew he lacked authority to take these actions. (Lifrak Opp. Dec. Ex. 58, Gicinto Dep. 133:3-134:10; 114:19-115:21; Tripp App. at ECF No. 171-2, Gicinto Dep. 37:21-38:10; 135:17-136:17; Ex. 54, 6/14/2018 Tripp Int. 156:1-9); *see Oracle USA, Inc. v. Rimini St., Inc.*, 191 F. Supp. 3d 1134, 1444 (D. Nev. 2016) (defendants' affirmative technical measures to evade detection was evidence that defendants "knowingly accessed and *without permission* took or made use of any data.") (reversed on other grounds).

## B.   Tripp's Reliance on *Oracle* is Misplaced.

Tripp relies on the Ninth Circuit's holding in *Oracle* to support his argument that because Tripp "had permission to access the information at the time he accessed it," he did not violate the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

NCCL.  (Mot. At 11.)  That is not the law, and Tripp's actions went far beyond merely accessing Tesla's confidential data.

In *Oracle*, plaintiff Oracle brought suit in the District of Nevada against a competitor, alleging violation of the CDAFA and NCCL.  *See Oracle USA, Inc.*, 191 F. Supp. 3d 1134.  It was undisputed that defendants had permission to access Oracle's website to download materially generally, but that Oracle did not want them to use automated downloading tools to do so.  *Id*. at 1139–40.  On appeal, the Ninth Circuit examined "whether, by using automated tools to take data in direct contravention of Oracle's terms of use, [Defendants] violated the statutes." *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018).  The Court held that because defendants had authorization to access and take the data in the first instance, the method of doing so was of no moment.  *Id*.  "We hold that taking data using a method prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA." *Id*.

Tripp's actions, however, are entirely different.  First, Tripp ███████████ ███████████████████████████████████████████████████ that were outside of his job responsibilities.  (Tesla App. at ECF No. 171-1, Tripp Dep. 91:1-95:16, 116:23-124:2; ECF No. 171-2, Gicinto Dep. 34:24-35:16.)  This alone sets his actions apart from the defendants in *Oracle* because he did not have authorization to access and compile all this information in the first place.  *See* Section C, *supra*.[4]

Moreover, and most importantly, Tripp's authorization to *use* Tesla's operating system and data was strictly limited to carrying out his job responsibilities.[5]  (Tesla App. at ECF Nos. 171-12; 171-13 at p. 182; 171-14 at p. 188; 171-15.).  Tripp was never authorized to modify, disclose, transfer, take, retain possession of, copy, or permit others to access Tesla's confidential

---

[4]  Tripp also relies on *Facebook, Incorporated v. Power Ventures, Incorporated*, 844 F.3d 1058 (9th Cir. 2016) for this argument.  However, like the Ninth Circuit in *Oracle,* this case addressed only the question of unauthorized access, and did not reach the question of unauthorized use.

[5]  As note *supra*, Section A, Tripp agreed that he would not ███████████████████ ████████████ (Tesla App. at ECF No. 171-15.)  Tripp has made no claim that his disclosure of Tesla's confidential information was in any way connected to his work with Tesla, nor could he.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

data and information—things he did by exporting Tesla's data and documents to his personal devices and the iCloud, altering some or all of the data, and sharing that data with reporters and the public via Twitter. (Lifrak Opp. Dec. Ex. 62.)  Nor was Tripp authorized to use and retain possession of Tesla's operating system and network by programming the spreadsheets of data he stole to automatically update on his own devices. (*Id.*)  This sets Tripp apart from the defendants in *Oracle* and puts him squarely within the scope of the NCCL, as detailed above.

Finally, even if authority to access data would absolve him of liability (it clearly does not), the question of whether Tripp had the requisite authority or was otherwise acting within the scope of his employment when he stole Tesla's confidential data and leaked it to the media and on Twitter, is a factual one for the jury, preventing summary judgment in any event. *See, e.g., C2 Educ. Sys., Inc. v. Lee*, 2019 WL 3220251, at *3 (N.D. Cal. July 17, 2019) (denying summary judgment on CDAFA because "[o]rdinarily, the determination whether an employee has acted within the scope of employment presents a question of fact").

## II.   THE COSTS TESLA INCURRED TO INVESTIGATE LEAKS OF ITS CONFIDENTIAL INFORMATION ARE PROPER DAMAGES.

After Tesla discovered it had been the victim of a saboteur, it had to investigate the scope of the leaks and the harm it had suffered.  Those out-of-pocket costs are recoverable under all of Tesla's causes of action.

