# Exhibit 58
# Nicholas Gicinto Deposition Excerpts



- COURT REPORTING
- LEGAL VIDEOGRAPHY
- VIDEOCONFERENCING
- TRIAL PRESENTATION
- MOCK JURY SERVICES
- LEGAL TRANSCRIPTION
- COPYING AND SCANNING
- LANGUAGE INTERPRETERS







(800) 528-3335
NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

TESLA, INC.,

    Plaintiff,

vs.                                     No.3:18-CV-00296-LRH-CBC

MARTIN TRIPP,

    Defendant.
_____

**CONFIDENTIAL**

**DEPOSITION OF**

**NICHOLAS RYAN GICINTO**

TAKEN ON
TUESDAAY, AUGUST 27, 2019
9:58 A.M.

HOME2SUITES CONFERENCE CENTER
2001 MAIN STREET
KANSAS CITY, MISSOURI 64108

MSJ_655

1  statement so you can read it.

2      A.   Thank you.

3           MR. GATES:  In the meantime, I'll

4  interject a foundation objection.

5           THE WITNESS:  Okay.

6      A.   So based on what I recall from the

7  investigation I wouldn't say that that is false.

8  BY MR. FISCHBACH:

9      Q.   Would you say it's true?

10     A.   It appears to be an accurate statement.

11     Q.   We talked earlier about -- I don't like

12 putting words in your mouth, but I'm going to put

13 words in your mouth.  I believe you testified that

14 the fact that Tripp was able to access the data he

15 did was indicative of his authority to at least

16 access that data, correct?

17     A.   Based on the permissioning systems, if he

18 had access it was because he was given the authority

19 to access it, yes, assuming it was permissioned

20 correctly.

21     Q.   All right.  You obviously take issue with

22 how he used the data, but in terms of access he had

23 authority to access the information?

24     A.   Correct.  And as I -- as I recall, some of

25 that access had been limited based on some

1  inappropriate use where he had given permissions to
2  other users and he had been caught doing that.  And
3  so at some point his access had been scaled down and
4  that had upset him from what I recall in the
5  investigation.  So I think at the time whatever he
6  had accessed he had likely had permission to do so,
7  but he may have ultimately had some access levels
8  downgraded.
9       Q.   Did your investigation ever uncover
10 instances in which Mr. Tripp accessed information
11 that was outside his authorized level of access?
12      A.   So using his personal login I don't recall
13 that being the case.  I think what I would want to
14 go back and take a closer look at from the
15 investigation, which again, I don't have any of that
16 in front of me and that's been some time, as I
17 recall he utilized a generic login which may have
18 been outside the scope of its intended or proper use
19 to access some -- some information, but that -- that
20 element I can't be positive of because it's just
21 been -- it's been a while.
22      Q.   Are there any documents that would help
23 you refresh your recollection on that issue?
24      A.   I mean, I -- it's a gray question and I
25 just can't say, not because I wouldn't say but I

1  and that it really didn't matter what we asked him
2  to do, you know, the request was to preserve so that
3  we could -- because it was clear he was not
4  cooperating with our requests to protect our
5  information.
6       Q.   Let's go back to the penumbra of
7  confidential information we were discussing earlier.
8  I want to make sure I have my -- I understand
9  exactly what was able -- what Tesla was able to
10 determine and maybe what it wasn't able to
11 determine.
12      A.   Right.
13      Q.   Mr. Tripp gave data, photographs and video
14 to Linette Lopez, correct?
15      A.   We did determine that, yes.
16      Q.   But he also admitted doing that during his
17 interview, correct?
18      A.   He did.
19      Q.   Did you identify any other -- did your
20 investigation identify any other misuse of
21 confidential information other than giving the data,
22 photographs, and video to Lopez?
23      A.   Ultimately and later, by the time that we
24 concluded our investigation, no.  But at the time,
25 because he had not been completely forthcoming and

1  truthful with us, we did not know the extent to
2  which he had provided information or that he had not
3  provided additional information.  Now again, we can
4  only see what we can see so the investigation did
5  not conclude that he provided anything else but I
6  think his actions later on also when he tweeted
7  those photos out, you know, about what, a year
8  later, something like that, I don't remember when it
9  was or maybe it was in August -- no, it was in
10 August, so several months later, seemed to indicate
11 he had retained information and we fundamentally
12 don't know everything that he had.  If -- if he had
13 been truthful from the beginning with us in the
14 interview I think it would give us a higher degree
15 of confidence in knowing that he had shared with us
16 everything that he had exfiltrated.  But his evasive
17 tactics and lack of truthfulness throughout the
18 interview gave us a fairly high degree of doubt that
19 he had provided us all the information.  Simply put,
20 when confronted he would admit it, but unless
21 confronted he was going to evade or lie.
22           (Deposition Exhibit 13 was marked for
23 identification.)
24 BY MR. FISCHBACH:
25      Q.   Sir, I'm handing you what's been marked as

