1
2

Robert D. Mitchell (*admitted pro hac vice*)
William M. Fischbach III (*admitted pro hac vice*)
Ace Van Patten (Nevada Bar No. 11731)

3

**TB** **TIFFANY & BOSCO**
P.A.

4
5
6
7
8

Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016-4229
Telephone: (602) 255-6000
Fax: (602) 255-0103
Emails: rdm@tblaw.com; wmf@tblaw.com; avp@tblaw.com
*Counsel for Defendant/Counterclaimant Martin Tripp*

9

**UNITED STATES DISTRICT COURT**

10

**DISTRICT OF NEVADA**

11
12
13
14
15
16
17

TESLA, INC., a Delaware corporation,

Plaintiff,

vs.

MARTIN TRIPP, an individual,

Defendant.

18
19
20

MARTIN TRIPP, an individual,

Counterclaimant,

21
22
23
24

TESLA, INC., a Delaware corporation,

Counterdefendant

Case No. 3:18-cv-00296-LRH-CBC

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT [ECF NO. 154]**

**ORAL ARGUMENT REQUESTED PER LR 78-1**

25

**I.      Introduction and summary of Tripp's reply.**

26
27
28

Nothing in Tesla's response [ECF No. 178] establishes any material factual dispute, and Tesla relies on inapposite authority or simply fails to cite any authority to support its positions.  Tripp's arguments in support of summary judgment are summarized as follows:

**1**     •     For Tesla to succeed on its NCCL claim, it must demonstrate that Tripp

**2**   "knowingly, willfully *and without authorization*" accessed the data he later gave to Lopez.

**3**   It is undisputed that Tripp had such authority.   Tesla's reliance on *United States v.*

**4**   *Christensen*, 828 F.3d 763 (9th Cir. 2015) is misplaced because that case focused on a

**5**   California statute that only requires "knowing access" rather than "unauthorized access."

**6**   Tesla's NCCL claim therefore fails as a matter of law.  *See* Part II.A., *infra*.

**7**     •     Tripp's motion does not challenge the admissibility of Kinrich's opinion

**8**   under *Daubert* or FRE 702.   Kinrich's opinion regarding $167.37 million in market

**9**   capitalization damages, even if admissible, fails to establish that Tesla suffered an actual

**10**   loss or injury that is compensable under any theory asserted by Tesla in this case.  *See* Part

**11**   II.B., *infra*.

**12**     •     Even if one accepts that Tesla has a compensable injury or loss, Kinrich failed

**13**   to conduct a proper event study to establish causation and admits that he cannot conclude

**14**   that Tripp caused any decrease in Tesla's stock price.  *See* Part II.C., *infra*.   There is no

**15**   authority that would allow Kinrich to "infer causation" by eliminating the other possible

**16**   causes of the temporary stock price decrease, but ample authority to the contrary.

**17**     •     Tesla's investigators were taking direction from, and working in coordination

**18**   with, Tesla's counsel, and Tesla has refused to disclose the *substantive* documents and

**19**   communications underlying the investigation based on attorney-client privilege.  Tesla cites

**20**   no authority in which a court allowed a plaintiff to recover investigative costs as damages

**21**   when, as here, the investigation was to build a case against Tripp.  *See* Part II.D., *infra*.

**22**     •     Rule 56 does not require Tripp to negate the existence of clear and convincing

**23**   evidence of oppression, fraud, or malice on Tesla's claim for punitive damages.  When put

**24**   to its proof on its punitive damages claim, Tesla fails to adduce the necessary clear and

**25**   convincing evidence to survive summary judgment.  *See* Part II.E., *infra*.

**26**     •     Despite claiming that Tripp continued to share confidential and proprietary

**27**   information on Twitter after Tesla filed suit, Tesla never sought a preliminary injunction or

**28**   other relief from this Court during two years of litigation.  This belies the existence of the

1  "irreparable injury" necessary to obtain a permanent injunction.  *See* Part II.F., *infra*.

2  **II.     Reply to Tesla's arguments.**

3
4          **A.     The NCCL does not apply because Tesla granted Tripp authority to access the information he later sent to Lopez.**

5                  1.     <u>The NCCL requires unauthorized access for a violation.</u>

6        Tesla's reliance upon *Christensen* is misplaced because the Ninth Circuit's holding

7  was based upon specific language in California's Computer Data Access and Fraud Act

8  ("CDAFA") (Cal. Penal Code § 502(c)(2)) that is not found in the NCCL.  In *Christensen*,

9  the defendants argued that the Ninth Circuit should interpret the CDAFA similarly to its

10  interpretation of the federal Computer Fraud and Abuse Act ("CFAA") in *United States v.*

11  *Nosal*, 676 F.3d 854 (9th Cir. 2012), wherein the Ninth Circuit held that the CFAA did not

12  make it a crime for employees of a company—who had authorized access to their

13  employer's data—to transmit the employer's data to a former employee that no longer had

14  authorized access.  *United States v. Christensen*, 828 F.3d 763, 788-89 (9th Cir. 2015).  The

15  *Nosal* court had rejected an interpretation of the CFAA that would criminalize an

16  employee's use of data that the employee was authorized to access because "such

17  interpretation would transform the CFAA from an anti-hacking statute into an expansive

18  misappropriation statute." *Nosal*, 676 F.3d at 857.

