1   Rory T. Kay (NSBN 12416)
    MCDONALD CARANO LLP
2   2300 West Sahara Avenue, Suite 1200
    Las Vegas, NV  89102
3   Telephone:  (702) 873-4100
    Facsimile:  (702) 873-9996
4
    QUINN EMANUEL URQUHART & SULLIVAN, LLP
5   Alex Spiro (admitted pro hac vice)
      alexspiro@quinnemanuel.com
6   51 Madison Avenue, 22nd Floor
    New York, New York 10010
7   Telephone: (212) 849-7000
8   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Michael T. Lifrak (admitted pro hac vice)
9     michaellifrak@quinnemanuel.com
    Jeanine M. Zalduendo (admitted pro hac vice)
10    jeaninezalduendo@quinnemanuel.com
    Aubrey Jones (admitted pro hac vice)
11    aubreyjones@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
12  Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
13
    Attorneys for Plaintiff/Counter Defendant
14  TESLA, INC.

15                 UNITED STATES DISTRICT COURT

16                       DISTRICT OF NEVADA

17

18
    TESLA, INC.,                          Case No. 3:18-cv-00296-LRH-CBC
19                        Plaintiff,
          v.                             **TESLA, INC.'S REPLY IN SUPPORT
20                                        OF ITS MOTION FOR SUMMARY
    MARTIN TRIPP,                         JUDGMENT**
21
                         Defendant.       **FILED UNDER SEAL UNDER COURT
22                                        ORDER ECF No. 44.**
23  ─────────────────────────────

24  AND RELATED COUNTERCLAIMS

25

26

27

28

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**INTRODUCTION**

Defendant and Counter-Plaintiff Martin Tripp "does not dispute" the material facts set out in Tesla's motion. (Opp. at 3). Those undisputed material facts demonstrate that Tripp's counterclaims fail. Under the applicable law, Tripp must prove that each of the challenged statements was made with actual malice (or, at the very least, that they were false). He cannot possibly do this because the undisputed evidence demonstrates that the statements were accurate or otherwise not defamatory. The Court should enter summary judgment in favor of Tesla on Tripp's counterclaims.

The (now undisputed) facts are startling. Tripp does not dispute that he stole volumes of Tesla's confidential information; that he peddled this information to numerous press outlets claiming that Elon Musk had lied to investors; that he then leaked the data to a reporter; that he told coworkers they also would be paid if they helped him; and that he did these things days after being disciplined and moved to a different department because of poor performance. Nor does Tripp dispute that Tesla investigated the leaks of its confidential information; that Tripp ultimately admitted to stealing and leaking the information; that Musk was informed on the status of the investigation and Tripp's confession; and that Musk sent an internal email to Tesla employees requesting their vigilance in light of the theft and leaks by an unnamed employee. Finally, Tripp does not dispute that on the day Tesla filed this lawsuit, he sent a threatening email to Musk; that someone claiming to be a very close friend of Tripp's later called in a warning to Tesla that Tripp was violent, volatile and very hostile as a result of being fired and sued by Tesla and that Tripp was very well armed and the caller was concerned for the safety of the workers at the Gigafactory; that Musk and Tesla later accurately reported the fact of this warning call to reporters; and that that they did so only after being asked specifically about Tripp's public assertions that he was a "whistleblower" and a victim. Simply put, the undisputed facts establish that Mr. Musk's June 17, 2018 email, the statements about the warning call about the Gigafactory, and Mr. Musk's July 5, 2018 tweet were about a public controversy into which Mr. Tripp injected himself and that they were not knowingly false or made with a reckless disregard of the truth.

1    Tripp's legal arguments about the actual malice standard do not save his claims.  He must

2    prove actual malice as to the June 17 email because Tripp admits there was a public controversy

3    regarding the management and operations of the Gigafactory.  That he *now* claims he wished to

4    hide his actions behind a reporter's promise of confidentiality does not change anything.  In fact,

5    Tripp told the reporter he would "love" to be named as the source.  He voluntarily injected himself

6    into a public controversy, ultimately admitted to Tesla that he was the source, then undertook a

7    public relations campaign to portray himself as the victim.  The statements about the warning call

8    to Tesla arose out of the same public controversy and also touched on a matter of public concern

9    (a threatened mass shooting).  In addition, Tripp ignores the fact that even if the actual malice

10    standard does not apply, he must prove that all the challenged statements were false.  He cannot

11    do this either.

12    The rest of Tripp's opposition consists of nothing more than misdirection.  He quibbles

13    with the wording of some of the statements, but none of that proves actual malice or falsity.  He

14    claims that he did not intend to engage in a mass shooting, but that misses the point—all Tesla

15    and Mr. Musk did was accurately report on a warning call made to the company.  Ultimately, to

16    avoid summary judgment, Tripp must show that the statements (a) are not subject to the actual

17    malice standard or were made with knowledge of falsity or reckless disregard for the truth; ***and***

18    (b) were actually false.  Tripp's claims fail because he cannot meet any of these requirements, and

19    so FRCP 56(a) requires judgment in Tesla's favor on Tripp's counterclaims.

20    **ARGUMENT**[1]

21    **I.    TRIPP CANNOT MEET HIS BURDEN AS TO THE JUNE 17 EMAIL.**

22    **A.    Tripp Must Prove Musk's June 17 Email was Made with Actual Malice.**

23    Tripp must prove that the statements contained in Musk's June 17 email were made with

24    actual malice for two reasons: (1) Tripp is a limited purpose public figure in a public debate to

25

26    _____

27    [1]    As noted, Tripp's opposition to Tesla's motion for summary judgment presents a number of new "facts" for the Court to consider.  Tesla will address these immaterial and inaccurate "facts"

28    in the relevant sections, *infra*.  The Declaration of Michael Lifrak (the "Lifrak Decl.") filed concurrently, provides several additional exhibits that further refute Tripp's new "facts."

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

which the June 17 email was germane, and (2) Musk's June 17 email was a protected intracorporate communication.

