EXHIBIT 1

Robert D. Mitchell (*admitted pro hac vice*)
William M. Fischbach III (*admitted pro hac vice*)
Ace Van Patten (Nevada Bar No. 11731)

**TB** **TIFFANY & BOSCO**
P.A.

Camelback Esplanade II, Seventh Floor
2525 East Camelback Road
Phoenix, Arizona 85016-4229
Telephone: (602) 255-6000
Fax: (602) 255-0103
E-mails: rdm@tblaw.com; wmf@tblaw.com; avp@tblaw.com
*Counsel for Defendant/Counterclaimant Martin Tripp*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN TRIPP, an individual,<br><br>Defendant. | Case No. 3:18-cv-00296-LRH-CBC<br><br>**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S PROPOSED SURREPLY TO TESLA, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT [ECF NO. 193]** |
| MARTIN TRIPP, an individual,<br><br>Counterclaimant,<br><br>TESLA, INC., a Delaware corporation,<br><br>Counterdefendant. | |

"Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (*quoting Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990)) (brackets in original). Accordingly, Tripp responds to Tesla's "additional exhibits" as follows:

1

1    •    Citing to a June 15, 2018 e-mail from Tripp to Lopez, Lifrak Dec. Ex. 71 [ECF

2    No. 194-2], Tesla argues that Tripp's claim that he wanted to remain anonymous is

3    "disingenuous" because he told Lopez in this e-mail that she could "freely use [his] name as

4    source after the 29th [of June 2018]." *Id.*; Tesla Reply [ECF No. 193] at 4.  Tesla overlooks

5    the timing of this email.  By June 14, 2018, Tesla had identified Tripp as the "leaker" and

6    commenced its two-day interrogation of Tripp.  Lifrak Dec. Ex. 6 [ECF No. 158-6].  By the

7    time Tripp sent the June 15, 2018 email to Lopez, his anonymity had been compromised, not

8    through his own conduct, but through Tesla's investigation.  Tesla's "additional exhibits" are

9    devoid of evidence that Lopez identified Tripp as her source *before* Tesla filed suit on June

10   20, 2018. [ECF No. 1].  The fact remains that Tesla first put Tripp into the public view with

11   its high-profile lawsuit, and only then did Tripp communicate with the press without the cloak

12   of anonymity.  *See* Tesla Reply [ECF No. 193] at 10-11.  By that time, whatever interactions

13   Tripp had with the press regarding Tesla's lawsuit did not make him a limited purpose public

14   figure.  *Hutchinson v. Proxmire*, 443 U.S. 111, 134 (1979) (holding that the plaintiff, a

15   research director and professor who had received federal funding for his studies, did not

16   become a limited purpose public figure by responding to press inquiries after a U.S. Senator

17   had bestowed a "Golden Fleece of the Month Award" on the plaintiff as an example of

18   wasteful government spending).

19   •    Citing to the deposition of Nicholas Gicinto, Tesla Senior Manager of Global

20   Security, Tesla argues that "although Tripp was not armed at the time he was approached by

21   police, Tesla determined in the course of its investigation that Tripp owned firearms."  Tesla

22   Reply [ECF No. 193] at 18 n.10; Lifrak Dec. Ex. 72 [ECF No. 194-2].  Tesla is overselling

23   this portion of Gicinto's deposition.  Gicinto testified that Tesla had determined that at some

24   point Tripp had attempted to sell a firearm to a coworker for $50, a price so low that it

25   appeared Tripp was "just trying to offload it."  Deposition of Nicholas Gicinto, attached as

26   **Exhibit J**, at 86:16-22.  This information was of so little consequence to Tesla that its

27   investigators never asked Tripp about his access to firearms during his June 14, 2018

28   interrogation.  *Id.* at 86:23-87:1.  Gicinto also disavowed that this had any corroborative value

1   for the anonymous call.  When asked whether "the mere fact of owning a firearm is an

2   indicator that [someone] might be a violent person?", Gicinto responded, "I've never said that

3   and that's not what I am saying."  *Id.* at 88:13-17.  Finally, whether Tripp did or did not once

4   own a firearm was never communicated to Elon Musk before Musk unleashed the false active

5   shooter threat narrative to the press on June 20, 2018.  *See* Tesla's Amended Responses to

6   Tripp's Second Set of Interrogatories at ROG, Interrogatory # 12, attached as **Exhibit K**.

7   •   Citing to Tripp's June 14, 2018 interrogation, Tesla argues that Tripp was not

8   "'dragged' unwilling into this controversy" because he knew "full well that Tesla would

9   investigate the leak."  Tesla Reply [ECF No. 193] a 4; Lifrak Dec. Ex 73 [ECF No. 194-3].

