UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TESLA, INC., | Case No. 3:18-cv-00296-MMD-CLB |
| Plaintiff and Counter Defendant, | ORDER |
| v. | |
| MARTIN TRIPP, | |
| Defendant and Counter Claimant. | |

## I.   SUMMARY

Plaintiff and Counter Defendant Tesla, Inc. sued Defendant and Counter Claimant Martin Tripp, a former employee, primarily for violations of federal and state trade secret law, after he shared confidential information about the production of Tesla's Model 3 car with a reporter. (ECF No. 1.) Tripp filed counterclaims for defamation and false light after Tesla's CEO Elon Musk, and others at Tesla, sent out various emails and tweets about Tripp. (ECF No. 25.) Before the Court are two primary, and four ancillary, motions: (1) Tripp's motion for summary judgment on some of the claims and damages theories Tesla asserts against him (ECF No. 154 ("Motion")); (2) Tesla's motion for summary judgment on Tripp's defamation and false light counterclaims (ECF Nos. 155, 162 (sealed) ("Cross-Motion")); (3) Tesla's motions to seal portions of its briefs and exhibits (ECF Nos. 161, 183, 195); and (4) Tripp's motion for leave to file a surreply to Tesla's Cross-Motion (ECF No. 197). As further explained below, the Court will grant in part, and deny in part, Tripp's Motion because it is persuaded Tripp's actions lack the requisite causal link to any diminution in the value of Tesla's stock, but is otherwise unpersuaded by Tripp's arguments in his Motion. The Court will grant Tesla's Cross-Motion because

the Court agrees with Tesla that Tripp must show actual malice, but cannot, and alternatively agrees none of the statements Tripp challenges were false. The Court will grant Tesla's motions to seal because compelling reasons support them, and they are unopposed. Finally, the Court will deny Tripp's motion for leave to file a surreply as unnecessary.

## II.    BACKGROUND

### A.    Claims

Tripp contends he is a whistleblower, blowing the whistle on production inefficiencies and delays in Tesla's race to produce 5,000 Model 3 cars per week. Tesla believes Tripp is a misguided leaker, who came to incorrect conclusions about the efficiency and effectiveness of Tesla's assembly lines at the Gigafactory[1] in the Nevada desert, then shared confidential information Tripp thought supported his conclusions with a reporter, without permission. These differing views color the parties' claims against each other in this case, and the way they approach it. Regardless, Tripp had a brief but dramatic tenure as a Tesla employee.

Tesla brings five claims against Tripp: (1) violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*; (2) violation of the Nevada Uniform Trade Secrets Act, NRS §§ 600A.10, *et seq.*; (3) breach of contract; (4) breach of the fiduciary duty of loyalty; and (5) violation of the Nevada Computer Crimes Law, NRS § 205.4765 ("NCCL"). (ECF No. 1 at 4-10.) Tripp asserts two[2] counterclaims: (1) defamation; and (2) false light. (ECF No. 25 at 9-25.)

///

---

[1]Both parties refer to Tesla's factory outside Reno, Nevada as the Gigafactory, so the Court adopts the same nomenclature for convenience. (ECF Nos. 25 at 11, 155 at 3, 157 at 1.) According to Tesla, it is named the Gigafactory to convey it is very large, incorporating 'Giga,' the unit of measurement representing 'billions.' *See* Tesla, *Tesla Gigafactory*, https://www.tesla.com/gigafactory (last visited Sept. 17, 2020).

[2]Tripp originally also brought a claim for intentional infliction of emotional distress (ECF No. 25 at 25), but later stipulated to dismiss that claim (ECF No. 66 (granting stipulation of dismissal of third counterclaim)).

**B.     Relevant Facts**

The following facts are undisputed unless otherwise noted, and proceed in roughly chronological order.

Tesla hired Tripp as a Lead Process Technician in October 2017. (ECF No. 155 at 3-4.) At and around the time Tesla hired Tripp, Tripp signed several agreements containing confidentiality provisions. (ECF Nos. 174-13 (sealed), 174-14 (sealed), 174-15 (sealed), 174-16 (sealed).) Later in 2017, Musk announced that one of Tesla's goals was to produce 5,000 Model 3 cars per week. (ECF No. 155 at 4; *see also* ECF No. 157 at 2.) This announcement led to media coverage and public interest regarding Tesla's production targets for the Model 3. (ECF No. 157 at 2.) Tripp's work at the Gigafactory contributed to Tesla's ability to achieve that goal, because assembly lines at the Gigafactory make batteries and drivetrains for the Model 3. (*Id.*)

Soon after he started, Tripp grew concerned about the amount of scrap generated by the assembly line he worked on. (ECF No. 177-1 at 5-7.) He got into disputes with coworkers about it, complained to his managers, and even sent Musk two emails about it—and Musk responded on at least one occasion, writing "[g]etting scrap from when cells exit Panasonic to less than 1 percent needs to be a hardcore goal." (ECF Nos. 174-11 (sealed), 174-18 (sealed), 177-1 at 5-7.)

Between the time he was hired, and when Tesla fired Tripp on June 19, 2020, Tripp was disciplined by his managers for fomenting conflict with his coworkers on at least three occasions. (ECF No. 155 at 4-5 (partially redacted).) On May 17, 2018, Tripp's managers transferred him from one assembly line at the Gigafactory to another. (*Id.* at 4-5.) On May 25, 2018, Tripp was formally disciplined regarding a conflict with his coworkers. (ECF No. 174-19 (sealed).)

///

///

///

On May 27, 2018, Tripp sent an email to several reporters saying that he had information about Tesla's Model 3 production he was willing to share.[3] (ECF No. 175-2 (sealed).) Tripp requested to remain anonymous in this email. (*Id.* at 2.) As to the content of the email, Tripp wrote that the amount of scrap generated during production at the Gigafactory was much higher than Tesla had previously disclosed publicly. (*Id.*) Tripp also wrote in the email that Tesla was not as close to hitting its production target of 5,000 Model 3s a week as Musk had stated publicly. (*Id.*) Finally, Tripp stated that Musk had changed manufacturing processes to increase speed, creating safety issues such as smoking batteries. (*Id.*) Linette Lopez of *Business Insider* responded that she was interested, and Tripp began sharing information with her. (ECF No. 155 at 6.) The information Tripp gathered and shared with Lopez forms the basis of Tesla's claims against Tripp. (ECF No. 1.)

On June 4, 2018, Lopez published an article in *Business Insider* titled, "Internal documents reveal Tesla is blowing through an insane amount of raw material and cash to make Model 3s, and production is still a nightmare" (the "Scrap Article"). (ECF No. 159-5.) Lopez used information that Tripp gave her in this article. (ECF No. 154 at 4.) Tesla held its annual shareholder meeting the next day, on June 5, 2018. (ECF No. 157 at 3.)