### A.   Tesla is Entitled to Response Costs for Tripp's Violation of the NCCL.

The NCCL expressly allows recovery of damages "***for any response costs***, loss or injury," punitive damages, and costs and attorneys' fees.  Nev. Rev. Stat. § 205.511(1)(a) (emphasis added).  This Court has determined that "response costs" under Nev. Rev. Stat. § 205.511(1)(a) include "'reasonable costs' that relate to investigating, determining the amount of damage, remedying or preventing future damage, and testing or restoring a computer system." *Oracle*, 191 F. Supp. 3d at 1145 (reversed on other grounds).  Here, Tesla incurred such investigative costs to identify who was the source of leaks, the scope of the leaks, and whether the leaks were ongoing. (Lifrak Opp. Dec. Exs. 66-69 (Kinrich Dep. Exs. 5-8).)  Thus, Tesla is entitled to its investigative costs for responding to Tripp's computer crimes under the NCCL. (*Id.*)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Tellingly, Tripp does not deny any of this and instead falls back on his baseless contention that Tesla cannot bring an NCCL claim because he had authorized access to the data he stole and leaked.  (Mot. at 18.)

### B.  Investigative Response Cost Damages are Available Under Tesla's Other Claims for Relief.

Tesla's investigation costs are also recoverable under its other causes of action.  It is blackletter law that defendants who misappropriate trade secrets, breach their agreements, and breach their fiduciary duties are responsible for all damages naturally flowing from their actions. *See*, *e.g.*, *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 491 (M.D. Pa. 2018) (plaintiff entitled to compensatory damages under Uniform Trade Secrets Act for damages "flowing from defendants' misappropriation"); *Daniel, Mann, Johnson & Mendenhall v. Hilton Hotels Corp.*, 98 Nev. 113, 115–16 (1982) (for breach of contract claims, defendants are liable for "direct or natural result of the breach"); *Colorado Environments, Inc. v. Valley Grading Corp.*, 105 Nev. 464, 471 (1989) (defendants liable for "a natural consequence" of breach of contract); *Foster v. Dingwall*, 126 Nev. 56, 69 (2010) (plaintiffs can recover for "injury resulting from the tortious conduct of the defendant who owes a fiduciary duty to the plaintiff" and upholding damages award where "damages sought were related to the asserted causes of action, and the damages were calculated to compensate for the harm").  That is what Tesla is seeking here.

Moreover, courts have repeatedly held that investigation costs represent an actual loss and injury and are an available form of compensatory damages under these claims.  *See e.g.*, *21st Century Systems Inc. v. Perot Sys. Gov't Servs., Inc.*, 284 Va. 32, 48 (2012) (trade secrets); *Food Servs. of Am., Inc. v. Carrington*, 2013 WL 4507593 (D. Ariz. Aug. 23, 2013) (trade secrets); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516 (Colo. App. 2011) (breach of contract); *Hampshire Grp., Ltd. v. Kuttner*, 2010 WL 2739995, at *2, *50-52 (Del. Ch. July 12, 2010) (breach of fiduciary duty).  Specifically:

In *21st Century Sys.*, that court upheld a jury award of $371,002 in costs for a computer forensics investigation under the Virginia Uniform Trade Secrets Act because "the evidence at trial was sufficient to demonstrate that the Defendants' actions caused [plaintiff] to initiate the

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

computer forensics investigation." 284 Va. at 48. In that case, the plaintiff suspected its former employees were "exporting or taking large numbers of files off of [plaintiff's] system and copying them off on to other devices." *Id*. at 47. The plaintiff discovered that several employees were in fact exporting the company's information, which prompted the plaintiff to hire a forensic investigator to "figure out what exactly [was] going on." *Id*. at 47-48. The investigation was part of an effort to "determine the extent to which [plaintiff's] confidential files and trade secrets had been compromised" and to staunch the potentially ongoing trade secrets violations. *Id*. at 36. The investigation ultimately uncovered that defendants were copying large amounts of plaintiff's confidential data to external hard drives. *Id*. at 48. Accordingly, the court determined that the costs associated with the forensic investigation were damages, and not litigation costs. *Id*. at 47.

Like *21st Century Sys.*, the court in *Food Servs. of Am., Inc. v. Carrington* assessed whether investigation-related costs were allowable damages under the Arizona Uniform Trade Secrets Act. *See* 2013 WL 4507593. Based on suspicions that a former employee possessed confidential company information, plaintiff investigated the former employee's e-mail account and "discovered that he had sent information to personal e-mail accounts" allegedly containing trade secret information. *Id*. at *6. Noting that plaintiffs are generally entitled to recover "'any proven pecuniary loss attributable to the appropriation of the trade secret' including 'the costs of remedial effort,'" the court determined that "[investigation] expenses incurred as a direct result of Defendants' conduct are damages for the purpose of proving [plaintiff's] claim under the AUTSA." *Id*. at *14 (*citing* the Restatement (Third) of Unfair Competition § 45 cmt. b, e (1995)).