1  Q.   It says writing software.  What software
2  did he write?
3  A.   I mean, I think that's probably generally
4  would be interpreted as writing -- writing code,
5  right, or writing a script.
6  Q.   A search query?
7  A.   Yes, but it's not like -- it's not like
8  you go into Google and type a word into a search
9  bar.  This is a little more technical than that.
10 **Q.   This software hacked Tesla's MOS.  Do you**
11 **stand by your earlier testimony, sir, that the**
12 **information that Mr. Tripp accessed, setting aside**
13 **what he did with it, but do you stand by your**
14 **earlier testimony the information Mr. Tripp accessed**
15 **was information he was authorized to access at the**
16 **time?**
17 **A.   So I stand by that he was authorized to**
18 **access the information, but again I think it's**
19 **impossible to separate the authorization with the**
20 **what you do with the information.  All right?  At**
21 **the point that you use it in a way that you**
22 **shouldn't be using it, it becomes unauthorized**
23 **access.**
24 **Q.   And the sentence goes onto state and**
25 **transferring several gigabytes of confidential and**

1  **proprietary Tesla data.  I see that but in terms of**
2  **trying to understand how it is he could hack data**
3  **that he was permitted to access.**
4          A.    I think it would -- the question would be
5  would you have written that query to do anything
6  else than to provide it to a third party or an
7  outside individual who didn't have a reason to
8  obtain it, right?  So if he is writing a query
9  that's legitimately needed for his job, permitted
10 use.  But I think you're essentially hacking the
11 system, right, when you write a query that is meant
12 to then extract the data for an unauthorized or
13 impermissible use.
14         **Q.    So whether or not someone is hacking**
15 **depends on the ultimate use of the information?**
16         A.    I think in this case that seems to make
17 sense to me.
18         **Q.    Then it says transferring several**
19 **gigabytes of confidential and proprietary Tesla data**
20 **to entities outside the company, entities is a**
21 **plural.  What entities were they transferred to?**
22         A.    So it was transferred to Microsoft when it
23 was transferred to SharePoint.  It was transferred
24 to Linette Lopez.  And it was transfer -- I mean, he
25 transferred it to his personal account, right, which

1  other people.  He did admit that that he tried to
2  recruit other people.  And we also understand by the
3  nature of how reporters work that they want to
4  corroborate stories.  So it seemed reasonable to us
5  that there would be somebody else that might have
6  contributed to the story and so we wanted to know
7  who might also be involved if he had any
8  accomplices, if he acted alone.  There were a number
9  of things we wanted to determine and an interview
10 would allow us to do that.
11       Q.    **Why was it important for you to answer**
12 **those unknowns?**
13       A.    **Well, the extent of the information that**
14 **was leaked to Linette Lopez in stories was**
15 **communicated to my team to be extremely damaging to**
16 **the company.  So if he was acting alone and we had**
17 **caught him we would be in a good position to limit**
18 **the damage any further.  But we needed to know what**
19 **the extent of the damage was and understand**
20 **everything that was -- that was exfiltrated and also**
21 **to understand how it was done and, further, whether**
22 **anything persistent remained on our network that we**
23 **needed to be concerned about from a malicious code**
24 **standpoint, from an exfiltration standpoint.  All of**
25 **that has to be answered and if he had not acted**

```
 1  alone and Ms. Lopez had additional sources that
 2  contributed to this article we needed to determine
 3  whether or not there were other avenues that we
 4  needed to continue to investigate to determine
 5  whether there were additional leaks.
 6       Q.   One of the things that you said that you
 7  needed to figure out was how he got the information
 8  and how he exfiltrated it.  Why was it important to
 9  know that?
10       A.   Well, it's important to know that broadly
11  speaking because you have to be able to take
12  measures to stop it from happening again, so you
13  want to know why somebody or how somebody does
14  something, so you can prevent those types of
15  actions, specifically because this was an
16  unauthorized disclosure and when something happens
17  like that, particularly with people who are in a
18  position of trust you need to be able to apply the
19  appropriate safeguards so that doesn't happen again.
20       Q.   You also mentioned something about you had
21  to figure out whether there was something persistent
22  on the system.  Can you explain to us what you meant
23  by that, what was persistent?
24       A.   Sure.  We make no assumptions whenever we
25  conduct an investigation as to what the outcome of
```