19        But in *Christensen,* the Ninth Circuit declined to apply its interpretation of the CFAA

20  in *Nosal* to the CDAFA because "[i]n contrast to the CFAA, the [CDAFA] does not require

21  unauthorized access. It merely requires knowing access."  *Christensen*, 828 F.3d at 789

22  (citing 18 U.S.C. §1030(a)(2) and Cal. Penal Code § 502(c)(2)).  The CDAFA penalizes a

23  person who "*[k]nowingly accesses* and without permission takes, copies, or makes use of

24  any data from a computer, computer system, or computer network, or takes or copies any

25  supporting documentation, whether existing or residing internal or external to a computer,

26  computer system or computer network."  Cal. Penal Code § 502(c)(2).  In contrast, the

27  CFAA makes it a crime if someone "*intentionally accesses a computer without*

28  *authorization or exceeds authorized access*, and thereby obtains . . . [various forms of

3

**1**  "information," including] information from any protected computer."   18 U.S.C.

**2**  §1030(a)(2) (emphasis added).  Because the CDAFA only used the term "knowingly" in

**3**  relation to access, *Christensen* held that "[w]hat makes the access unlawful is that the

**4**  person 'without permission takes, copies, or makes use of' data on the computer."

**5**  *Christensen*, 828 F.3d at 789.

**6**  　　　Like the CFAA, the NCCL makes it unlawful for someone to "knowingly, willfully

**7**  *and without authorization*" commit one of the listed acts with respect to "data, a program or

**8**  any supporting documents which exist inside or outside a computer, system or network."

**9**  Nev. Rev. Stat. § 205.4765(1).  Unlike the CDAFA, the NCCL does not premise a violation

**10**  simply upon "knowing access."   *Id.*   As such, the NCCL is more analogous to the CFAA

**11**  and *Nosal* in this regard, rendering *Christensen* inapplicable to the application of the NCCL.

**12**  　　　Tesla's citations to California state cases provide no support for its argument

**13**  regarding the NCCL.  In *Gilbert*, the plaintiff was a former public safety officer that claimed

**14**  he was denied procedural due process in relation to his termination, which was based upon

**15**  the plaintiff having assisted the operator of a prostitution business by accessing state and

**16**  federal computer systems without a legitimate law enforcement purpose.  *Gilbert v. City of*

**17**  *Sunnyvale*, 130 Cal. App. 4th 1264, 1272-73 (2005).  The plaintiff's termination was based

**18**  upon this general misconduct and not specifically based upon a violation of the CDAFA.

**19**  *Id.* at 1272-73, 1280-81.  After noting that the "clear-cut evidence of misconduct . . . itself

**20**  justifies dismissal," the *Gilbert* court stated in dicta, and without any analysis, that

**21**  "[k]nowingly accessing and without permission making use of any data from a computer

**22**  system is a crime."   *Id*. at 1281.  Similarly, in *People v. Hawkins*, the California Court of

**23**  Appeals did not provide any pertinent analysis on the NCCL or the CDAFA, as the primary

**24**  issue before the court was whether the defendant's violation of the CDAFA should have

**25**  been a misdemeanor or a felony.  98 Cal. App. 4th 1428, 1433-34 (2002).

**26**

**27**

**28**

**1**

**2**

**3**

**4**

**5**

**6**

**7**

**8**

**9**

**10**

**11**

**12**

**13**

**14**

**15**

**16**

**17**

**18**

**19**

**20**

**21**

**22**

**23**

**24**

**25**

**26**

**27**

**28**

2.     *Oracle* established that the "key" to the NCCL is whether the defendant was authorized to access the information at issue.

The Ninth Circuit decided *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948 (9th Cir.), rev'd in part on other grounds, 139 S. Ct. 873 (2019) two years after *Christensen*.  In *Oracle,* the Ninth Circuit established as a general principle that "the key" to the NCCL "is whether [the defendant] was authorized in the first instance to take and use the information" at issue.  *Id*. at 962.  This holding specifically overruled this Court's finding that the "key inquiry" was not "whether or not [the defendants'] had authority to access the website." *Compare id. and Oracle USA, Inc. v. Rimini Street, Inc*., 191 F. Supp. 3d 1134, 1143-44 (D. Nev. 2016).  Tesla invites the Court to make the same error here by arguing that Tripp violated the NCCL despite his authorized access to the data at issue.  It does not matter that *Oracle* was addressing the issue of automated downloading of authorized material; the "key" to the NCCL remains the same.

Finally, Tesla's reliance on *C2 Educational Systems, Inc. v. Lee* 18-CV-02920-SI, 2019 WL 3220251, \*3 (N.D. Cal. July 17, 2019), which is another CDAFA case, is unpersuasive.  Whether Tripp was acting in the scope of employment by sending data to Lopez is irrelevant under the NCCL analysis.  The only relevant question under the NCCL is whether Tripp had authority to *access* the data in the first place as part of his job responsibilities.  Tesla's lead internal investigator Nick Gicinto answered this question unequivocally in the affirmative.  Tripp's Statement of Facts ("SOF") to Motion for Summary Judgement [ECF No. 154] at ¶¶ 3-5; *see also Oracle*, 879 F.3d at 962 ("[T]he key to the [NCCL] is whether [the defendant] was authorized in the first instance to take and use the information"); Nev. Rev. Stat. Ann. § 205.509 (employee presumed to have authority to access and use employer's computer system).  Tesla practically boasts in its response that it was able to identify Tripp quickly as the "leaker" by "using a computer program to check every search that had been run on the MOS to determine '*who had access to every single bit of that information*'" that was leaked to Lopez." Tesla Response [ECF No. 178] at 7-8 (emphasis added).  Stated differently, it is precisely because Tripp had authority to access

1  and use the data at issue that Tesla was able to pinpoint him as the "leaker" right away.

2  Tesla cannot identify a single byte of data that Tripp sent to Lopez that he did not

3  have authority to access as part of his job responsibilities in the first place.  Accordingly,

4  there can be no violation of the NCCL.

5      **B.      Tesla cites no authority for the proposition that a temporary decline in**
       **Tesla's stock price is an actual injury or loss that is compensable under**
6      **any of the claims asserted by Tesla.**

7          1.    Tripp's motion does not challenge the admissibility of Kinrich's
8                opinion under *Daubert* or FRE 702.