### 1.        Tripp is a Limited Purpose Public Figure.

The First Amendment requires limited purpose public figures to prove an allegedly defamatory statement was made with "actual malice." *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964).  A plaintiff is a limited purpose public figure if:  (1) there is a public controversy; (2) the plaintiff "undert[ook] some voluntary act through which he or she sought to influence resolution of the public issue;" and (3) the statement at issue is "germane" to the person's participation in the controversy.  *Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1129 (D. Nev. 2014).  Tripp does not dispute that there was an existing public controversy regarding the operation and management of Tesla, nor does he dispute that Musk's June 17 email was germane to this ongoing controversy.  Rather, Tripp argues that he did not take any voluntary act to inject himself into the controversy.  Tripp is wrong for several independent reasons:

First, Tripp argues that he leaked Tesla's information to the press "confidentially" in an attempt to preserve his anonymity.  (Opp. at 15-16.)  That is not a valid excuse.  Confidential sources can be limited purpose public figures, and Tripp points to no authority stating otherwise. The relevant question is whether Tripp voluntarily inserted himself into a public debate, and he clearly did that.  *See e.g., McDowell v. Palewonsky*, 769 F.2d 942, 949 (3d Cir. 1985) (public figure "even though an individual does not intend to attract attention" if he "undertakes a course of conduct that invites attention."); *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 15 (1st Cir. 2011) (relevant inquiry is whether plaintiff "volunteered for an activity out of which publicity would foreseeably arise"); *Rosanova v. Playboy Enter., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) ("It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.  It is sufficient that [plaintiff] voluntarily engaged in a course that was bound to invite attention and comment.").  Tripp "assumed the risk…[]he would find [him]self at the center of the controversy," by stealing Tesla's confidential information and peddling it to numerous reporters.  *Lohrenz v. Donnelly,* 350 F.3d 1272, 1280–81 (D.C. Cir. 2003).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Tripp admitted that he knew his anonymity could be fleeting, "half expect[ing]" to be found out, but that he was "still going to try" to give Lopez information anyway—putting the lie to his claim that he "purposefully avoided placing himself into any controversy." (ECF No. 171-6 at 184:16-20; Opp. at 15.) Indeed, Tripp *wanted credit* for his actions. On June 15, 2018—five days **before** Tripp's name became public—Tripp told Lopez: "You can use my name as a source after June 29…I would love it if you did!" (Lifrak Decl. Ex. 71.)[2] His claim that he wanted to remain anonymous is disingenuous (in addition to being legally irrelevant).

Second, Tripp claims he was "dragged" unwillingly into this controversy as a result of Tesla's investigation to "smoke out" the identity of the leaker and its subsequent lawsuit against him. (Opp. at 16-17.) However, this argument is premised on a fiction that Tesla would not try to identify an employee who illegally leaked confidential data. Tripp knew full well that Tesla would investigate the leak. (Lifrak Decl. Ex. 73 at 153:24-154:1.) As he expected, Tripp's behavior invited public attention to both the veracity and origin of the leaked information.

Third, Tripp claims that he wasn't a "principal player in the debate" likely to have "much effect on its resolution." (Opp. at 15.) However Tripp himself asserted that he "hoped the information he shared with Lopez would lead to changes at Tesla." (Opp. at ¶ 7.) He "was hoping that [the leaks] would cause Tesla to change it's [sic] ways and improve things." (Lifrak. Decl. Ex. 70 at 55:23-56:4, 113:20-24, 115:2-19.) Based on Tripp's own words, his actions were indeed "directed at the public in order to influence resolution of … some broader issue" and therefore Tripp qualifies as a limited purpose public figure for that reason alone. *Oracle USA,* 6 F. Supp. 3d 1108, 1129 (D. Nev. 2014); *see also Prendeville v. Singer*, 155 F. App'x 303, 305–06 (9th Cir. 2005) (plaintiff was a public figure because he contacted the media regarding his claims of wrongful termination, stating that "publicity of his complaint was important for the dual purposes of helping people and putting pressure on the company to correct its alleged unlawful activities.").

---

[2]  This email also puts the lie to Tripp's ongoing claim that he was acting as a genuine whistleblower. (ECF No. 154 at 2; ECF No. 173-19.)  In reality, Lopez told Tripp to file a whistleblower suit in response *if* Tesla sued him.  (Lifrak Ex. 71.)

### 2. Tripp Manufactures a Non-Existent Exception to the Intracorporate Communications Privilege.

Regardless of Tripp's status as a limited purpose public figure, Tripp must still prove that Musk published the June 17 email with actual malice because it is separately protected by Nevada's intracorporate communications privilege.  Nevada's intracorporate communications privilege "applies to a statement involving 'the regular course of the corporation's business,' if the statement is made in good faith to a person with an interest in the subject matter of the statement." *Cummings v. Valley Health Sys., LLC*, 705 F. App'x 529, 531 (9th Cir. 2017) (citing *Simpson v. Mars Inc.*, 113 Nev. 188, 192 (1997)).[3]  Internal company communications regarding an employee's misconduct are covered by this privilege.  *See Gallues v. Harrah's Club*, 87 Nev. 624, 626-27 (1971); *Hoff*, 2013 WL 275298, at *2.

Tripp's argument that Musk's June 17 email cannot fall within the intracorporate communications privilege because "Musk engaged in excessive publication" is manufactured and contrary to existing law.  (Opp. at 20.)  While excessive publication can void the intracorporate privilege, it requires that the speaker "***knowingly*** publish the matter to a person to whom its publication is not otherwise privileged." Restatement (Second) of Torts § 604 (emphasis added). Here, it is uncontested that Musk sent the June 17 email *only* to Tesla employees.  (*See* ECF No. 177 at 21; ECF No. 25-1.)  Although a reporter did inquire the following day about the email, Tripp can point to no evidence that Musk supplied the email to the reporter, and no authority that Musk's statements lost their privileged status because a reporter found out about the email.  Nor does Tripp provide *any* basis for his supposition that Musk "anticipated, perhaps even desired, that his e-mail would leak."  (Opp. at 21.)