10   The quoted portions of Tripp's June 14, 2018 interrogation say no such thing and are instead

11   a resigned statement from Tripp that he "[knew] there's consequences" and "expected them

12   to come."  *Id.*[1]  More importantly, Tesla fails to reconcile its argument here with the holding

13   in *Wolston v. Reader's Digest Association, Inc.* that a "private individual is not automatically

14   transformed into a public figure just by becoming involved in or associated with a matter that

15   attracts public attention."  443 U.S. 157, 167-68 (1979).

16   •   Citing to Elon Musk's deposition, Tesla argues that Musk's July 5, 2018 Tweet

17   posed an "open ended question" rather than a statement that Tripp had been compensated by

18   Lopez.  Tesla Reply [ECF No 193] at 20; Lifrak Dec. Ex. 76 [ECF No. 194-7].  The portions

19   of Musk's deposition cited by Tesla are not helpful to its argument.  Musk states in the cited

20   portions of his testimony that Lopez could have easily denied the implicit charge of bribery.

21   *Id.* at 83:21-22.  This merely underscores that Musk intended his Tweet to be an accusation

22   to be accepted as true unless Lopez (or Tripp) affirmatively denied it.  In any event, Tesla

23   cannot deny that when asked at his deposition—point blank—what "message [Musk] wanted

24   to send" with the July 5 Tweet, Musk responded, "[O]ne of the members of Tesla security,

25

26   [1] In this same interview, Tripp professed, "I love working here" but "just wanted to get the

27   facts out."  Lifrak Dec. Ex 73 [ECF No. 194-3] at 154:20-25.  This is in stark contrast to
   Tesla's characterization of Tripp as a vengeful employee determined to harm Tesla.

28

had told me that there was some guy who was a friend of Tripp's who said that Linette Lopez had offered him $50,000 for, you know, basically insider information on Tesla and implied that Tripp had received similar payment." Tripp SOF ¶ 62.  That Musk attempted to unwind this concession later in his deposition changes nothing.

- Citing to the depositions of Dave Arnold and Sarah O'Brien from Tesla's communications team, Tesla argues that "the call warning of a threat against the Gigafactory was true—it happened," and "[t]he fact that the Sheriffs did not find that Tripp was an active threat at that moment does not change the fact that the call, as reported, actually happened, nor does it mean that the caller was wrong about Tripp's intentions." Tesla Reply [ECF No. 193] at 18; Lifrak Dec. Exs. 74, 75 [ECF No. 194-5, 194-6].  The problem with this argument is that *there was no threat*.  Neither Arnold nor O'Brien took or listened to the call, which was unrecorded.  Tripp SOF ¶ 30.  According to Shamara Bell, the call center operator that took the anonymous call, the caller never stated that Tripp "was going to come back and shoot people" or that he "would be coming to the Gigafactory to shoot the place up." *Id.* at ¶ 31. The "threat" was a fiction authored to the press by Tesla.

- Citing to the deposition of its former Gigafactory security manager Sean Gouthro, Tesla argues that Gouthro's "own testimony contradicts that he knew where Tripp was or where the threat was directed." Tesla Reply [ECF No. 193] at 17; Lifrak Dec. Ex. 76 [ECF No. 194-8].  The cited portions of Gouthro's deposition reference the early stages of Tesla's reaction to the active shooter threat—which was ultimately proven a hoax.  In this portion of his deposition, Gouthro was discussing his early concern that the "threat" never even identified any particular Tesla facility, be it the Gigafactory in Sparks, NV, Tesla's main production facility in Freemont, CA, or Tesla's call center in Las Vegas, NV. *Id.*  Again, this is because the anonymous caller *never* said that Tripp was on his way to the Gigafactory or any other Tesla location.  Tripp SOF ¶¶ 28, 31.  Even Gouthro appears to have appreciated that at the time.  In the later portions of his deposition testimony, Gouthro is quite clear that Tesla's private investigators were feeding him precise information on Tripp's whereabouts in Reno on June 20, 2018. *See* Deposition of Sean Gouthro [ECF No. 177-4] at 106:7-108:7.

DATED this __ day of __, 2020.

TIFFANY & BOSCO, P.A.