On June 6, 2018, Lopez published another article in *Business Insider* titled, "Tesla's new Gigafactory robots that are supposed to help it ramp up Model 3 production

---

[3]Tripp collected information to build his case Tesla was generating too much scrap before reaching out to reporters. Specifically, there is no dispute that Tripp took the following actions. (ECF No. 177 at 3 ("As to those material facts Tesla does assert, Tripp does not dispute them *per se.*").) He forwarded an email about Tesla's manufacturing processes and excel sheets purporting to show scrap levels to his personal email account. (ECF Nos. 174-21 (sealed), 174-22 (sealed).) He took pictures inside the Gigafactory on his personal phone. (ECF Nos. 174-23 (sealed), 174-24 (sealed).) He also used Tesla's internal software to run queries and generate charts to support his view that scrap levels were too high, and sent that information to personal email and cloud storage systems so he could share the information with reporters. (ECF No. 155 at 5.)

aren't working yet" (the "Robot Article"). (ECF No. 159-6.) Lopez also used information that Tripp gave her in this article. (ECF No. 154 at 4.)

Musk was unhappy with the publication of these two articles. (ECF No. 157 at 3.) Thus, Musk initiated an investigation into the source of the articles. (*Id.* at 3-4.) Members of Tesla's security team, including Tesla employee Nicholas Gicinto, working with security investigation contractors, worked backwards from the information included in the Scrap Article and the Robot Article to uncover Lopez's source. (ECF No. 174-2 (sealed) at 6-7.) They were able to pinpoint Tripp as the potential source using the audit logs of Tesla's Manufacturing Operating System ("MOS"), Tesla's internal computer system it uses to keep track of its manufacturing processes.  (*Id.* at 8-9.)

Tesla security employees interviewed Tripp on June 14 and 15, 2020. (*Id.* at 9-10.) While at first he denied being the source for the two articles, he later admitted he was the source, and stated he knew he was not permitted to share the information he had shared with Lopez. (*Id.* at 26-28; *see also* ECF No. 174-6.) Over the weekend of June 16-17, 2018, Tesla's security team passed the results of their investigation on to Musk. (ECF No. 157 at 4.)

Having received these results, Musk sent an email to all employees at Tesla at 11:55 p.m. that Sunday night. (ECF No. 160-17.) In the email, without naming Tripp, Musk wrote he was "dismayed to learn this weekend about a Tesla employee who had conducted quick extensive and damaging sabotage to our operations." (*Id.* at 2.) Musk went on to write this employee had made direct changes to the MOS, and exported "large amounts of highly sensitive Tesla data to unknown third parties." (*Id.*) After speculating that "there may be more to this situation than meets the eye," Musk noted Tesla's investigation will continue, and stated "there are a long list of organizations that want Tesla to die[,]" including Wall Street short-sellers, oil and gas companies, and "big gas/diesel car company competitors." (*Id.*) Musk wrapped up the email by warning all employees to remain vigilant, encouraging them to report any suspicious activity to him.

(*Id.*) This email is the First Challenged Statement upon which Tripp bases his counterclaims for defamation and false light. (ECF No. 177 at 2.)

On June 19, 2018, Tesla terminated Tripp's employment. (ECF No. 159-9.) Tesla filed this lawsuit the next day. (ECF No. 1.) Then things heated up. The same morning Tesla filed this lawsuit, Musk and Tripp exchanged escalating emails about the articles and this case in which Tripp wrote to Musk that he had "what's coming to you for the lies you have told the public and investors[,]" they both called each other 'horrible human beings,' and Musk warned Tripp that "[t]hreatening me only makes it worse for you[.]" (ECF No. 172-10.) Tripp forwarded some portion of this email thread to a reporter at the *Guardian.* (*Id.*)

At 1:40 p.m. that same day, Tesla's call center in Las Vegas received a call from someone claiming to be a friend of Tripp's, warning the call center employee that Tripp was "extremely volatile," and was "very well heavily armed." (ECF No. 172-11.) The call center employee passed this information along to Tesla's security team, who quickly passed it on to Musk. (ECF Nos. 159-12, 159-13.) Tesla's security team also reported the threat to the local police, who began investigating it. (ECF No. 160-7.) As Musk had recently received an email from the reporter at the *Guardian* seeking comment on the emails Musk had exchanged that morning with Tripp, Musk responded to the *Guardian* reporter that he "was just told that we received a call at the Gigafactory that [Tripp] was going to come back and shoot people." (ECF No. 160-19.) Musk's email to the *Guardian* reporter included members of Tesla's communications staff on the cc line, and included a forwarded copy of Musk's email thread with Tripp. (*Id.*) Musk's email to the *Guardian* reporter is the Second Challenged Statement forming the basis for Tripp's defamation and false light counterclaims. (ECF No. 177 at 2.)

Tesla's communications staff followed up with the *Guardian* reporter that evening with another email. The email included an 'on background' section that basically refuted Tripp's claims about the production issues with the Model 3, and included an "Attributed to a Tesla spokesperson" quote that read as follows:

> "This afternoon, we received a phone call from a friend of Mr Tripp telling us that Mr Tripp would be coming to the Gigafactory to "shoot the place up." Police have been notified and actions are being taken to enhance security at the Gigafactory."

(ECF No. 159-15 at 2.) This portion of this email is the Third Challenged Statement forming the basis of Tripp's counterclaims against Tesla for defamation and false light. (ECF No. 177 at 2.)

The local police found Tripp at a casino hotel in Reno about an hour after Tesla's communications team sent the email containing the Third Challenged Statement. (ECF No. 160-7 at 6.) Tripp was "visibly shaken" and "crying." (*Id.*) The local police determined Tripp was not a threat, and told Tesla's security team that at 7:19 p.m. (again, on June 20). (*Id.* at 7.) Nonetheless, Tesla's communications team sent the email containing the Third Challenged Statement around to other reporters on June 21 and 22, 2018. (ECF Nos. 160-1, 160-2, 160-3, 176-4 (sealed), 160-5.) "The 'shoot the place up' statement in Tesla's press releases was published by media outlets on June 21 and 22, 2018, including Ars Technica, the Guardian, CNBC, Newsweek, Fortune, and the Washington Post." (ECF No. 177 at 10 (citing ECF Nos. 25-3, 25-4, 25-5, 25-6, 25-7).)

Meanwhile, another former Tesla employee and friend of Tripp named James Uelmen emailed Musk on June 20 and 21, 2018. (ECF No. 177 at 10.) Musk wrote back. (*Id.*) Uelmen then voluntarily acted as a mole for Tesla, texting with Tripp in an attempt to find out more about the information he was sharing with Lopez. (*Id.*; *see also* ECF No. 160-8.) Tripp told Uelmen in a text message that Uelmen would get some money if he shared information with Lopez, and apparently told him the same thing in person. (ECF Nos. 158-7, 160-8.) Uelmen relayed this to Gicinto on Tesla's security team (ECF No. 160-8), who, in turn, told Musk. Musk "did not know or believe this information to be false. Nor did I entertain serious doubts as to its truth." (ECF No. 157 at 7.)

Some time later, specifically, July 5, 2018, Musk asked Lopez on Twitter if she paid Tripp. Musk wrote:

"Indeed, very simple question. To be specific @lopezlinette, did you compensate or promise to compensate Martin Tripp for inside information about Tesla? Did he, under that inducement, provide you with exaggerated negative info, which you printed but turned about to be untrue?"