In *Saturn Sys.*, the plaintiff hired a computer and website specialist to investigate suspected unauthorized access of plaintiff's website after learning that defendant, a former employee, was visiting its customers. 252 P.3 at 520. The court ultimately concluded that "the cost of [the] computer investigation prior to the commencement of litigation, was recoverable as actual damages as a matter of law" because the money plaintiff "spent to retain [the investigator] was traceable to and the direct result of [defendant's] breach of the nonsolicitation clause of the Agreement." *Id*. at 52. Further, [plaintiff] introduced as an exhibit [the investigator's] invoice for his investigation, thereby proving the existence and the exact amount of its actual damages." *Id*.

at 529. *See also, Hampshire Grp.*, 2010 WL 2739995, at *2, *50-52 (finding that former employees breached the duty of loyalty to former employer and were thus "responsible for the corporation's costs of investigating and rectifying that misconduct," allowing plaintiff to recover costs for investigation into the instances of misconduct giving rise to the breached duty of loyalty).

In this case, as soon as Tesla became aware that *Business Insider* had internal, confidential information that it was planning to publish, Tesla began investigating the source of the leaks. Tesla was forced to investigate the information contained in the *Business Insider* publications to determine the source, the extent of the leaks or other breaches of Tesla security, and to mitigate ongoing leaks. (Tesla App. at ECF No. 171-2, Gicinto Dep. 16:19-17:8; 24:21-29:19; 30:9-34:6; 37:21-38:10; 134:11-136:17; 142:13-144:6; Lifrak Opp. Dec. Ex. 58, Gicinto Dep. 139:4-140:24.) Indeed, *Business Insider* published two articles timed to harm Tesla, which made mitigation efforts to ensure that no future leaks would occur imperative to the company. Tesla has provided itemized invoices that detail these costs. (Lifrak Opp. Dec. Exs. 66-69.) Such remedial efforts are plainly available as compensatory damages under Tesla's claims.

### A.    Tripp's Arguments About "Attorneys' Fees" and the Burden of Proof Are Misleading and Incorrect.

Tripp tries to evade responsibility for Tesla's investigative costs by making a series of novel arguments that do not hold water. First, Tripp asserts that Tesla's investigative costs are really attorneys' fees in disguise, and therefore not recoverable as damages. (Mot. at 19.) That is simply not true, and no case says that. It is irrelevant that Tesla's investigation into the leak of its confidential information took place at the direction of attorneys, and the cases Tripp cites for this proposition are inapposite.

Tripp relies on *Rolex Watch U.S.A., Inc. v. Zeotec Diamonds, Inc*., 2003 WL 23705748, at *3 (C.D. Cal. May 2, 2003) and *Lifted Research Group Inc. v. Biglarpour*, 2008 WL 11342709, at *4 (C.D. Cal. July 16, 2008) for the proposition that because Tesla refused to disclose privileged documents related to the investigation, the investigative costs ***must be*** attorneys' fees, not damages. (Mot. at 19.) In the first instance, and contrary to Tripp's assertion (Mot. P34), Tesla has produced documents that originated from the investigation and has allowed extensive

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    testimony from the witnesses who oversaw the investigation.  (*See, e.g.,* Tesla App. at ECF No.

2    171-6, 06/14/2018 Int.; ECF No. 173-8; TES-TRIPP_00002.)

3            Moreover, the cases cited by Tripp do not hold that investigative costs *must* be classified

4    as attorney's fees and thus *not* recoverable as damages—only that they *can be* recovered as

5    attorney's fees if they are incurred solely in the furtherance of litigation and sought in a post-trial

6    motion.  Neither case had anything to do with whether a party could recover investigation

7    expenses as damages, and neither case is relevant to the circumstances of this action.  Both cases

8    involved trademark or copyright infringement claims where the investigations were performed

9    specifically to aid the litigations.  For example, in *Rolex*, the investigation at issue involved

10   attorney-directed investigators going to trade shows and purchasing infringing watches in order

11   to collect evidence demonstrating willful infringement of Rolex's trademark.   2003 WL

12   23705748, at *4.  Likewise, the plaintiff in *Lifted Research Group* "was required to engage

13   counsel and investigators to commence this legal action against the Defendant."  *See* Plaintiff's

14   Motion for Default Judgment in *Lifted Research Group Inc. v. Biglarpour*, 2008 WL 2723791

15   (C.D. Cal., June 20, 2008) (noting that the investigative firm "was retained to investigate the

16   suspected sale of counterfeit products by Defendant.").  These investigations began specifically

17   for the purpose of preparing for and furthering litigation, and the courts held that the investigatory

18   expenses could be recovered through an attorney's fees award.  That is very different from the

19   situation here, where the investigation began to uncover and mitigate the massive security

20   breach—in particular to determine what confidential information was leaked, how the information

21   was leaked, the identity of the person leaking the information, and if the problem was ongoing—as

22   it would have been but for this investigation.  (Tesla App. at ECF No. 172-7, noting that Tripp

23   and Lopez were "just getting started" and Tripp appeared excited about the possibility of

24   continuing to leak information to Lopez,).