1  that investigation will be.  And specifically if we
2  do identify the individual who is responsible we
3  make no assumptions as to what the HR implication or
4  the employment implication will be of that
5  individual. We don't know whether they'll be
6  returned to work, suspended, terminated, whatever.
7  So we pursue every investigation to ensure that we
8  are containing any amount of possible damage and
9  future damage beyond that investigation.  One of the
10 things that you have to account for is if the person
11 is terminated and they're no longer able to provide
12 information, did they leave anything behind from a
13 code perspective on the network which would allow
14 them to continue to exfiltrate data or anything
15 malicious on the network that would cause harm to
16 the systems at Tesla even after they're gone.  And
17 that's what we had to determine in this case.
18     Q.    During the interview of Mr. Tripp the
19 first one, on June 14th, I believe you said that at
20 some point you confronted him with the smoking gun
21 evidence?
22     A.    Yes.
23     Q.    How long into the interview was it before
24 you confronted him with that evidence?
25     A.    From what I recall it was probably two and

1  a half hours in, something hike that, two hours
2  maybe, two and a half hours.
3       Q.    Why would you interview him for two hours
4  before just confronting him with this evidence?
5       A.    Well, in an investigation like that,
6  particularly where we had identified an individual
7  who had leaked something so damaging, if we had
8  started the investigation with accusations right off
9  the bat and confronted him, in my experience that
10 limits the opportunity in which you can potentially
11 obtain other information that's pertinent to your
12 investigation.  So you start the investigation by,
13 first of all, establishing a baseline of the
14 person's personality and how they react to you in
15 that conversation, so you can then determine whether
16 or not there's a change in behavior when you ask
17 certain questions, when they answer certain
18 questions.  And because we knew already so many
19 different pieces of information we can verify
20 whether or not he was being truthful with us and
21 gauge his reaction and use that as a baseline for
22 determining whether or not he was being honest and
23 truthful with us.  So it's very useful in
24 investigations of this nature particularly when
25 there are still a number of unknowns and, you know,

==mark==my objective in the investigation is certainly to==/mark==
==mark==identify the party that's responsible but also is to==/mark==
==mark==protect Tesla and we needed to answer those==/mark==
==mark==questions.  So it took some time to get to that==/mark==
==mark==point with Mr. Tripp, but he also was not truthful,==/mark==
==mark==and was evasive with questions.  As opposed to just==/mark==
==mark==coming forth and admitting certain things, we had to==/mark==
==mark==go about it in a roundabout way with him and it==/mark==
==mark==certainly would have saved a lot of time if he would==/mark==
==mark==have answered truthfully to many of our questions.==/mark==

**Q.   Prior to the interview I think you said that he had been given a loner laptop?**

A.   Yes.

**Q.   Why was that?**

A.   We needed to image his primary work computer hard drive to look for evidence to determine what he had exfiltrated.  We wanted to do that as part of our investigation to see whether or not he was the individual who had -- who had provided the information to Ms. Lopez, but we also then, if you confirm that, you want to see what -- what evidence is present on the laptop to either frame that question of the extent of the damage because you may possibly see forensic evidence to suggest this is how much information was

1  her a copy of the exact query that he ran -- that he
2  wrote and ran on our system to extract the data that
3  populates his spreadsheet.



1  ███████████████████████████████
2          ███████████████████████████████
3  █████████████████████████████████████████
4  ██████████████████████████████████████████
5  ████████████████████████████████
6  █████████████████████████████████████████
7  █████████████████████████████████████████
8  █████████████████████████████████████████
9  ██████████████████████████████████████████
10 ████████████████████████████████████
11 ████████████████████████████████████████
12 ███████████████████████
13    █ ███████████████████████████████████
14 █
15    █ ██████████████████████████
16    █ ████████████████████████████████
17    █ ██████████████████████████████
18 ██████████████████████████████████████████
19 ████████████████████████████████████
20 █████████████████████████████████████████
21 ██████████████████████████████
22 ████████████████████████████████████████
23 ████████████████████████████████████████
24 ███████████████████
25     Q.   Going back to the interview with Mr.

CERTIFICATE

I, Terri L. Huseth, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 4th day of September, 2019.

_____
Terri L. Huseth