9  Tesla's argument that Tripp's motion for summary judgment is premature is wrong.

10 The Court's prior order [ECF 118] denied Tripp's *Daubert* motion as "premature" because

11 "[g]enerally, evidentiary-related motions like *Daubert* motions should not be adjudicated

12 until the eve of trial and after a pretrial order has been filed."  The Court further stated that

13 Tripp could refile his *Daubert* motion "[i]f Tesla has any claims remaining against Tripp

14 following the adjudication of any dispositive motions that may be filed."  Order on *Daubert*

15 Motion [ECF 118] at 2.

16 Unlike Tripp's *Daubert* motion, Tripp's motion for summary judgment does not

17 challenge the *admissibility* of Kinrich's opinion.  Rather, Tripp's motion for summary

18 judgment argues that Kinrich's opinion fails to establish causation or a compensable injury

19 or loss.  A defendant may properly raise through summary judgment the plaintiff's inability

20 to establish causation or damages.  *See, e.g., Wells Enterprises v. Wells Bloomfield, LLC*,

21 989 F. Supp. 2d 1055, 1061 (D. Nev. 2013) (granting defense partial motion for summary

22 judgment on damages); *Kraft v. Jacka*, 669 F. Supp. 333, 339 (D. Nev. 1987), aff'd, 872

23 F.2d 862 (9th Cir. 1989) (granting summary judgment due to lack of causation).  Discovery

24 is now closed, and Tripp's motion for summary judgment based on Tesla's inability to

25 establish causation or damages is both appropriate and ripe for determination.

26

27

28

**1**
**2**

 2. Two temporary and fractional decreases in Tesla's stock price that each vanished within 24 hours do not establish a compensable loss or injury, let alone $167.37 million in damages.

**3** The Court need not even address causation unless Tesla can demonstrate an actual

**4** injury or loss under the claims it has asserted. Tesla does not dispute that any minute drops

**5** in its stock price on June 4 and June 6, 2018 were erased in less than 24 hours. SOF ¶¶ 12-

**6** 13, 29-30. Tesla also does not (and cannot) dispute that the value of Tesla's stock nearly

**7** tripled to $917.42/share by February 19, 2020. SOF ¶ 32.[1] Tesla cites no authority to

**8** support its claim that temporary and statistically insignificant price drops over a matter of

**9** minutes can somehow be aggregated into a $167.37 million market capitalization damages

**10** claim when those drops disappear in less than 24 hours, and no loss was even reported to

**11** shareholders. SOF ¶ 28. Tesla does not even address Tripp's argument on this point at all.[2]

**12** The point emphasized by the court in *Perfection Corporation*—which Tesla does not

**13** cite to or distinguish in its response—is simple: a theory of damages based on temporary

**14** changes in stock price can demonstrate potential damages for *shareholders* in relation to

**15** their ability to resell such shares in fraud-on-the-market cases, but cannot demonstrate

**16** damages to the *corporation* itself under other theories of relief. *Perfection Corp. v.*

**17** *Lochinvar Corp.,* 812 N.E.2d 465, 472-73 (Ill. Ct. App. 2004) (citing several cases).

**18**

---

**19** [1] On the date of filing, Tesla stock price hit an all-time intra-day high of $951.41/share.

**20** [2] In its response, Tesla "refers [the Court] to its detailed Opposition to Tripp's *Daubert* Motion at ECF No. 89." Response [ECF No. 178] at 23. This is an improper attempt to

**21** circumvent the page limits imposed by LR 7-3. If Tesla wished to deploy the same argument in its response to Tripp's *Daubert* motion, it was required to fit them within the

**22** 30-page limit of LR 7-3. *See, e.g., Masimo Corp. v Philips Elec. N.A. Corp.*, 62 F. Supp. 3d

**23** 368, 376 (D. Del. 2014) (holding it is improper to incorporate prior briefing by reference to circumvent briefing page limits); *see also Phoenix Licensing, L.L.C. v. Advance Am.*, 2:15-

**24** CV-1367-JRG-RSP, 2016 WL 6217180, at *10 (E.D. Tex. Oct. 25, 2016) ("The Court finds

**25** that incorporating arguments by reference is improper and would circumvent the page limit requirements established by the Court's Local Rules."); *Dickinson v. Bagwell*, CIV 06-0257

**26** MCA/LAM, 2008 WL 11428238, at *1 (D.N.M. Feb. 12, 2008) ("[I]ncorporation by

**27** reference [of prior filings] circumvents the page limitations in the Court's local rules for motions and supporting briefs."). The Court should therefore decline Tesla's invitation to

**28** consider its response to Tripp's *Daubert* motion at summary judgment.

**1**

**2**

**3**
Instead, the corporation must demonstrate some other tangible form of damages, like lost customers, lost profits, declines in revenues, or loss of sales. *Id*. at 472. It remains undisputed that Tesla has no evidence of any such damages. SOF ¶¶ 8-10.

**4**

**5**

**6**
Kinrich's opinion, even if admissible, fails to establish any compensable loss or injury with respect to Tesla's stock price under any claim. This Court should therefore grant summary judgment on Tesla's $167.37 million in market capitalization damages.

**7**

**8**

**9**
> **C.** **Even if one accepts Tesla's $167.37 million calculation as an actual injury or loss, Tesla's expert Kinrich failed to conduct a proper event study to establish causation. Kinrich even admits he cannot conclude that Tripp caused any decrease in Tesla's stock price.**

**10**

**11**
> 1. <u>Kinrich did not conduct an event study, and Tesla cannot survive summary judgment without a proper event study.</u>

**12**

**13**

**14**

**15**

**16**

**17**

**18**

**19**

**20**
When a plaintiff relies on expert opinion to establish causation, summary judgment is appropriate if the expert's opinion, even if admissible, fails to establish a triable issue on causation. *See, e.g., Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming defense summary judgment where "bits and pieces of testimony" from experts "could not give rise to a triable issue of causation"); *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1350 (6th Cir. 1992) (holding that scientific evidence that provided foundation for expert testimony, viewed in the light most favorable to plaintiffs, was not sufficient to allow a jury to find it more probable than not that defendant caused plaintiff's injury).