---

[3]   In *Chocolate Magic Las Vegas, LLC v. Ford*, cited by Tripp, the Court determined that statements made "with the intent to harm the company" would not be "privileged because such statements are not made in the regular course of business or with any right or duty related to the business."  337 F. Supp. 3d 950, 958 (D. Nev. 2018).  The case has no applicability because Musk's June 17 email was intended to *prevent harm to the company* by warning employees to be vigilant of suspicious activity.  *Id.*

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    As much as Tripp takes issue with Musk sending the June 17 email to all Tesla employees,

2    he fails to provide authority that Musk's doing so somehow crossed any threshold into excessive

3    publication.  Tripp cites no case holding that the number of employees who receive a corporate

4    communication is a factor in whether the communication is privileged.  Indeed, he concedes that

5    "it is permissible for a CEO to send out a company-wide e-mail encouraging employees to observe

6    confidentiality protocols [and] remain vigilant for threats to the company."  (Opp. at 21.)

7    Moreover, Tripp was not identified by name, and Tripp points to no evidence that Tesla employees

8    even knew it pertained to him at that time.[4]  (*Id.*)

9        **B.**     **Tripp Has Not Proven with Clear and Convincing Evidence that Musk Sent the Email with Malice.**

10

11    Tripp argues that he has met his burden as to malice because Musk's email alleged that an

12    unnamed employee engaged in "extensive and damaging sabotage," made computer code

13    changes, and that other third-parties wanted to harm Tesla.  (Opp. at 28.)  None of this constitutes

14    defamation.

15    As an initial matter, Tripp does not actually address his burden of having to prove by clear

16    and convincing evidence that Musk sent the June 17 email with malice.  *See New York Times*, 376

17    U.S. at 280; *Wynn v. Smith*, 117 Nev. 6, 16-17 (2001).  The actual malice standard is subjective

18    and considers what Musk actually "believed and intended to convey at the time [he] published"

19

20    _____

21    [4]  Although not directly relevant to the intracorporate communication issue, Tripp argues that the

22    fact that the June 17 e-mail does not identify him by name does not matter because "an otherwise defamatory statement is actionable if the objects of the defamatory statement can be readily

23    ascertained."  (Opp. at 28 n.3, citing *Reynolds v. Reynolds*, 231 Ariz. 313, 318, ¶ 11 n.3 (App. 2013).)  However, where a statement does not name someone and does not provide information

24    that would allow a recipient of the statement to reasonably understand the statement to refer to the plaintiff, the statement is not defamatory.  *See* Restatement (Second) of Torts § 564 (1977) ("It is

25    necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff."); *see also SDV/ACCI, Inc. v. AT & T Corp.*, 522 F.3d 955, 959 (9th Cir. 2008) ("If there is no express reference to the plaintiff in a defamatory statement, the claim will fail unless

26    the statement refers to the plaintiff by reasonable implication").  Moreover, where the plaintiff is a member of a large group (e.g., thousands of Tesla employees), courts "have consistently held

27    that plaintiffs cannot show that the statements were 'of and concerning them.'"  *Bartholomew v. YouTube, LLC.*, 17 Cal. App. 5th 1217, 1231 (2017).  There is simply no information in the June

28    17 email that would have allowed Tripp's identity to be ascertained from among all Tesla employees.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

the email.  *Pegasus*, 118 Nev. at 722.  Only "false statements made with the high degree of awareness of their probable falsity" are liable under the actual malice test.  *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  Indeed, even where "an inference of malice arises," if such inference is not "'sufficiently strong to command the unhesitating assent of every reasonable mind,'" there is not clear and convincing evidence of actual malice.  *Christian Research Institute v. Alnor*, 148 Cal. App. 4th 71, 85 (2007).  Tripp has not demonstrated at all, let alone by clear and convincing evidence, that Musk either knew the contents of the June 17 email were false or entertained serious doubts as to their truth.

### 1.   Using the Word "Sabotage".

Tripp first argues that Musk's email was knowingly false because it claimed the unnamed employee engaged in "sabotage."  But even Tripp admits the definition of that word includes "an act . . . tending to hamper or hurt," (Opp. at 27-28), which is exactly what Tripp was trying to do.  Moreover, "sabotage" is also defined as "[t]he deliberate attempt to damage, destroy, or hinder a cause or activity."  American Heritage Dictionary (3d ed. 1994).  Tripp's actions clearly fall within all of these definitions.  Moreover, the question for the Court is not whether Tripp's actions fit into a precise definition but rather whether the gist of Musk's statements was false—and knowingly false.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991); *see also Wynn*, 117 Nev. at 16–17 (2001); *Anderson v. Cramlet*, 789 F.2d 840, 843 (10th Cir. 1986) (to avoid liability, "it is sufficient if the substance, the gist, the sting, of the matter is true").

Someone who steals data from a company and illegally leaks it publicly in an effort to undermine the company engages in "sabotage."  There is hardly a better word for it.  And at worst, "sabotage" as Musk used the term, should be viewed as an "exaggeration or generalization," or "rhetorical hyperbole," and therefore not defamation.  *Pegasus*, 118 Nev. at 715; *see also Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of the word "blackmail" to describe negotiation techniques was "no more than rhetorical hyperbole" and "a vigorous epithet," and therefore not defamatory); *Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1168, (2004) (because "convicted" could also mean something besides a legal conviction, phrase "convicted

1   perpetrator of domestic abuse" did not support inference of malice).[5]

2   **2.     Allegation that the Employee Made Code Changes.**

3   Nor was it defamation for Musk to say that the unnamed employee made "direct code

4   changes." (Opp. at 28.)  The relevant inquiry is Musk's state of mind at the time.  *See Pegasus*,

5   118 Nev. at 722 (relevant inquiry is what defendant "believed and intended to convey ***at the time***

6   it published" the statement) (emphasis added);*Glenn K. Jackson, Inc. v. Rose* 273 F.3d 1192, 1202

7   (9th Cir. 2011) ("[I]t is not sufficient that the statements are shown to be inaccurate, or even

8   unreasonable. 'Only willful falsity or recklessness will suffice.'") (citations omitted).  Musk's

9   statement that Tripp made direct code changes was supported at that time by information on

10  Tripp's devices that indicated he may have implemented code changes across Tesla's operating

11  system.  (ECF No. 180-7, at 139:4-140:24.)  This is undisputed and dispositive.  Musk's

12  statements were based upon his knowledge at the time, supported by what the investigators

13  believed at that time. *See Ferguson v. Williams & Hunt, Inc.,* 221 P.3d 205, 216 (2009) ("While

14  there may be questions about the adequacy of Defendants' investigation and what, in hindsight,

15  may appear to have been a premature and possibly even erroneous conclusion," such evidence

16  was not sufficient to demonstrate malice); *see also* (ECF Nos. 171-1 at 91:1-95:16, 106:17-23;

17  171-6 at 50:21-25, 47:12-13, 172:13-188:25; 171-2 at 37:21-38:10, 139:4-140:24, 142:13-144:6.)