By /s/*William M. Fischbach III*
    Robert D. Mitchell
    William M. Fischbach III
    Camelback Esplanade II, Seventh Floor
    2525 East Camelback Road
    Phoenix, Arizona 85016-4229
    *Counsel for Defendant/Counterclaimant*

## PROOF OF SERVICE

I am employed in the County of Maricopa, State of Arizona.  I am over the age of 18 and not a party to the within action; my business address is Tiffany & Bosco, P.A. 2525 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

On ___, 2020, I served the following described as:

**DEFENDANT/COUNTERCLAIMANT MARTIN TRIPP'S PROPOSED SURREPLY TO TESLA, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT [ECF NO. 193]**

on the following interested parties in this action:

Rory T. Kay (NSBN 12416)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rkay@mcdonaldcarano.com

Alex Spiro
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com

Michael Lifrak
Jeanine M. Zalduendo
Alex Bergjans
Aubrey Jones
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
michaellifrak@quinnemanuel.com
jeaninezalduendo@quinnemanuel.com
alexbergjans@quinnemanuel.com
aubreyjones@quinnemanuel.com

**[X] (BY E-MAIL)** By transmitting the above documents to the above e-mail addresses.

**[X] (STATE)** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this __ day of __, 2020 at Phoenix, Arizona.

*/s/William M. Fischbach III*

# EXHIBIT J





COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

TESLA, INC.,

     Plaintiff,

vs.                 No.3:18-CV-00296-LRH-CBC

MARTIN TRIPP,

     Defendant.

_____

**CONFIDENTIAL**

**DEPOSITION OF**

**NICHOLAS RYAN GICINTO**

**TAKEN ON**
**TUESDAAY, AUGUST 27, 2019**
**9:58 A.M.**

**HOME2SUITES CONFERENCE CENTER**
**2001 MAIN STREET**
**KANSAS CITY, MISSOURI 64108**

1                          **APPEARANCES**

2

3   **APPEARING FOR THE PLAINTIFF:**

4   Sean P. Gates, Esquire

5   **Charis Lex P.C.**

6   16 North Marengo Avenue, Suite 300

7   Pasadena, California 91101

8   (626) 508-1717

9   sgates@charislex.com

10

11  **APPEARING FOR THE DEFENDANT:**

12  William M. Fischbach, Esquire

13  **Tiffany & Bosco, P.A.**

14  Camelback Esplanade II, Seventh Floor

15  2525 East Camelback Road

16  Phoenix, Arizona 85016

17  (602) 255-6036

18  (602) 255-0103 Fax

19  wmf@tblaw.com

20

21

22

23

24

25

1                 **APPEARANCES CONTINUED**

2

3 **APPEARING FOR THE WITNESS:**

4 Matthew Donald Umhofer, Esquire

5 **Spertus Landes & Umhofer LLP**

6 1990 South Bundy Drive, Suite 705

7 Los Angeles, California 90025

8 (310) 826-4700

9 (310) 826-4711 Fax

10 matthew@spertuslaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  EXAMINATION

 2  BY MR. FISCHBACH:

 3      Q.   Good morning, sir.  Could we have your

 4  full name for the record.

 5      A.   Nicholas Ryan Gicinto.

 6      Q.   And sir, have you been deposed before?

 7      A.   Yes.

 8      Q.   I'm going to tell you a couple things you

 9  probably know but they're good to get on the record

10  early on.

11      A.   Okay.

12      Q.   You strike me as an intelligent and

13  educated guy, so you're probably going to anticipate

14  a lot of my questions and where they're going.

15  Please let me finish the question.  It helps the

16  court reporter get a good, clean record.

17      A.   Okay.

18      Q.   Let's do our best not to talk over each

19  other, because again, it makes it much harder on the

20  court reporter if she has to transcribe two people

21  talking.