(ECF Nos. 157 at 7, 160-20.) This tweet is the Fourth Challenged Statement forming the basis for Tripp's defamation and false light counterclaims. (ECF No. 177 at 2.)

## III.    LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for

trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

## IV.    DISCUSSION

The Court first addresses Tripp's Motion, then Tesla's Cross-Motion, and then Tesla's motions to seal.

### A.    Tripp's Motion

Tripp seeks summary judgment on some, but not all, of Tesla's damages theories, and some, but not all, of Tesla's claims. As further explained below, the Court is persuaded by Tripp's argument that his actions could not have caused the declines in Tesla's stock price proffered by Tesla's damages expert Jeffrey H. Kinrich, but is otherwise unpersuaded by the arguments in his Motion. The Court addresses each of Tripp's arguments, in turn, below.

#### 1.    Market Capitalization Damages

Tesla's damages expert Kinrich identifies three categories of damages that Tesla allegedly suffered because of Tripp's actions. (ECF No. 154 at 4.) The most significant of those categories—in terms of the amount of money Tesla seeks—is Tesla's theory that Tripp's disclosure of confidential information to Lopez resulted in $167.37 million in market capitalization damages to Tesla stock. (*Id.*) Tripp argues he is entitled to summary judgment on this damages theory for three, alternative reasons: (1) it does not reflect an actual loss; (2) even Kinrich concedes that he cannot establish causation; and (3) Kinrich did not conduct an 'event study,' the only analysis purportedly robust enough to show that Tripp's alleged breaches caused Tesla's stock price to decline. (*Id.* at 12-

18.) The Court finds Tripp's arguments persuasive, particularly his second argument on lack of causation.

Tesla's primary response to Tripp's arguments is they remain premature—as Judge Hicks found in a prior order denying Tripp's *Daubert* motion seeking exclusion of Kinrich's testimony (ECF No. 118)—and would require the Court to engage in a *Daubert* analysis. (ECF No. 178 at 22.) Tripp replies this mischaracterizes his argument. (ECF No. 192 at 6.) Tripp says he does not challenge the admissibility of Kinrich's testimony, but instead clarifies that he is arguing as a matter of law Tesla cannot establish actual loss or causation based on Kinrich's report. (*Id.* at 6-12.) The Court finds this a subtle, but persuasive, clarification.

Tripp does not, as would be typical in a *Daubert* motion, challenge Kinrich's qualifications, and only challenges Kinrich's methodology to the extent Tripp argues Kinrich should have conducted an event study. (*Id.*) The Court understands Tripp's argument as operating at a higher conceptual level than a *Daubert* challenge, in gist arguing that no matter how qualified Kinrich is,[4] or how spot-on his methodology, Tripp's actions cannot have caused Tesla approximately $167 million in damages. So construed, the Court agrees.

The causal chain a rational jury would have to accept to agree Tripp should be on the hook for Tesla's purported market capitalization damages is too long, and too attenuated. Tripp's purported wrongdoing is gathering information and using it in a way he was not authorized to—sharing it with a reporter. (ECF No. 1.) The reporter then wrote two articles based on that information. Tesla's market capitalization damages theory looks at the price of Tesla's stock between the moment the two articles hit the internet and the end of the corresponding trading day. (ECF No. 154-4 at 8-10, 33-36.) Kinrich summarized his calculations in the following table:

///

---

[4]Kinrich appears to be well qualified based on his CV. (ECF No. 154-4 at 11-24.)

**Tesla Market Capitalization Effect, as of June 4 and June 6 Articles**

| | June 4, 2018 3:42 PM ET | June 6, 2018 3:21 PM ET | |
|---|---|---|---|
| Price Before Event | $296.94 | $320.28 | [A] |
| Closing Price | $296.74 | $319.50 | [B] |
| Price Difference | -$0.20 | -$0.78 | [C] = [B]-[A] |
| Shares Outstanding (millions) | 170.52 | 170.52 | [D] |
| Market Capitalization Effect ($millions) | -$33.56 | -$133.82 | [E]=[C]*[D] |
| Total Market Capitalization Effect ($millions) | | -$167.37 | [F] |

(ECF No. 154-4 at 36.) Kinrich thus holds Tripp responsible for temporary 20 cent and 78 cent reductions in Tesla's share price, and multiplies those losses by all of Tesla's outstanding 170.52 million shares to arrive at approximately $167 million.

While Kinrich attempted to rule out other causes for these reductions in his analysis, he freely admitted in his deposition that he could not conclude the publication of the articles caused the losses he calculated. (ECF No. 154-6 at 9-12, 17.) Moreover, that concession does not account for the possibility that some information in the articles that did not come from Tripp caused the drop in Tesla's stock price. Said otherwise, Kinrich's calculations do not even attempt to make the first link between Tripp and the articles—they instead use the articles as the point of reference. Even though damages are typically a fact issue, there are so many tenuous links in the causal chain between Tripp's actions and any drop in Tesla's stock price that no rational jury could find Tripp caused it. *Compare World Mkt. Ctr. Venture, LLC v. Strickland*, Case No. 2:08-CV-00968-RLLH-R, 2011 WL 573757, at *6 (D. Nev. Feb. 14, 2011) (stating a particular damages theory was "beyond possibility" but denying a summary judgment motion on damages because damages calculations present factual questions) *with Estate of Claypole v. Cty. of Monterey*, Case No. 14-CV-02730-BLF, 2016 WL 693282, at *12 (N.D. Cal. Feb. 22, 2016) (finding that an admission from the plaintiffs' expert he could not draw a conclusion as to causation meant that the plaintiffs "failed to demonstrate the existence of disputed facts that would preclude summary judgment").

In addition, the Court finds persuasive Tripp's broader, alternative argument that Tesla did not suffer any losses at all—because its stock price quickly recovered from

these two drops that even Kinrich identified as not statistically significant, and were eliminated by the next trading day. (ECF No. 154 at 12-14.) Tesla does not dispute that the price of Tesla's stock fluctuates, and recovered quickly after the drops Kinrich relies on. (*Compare* ECF No. 154 at 4-9 (listing as undisputed facts showing that Tesla's stock price fluctuates, and quickly recovered the losses identified by Kinrich) *with* ECF No. 178 at 10-11, 22-23 (emphasizing the losses, but ignoring the subsequent gains).) Indeed, it would be irrational to conclude that Tripp harmed Tesla through its purported market capitalization damages when Tesla's stock price declined for less than a day. And Kinrich's market capitalization damages theory seems even less rational in view of the fact that Tesla's share price is now much higher than it was at the time, especially considering Tesla has not even argued it lost revenue, profits, sales, or customers as a result of Tripp's purported misconduct.[5] (ECF No. 154 at 13-14.)