25           Tripp has pointed to no authority holding that investigative costs are not recoverable as

26   damages.  To the contrary, as discussed above, numerous courts have found that investigative

27   costs are recoverable damages whether or not authorized by statute.  Therefore—although Tripp

28   is correct that the Nevada Supreme Court held in *Childs v. Selznick* that attorney's fees and other

litigation expenses typically "cannot be considered 'damages'"—this statement is irrelevant where the investigative costs at issue in this case are not attorneys' fees or litigation expenses. 281 P.3d 1161, at *2 (Nev. 2009).[6]

Second, Tripp argues that allowing Tesla to characterize the cost of its investigation as damages eliminates Tesla's burden of proving actual harm resulting from Tripp's purported wrongdoing, citing *News Am. Mktg. In-Store, Inc. v. Marquis* and *Tank Connection, LLC v. Haigh*. (Mot. at 18.). This too is baseless.

In *News Am. Mktg*, the investigation at issue was undisputedly conducted "in order for the plaintiff to determine whether it could or should pursue litigation" against the defendant. 86 Conn. App. 527, 540 (2004), *aff'd*, 276 Conn. 310, 885 A.2d 758 (2005). Likewise, in *Tank Connection, LLC v. Haight*, plaintiff "undertook the forensic investigation to ascertain if there had been any theft of its proprietary information and, if so, to demonstrate a basis for legal action against" the defendant. 161 F. Supp. 3d 957, 966 (D. Kan. 2016). The investigation that had taken place in *Tank*, as the plaintiff admitted, "was an attempt to find proof of data misappropriation" for litigation, rather than as "part of a remedial effort to staunch what was known to be ongoing misappropriation of company data." *Id*. (differentiating *21st Century Sys.*).

Here, Tesla's costs were a *direct result* of Tripp's actions. Tesla's investigative costs are not a mere proxy for damages where they would not otherwise lie, as cautioned by the courts in *News Am. Mktg*. and *Tank Connection*. Nor did Tesla conduct its internal investigation for the purpose of preparing for litigation against Tripp. To the contrary, the evidence demonstrates that Tesla initiated the investigation to mitigate harm it had suffered and would continue to suffer from the leaks, by determining how Tesla's confidential information and data was being leaked to *Business Insider*, the extent of the information being leaked, whether the leak was ongoing, and whether Tesla's computer systems were compromised in the execution of the leak. (Lifrak Opp.

---

[6] The same is true for Tripp's citation to *Sandy Valley Associates v. Sky Ranch Estates Owners Ass'n*, 117 Nev. 948, 957 (2001), receded from on other grounds by *Horgan v. Felton*, 123 Nev. 577 (2007). This case merely affirms the rule that attorneys' fees are not generally damages. It does not, however, suggest that investigative costs are attorneys' fees; nor does it discuss response costs or investigative costs at all.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  Dec. Ex. 58, Gicinto Dep. 139:4-140:24; Tesla App. at ECF No. 171-2, Gicinto Dep. 16:19-17:8;

2  24:21-29:19; 30:9-34:6; 37:21-38:10; 142:13-144:6; Tesla App. at ECF. No. 173-5.)  Litigation

3  became necessary only after the scope of Tripp's illegal behavior was revealed.  Therefore, Tesla's

4  investigation costs are appropriate damages under any of its causes of action.

5  **II.    TRIPP'S ATTEMPT TO EXCISE TESLA'S MARKET CAPITALIZATION DAMAGES FAILS.**

6

7      Next, Tripp tries to argue that Tesla's other compensatory damages claim should be

8  excised from the case, but this argument is procedurally and legally baseless.  (Mot. at 12-18.)

9      **A.    <u>Tripp's Motion Is Still Premature.</u>**

10     Before the close of discovery, Tripp moved the Court to exclude the testimony of Tesla's

11 damages expert, Jeffrey Kinrich.  (Tripp's *Daubert* Motion at ECF No. 86.)  The Court denied the

12 motion as premature, noting that "[g]enerally, evidentiary-related motions like Daubert motions

13 should not be adjudicated until the eve of trial and after a pretrial order has been filed," and

14 specifically directed Tripp to refile the motion after the entry of the pre-trial order, which has not

15 yet occurred.  (Court Order at ECF No. 118, at 2.)  In the present Motion, Tripp rehashes his

16 criticisms of Kinrich's methodology, which would necessarily require the Court to engage in a

17 full *Daubert* analysis.  It is still premature to do so, and a motion for summary judgment is not the

18 proper vehicle to exclude an expert's testimony.

19     **B.    <u>The Facts Related to Tesla's Market Capitalization Damages Are Disputed.</u>**

20     The issues Tripp raises only serve to demonstrate the numerous disputed factual issues

21 about Tesla's damages that cannot be resolved at summary judgment.  *See Kohlrautz*, 2003 WL

22 27380941, at *2 (opposing party can overcome motion for summary judgment by presenting

23 "specific facts demonstrating that there is a factual dispute about a material issue.").

24     Even Tripp does not dispute that Tesla's stock price dropped immediately after the

25 publication of the *Business Insider* articles.  (Mot. ¶¶ 12-13.)  The parties do, however, dispute

26 whether or not Tripp's actions of leaking damaging (and false) information was the cause of that

27 drop.  Kinrich will present evidence at trial that:

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

- Tesla's stock was negatively impacted immediately after the release of the two articles in question;

- Other comparator indices were not similarly impacted;

- The loss in Tesla's stock was not attributable to other trends;

- There was no other news impacting Tesla stock at the time.