**21**

**22**

**23**

**24**

**25**

**26**

**27**

**28**
As noted in Tripp's motion, courts have held uniformly that a plaintiff bringing claims premised on a publicly reported event harming a stock's price must support those claims with a proper event study, or summary judgment will be granted. In some instances, the trial court may grant summary judgment if the expert's opinion is inadmissible under *Daubert*. *See, e.g., In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003), aff'd sub nom. *Mortensen v. Snavely*, 145 Fed. Appx. 218 (9th Cir. 2005) (granting defense motion for summary judgment after excluding expert's damages opinion under *Daubert*). But in other cases, trial courts have granted summary judgment because

1    the expert's opinion, even if admissible, failed to establish causation.  *See, e.g., In re*

2    *Omnicom Group, Inc.* Sec. Litig., 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), aff'd, 597

3    F.3d 501 (2d Cir. 2010) (granting summary judgment) ("Assuming for the purposes of this

4    motion that the [plaintiff's] event study is adequate. . . it nevertheless fails to demonstrate

5    loss causation."); *Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 540 (E.D.

6    Pa. 1999) ("Needless to say, were we to accept [the] "expert report" as true, we would still

7    find that the evidence does not provide the kind of direct evidence required on summary

8    judgment to raise an issue of material fact on the issue of special damages.").  For purposes

9    of Tripp's motion for summary judgment, Kinrich's opinion falls in the latter category in

10    that it fails to establish causation even if it were admissible.

11    It is undisputed that Kinrich did not conduct an event study.  At his deposition,

12    Kinrich testified that his analysis "probably isn't quite an event study" but had "some

13    characteristics that are related."  SOF ¶ 15.  Tesla has not cited to any authority in which a

14    plaintiff survived summary judgment based on the kind of "not-quite-an-event-study"

15    opinion offered by Kinrich.  With no event study, Tesla cannot survive summary judgment

16    on its market capitalization damages.  Period.  *In re Novatel Wireless Sec. Litig.*, 08-CV-

17    1689 AJB (RBB), 2013 WL 12144150, at *5 (S.D. Cal. Oct. 25, 2013) ("The absence of an

18    event study for damages . . . will result in summary judgment in favor of defendants.").

19    Tesla relies on two cases to argue that no event study is required.  Both are

20    inapplicable.  First, *City of Ann Arbor Employees' Retirement System v. Sonoco Products*

21    *Company*, 827 F. Supp. 2d 559 (D.S.C. 2011) was a shareholder fraud-on-the-market case

22    in which the plaintiff—whose expert did conduct an event study—moved to exclude the

23    defendant's expert—who did not conduct an event study.  The court denied the motion

24    because the defense expert determined that the information at issue was "not new

25    information disseminated to market," meaning "there was no 'event,' so there is no need for

26    an event study."  *Id.* at 572.  The same cannot be said here.  Kinrich identified two distinct

27    events down to the minute: the June 4, 2018 article published at 3:42 PM Eastern Time and

28    the June 6, 2018 article published at 3:21 PM Eastern Time.  SOF ¶¶ 1, 11.

**1**
**2**
**3**
**4**
**5**
**6**
**7**
**8**
**9**
**10**
**11**
**12**
**13**
**14**
**15**
**16**
**17**
**18**
**19**
**20**
**21**
**22**
**23**
**24**
**25**
**26**
**27**
**28**

The other case is *RMED International, Inc. v. Sloan's Supermarkets, Inc.*, 94-CIV-5587-PKL-RLE, 2000 WL 310352 (S.D.N.Y. Mar. 24, 2000).  In that case, there were two factors that "hindered [the expert's] ability to estimate plaintiffs' damages using statistical methods."  *Id.* at *7.  First, the defendant's "life as an operating company and the alleged fraud began at approximately the same time.  Accordingly, there did not exist a meaningful price history for [the defendant's] stock that [the plaintiff's expert] could designate as the control or 'clean' period from which to estimate its true value using statistical analysis."  *Id.* at *7.  Second, there was no singular event.  The "[d]efendants' alleged misrepresentations and omissions were not revealed to the market in a single clean announcement.  Rather, [the defendant's] stock price declined gradually" over time.  *Id.*  These two factors made an event study unfeasible in *RMED*.  Given these limitations, the court permitted the plaintiff to rely on an alternative "microanalysis of each company-specific event which could have influenced [the company's] stock price [that] methodically chart[ed] those events on a daily basis."  *Id.* at *6.  Kinrich had no such limitations.  He identified the Business Insider articles on June 4 and June 6, 2018 as the two "events" and focused on the 19- and 40-minute windows between the publication of each article and closing of the NASDAQ exchange.  SOF ¶¶ 1, 11.  Unlike the expert in *RMED*, Kinrich had years of Tesla stock price data "as the control or 'clean' period" from which to run a linear regression analysis.  2000 WL 310352, *7.  He simply chose not to, and he admitted at his deposition that the fractional dips in Tesla stock price were not statistically significant anyway.  SOF ¶¶ 18, 19.

> 2. <u>Tesla cannot survive summary judgment when its own expert admits that he cannot opine on causation.</u>

It is undisputed that Kinrich admitted repeatedly at his deposition that he could not opine that Tripp caused damage to Tesla's stock.  SOF ¶ 16.  This concession from Tesla's expert should by itself end the analysis at summary judgment.  *See, e.g., Estate of Claypole v. County of Monterey*, Case No. 14-CV-02730, 2016 WL 693282, *12 (N.D. Cal. Feb. 22, 2016) (granting defense motion for summary judgment where plaintiff's "own expert …

1    testified that he could not conclude based upon his knowledge of the case that [the

2    defendant's] actions or inactions contributed to [the harm]").