18  The record is bare of any evidence that Musk "had a high degree of awareness of the statement's

19  probable falsity." *See Hoff v. Walco, Int'l*, 2013 WL 275298 (D. Nev. Jan. 23, 2013) at *2.

20  **3.     Statements About Third-Parties.**

21  Finally, Tripp argues that Tesla failed to move for summary judgment on a purported

22  insinuation in the June 17 email that Tripp was working with "Wall Street short sellers," "oil &

23  gas companies," or "big gas/diesel car company competitors." (Opp. at 28.)  This is a strawman

24  argument.  Tesla moved for summary judgment as to the entire email. *See Yeager v. NPR, et al.,*

25

26  _____

27  [5]   Contrary to Tripp's assertion, Musk's email dated June 18, 2018, referenced in paragraph 17
    of the Opposition, does not name Tripp or otherwise imply that he was in way connected to a fire

28  at the Gigafactory. (Opp. at 28.)  The June 18 email was not included among allegedly defamatory
    statements in Tripp's Counter-Complaint, nor is there any evidence that Musk was referring to
    Tripp in that email.  (*See* ECF No. 25.)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

2018 WL 3633894, at *6 (D. Kan. July 31, 2018) (motion to dismiss defamation claim granted as to entire claim even though several purportedly defamatory statements were not specifically addressed by the motion); *see also* (ECF No. 155, at 14-18, 21-26.)

Nor was Musk's purported insinuation defamatory in any event.  Musk stated that Tesla "need[ed] to figure out if [Tripp] was acting alone or with others at Tesla and if he was working with any outside organizations."  (ECF No. 173-17.)  There is no insinuation here—Musk does not claim to know, or even believe that Tripp was specifically working with anyone, let alone short sellers or with the oil and gas industry.  Rather, Musk simply stated a point of focus in the ongoing investigation.  If anything, Musk's email insinuated that Tripp probably wasn't working with outsiders but was motivated by his own revenge.  (*See id.*, "Most of the time, when there is a theft of goods, leaking of confidential information, dereliction of duty or outright sabotage, the reason really is something simple like wanting to get back at someone within the company or at the company as a whole.  Occasionally it is much more serious.").

Musk's statement was not an insinuation of the type that could be found to be defamatory. *See*, e.g., *Ornatek v. Nevada State Bank*, 93 Nev. 17, 20, 558 P.2d 1145, 1147 (1977) (statement not defamatory where neither the "words themselves" nor "the circumstances under which they were used" conveyed defamatory meaning).  Liability for defamation by implication arises only where the statement can "reasonably be understood as implying the alleged defamatory content," which is not the case here.  *Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010) (finding no defamation by implication where no direct allegation of illegal conduct and other insinuations were "vague") (quotation omitted).  Musk's email does not make any statement of fact regarding whether the unnamed leaker was working with third parties, and the email cannot reasonably be read to imply that, as a matter of fact, Tripp was doing so.

### C.   Even if Tripp Does Not Have to Prove Actual Malice, His Claim Still Fails Because Has Not Shown that the Statements Were False.

Summary judgment is appropriate on the question of falsity where the facts are undisputed. *See D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1288 (C.D. Cal. 2000), *aff'd sub nom.*, 270 F.3d 793 (9th Cir. 2001).  In order to prove falsity, Tripp must demonstrate that the

statements in the June 17 email had "no basis in truth."  *Wellman*, 108 Nev. at 88; *see also Maheu v. Hughes Tool Co.*, 569 F.2d 459, 465-66 (9th Cir. 1977) (a statement is protected if the "imputation is substantially true so as to justify the 'gist' or 'sting' of the remark"); *Masson*, 501 U.S. at 517 (an allegedly defamatory statement "is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced'").  As described in detail in the Motion and above, there was nothing false in the June 17 email.  Tripp cannot demonstrate that the June 17 email has "no basis in truth" because the statements therein are all founded on facts that Tripp does not dispute.  Summary judgment is warranted as to the entire June 17 email.

## II.   TRIPP HAS NOT MET HIS BURDEN AS TO THE STATEMENTS ABOUT THE GIGAFACTORY THREAT.

Tripp's claims are based on the notion that Tesla defamed Tripp due to statements on June 20, 2018 about a call made to Tesla about a potential threat.[6]  Whether viewed under the actual malice standard (as it should) or not, these statements cannot possibly constitute defamation because they were indisputably ***accurate and true***.

### A.   Tripp Must Prove Actual Malice Because the Statements Were Germane to the Existing Controversy.[7]

The statements about the threat to the Gigafactory were relevant to a public controversy and thus subject to the actual malice standard.  Tripp does not dispute that there was an ongoing public debate over Tesla's management and operations.  (Opp. at 17.)  Nor does he dispute what happened on June 19 and 20, 2018:

- Tripp was fired on June 19, 2018.  (ECF No. 172-9.)

- Tesla filed this action in the early morning of June 20, 2018.  (ECF No. 1.)

- At 8:57 a.m. that morning, shortly after Tesla filed this action, Tripp sent a

---

[6]  All of the arguments in this section apply to the June 22 statement regarding the same threat.