22      A.   I understand.

23      Q.   And then please know if you have an

24  affirmative response or a negative response please

25  give me a yes or a no or something along those
```

1 **near future?**

2      A.   I think if someone had the -- somebody,

3 you know, who is working as a production associate

4 at that stage, who had bounced around to a few

5 different jobs, and, you know, who is selling off,

6 particularly selling off things because they needed

7 the money to move is the way they had sort of -- I

8 mean, it just -- it was a very strange sort of

9 confluence of indicators, right?  You know, selling

10 things for a matter of $50 or selling things that

11 were very important to them because they were

12 leaving, moving overseas, yet they had a retirement

13 plan.  Just it was -- I would say at the most or

14 maybe at the very least it was something that just

15 didn't seem to fit together.

16      Q.   **What was he trying to sell for $50?**

17      A.   The firearm.

18      Q.   **Did you think that was a low price, high**

19 **price?**

20      A.   It seemed to be a low price like just

21 trying to offload it to somebody and make it an

22 attractive price.

23      Q.   **When you interviewed Mr. Tripp on June**

24 **14th and 15th, did you inquire about his access to**

25 **weapons?**

1    A.    No.

2    Q.    Did you have any concerns -- well, did

3  anything in that interview give you any concern that

4  Mr. Tripp might do something violent?

5    A.    So we understood a few indicators of his

6  background.  We had the -- we had the information

7  about, you know, selling the firearm or attempting

8  to sell a fireman, attempting to sell some related

9  material online, and, you know, we understood from -

10 - from interviews and from his work history and file

11 that he had been somewhat volatile, getting very

12 upset particularly when he disagreed with

13 colleagues, you know, he walked in with a backpack,

14 we didn't ask to look at the backpack or see

15 anything inside.  We allowed him to sit close to the

16 door which put our backs to the wall with only one

17 exit.  These are things you think about from a basic

18 security standpoint.  It wasn't anything

19 specifically with him about how we placed the room

20 but we try to make the interviewee feel as

21 comfortable as possible.  So I think you tend to

22 have that always in the back of your mind about

23 whether or not when it gets to the point in the

24 interview where the interviewee feels as though, you

25 know, they -- they may be in the wrong and it's

```
 1  obvious and apparent they're in the wrong based on

 2  where the questions are going, they may react, you

 3  know, in a certain way.  So it had come to our

 4  attention in the past he had become quite upset.  So

 5  I think you just think about those factors.

 6          Q.  Do you own a firearm?

 7              MR. UMHOFER:  Objection.  I instruct the

 8  witness not to answer.  He's got a right to privacy.

 9              MR. FISCHBACH:  Do you have a position on

10  that, Sean?

11              MR. GATES:  No, it's up to him.

12  BY MR. FISCHBACH:

13          Q.  Is it your testimony that the mere fact of

14  owning a firearm is an indicator that you might be a

15  violent person?

16          A.  I've never said that and that's not what I

17  am saying.