Further, the Court finds Tesla's other responsive argument unpersuasive. Tesla merely points to certain testimony it says Kinrich will offer at trial as creating a factual dispute rendering this issue inappropriate for summary disposition. (ECF No. 178 at 22-23.) However, each of those pieces of testimony were included in Kinrich's report (ECF No. 154-4), and covered in his deposition (ECF No. 154-6), so would not actually be additional testimony. More importantly, none of it matters in light of Kinrich's admission in his deposition that he cannot say the articles caused the drops in Tesla's stock price. (*Id.* 154-6 at 9-12, 17.) Tripp's actions may have harmed Tesla in certain ways, but they did not cause Tesla to lose $167 million dollars in share value. The Court therefore grants Tripp summary judgment on Tesla's market capitalization damages theory. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607-08 (9th Cir. 2002) (affirming the district court's grant of summary judgment to the defendants where the testimony of the plaintiff's expert witnesses was insufficient to raise a triable issue of fact regarding

---

[5]This analysis also sets aside Tripp's persuasive argument that Tesla's market capitalization damages theory cannot show damages to Tesla itself, even if it could be used to show damages to Tesla's shareholders. (ECF Nos. 154 at 12-13.)

1    causation); *see also Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 836-40 (9th
2    Cir. 2011) (affirming the district court's grant of summary judgment on lack of causation
3    where the district court found an expert's testimony could not establish causation).

4                    **2.      Nevada Computer Crimes Law**

5           Tripp also seeks summary judgment on Tesla's NCCL claim, arguing he cannot
6    have violated it as a matter of law because he had authority to access the information
7    forming the basis for that claim. (ECF No. 154 at 11-12.) Tesla responds that the NCCL
8    also prohibits unauthorized use of data—so Tripp is not entitled to summary judgment on
9    this claim—especially considering Tripp admitted he was not authorized to use the data
10   in the way he did. (ECF No. 178 at 13-16.) The Court agrees with Tesla.

11          Tripp's argument relies heavily on *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d
12   948, 962 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 52 (2018), *and rev'd in part on other*
13   *grounds*, 139 S. Ct. 873 (2019) ("*Oracle III*"). (ECF Nos. 154 at 11.) Specifically, Tripp
14   contends that the key question under *Oracle III* and consistent caselaw is whether Tripp
15   had access to the information he shared with Lopez. (ECF No. 154 at 11-12.) Because
16   he did, Tripp argues, he cannot have violated the NCCL. (*Id.*) However, the Court
17   disagrees with Tripp's reading of the pertinent portion of *Oracle III*.

18          To start, the *Oracle III* court found that a different type of behavior than Tripp's
19   actions here—"taking data using a method prohibited by the applicable terms of use,
20   when the taking itself generally is permitted"—did not violate the NCCL. 879 F.3d at 962.
21   That is not what Tripp admittedly did. Tripp was not permitted to take the data he took to
22   use it in the way that he did. (ECF No. 185-6 (sealed) at 8, 10, 12, 14, 20, 21 (admitting
23   he knew he was not authorized to share the information he took and shared with Lopez
24   or anyone else outside of Tesla, and confirming he knew that at the time.)) Thus, *Oracle*
25   *III* does not sanction Tripp's conduct. *See Oracle III*, 879 F.3d at 962 ("But the key to the
26   state statutes is whether [the defendant] was authorized in the first instance to take *and*
27   *use* the information that it downloaded.") (emphasis added). Moreover, the *Oracle III*
28   court favorably cited both *U.S. v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) and

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016), *cert. denied*, 138 S.Ct. 313 (2017),[6] but the parentheticals the *Oracle III* court uses to describe the key holdings of both of those cases make clear that an unauthorized use could also violate the NCCL. *See Oracle III*, 879 F.3d at 962. Thus, *Oracle III* does not foreclose Tesla's argument that Tripp's unauthorized use of the data could violate the NCCL. (ECF No. 178 at 13-14.)

Tesla's argument also better aligns with the text of the statute itself, which prohibits unauthorized use, disclosure, transfer, or copying of data that exists within a computer system. (*Id.* (citing NRS § 205.4765(1)).) Because Tripp admitted during his deposition that he shared information with Lopez he was not authorized to share with her (*see, e.g.*, ECF No. 185-6 at 21), he conceivably violated the plain language of the NCCL. For these reasons, it would be inappropriate to grant Tripp summary judgment on Tesla's NCCL claim.[7] Tripp's Motion is thus denied as to Tesla's NCCL claim.

### 3. Response Costs

Tripp also makes the related argument that Tesla cannot recover its claimed $261,919 in investigative costs as "response costs" under the NCCL because Tripp had authority to access the data at issue. (ECF No. 154 at 18-19.) Nor can, Tripp further argues, Tesla recover these investigative costs under any other theory because they are not damages—they are attorneys' fees. (*Id.*) Tesla responds the NCCL expressly permits it to recover its investigative costs as "response costs," and that the other caselaw upon which Tripp relies does not preclude Tesla from recovering its investigative costs under these circumstances. (ECF No. 178 at 16-22.) The Court again agrees with Tesla.

---

[6] Tripp also relies on *Power Ventures*. (ECF No. 154 at 12.)

[7] Tripp attempts to distinguish *Christensen* because it addressed a California law, not the NCCL, but the *Oracle III* court both treated the two statutes as equivalent and cited favorably to *Christensen* with the quote "'A plain reading of the [California law] demonstrates that its focus is on unauthorized taking or use of information.'" (ECF No. 192 at 3-4.) *See also Oracle III*, 879 F.3d at 962. Thus, *Christensen* supports Tesla's position on its NCCL claim as pertinent to Tripp's Motion.

First, Tripp's argument that Tesla cannot recover response costs whose recovery is permitted by the NCCL—because he did not violate the NCCL—is untenable in light of the Court's holding above that he may have violated the NCCL. Indeed, Tripp effectively concedes as much. (ECF No. 192 at 12.) Moreover, the Court agrees with Tesla (ECF 178 at 16) that the NCCL allows recovery for "for any response costs, loss or injury," NRS § 205.511(1)(a), where response costs are the reasonable costs "that relate to investigating, determining the amount of damage, remedying or preventing future damage, and testing or restoring a computer system." *Oracle USA, Inc. v. Rimini St., Inc.*, 191 F. Supp. 3d 1134, 1145 (D. Nev. 2016) ("*Oracle II*") (citations omitted). The Court therefore rejects Tripp's argument that depends on his other argument he could not have violated the NCCL.

Second, Tripp's argument that Tesla's investigative costs are not recoverable because they are actually attorneys' fees is unpersuasive because Tripp supports that argument with caselaw tending to establish that investigators' fees can be considered attorneys' fees under some circumstances—not that attorneys' fees can never be recovered as investigative costs. (ECF No. 154 at 19 (first citing *Rolex Watch U.S.A., Inc. v. Zeotec Diamonds, Inc.*, Case No. CV02-1089GAFVBKX, 2003 WL 23705748, at *3 (C.D. Cal. May 2, 2003), then citing *Lifted Research Group Inc. v. Biglarpour*, Case No. SACV0800033JVSANX, 2008 WL 11342709, at *4 (C.D. Cal. July 16, 2008)).) And to the extent Tripp argues Tesla has manufactured damages (ECF No. 192 at 12-15), that argument goes to the reasonableness of the amount of damages Tesla seeks—an issue better resolved later in this case. *See Oracle II*, 191 F. Supp. 3d at 1145 (explaining that response costs must be reasonable in ruling on a post-trial motion to reduce the jury's damages award). Having found both of Tripp's arguments about Tesla's potential recovery of its investigative costs unpersuasive, the Court denies Tripp's Motion to the extent it seeks summary judgment that Tesla may not claim those costs as damages.