*See* Section F, *supra*.  Tesla will supplement Kinrich's testimony with other testimony from witnesses knowledgeable about Tesla's operations and public perception at the time.  And notably, Tripp does not provide any evidence to the contrary or other explanations for the drop in Tesla's stock immediately after the articles were released.

This is a classic factual issue that must be determined at trial, and Kinrich's testimony will be relevant to that determination.  To decide the issue now would usurp the role of the jury.  "The reasonableness of the assumptions underlying the experts' … analysis, [or] criticisms of an expert's method of calculation [are] matter[s] for the jury's consideration in weighing that evidence." *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (calculations of lost profits were "necessarily an estimate" and "could not be shown with mathematical precision," criticisms thus went to weight rather than admissibility) (internal citations omitted); *see also World Mkt. Ctr. Venture, LLC v. Strickland*, 2011 WL 573757, at *6 (D. Nev. Feb. 14, 2011) (denying summary judgment on for lack of damages because "the actual or reasonably related amount of damages is still a fact question."); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993) (Rule 702 inquiry "must be solely on principles and methodology, not on the conclusions that they generate.").

C.   **Tripp's Arguments About Kinrich's Methodology Are Misplaced.**

Tripp's arguments about Kinrich's methodology are premature and not subject to summary judgment, as detailed above.  To the extent the Court considers them, Tesla refers to its detailed Opposition to Tripp's *Daubert* Motion at ECF No. 89.  To respond to some of the specific legal points raised by Tripp:

Tripp first claims that an event study is not the only proper means of determining causation for market capitalization damages.  (Mot. 12-13.)  However, an "event study" is not required to

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    prove harm or causation. *See, e.g.*, *City of Ann Arbor Employees Ret. Sys. v. Sonoco Prods. Co.*,

2    827 F. Supp. 2d 559, 572 (D.S.C. 2011) (denying motion to exclude expert testimony about

3    whether certain news caused stock price declines where expert did not conduct an "event study");

4    *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 2000 U.S. Dist. LEXIS 3742, at *22-23 (same);

5    (Lifrak Opp. Dec. Ex. 61, Kinrich Dep. 194:2-8.)

6        Tripp then attacks Kinrich for failing to determine that the news stories created by Tripp

7    directly caused Tesla's stock price drop. (Mot. at 15.) But Tripp admits that Kinrich has attempted

8    to rule out other causes of Tesla's stock price drop. (Mot. ₱ 23.) And Tripp fails to identify any

9    other causal factor that could have impacted Tesla's stock price drop at those times. (*Id.*)

10       Finally, Tripp argues that because Kinrich did not provide an ultimate "conclusion" as to

11   causation in his report, Tesla has no proof of its market capitalization damages. (Mot. at 16.) But

12   an expert's report need not reach the ultimate conclusion for the expert's testimony to be

13   admissible. It need only be relevant. *See* Fed. R. Evid. 702. Kinrich's opinions are plainly

14   relevant and should be considered by the jury at trial. Tesla is permitted to use Kinrich's testimony

15   to "'support an inference of causation'" and leave "'the ultimate conclusion as to what the

16   evidence proves for the jury.'" *In re Apollo Group, Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 846 (D.

17   Ariz. 2007) (*quoting Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648 (1969)). There is no

18   basis, procedural or substantive, to exclude Kinrich's testimony now or to prevent Tesla from

19   presenting evidence at trial regarding its damages.

## III.   TESLA IS ENTITLED TO PUNITIVE DAMAGES DUE TO TRIPP'S MALICIOUS ACTIONS.

22       Tripp attacks Tesla's claim for punitive damages on two bases: (1) Tesla is not entitled to

23   punitive damages where it has not suffered actual damages; and (2) in any event, Tesla cannot

24   prove by clear and convincing evidence that Tripp acted with oppression, fraud, or malice to

25   warrant such damages. (Mot. at 20-21.) He is wrong in both regards.

26       ### A.   Tesla Has Suffered Actual Damages.

27       Tripp argues that for all but one of Tesla's claims, Tesla has suffered no actual damages,

28   and is therefore not entitled to punitive damages on those claims. He arrives at this conclusion by

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   arguing that Tesla has no proof of its response cost damages or its market capitalization damages.

2   (Mot. at 20.)  In the first instance, Tripp admits that Tesla may be entitled to recovery of the wages

3   paid to Tripp when he was breaching his fiduciary duties, and Tesla thus would still be entitled to

4   punitive damages related thereto.  (*Id*.)  Moreover, as explained at length above, Tripp's attempts

5   to knock out these other forms of compensatory damages fail.  As a result, Tesla remains entitled

6   to a recovery of actual damages and thus punitive damages.  *See Evans v. Dean Witter Reynolds,*

7   *Inc.*, 116 Nev. 598, 612 (2000) ("where the district court has determined that the conduct at issue

8   is, as a threshold matter, subject to civil punishment, the allowance or denial of exemplary or

9   punitive damages rests entirely in the discretion of the trier of fact").