3            Nevertheless, Tesla attempts to back into an "inference of causation" with Kinrich's

4    analysis of "comparator indices" and other news stories on June 4 and June 6, 2018.  Tesla's

5    citation to *In re Apollo Group Inc. Securities Litigation* on this point is not helpful to its

6    argument.  Indeed, the complete quotation from *Apollo Group* is this: "'*If there is sufficient*

7    *evidence in the record to support an inference of causation*, the ultimate conclusion as to

8    what the evidence proves is for the jury.'"  509 F. Supp. 2d 837, 46 (D. Ariz. 2007)

9    (quoting *Perkins v. Stand. Oil Co. of Cal.*, 395 U.S. 642, 648 (1969)).  Kinrich's analysis

10   of "comparator indices" or other news stores does not represent "sufficient evidence in the

11   record to support an inference of causation."  *Id.*

12           As noted in Tripp's motion, the court in *Computer Aid, Incorporated v. Hewlett-*

13   *Packard Company*, *supra* held that the same kind of "analysis" of "comparator indices" that

14   Kinrich performed was not probative of causation because, like Kinrich, the expert

15   "assume[d] that [the plaintiff] is essentially tied perfectly to or 'moves with' the market,

16   which may not be the case," and "tend[ed] to focus on stock price changes, not the statistical

17   and qualitative significance of those changes."  56 F. Supp. 2d at 540.  Like the expert in

18   *Computer Aid*, Kinrich conducted no analysis to test for correlation or statistical

19   significance with respect to Tesla stock and the three "comparator indices" Kinrich looked

20   at. SOF ¶ 25.  Tesla's response does not distinguish, or even reference, *Computer Aid*.

21           The same can be said for Kinrich's opinion that the Business Insider articles may

22   have damaged Tesla's stock price because Kinrich could not find any other negative news

23   stories regarding Tesla during the relevant periods on June 4 and June 6, 2018.  Courts have

24   held repeatedly that such "news analyses" are rank speculation.  *See In re Williams Sec.*

25   *litigation-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009); *Bricklayers & Trowel*

26   *Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D.

27   Mass. 2012), aff'd sub nom. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit*

28   *Suisse Sec.*, 752 F.3d 82 (1st Cir. 2014).  Tesla fails to cite any authority to the contrary.

**1**
**2**
**3**

Kinrich's "news analysis" is mere speculation, and "mere speculation is not enough to defeat a motion for summary judgment." *Tate v. Lau*, 865 F. Supp. 681, 688 (D. Nev. 1994).

**4**
**5**
**6**
**7**
**8**
**9**
**10**
**11**
**12**

In its response, Tesla also professes that it will "supplement Kinrich's testimony with other testimony from witnesses knowledgeable about Tesla's operations and public perception at the time." Response [ECF 178] at 23. The purpose of a defense motion for summary judgment is to put the plaintiff to its proof. *Terramorse v. Yellow Freight Sys., Inc.*, 12 F.3d 1108 (9th Cir. 1993). Vague promises to produce other evidence at trial cannot defeat summary judgment. Tesla also argues that "Tripp fails to identify any other causal factor that could have impacted Tesla's stock price drop at those times." Response [ECF No. 178] at 24. It is not Tripp's burden to negate causation; rather, it is Tesla's burden to establish it at summary judgment. It has failed to do so.

**13**
**14**

> **D.     Tesla cannot recover its $261,919 in investigative costs as damages under any theory because those costs were litigation expenses incurred to build Tesla's case against Tripp.**

**15**
**16**
**17**
**18**

As discussed *supra*, the NCCL is not applicable to Tesla's claims. Tesla therefore cannot recover its $261,919 in investigative costs as "response costs" under the NCCL. Tesla cannot recover its investigative costs under its other causes of action because those costs are litigation expenses incurred to build a case against Tripp.

**19**
**20**
**21**
**22**
**23**
**24**
**25**
**26**
**27**
**28**

In his motion, Tripp cited to *Tank Connection, LLC v. Haight*, 161 F. Supp. 3d 957, 966 (D. Kan. 2016) and *News American Marketing In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 542 (2004), aff'd, 276 Conn. 310, 885 A.2d 758 (2005) for the proposition that Tesla cannot recover investigative costs as damages in the absence of an actual loss or injury. The policy underlying the holdings in those cases is both simple and important: the plaintiff should not be permitted to manufacture damages through an investigation to build its case against the defendant. *Tank Connection*, 161 F. Supp. 3d at 966-67; *News American Marketing*, 862 A.2d at 846-47. Yet that is precisely what Tesla did here. The Court need only look to Tesla' own summary judgment briefing to see how its investigation was the