[7]  For the same reasons noted in Section I.A.1 *supra*, Tripp is a limited purpose public figure with regard to the statements pertaining to the call warning of a threat to the Gigafactory.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

threatening email to Musk: "Don't worry, **you have what's coming to you** for the lies you have told the public and investors." (ECF 173-18 (emphasis added).)

- At 1:44 p.m. Tripp forwarded his subsequent email exchange with Musk **to members of the press**, including a reporter for the *Guardian*, falsely insisting that it was really Musk who initiated the exchange by threatening Tripp first: "I think I deleted [Musk's] very first email and then cleared my delete history after Linette told me to. Basically he said 'how could you?!' I was on the fence on sending the response but then did." (ECF No. 172-10.)

- At almost the same exact time, a person claiming to be a "very good friend" of Tripp's was concerned enough about the safety of employees of the Gigafactory, to call Tesla and warn them that Tripp was "hostile," "may do something violent and volatile" and was "very well armed." (ECF No. 172-11.)

- At 4:38 p.m., the reporter from the *Guardian* who had been communicating with Tripp, emailed Musk two questions: (1) "Do you or Tesla want to comment on Tripp's claim that he was acting as a whistleblower;" (2) "And do you want to add any comment to the emails you sent to Tripp's personal account today, calling him a 'horrible human being', among other things. Why did you decide to email Tripp after you had already fired and sued him?" (ECF No. 173-19.)

It is against this backdrop that Musk (and then Tesla) made statements to the press accurately reporting the Gigafactory threat. These statements were germane to a public controversy for several reasons:

First, they were in direct response to Tripp's numerous public claims to reporters that Musk had instigated a threatening exchange with him. Musk's email provided accurate factual information to discredit Tripp's false narrative—it was Tripp who posed a repeated threat to Musk and Tesla—not the other way around. *See Metastorm, Inc. v. Gartner Grp., Inc.*, 28 F. Supp. 2d 665, 669 (D.D.C. 1998) (allegedly defamatory statements "directly refut[ing]" statements plaintiff made in a press release were germane to plaintiff's participation in the public controversy); *Dubai World Corp. v. Jaubert*, 2011 WL 579213, at *15 (S.D. Fla. Feb. 9, 2011) (comments germane to

1   controversy where reporter solicited the allegedly defamatory quote by seeking "response to

2   [plaintiff's] assertions on the subject").

3        Second and independently, they are relevant to Tripp's credibility as a participant in the

4   public debate about Tesla and thus were germane to the existing public controversy.  *Jankovic v.*

5   *Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016)  ("'Misstatements wholly unrelated to the

6   controversy' are not protected, but statements, including those highlighting a plaintiff's 'talents,

7   education, experience, and motives,' can be germane.");  *Waldbaum v. Fairchild Publications,*

8   *Inc.,* 627 F.2d 1287, 1298 (D.C. Cir. 1980) (plaintiff's "talents, education, experience, and

9   motives" are germane to controversy because they "could have been relevant to the public's

10  decision whether to listen to him").  Here, Tripp's motives were germane.

11       Tripp relies on two criminal cases for the premise that allegations of criminal behavior are

12  irrelevant to his credibility in the public debate.  However, these cases are inapposite.  Both

13  address whether a third-party witness could be cross-examined about prior criminal conduct.  *See*

14  *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002); *United States v. Meserve*, 271 F. 3d

15  328-29 (1st Cir. 2001).  Neither case dealt with the question of germaneness to a public controversy

16  in the context of defamation.

17       **B.      The Gigafactory Threat Also Touched on an Issue of Public Concern.**

18       Tripp must prove actual malice for the separate reason that statements about matters of

19  public concern receive a qualified privilege.  *See Shapiro v. Welt*, 133 Nev. 35, 38–39 (2017).

20  This privilege applies to statements "made in direct connection with an issue of public interest in

21  a place open to the public or in a public forum, which is truthful or is made without knowledge of

22  its falsehood." *Id*. at 39.  "Under a qualified privilege, the plaintiff must prove by a preponderance

23  of the evidence that the defendant abused the privilege by publishing the defamatory

24  communication with actual malice. . . a statement is published with knowledge that it was false or

25  with reckless disregard for its veracity."  *Pope v. Motel 6*, 121 Nev. 307, 317 (2005) (citation

26  omitted).  The statements about the Gigafactory threat are protected by this privilege and can only

27  be found defamatory upon a showing of actual malice.  *Id*.  Tripp's argument that a threatened

28  mass shooting is not a matter of public concern is clearly misplaced.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ◆ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   The Ninth Circuit has held that "[p]ublic allegations that someone has been involved in

2   crime"—as here—are generally matters of public concern. *Obsidian Fin. Grp., LLC v. Cox*, 740

3   F.3d 1284, 1292 (9th Cir. 2014) (tax fraud matter of public concern in defamation action);

4   *Accuardi v. Fredericks*, 2014 WL 848263, at *1 (D. Or. Mar. 4, 2014) (involvement in illegal

5   telemarketing schemes matter of public concern in false light case).

6   Tripp does not claim otherwise. Instead, the handful of cases Tripp cites are employment

7   cases examining public employees' First Amendment speech claims, not defamation cases. *See,*

8   *e.g., Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (civil rights case by district attorney

9   terminated for exercising free speech); *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131

10  F.3d 564, 578 (6th Cir. 1997) (EMT sued county fire and ambulance boards for First Amendment

11  violations in retaliation for criticisms publicly raised by EMT); *Johnson v. Multnomah County,*

12  *Or.*, 48 F.3d 420, 425 (9th Cir. 1995) (Section 1983 action by discharged county employee for

13  statements made publicly about her supervisor); *Havekost v. U.S. Dept. of Navy*, 925 F.2d 316,

14  318 (9th Cir. 1991 ) (civil rights action by naval station employee for termination stemming from

15  a circulated questionnaire).[8]

16  Nor do Musk's motives or purported animosity for Tripp impact a finding of public

17  concern. (Opp. at 19.) The cases cited by Tripp make clear that Musk's "motive should not be

18  used as a litmus test for public concern," *Havekost*, 925 F.2d at 318 (9th Cir. 1991), and that only