18          Q.  I just wanted to make sure because --

19          A.  What I'm discussing is the access to,

20  right, so we had, at least had an indication of

21  access to.  If we had no -- nothing to -- nothing to

22  suggest that there was access to, it doesn't mean

23  that he didn't, but it's at least on our mind,

24  right? We know it because it had come up in the

25  interviews so you can't just block that out.
```

1  charges 395 now.

2         Q.   And I'm sure you're worth it, sir.

3             MR. FISCHBACH:  Thank you very much for

4  your time today.  I don't have any further.

5             MR. GATES:  No further questions.

6             THE VIDEOGRAPHER:  Please stand by. We do

7  need to take transcript and video orders on record.

8             MR. FISCHBACH:  Oh, I've got to go first?

9  We'll do electronic with exhibits, please. Full size

10 and mini.

11            MR. GATES:  I need electronic transcripts

12 in text format and the video with sync.

13            MR. FISCHBACH:  Yeah, me too.

14            MR. UMHOFER:  We want an opportunity for

15 him to review the transcript for accuracy.

16            THE VIDEOGRAPHER:  The time is 3:21 p.m.

17 and we are going off the record.

18            (Deposition concluded at 3:21 p.m.)

19

20

21

22

23

24

25

# CERTIFICATE

I, Terri L. Huseth, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 4th day of September, 2019.


_____
Terri L. Huseth

# EXHIBIT K

1   **JACKSON LEWIS P.C.**
    Joshua A. Sliker, Nevada Bar No. 12493
2   *Joshua.Sliker@jacksonlewis.com*
    3800 Howard Hughes Parkway, Suite 600
3   Las Vegas, NV 89169
    Telephone:     (702) 921-2460
4   Facsimile:     (702) 921-2461

5
    **HUESTON HENNIGAN LLP**
6   John C. Hueston *(admitted pro hac vice)*
    *jhueston@hueston.com*
7   Robert N. Klieger *(admitted pro hac vice)*
    *rklieger@hueston.com*
8   Allison L. Libeu *(admitted pro hac vice)*
    *alibeu@hueston.com*
9   523 West 6th Street, Suite 400
    Los Angeles, CA 90014
10  Telephone:     (213) 788-4340
    Facsimile:     (888) 775-0898
11

12  Attorneys for Plaintiff/Counter-Defendant
13  Tesla, Inc.

14              **UNITED STATES DISTRICT COURT**

15                  **DISTRICT OF NEVADA**

16  TESLA, INC., a Delaware corporation,         Case No. 3:18-cv-00296-LRH-CBC

17              Plaintiff,

18        vs.                                     **PLAINTIFF AND COUNTER-DEFENDANT
                                                  TESLA, INC.'S AMENDED RESPONSES
19  MARTIN TRIPP, an individual,                  AND OBJECTIONS TO DEFENDANT AND
                                                  COUNTER-CLAIMANT MARTIN TRIPP'S
20              Defendant.                        SECOND SET OF INTERROGATORIES

21

22  AND RELATED COUNTERCLAIMS

23

24        PROPOUNDING PARTY:        Defendant/Counter-Claimant Martin Tripp

25        RESPONDING PARTY:         Plaintiff/Counter-Defendant Tesla, Inc.

26        SET NO.:                  Two (Nos. 9-25)

27

28

        TESLA, INC.'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES, SET TWO
    5539004

EXHIBIT 12
Musk
2/21/2020
Reported by: Michael P. Hensley
CSR 14114, RDR

CONFIDENTIAL

19 **INTERROGATORY NO. 12**:

20        Identify and explain All information regarding the Alleged Threat known by Elon Musk

21 prior to his sending the e-mail communication referenced in Paragraph 54 of the Counterclaim,

22 including:

23        &bull;     When Mr. Musk first became aware of the Alleged Threat

24        &bull;     All persons with whom Mr. Musk discussed the Alleged Threat on June 20, 2018

25        &bull;     Who provided Mr. Musk with the information of which he was aware

26        &bull;     What actions Mr. Musk took to verify the information

27

28

- 7 -

TESLA, INC.'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES, SET TWO

5539004

**CONFIDENTIAL**

1 **AMENDED RESPONSE TO INTERROGATORY NO. 12**:

2       In addition to its general objections, which are incorporated herein by reference, Tesla

3 objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of

4 the case in that it asks Tesla to "[i]dentify and explain All information regarding the Alleged Threat

5 known by Elon Musk" regarding the threat to the Gigafactory on June 20, 2018. Tesla objects to

6 this Request as argumentative, particularly as to the use of the term "Alleged Threat." Tesla further

7 objects to this Interrogatory to the extent that it calls for information protected by the

8 attorney-client privilege, work product doctrine, and all other applicable privileges, protections, or

9 immunities. Such information will not be provided in response.

10       Subject to and without waiving the foregoing general and specific objections, Tesla

11 responds to this Interrogatory as follows:

12       On June 20, 2018, Shamara Bell, an operator at Tesla's Las Vegas call center, received a

13 phone call from someone who stated that he was a very close friend of Tripp. The caller told

14 Ms. Bell that he feared for the safety of employees at the Gigafactory because Tripp was extremely

15 volatile, very well heavily armed, extremely upset, and very hostile. The caller sounded genuinely

16 concerned and afraid that Tripp would do something violent and volatile. Ms. Bell asked the caller

17 to provide his name and contact information. The caller declined, stating that he wanted to remain

18 anonymous. *See* TES-TRIPP_0000970; TES-TRIPP_0003390. Ms. Bell reported the call to her

19 supervisors (including Angel Besinaiz and Kristin Krerowicz) who notified members of Tesla's

20 security team (including Jeff Jones, Avery Bustamante, and Marshall Sprott). *See, e.g.*, TES-