///

### 4.    Punitive Damages

Tripp also seeks summary judgment on Tesla's punitive damages claim, arguing Tesla cannot recover punitive damages because it cannot establish that Tripp acted with fraud, oppression, or malice. (ECF No. 154 at 19-21.) Tesla responds that summary judgment on this damages theory would be inappropriate because Tesla has suffered actual damages, and there is evidence Tripp acted with malice. (ECF No. 178 at 24-27.) Tripp replies that Tesla's proffered evidence does not establish fraud, oppression, or malice. (ECF No. 192 at 15-17.) The Court again agrees with Tesla.

The parties agree Nevada law governs the question of whether Tesla may recover punitive damages against Tripp. (ECF Nos. 154 at 19-20, 178 at 25-27.) So does the Court. Nevada law permits the recovery of punitive damages where the plaintiff can prove by clear and convincing evidence the defendant acted with fraud, oppression, or malice—express or implied. *See* NRS § 42.005. Tesla argues that Tripp acted with malice in collecting information about Tesla's operations at the Gigafactory and sharing it with Lopez. (ECF No. 178 at 25.) Nevada law defines "[m]alice, express or implied" as "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." NRS § 42.001(3). Circumstantial evidence that one acted with conscious disregard for the rights of another may be enough to support a punitive damages award. *See Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 255-56 (Nev. 2008).

A material factual dispute as to whether Tripp acted with malice in taking information without authorization and sharing it with Lopez precludes summary judgment on Tesla's punitive damages claim. Because of the agreements he signed when Tesla hired him, Tripp had a duty not to disclose Tesla's confidential information. (ECF Nos. 171-13 at 5 (including confidentiality protections and proper use of company assets clauses), 174-14 at 2 (sealed) (noting that Tesla employees sign a confidentiality agreement prohibiting them from sharing confidential information with anyone outside the company), 174-15 at 2 (sealed) (requiring all Tesla employees hold confidential

information in strictest confidence), 174-16 (sealed) (agreeing to protect confidential information).) Tripp's duty gave Tesla a corresponding right to not have Tripp breach his confidentiality obligations. Tripp understood this, but nonetheless shared information with Lopez he knew he was not authorized to share with her. (ECF No. 174-1 (sealed) at 8, 18.) He also admitted he tried to get other employees to talk to Lopez (*id.* at 22), which was prohibited (ECF No. 174-14 (sealed)). Tripp specifically wrote to Uelmen, "[o]h, if you are helpful you will get some money, I GUARANTEE you. There is stuff going on that I cannot tell anyone…it is GOOD though." (ECF No. 171-7 at 2.) Viewing this evidence in the light most favorable to Tesla as the party opposing summary judgment, a rational trier of act could reasonably find Tripp acted in conscious disregard of Tesla's rights. It would therefore be inappropriate to grant Tripp's Motion as to this issue. Tripp's Motion is thus denied to the extent it seeks to preclude Tesla from arguing for punitive damages.

### 5.  Ability to Seek Permanent Injunction

Tripp finally argues that the Court should preclude Tesla from seeking a permanent injunction at the conclusion of this case allowing Tesla to inspect Tripp's electronic devices, primarily because Tesla never moved for a preliminary injunction in this case, and thus, Tripp argues, Tesla cannot establish irreparable harm. (ECF No. 154 at 21-23.) Tesla responds it is not necessarily precluded from obtaining a permanent injunction because it did not seek a preliminary injunction—and argues the fact that Tripp has publicly disclosed confidential information several times during this litigation tends to show that Tesla will be irreparably harmed in the absence of an injunction prohibiting Tripp from disclosing more information. (ECF No. 178 at 27-30.) The Court agrees with Tesla.

As Tesla argues, Tripp's actions since the start of this case indicate Tesla may be able to show the irreparable harm necessary to obtain a permanent injunction. At the time Tesla responded to Tripp's Motion, it pointed to two instances—in 2018 and 2020— where Tripp tweeted purportedly confidential Tesla information. (ECF Nos. 180-12, 181-

2.) Since Tesla responded to Tripp's Motion, Tripp tweeted more links to confidential information on at least one other occasion, including information explicitly designated 'attorneys' eyes only.' (ECF Nos. 207, 208, 211, 212 (confirming he took the materials down after agreeing to do so at a hearing before Judge Baldwin).) Tripp thus has a demonstrated history of disclosing information Tesla contends is confidential, suggesting he may continue to do so if not enjoined. It would therefore be premature to rule at this stage Tesla is precluded from attempting to seek a permanent injunction towards the conclusion of this case. Tripp's Motion is denied to the extent that is the relief he seeks.

### B.   Tesla's Cross-Motion

Tesla's Cross-Motion seeks summary judgment on Tripp's counterclaims for defamation and false light. (ECF No. 155.) The Court first addresses the procedural matter of Tripp's motion for leave to file a surreply to Tesla's Cross-Motion, then addresses Tesla's arguments in its Cross-Motion.

### 1.   Tripp's Motion for Leave to File a Surreply

Tripp filed a motion for leave to file a surreply to Tesla's Cross-Motion, to respond to what Tripp contends is additional evidence that Tesla attached to its reply in support of its Cross-Motion. (ECF No. 197.) Tesla responds the Court should deny Tripp's motion because none of Tesla's additional proffered evidence, or Tripp's proposed surreply, relates to a material disputed fact, and even if it did, Tesla was merely offering factual refutations to purported 'additional facts' offered by Tripp in his opposition to Tesla's Cross-Motion. (ECF No. 198.) The Court agrees with Tesla.

Local Rule 7-2(b) allows a motion, a response and a reply. "Surreplies are not permitted without leave of court; motions for leave to file a surreply are discouraged." *Id.* Because surreplies are discouraged, "[o]nly the most exceptional or extraordinary circumstances warrant permitting a surreply to be filed." *Stevens v. Prentice*, Case No. 2:17-cv-970-JCM-PAL, 2018 WL 3758577, at *1 (D. Nev. Aug. 8, 2018) (citation omitted).

///

No such circumstances exist here. While Tripp disagrees with the argumentative nature of Tesla's statement of facts in its Cross-Motion, "[a]s to those material facts Tesla does assert, Tripp does not dispute them *per se*." (ECF No. 177 at 3.) The parties thus agree their dispute regarding the propriety of Tripp's motion for leave to file a surreply is limited to immaterial facts. (*See id.*; *see also* ECF No. 198 at 4.) Accordingly, the Court denies Tripp's motion for leave to file a surreply because a surreply—already disfavored—is unnecessary for the Court to properly resolve the Cross-Motion.