10         **B.      There is Ample Evidence Tripp Acted with Malice.**

11         Tripp next contends that Tesla cannot recover punitive damages even as to his fiduciary

12   duty claim because Tesla cannot prove by clear and convincing evidence that Tripp acted with

13   fraud, oppression, or malice.  Nev. Rev. Stat. Ann. § 42.005.[7]  (Mot. at 21.)  Tripp is wrong.

14         First, Tripp points to nothing in the record to support his bare conclusion.  It is not enough

15   for Tripp, as the movant, to base his argument on nothing more than a conclusory assertion that

16   Tesla has no evidence to support its entitlement to punitive damages.  *See Celotex Corp. v. Catrett*,

17   477 U.S. 317, 328 (1986) (White, J., concurring); *Nissan Fire & Marine Ins. Co.*, 210 F.3d at

18   1105 ("A moving party may not require the nonmoving party to produce evidence supporting its

19   claim or defense simply by saying that the nonmoving party has no such evidence"); *Tokidoki,*

20   *LLC v. Fortune Dynamic, Inc.*, 2008 WL 11338730, at *6 (C.D. Cal. May 27, 2008) (defendant's

21   conclusory statement that plaintiff "has not produced evidence" is "insufficient to demonstrate an

22   absence of triable issue").  As a result, Tripp does not carry his burden as the moving party on

23

24   _____

25   [7]   It is clear that malice may be shown via circumstantial evidence, and that punitive damages are
     appropriate where malice is thus shown.  *See Countrywide Home Loans, Inc. v. Thitchener*, 124
26   Nev. 725, 744 (2008) (punitive damages appropriate where there "was sufficient evidence to infer"
     that defendant acted with malice); *Bongiovi v. Sullivan*, 122 Nev. 556, 582 (2006) (upholding
27   punitive damages award where "the nature of the statements and the circumstances under which
     they were made" were sufficient for jury to have concluded defendant acted with malice,
28   oppression, or fraud).

summary judgment.  *See Adickes*, 398 U.S. at 157 ("[a]s the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact"); *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993) ("Summary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues.").

Second, there is substantial evidence that Tripp did act with malice.  Among other things:

- There is evidence that Tripp was enriched through his actions.  According to a former co-worker, Tripp suggested that he was paid $50,000 for providing information Lopez, and implied that others would be paid too.  (Tesla App. at ECF No. 171-7; Ex. 173-8, 6/24/18 Uelmen Int. 4:21-7:15; 16:8-18:1.)  In fact, Tripp texted this co-worker whom he put in contact with Lopez that "if you are helpful you will get some money, I GUARANTEE you."  (*Id.*)  In *Clark v. Lubritz*, 113 Nev. 1089, 1099 (1997), a case cited by Tripp, the court made clear that such evidence, including financial benefit at the detriment of another, could be considered in imposing punitive damages;

- There is ample evidence of Tripp's improper conduct.  *See* Section C, *supra*.  There is also evidence Tripp was unhappy with the way he was being treated by his supervisors and stole and leaked Tesla's information to get revenge.  (Lifrak Opp. Dec. Ex. 57, Tripp Dep. 57:25-59:24, 174:25-176:9.)  There is also evidence that Tripp chose to work with a reporter he knew had a "grudge" against Tesla, (Tesla App. at ECF No. 171-1, Tripp Dep. at 71:17-22), leaked information right before and after Tesla's annual shareholder meeting, (Declaration of Elon Musk at ECF No. 157, ¶¶ 9, 11), and leaked more information designed to harm Tesla after being terminated, (Lifrak Opp. Dec. Ex. 63.)  Clear and convincing evidence of malice can be found where a defendant made "a conscious decision" to take actions that could injure the plaintiff.  *Clark*, 113 Nev. at 1099.

- Tripp attempted to conceal his actions and identity as the individual taking Tesla's confidential and trade secret information and leaking it to the press.  (Tesla App.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

at ECF No. 171-2, Gicinto Dep. 37:21-38:10; 135:17-136:10; Lifrak Opp. Dec. Ex. 58, Gicinto Dep. 114:19-115:21; 133:3-134:10; Ex. 54, 6/14/2018 Tripp Int. 156:1-9; Ex. Tripp Dep. 108:1-19.)  Notably, when asked whether he would have done anything differently, Tripp responded, ███████████ (Tesla App. at ECF No. 171-6, at 244:13-17.)  Actions taken to conceal a breach of fiduciary duty also serve as evidence of malice, as seen in another case cited by Tripp. *Serv. Employees Internat. Union, Local 250 v. Colcord*, 160 Cal. App. 4th 362, 375 (2008) (malice where defendants made "every effort to keep their plans [of disloyalty] secret" from an employer.); *see also Clark*, 113 Nev. at 1099.