**1** means by which it built its case against Tripp.  *See e.g.*, Response [ECF 178] at 7-8; Tesla's

**2** MSJ [ECF 155] at 7-8.  Tesla's self-serving and unsupported claims that the investigation

**3** represented "mitigation efforts" or was merely "remedial" in nature, Response [ECF No.

**4** 178] at 19, are not evidence.

**5** Tesla claims that it "has produced documents that originated from the investigation."

**6** Response [ECF No. 178] at 19.  Those "documents" fall into two categories.  First, Tesla

**7** produced receipts for their investigators' equipment, travel, and meals.  Second, Tesla

**8** produced an Excel spreadsheet with ambiguous descriptions for investigative services, such

**9** as $44,016 for "Lead Investigator," $146,625 for "Nisos onsite team . . . and support for

**10** investigation from June 18-23," and $11,250 for "Marty Trip [sic] BG report complete 25

**11** June."  Ex. 66 to Lifrak Dec. [ECF 181-3] at MSJ_714.  Stated differently, Tesla only

**12** disclosed a tally of the investigative costs—most of which were incurred after Tripp

**13** admitted to Tesla interrogators on June 14, 2018 that he was the "leaker"—so that Kinrich

**14** could plug them into his damages report.  But it is undisputed that (1) Tesla's investigators

**15** were taking direction from, and working in coordination with, Tesla's counsel and, for that

**16** reason, (2) Tesla has withheld the *substantive* communications and documents—such as

**17** billing records and investigative reports—relative to its investigation based upon attorney-

**18** client privilege. SOF ¶¶ 33, 34.  This belies any claim that Tesla's investigation was

**19** "remedial" and not for the purpose of building its case against Tripp.[3]

**20** The four cases cited by Tesla are distinguishable in two significant ways.  First, none

**21** of the plaintiffs in these four cases withheld production of substantive documents from the

**22** [3] It is also impossible for Tesla to square its conduct with its mandatory disclosure

**23** obligations under Rule 26(a)(1)(A)(iii), which is "the functional equivalent of a standing
Request for Production under Rule 34" for all documents pertinent to Tesla's damages.

**24** *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (citing Fed. R. Civ. P. 26

**25** Advisory Committee Notes to 1993 Amendments).  Tesla cannot invoke attorney-client
privilege to justify nondisclosure because it put its investigation "at issue" by seeking

**26** damages for that investigation.  *Potomac Elec. Power Co. v. California Union Ins. Co.*, 136

**27** F.R.D. 1, 4 (D.D.C. 1990).  As noted in prior filings, this may be the subject of a separate
motion for Rule 37 sanctions if Tesla is permitted to proceed past summary judgment on this

**28** issue.

1   investigation based on attorney-client privilege. *See generally 21st Century Systems Inc. v.*

2   *Perot Sys. Gov't Servs., Inc.*, 284 Va. 32 (2012); *Food Servs. of Am., Inc. v. Carrington*,

3   2013 WL 4507593 (D. Ariz. Aug. 23, 2013); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516

4   (Colo. App. 2011); *Hampshire Grp., Ltd. v. Kuttner*, CIV.A. 3607-VCS, 2010 WL 2739995

5   (Del. Ch. July 12, 2010).   In fact, in at least two of those cases, the plaintiffs disclosed

6   highly detailed information regarding the investigation to allow the court to determine if the

7   investigatory costs were both reasonable and attributable to the defendant's conduct. *See*

8   *21st Century*, 284 Va. at 48 (noting that the plaintiff had submitted "highly detailed

9   invoices, totaling $371,002, related to the computer forensics investigation"); *Hampshire*

10  *Group*, 2010 WL 2739995, at *52 (court engaged in detailed analysis of the evidence of

11  investigative activity and ultimately determined that the defendant was responsible for only

12  $18,472 of $5,540,739 in claimed investigative costs).[4]

13          Second, none of these cases included an extensive investigation and interrogation

14  conducted by the plaintiff for the purpose of building a civil case (and a criminal case)[5]

15  against the defendant.   In *21st Century Systems*, the company's president was concerned that

16  several executives left the company all at once and hired a forensic examiner to inspect a

17  computer system to determine if something might be "going on."   *21st Century Sys.*, 284

18  Va. at 47.   There was no indication that the investigation went beyond determining if, and

19  what, files might have been copied by the departing executives. *Id*. at 36, 47-48.   Nor does

20  Tesla's $261,919 investigation in any way resemble the $525 investigation conducted by the

21  examiner in *Saturn Systems*.   252 P.3d at 522.   In that case, the company became suspicious

22  after learning that its former employee had visited the company's client, and simply hired an

23  investigator to determine if its confidential webpages had been accessed by the employee.

24  _____

25  [4] There is little discussion regarding the investigative costs at issue in *Food Services of*
    *America*; rather, the court merely noted that the plaintiff had "incurred expenses from its
26  investigation of Defendants' misconduct."   2013 WL 4507593, at *22.   Meanwhile, the
    investigation in *Saturn Systems* cost was a miniscule $525 and did not require extensive
27  documentation.   252 P.3d at 529 (Colo. App. 2011).

28  [5] *See* Tripp's Response to Tesla's Motion for Summary Judgment [ECF 177] SOF ¶ 75.

**1**  *Id.*  Similarly, the investigation in *Food Services of America* simply involved reviewing the

**2**  employee's work email to determine if he had sent information to his personal email.  2013

**3**  WL 4507593 at \*6.  Lastly, the investigation in *Hampshire Group* is not factually applicable

**4**  in any sense because the company in that case was investigating whether its own employee

**5**  had made illegal designations of other employee personal expenses as reimbursable, which

**6**  caused the corporation itself to violate the law and required remedial efforts to bring the

**7**  company into compliance.  2020 WL 2739995 at \*2, 51-52.

**8**  Tesla's extensive investigation of Tripp was for the purpose of litigation—which is

**9**  precisely why Tesla invoked attorney-client privilege.  Tesla now wants Tripp to pay the

**10**  costs of the investigation—to include the costs to feed and transport its investigators—as

**11**  damages.  Allowing Tesla to do so would contravene the general American rule, adopted in

**12**  Nevada, that attorney's fees and litigation costs are generally not damages.  *Thomas v. City*

**13**  *of N. Las Vegas*, 122 Nev. 82, 91 (2009) ("Nevada follows the American rule that

**14**  attorney fees may not be awarded absent a statute, rule, or contract authorizing such

**15**  award."); *Childs v. Selznick*, 281 P.3d 1161, \*2 (Nev. Sept. 28, 2009) (unpublished)

**16**  (explaining that "litigation expenses alone cannot be considered 'damages' in this context").

**17**  **E.  Rule 56 does not require Tripp to prove the absence of oppression, fraud**
**18**  **or malice; it only requires Tripp to point out to the Court that Tesla lacks**
      **clear and convincing evidence of the same.**