19  in "a close case, when the subject matter of a statement is *only marginally related to issues of*

20  *public concern*," is the fact that a statement was made "because of a grudge or other private

21  interest," of any moment to the analysis of public concern. *Johnson, Or.*, 48 F.3d at 425 (emphasis

22

23  ───────────────

24  [8]  Even applying the test put forth in *Connick* that "a matter of public concern must be determined
    by the content, form, and context of a given statement, as revealed by the whole record," the
25  statements at issue here regard a matter of public concern. 461 U.S. at 147-48. The content about
    a possible shooting threat is a matter of public concern. *See Obsidian*, 740 F.3d at 1292 (public
26  allegations of a crime are matters of public concern); *see also Havekost*, 925 F.2d at 318 ("content
    is the greatest single factor in the Connick inquiry"). The form of Musk's and Tesla's statements
27  dictates the same result. The courts in both *Johnson* and *Havekost*, cited by Tripp, confirm that
    statements published broadly (as here, to reporters) rather than to a few targeted individuals
28  support a finding of a matter of public concern. *See Johnson*, 48 F.3d at 425; *Havekost*, 925 F.2d
    at 318. And the context in which the statements were made, discussed *supra* Section II.A confirms
    the statements describing a call of a threat to the Gigafactory regard a matter of public concern.

1   added).  This is not a close case; Musk's and Tesla's statements are squarely within parameters

2   adopted by the Ninth Circuit for matters of public concern.  *See Obsidian*, 740 F.3d at 1292.

3        Finally, Tripp argues that to the extent the statements ever regarded a matter of public

4   concern, that ceased the moment the Sheriff's Office determined the "threat was not viable at that

5   time." (Opp. at 20.)  However, whether a statement regards a matter of public concern does not

6   depend on whether the statement is ultimately true or false.  *See Melaleuca, Inc. v. Clark*, 66 Cal.

7   App. 4th 1344, 1363 (1998).  Thus it is of no moment that the Sheriffs determined that Tripp did

8   not pose a viable threat later, when they eventually spoke to him.  Moreover, explained further in

9   Section II.D *infra*, the fact that Tesla received a call warning of a threat by Tripp was true, and

10  that never changed.  In the cases cited by Tripp, (Opp. at 20), the speaker perpetuated specific

11  allegations of wrongdoing weeks after the allegations had been debunked—materially different

12  from Tesla's statement accurately reporting it received a warning regarding a potential threat.

13      **C.**    <u>**Tripp Has Not Proven with Clear and Convincing Evidence that the Statements Were Made With Malice.**</u>

14

15       The statements by Musk and Tesla regarding the Gigafactory threat were not knowingly

16  false or made with a reckless disregard for the truth.  The telephone call regarding the threat

17  actually happened; Tesla took it seriously; and Tesla made truthful statements about it.  That is

18  not defamation.  Each of Tripp's arguments to the contrary is misplaced.

19      **1.**    <u>**Use of the Phrase "Shoot the Place Up" in the Statements.**</u>

20       It does not matter whether or not the caller used the exact phrase "shoot the place up."

21  Musk and Tesla believed that the caller did.  ***While the warning call was still live***, Kristin

22  Krerowicz, the call center coordinator, sent a Skype message passing along the caller's warning.

23  (ECF No. 172-12.)  In it, she stated that the caller said that Tripp was "heavily armed and headed

24  for the Giga Factory."  (*Id*.)  This message was forwarded up Tesla's chain of command and was

25  interpreted by those who received it that Tripp intended to shoot people at the Gigafactory.  (EFC

26  171-5, at 172:25-173:17.)  By the time the information was passed to Musk and Tesla's

27  Communications team, the warning was exactly that.  (*Id*.; Lifrak Exs. 74-75.)  Even if the exact

28  words of the caller were altered along the way, that "does not equate with knowledge of falsity

McDONALD ● CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 ● LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 ● FAX 702.873.9966

1  for purposes of *New York Times Co. v. Sullivan* and *Gertz v. Robert Welch. Inc.*[] unless the

2  alteration results in a material change in the meaning conveyed by the statement." *Flowers v.*

3  *Carville*, 310 F. Supp. 2d 1157, 1166–67 (D. Nev. 2004) (citations omitted).  Here, there was no

4  material change in the meaning of the statements.  Indeed, Shamara Bell, the Tesla employee who

5  spoke to the caller, testified that she understood that the caller was warning her that Tripp might

6  shoot employees at the Gigafactory.  (ECF No. 171-4, at 87:22-89:2.)

7  <u>**2.     Corroboration of the Statements.**</u>

8         Nor does Tripp's claim that Tesla did not corroborate the call demonstrate malice.  (Opp.

9  at 24.)  The "failure to investigate alone…is not grounds for a finding of actual malice." *Pegasus*,

10  118 Nev. at 723; *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)

11  ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have

12  done so, is not sufficient to establish reckless disregard."); *Ferguson*, 221 P.3d at 216 (inadequate

13  investigation in hindsight does not prove malice).  In any event, contrary to Tripp's assertions,

14  Tesla did investigate, and the caller's statements were corroborated.  The caller stated numerous

15  facts that confirmed he knew Tripp personally:  (1) he knew that Tripp had worked at Tesla; (2)

16  he knew that Tripp had been recently fired; (3) he knew that Tripp had just been identified in the

17  press that same day; and (4) he knew that Tripp had weapons.  (ECF No. 172-11.)  And indeed,

18  the caller confirmed he was referring to Tripp when directly asked.  (*Id.*)  Although the caller did

19  not provide his name, he identified himself as a very close friend of Tripp's and sounded

20  "genuinely concerned [and] afraid."  (*Id.*)  Tripp nonetheless implies that Tesla's response was

21  unwarranted because "[n]ot all people who lose their jobs are potential mass murders." (Opp. at

22  24.)  However, not all people who are fired have a history of issues in the workplace, steal and

23  leak confidential information from their employer, and send a threatening email to the CEO earlier

24  in the same day—nor have a caller clearly familiar with that person express concerns that they

25  might shoot people.  (ECF Nos. 171-18 - 171-26, 173-19.)  Tesla was fully justified in taking this

26  warning seriously, and just because Tripp did not—in fact—come to Tesla and try to shoot people

27  does not render the call a hoax.  (Opp. at 23.)