21 TRIPP_0003386-88. Tesla security immediately alerted the Storey County Sheriff's Office and

22 mobilized additional security personnel to the Gigafactory.

23       Tesla security also reached out to personnel at the Las Vegas call center to obtain more

24 information about the call. Mr. Bustamante spoke with Ms. Bell, who confirmed that the caller

25 identified Tripp as the source of the threat and the Gigafactory as the target. Mr. Bustamante spoke

26 to Ms. Bell a second time, asking Ms. Bell to send an email to Mr. Jones recapping the call that she

27 received. *See* TES-TRIPP-0016596-97. Tesla security also informed Sarah O'Brien, Tesla's

28 former Vice President of Communications, that security received an alert from the Las Vegas call

CONFIDENTIAL

1  center about a threat to the Gigafactory. Thereafter, Ms. O'Brien spoke to Mr. Besinaiz, who

2  confirmed that the call center received the call described above.  On June 21, 2018, Ms. O'Brien

3  spoke to Ms. Bell and **Ashley Ferrigno, Ms. Bell's and Mr. Besinaiz's supervisor**. Ms. Bell

4  confirmed that she answered a call on June 20, 2018 from an anonymous caller who identified

5  himself as a friend of Tripp. Ms. Bell further confirmed that the caller stated that he feared for the

6  safety of employees at the Gigafactory because Tripp was extremely upset, extremely volatile, and

7  heavily armed.

8  Mr. Musk was initially informed of the threat to the Gigafactory on June 20, 2018, likely by

9  Sam Teller, Director, Office of the CEO.  Mr. Musk was informed that Tesla received a call that

10  Tripp was going to come in and shoot people at the Gigafactory.  Mr. Musk was further informed

11  that Tesla security alerted the police and posted additional security personnel at the Gigafactory.

12  Mr. Musk also discussed the Gigafactory threat with Mr. Jones, Ms. O'Brien, and Dave Arnold,

13  Tesla's Senior Director of Global Communications. Mr. Musk relied on Tesla's security and

14  communications teams to obtain information concerning the threat to the Gigafactory.

15  **INTERROGATORY NO. 13**:

16  Identify and explain All information known by Elon Musk regarding the contents of the

17  e-mail communication referenced in Paragraph 47 of the Counterclaim before sending said e-mail

18  communication, including:

19  • When Mr. Musk first became aware of the "sabotage" alleged therein

20  • Who provided Mr. Musk with the information of which he was aware

21  • What actions Mr. Musk took to verify the information

22  **RESPONSE TO INTERROGATORY NO. 13**:

23  In addition to its general objections, which are incorporated herein by reference, Tesla

24  objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of

25  the case in that it asks Tesla to "[i]dentify and explain All information." Tesla objects to this

26  Request as overly broad, vague, and ambiguous to the extent that it fails to specify the portions of

27  the email to which it refers. Tesla further objects to this Interrogatory to the extent that it seeks

28  information protected by the attorney-client privilege, work product doctrine, and all other

- 9 -

CONFIDENTIAL

11

12   Dated: May 20, 2019                    **HUESTON HENNIGAN LLP**

13

14                                      By: _____

15                                          Allison L. Libeu
                                            Attorneys for Plaintiff and
16                                          Counter-Defendant Tesla, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -

TESLA, INC.'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES, SET TWO

5539004

1

**PROOF OF SERVICE**

2       I am employed in the County of Orange, State of California. I am over the age of 18 and not
a party to the within action. My business address is 620 Newport Center Drive, Suite 1300, Newport
3    Beach, CA 92660.

4       On May 20, 2019, I served the foregoing document(s) described as:

5       **PLAINTIFF AND COUNTER-DEFENDANT TESLA INC.'S RESPONSES AND
OBJECTIONS TO DEFENDANT AND COUNTER-CLAIMANT MARTIN TRIPP'S
6              SECOND SET OF INTERROGATORIES**

7    ☒      (BY E-MAIL) By transmitting a true copy of the foregoing document(s) by **Email or
Electronic Transmission**:
8

Based on an agreement of the parties to accept service by email or electronic transmission. I
9    caused the document(s) to be sent from email address sjones@hueston.com to the persons at
the email addresses listed on the Service List. I did not receive, within a reasonable time after
10   the transmission, any electronic message or other indication that the transmission was
unsuccessful:
11

12          Robert D. Mitchell
            William M. Fischbach III
13          Christopher J. Waznik
            Matthew D. Dayton
14          TIFFANY & BOSCO, P.A.
            2525 E. Camelback Road
15          7th Floor, Camelback Esplanade II
            Phoenix, AZ 85016-4229
16
            TEL: 602-255-6000
17          FAX: 602-255-0103
            E-MAIL: rdm@tblaw.com
18          E-MAIL: wmf@tblaw.com
            E-MAIL: cjw@tblaw.com
19          E-MAIL: md@tblaw.com

20      I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct, and that I am employed in the office of a member of the bar of this
21   Court at whose direction the service was made.

22      Executed on May 20, 2019, at Newport Beach, California.

23

   _____            */s/ Stephen Richards*
24          Stephen Richards                    _____
          (Type or print name)                       (Signature)

25

26

27

28

TESLA, INC.'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES, SET TWO

5539004