## 2.    Defamation and False Light

Tripp's defamation and false light counterclaims are based on the four challenged statements described *supra* in Section II. (ECF No. 25 at 17-22.) "To prevail on a defamation claim, the plaintiff must show: (1) a false and defamatory statement by a defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Rosen v. Tarkanian*, 453 P.3d 1220, 1225 (Nev. 2019) (internal quotation marks, punctuation, and citation omitted). "But in a defamation action, it is not the literal truth of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the gist or sting of the statement is true or false." *Id.* at 1224 (internal quotation marks and citation omitted); *see also Chowdhry v. NLVH, Inc.*, 851 P.2d 459, 463 (Nev. 1993) ("words must be reviewed in their entirety and in context to determine whether they are susceptible of defamatory meaning."). Moreover, "[a] statement may be defamatory only if it contains a factual assertion that can be proven false." *Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1128 (D. Nev. 2014), *order clarified sub nom. Oracle USA, Inc. v. Rimini St., Inc.*, Case No. 210-CV-00106-LRH-PAL, 2014 WL 5285963 (D. Nev. Oct. 14, 2014) ("*Oracle I*"). Whether a statement contains a false factual assertion is a question of law. *See id.*

While the line between defamation and false light is blurry, in Nevada, false light does not—unlike defamation—require a plaintiff to show reputational injury. *See Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002). That said, false light, "like defamation,

19

1   requires at least an implicit false statement of objective fact." *Id.* (citation omitted).

2   Further, "just like public figure defamation, it requires actual malice—knowing or reckless

3   disregard of the truth." *Id.*

4          Questions of actual malice and falsity are thus potentially dispositive as to both of

5   Tripp's defamation and false light counterclaims. The Court addresses the question of

6   actual malice first, and then examines the falsity of each of the four sets of statements

7   forming the basis of Tripp's counterclaims.

8                          **3.     Actual Malice**

9          Tesla argues Tripp must show that all four of the challenged sets of statements

10   were made with actual malice because Tripp became a limited purpose public figure

11   when he intentionally inserted himself into the public debate surrounding Model 3

12   production. (ECF No. 155 at 13-21.) Tesla further argues it is entitled to summary

13   judgment on Tripp's defamation and false light claims because he cannot show actual

14   malice. (*Id.*) In addition, Tesla argues the lack of actual malice is dispositive of Tripp's

15   false light claims regardless of whether Tripp is a public figure. (*Id.*) Tripp responds that

16   actual malice is not the correct standard because he initially tried to remain anonymous

17   when he shared information with Lopez, but Musk and other Tesla employees dragged

18   him into the public arena. (ECF No. 177 at 14-17.) Tripp further responds that even if he

19   is a public figure, Tesla's statements to the press to the effect that Tesla received a

20   report Tripp was an active shooter threat were not germane to the controversy. (*Id.* at

21   17-20.) Tesla replies that Tripp can be a limited purpose public figure even though he

22   initially told reporters he wanted to remain anonymous because he nonetheless injected

23   himself into a public controversy—production issues or lack thereof with the Model 3.

24   (ECF No. 193 at 4-5.) As to the active shooter threat, Tesla replies these statements

25   were germane to the controversy because they were in response to Tripp's public

26   statements to the press that Musk started the threatening email thread, and were

27   relevant to Tripp's credibility as a participant in the public debate about Tesla's

28   operations. (*Id.* at 11-13.) The Court agrees with Tesla.

A person becomes a limited purpose figure when: (1) there is a public controversy, meaning a publicly-debated issue that has ramifications for nonparticipants; (2) the person's role in the controversy is more than trivial or tangential, meaning they took some voluntary act to influence resolution of the public issue; and (3) the alleged defamation is germane to the person's participation in the controversy. *See Oracle I*, 6 F. Supp. 3d at 1129. "The determination of whether a party is a public figure, or a limited purpose public figure, is an issue of law to be decided by the court." *Id.*

Tripp became a limited purpose public figure by June 17, 2018 because he intentionally inserted himself into the public controversy surrounding Tesla's Model 3 production issues. After Musk announced the goal of producing 5,000 Model 3s per week, whether Tesla could hit that target on the timeline Musk also announced became a public controversy. (ECF No. 157 at 2-3; *see also* ECF Nos. 158-8, 158-9, 158-10 (reporting on Tesla's Model 3 production in light of the 5,000 per week target from CNBC.com, NPR, and the *New York Times*).) The information Tripp passed to Lopez led to the Scrap Article and the Robot Article, both of which centered on information directly relevant to whether Tesla would hit its goal of producing 5,000 Model 3s per week— suggesting Tesla would not, or would at least spend an unsustainable amount of money to get there. (ECF Nos. 159-5, 159-6.) As these news articles indicate, Tesla's Model 3 production issues had ramifications for nonparticipants in this case, such as investors in Tesla and customers who had reserved Model 3s. (ECF No. 158-8 (indicating that Tesla's share price fell after the Moody's credit-rating agency downgraded Tesla's credit rating because of a shortfall in the Model 3 production rate); ECF No. 158-10 ("But a series of setbacks have left Tesla far behind schedule in turning out the Model 3 — for which nearly 400,000 prospective buyers have already put down $1,000 deposits — and it is taking some extraordinary measures to turn things around.").) Thus, there was a public controversy surrounding the Model 3's production. *See Oracle I*, 6 F. Supp. 3d at 1129 (indicating this is one of three factors that must be satisfied for someone to be a limited-purpose public figure); *see also Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266-

67 (9th Cir. 2013) ("concluding that a public controversy existed over Trump University's educational and business practices" where it had been reported on by the mainstream media and could affect third party investors).

Second, Tripp voluntarily inserted himself into this controversy. As noted, he argues he cannot be considered a limited-purpose public figure because he requested he remain anonymous in his initial email to reporters. (ECF No. 177 at 14-17.) He no doubt made that request. (ECF No. 175-2 (sealed) at 2.) However, the Court agrees with Tesla that is not the test. (ECF No. 193 at 4.) The test is whether he voluntarily injected himself into a public controversy. *See Flowers*, 310 F.3d at 1129. And the undisputed evidence shows he did. Specifically, he took it upon himself to email reporters from several news outlets regarding the public controversy surrounding Model 3 production, indicating an awareness of the public nature of the controversy in stating, "[o]n several occasions Elon [Musk] has flat out lied to the public/investors." (ECF No. 175-2 (sealed).) Sending this email was a voluntary act. *See Oracle I*, 6 F. Supp. 3d at 1129 ("This factor requires the person to have undertaken some voluntary act through which he or she sought to influence resolution of the public issue.") (citation and internal quotation marks omitted).