There is ample evidence, both direct and circumstantial, that could allow a jury to find that Tripp breached his fiduciary duty of loyalty to Tesla knowingly and with intention to punish Tesla for demoting him.  Accordingly, the Court should deny Tripp's motion for summary judgment on Tesla's punitive damages claim.[8]

## IV.    TESLA IS ENTITLED TO A PERMANENT INJUNCTION.

Tripp's conduct entitles Tesla to an injunction based on actual and threatened misappropriation as set forth in 18 U.S.C. § 1836(b)(3)(A)(i).[9]  Pursuant to this section of the

---

[8]    Finally, Tripp argues that for disloyalty to warrant punitive damages, there must be "extreme moral culpability" by the defendant.  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 292 (2d Cir. 2006).  However the requirement of such "extreme moral culpability" for punitive damages as articulated in *Design Strategy* is specific to New York state law.  *See Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991) (punitive damages under New York law require, "gross, wanton, or willful fraud or other morally culpable conduct.").  The court in *Design Strategy* was merely applying the required standard in a case that happened to involve a breach of fiduciary duty.  Tripp cites to no Nevada case articulating this requirement for the award of punitive damages under Nevada law, and thus it is of no moment this Court's analysis.

[9]    For the reasons described above, the Court should take action to protect Tesla's trade secrets, as set forth in 18 U.S.C. § 1836(b)(3)(A)(ii), including by ordering the inspection of Tripp's computers, personal USB and electronic storage devices, email accounts, "cloud"-based storage accounts, and mobile phone call and message history to determine the extent to which Tesla trade secrets were wrongfully taken and/or disseminated to others.  Tesla requested this relief in the Complaint, (*see* ECF No. 1 at ¶¶ 26, 36), and is entitled to this statutory remedy.  It is not relevant that Tesla did not request to inspect all of Tripp's devices during discovery.  Tesla is not seeking to inspect such devices to discover more evidence related to its causes of action; it is seeking to protect its trade secrets, a statutory remedy for trade secrets violations provided in 18 U.S.C. § 1836(b)(3)(A)(ii), so that it can mitigate the damage caused by Tripp's illegal activities (for example, by requiring Tripp to delete any trade secret information found on his devices, or by

DTSA, Tesla is entitled to an injunction "to prevent any actual or threatened misappropriation" of trade secrets by Tripp.  *Id*.  Tripp's assertions that (1) Tesla has forfeited its right to request a permanent injunction, and (2) that the protective order in this action can stand in place of such an injunction, are both unavailing.  (Mot. at 22-23.)

First, Tripp argues that because Tesla has not yet sought a preliminary injunction, it will not be able to obtain a permanent injunction.  To obtain a permanent injunction, Tesla must establish four factors: (1) that Tesla has suffered irreparable injury; (2) remedies at law, such as monetary damages, are inadequate to compensate for Tesla's injury; (3) considering the balance of hardships between Tesla and Tripp, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction against Tripp.  *See Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 965 (D. Nev. 2018), *on reconsideration in part on other grounds*, 2018 WL 3127454 (D. Nev. June 26, 2018); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Tripp is wrong that Tesla cannot demonstrate these factors, and wrong in arguing that because Tesla has not sought Rule 65 relief, it is precluded from any claim of an "irreparable injury" necessary to obtain a permanent injunction.  (Mot. at 22.)

In *Tokidoki, LLC v. Fortune Dynamic, Inc.*, which Tripp cites to support this argument, the fact that the plaintiff had not sought a preliminary injunction did not preclude a permanent injunction.  2009 WL 2366439, at *15 (C.D. Cal. July 28, 2009), *aff'd*, 434 Fed. Appx. 664 (9th Cir. 2011), *opinion withdrawn and superseded on other grounds*, 473 Fed. Appx. 522 (9th Cir. 2011), *and aff'd*, 473 Fed. Appx. 522 (9th Cir. 2011).  Critically, in that case, the plaintiff did not request injunctive relief in the Pretrial Order, did not demonstrate that it suffered injury, and did not establish that the alleged infringement was "willful."  *Id*.  Further, the court determined that defendant had ceased its illegal activity years before and did not intend to do so again.  *Id.* (discussing that defendant did not intend to make its trademark infringing shoes in the future).  To the contrary, in this case Tripp has demonstrated that he continues to have access to, and the ability

---

locating any additional persons to whom he may have leaked or attempted to leak Tesla's information in order to prevent those individuals from disseminating the information).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    and desire to disseminate, Tesla's confidential information, including as recently as **this year**.

2    (*See, e.g.,* Lifrak Opp. Dec. Ex. 63, Tripp's August 2018 tweets; Ex. 65, Tripp's 2020 tweets.)[10]

3         Moreover, there is no requirement that plaintiffs seek a preliminary injunction in order to

4    obtain a permanent injunction either under general equitable principles or 18 U.S.C. §

5    1836(b)(3)(A)(i) specifically.  *See e.g.*, *Cooper Notification, Inc. v. Twitter, Inc.*, 2010 WL

6    5149351, at *4 (D. Del. Dec. 13, 2010) (failure to seek preliminary injunction is immaterial to

7    permanent injunction test, as it "tells one nothing about [plaintiff's] motivation to obtain injunctive

8    relief, or even about the potential irreparability of any harm from any infringement").