**19**  Tesla's argument that Tripp did not meet his initial Rule 56 burden with respect to

**20**  punitive damages is not well taken.  A party seeking summary judgment "bears the initial

**21**  responsibility of informing the district court of the basis for its motion, and identifying those

**22**  portions" of the record "which it believes demonstrate the absence of a genuine issue of

**23**  material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, there is no

**24**  "requirement in Rule 56 that the moving party support its motion with affidavits or other

**25**  similar materials negating the opponent's claim."  *Id*. (emphasis in original); *see also*

**26**  *Marketel Int'l, Inc. v. Priceline.com*, 138 F. Supp. 2d 1210, 1214 (N.D. Cal. 2001), aff'd

**27**  sub nom. *Marketel Int'l, Inc. v. Priceline.com, Inc.*, 36 Fed. Appx. 423 (Fed. Cir. 2002)

**28**

**1**  (holding that "defendants are not obliged to offer evidence to prove a negative" when

**2**  moving for summary judgment").  "If the moving party points out a lack of evidence, the

**3**  opposing party must submit facts showing a genuine issue of material fact."  *Landow v.*

**4**  *Med. Ins. Exch. of California*, 892 F. Supp. 239, 240 (D. Nev. 1995).  In his motion, Tripp

**5**  referenced the record by explaining that the wrongful conduct alleged—giving information

**6**  to a reporter—does not provide a basis for punitive damages as a matter of law.  Tripp MSJ

**7**  [ECF 154] at 21 (citing SOF 2).  That satisfied Tripp's Rule 56 burden.

**8**  In its response, Tesla identified three purported bases for punitive damages.  Even

**9**  taken in a light most favorable to Tesla, none of them can establish oppression, fraud or

**10**  malice by clear and convincing evidence.  First, Tesla claims that "[t]here is evidence that

**11**  Tripp was enriched through his actions."  This issue has been addressed on the current

**12**  record before the Court in Tripp's Response to Tesla's Motion for Summary Judgment

**13**  [ECF 177] (SOF ¶¶ 62-68) wherein Tesla's investigators admitted that they ultimately

**14**  uncovered no actual evidence that Lopez compensated Tripp or offered to compensate

**15**  Tripp.  Given the clear and convincing standard, an ambiguous statement from Tripp cannot

**16**  overcome Tesla's own acknowledgment that its investigators uncovered no evidence of

**17**  compensation.

**18**  Second, Tesla claims that there is evidence that Tripp made "'a conscious decision'

**19**  to take actions that could injure" Tesla.  Contrary to Tesla's position in its response that

**20**  Tripp chose Lopez because she had a "grudge" against Tesla, Tesla previously explained in

**21**  its own motion that Tripp reached out to several news outlets and that Tripp found only

**22**  "one who was interested."  Tesla's MSJ [ECF 155] at 5-6.  And there is no evidence Tripp

**23**  "chose" Lopez because of a purported "grudge."  Although Tesla provides some references

**24**  to Tripp disagreeing with Tesla's treatment of him, there is no evidence suggesting that

**25**  Tripp provided information to Lopez *because* of that treatment.  It is not uncommon for

**26**  employees to feel that their employer has treated them unfairly.  That hardly equates to

**27**  oppression, fraud or malice.  Tesla also offers no evidence that Tripp directed Lopez or

**28**  Business Insider to publish the articles to coincide with Tesla's annual shareholder meeting.

**1**    Furthermore, Tesla cannot establish any link between Tripp's alleged "leaks"—i.e., Twitter

**2**  posts—in August 2018 and his communications with Lopez in May 2018.   While those

**3**  Twitter posts may be indicative of Tripp's displeasure with Tesla, they occurred months

**4**  *after* Tesla had sued Tripp and defamed him as a would-be mass shooter.

**5**         Third, Tesla claims that Tripp's efforts to conceal his identity by being a confidential

**6**  source can somehow support punitive damages.   Again, the authorities cited by Tesla are

**7**  not helpful to its argument.   In *Service Employees International Union, Local 250 v.*

**8**  *Colcord*, the salient fact giving rise to punitive damages was that the defendants launched a

**9**  campaign to decertify the union that employed them while establishing a competitor union.

**10**  160 Cal. App. 4th 362, 375 (2008).   Similarly, in *Clark v. Lubritz*, the Supreme Court of

**11**  Nevada did not base its holding on the partners' efforts to conceal their conduct.   Rather, the

**12**  gravamen of the partners' misconduct was that they deliberately reduced the plaintiff's

**13**  partnership distribution share and enriched themselves in the process.   113 Nev. 1089, 1099

**14**  (1997).   In both cases, the punitive damages were warranted because of the nature of the

**15**  harm, not merely because the defendants concealed their activities.

**16**         Tesla has not provided any evidence that meets Nevada's "high threshold for

**17**  punitive damages" based upon an act of "oppression, fraud or malice," and summary

**18**  judgment is therefore appropriate on Tesla's claims for punitive damages.   *Villagomes v.*

**19**  *Lab. Cop. of Am.*, 783 F. Supp. 2d 1121, 1127 (D. Nev. 2011); Nev. Stat. § 42.005(1).

**20**         **F.     The fact that Tesla never sought a preliminary injunction or other relief**
**21**                  **from this Court during two years of litigation belies the existence of the**
**22**                  **"irreparable injury" necessary to obtain a permanent injunction or the**
          **need to allow an inspection of Tripp's devices.**