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

### 3.   Tesla's Alleged Motivation for the Statements.

Musk did not have an "obvious motive to defame" Tripp.  (Opp. at 25.)  In arguing otherwise, Tripp is misunderstanding the definition of malice.  Actual malice for the purpose of a defamation suit has nothing to do with whether Musk harbored animus toward Tripp; the relevant question is whether the speaker made the statements "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not."  *New York Times*, 376 U.S. at 280; *Wynn*, 117 Nev. at 16–17; *see also Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 709 (2007) (courts will not infer actual malice solely from evidence of a defendant's ill will, personal spite, or bad motive).  The record is bare of evidence indicating that Musk or Tesla believed their statements were false, and in fact, as explained *infra*, their statements were true.

In making this irrelevant argument, Tripp also does not provide a full description of the facts.  Musk responded to an inquiry from a reporter who asked him why ***he wrote a threatening email to Tripp that morning***, based upon an email Tripp sent her claiming that Musk instigated the exchange.  (ECF No. 173-19.)  Musk responded to the inquiry with facts—(1) that he did not instigate the email with Tripp, rather Tripp began by threatening him, and (2) that Tesla also received warning of a threat that Tripp "was going to come back and shoot people."  (*Id.*)  In context, it is reasonable that Musk wanted the reporter to have the full and correct story prior to printing Tripp's false accusations that Musk threatened him.  *See Dubai World*, 2011 WL 579213, at *15 (statements germane to controversy where reporter sought a "response to [plaintiff's] assertions on the subject"); (ECF No. 177-1 60:12-61:4.)

Tripp's additional descriptions of Musk's purported "acrimony towards Tripp" remain legally irrelevant and are manufactured, out of context, and fail to demonstrate Musk's statement was made with malice.  By way of example, Tripp repeatedly states that Musk wanted Tripp to face "legal penalties" for his actions, implying he wanted to punish Tripp.  (Opp. at ¶¶ 8, 72, 74.)  But Musk's testimony is actually much more benign.  When he was asked in deposition what he wanted "to happen to the leaker," he merely responded as any plaintiff would, that Tripp "would have to pay the appropriate legal penalty for violating [his] confidentiality agreement."  (ECF No. 177-1, at 19:10-14; 40:8-13 (when asked again what penalties he wanted, Musk responded

1    "whatever is appropriate under the law").)[9]  At the end of the day, that Musk does not hold Tripp

2    in high regard is not evidence of falsity or reckless disregard of the truth.

3                    **4.**    **Tesla's Purported Knowledge of Tripp's Location.**

4           Tripp next asserts that Tesla knew the threat was not legitimate because it knew Tripp's

5    whereabouts on June 20th.  (Opp. at 25.)  This purported fact is immaterial to the question of

6    malice.  That a single former employee of Tesla claims to have known Tripp's location in Reno—

7    a short drive to the Gigafactory—does not mean that Tesla knew whether Tripp was armed, angry,

8    and intending to commit an act of violence at the factory nor make the warning thereof any less

9    serious.  And it does not negate the fact that Tesla received a call warning about Tripp.  Tripp

10   points to no evidence indicating that the Tesla employees who received the warning call, passed

11   the warning along, or reported on the call to the press had reason to believe the warning was

12   anything but serious.  That is the only question relevant to this malice inquiry.

13          The cases Tripp relies on stand only for the premise that knowledge of falsity or reckless

14   disregard can be imputed from an employee to an employer.  For example, in *Dickinson v. Merrill*

15   *Lynch, Pierce, Fenner & Smith, Inc.*, an in-house lawyer knew allegations regarding an

16   employee's actions were false, which was imputed to the company.  431 F. Supp. 2d 247, 254 (D.

17   Conn. 2006).  But that is not close to the situation here.  Even the Tesla employee who claims to

18   have known where Tripp was for part of the day took the threat seriously.  (Lifrak Decl. Ex. 77 at

19   75:18-76:15; 77:4-78:19; 98:9-15.)  Indeed, Gouthro's own testimony contradicts that he knew

20   where Tripp was or where the threat was directed: "During the same course of time I also asked

21   the question, we're receiving the information from Las Vegas.  It was never clearly articulated

22   what location he was on his way to.  It could have been Fremont, it could have been Sparks . . .

23   But it was presumed because of the fact that he was on administrative leave at that time that the

24   intent was for him to show at the gigafactory. That's the reason why we made a decision to have

25   the armed presence there at that site that day." (*Id.* at 77:4-78:19)  Further, the two facts—Tripp's

26

27   _____

28   [9]   Tripp also makes much of the fact that Musk testified that he thinks Tripp is a "criminal."  Musk
     did testify to this and was specifically referring to ███████████████████████████████
     ████████████████████.  (ECF No. 177-1, at 102:8-19; 103:21-104:1.)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

location and the potential to attack the Gigafactory—are not mutually exclusive.

### D.   The Sheriff's Determination.

Finally, Tripp argues that he has proven malice because Tesla continued to disseminate the fact of the phone call after Sheriff's deputies determined that Tripp was not an immediate threat.  (Opp. at 26.)  However, that misses the point.  As described below, the call warning of a threat against the Gigafactory was true—it happened; Tripp does not deny it; and Tesla was reporting that fact.  (Lifrak Decl. Ex. 74 at 42:11-20; 61:18-62:1; Ex. 75 at 66:8-19.)  The fact that the Sheriffs did not find that Tripp was an active threat at that moment does not change the fact that the call, as reported, actually happened, nor does it mean that the caller was wrong about Tripp's intentions.  In order to prove malice, Tripp must show that Tesla engaged in a "purposeful avoidance of the truth or the product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges." *Rosenaur v. Scherer*, 88 Cal. App. 4th 260, 277 (2001); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (malice only "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] ... [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.").