Further, Tripp ratcheted up his entanglement in the public controversy surrounding Telsa's Model 3 production issues as time went on. *See supra* Section II. While he requested to remain anonymous in his initial email to reporters, he emailed with Musk directly shortly after Tesla fired him and filed this lawsuit, and then sent that email thread around to more reporters. *See id.* That makes the factual circumstances of this case unique. Tripp, a single, non-executive-level employee, got into a very public dispute directly with the CEO of his former employer that generated its own news cycle. (ECF No. 177 at 10 (citing ECF Nos. 25-3, 25-4, 25-5, 25-6, 25-7).) That is unusual. And in addition to exchanging threatening emails, both Tripp and Musk were attempting to influence public perception of the other by emailing their dispute directly to reporters, most notably at the *Guardian*. Under these unique factual circumstances, the Court

concludes Tripp voluntarily inserted himself into a public controversy. *See Flowers*, 310 F.3d at 1129 (finding the plaintiff voluntarily inserted herself into a public controversy when she held a press conference in which she played tapes of her phone calls with Bill Clinton during a presidential campaign).

Third, the four challenged statements are all germane to this controversy. The Court examines each of the four challenged statements in more detail below as to their falsity, but, for now, all of the challenged statements are germane to the controversy because they either bear directly on Tesla's Model 3 production issues, or Tripp's credibility as to his position on those production issues. That said, Tripp focuses only on the active shooter element of the challenged statements in arguing they were not germane to the controversy, so the Court does as well. (ECF No. 177 at 17-18.)

As to the report of the active shooter threat Musk and Tesla continued passing along to reporters even after they learned it was not credible, the Court agrees with Tesla this report was relevant to Tripp's credibility as a participant in the public debate about Tesla's operations that he injected himself into. (ECF No. 193 at 11-13.) In some key respects, the dispute that spun into this case pits Tripp's word against Musk's. As noted, Tripp first sought out reporters to report on what he viewed as unacceptably high levels of scrap and unused robots in Model 3 production lines by leading with, "[o]n several occasions Elon [Musk] has flat out lied to the public/investors." (ECF No. 175-2 (sealed).) Because Tripp believes Musk is a liar, and has, at this point, repeatedly said so publicly, Tripp's credibility is germane to this controversy as well. And even drawing all inferences in Tripp's favor, Musk and Tesla passing on a report that Tripp may commit a mass shooting even after they learned he was not going to is an attempt to undermine Tripp's credibility—to undermine, in turn, his claim that Musk and Tesla lied to investors by spending too much money to hit unrealistic Model 3 production targets. And that is the public controversy: Model 3 production. Even relaying the active shooter report to reporters after police determined it was not credible is therefore germane to the controversy.

23

In sum, Tripp became a limited-purpose public figure by June 17, 2018 because he achieved a certain level of "notoriety based on [his] role in a particular public issue[,]" specifically, Tesla's issues in ramping up Model 3 production, its more particular outgrowth that is this case, and Tripp's public dispute with Musk. *Prendeville v. Singer*, 155 F. App'x 303, 305 (9th Cir. 2005) (citations omitted). Tripp must therefore show the four challenged statements were made with actual malice—"that is, knowledge that a statement was false or reckless disregard of whether it was false or not[,]" *Flowers*, 310 F.3d at 1129 (internal punctuation and citations omitted)—to prevail on his defamation claims.[8]

### 4.   Falsity

Tripp cannot show actual malice. Indeed, the Court finds he cannot even meet the lower bar of falsity. The Court addresses the falsity of each of the four challenged statements below. For purposes of this analysis, the Court reiterates that "it is not the literal truth of each word or detail used in a statement which determines whether or not it is defamatory; rather, the determinative question is whether the gist or sting of the statement is true or false." *Rosen*, 453 P.3d at 1224 (internal quotation marks, punctuation, and citation omitted).

### a.   First Challenged Statement

The gist of the First Challenged Statement is true. Musk's email included a number of statements about Tripp,[9] but none of them were false. (ECF No. 160-17.) At most, Musk's email was hyperbolic. But "a statement is not defamatory if it is an exaggeration or generalization that could be interpreted by a reasonable person as 'mere rhetorical hyperbole.'" *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 88 (Nev. 2002) (citation omitted). For example, Musk's statement that Tripp committed "extensive

---

[8]As noted, Tripp has to show the statements were made with actual malice to prevail on his false light claims regardless of whether he is a limited-public purpose figure. *See Flowers*, 310 F.3d at 1132.

[9]While the email did not name Tripp, that is immaterial. *See, e.g.*, *Gerald Peters Gallery, Inc. v. Stremmel*, 815 F. App'x 138, 138-141 (9th Cir. 2020).

and damaging sabotage" falls into this category. (ECF No. 160-17 at 2.) The gist of Musk's statement was an employee had done something Musk felt could harm Tesla's reputation, which is true in the sense that the Scrap Article and the Robot Article were not favorable to Tesla. Further, as Tesla points out (ECF No. 193 at 8), even Tripp argues that sabotage can be defined as an act tending to hamper (ECF No. 177 at 27-28)—and Tripp's actions could fall within that definition.

Tripp next points to the fact that Musk followed up his email with another email the following day describing an unexplained fire in Tesla's Fremont, California factory which Tripp argues creates the implication Tripp had something to do with the fire. (*Id.* at 28.) But when the Court reads both emails together (ECF No. 160-17), Musk is not making any such implication. The better read is that Musk followed one email up with the other because they both involved an adverse event at a Tesla manufacturing facility. Tripp's unpersuasive argument about the fire email also dovetails with Tripp's argument that Musk's email implies Tripp was working with Wall Street short sellers, the oil and gas industry, or the "gas/diesel" car industry. (ECF No. 177 at 28-29.) That is not the gist of the email. (ECF No. 160-17.) The gist of both emails is 'bad things are happening to Tesla so we must remain vigilant as we ramp up Model 3 production.' (*Id.*) No reasonable person would read the emails as suggesting that Tripp is responsible for the fire, or part of a vast conspiracy of everyone whose financial interests are adverse to Tesla. And even construing the emails that way, Musk's statements in the emails constitute "mere rhetorical hyperbole" at most. *See Pegasus*, 57 P.3d at 88.

Tripp additionally argues that two of Musk's specific statements in the First Challenged Statement are false. (ECF No. 177 at 28.) But those statements do not change the gist of the email. The Court also does not find Tripp's particular arguments as to these statements persuasive. Specifically, Tripp argues Musk's statement Tripp made "direct code changes" to the MOS is false. (*Id.*) But Tripp admitted to building custom SQL (Structured Query Language) queries to generate the reports he shared with Lopez. (ECF No. 174-1 (sealed) at 9-13.) Thus, while perhaps not precisely true, the

gist of Musk's statement was. Getting into exactly what constitutes a "direct code change" in the context of the interaction between an end user's query and various internal Tesla software systems would require an impermissibly granular review of each word in the email—getting away from the 'gist' or 'sting' of the whole email. Tripp also argues Musk's statement that Tripp's "stated motivation" for his "sabotage" was that he "wanted a promotion" is false. (ECF No. 177 at 28.) This also falls into the category of "mere rhetorical hyperbole[,]" *see Pegasus*, 57 P.3d at 88, because there is no dispute Tripp was upset he was not really given a "lead" role throughout his time at Tesla, though it was in his job title (ECF No. 174-1 at 38).