9         Nor has Tripp shown that there are no factual issues with regard to Tesla's ability to meet

10   the test for a permanent injunction.  To the contrary, Tesla has brought forward ample evidence

11   that it has suffered irreparable harm from Tripp's illegal dissemination of Tesla's confidential

12   data, and it will continue to suffer such harm in the future if the Court does not enjoin Tripp from

13   further disseminating this data.  *See* Sections C, F, G, *supra*.

14        Further, Tripp alleges that the protective order in this action can stand in place of an

15   injunction under 18 U.S.C. § 1836(b)(3)(A)(i).  Not so.  The protective order in this case applies

16   to the documents produced in discovery.  (Protective Order Regarding the Disclosure and Use of

17   Discovery Material ("Protective Order"), at ECF No. 43.)  Tripp fundamentally misunderstands

18   the nature of the injunction sought under 18 U.S.C. § 1836(b)(3)(A)(i), which is not to prevent

19   Tripp from disseminating materials produced in discovery, but to prevent him from disclosing

20   trade secrets he may have in his possession from any source, including the documents stolen from

21   Tesla.  As Tripp has already demonstrated by posting images of Tesla's confidential data to

22   Twitter several months after the commencement of this litigation and again in 2020, it is clear that

23   Tripp continues to have access to, and the ability and desire to disseminate, confidential

24   information he took from Tesla.  (Lifrak Opp. Dec. Exs. 63, 65.)  Consequently, the protective

25

26   ────────────────

27   [10]  Tripp's citation to *In re Adirondack Ry. Corp.* is similarly unavailing.  *See* 28 B.R. 251 (Bankr. N.D.N.Y. 1983),  In that bankruptcy proceeding, the court made a proposed finding that the plaintiff's request for a permanent injunction was not ripe.  *Id.* at 261.  The case does not speak to

28   whether a plaintiff may obtain a permanent injunction without having sought a preliminary injunction under Fed. R. Civ. P. 65.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

order has not "eliminate[d] the possibility of 'irreparable harm' to Tesla."  (ECF No. 154 at 23, *see* Protective Order at ECF No. 44.)

The cases Tripp cites are inapposite.  *Chamber of Commerce of U.S. v. Legal Aid Soc. of Alameda County* held that the party in that case seeking an emergency order staying discovery "will not suffer irreparable injury from disclosure of the documents because the District Court has entered a protective order permitting only attorneys for the [plaintiff] to examine the assertedly privileged documents."  423 U.S. 1309, 1312 (1975).  But the injunction Tesla seeks in this case under 18 U.S.C. § 1836(b)(3)(A)(i) is not related to documents produced in discovery.  Rather, the injunction will permanently prevent Tripp from disclosing the trade secrets taken from Tesla.[11] Tesla has therefore not forfeited its right to seek the statutorily-provided injunction.

## **CONCLUSION**

Tesla respectfully submits that the Court should deny Tripp's motion because material facts are genuinely in dispute and Tripp is not entitled to judgment as a matter of law.  FRCP 56 prevents summary judgment in this case.

---

[11]  Tripp also cites *Oracle USA, Inc. v. Rimini St., Inc.*, 2012 WL 6100306, at *13 (D. Nev. Dec. 7, 2012) and *Superior Edge, Inc. v. Monsanto Co.*, 2014 WL 7183797, at *3 (D. Minn. Dec. 16, 2014), which involved discovery disputes.  In *Oracle*, Oracle sought a modification to a protective order to use confidential information from a third party,  against that third party in another lawsuit. The court held that the third party would not be prejudiced in the absence of a stay pending appeal to the district court's decision to allow Oracle to use discovery materials in collateral litigation. *Id*.  That scenario has absolutely nothing to do with Tesla's requested injunction under 18 U.S.C. § 1836(b)(3)(A)(i).  In *Superior Edge*, the "only remaining issue for this Court [wa]s whether a third-party custodian should be required" to secure the source code that was to be produced in discovery.  2014 WL 7183797, at *1.  The court determined that a third-party custodian was not necessary because the court's protective order was sufficient to prevent disclosure of defendant's trade secrets.  There is no discovery issue related to the protective order in this case, and *Superior Edge* is not relevant to Tesla's requested injunction under 18 U.S.C. § 1836(b)(3)(A)(i).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    Respectfully submitted this 5th day of May, 2020.

2                                    QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
3

4                                    By: /s/ Alex Spiro
                                         Alex Spiro
5                                        51 Madison Avenue, 22nd Floor
                                         New York, New York 10010
6
                                         Rory T. Kay (NSBN 12416)
7                                        MCDONALD CARANO LLP
                                         2300 West Sahara Avenue, Suite 1200
8                                        Las Vegas, NV  89102

9                                        *Attorneys for Plaintiff/Counter-Defendant
                                         TESLA, INC.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28