**23**         Tesla's speculative argument that it could still conceivably request an inspection of

**24**  Tripp's devices (even though discovery is closed) and seek permanent injunctive relief in its

**25**  pretrial order ignores the substantive fact that Tesla never sought such relief immediately,

**26**  much less at any point during the two years this case has been pending.   This was the simple

**27**  point made by the district court in *Tokidoki*.   The *Tokidoki* court isolated this issue in its

**28**  ruling and explained that—apart from the plaintiff's failure to request a permanent

**1**   injunction in the pretrial order or the defendant's current lack of selling the trademarks in

**2**   dispute—the "[plaintiff], which never found any need to seek issuance of a temporary

**3**   restraining order or preliminary injunction, failed to make the showing necessary of a

**4**   permanent injunction, including evidence that is has suffered an irreparable injury."

**5**   *Tokidoki, LLC v. Fortune Dynamic, Inc.*, CV 07-1923, 2009 WL 2366439, \*15 (C.D. Cal.

**6**   July 28, 2009), aff'd, 434 Fed. Appx. 664 (9th Cir. 2011), opinion withdrawn and

**7**   superseded on other grounds, 473 Fed. Appx. 522 (9th Cir. 2011), and aff'd, 473 Fed.

**8**   Appx. 522 (9th Cir. 2011).  A plaintiff cannot claim that it would be irreparably harmed by

**9**   the absence of a permanent injunction if it lets years go by without taking any action to

**10**  prevent or mitigate the alleged harm.  This applies *a fortiori* in this case where Tesla claims

**11**  that Tripp purportedly posted confidential information on Twitter in August 2018 and

**12**  February 2020, *see* Ex. 63 to Lifrak Dec. [ECF No. 180-12] at MSJ_693-96 and Ex. 65 to

**13**  Lifrak Dec. [ECF No. 181-2] at MSJ_710-711, but never sought any relief from this Court.

**14**  Tesla's reliance upon *Cooper Notification, Inc. v. Twitter, Inc*. is misplaced.  The

**15**  plaintiff in that case explained that it could not have successfully established the irreparable

**16**  harm requirement of a preliminary injunction without "substantial discovery," and because

**17**  of that point, the plaintiff's decision not to pursue preliminary injunctive relief told the court

**18**  "nothing" about the "potential irreparability of any harm" at issue in a permanent injunction.

**19**   2010 WL 5149351, \*4 (D. Del. Dec. 13, 2020).  Tesla does not offer a similar explanation

**20**  for its failure to seek injunctive relief during this case.  Moreover, the *Cooper Notification*

**21**  opinion was in response to a motion to stay the case, not one for summary judgment after

**22**  the end of the discovery period.  *Id*. at \*5.

**23**  Tesla has also failed to explain why the Protective Order Regarding the Disclosure

**24**  and Use of Discovery Material [ECF 44] ("Protective Order") does not eliminate the

**25**  possibility of irreparable harm to Tesla.  The Protective Order was entered on October 11,

**26**  2018 and was not in place when Tripp made his August 2018 Twitter posts.  *See* Ex. 63 to

**27**  Lifrak Dec. [ECF No. 180-12].  Although Tripp's February 2020 Twitter posts occurred

**28**  while the Protective Order was in effect, nothing in those handful of posts consisted of

litigation materials.   Nor is there anything in those posts that could be considered confidential or proprietary.  Even if anything in those posts could be considered confidential or proprietary, Tesla's own failure to seek an injunction or any other relief for the past two years only underscores the absence of an irreparable injury to Tesla.  The same can be said for the inspection of Tripp's devices.  Tesla is seeking the inspection remedy under the general injunctive provisions of 18 U.S.C. § 1836(b)(3)(A).  Even if such inspection could occur outside the parameters of discovery, the fact that Tesla never sought an inspection order during discovery (when such an inspection could actually be useful) should be deemed a concession that Tesla has no need to conduct the inspection at all.

Tesla has failed to cite a single case in which a plaintiff was granted permanent injunctive relief after failing to seek any injunctive relief during two years of litigation, all while the defendant was purportedly disseminating "trade secrets" or "confidential data" on Twitter.  Accordingly, Tesla has waived any right to inspect Tripp's devices or seek injunctive relief.

## III.    Conclusion.

Nothing in Tesla's response establishes any material factual dispute, and none of the legal authorities cited by Tesla allow it to seek the relief sought, with perhaps the exception of its $7,385 claim for breach of fiduciary duty of loyalty.   Accordingly, this Court should grant summary judgment on Tesla's $167.37 in market capitalization damages, $261,919 in investigative costs, and punitive damages claims, and only permit Tesla to procced to trial on its $7,385 claim for breach of fiduciary duty of loyalty.

DATED this 9th day of June, 2020.

TIFFANY & BOSCO, P.A.

By /s/*William M. Fischbach III*
   Robert D. Mitchell
   William M. Fischbach III
   Camelback Esplanade II, Seventh Floor
   2525 East Camelback Road
   Phoenix, Arizona 85016-4229
   *Counsel for Defendant/Counterclaimant*

## PROOF OF SERVICE

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On June 9, 2020, I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT [ECF NO. 154]**

on the following interested parties in this action:

| | |
|---|---|
| Rory T. Kay (NSBN 12416) | Michael Lifrak |
| McDONALD CARANO LLP | Jeanine M. Zalduendo |
| 2300 West Sahara Avenue, Suite 1200 | Alex Bergjans |
| Las Vegas, Nevada 89102 | Aubrey Jones |
| Telephone: (702) 873-4100 | QUINN EMANUEL URQUHART & |
| rkay@mcdonaldcarano.com | SULLIVAN, LLP |
| | 865 S. Figueroa St., 10th Floor |
| Alex Spiro | Los Angeles, California 90017 |
| QUINN EMANUEL URQUHART & | Telephone: (213) 443-3000 |
| SULLIVAN, LLP | michaellifrak@quinnemanuel.com |
| 51 Madison Avenue, 22nd Floor | jeaninezalduendo@quinnemanuel.com |
| New York, New York 10010 | alexbergjans@quinnemanuel.com |
| Telephone: (212) 849-7000 | aubreyjones@quinnemanuel.com |
| alexspiro@quinnemanuel.com | |

**[X] (BY EMAIL)** By transmitting the above documents to the above email addresses.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this 9th day of June, 2020 at Phoenix, Arizona.

*/s/William M. Fischbach III*