Here, it is undisputed that the statements about the phone call were true.  That the Sheriff did not find that Tripp was an active threat when they interviewed him does not change anything, nor does it show that anything Tesla said was false.[10]

### E.   Even if Tripp Does Not Have to Prove Actual Malice, His Claim Still Fails Because He Has Not Shown that the Statements were False.

Tripp repeatedly describes the statements regarding the threat to the Gigafactory as false and a hoax.  (*See, e.g.*, Opp. at 18, 23.)  However, it is undisputed that Tesla did, in fact, receive a call warning about Tripp.  (Opp. at 3, and ¶¶ 27-28.)  The statements by Musk and Tesla say no more than that, which was true. (*See* ECF Nos. 173-19 ("we received a call at the Gigafactory

---

[10]   For example, although Tripp was not armed at the time he was approached by police, Tesla determined in the course of its investigation that Tripp owned firearms. (Lifrak Decl. Ex. 72 at 77:19-78:23.)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ※ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    …"); 172-15 ("we received a phone call from a friend of Mr. Tripp …").)

2          Rather, what Tripp takes issue with is the description of the caller's warning; that the Tesla

3    employee, Shamara Bell, who received the call stated that the caller was concerned about the

4    safety of the employees at the Gigafactory because Tripp "may do something violent & volatile"

5    because he was "very hostile [and] very well armed"—as Tripp admits (Opp. ¶ 28), not that he

6    would "shoot people" or "shoot the place up" as Musk and Tesla Communications Team reported.

7    (Opp. at 23.)   However such hair splitting does not render Musk's and Tesla's statements

8    actionably false.  *See Wellman*, 108 Nev. at 88 (factual assertions are not actionable unless they

9    have no basis in truth).   Moreover, an allegedly defamatory statement "is not considered false

10   unless it 'would have a different effect on the mind of the reader from that which the pleaded truth

11   would have produced.'"  *Masson*, 501 U.S. at 517. Tripp does not and cannot demonstrate how

12   slight differences in the description of the caller's warning would produce a different effect on the

13   mind of any reader.  (ECF No. 171-4, at 87:22-89:2.)[11]

14   **III.    TRIPP HAS NOT MET HIS BURDEN AS TO THE JULY 5, 2018 TWEET.**

15        **A.    The Tweet Does Not Make An Actionable Statement of Fact.**

16         Tripp does not dispute that to survive summary judgment as to the July 5 tweet, he must

17   show by clear and convincing evidence that Musk made the tweet with malice.   However, the

18   Court need not reach the question of falsity/reckless disregard for the truth because the tweet was

19   not a statement of fact and is therefore not defamatory in the first instance.  *See Pegasus*, 118 Nev.

20   at 714 ("Defamation is a publication of a false statement of fact.").   Questions are typically not

21   fact statements.  *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015)

22   (generally "questions are questions" not "factual representations").

23         Musk's July 5 tweet asked: (1) whether Lopez paid or promised to pay Tripp and (2)

24

25   _____

26   [11]  *Maheu*, 569 F.2d at 466, does not stand for the premise that whether a statement is substantially
     true is a matter for the jury.  (Opp. at 24.)  Rather, as with any issue at summary judgment, it is a

27   matter for the jury only where the underlying facts are sufficiently disputed.  *Id. See also Dinkins
     v. Schinzel*, 362 F. Supp. 3d 916, 929 (D. Nev. 2019) (where there exists a question of fact over

28   truth of statements, question is best left to jury).  Here, the facts regarding the call warning of a
     threat to the Gigafactory are not in dispute.

whether Tripp provided Lopez with information in exchange for compensation. (ECF No. 173-20.) Contrary to Tripp's assertion, Tesla does not argue that a question can never be defamatory. (Opp. at 29.) Tesla's Motion expressly recognizes that a factual assertion embedded in a question or a question that assumed the predicate can be defamatory and provides examples thereof. (*See* Mot. at 30.) However, those are not the type of questions posed by Musk's tweet.

Nor does Tripp rebut the authority cited by Tesla that the type of open-ended questions contained in the July 5 tweet cannot be the basis for a defamation claim. Indeed, he admits that to be defamatory, a question "must reasonably be read as an *assertion* of a false *fact*; inquiry itself, however embarrassing or unpleasant to its subject, is not an accusation." (Opp. at 29, citing *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995).) Instead, Tripp claims that "Musk intended to convey a factual message," misleadingly citing to Musk's deposition testimony. (Opp. at 29; ECF No. 177-1 at 81:4-82:9.) However, his full testimony demonstrates otherwise. When Musk was asked "why were you suggesting that there had been compensation in this tweet on July 5th of 2018?," Musk made clear that he was merely asking a question for which he wanted a sincere answer: "I was asking her if this was true. Since it -- just -- Nick Gicinto had said that a friend of his -- a friend of Tripp's had been offered money for insider information by Linette Lopez, then perhaps Tripp had as well. And this is a very simple thing to just say 'No. No, he didn't.'" (Lifrak Decl. Ex. 76 at 83:8-22.)

**B.    There is No Proof of Actual Malice in Any Event.**

Should the Court determine the tweet was a statement of fact, which it should not, Tripp has not shown it was made with actual malice. Prior to posting the tweet, Musk had learned that there was evidence that Tripp had received payment. (ECF No 171-2, at 97:8-99:6; 173-8, at 4:21-7:15; 16:8-18:1; 171-7.) Thus any "facts" contained in Musk's tweet were not "fabricated" or "the product of his imagination." *See St. Amant*, 390 U.S. at 732.

**CONCLUSION**

Tesla respectfully submits that the Court should grant Tesla's motion because there are no material facts genuinely in dispute and Tesla is entitled to judgment as a matter of law.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    Respectfully submitted this 9th day of June, 2020.

2                          QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ *Alex Spiro*
    Alex Spiro
    51 Madison Avenue, 22nd Floor
    New York, New York 10010

    Rory T. Kay (NSBN 12416)
    MCDONALD CARANO LLP
    2300 West Sahara Avenue, Suite 1200
    Las Vegas, NV 89102

    *Attorneys for Plaintiff/Counter-Defendant TESLA, INC.*

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966