Thus, the Court finds the First Challenged Statement substantially true, or at most too hyperbolic to be actionable.

### b.    Second and Third Challenged Statement

The Court addresses the Second and Third Challenged Statements together because Tripp's argument is the same as to both statements—that Musk and Tesla used some inexact variant of the phrase 'shoot the place up' in describing the report they received about Tripp, even though the Tesla call center employee who received the report never used that exact phrasing in passing the threat along, and even after Tesla learned Tripp was not a credible active shooter threat. (ECF No. 177 at 23-27.) But Tripp cannot prevail as to either of these statements because they were true—Tesla did receive a report. (ECF Nos. 157 at 6, 159-11, 159-12, 159-13.) Indeed, looking at both of the challenged statements, they state just that—that Musk and Tesla received a report. (ECF Nos. 159-15, 160-19.) Moreover, Tripp does not proffer any contrary evidence. (ECF No. 177 at 23-27.)

Tripp also argues the statements are actionable because the call center employee who took the call never used the phrase "come back and shoot people," like Musk did, and Tesla's communications employees used fake quotations to create "shoot the place up[,]" which nobody ever said. (*Id.* at 23-24.) This argument is unpersuasive because the gist of the statements is the same, even with the fake quotations. *See Rosen*, 453 P.3d

26

at 1224. The gist of the challenged statements is that Tesla received an active shooter threat about Tripp. (ECF Nos. 157 at 6, 159-11, 159-12, 159-13 159-15, 160-19.) Moreover, and contrary to Tripp's argument (ECF No. 177 at 24), false quotes do not necessarily make a statement defamatory so long as—like here—the false quotes do not change the gist of the statement. *See Flowers v. Carville*, 310 F. Supp. 2d 1157, 1166-68 (D. Nev. 2004) (granting summary judgment to defendants who the plaintiff accused of creating misleading quotations in defamation action).

The Second and Third Challenged Statements are therefore not defamatory because the gist of these statements is substantially true.

### c.   Fourth Challenged Statement

Tripp finally argues Musk's tweeted question to Lopez about whether she paid Tripp for the information about Tesla he gave her is defamatory because it implies an assertion of fact—that Lopez did pay Tripp. (ECF No. 177 at 29-30.) The Court disagrees. The question Musk tweeted at Lopez was open-ended, and therefore could not reasonably be read as an assertion of fact. (ECF No. 160-20.) *See also Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) ("A question can conceivably be defamatory, though it must reasonably be read as an assertion of a false fact; inquiry itself, however embarrassing or unpleasant to its subject, is not an accusation.") (quoting *Chapin v. KnightRidder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993)) (emphasis omitted). Moreover, Musk says in his declaration that he was simply asking a question. (ECF Nos. 157 at 7.) Tripp offers no evidence directly to the contrary. (ECF No. 177 at 29-30 (merely pointing to Musk's answer in his deposition explaining why he wanted to ask Lopez the question).) Thus, there is no material factual dispute as to whether Musk's question implied a false assertion of fact. It was an open-ended question that cannot be either true or false. *See Oracle I*, 6 F. Supp. 3d at 1128 ("A statement may be defamatory only if it contains a factual assertion that can be proven false.").

In sum, because none of the four statements he challenges were false, Tesla is entitled to summary judgment on Tripp's defamation counterclaim. *See Rosen*, 453 P.3d

at 1225 (stating that falsity is a required element of defamation). Because he cannot show falsity, he cannot show actual malice. *See Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063 (9th Cir. 1998) ("Mere negligence, however, is insufficient to demonstrate actual malice."). Tesla is therefore also entitled to summary judgment on Tripp's false light claim. *See Flowers*, 310 F.3d at 1132 (stating that a showing of actual malice is required to prevail on a false light claim). Thus, the Court will grant Tesla's Cross-Motion in its entirety.

### C.   Tesla's Motions to Seal

Tesla seeks to seal portions of its briefing addressed in this order, along with certain exhibits to that briefing. (ECF Nos. 161, 183, 195.) Tripp initially opposed only the earliest-filed of the three motions (ECF No. 161). (ECF No. 167.) However, in that opposition, Tripp noted the parties met and conferred, and agreed to more limited redactions. (*Id.*) Consistent with Tripp's response, Tesla subsequently filed another set of exhibits with more limited redactions. (ECF Nos. 170, 171, 172, 173, 174, 175, 176.) Tripp did not file oppositions to Tesla's two other pending motions to seal. (ECF No. 183, 195.) Therefore, after accounting for the additional set of exhibits Tesla filed, the parties agree Tesla's pending motions to seal should be granted.

In the Ninth Circuit there is "a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (citation omitted). To overcome this presumption, a party must articulate "compelling reasons" justifying nondisclosure, such as use of the record to gratify spite, permit public scandal, circulate libelous statements, or release trade secrets. *See Kamakana v. City of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* (citation omitted).

Tesla generally agues the Court should grant the pending motions to seal "in order to prevent the improper use of Tesla's proprietary information and trade secrets, and Tripp's personal information." (ECF No. 161 at 4.) Tesla provides reasonable

1  specificity about the information it seeks to seal. (ECF Nos. 161 at 4-5, 183 at 4-5, 195 at

2  3-4.) Further, having reviewed the documents and portions of documents Tesla seeks to

3  seal, the Court agrees they contain trade secrets and/or personal information that should

4  remain under seal. *See Amarin Pharma, Inc. v. W.-Ward Pharm. Int'l Ltd.*, 407 F. Supp.

5  3d 1103, 1119 (D. Nev. 2019) (granting in pertinent part motions to seal documents that

6  contained proprietary and trade secret information); *NML Capital Ltd. v. Republic of*

7  *Argentina*, Case No. No. 2:14–cv–492–RFB–VCF, 2015 WL 727924, at *5 (D. Nev. Feb.

8  19, 2015) (permitting in pertinent part personal email address to remain under seal). The

9  Court will therefore grant all three of Tesla's now-unopposed pending motions to seal.

10  (ECF Nos. 161, 183, 195.)

11  **V.    CONCLUSION**

12      The Court notes that the parties made several arguments and cited to several

13  cases not discussed above. The Court has reviewed these arguments and cases and

14  determines that they do not warrant discussion as they do not affect the outcome of the

15  motions before the Court.

16      It is therefore ordered that Tripp's motion for summary judgment (ECF No. 154) is

17  granted in part, and denied in part, as specified herein.

18      It is further ordered that Tesla's motion for summary judgment on Tripp's

19  counterclaims (ECF Nos. 155, 162 (sealed)) is granted.

20      It is further ordered that Tesla's first motion to seal (ECF No. 161) is granted.

21      It is further ordered that Tesla's second motion to seal (ECF No. 183) is granted.

22      It is further ordered that Tesla's third motion to seal (ECF No. 195) is granted.

23      It is further ordered that Tripp's motion for leave to file a surreply (ECF No. 197) is

24  denied.

25      DATED THIS 17th Day of September 2020.

26

27  _____

28  MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE